

United States Courts
Southern District of Texas
FILED

MAR 1 5 2002

Michael N. Milby, Clerk

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| HARVEN MICHAEL MCKENZIE | § | JOINTLY ADMINISTERED UNDER |
| STEVEN DARRYL MCKENZIE | § | CASE NO. 95-47219-H5-7 |
| TIMOTHY STEWART MCKENZIE | § | CHAPTER 7 |
| W. STEVE SMITH, TRUSTEE, | § | |
| Plaintiff | § | |
| | § | |
| VS. | § | **Consolidated for Trial** |
| | § | **ADVERSARY NO. 97-4114** |
| ROLF SCHLEGEL, | § | (Adversary No. 97-4114 and 97-4155) |
| MCK DEVELOPMENT B.V., CLARON | § | |
| N.V., JEFFREY LTD., OKIBI N.V., | § | |
| MCKENZIE METHANE POLAND CO., | § | |
| HARVEN MICHAEL MCKENZIE, | § | |
| TIMOTHY STEWART MCKENZIE, | § | |
| STEVEN DARRYL MCKENZIE | § | |
| EUROGAS, INC., GLOBEGAS, B.V., | § | |
| POL-TEX METHANE SP. Z.O.O., | § | |
| INVICO CAPITAL CORPORATION, A.G. | § | |
| WOLFGANG RAUBALL, REINHARD | § | |
| RAUBALL and ARMANDO ULRICH | § | |
| Defendants | § | |

TRUSTEE'S SECOND SUPPLEMENTAL RESPONSE TO RAUBALL DEFENDANTS'
MOTION TO DISMISS AND TRUSTEE'S FIRST SUPPLEMENTAL RESPONSE TO
AMENDED MOTION OF EUROGAS, INC., GLOBEGAS, B.V. AND POL-TEX METHANE,
SP. Z.O.O. TO DISMISS FIRST AMENDED COMPLAINT OR, ALTERNATIVELY, FOR
MORE DEFINITIVE STATEMENT

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Comes now, W. Steve Smith, Trustee and Plaintiff herein ("Trustee") and files this his

Second Supplemental Response to Rauball Defendants' Motion to Dismiss and Trustee's First

Supplemental Response to Amended Motion of EuroGas, Inc., GlobeGas, B.V. and Pol-Tex

Methane, Sp. Z.O.O. to Dismiss First Amended Complaint or, Alternatively, for More Definitive

Statement, respectfully showing unto the Court as follows:

I.      Reason for Supplement

1.      The deposition of Rolf Schlegel was conducted in London during the period of April 18 through April 21, 2001 (the "Schlegel Deposition").   In addition, this Court entered summary judgment in Adversary No. 01-3064 granting Trustee access to the production of records by Kruse, Landa & Maycock, L.L.P., as counsel for EuroGas, Inc. ("EuroGas") to the extent such records met the criteria of a KLM Document (the "KLM Documents").   Although that Judgment is on appeal, EuroGas took no action to supersede its effect. The evidence obtained from both sources is extremely relevant to this Court's determination of the motions to dismiss.

II.     Additional Facts or Substantiation

A.      Cast of Characters – McKenzie Side

1.      Rolf Schlegel and Invico Capital Corporation, Ltd.

Rolf Schlegel ("Schlegel") and his company, Invico Capital Corporation, Ltd. ("Invico"), were utilized by Harven Michael McKenzie ("McKenzie") as the vehicle for coordinating and funding of the Poland Project. *See* Agreement dated May 14, 1992, (Schlegel Deposition Exhibit 1) and the relevant excerpts from the Schlegel Deposition, Vol. 1, p. 29, lines 19-25, and p. 30, lines 1-5, at Tab 2.[1]  By this Agreement, Invico served as trustee/administrator for McKenzie under his direction. *See* Schlegel Deposition, Vol. 1, p. 15, lines 18-25, at Tab 3.  Invico was serving as administrator for a joint venture to hold the Poland Project for Bertil Nordling ("Nordling") and McKenzie.  *See* Schlegel Deposition, Vol. 1, p. 34, lines 20-25, p. 35, lines 1-18, p. 37, lines 1-19, and Agreement dated June 7, 1991, part of Attachment to Document 852 of

---

[1] Tab 1 hereto consists of the cover pages of the four transcripts, the reporter's affidavit, Schlegel's signature pages Schlegel's identification vis-à-vis Invico (Schlegel Deposition, Vol. 1, p. 11, lines 4-25 and p. 12, lines 6-25), and excerpts pertaining to business records (Schlegel Deposition, Vol. 3, p. 670, lines 11-25 and p. 671, lines 1-23).

Schlegel Deposition, at Tab 4.  However Nordling quit paying after his initial $3.9 million was paid and McKenzie just continued the venture on his own.  *See* Schlegel Deposition, Vol. 1, p. 39, lines 16-24 and p. 41, lines 9-14, at Tab 5.

> 2.     MCK Development, B.V. and McKenzie Methane Poland, B.V.

McKenzie directed Invico to create MCK Development, B.V. ("MCK") and McKenzie Methane Poland, B.V. ("MMPBV").  *See* Schlegel Deposition, Vol. 1, p. 17, lines 17-25, p. 18, lines 1-5, and p. 80, lines 13-22, at Tab 6.  MMPBV owned the 85% interest in Pol-Tex Methane Sp. Z.O.O. ("PTM") and MCK owned MMPBV.  McKenzie served as sole director of MCK from creation until January 1, 1995, following the sale of the initial 16% interest in MMPBV (consisting of Baron Financial Ltd.'s ("Baron") 4% and Jeffrey, Ltd.'s ("Jeffrey") alleged 12%) to EnergyGlobal, A.G. ("EGA").  From January 1, 1995 until early 1996, Schlegel served as sole director of MCK.  McKenzie served as sole director of MMPBV from its creation until he shared director status with Wolfgang Rauball following the above sale of the 16% interest.  *See* Schlegel Deposition, Vol. 1, p. 78, lines 20-25 and p. 79, lines 1-19, at Tab 7.  As will be shown, McKenzie beneficially owned MCK.

> 3.     Okibi, N.V.

McKenzie caused the creation of and was the beneficial owner of Okibi, N.V. ("Okibi"). By secret Trust Agreement dated March 3, 1992, McKenzie directed Invico to create Okibi to be beneficially owned by McKenzie to acquire 49% of MCK.  *See* Trust Agreement (Schlegel Deposition Exhibit 2) and related excerpts from Schlegel Deposition, Vol. 1, p. 18, lines 9-25, p. 42, lines 5-14, 22-25, p. 43, lines 1-25, and p. 44, lines 1-7, 18-21, at Tab 8.  McKenzie was invoiced for and paid for the formation costs of Okibi.  *See* Invoice (Schlegel Deposition Exhibit 131) and related excerpts from Schlegel Deposition, Vol. 3, p. 587, lines 3-8, at Tab 9.  The

3

bearer shares of Okibi were held by Invico until transferred to Petenes Foundation on May 8, 1995. *See* Stock Certificate and Certificate of Deposit (Schlegel Deposition Exhibits 3 and 4) and related excerpts from Schlegel Deposition, Vol. 1, p. 53, lines 1-23, p. 62, lines 15-25, and p. 63, lines 1-3, at Tab 10. Okibi created MCK. *See* Schlegel Deposition, Vol. 1, p. 44, line 2, at Tab 11. The money for Okibi to create MCK came from McKenzie. *See* Schlegel Deposition, Vol. 1, p. 45, lines 2-20, at Tab 12.

        4.      Claron, N.V.

McKenzie caused the creation of and was the beneficial owner of Claron, N.V. ("Claron"). By secret Trust Agreement dated December 8, 1993, McKenzie directed Invico to create Claron, to be beneficially owned by McKenzie, to acquire 51% of MCK. *See* Trust Agreement (Schlegel Deposition Exhibit 5) and related excerpts from Schlegel Deposition, Vol. 1, p. 19, lines 12-23, p. 99, lines 1-25, p. 100, lines 1-25, and p. 101, lines 1-5, at Tab 13. The bearer shares of Claron were held by Invico until transferred to Petenes Foundation on May 8, 1995. *See* Stock Certificate and Certificate of Deposit (Schlegel Deposition Exhibits 6 and 7) and related excerpts from Schlegel Deposition, Vol. 1, p. 105 lines 21-25, p. 106, lines 1-5, 10-25, p. 107, lines 1-8, lines 20-25, p. 108, lines 1-13, and p. 109, lines 11-25, at Tab 14. McKenzie was invoiced for and paid the formation costs of Claron, although he concealed payment. *See* Invoice and McKenzie letter of September 16, 1993 with handwritten instructions and Schlegel notes (Schlegel Deposition Exhibits 129 and 128) and related excerpts from Schlegel Deposition, Vol. 3, p. 582, lines 14-25, p. 583, lines 1-25, p. 584, lines 1-8, and p. 585, lines 7-15, at Tab 15.

As a result of his ownership of Claron and Okibi, McKenzie was the ultimate beneficiary of MCK, and its, initially, wholly-owned subsidiary, MMPBV. *See* Trust Agreement dated

January 20, 1995 (Schlegel Deposition Exhibit 133) and related excerpts from Schlegel Deposition, Vol. 3, p. 588, lines 3-25 and p. 589, lines 1-25, at Tab 16.

      5.     Jeffrey, Ltd.

As will be shown later, in June of 1994, Wolfgang Rauball, through an entity in formation controlled by him and known as EuroGas, A.G., later changed to EnergyGlobal, A.G. ("EGA"), broke off negotiations with McKenzie to acquire from MCK up to just under 50% of MMPBV for $12 million in cash and stock. Merlin Fish ("Fish") at this time was president of Northampton, Inc. ("Northampton"), a Utah corporation (it later merged with EGA, Northampton being the surviving entity, which then changed its name to EuroGas, Inc., a company whose stock was thereafter sold on U.S. and European stock exchanges). Fish stepped in to replace the Rauball group with his Northampton. However, it did not have $12 million. In lieu of cash, but to establish a "value" for MMPBV which could then be used by the company acquiring a percentage interest in MMPBV on its balance sheet, Fish and McKenzie discussed utilization of a shelf corporation, known as Jeffrey, to allegedly acquire a 12% interest in MMPBV for a $12 million promissory note (originally to MMPBV, but later corrected to MCK, the owner of MMPBV), which was unsecured and payable in 10 years. Once Wolfgang Rauball and Reinhard Rauball re-entered negotiations, they joined in utilization of Jeffrey for this purpose. *See* General Agreement (Schlegel Deposition Exhibit 46), Stock Exchange Agreement (Schlegel Deposition Exhibit 44), McKenzie fax to Fish dated August 1, 1994 (Schlegel Deposition Exhibit 45) and related excerpts from Schlegel Deposition, Vol. 1, p. 251, lines 2-29, p. 252, lines 2-4, p. 265, lines 8-25, p. 266, lines 1-7, 10-17, p. 267, lines 2-9, 12-14, 20-25, p. 268, lines 1-5, 7-9, p. 269, lines 2-7, 14-19, 23-25, p. 270, lines 1-25, p. 273, lines 4-25, p. 274, lines 1-25, p. 276, lines 24-25, p. 277, lines 1-22, at Tab 17.

Jeffrey is McKenzie. *See* Schlegel Deposition, Vol. 1, p. 340, lines 18-24, at Tab 18. It is he who paid the costs related to Jeffrey and who negotiated the "purchase" of the 12% interest in MMPBV. *See* Schlegel Deposition, Vol. 1, p. 268, lines 1-9, p. 269, lines 14-17, at Tab 17; *see also* St. Vincent Trust Services, A.G. invoice (Schlegel Deposition Exhibit 59) and related excerpts from Schlegel Deposition, Vol. 1, p. 339, lines 1-19, and p. 340, lines 7-24, at Tab 19. Schlegel/Invico acted as the administrator in Switzerland for Jeffrey's sales of its EuroGas stock under 2 separate options, one between Jeffrey and Herbert Zimmer ("Zimmer") and one between Jeffrey and Ostrov. *See* Schlegel Deposition, Vol. 1, p. 223, lines 5-11, p. 224, lines 2-7, 11-15, 21-25, p. 225, lines 1-10, 14-25, and p. 226, lines 1-3, at Tab 20. An account was set up in Switzerland to handle receipt and disbursement of the option money and Swiss law requires disclosure of the beneficial owner of the account. That owner is McKenzie. *See* Invico Letter (Schlegel Deposition Exhibit 43 (especially the last page thereof)), and related excerpts from Schlegel Deposition, Vol. 1, p. 248, lines 17-25, p. 249, lines 2-8, 18-25, and p. 250, lines 1-7, at Tab 21.

6.    Petenes Foundation

Petenes Foundation ("Petenes") was bought by Invico for McKenzie. *See* Schlegel Deposition, Vol. 4, p. 805, lines 3-25, and p. 806, line 1, at Tab 22. As shown at Tab 10 and Tab 14, the bearer shares of Okibi and Claron were transferred to Petenes on May 8, 1995 by Invico. They were received by Petenes' acknowledgement on the bearer shares certificate at Tabs 10 and 14. These share certificates were delivered to Petenes because the trust relationships between McKenzie and Invico were purportedly terminated May 8, 1995.[2]   Even though allegedly

---

[2] Termination required 6 months prior written notice at a quarter end (*See* Tabs 8 and 13, Articles 14). The only written termination notice was given on May 8, 1995. . *See* Letter dated May 8, 1995 (Schlegel Deposition Exhibit 24) and related Schlegel Deposition excerpts, Vol. 1, p. 167, lines 1-24 and p. 55, lines 1-25, at Tab 23. The

terminated on May 8, 1995, Schlegel did remain director of MCK and continued to take his instructions from McKenzie. *See* Schlegel Deposition, Vol. 1, p. 68, lines 16-25 and p. 69, lines 1-14, at Tab 24. Petenes was a "shelf" foundation utilized at the direction of McKenzie to hold his properties; Elmor Bissig ("Bissig") is the principal of Forum Trust which is the "principal" of Petenes and Forum Trust offices in the same building as Bryan Jeeves and Normann Marxer.[3] *See* Schlegel Deposition, Vol. 1, p. 58, lines 10-25, p. 59, lines 1-6, 12-16, 23-25, and p. 60, lines 1-5, 19-25, at Tab 25.

B.     Cast of Characters – Rauball Side

7.     Baron Financial, Ltd.

In 1993, Baron Financial, Ltd. ("Baron") acquired a 4% interest in MMPBV. Although Baron is owned by more than just Wolfgang Rauball, he testified he held all of the interests in trust. All of the negotiations for Baron's acquisition were handled by Wolfgang Rauball for Baron and McKenzie for MCK/MMPBV. *See* Schlegel Deposition, Vol. 1, p. 96, lines 7-25, and KLM Documents Escrow Nos. 100310-12, at Tab 31.

---

termination was at the same time as the McKenzie Methane Corporation Chapter 11 Trustee was conducting an investigation into the Poland Project and his agent was attempting to contact Schlegel

[3] Bissig is signatory on EGA's bank account and director of EGA, is a member with Bryan Jeeves ("Jeeves") of Lexadmin Trust Reg., with whom Normann Marxer ("Marxer") officed until March 1996. Lexadmin Trust Reg. served as agent for EuroGas, A.G., for Crawford, Ltd., Middle & Egmont St., Kingston, St. Vincent & The Grenadines, for Sinbad, Ltd., at the same address, for Westlake, Ltd., at the same address and Jeffrey at the same address, all of which owned or acquired shares of stock in EuroGas, Inc. *See* KLM Documents Escrow Nos. 023540-42, 104540, 104558, 106175, 106174, 106173, 100546-48 and 107657, at Tab 26. Marxer and Jeeves were "directors" of EGA and were the principals of Lexadmin Trust Reg. *See* General Agreement (Schlegel Deposition Exhibit 52) and KLM Document Escrow Nos. 104434, 100691-92, 100578-79 and 100535, at Tab 27. Marxer was the "authorized agent" of Jeffrey. *See* KLM Documents Escrow Nos. 105913, 026209-10, and Schlegel Letter to Fish (Schlegel Deposition Exhibit No. 49), where it had not been decided whether Jeeves or Marxer would "represent' Jeffrey, at Tab 28. Bissig was also the authorized representative for MSA Mesa, an offshore company for the benefit of Fish which also acquired shares in EuroGas. *See* KLM Document Escrow Nos. 023818-19 at Tab 29. Bissig was also the "administrator" for Petenes. *See* Schlegel letter to Bissig and Bissig response (Schlegel Deposition Exhibits Nos. 87 and 115), and related excerpts from Schlegel Deposition, Vol. 2, p. 447, lines 11-25, p. 449, lines 16-25, p. 450, lines 1-6, Vol. 3, p. 542, lines 5-25, and p. 543, lines 1-8, at Tab 30. Marxer, Jeeves and Bissig are nothing more than "for hire" as "administrators" for offshore or concealed companies.

8.      Ostrov Resources, Ltd.

The alleged president, Mr. Agyogos, as will be shown, was used by Wolfgang Rauball, much like Jeeves, Marxer and Bissig. In reality, Ostrov Resources, Ltd. ("Ostrov") is Wolfgang Rauball. *See* Scott Godderidge (auditor for EuroGas/Energy Global acquisition of MMPBV) letter of January 30, 1995, KLM Documents Escrow Nos. 100578-79, and conversion of Ostrov debt to equity in MMPBV by Wolfgang Rauball, KLM Documents Escrow Nos. 106547 and 100230, at Tab 32. *See also* Exhibit 15 to Trustee's Response to Rauball Defendants' Motion to Dismiss ("Response to Rauball Motion").

9.      Sonanini Holdings, Ltd.

Wolfgang Rauball has admitted in his deposition that Sonanini Holdings, Ltd. ("Sonanini") is his company.

10.     WR Financial Consultants, Ltd.

Wolfgang Rauball has denied in his deposition that WR Financial Consultants, Ltd. ("WR Financial") *remained* his company in the 1996-1997 time frame when it made payments to McKenzie and Tim McKenzie on their employment contracts with MMPBV. Wolfgang Rauball is WR Financial. *See* KLM Documents Escrow No. 041529, at Tab 33.

11.     Energy Global, A.G.

Energy Global, A.G. ("EGA") was originally registered (incorporated) as EuroGas, A.G. *See* Exhibit 16 to Response to Rauball Motion. The initial sole shareholder was Wolfgang Rauball. Subsequently, Reinhard Rauball and others became investors in EGA, but Wolfgang Rauball held all of EGA's bearer shares. EuroGas, A.G., by Wolfgang Rauball, entered into the first of many agreements to purchase an interest in MMPBV. *See* General Agreement, Exhibit 17 to Response to Rauball Motion, signed by Wolfgang Rauball on behalf of EuroGas, A.G. and

8

McKenzie on behalf of MCK.  EGA acquired 16% of MMPBV and then reverse merged with EuroGas, Inc. ("EuroGas"), so that the owners of EGA became the over-whelming owners of EuroGas.  The major owners of EGA and thereafter EuroGas are Wolfgang Rauball and Reinhard Rauball.

      12.    EuroGas, Inc.

EuroGas, as a result of the reverse merger with EGA, following its acquisition of 16% of MMPBV and its subsequent acquisition of the balance of MMPBV concluded on October 4, 1995, (*see* March 11, 1996 letter, KLM Documents Escrow No. 010570, at Tab 34), owned 100% of MMPBV when McKenzie filed bankruptcy on October 30, 1995.  The 10-K's filed on behalf of EuroGas from 1994 to the present show Wolfgang Rauball and Reinhard Rauball to be control persons of EuroGas, not only through their offices held, but as a result of their stock holdings.  Initially, Jeffrey was shown as a "control person" of EuroGas because its shareholdings exceeded 5%.  *See* Exhibit 1 to Response to Rauball Motion.  Jeffrey was subsequently removed as a control person of EuroGas.  Although the EuroGas stock issued in the name of MCK greatly exceeded 5%, MCK, Claron, Okibi, and Schlegel were never identified as control persons of EuroGas.  Chemilabco, B.V. ("Chemilabco") did become a reported control person of EuroGas.  Chemilabco was owned by Oxbridge, Ltd. ("Oxbridge").  Chemilabco and/or Oxbridge is a client of Reinhard Rauball.  Merlin Fish served as president of Northampton and initially as president of EuroGas until he was succeeded in December of 1995 by Paul Hinterthur ("Hinterthur").  Reinhard Rauball has served as chairman of the Board of EuroGas since its inception (save for a brief time period, approximately 2 months) in the very late 1990's).  Wolfgang Rauball is and has been "chief consultant" to EuroGas.  Both Rauballs have consistently been the highest paid at EuroGas.  Hinterthur and the Rauballs have held significant

9

stock holdings in EuroGas and are control persons. *See* Exhibit 22 to Response to Rauball Motion. Howard Landa ("Landa") and Kruse, Maycock & Landa, L.L.P. ("KLM") have been counsel to Northampton and then, from its inception until well into this litigation, for EuroGas. The Rauballs have been active players with McKenzie since early 1993 and Landa and KLM have been involved since at least May 20, 1994. *See* Jeu letter, KLM Documents Escrow No. 022920, and Wolfgang Rauball instructions to pay KLM, KLM Documents Escrow No. 107564, and Landa letter, KLM Documents Escrow No. 101434-35, at Tab 35.

13.    Wolfgang Rauball

Wolfgang Rauball negotiated Baron's initial acquisition of 4% in MMPBV with McKenzie, and Wolfgang Rauball, later joined by Fish, negotiated exclusively with McKenzie for the initial EGA acquisition which closed in August 1994. *See* Schlegel Deposition, Vol. 1, p. 85, lines 14-19 and p. 86, lines 1-25, p. 87, lines 1-21, p. 88, lines 4-25, KLM Documents Escrow Nos. 101432, 101454, 101356-8 and 101412, at Tab 36. As early as May 2, 1994, Fish advised Landa of a restructure of the option with McKenzie to buy stock in MMPBV and acknowledged Landa's "language you talked about to insure this is a pass through deal." *See* KLM Documents Escrow Nos. 074747, at Tab 37. On August 9, 1994, Fish wrote Landa to inform him of the closings and discussed the Jeffrey $4 million and $5 million debentures from EuroGas. Fish also advised Landa that he had asked the Jeffrey trustee to contact Landa directly, pointing out to Landa that the trustee "will probably not be Mr. Jeeves – hard to keep track of all of the players out here." *See* KLM Documents Escrow No. 074580, at Tab 38.

14.    Part of the pass through to McKenzie was represented by the alleged Employment Contract payments to McKenzie and his sons. In August of 1994, Wolfgang Rauball became a co-director of MMPBV. He directed payment from EGA to MMPBV and to Northampton in the

10

U.S. *See* KLM Documents Escrow No. 104748, at Tab 39. In that status he had exclusive authority over how money would be spent. *See* Schlegel Deposition, Vol. 1, p. 89, lines 8-25, at Tab 40. Wolfgang Rauball "negotiated" the Employment Contracts between MMPBV and McKenzie and his sons and directed the payment by MMPBV (Wolfgang Rauball "called the tune" for MMPBV in August of 1994 and any kind of transfer of its money required his signature or that of Armando Ulrich). *See* Contracts at Exhibits 28-30 to Response to Rauball Motion and excerpts from Schlegel Deposition, Vol. 1, p. 341, lines 21-25, p. 342, lines 1-24, p. 343, lines 7-19, p. 345, lines 4-7, at Tab 41. There were several payments by Schlegel, as directed by Wolfgang Rauball, to McKenzie in 1994 from MMPBV's account and carried on the books of MMPBV. Schlegel testified that if there were payments pursuant to the employment contracts between August 1, 1994 and October 1, 1995, they would be so reflected on MMPBV's books and he was unaware of any such payments from any other source. *See* Schlegel Deposition, Vol. 1, p. 348, lines 13-21, at Tab 42. Yet, when pressed by Trustee, EuroGas could not account for payments to McKenzie until several years later into this litigation. The accounting provided is still not correct, according to Wolfgang Rauball, but is attached at Tab 43, along with copies of the promissory notes allegedly given by EGA to the Wolfgang Rauball entities (Conquest Financial, WR Financial, Rockwell, and Sonanini), making direct payments to McKenzie. *See* KLM Documents Escrow Nos. 020547, 008239, 008238, 008233, 008232, 008245, 008229, 008228, 008259, 008227, 008224, 008225, 008226, 008278, 08286, 008282, 008283, 008279, 008280, 008281, at Tab 43. Payments by Wolfgang Rauball's companies were not carried on the books of MMPBV and were made directly to McKenzie and not through the account of MMPBV. The payments which did originate from the account of MMPBV, as authorized by Wolfgang Rauball, were missing from the accounting of employment contract

11

payments prepared by EuroGas.  In addition, a payment of $142,000.00 to McKenzie just prior to his bankruptcy commencement was not included in the accounting in spite of McKenzie's testimony and Gayle Holt's affidavit that such payment, plus $8,000.00 in cash earlier given, represented MMPBV salary and expense reimbursement.  *See* Affidavit, at Tab 44.  In addition, Wolfgang Rauball gave money directly and through his companies to McKenzie which were later characterized by each as loans.  These loans were represented only in part by notes, prepared well after the fact and on which there has been no payment.  The total given in 1996 alone was over $310,000.00.  *See* Exhibit 17 to Trustee's Response to Amended EuroGas Motion.

15.     As a result of the first closing in August of 1994, Jeffrey was issued 2.1 million shares of common stock of EuroGas and a $4 million and $5 million debenture of EuroGas, each convertible into additional 1 million shares each of EuroGas common stock.  *See* KLM Documents Escrow Nos. 074560-47, at Tab 45; *see also* certificates of 100,000 shares each to Jeffrey to be numbers 4061 through 4081.  The $4 million debenture was converted on or about November 14, 1994 into certificates numbers 4552 through 4561 of 100,000 shares each.  *See* KLM Documents Escrow Nos. 074515-22, 074514, and 074511, at Tab 46.  This ability to convert is contrary to Jeffrey's purported pledge of its EuroGas stock and debentures to MCK to secure its $12 million note.  *See* Letter of August 11, 1994 and Deed of Pledge and Assignment (Schlegel Deposition Exhibit Nos. 55 and 56), and related excerpts from Schlegel Deposition, Vol. 2, p. 327, lines 21-25, p. 328, lines 4-19, 24-25, p. 329, lines 4-17, 23-25, and p. 330, lines 1-6, at Tab 47.  Invico received and held in safekeeping the 2.1 million shares of EuroGas common stock (certificate nos. 4061-4081) and the $5 million debenture.  *See* Receipt (Schlegel

12

Deposition Exhibit 64), and related excerpts from Schlegel Deposition, Vol. 2, p. 359, lines 6-8, 15-25, and p. 360, lines 1-18, at Tab 48.

15. On or about November 17, 1994, Jeffrey and Herbert Zimmer ("Zimmer") entered into an Option Agreement to sell to Zimmer 3.1 million shares and the $5 million debenture for $7 million, exercisable in whole or in part at the rate of $1.707 per share. The price was negotiated by McKenzie and Wolfgang Rauball. Wolfgang Rauball introduced Zimmer to McKenzie. *See* Zimmer letter of November 17, 1994 (Schlegel Deposition Exhibit 63), and related excerpts from Schlegel Deposition, Vol. 2, p. 356, lines 7-25, p. 357, lines 1-24, Invico letters of November 17, 1994 and November 18, 1994 (Schlegel Deposition Exhibits 35 and 34) and related excerpts from Schlegel Deposition, Vol. 1, p. 227, lines 2-21, p. 228, lines 1-5, and p. 229, lines 11-22, at Tab 49. Immediately upon receipt by Jeffrey of this money from the Zimmer option, McKenzie directed the transfer by Invico of $350,000.00 to his account in Houston under the name of RWT, Inc. It was disguised as a loan to McKenzie. *See* McKenzie letter, $350,000.00 promissory note and transfer advices, (Schlegel Deposition Exhibit No. 31) and related excerpts from Schlegel Deposition, Vol. 1, p. 211, lines 2-14, 18-25, p. 212, lines 15-25, p. 215, lines 23-25, and p. 216, lines 1-10, at Tab 50. The payment of money was concealed as a loan; otherwise, it would be treated as dividend to McKenzie as a shareholder subject to a heavy tax. No McKenzie note to MCK was repaid. *See* Schlegel Deposition, Vol. 1, p. 220, lines 1-18 at Tab 51.

16. Zimmer purchased approximately 234,000 shares under this option and ceased further exercise. Wolfgang Rauball wanted "an option of the remains of the share option with more or less the same terms as H. Zimmer has signed." *See* Invico letter (Schlegel Deposition Exhibit 69) and related excerpts from Schlegel Deposition, Vol. 2, p. 377, lines 1-16, p. 378,

lines 1-19, and p. 383, lines 24-25, at Tab 52. That option was granted through Wolfgang

Rauball's utilization of Ostrov. *See* Option Agreement (Schlegel Deposition Exhibit 72) and

related excerpts from Schlegel Deposition, Vol. 2, p. 394, lines 3-9, and p. 395, lines 1-19, at Tab

53. In exchange for $170,700.00 paid in by Wolfgang Rauball, a 100,000 share certificate in

EuroGas was transferred to Ostrov and receipted for by Wolfgang Rauball. *See* Confirmation

(Schlegel Deposition Exhibit 82) and related excerpts from Schlegel Deposition, Vol. 2, p. 431,

lines 5-17, 24-25, and p. 432, lines 1-2, 11-16, at Tab 54. *See also* at Tab 54, Schlegel Deposition

Exhibit 65 and related excerpts from Schlegel Deposition, Vol. 2, p. 361, lines 2-13, 23-25, p.

362, lines 2-17, 20-23, p. 364, lines 10-13, p. 365, lines 18-24, and p. 366, lines 12-14, 21-23,

regarding the shares issued to Zimmer and Ostrov.

17.     The $170,700.00 for the 100,000 shares to Ostrov came in part from Reinhard

Rauball to the extent of approximately $130,700.00. *See* Schlegel Deposition Exhibit 42, and

related excerpts from Schlegel Deposition, Vol. 1, p. 241, lines 21-25, p. 242, lines 1-6, p. 245,

lines 22-25, p. 246, lines 1-25, p. 247, lines 1-7, 10-18, at Tab 55. The approximate $40,000.00

balance came from a direct wire transfer from Ostrov.[4] *See* Schlegel Deposition Exhibits 41, 28,

and 32 (the difference between the $170,700.00 credited to Jeffrey (consisting of 182,000 DM

($130,000.00) which was paid by Reinhard Rauball to Jeffrey and then paid to MCK, and the

$40,000.00 wire transfer to McKenzie) and $209,700 being "loaned" by MCK to McKenzie (was

cash on deposit in MCK) and related excerpts from Schlegel Deposition, Vol. 1, p. 239, lines 12-

14, 23-25, p. 240, lines 2-3, 10-12, p. 194, lines 22-25, p. 195, line 1, p. 198, lines 22-25, p. 199,

---

[4] McKenzie, his in-house accountant, and Wolfgang Rauball, all testified the $40,000.00 was for McKenzie's salary. EuroGas' accounting does not reflect this payment as salary and Schlegel has testified it represented the balance due on the $170,700.00 option exercised by Ostrov.

14

lines 1-3, p. 204, lines 24-25, p. 205, lines 2-4, 9-19, p. 206, lines 2-6, 22-24, p. 207, lines 2-25, p. 208, lines 1, 6-19, p. 221, lines 19-25, and p. 222, lines 1-2, at Tab 56.

18.     In addition to Jeffrey's sale of stock under these options, Jeffrey was also actively seeking to sell its debentures.  Hinterthur, who became president of EuroGas, was attempting to do just that on behalf of McKenzie.  In referring back to Exhibit 69 at Tab 52, Schlegel testified that Hinterthur proposed to buy the $9 million in debentures of Jeffrey and he was well aware that McKenzie was Jeffrey, that he was paid commissions for obtaining Zimmer on the Ostrov option with Jeffrey and on the Ostrov option with MCK (to be discussed later), and that such commission was due from McKenzie.  *See* Schlegel Deposition, Vol. 1, p. 379, lines 21-25, p. 380, lines 1-25, p. 381, lines 1-25, p. 382, lines 1-17, 24-25, and p. 383, lines 1-12, at Tab 57. *See also* Schlegel Deposition Exhibit 121A which is the translation of Hinterthur's Receipt for such commissions, at Tab 58.   Wolfgang Rauball was well aware that the payments of commissions to Hinterthur were made and due from McKenzie.  *See* Schlegel Deposition Exhibit 120A, at Tab 59.

19.     The EuroGas shares and the $5 million debenture which remained in Jeffrey's name were sent to Petenes.  *See* Schlegel Deposition, Vol. 2, p. 433, lines 12-25, and p. 434, lines 1-11; August 8, 1995 letter (Schlegel Deposition Exhibit 87) and related excerpts from Schlegel Deposition, Vol. 2, p. 447, lines 9-25, p. 448, lines 18-25, p. 449, lines 16-25, and p. 450, lines 1-6, at Tab 60.  Bissig sent Jeffrey's EuroGas shares on to Reinhard Rauball on November 22, 1995, who held them in spite of demands by McKenzie and Schlegel.  *See* Schlegel Deposition Exhibit 115 and related excerpts from Schlegel Deposition, Vol. 3, p. 542, lines 1-25, p. 543, lines 1-25, and p. 544, lines 1-4, at Tab 61.

20.     On February 10, 1995, MCK and Ostrov entered into an Option Agreement whereby Ostrov could purchase 21 shares (3 ½%) of MMPBV for $1.5 million, exercisable in whole or part of at least 5 shares at a price per share of $71,430.00.  *See* Option Agreement (Schlegel Deposition Exhibits 70 and 71) and related excerpts from Schlegel Deposition, Vol. 2, p. 386, lines 4-25, p. 387, lines 18-20, p. 388, lines 7-17, 23-25, p. 390, lines 6-21, and p. 392, lines 8-21, at Tab 62.  The option was sent to Wolfgang Rauball, because he negotiated it (p. 386).  It is returned by Wolfgang Rauball bearing the signatures of Mr. Agyogos on behalf of Ostrov. (p. 388).  The option agreement ties back to what was negotiated by Wolfgang Rauball in Schlegel Deposition Exhibit 69, at Tab 52, in exchange for which he, allegedly for Ostrov, obtained an option from Jeffrey similar to that afforded to Zimmer (p. 390).  McKenzie found this acceptable as set forth in Exhibit 69 (p. 392).

21.     This Option Agreement required payment of an initial $100,000.00.  Although Schlegel could not testify that such payment was made, from the KLM Documents Escrow No. 107905 is a $100,000.00 check to McKenzie dated May 7, 1996 at Tab 63.  Schlegel did identify a $300,000.00 payment made by Armando Ulrich on the Ostrov option drawn on EGA.  *See* Schlegel Deposition Exhibit 78 and related excerpts from Schlegel Deposition, Vol. 2, p. 413, lines 3-8, 15-21, p. 414, lines 1-22, p. 415, lines 2-10, p. 416, lines 13-21, and p. 417, lines 6-9, at Tab 64. By Sale and Assignment dated "10th day, 1995" (the fax header from Ostrov reflects a date of April 10, 1995), Ostrov assigned its rights and interests under the MCK/Ostrov option of February 10, 1995 to EGA for $4,014,500.00. *See* KLM Document Escrow No. 100226, at Tab 65.

22.     By Option and Share Exchange Agreement dated March 7, 1995 between MCK and EuroGas (not EGA), MCK agreed to transfer its rights in MMPBV, approximately 80.3%

(some of which "shares are subject to an Option and General Agreement with Energy Global, A.G. and Ostrov Resources, Ltd. or its assigns"), to MCK in exchange for EuroGas common and preferred stock. The closing was set to occur upon receipt of audited financial statements of MMPBV. This agreement did provide that MCK had the right to allow its shareholders to receive their proportionate shares of EuroGas common and preferred stock directly. *See* Option and Share Exchange Agreement (part of Schlegel Deposition Exhibit 89) and related excerpts from Schlegel Deposition, Vol. 2, p. 460, lines 17-25, p. 462, lines 1-11, 16-25, and p. 463, lines 1, 22-24, at Tab 66.

23.   On May 16, 1995, EuroGas requested Landa to issue the EuroGas 1995 preferred stock and Interwest Transfer Company, to issue the EuroGas common stock to Claron, Okibi, Schlegel and MCK. The shares were issued:

| Name | Shares of Common Stock | Shares of Preferred Stock |
|---|---|---|
| Claron | 365,971 | 609,952 |
| Okibi | 315,740 | 526,233 |
| Schlegel | 35,880 and 192,600 | 59,799 |
| MCK | 665,090 and 52,900 | 1,195,984 |

Subsequently, on May 31, 1996, another 10,000 shares of common stock was issued in the name of MCK. *See* KLM Documents Escrow Nos. 010857, 012846-49, 011144-46, 012833-38, 026295-99, and 010458-60, at Tab 67. However, the shares were never delivered to MCK, Claron, Okibi or Schlegel. Even though EuroGas acquired the remaining interest in MMPBV on October 4, 1995, which was 26 days before McKenzie filed bankruptcy. *See* Schlegel Deposition, Vol. 1, p. 23 and KLM Documents Escrow Nos. 080732, at Tab 68. With the exception of the common shares issued to Schlegel, the common and preferred shares due to

Claron, Okibi and MCK and the preferred shares due to Schlegel were held by Reinhard Rauball as trustee pursuant to a (not produced) June 2, 1995 EGA letter. *See* Schlegel Deposition Exhibit 119 and corrected translation at Exhibit No. 119A and related excerpts from Schlegel Deposition, Vol. 3, p. 554, lines 17-25, p. 555, lines 1-2, p. 556, lines 23-25, and p. 557, lines 1-25, at Tab 69.

24.     A number of negotiations occurred in 1995 within months of the October 4, 1995 "closing," while Reinhard Rauball held the MCK, et al stock in EuroGas, all negotiated by McKenzie and Wolfgang Rauball. First, there was contemplation of transfer of the MCK shares from Claron, Okibi and any other owner of MCK stock to EGA for $2.2 million. McKenzie prepared the initial drafts of the Shareholder's Resolution and Power of Attorney to accomplish that and a draft of the Share Purchase Agreement was sent to Armando Ulrich. *See* Schlegel Deposition Exhibits 94 and 103, and related excerpts from Schlegel Deposition, Vol. 3, p. 493, lines 5-14, p. 507, lines 3-18, at Tab 70. On September 4, 1995, McKenzie, on behalf of Claron and Okibi, authorized that transaction. *See* Schlegel Deposition Exhibits 20 and 21, and related excerpts from Schlegel Deposition, Vol. 1, p. 156, lines 23-25, p. 157, lines 1-18, 23-25, p. 158, lines 1-12, 16-23, and p. 159, lines 1-13, at Tab 72. Next was the effort to sell the EuroGas stock of MCK, Claron and Okibi to Oxbridge, Ltd. As part of Tab 66, are the corporate resolutions of MCK to sell its 717,590 shares of common stock to Oxbridge for $1.50 per share and a related Option Agreement, signed by MCK, but not Oxbridge, and like Option Agreement of Okibi to sell its 315,740 shares of common stock to Oxbridge for $473,610.00. There exists a like option executed by Claron. *See* Schlegel Deposition Exhibit 92, at Tab 73. The notes, resolutions, power of attorney to sell the MCK stock to Oxbridge for $1.0 million and all Claron and Okibi executions were obtained at the authorization of McKenzie. Oxbridge had returned its Power of

18

Attorney for transaction. These Claron and Okibi documents were executed post-McKenzie bankruptcy commencement. *See* Schlegel Deposition Exhibits 95 and 100 and related excerpts from Schlegel Deposition, Vol. 3, p. 497, lines 2-25, p. 498, lines 1-6, p. 499, lines 4-11, p. 506, lines 5-11, 20-25, and p. 507, lines 1-2, at Tab 71.

26. As of the date of commencement of McKenzie's bankruptcy, McKenzie was still and thereafter attempting to recover his stock through Schlegel, he was attempting to recover a trust agreement for the shares due to MCK, et al and payment of promissory note or notes due in regard to Jeffrey (*see* Schlegel Deposition Exhibit 101) and he was meeting in November with Wolfgang Rauball to obtain a trust agreement or the shares (*see* Schlegel Deposition Exhibit 117) and in December he apparently reached some agreement with Wolfgang Rauball for payment and promissory notes (*see* Schlegel Deposition Exhibit 90A, and related excerpts from Schlegel Deposition, Vol. 3, p. 507, lines 3-18, p. 549, lines 24-25, p. 550, lines 1-17, 22-25, p. 551, lines 1-22, p. 490, lines 23-25, and p. 491, lines 1-6, 10-16, 22-24, at Tab 74.

26. In any event, as of the date of McKenzie's bankruptcy commencement, Reinhard Rauball held the following shares of EuroGas, belonging, as indicated, to Claron, Okibi, and MCK and thereby, McKenzie:

| Name | Shares of Common Stock | Shares of Preferred Stock |
|---|---|---|
| Claron | 365,971 | 609,952 |
| Okibi | 315,740 | 526,233 |
| MCK | 665,090 and 52,900 | 1,195,984 |

After bankruptcy commencement, on November 22, 1995, Petenes sent to Reinhard Rauball Jeffrey's, and thereby McKenzie's, approximate 2.7 million remaining shares plus the additional

1.0 million shares represented by the $5 million debenture. After bankruptcy, on or about May 31, 1996, Reinhard Rauball received another 10,000 shares of EuroGas common stock of MCK. With the 2 for 1 conversion on the preferred shares, Reinhard Rauball, who was then chairman of EuroGas, held the equivalent of over 9.7 million shares of common stock of EuroGas belonging to this estate. He also had the stock powers in blank for Jeffrey's EuroGas shares sent to him by Bissig and the stock power in blank related to the MCK, et al's EuroGas shares. *See* Schlegel Deposition, Vol. 3, p. 516, lines 1-7, at Tab 75.

27.    The existence of McKenzie's financial problems, his litigation woes, the MMC Trustee investigation into Poland, the McKenzie's filing of bankruptcy was well known to EuroGas, the Rauballs, Landa and KLM. His bankruptcy was the supposed basis for his resignation from the MMPBV Board. This knowledge explains the efforts to secret payments to him, i.e. the RWT, Inc. and IDG accounts, treating "dividend" or purchase payments as loans never to be paid or as salary which is not even carried on the books of MMPBV or EGA and for which no promissory notes are even issued until questioned by Trustee. The concealment goes much further and continues up to today. In addition to the matters set forth to this point, the Oxbridge transaction was handled by Wolfgang Rauball who was acting on behalf of Oxbridge. *See* Schlegel Deposition, Vol. 3, p. 526, lines 19-25, and p. 527, lines 1-2 at Tab 76. Its subsidiary, Chemilabco, is a client of Reinhard Rauball. The Option Agreements with Oxbridge provide that the EuroGas shares owned by Claron, Okibi and MCK will be held in trust by Reinhard Rauball for both Optioner and Optionee for the duration of the agreement, but not later than December 15, 1995, at which time the shares not purchased shall be returned to Claron, Okibi and/or MCK. *See* paragraphs V at Tab 73. Since December 15, 1995, there has been no payment and no return of stock due to this estate. In 1997, Chemilabco and its subsidiary

20

Oxbridge became the largest single stockholder in EuroGas as the result of a purchase of 1,430,000 shares of EuroGas restricted stock for a cash purchase price of $10 million. *See* excerpt of EuroGas S-1, p. 43-44, at Tab 77.[5]  Coincidentally, on August 26, 1996, not December 15, 1995, Reinhard Rauball purportedly surrendered his "trusteeship." *See* KLM Document Escrow No. 004866, at Tab 78.

28.     This Court approved a Compromise and Settlement Agreement dated March 6 and 7, 1997, between Trustee and EuroGas, by which Trustee consented to a sale by EuroGas to Texaco, waiving any claim against Texaco or the property of Texaco was acquiring.   In exchange, EuroGas agreed to help recover the shares of stock issued to or due to Jeffrey, MCK, Claron and Okibi, or other thing of value to or due to McKenzie.   This agreement was approved/ratified by the Board of EuroGas.  The Board consisted of Reinhard Rauball as CEO. Unofficially, it included Wolfgang Rauball who also ratified the agreement.

29.     This agreement has been honored only in its breach, and EuroGas, as well as the Rauballs and Landa and KLM set on a course to misrepresent and misdirect Trustee's efforts. The facts set forth above were obtained by Trustee in spite of EuroGas, the Rauballs, Landa and KLM and refute every statement made by them. Landa wrote Trustee on March 21, 1977 stating:

> d(ii) GlobeGas and all the other shareholders were represented by Rolf Schlegel. It is my understanding that Claron and Okibi received their interest in EuroGas through a distribution from MCK Development...My client did not have a direct contractual relationship with Claron or Okibi and therefore does not have much information about them. (Except the limited amount provided by Schlegel). Exhibit 3 contains a letter from Mr. Schlegel directing distribution of shares to each of the entities.

---

[5] At Tab 84, Chemilabco is shown to have acquired 10,300,000 shares between July 22, 1996 and September 12, 1997.

(vii)...As far as I know, for a significant period of time, no common stock has shown the name of MCK Development, Claron or Okibi. I can only assume that this stock filtered through the system over the past two years. The only stock restricted with respect to that underwriting was the newly created Preferred Stock upon which EuroGas received your notice of adverse claim.

4. The company is currently unsure as to who the principals of Claron, Jeffrey, and Okibi are...

*See* Tab 79.

30.     The Rauballs are the persons at or in charge of EuroGas to whom Landa and KLM reported. Wolfgang Rauball caused the funding of part of the EuroGas fees to KLM. *See* KLM Document Escrow No. 106262, at Tab 80.   In addition to their personal knowledge of McKenzie's ownership of Claron, Okibi, MCK and Jeffrey being imputed to EuroGas, EuroGas and Landa knew directly as well.  For instance:

a.      KLM Document Escrow No. 026306-08 for the EuroGas secretary to pick up a 10,000 share certificate for delivery to MCK Zurich, in 1996;

b.      KLM Document Escrow No. 068149 dated November 26, 1996 where Landa provides his "understanding of who holds the preferred shares issued in the acquisition of GlobeGas";

c.      KLM Document Escrow No 068150 Memorandum dated  November 20, 1996 of Landa requesting Rich Ludlow to trace certain shares he has listed;

d.      KLM Document Escrow No. 010119-20, Report of Rich Ludlow to Landa dated December 2, 1996 on the shares issued to Claron, Okibi, Schlegel and MCK;

e.      KLM Document Escrow Nos. 069151, 069150 and 069168 giving opinions on beneficial ownership of Claron and Okibi; and

f.      KLM Document Escrow Nos. 042129-31 referencing in 1996 a current list of common stockholders and an updating of the list of preferred shareholders,

at Tab 81.

31.     The action did not stop at failing to disclose or misrepresenting facts.  In spite of ongoing negotiations and discussions with Trustee and counsel for KUKUI, Inc. on how to structure recovery of Jeffrey shares, on February 13, 1997, Landa strongly suggested to Paul

Hinterthur, President of EuroGas, and Wolfgang Rauball "that the purchasers (of Jeffrey's stock) send the certificates to the transfer agent to have them put into the actual names of the owners and I would suggest that they do it immediately for their own protection." *See* KLM Document Escrow Nos. 043163, at Tab 82. Landa wrote the next day to Hinterthur and Wolfgang Rauball advising of how he, on behalf of EuroGas, had postured a claim superior to the Bishop Estate for the MCK preferred shares. Even though he has put Schlegel (who has been out of the picture for over a year) on notice of the adverse claim of Trustee, Landa states that "EuroGas can always change its mind and allow a transfer." *See* KLM Document Escrow Nos. 020535-37 at Tab 83. A comparison of "The Complete Stockholders List of EuroGas, Inc. as of April 25, 1997 (right after the Settlement Agreement with Trustee) and November 14,1997, reveals that:

a.   Baron sold 1,120,000 shares between dates

b.   Nicola Belanen who bought 200,000 shares from Jeffrey sold out between dates

c.   Jeffrey sold 1,000,000 shares between dates

d.   Chemilabco sold 2.2 million shares between dates

e.   Conquest acquired 500,000 shares between dates

f.   Wolfgang Rauball's wife sold 800,000 shares between dates

g.   Oxbridge acquired 1.4 million shares between dates

h.   Reinhard Rauball, Trustee sold 1,100,000 shares between dates.

*See* KLM Documents Escrow Nos. 002716-800, at Tab 84.

Finally, and again, while negotiating with Trustee, Landa opines in February of 1997 that upon sale of 40,000 shares of restricted stock, Jeffrey can loan money to EuroGas. *See* KLM Document Escrow Nos. 043225-26, at Tab 85.

## CONCLUSION

32.     The evidence makes clear now that the suit is not one of fraudulent transfer avoidance on behalf of McKenzie Methane Poland Co. ("MMPCO").  The suit is one to recover property of McKenzie and of the McKenzie estate, namely denial of the estate, the value of its shares of EuroGas stock in the name of Claron, Okibi, MCK and Jeffrey.  It is recoverable from those who conspired to deprive the estate of that value – McKenzie, EuroGas, Wolfgang Rauball and Reinhard Rauball.

Dated this ⟍⟋ day of March, 2002.

<div align="right">

Respectfully submitted:

W. STEVE SMITH, P.C.

By:  _____
W. STEVE SMITH
State Bar No. 18700000
BLANCHE DUETT SMITH
State Bar No. 00783991
2015 Crocker
Houston, Texas  77006
Telephone:  (713) 533-1833
Facsimile:  (713) 533-1834

ATTORNEYS FOR W. STEVE SMITH,
TRUSTEE

</div>

24

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the *Notice,* has been served upon the following parties by Overnight Mail, postage prepaid, on the _____15ᵗʰ_____ day of March, 2002:

Mr. Richard L. Tate
Attorney at Law
206 South 2nd Street
Richmond, TX 77469

Mr. Joseph O. Collins, Jr.
Kessler & Collins, P.C.
5950 Sherry Lane, Suite 222
Dallas, Texas 75225

Mr. Mark A. Weisbart
Law Office of Mark A. Weisbart
5950 Sherry Lane, Suite 222
Dallas, Texas 75225

Mr. H. Mike McKenzie
c/o International Geological Consultants, Inc.
8600 Westpark, Suite 111
Houston, TX 77063

Mr. Robert B. Crotty
Crotty & Johansen, L.L.P.
2311 Cedar Springs Road, Suite 250
Dallas, TX 75201

Mr. Steven D. McKenzie
c/o International Geological Consultants, Inc.
8600 Westpark, Suite 111
Houston, TX 77063

By: _____

W. STEVE SMITH

25

# COPY TRANSCRIPT

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

IN RE:

| | |
|---|---|
| **HARVEN MICHAEL MCKENZIE** | JOINTLY ADMINISTERED UNDER |
| **STEVEN DARRYL MCKENZIE** | CASE NO. 95-47219-H5-7 |
| **TIMOTHY STEWART MCKENZIE** | CHAPTER 7 |
| **W. STEVE SMITH, TRUSTEE,** | |

Plaintiff,

Consolidated for Trial
ADVERSARY NO. 97-4114
vs.
(Adversary No. 97-4114
and 97-4155)

**ROLF SCHLEGEL,**
**MCK DEVELOPMENT B.V., CLARON**
**N.V., JEFFREY LTD., OKIBI N.V.,**
**MCKENZIE METHANE POLAND CO.,**
**HARVEN MICHAEL MCKENZIE,**
**TIMOTHY STEWART MCKENZIE,**
**STEVEN DARRYL MCKENZIE**
**EUROGAS, INC., GLOBEGAS, B.V.,**
**POL-TEX METHANE SP. Z.O.O.,**
**INVICO CAPITAL CORPORATION, A.G.**
**WOLFGANG RAUBALL, REINHARD**
**RAUBALL** and **ARMANDO ULRICH**

Defendants.

_____/

VOLUME I - PAGES 1 to 259

DEPOSITION UPON ORAL EXAMINATION
of
**ROLF SCHLEGEL**

on Wednesday, April 18, 2001

Taken at the offices of:
Denton Wilde Sapte
Five Chancery Lane
Clifford's Inn
London  EC4A 1BU, England

Before: Shirley A Tanner, MBIVR



**REPORTING INTERNATIONAL LIMITED**
Depositions · Arbitrations · Interviews · Hearings · Inquiries · Real-Time · Daily Copy
32 Grassmount, Taymount Rise, London SE23 3UW
Telephone: 01144 181 291 9777   E-mail: 106063.1565@compuserve.com   Fax: 01144 181 291 9888

Member: National Court Reporters Association, Society for the Technological Advancement of Court Reporting, British Institute of Verbatim Reporters

2

1                    A P P E A R A N C E S:

2

FOR W STEVE SMITH, TRUSTEE:
3
            W Steve Smith, Esq
4           and
            Blanche A Duett, Esq
5           W STEVE SMITH, PC
            5701 Memorial Drive
6           Houston, Texas 77007
            Tele: (713) 803-5655   Fax: (713) 803-5656
7

8   FOR KUKUI, INC, A CREDITOR:

9           Richard L Tate, Esq
            TATE & ASSOCIATES
10          206 South 2nd Street
            Richmond, Texas 77469
11          Tele: (281) 341-0077   Fax: (281) 341-1003

12

FOR ROLF SCHLEGEL & INVICO:
13
            Mark E MacDonald, Esq
14          MACDONALD & SCHUBLE, LLP
            1700 Pacific Avenue
15          Suite 1650
            Dallas, Texas 75201
16          Tele: (214) 922-9050   Fax: (214) 922-9718

17

FOR EUROGAS:
18
            Mark A Weisbart, Esq
19          KESSLER COLLINS
            5950 Sherry Lane
20          Suite 222
            Dallas, Texas 75225
21          Tele: (214) 379-0722   Fax: (214) 696-5455

22  NOTARY PUBLIC:

23          Jeremy B Burgess MA (Cantab)
            Cheeswrights
24          Notaries Public
            10 Philpot Lane
25          London EC3M 8BR

# COPY TRANSCRIPT

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

IN RE:

| | |
|---|---|
| HARVEN MICHAEL MCKENZIE | JOINTLY ADMINISTERED UNDER |
| STEVEN DARRYL MCKENZIE | CASE NO. 95-47219-H5-7 |
| TIMOTHY STEWART MCKENZIE | CHAPTER 7 |
| W. STEVE SMITH, TRUSTEE, | |
| | Consolidated for Trial |
| Plaintiff, | ADVERSARY NO. 97-4114 |
| vs. | (Adversary No. 97-4114 |
| | and 97-4155) |

ROLF SCHLEGEL,
MCK DEVELOPMENT B.V., CLARON
N.V., JEFFREY LTD., OKIBI N.V.,
MCKENZIE METHANE POLAND CO.,
HARVEN MICHAEL MCKENZIE,
TIMOTHY STEWART MCKENZIE,
STEVEN DARRYL MCKENZIE
EUROGAS, INC., GLOBEGAS, B.V.,
POL-TEX METHANE SP. Z.O.O.,
INVICO CAPITAL CORPORATION, A.G.
WOLFGANG RAUBALL, REINHARD
RAUBALL and ARMANDO ULRICH

Defendants.

_____/

VOLUME II - PAGES 260 to 476

DEPOSITION UPON ORAL EXAMINATION
of
**ROLF SCHLEGEL**

on Thursday, April 19, 2001

Taken at the offices of:
Denton Wilde Sapte
Five Chancery Lane
Clifford's Inn
London  EC4A 1BU, England

Before: Shirley A Tanner, MBIVR



REPORTING INTERNATIONAL LIMITED
DEPOSITIONS · ARBITRATIONS · INTERVIEWS · HEARINGS · INQUIRIES · REAL-TIME · DAILY COPY
32 GRASSMOUNT, TAYMOUNT RISE, LONDON SE23 3UW
TELEPHONE: 01144 181 291 9777    E-MAIL: 106063.1565@COMPUSERVE.COM    FAX: 01144 181 291 9888

MEMBER: NATIONAL COURT REPORTERS ASSOCIATION, SOCIETY FOR THE TECHNOLOGICAL ADVANCEMENT OF COURT REPORTING, BRITISH INSTITUTE OF VERBATIM REPORTERS

261

1                    A P P E A R A N C E S:

2

FOR W STEVE SMITH, TRUSTEE:
3
            W Steve Smith, Esq
4           and
            Blanche A Duett, Esq
5           W STEVE SMITH, PC
            5701 Memorial Drive
6           Houston, Texas 77007
            Tele: (713) 803-5655   Fax: (713) 803-5656
7

8   FOR KUKUI, INC, A CREDITOR:

9           Richard L Tate, Esq
            TATE & ASSOCIATES
10          206 South 2nd Street
            Richmond, Texas 77469
11          Tele: (281) 341-0077   Fax: (281) 341-1003

12

FOR ROLF SCHLEGEL & INVICO:
13
            Mark E MacDonald, Esq
14          MACDONALD & SCHUBLE, LLP
            1700 Pacific Avenue
15          Suite 1650
            Dallas, Texas 75201
16          Tele: (214) 922-9050   Fax: (214) 922-9718

17

18  FOR EUROGAS:

19          Mark A Weisbart, Esq
            KESSLER COLLINS
20          5950 Sherry Lane
            Suite 222
            Dallas, Texas 75225
21          Tele: (214) 379-0722   Fax: (214) 696-5455

22

23

24

25

# COPY TRANSCRIPT

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

IN RE:

| | |
|---|---|
| **HARVEN MICHAEL MCKENZIE** | JOINTLY ADMINISTERED UNDER |
| **STEVEN DARRYL MCKENZIE** | CASE NO. 95-47219-H5-7 |
| **TIMOTHY STEWART MCKENZIE** | CHAPTER 7 |
| **W. STEVE SMITH, TRUSTEE,** | |

Consolidated for Trial
Plaintiff,    ADVERSARY NO. 97-4114
vs.    (Adversary No. 97-4114
and 97-4155)

**ROLF SCHLEGEL,**
**MCK DEVELOPMENT B.V., CLARON**
**N.V., JEFFREY LTD., OKIBI N.V.,**
**MCKENZIE METHANE POLAND CO.,**
**HARVEN MICHAEL MCKENZIE,**
**TIMOTHY STEWART MCKENZIE,**
**STEVEN DARRYL MCKENZIE**
**EUROGAS, INC., GLOBEGAS, B.V.,**
**POL-TEX METHANE SP. Z.O.O.,**
**INVICO CAPITAL CORPORATION, A.G.**
**WOLFGANG RAUBALL, REINHARD**
**RAUBALL and ARMANDO ULRICH**

Defendants.
_____/

VOLUME III - PAGES 477 to 674

DEPOSITION UPON ORAL EXAMINATION
of
**ROLF SCHLEGEL**

on Friday, April 20, 2001

Taken at the offices of:
Denton Wilde Sapte
Five Chancery Lane
Clifford's Inn
London  EC4A 1BU, England

Before: Shirley A Tanner, MBIVR



REPORTING INTERNATIONAL LIMITED
DEPOSITIONS · ARBITRATIONS · INTERVIEWS · HEARINGS · INQUIRIES · REAL-TIME · DAILY COPY
32 GRASSMOUNT, TAYMOUNT RISE, LONDON SE23 3UW
TELEPHONE: 01144 181 291 9777    E-MAIL: 106063.1565@COMPUSERVE.COM    FAX: 01144 181 291 9888

MEMBER: NATIONAL COURT REPORTERS ASSOCIATION. SOCIETY FOR THE TECHNOLOGICAL ADVANCEMENT OF COURT REPORTING. BRITISH INSTITUTE OF VERBATIM REPORTERS

478

**A P P E A R A N C E S:**

FOR W STEVE SMITH, TRUSTEE:

        W Steve Smith, Esq
        and
        Blanche A Duett, Esq
        W STEVE SMITH, PC
        5701 Memorial Drive
        Houston, Texas 77007
        Tele: (713) 803-5655  Fax: (713) 803-5656

FOR KUKUI, INC, A CREDITOR:

        Richard L Tate, Esq
        TATE & ASSOCIATES
        206 South 2nd Street
        Richmond, Texas 77469
        Tele: (281) 341-0077  Fax: (281) 341-1003

FOR ROLF SCHLEGEL & INVICO:

        Mark E MacDonald, Esq
        MACDONALD & SCHUBLE, LLP
        1700 Pacific Avenue
        Suite 1650
        Dallas, Texas 75201
        Tele: (214) 922-9050  Fax: (214) 922-9718

FOR EUROGAS:

        Mark A Weisbart, Esq
        KESSLER COLLINS
        5950 Sherry Lane
        Suite 222
        Dallas, Texas 75225
        Tele: (214) 379-0722  Fax: (214) 696-5455

ALSO PRESENT (for the reading of McKenzies' Questions):

        Jeremy B Burgess MA (Cantab)
        Cheeswrights
        Notaries Public
        10 Philpot Lane
        London EC3M 8BR

# COPY TRANSCRIPT

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

IN RE:

**HARVEN MICHAEL MCKENZIE**  JOINTLY ADMINISTERED UNDER
**STEVEN DARRYL MCKENZIE**   CASE NO. 95-47219-H5-7
**TIMOTHY STEWART MCKENZIE**  CHAPTER 7
**W. STEVE SMITH, TRUSTEE,**

        Consolidated for Trial
     Plaintiff,  ADVERSARY NO. 97-4114
vs.         (Adversary No. 97-4114
          and 97-4155)

**ROLF SCHLEGEL,**
**MCK DEVELOPMENT B.V., CLARON**
**N.V., JEFFREY LTD., OKIBI N.V.,**
**MCKENZIE METHANE POLAND CO.,**
**HARVEN MICHAEL MCKENZIE,**
**TIMOTHY STEWART MCKENZIE,**
**STEVEN DARRYL MCKENZIE**
**EUROGAS, INC., GLOBEGAS, B.V.,**
**POL-TEX METHANE SP. Z.O.O.,**
**INVICO CAPITAL CORPORATION, A.G.**
**WOLFGANG RAUBALL, REINHARD**
**RAUBALL** and **ARMANDO ULRICH**

     Defendants.
            /
_____

VOLUME IV - PAGES 675 to 852

DEPOSITION UPON ORAL EXAMINATION
of
**ROLF SCHLEGEL**

on Saturday, April 21, 2001

Taken at the offices of:
Denton Wilde Sapte
Five Chancery Lane
Clifford's Inn
London   EC4A 1BU, England

Before: Shirley A Tanner, MBIVR



REPORTING INTERNATIONAL LIMITED
DEPOSITIONS · ARBITRATIONS · INTERVIEWS · HEARINGS · INQUIRIES · REAL-TIME · DAILY COPY
32 GRASSMOUNT, TAYMOUNT RISE, LONDON SE23 3UW
TELEPHONE: 01144 181 291 9777 E-MAIL: 106063.1565@COMPUSERVE.COM FAX: 01144 181 291 9888

MEMBER: NATIONAL COURT REPORTERS ASSOCIATION, SOCIETY FOR THE TECHNOLOGICAL ADVANCEMENT OF COURT REPORTING. BRITISH INSTITUTE OF VERBATIM REPORTERS

676

**A P P E A R A N C E S:**

FOR W STEVE SMITH, TRUSTEE:

        W Steve Smith, Esq
        and
        Blanche A Duett, Esq
        W STEVE SMITH, PC
        5701 Memorial Drive
        Houston, Texas 77007
        Tele: (713) 803-5655  Fax: (713) 803-5656

FOR KUKUI, INC, A CREDITOR:

        Richard L Tate, Esq
        TATE & ASSOCIATES
        206 South 2nd Street
        Richmond, Texas 77469
        Tele: (281) 341-0077  Fax: (281) 341-1003

FOR ROLF SCHLEGEL & INVICO:

        Mark E MacDonald, Esq
        MACDONALD & SCHUBLE, LLP
        1700 Pacific Avenue
        Suite 1650
        Dallas, Texas 75201
        Tele: (214) 922-9050  Fax: (214) 922-9718

FOR EUROGAS:

        Mark A Weisbart, Esq
        KESSLER COLLINS
        5950 Sherry Lane
        Suite 222
        Dallas, Texas 75225
        Tele: (214) 379-0722  Fax: (214) 696-5455

851

## C E R T I F I C A T E

I do hereby certify that the testimony of the witness taken in the above-mentioned matter, contained herein, was reduced to writing in the presence of the witness by means of stenography; afterwards transcribed; and is a true and complete transcript of the testimony given by the witness.

I further certify that I am not connected by blood or marriage with any of the parties; their attorneys or agents; and that I am not interested, directly or indirectly, in the matter of controversy.

In witness whereof I have hereunto set my hand at London, England, United Kingdom, this, the 21st day of May 2001.



SHIRLEY A TANNER, MBIVR

259

# S I G N A T U R E

    I declare that I have read my within
deposition, and the same is true and accurate, except
for changes and/or corrections, if any, as indicated by
me on the change sheet flypaper page hereof.


Signed in   Zurich _____

on the  4 th  day of   July_____, 2001.


_____

                         ROLF SCHLEGEL

476

## S I G N A T U R E

        I declare that I have read my within
deposition, and the same is true and accurate, except
for changes and/or corrections, if any, as indicated by
me on the change sheet flypaper page hereof.


        Signed in _____Zurich_____

        on the __4th__ day of ____July_____, 2001.



_____

                            ROLF SCHLEGEL

674

# S I G N A T U R E

1

2

3        I declare that I have read my within

4   deposition, and the same is true and accurate, except

5   for changes and/or corrections, if any, as indicated by

6   me on the change sheet flypaper page hereof.

7

8        Signed in    Zurich

9        on the   4th   day of   July          , 2001.

10

11

12   _____

13                                    ROLF SCHLEGEL

14

15

16

17

18

19

20

21

22

23

24

25

REPORTING INTERNATIONAL
London, England
Tel:   011 44 208 291 9777   Fax:   011 44 208 291 9888

852

## S I G N A T U R E

1

2

3     I declare that I have read my within

4  deposition, and the same is true and accurate, except

5  for changes and/or corrections, if any, as indicated by

6  me on the change sheet flypaper page hereof.

7

8     Signed in _____Zurich_____

9     on the __4th__ day of __July_____, 2001.

10

11

12  _____

13                              ROLF SCHLEGEL

14

15

16

17

18

19

20

21

22

23

24

25

REPORTING INTERNATIONAL
London, England
Tel:  011 44 208 291 9777   Fax:  011 44 208 291 9888

11

1                           ROLF SCHLEGEL

2                       EXAMINATION CONDUCTED

3    BY MR SMITH:

4          Q.    Would you state your name for me, please.

5          A.    My name is Rolf Schlegel.

6          Q.    And what is your business address,

7    Mr Schlegel?

8          A.    My business address is Kirchgasse 24 in

9    Zurich, Switzerland.

10         Q.    I think you're going to have to spell that.

11         A.    Yes, I will.  I will give you my card.

12   (Business card handed to the reporter)

13         Q.    By whom are you employed, Mr Schlegel?

14         A.    I am employed by Invico Capital

15   Corporation.

16         Q.    And how long have you been employed by

17   Invico Capital Corporation?

18         A.    Since 1991 or 1990.

19         Q.    Are you -- is it a corporation?

20         A.    It's a corporation according to Swiss law.

21         Q.    Are there stockholders?

22         A.    There are stockholders.  I am the

23   stockholder.

24         Q.    100 per cent?

25         A.    100 per cent.

12

1      Q.    You hold all the offices of the
2   corporation?
3      A.    Sorry?
4      Q.    Do you hold all of the offices of the
5   corporation, president --
6      A.    I am the President.  There is a director,
7   but I'm the President.
8      Q.    Are you also a director or are
9   there other -- is someone else a director?
10     A.    I'm a director and I have a colleague who
11  is also a director.
12     Q.    Do you keep all of the business records of
13  Invico under your control and custody? .
14     A.    We do this according to Swiss law, that we
15  have to  keep records at home, yes, in the office     .
16     Q.    OK.  And you do  keep it in compliance with
17  Swiss law?
18     A.    Absolutely.
19     Q.    What is the business of Invico?
20     A.    Our business today is administration of
21  companies.  We do accounting; we do salary, payroll
22  accounting, for international companies that come to
23  Switzerland to start up; we do then the insurance and
24  all the human resources activities.  That's part of our
25  business from Invico Capital Corporation nowadays.

670

1    taken in regard to it."

2         A.    No.

3              MR SMITH:  Is that all the questions,

4    Mr Burgess?

5              MR BURGESS:  That is all the questions.

6              MR SMITH:  Before you leave, could we --

7    I want to ask just a few questions in your presence of

8    Mr Schlegel again.

9                   **FURTHER EXAMINATION CONDUCTED**

10   **BY MR SMITH:**

11        Q.    Mr Schlegel, you have produced Exhibits 1

12   through 146 here today with some three or four A

13   exhibits as annexes too, correct?

14        A.    That's right.

15        Q.    And those are here in the middle of the

16   table?

17        A.    That's correct.

18        Q.    And have those all been produced -- with

19   the exception of the translations of those documents,

20   have those all been produced from the files of Invico

21   either in its individual capacity or in its capacity as

22   an administrator or trustee for its clients?

23        A.    Yes.

24        Q.    And these files that you maintained were

25   maintained on a regular basis in the regular course of

# A G R E E M E N T



EXHIBIT
1
April 18, 2001

between

Michael McKenzie representing
the McKenzie Companies
7880 San Felipe Road                          "MMK"

Houston
Texas


and


INVICO CAPITAL CORPORATION Ltd.
Storchengasse 7                               "ICC"

CH-8022 Zürich


ARTICLE I        Preamble

Whereas "MMK" explores and develops coalbed-methane gas fields in Europe,
Asia and South-America and offers its partners Joint Ventures in the energy
field in financial and trading services, it has asked "ICC" from time to
time and in certain projects to advise in commercial and financial aspects
of certain transactions and to function as Westeuropean Liaison Office to
the McKenzie Group.

"MMK" entrust "ICC" therefore with following mandate:

- 2 -

## ARTICLE II      Scope of Work

1.  To advise on the financial structuring of the coalbed methane
    projects in Germany, Poland and other Eastern European Countries
    including CIS, in India and possibly other countries.

2.  To find equity partners for these projects

3.  To advise, structures and coordinate the financing of the  projects
    together with first class Banks and Institutions.

4.  To initiate  and advise and coordinate tax and legal  matters  ~~where~~
    required.

## ARTICLE III      Representation/Authority

This mandate given to "ICC"  in relation to the present and future projects
which will  be  clearly defined, reflects  "ICC"  authority  as  exclusive
representative of  "MMK"  to work together  with  leading  financial  and
industrial institutions and to structure deals in coordination with "MMK's"
Management. "MMK" will support "ICC" in its activities.

## ARTICLE IV      Project Preparation

1.  "ICC will  propose  and discuss with key  personnel   of  "MMK"  the
    strategy,  structuring  and  execution  of  financial  projects  and
    possible trading arrangement.

2.  In  order to achieve an optimal finance structure per  project  "ICC"
    will evaluate each project with "MMK" and consider with the financing
    partners what due diligence process is to be started.

3.  "MMK"  agrees  to make available to "ICC"  documentation  in  English
    language.  Outside consultants for local and technical expertise will
    only be engaged with "MMK"'s approval.



- 3 -

ARTICLE V      Project execution

1.   "ICC" will look at the optimal financing suitable for  each  project
     which could include

               Export Risk Financing
               Local Currency Financing
               Debt/Equity Financing
               Equity Participation
               Project Financing
               Leveraged Financing
               Non-Recourse Financing
               Contract/Delivery Financing

2.   "ICC" will minimize project financing costs by negotiating on behalf
     of "MMK" attractive rates and commissions.

3.   Financing  should  be structured optimally to maximise  cashflow  for
     reinvestment  and  project development rather  than  for  debtservice
     payments.

4.   Act as fiduciary/trustee where required for financial structuring and
     maintain  clear control of the financing process by coordinating  and
     assisting finance institutions in their syndication efforts.

ARTICLE VI      Fees

In  consideration  of the work to be performed under this  agreement  "MMK"
agrees that a fee according following schedule is due to "ICC":

A)   Coordination  advice and structuring of loan financing through  Banks
     and institutions where a separate mandate between "MMK" and the banks
     exists.

               Per payment transaction

               For the first      US$ 10   Mio.      1   %
               For the following  US$ 10-50 Mio.     1/2 %
               For over           US$ 50   Mio.      1/4 %

               on a Transaction per Transaction base
               payable at the time of each transaction payment

- 4 -

B)   For  identifying and finding and convincing equity investors to  take
     participations  following schedule on a transaction  per  transaction
     base

|  |  |  |  |  |
|---|---|---|---|---|
| 5 | % | for up to | US$ 5 | Mio. |
| 4 | % | for the following | US$ 5-10 | Mio. |
| 3 | % | for the following | US$ 10-50 | Mio. |
| 1 1/2 % | | for over | US$ 50 | Mio. |

     Whereby  this  commission will be shared by ICC  with  third  parties
     that assist "ICC" and "MMK" in obtaining these  funds.  Third parties
     will include Banks, Brokers, Institutions etc.

C)   If  equity  investors are brought to the project by Banks  with  whom
     "MMK" has been in contact previously and a mandate between "MMK"  and
     the Bank exists and "ICC"  contribution is minimal,  schedule A) will
     apply.

D)   All expenses incurred by "ICC"  for third parties such as consultancy
     fees  for Lawyers,  taxadvisors, engineers and  whatever  consultancy
     expertise  is needed for ICC to complete its mandate will be paid  by
     "MMK". Such consultancy would be discussed beforehand and agreed with
     by "MMK".

E)   Out of pocket expenses for travel expenses such as Board and Lodgings
     will be  refunded to "ICC" after invoicing "MMK". These costs however
     will be  deducted from any success fee as per Para A,B and C.

ARTICLE VII     Responsibility

"ICC"  will  execute  its  work  and  fulfill  its  responsibilities  with
appropriate  care and diligences required.  It can only be held liable  for
its  actions  which  were  deliberate  violations  of  the  law  or  gross
negligence. Any and all further liability is hereby waived.

"ICC" cannot be liable for damages resulting from governmental actions  of
any kind.  It can also not be held liable for damages due to the failure of
collecting  funds  from Banks and institutions who are  not  meeting  their
commitments.

- 5 -

ARTICLE VIII    Cancellation, Venue

1.    This  agreement  can be cancelled by each of the parties with  a  six
months notice. Pending projects which are consumated within a year of
cancellation are still subject to this agreement.

2.    This  agreement  is  to be administered under  Swiss  law  only.  All
disputes arising out of or in connection with the present  agreement,
incuding disputes on its conclusion,  binding effect,  amendment  and
termination,  shall  be  resolved,  to the exclusion of  the  ordinary
courts  by  a sole arbitrator in accordance  with  the  International
Arbitration Rules of the Zurich Chamber of Commerce.


Zurich, .14 MAY 1992.


ICC:                                    MMK:


.................................       ......................................

INVICO CAPITAL CORPORATION Ltd.         Mr. Michael McKenzie
                                        Representing the McKenzie
                                        Group of Companies

29

BY MR SMITH:

Q.   Do  you have before you a copy of what we have marked here as Exhibit 1, Mr Schlegel?

A.   Yes.

Q.   All right.  This is an agreement and it's between Michael McKenzie representing the McKenzie companies and Invico Capital Corporation dated May 14, 1992, is that correct?

MR MACDONALD:  (To the witness)  Do  you want him to reread the question?

THE WITNESS:  Yes, please.

THE REPORTER:  Yes, certainly.

MR SMITH:  Exhibit --

MR MACDONALD:  She can reread it.  He was reading something.

MR SMITH:  OK.

MR MACDONALD:  He wasn't listening to you.

BY MR SMITH:

Q.   Exhibit 1, am I correct, is an agreement between Michael McKenzie representing the McKenzie companies, 7880 San Felipe Road, and Invico Capital Corporation, dated May 14, 1992?

A.   That's correct.

Q.   And what you have given to  me, MrSchlegel, is the original document and that bears your signature,

30

1    it that correct?

2         A.    That is correct.

3         Q.    And does that bear Mr Michael McKenzie's

4    signature?

5         A.    That is correct.

6         Q.    Was this signed in your presence?

7         A.    I do not know anymore.  That was 9 years

8    ago.

9         Q.    OK.  But you have had this agreement in

10   your hand for at least 9 years and there has not been

11   any rescission or cancellation that you're aware of?

12             MR MACDONALD:  You mean by McKenzie?

13             MR SMITH:  By McKenzie.

14             THE WITNESS:  That's correct.  There's

15   nothing in writing, no.

16   BY MR SMITH:

17        Q.    All right.  And is it true that, pursuant

18   to this agreement, you did serve in advising the

19   financial structuring, to work with financing,

20   coordinate tax and legal matters, on behalf of the

21   McKenzie companies in Switzerland?

22        A.    Well, Mr McKenzie and Stephen Jeu were in

23   Switzerland and they started this international group,

24   and within the legal situation in United States they

25   wanted to use a Dutch company, which every big market

15

1    correctly -- please correct me if I'm wrong -- a

2    trustee, under Swiss law, is one who does or does not

3    take legal title?  Does take legal title?

4         A.    It does not, it takes -- it's a trustee

5    function taking title.

6         Q.    OK, I understand.  I understand.  All

7    right.  Is there any government licensing required to

8    serve as a trustee?

9         A.    No, sir.

10        Q.    Any kind of government reporting?

11        A.    No, sir.

12        Q.    Is there a distinction between serving as a

13   trustee and serving as an administrator?

14        A.    Not often, no, because as a trustee -- and

15   you will see from the contracts, the administration

16   contracts that we have, it's basically a combination of

17   both.

18        Q.    All right.  In either event, as the trustee

19   or as an administrator, do  you have any independent

20   discretion or do you act solely at the discretion -- at

21   the direction of your client?

22        A.    We act under direction of the client;

23   I think this is in all our contracts.  So that's, you

24   see, a difference between an Anglo-Saxon trust and what

25   I described beforehand.

34

1   date of Exhibit 1?

2           A.   I'm not aware of that.

3           Q.   Did you participate, you or Invico

4   participate in any way in the joint venture creation

5   known as the PTM, Pol-Tex Methane SP ZOO?

6           A.   That was before my time.

7           Q.   It was already in existence?

8           A.   Everything was in existence, yes.

9           Q.   In dealing with the McKenzie companies, did

10  you deal with anyone other than Mike McKenzie?

11          A.   We had contact with Jim.  He was the man

12  responsible for the financing.  Jim McKenzie.

13          Q.   Tim McKenzie?

14          A.   Tim.  Tim.  Tim McKenzie, yes.

15          Q.   All right.

16          A.   Yes.

17          Q.   Any contacts with Steve McKenzie?

18          A.   Steve McKenzie was also once in

19  Switzerland.  We didn't have much contact with him.

20          Q.   Did you participate in any way in obtaining

21  loans from Bertil Nordling?

22          A.   Yes.  We were the administration partner of

23  the situation with Mr Nordling.

24          Q.   I don't understand.

25          A.   Mr Nordling and Mr McKenzie had this joint

35

1    venture and they insisted that we would be the
2    administrator.
3         Q.   OK.  And what was the name of that joint
4    venture, do  you remember?
5         A.   Just -- they just tried to form this
6    company and that the -- because of the tax situation,
7    the company wasn't formed.  And then, at that stage,
8    I think Nordling stopped paying or he disappeared for a
9    bit.
10        Q.   All right.  This joint venture, was it
11   intended to have anything to  do with the --
12        A.   Pol-Tex.  With the Poland situation, yes.
13        Q.   With the Poland situation?
14        A.   Yes.
15        Q.   OK.  And your understanding -- you were the
16   administrator for what was to be this joint venture
17   between the two of them, is that correct?
18        A.   That's correct.
19        Q.   And were you to create another company for
20   the --
21             MR MACDONALD:  Could we just get
22   clarification that, when you say "you", it's Invico
23   collectively?
24             MR SMITH:  It's collectively.
25             MR MACDONALD:  You're either saying "you"

37

1   Invico was to serve as an administrator for this joint

2   venture to be created by Bertil Nordling and

3   Mike McKenzie?

4        A.   Yes.   When I say joint venture, that

5   obviously leads and can lead into a limited company,

6   yes.

7        Q.   OK.   What's the difference between a joint

8   venture and a limited company?

9        A.   A joint venture is when you and I do

10   something together, and today we do it together and the

11   name of this joint venture and that's it.   With a

12   limited company, you are the shareholder of the

13   company, I am a shareholder of the company.

14        Q.   OK.   Was it the intent, as you understood

15   it, of this joint venture to become a limited company?

16        A.   Yes.

17        Q.   Were you in fact, you Invico, in fact to

18   create this limited company?

19        A.   Yes.

20        Q.   Is an NV a limited company?

21        A.   That's correct.

22        Q.   What is the difference between an NV and a

23   BV?

24        A.   Yes.   Another reason why they had two

25   companies, in Holland, at that time, they changed the

# Attachment to Document 852

Whilst looking through the archives for the requested (during the deposition) bank account statement of MCK Development BV. at the Bilfinanz und Verwaltung AG I came across some records regarding Mr. Bertil Nordling which gave me a chance to refresh my memory on INVICO'S first contacts with Mr. Nordling which took place over 12 years ago. I found amongst other correspondence the attached documentation which may clarify some questions. Going through the Nordling records enabled me to recall matters that took place such a long time ago which were not present with me when answering 741 / Lines 17 and 22, 804 Lines 9 and 22, which I would like to correct and clarify. I have now seen that INVICO had a consultancy agreement with Mr. B. Nordling dated 15.03.1991 and I came across some invoices that were raised for services to structure his German real estate activities. I also saw correspondence regarding the sulphur mine in Poland which I mentioned in 803 Line 23. After Mr. Nordling stopped funding the Poland project the relationship started to fizzle out and only some small administrative work was left and afterwards INVICO lost sight of him and his whereabouts are unknown to me.

ZURICH, July 4th 2001

EXHIBIT C

## TELECOPY

April 7, 1992

*KOPIE
au
Hrn. Nordling
21. Charles Street
gesandt
10.4.*

TO:        Rolf Schlegel
                Invico Capital Corporation AG
                Zurich, Switzerland
                011-41-1-2210280

FROM:     Douglas B. Glass
                Vinson & Elkins L.L.P.
                (713) 758-2346

RE:         McKenzie/Nordling

      Attached is a letter intended for Bertil Nordling. Again, would you please pass this letter along to Mr. Nordling either in person, by fax or orally. Thank you for your courtesies.

                    Regards,

                    Douglas B. Glass

0353:2361
Enclosure

cc:     Stephen Jeu
        Mike McKenzie
        McKenzie Methane
        (713) 972-3300

0353:2361:04/09/92
f:\dg0353\mck469\intern7schlegel.tlx

# AGREEMENT

between

| | |
|---|---|
| Michael McKenzie | "M.M." |
| 7880 San Felipe Road | Trustor |
| Suite 100 | |
| Houston | |
| Texas 77063 | |
| U.S.A. | |

and

| | |
|---|---|
| Bertil Nordling | "B.N." |
| 9, Vane Close | Trustor |
| London, NW3 | |
| England | |

and

| | |
|---|---|
| Invico Capital Corporation | "I.C.C" |
| Storchengasse 7 | Trustee |
| CH-8022 Zürich | |

1.

Michael McKenzie and Bertil Nordling have agreed on 7th June 1991 to cooporate in exploiting possible methane gas deposits in Poland and, in order to exploit these concessions, to form a corporation - McKenzie Methane Poland B.V.  Whereas McKenzie is contributing to this company certain exploitation rights and concessions in Poland, Bertil Nordling is contributing to the company funds to finance part of the work.  Other funds may be obtained through credits, debt equity swap or other financing.

2.

Both parties have installed a control mechanism regarding the distribution of the funds by asking Invico Capital Corporation in Zürich as the trustee of the two parties concerning the payment of the funds.

3.  Invico Capital Corporation will be asked to act as trustee to distribute the payments as per joint instructions of the two parties.  For this purpose,  M.M. and B.N. will countersign any payment instructions before I.C.C. is enpowered to execute the corresponding payments.

4.

Both parties agree that no payment must be made by I.C.C. unless each of parties confirms payment in writing.  Authorized to give instructions are: Mr. Michael McKenzie, Houston and Mr. Bertil Nordling, living in Vane Close, London.  Each party is, however, allowed to appoint representatives who are empowered with the correct legal instruments to sign on their behalf.

5.

A servicing fee is payed to I.C.C. for these trustee and administrative and support activities which include financial advice, negociations of credit contracts with the Swiss banks, servicing of the accounts of the company as well as the accounting of MMP B.V. and the liaison between the partners. MMP B.V. will pay a servicing fee of the incoming funds deposited to MMP B.V. or any associated unit based on the following schedule:

| TRANSACTION AMOUNT | FEE |
|---|---|
| less than or equal to $ 5 Mio | 1% |
| $ 5 - 10 Mio | 1/2% |
| over 10 Mio | 1/4% |

on a transaction by transaction basis.

6.

This agreement can be cancelled by each of the parties with a three months' notice.  Corresponding notice will be given to the banks to cancel the signatures of authority.  Pending projects which are consumated within a year of cancellation are still subject to this agreement.

- 3 -

7.

Swiss law is applicable and the courts of <u>Zurich 1</u>.

The Trustor:

<u>Michael McKenzie</u>

................................

Mr. Michael McKenzie

The Trustor:

................................

Bertil Nordling

The Trustee:

<u>Invico Capital Corporation</u>

................................

R. Schlegel

671

1    business of Invico?

2         A.    That is correct.

3         Q.    And they included a number of documents

4    that were addressed to or addressed -- addressed to or

5    sent from Invico and you have identified each and every

6    one of those as being received in the ordinary course

7    of business, maintained in the ordinary course of

8    business?

9         A.    That is correct.

10        Q.    And these documents that you have and you

11   have produced today were made at or near the time

12   indicated on the documents?

13        A.    That is correct.

14        Q.    And in the case of summarizations, such as

15   the list of promissory notes, those were prepared from

16   documents, original documents, within the files of

17   Invico?

18        A.    Original documents or transactions that we

19   know of, yes.

20        Q.    Thank you.  They were -- and it was the

21   regular practice of Invico to so maintain these

22   records?

23        A.    We do indeed.

24        Q.    Thank you.  I have one other question.  Are

25   your answers to the questions today asked by Mr Burgess

39

1              THE WITNESS:  Of 1992.  And I must come

2    back to your questions.  You asked me on this.  It was

3    dated 14th May 1992.  Okibi was incorporated on

4    14th February.

5    BY MR SMITH:

6         Q.   Of '92?

7         A.   And you asked me have you formed the

8    company beforehand?  I see this company was formed in

9    February 1992.

10        Q.   And you participated in that formation?

11        A.   With the people, yes, instructing, yes.

12        Q.   OK.

13        A.   Then we have all the instructions.

14        Q.   Then you have the other instructions?

15        A.   Yes.

16        Q.   OK.  Did you, as the administrator for this

17   joint venture between Mr McKenzie and Bertil Nordling,

18   receive any of the monies that were paid by

19   Mr Nordling?  You said he quit paying, did he make some

20   payments?

21        A.   Yes, he did.

22        Q.   Do you remember approximately how much?

23        A.   Yes.  $3.9 million, the famous figure.

24   I think it was $3.9 million.

25        Q.   And who received the $3.9 million?

41

1      Q.   I'm sorry, what?

2      A.   Ah, no.  No, that's Nordling's private

3 account.  I have a list of the payments that have been

4 made.

5      Q.   All right.

6      A.   That is correct, yes.  There was not a

7 specific account as far as I can remember.  It's a long

8 time ago.

9      Q.   Nordling ceased paying you said?

10     A.   Yes.

11     Q.   What happened to the joint venture, was it

12 then terminated?

13     A.   Well, as far as I remember, McKenzie just

14 continued on his own.

15     Q.   Right.  OK.  Did you receive, did Invico

16 receive, a commission for the Nordling payments?

17     A.   Yes, we did.

18     Q.   I need for you now to pull the original of

19 what we discussed as RS256 to 260 which would be the

20 trust agreement for the creation of Okibi.

21     A.   2?

22     Q.   Yes, 256 to 260.  It's dated March 3, 1992.

23     A.   Do you need to see the original?

24     MR SMITH:  Yes, I do.

25     (To the reporter)  Would you mark this as

17

1          Q.    How are you familiar with that company?

2          A.    I was familiar with it at a later stage,

3    say 1993.   There's a lot of -- Pol-Tex was the company

4    which developed, in Upper Silesia, Methane Gas

5    Developments.

6          Q.    All right.   Are you familiar with a company

7    known as MCK Development BV?

8          A.    Yes, sir.

9          Q.    Did you help create MCK Development BV?

10         A.    Invico gave instructions to a company, to a

11   lawyer, to form the company.

12         Q.    Do you know which lawyer that was?

13         A.    MCK Development, that's -- yes, that's

14   Caron & Stevens.   My question was only because I didn't

15   know whether it was formed -- no, it was Caron &

16   Stevens.   You have the materials in here.

17         Q.    Are you familiar with a company by the name

18   of McKenzie Methane Poland BV?

19         A.    Yes, sir.

20         Q.    Did you have any participation in,

21   involvement in, creating that company?

22         A.    Yes.   It was created -- again we have been

23   asked to create a company.

24         Q.    And who asked you to create that company?

25         A.    That's McKenzie, Mr McKenzie.

18

1      Q.   Michael McKenzie?

2      A.   Yes.

3      Q.   Is that true also of MCK Development BV,

4 was that created at the request of Michael McKenzie?

5      A.   That's correct, yes.

6      Q.   Are you also familiar with a company by the

7 name of Claron -- no, I'm sorry: Okibi, O-k-i-b-i, NV?

8      A.   Yes, sir.

9      Q.   And did you have any participation in

10 creating Okibi NV?

11      A.   Invico gave instructions or asked the

12 company to form Okibi.

13      Q.   Was that at the request of

14 Michael McKenzie?

15      A.   Yes.

16      Q.   Isn't it true that Invico served as the

17 trustee of Okibi NV?

18      A.   There is a trust agreement which is,

19 I think, Exhibit 1A.

20      Q.   Yes.  I'm really just trying to give just

21 an overall picture right now.

22      A.   Yes.

23      Q.   But there is a trust agreement involving

24 the creation of Okibi NV?

25      A.   Yes.

80

1   succeed you?

2        A.    Somebody.  I don't know.  Mr McKenzie or

3   whoever, I don't know.

4        Q.    Am I correct that the owners of MCK are the

5   ones responsible for the appointment of a director?

6        A.    That is usually the case in a limited

7   company, that shareholders decide on their directors.

8        Q.    And when you stepped down in March of '96,

9   the shareholders were still Okibi, Claron and yourself,

10  at least securitywise you?

11       A.    I had no other information in that

12  direction, correct.

13       Q.    Did you participate in the creation of

14  McKenzie Methane Poland BV?

15       A.    The company gave instructions to a lawyer

16  in a big law company in Holland to form MMP BV, yes.

17       Q.    And the company being Invico?  You said the

18  company gave instructions.

19       A.    Invico, yes.  Yes.

20       Q.    And at whose direction was MMP BV to be

21  created?

22       A.    Mr McKenzie.

23       Q.    Why did you need two tiers?

24       A.    We needed two tiers because of the --

25  I think it's called sub-part situation in America at

78

1      Q.   OK.  And is that the one guilder

2  acquisition?

3      A.   No, that's -- no, that's, I think, a normal

4  price acquisition.  That was because of being a

5  director I had those shares, bought them from Okibi and

6  gave them back to them again.

7      Q.   All right.

8      A.   So it was just as a security as a director.

9      Q.   Did you do the same with Claron or was it

10  just with Okibi?

11      A.   It was just Okibi.

12      Q.   All right.  So if, at this stage of the

13  game when MCK was created, 49 per cent was held by

14  Okibi, the other 51 per cent then was held by MMP Co?

15      A.   Yes.

16      Q.   And at that time the asset of MCK initially

17  was the ownership of PTM?

18      A.   I wouldn't know anymore.  It was created --

19  MCK was created to  own MMP BV

20      Q.   All right.  From the outset, when MCK was

21  first created, do you know who served as its director

22  or directors?

23      A.   MCK, Mr McKenzie.

24      Q.   He served as sole director for a number of

25  years, did he not?

79

1        A.    Yes.

2        Q.    When that changed, who became the director

3    or co-director?

4        A.    Of MCK?

5        Q.    Yes, sir.

6        A.    I became director I think in January 1995.

7        Q.    Were you sole director?

8        A.    Yes.

9        Q.    So for the period of time through

10   October 31st, 1995, from the creation to October 31st,

11   the only directors were, first, Mike McKenzie and then

12   you?

13       A.    Can you come with the dates again?

14       Q.    Sure.  From creation -- when did you step

15   down?

16       A.    On 23rd March 1996.

17       Q.    OK.  From beginning to your end were you --

18   was Mike McKenzie the sole director followed by you as

19   a sole director?

20       A.    Yes, correct.

21       Q.    Do you know who succeeded you?

22       A.    Mr Ulrich.

23       Q.    Armando Ulrich?

24       A.    Armando Ulrich.

25       Q.    Do you know who appointed Mr Ulrich to



**EXHIBIT**
2
April 18, 2001

# TRUST   AGREEMENT

between

Riseparc Trust, represented by

Harven Michael McKenzie                          as Trustor
2222 Country Club Blvd.
Sugar Land
Texas 77478 U.S.A.

and

INVICO CAPITAL CORPORATION Ltd.                  as Trustee
Storchengasse 7
8001 Zürich

<u>Preamble</u>

The Trustor owns 49% of the shares of MCK Development B.V. (MCK Dev), a holding company which, in turn, owns a majority of the shares of McKenzie Methane Poland B.V. "in formation", Herengracht 320, 1016 CE Amsterdam (NL). McKenzie Methane Poland B.V. is involved in methane gas exploration, as well as marketing, production, and other related activities pertaining to projects in Poland. The Trustor hereby authorizes the Trustee to exercise Trusteeship of this investment. This agreement governs the fiduciary responsibilities of the Trustee with respect to the securing the property and interests of the Trustor in MCK Dev. The administration of MCK Dev will be covered in a separate mandate agreement.

- 2 -

## Article 1

The Trustor authorizes the Trustee,  in its own, but for the account of and at the risk of the Trustor to form a corporation in the Netherland Antilles namely OKIBI S.A. N.V. which shall buy 49% of the share capital of MCK Dev, which is to be held in fiduciary trust on behalf of the Trustor.

## Article 2

The Trustor affirms its knowledge and full approval of both the  conditions of  the contract for the purchase of 49% of MCK Dev and the  activities  of MCK Dev.

## Article 3

The  authority  and  responsibility of the Trustee  becomes  effective  only after  the  Trust  Agreement  is signed by both  parties  and  after  funds sufficient  to  carry out  this mandate are placed  by  at  the  Trustee's disposal by the Trustor.

## Article 4

The Trustee agrees that any and all actions,  including with respect to the Antilles  Corporation,  it  may  take  pertaining  to  control,  direct  or indirect,  over  the  49% ownership of MCK Dev,  or  any  portion  of  this ownership, such as selling, transferring, pledging of shares (including the shares  of  the Antilles Company) as security,  and any  actions  in  legal proceedings  relating  to this ownership or rights associated  thereto,  in particular  voting  rights,  will be undertaken  only  in  accordance  with instructions given to it by the Trustor or parties acting with legal  power of attorney from the Trustor.

## Article 5

The Trustee agrees that it will distribute any and all profits,  dividends, additional  shares  issued  in the future,  and  any  other  consideration, including  proceeds  of liquidation,  which it receives as a result  of  its ownership stake in MCK Dev,  in accordance with instructions given to it by the Trustor.

## Article 6

The  Trustee  pledges that it will discharge its  Trusteeship  function  in conformity with Swiss law and good business practice.

## Article 7

In fulfilling its responsibilities as Trustee, the Trustee will follow all written instructions (letter, telex, fax) of the Trustor. In the absence of instructions from the Trustor, the Trustee has the right, but not the obligation, to make decisions without such instruction in cases which, in the Trustee's judgment, the best interests of the Trustor are served by acting without delay.

## Article 8

The Trustee will administer trusted assets and fulfill its responsibilities as trustee with the appropriate care and diligence required. The Trustee, however, can only be held liable for its actions which were deliberate violations of the law or gross negligence. Any and all further liability is herby waived.

## Article 9

In particular, the Trustee is not liable for damages resulting from governmental actions of any kind. It can also not be held liable for damages due to the failure of collecting claims from third parties unless it clearly disregarded given instructions. The Trustee is furthermore not liable for communication errors or delays nor can it be held liable for failure to recognize forgeries, for example, pertaining to the authority or legitimacy of the Trustor.

## Article 10

The Trustee agrees to keep the Trustor's identity and this Trusteeship Agreement secret, unless he is legally required (in particular, due to Swiss Tax Law) to disclose such. The Trustor agrees likewise to this secrecy agreement.

## Article 11

The Trustor will undertake to ensure that the Trustee and its employees do not suffer any damages in the course of fulfilling this Trusteeship. This applies particularly to taxes and fees of any kind as well as payments for the purchase of shares. The Trustor further agrees hereby to fully compensate the Trustee without delay or objection for all direct or indirect claims made upon it or its employees in connection with carrying out the Trusteeship, to support the Trustee in any disputes with third parties and, at the request of the Trustee, to handle such disputes by themselves. The Trustee must give proper advice to the Trustor on any such claims, disputes and allow the Trustor the opportunity to remedy or clarify the disputes.

- 4 -

Should the Trustor fail for any reason to so compensate or support the Trustee, the latter is allowed to use the trusteed assets to defend or reimburse itself against such claims. In the absence of full support and compensation from the Trustor or availability of trusted assets, the Trustee is relieved of any responsibility to defend the interests of the Trustor vis à vis the third parties and of the secrecy obligation under Article 10.

Article 12

As consideration for carrying out the Trusteeship, the Trustee will receive an annual commission from the Trustor, payable in advance, which shall equal the greater of (a) 2% of the periodic dividends from the trusteed assets or (b) the sum of o.2% of the trusteed assets or (c) SFR. 12'000.-- but in any case not more than SFR. 300'000.-- .

In addition the Trustor will reimburse the Trustee for the time spent by the Trustee in fulfilling the Trusteeship, in accordance with the standard fee schedule of the Trustee. Furthermore, the Trustee will also be reimbursed by the Trustors for all out of pocket expenses and payments to third parties which arise in the course of carrying out the Trusteeship.

Article 13

The Trustor bears ultimate responsibility for all actions, individually and collectively, taken by the Trustee in accordance with the fulfillment of its responsiblities under this agreement. All assets retained by the Trustee in connection with the Trusteeship may be used by the Trustee, if necessary, to offset all expenses it incurs as Trustee and to meet the claims of the third parties provided that there is proper notice and opportunity to remedy.

Article 14

This agreement may be terminated by either party upon six months prior written notice presented at quarter's end. If the Trustor should fall more than two months behind in its payments as required under Article 11 or 12 hereof, then the Trustee has the right to immediate termination, of which notice shall also be in writing.

Article 15

This agreement is to be administered under Swiss Law only.

- 5 -

All disputes arising out of or in connection with the present agreement, including disputes on its conclusion, binding effect, amendment and termination, shall be resolved, to the exclusion of the ordinary courts by a sole arbitrator in accordance with the International Arbitration Rules of the Zurich Chamber of Commerce.

The Trustee may also undertake legal proceedings to secure its rights hereunder in the jurisdiction of the Trustor or anywhere else, however Swiss Law shall continue to govern the agreement in such cases as well.

Zurich, *March 3rd 1992*

Trustee:

INVICO CAPITAL CORPORATION Ltd.

Trustor:

Riceparc Trust
Mr Harven Michael McKenzie

18

1        Q.    Michael McKenzie?

2        A.    Yes.

3        Q.    Is that true also of MCK Development BV,

4    was that created at the request of Michael McKenzie?

5        A.    That's correct, yes.

6        Q.    Are you also familiar with a company by the

7    name of Claron -- no, I'm sorry: Okibi, O-k-i-b-i, NV?

8        A.    Yes, sir.

9        Q.    And did you have any participation in

10   creating Okibi NV?

11       A.    Invico gave instructions or asked the

12   company to form Okibi.

13       Q.    Was that at the request of

14   Michael McKenzie?

15       A.    Yes.

16       Q.    Isn't it true that Invico served as the

17   trustee of Okibi NV?

18       A.    There is a trust agreement which is,

19   I think, Exhibit 1A.

20       Q.    Yes.  I'm really just trying to give just

21   an overall picture right now.

22       A.    Yes.

23       Q.    But there is a trust agreement involving

24   the creation of Okibi NV?

25       A.    Yes.

42

1   Exhibit 2, please.

2                               (Exhibit 2 was marked

3                               for identification)

4   BY MR SMITH:

5        Q.   Do you have before you, Mr Schlegel, the

6   copy of what we have marked as the original, Exhibit 2?

7        A.   Yes, I do.

8        Q.   This is a trust agreement dated

9   March 3rd, 1992, and is this bearing the original of

10  your signature and that of Mr McKenzie?

11       A.   It does.

12       Q.   And do the pages bear your initials at the

13  bottom of each, plus that of Mr McKenzie?

14       A.   Yes.

15       Q.   With the exception of the last page.  Now,

16  this is for the -- I'm going to need either that

17  back or the --

18            MR MACDONALD:  Why don't we give him the

19  original.  (Document handed)

20            MR SMITH:  Thank you.

21  BY MR SMITH:

22       Q.   Am I correct that this is a trust agreement

23  between Riseparc, R-i-s-e-p-a-r-c, Trust represented by

24  Harven Michael McKenzie, and Invico Capital

25  Corporation?

43

1        A.    Yes.

2        Q.    What is Riseparc Trust?

3        A.    Riseparc Trust did not exist.

4  Riseparc Trust was just a name of maybe a future

5  structure or whatever, but this really means nothing.

6        Q.    All right.  Your dealings were with

7  Mike McKenzie?

8        A.    Yes.

9        Q.    This calls for the creation of a company

10 known as Okibi SA NV?

11       A.    Yes.

12       Q.    And am I correct that you were directed to

13 prepare or create Okibi SA NV?

14       A.    Yes.

15       Q.    And did you cause the creation of Okibi SA

16 NV?

17       A.    Yes.  Invico  gave instructions to a company

18 in Antilles to form Okibi.

19       Q.    And was it created?

20       A.    Yes, sir.

21       Q.    And it also directs Invico to use Okibi to

22 acquire 49 per cent of MCK Development?

23       A.    Yes.

24       Q.    And did Invico in fact do that?  Did it

25 acquire, in the name of Okibi, 49 per cent of the share

44

1    capital of MCK Development?

2            A.    Yes, Okibi formed MCK Development.

3            Q.    And is it true also that, once formed,

4    Invico did in fact hold in fiduciary trust on behalf of

5    Mike McKenzie the 49 per cent share of MCK Development?

6            A.    Yes, we did, held it in custody.   In

7    custody.

8            Q.    OK.   In custody?

9            A.    Yes.

10           Q.    That's different from in trust?

11           A.    Yes.

12           Q.    What's the difference?

13           A.    In custody you have them in your office,

14   and in trust is if you basically have power over them.

15           Q.    OK.   Now, by having in custody, you in fact

16   had possession of the bearer shares of Okibi, did you

17   not?  Is that what you meant by "in custody"?

18           A.    No.   Custody, as it says here clearly in

19   Article 4, all voting rights, et cetera, "... will be

20   undertaken only in accordance with instructions

21   given ... by the Trustor ..."  So in other words you

22   are not, according to the English sense, a trustee.

23           Q.    OK.   OK.   So that's the difference that

24   you're trying to  make there, is that you were a

25   custodian and not a trustee?



INVICO
CAPITAL CORPORATION AG

Kirchgasse 24
Postfach 4754
CH-8022 Zürich

Telefon 0041-1-261 72 11
Telefax 0041-1-261 72 88

Mr Mike McKenzie
7880 San Felipe Road
Suite 100
Houston
Texas 77063 / USA

Zurich, 17. September 1993
SR/psc

## *I N V O I C E*                     Re 93054

---

**OKIBI N.V.**

EXHIBIT
131
April 20, 2001

Formation of company                  sFr.  5'000.--

Administration, service and
communication fee                     sFr. 12'000.--

sFr. 17'000.--
========

Payment via SKA, Paradeplatz 8, CH-8001 Zürich, account no. **276439-21** (SFr.)

RS00299

587

1                                (Exhibit 131 was marked

2                                for identification)

3          Q.    I'm going to show you Exhibit 131 and ask

4    you to identify that?

5          A.    That's the formation of Okibi, the costs.

6          Q.    And is that a bill issued to Mr McKenzie?

7          A.    A bill issued to Mr McKenzie and it was

8    paid.

9          Q.    All right.

10                                (Exhibit 132 was marked

11                                for identification)

12               And then 132?

13         A.    That is an administration fee paid on

14   September 17th, 1993.

15         Q.    And that's addressed to Mr McKenzie?

16         A.    That's addressed to Mr McKenzie.

17         Q.    What's the administration fee for, of what?

18         A.    Of one of the companies.  That's 12,000 as

19   per trust agreement of 3rd March 1992.

20                                (Exhibit 133 was marked

21                                for identification)

22         Q.    I will show you what has been marked as

23   Exhibit 133 and ask -- (Referring to another document):

24   Is that an original?

25         A.    Yes.

OKIBI N.V.



EXHIBIT
3
April 18, 2001

INCORPORATED UNDER THE LAWS OF THE NETHERLANDS ANTILLES
ESTABLISHED IN CURAÇAO

STOCK CERTIFICATE NO: 1 SHARES NOS: 1 THROUGH 6000

This is to certify that Bearer is entitled to (sixthousand)
6000 common shares, having a par or nominal value of
ONE DOLLAR (US$ 1.00) United States currency each and fully
paid of the capital stock of:

OKIBI N.V.

a corporation organized under the laws of the Netherlands
Antilles by notarial deed executed by civil law notary D.M.
Senior in Curaçao, on the 14th day of February 1992, the text
of this deed having been approved by the Minister of Justice
of the Netherlands Antilles on the 14th day of February 1992,
by Decree number 3419/N.V.; this stock certificate and shares
being subject in all respect to the terms and conditions set
forth in the said notarial deed of incorporation of
OKIBI N.V.

AUTHORIZED CAPITAL US$ 30,000.00

divided into 30,000 shares each of US$ 1.00

IN WITNESS WHEREOF, OKIBI N.V., has caused this certificate
to be signed by its Managing Director on this 12th day of
March 1992.

LEEWARD TRUST COMPANY N.V.
Managing Director

Original erhalten
fin Kleiner found.
10.5.95

EXHIBIT 3

RS00163

53

1    BY MR SMITH:

2         Q.    I'm going to show you Exhibit 3 and ask you

3    if you can identify that, please?

4         A.    Yes, I can.

5         Q.    What is that?

6         A.    This is a stock certificate.   Its stock

7    certificate number 1, shares 1 to 6000, of Okibi NV.

8         Q.    To your knowledge -- let me ask you this:

9    did Invico hold this stock certificate from the

10   inception of the company?

11        A.    More or less, yes, as custody.

12        Q.    In custody?

13        A.    Yes.

14        Q.    OK.  And these are bearer shares, are they

15   not?

16        A.    That's correct.

17        Q.    And you held these until on or about

18   May 8th, 1995?

19        A.    That's correct.

20        Q.    And on May 8th, 1995 it's my understanding

21   that you transferred this -- you didn't transfer it,

22   you delivered it to Petenes Foundation?

23        A.    That's correct, yes.

24             MR TATE:  So this is a copy of the share

25   certificate?

# CERTIFICATE OF DEPOSIT



The undersigned:

hereby certifies and confirms:

1) to have received to keep in safe custody one (1) share certificate nos.
   1 representing 6'000 bearer shares in the corporation

                        OKIBI N.V.

   established in Curaçao having its registered office at Kaya Flamboyan
   3d, Willemstad, Curaçao, of which corporation Leeward Trust Company
   N.V. is the managing director.

2) to have been entrusted with full and unrestricted power to represent
   the beneficial owner(s) of the abovementioned shares and to give voting
   instructions on his behalf at general meetings of shareholders.

3) that the real parties in interests on whose behalf and for whose
   account he holds the aforementioned share certificate(s) are of good
   character and of sound credit standing.

4) to notify Leeward Trust Company N.V. immediately of any event which may
   result in the power of attorney referred to herinabove sub 2), being
   withdrawn or another wise terminated and, in default of any such
   notification to hold Leeward Trust Company N.V. harmless and to
   forthwith reimburse Leeward Trust Company N.V. any damages and costs
   incurred as a consequence thereof, and

5) to hold said share certificates as custodian and to forthwith notify
   Leeward Trust Company N.V. if the shares are delivered to any party or
   physical possesion of the shares is lost, and

6) to deliver and grant unto Leeward Trust Company N.V. or its nominee the
   necessary proxies it may require to keep the company in goodstanding in
   the Netherlands Antilles.

Name of custodian:            INVICO CAPITAL CORPORATION AG            EXHIBIT 39

                                        INVICO
                              Capital Corporation AG
                                   Postfach 4784
Signature of custodian:            CH-8022 Zürich

                                                                    RS00162

                              2 9. 6. 93            RS-ANC 00138

62

1    that?

2           A.    That's correct.

3           Q.    And did he mail that back to you?

4           A.    I wouldn't know anymore.

5           Q.    And we will look at the break then for

6    the -- that bearing the original of his signature in

7    handwriting in the lower right-hand corner.  Do you

8    think --

9           A.    If I have it here, otherwise I will have to

10   provide it.

11          Q.    All right.

12          A.    It is available.

13          MR SMITH:  Thank you.  RS00162.  Would you

14   turn to  RS-- no, here it is.  That's number 4.

15                               (Exhibit 4 was marked

16                                for identification)

17   BY MR SMITH:

18          Q.    Mr Schlegel, is that your signature in the

19   lower right, in the lower half of that?

20          A.    That is correct.

21          Q.    And it bears a date of June 29th, 1993?

22          A.    That's correct.

23          Q.    Is that also in your handwriting?

24          A.    That is correct.

25          Q.    Now, this, if I understand correctly, this

63

1   is the certificate of deposit, meaning the -- you're

2   holding in custody the shares of stock?

3          A.   Yes.

4          Q.   And for whose benefit is this certificate

5   of deposit signed?

6          A.   I think it's held for the benefit of

7   Leeward Trust Company to administrate and manage the

8   affairs of Okibi NV.

9          Q.   All right.  But this is acknowledging the

10  custody by Invico of the 6,000 bearer shares of Okibi?

11         A.   That's correct.

12         Q.   And Leeward Trust Company, what is its

13  involvement with Okibi?

14         A.   Leeward Trust Company were the

15  administrator of the company in the Antilles.

16         Q.   I'm sorry.  Say that one more time.

17         A.   Leeward Trust Company were the

18  administrator of the Okibi in the Antilles.

19         Q.   Can you tell me what an administrator in

20  the Antilles means?

21         A.   They do the accounts; they make sure that

22  the company is of good standing; they coordinate with

23  the shareholders.

24         Q.   In this case their coordination with the

25  shareholder would be with Invico?

44

1  capital of MCK Development?

2          A.    Yes, Okibi formed MCK Development.

3          Q.    And is it true also that, once formed,

4  Invico did in fact hold in fiduciary trust on behalf of

5  Mike McKenzie the 49 per cent share of MCK Development?

6          A.    Yes, we did, held it in custody.  In

7  custody.

8          Q.    OK.  In custody?

9          A.    Yes.

10         Q.    That's different from in trust?

11         A.    Yes.

12         Q.    What's the difference?

13         A.    In custody you have them in your office,

14  and in trust is if you basically have power over them.

15         Q.    OK.  Now, by having in custody, you in fact

16  had possession of the bearer shares of Okibi, did you

17  not?  Is that what you meant by "in custody"?

18         A.    No.  Custody, as it says here clearly in

19  Article 4, all voting rights, et cetera, "... will be

20  undertaken only in accordance with instructions

21  given ... by the Trustor ..."  So in other words you

22  are not, according to the English sense, a trustee.

23         Q.    OK.  OK.  So that's the difference that

24  you're trying to  make there, is that you were a

25  custodian and not a trustee?

45

1      A.    Yes.

2      Q.    All right.  You said that Okibi created

3   MCK Development, what do you mean?  How did it do that?

4      A.    The documentation, again, is in here.  But

5   as far as I remember, and it's a long time ago, the

6   money went to Okibi.  Okibi then sent the money to

7   Holland to invest the capital, minimum capital, and

8   form the company.

9      Q.    All right.  OK.

10     A.    It was done very normal.  I mean there's

11  nothing specific about that.

12     Q.    And when you say the money was sent by

13  Okibi, do you mean that that was sent by Mike McKenzie?

14     A.    That is the only investment he ever made.

15                    (Laughter)

16     Q.    How much are we talking about?

17     A.    15/16 thousand dollars.

18     Q.    OK.  But that did come from

19  Michael McKenzie or one of his companies?

20     A.    Yes.

21     Q.    It states in Article 1 that the trustee

22  authorizes -- I'm sorry: "The Trustor" --

23  Michael McKenzie -- "authorizes the Trustee," --

24  Invico -- "in its own, but for the account of and at

25  the risk of the Trustor to form a corporation ..."



EXHIBIT
5
April 18, 2001

# TRUST AGREEMENT

between

Michael McKenzie                                    as Trustor
2222 Country Club Blvd.
Sugar Land
Texas 77478 U.S.A.

and

INVICO CAPITAL CORPORATION Ltd.                     as Trustee
Kirchgasse 24
CH-8001 Zürich

## Preamble

The Trustor plans to develop coalbed methane in Poland and wants to purchase a 51 % stake of MCK Development B.V. This company is involved in methane gas exploration as well as marketing, production, and other related activities pertaining to projects in Poland. The Trustor hereby authorizes the Trustee to exercise Trusteeship of this investment. This agreement governs the fiduciary responsibilities of the Trustee with respect to the securing the property and interests of the Trustor in MCK Development B.V., which owns a majority of McKenzie Methane Poland B.V. The administration of the companies will be covered in a separate mandate agreement.

- 2 -

## Article 1

The Trustor authorizes the Trustee, on its own, but for the account of and at the risk of the Trustor to form a corporation in the Netherland Antilles namely Claron N.V., which shall buy 51 % of the share capital of MCK Development B.V. (MCK), which is to be held in fiduciary trust on behalf of the Trustor.

## Article 2

The Trustor affirms its knowledge and full approval of both the conditions of the purchase costs of the shares of 51 % (MCK) and the activities of MCK.

## Article 3

The authority and responsibility of the Trustee becomes effective only after the Trust Agreement is signed by both parties and after funds sufficient to carry out this mandate are placed by at the Trustee's disposal by the Trustor.

## Article 4

The Trustee agrees that any and all actions, including with respect to the Antilles Corporation, it may take pertaining to control, direct or indirect, over the 51 % ownership of MCK, or any portion of this ownership, such as selling, transferring, pledging of shares (including the shares of the Antilles Company) as security, and any actions in legal proceedings relating to this ownership or rights associated thereto, in particular voting rights, will be undertaken only in accordance with instructions given to it by the Trustor or parties acting with legal power of attorney from the Trustor.

## Article 5

The Trustee agrees that it will distribute any and all profits, dividends, additional shares issued in the future, and any other consideration, including proceeds of liquidation, which it receives as a result of its ownership stake in MCK, in accordance with instructions given to it by the Trustor.

## Article 6

The Trustee pledges that it will discharge its Trusteeship function in conformity with Swiss law and good business practice.

## Article 7

In fulfilling its responsibilities as Trustee, the Trustee will follow all
written instructions (letter, telex, fax) of the Trustor. In the absence of
instructions from the Trustor, the Trustee has the right, but not the
obligation, to make decisions without such instruction in cases which, in
the Trustee's judgment, the best interests of the Trustor are served by
acting without delay.

## Article 8

The Trustee will administer trusted assets and fulfill its responsibilities
as trustee with the appropriate care and diligence required. The Trustee,
however, can only be held liable for its actions which were deliberate
violations of the law or gross negligence. Any and all further liability is
herby waived.

## Article 9

In particular, the Trustee is not liable for damages resulting from
governmental actions of any kind. It can also not be held liable for
damages due to the failure of collecting claims from third parties unless
it clearly disregarded given instructions. The Trustee is furthermore not
liable for communication errors or delays nor can it be held liable for
failure to recognize forgeries, for example, pertaining to the authority or
legitimacy of the Trustor.

## Article 10

The Trustee agrees to keep the Trustor's identity and this Trusteeship
Agreement secret, unless he is legally required (in particular, due to
Swiss Tax Law) to disclose such. The Trustor agrees likewise to this
secrecy agreement.

## Article 11

The Trustor will undertake to ensure that the Trustee and its employees do
not suffer any damages in the course of fulfilling this Trusteeship. This
applies particularly to taxes and fees of any kind as well as payments for
the purchase of shares. The Trustor further agrees hereby to fully
compensate the Trustee without delay or objection for all direct or
indirect claims made upon it or its employees in connection with carrying
out the Trusteeship, to support the Trustee in any disputes with third
parties and, at the request of the Trustee, to handle such disputes by
themselves. The Trustee must give proper advice to the Trustor on any such
claims, disputes and allow the Trustor the opportunity to remedy or clarify
the disputes.

- 4 -

Should the Trustor fail for any reason to so compensate or support the Trustee, the latter is allowed to use the trusteed assets to defend or reimburse itself against such claims. In the absence of full support and compensation from the Trustor or availability of trusted assets, the Trustee is relieved of any responsibility to defend the interests of the Trustor vis à vis the third parties and of the secrecy obligation under Article 10.


Article 12

As consideration for carrying out the Trusteeship, the Trustee will receive an annual commission from the Trustor, payable in advance, which shall equal the greater of (a) 2% of the periodic dividends from the trusteed assets or (b) the sum of o.2% of the trusteed assets or (c) SFR. 12'000.-- but in any case not more than SFR. 300'000.-- .

In addition the Trustor will reimburse the Trustee for the time spent by the Trustee in fulfilling the Trusteeship, in accordance with the standard fee schedule of the Trustee. Furthermore, the Trustee will also be reimbursed by the Trustors for all out of pocket expenses and payments to third parties which arise in the course of carrying out the Trusteeship.


Article 13

The Trustor bears ultimate responsibility for all actions, individually and collectively, taken by the Trustee in accordance with the fulfillment of its responsiblities under this agreement. All assets retained by the Trustee in connection with the Trusteeship may be used by the Trustee, if necessary, to offset all expenses it incurs as Trustee and to meet the claims of the third parties provided that there is proper notice and opportunity to remedy.


Article 14

This agreement may be terminated by either party upon six months prior written notice presented at quarter's end. If the Trustor should fall more than two months behind in its payments as required under Article 11 or 12 hereof, then the Trustee has the right to immediate termination, of which notice shall also be in writing.


Article 15

This agreement is to be administered under Swiss Law only.

- 5 -

All disputes arising out of or in connection with the present agreement, including disputes on its conclusion, binding effect, amendment and termination, shall be resolved, to the exclusion of the ordinary courts by a sole arbitrator in accordance with the International Arbitration Rules of the Zurich Chamber of Commerce.

The Trustee may also undertake legal proceedings to secure its rights hereunder in the jurisdiction of the Trustor or anywhere else, however Swiss Law shall continue to govern the agreement in such cases as well.

Zurich, ...........................

Trustee:

INVICO CAPITAL CORPORATION AG

Trustor:

Mr Michael McKenzie

19

1    Q.    And the administration of Okibi NV?

2    A.    Yes.

3          MR SMITH:  OK.

4          MR MACDONALD:  (To the witness)  You need

5    to wait just long enough for him to get his full

6    question out before you answer.  It makes it harder for

7    the court reporter and it's always best to listen to

8    the full question, even though you think you know the

9    answer.

10         MR SMITH:  Thank you.

11   BY MR SMITH:

12   Q.    Were you or Invico familiar with a company

13   by the name of Claron NV?

14   A.    Yes.

15   Q.    And did you or Invico have any

16   participation in the creation of Claron NV?

17   A.    We have given instructions to create the

18   company.

19   Q.    OK.  Was that again the result of a

20   contract between your company and the McKenzies,

21   Michael McKenzie?

22   A.    That's right.  Trust agreement between

23   Michael McKenzie and Invico Capital Corporation.

24   Q.    Are you also familiar with a company by the

25   name of Jeffrey Limited?

99

1                              (Exhibit 5 was marked

2                              for identification)

3    BY MR SMITH:

4         Q.    I'm going to show you what I've marked as

5    Exhibit 5 and ask you, Mr Schlegel, does that bear your

6    signature?

7         A.    Yes, sir.

8         Q.    Do you recognize the signature of the other

9    party as being that of Michael McKenzie?

10        A.    That is correct.

11        Q.    And this is a trust agreement dated

12   December 8, 1993?

13        A.    Yes, sir.

14        Q.    And did you initial each of the first four

15   pages of this, Exhibit 5?

16        A.    One of the initials is my initials, yes.

17        Q.    OK.  And the other, do you recognize that

18   to be the initial of Michael McKenzie?

19        A.    That's correct.

20        Q.    And am I correct that this is, if not the

21   mirror image, it's very close to the trust agreement

22   created for the purpose of Okibi?

23        A.    Yes, sir.

24        Q.    Is this your form?

25        A.    It's a standard form.

REPORTING INTERNATIONAL
London, England
Tel:  011 44 208 291 9777   Fax:  011 44 208 291 9888

100

1        Q.    Standard form?

2        A.    Yes.  It used to be; we don't make these

3    anymore.

4        Q.    OK.  Now, am I correct that by this trust

5    agreement you were being directed by Mr McKenzie to

6    create Claron NV which would then buy 51 per cent of

7    MCK Development BV?

8        A.    That's right, yes.

9        Q.    Did you in fact create or cause to be

10   created Claron NV?

11       A.    Invico gave instructions to Leeward Trust

12   to form this company.

13       Q.    All right.  And was Claron created by

14   Leeward Trust?

15       A.    Yes, sir.

16       Q.    And did Claron then -- did you, on behalf

17   or help Claron purchase the 51 per cent capital share

18   of MCK Development?

19       A.    They done, yes.

20       Q.    I'm sorry, what?

21       A.    They, Claron, then bought those shares

22   I understand.

23       Q.    They bought them from MMP Co, right?

24       A.    Yes.

25       Q.    And, again, this is another agreement

101

1   where, even though you're trustee, you act only in

2   accordance with instructions --

3       A.   Yes.

4       Q.   -- given by Mr McKenzie?

5       A.   Correct.

6       Q.   Is this another trusteeship that was

7   terminated on or about May 8, 1995?

8       A.   That is correct.

9       Q.   Until then, though, you, Invico, did serve

10  as the trustee on behalf of Michael McKenzie, trustor?

11      A.   Yes, as administrator and for help.

12      Q.   Under Article 12 Invico  was to receive an

13  annual commission again based upon either dividends,

14  trusteed assets or a flat fee, minimum fee, is that

15  correct?

16      A.   That is correct.

17      Q.   And were -- was Invico in fact paid on one

18  or more occasions this commission, annual commission?

19      A.   I think we were paid that one occasion.

20      Q.   And who authorized that payment?

21      A.   Mr McKenzie.

22      Q.   Did you or Invico participate in the

23  acquisition of the 51 per cent from MMP Co?

24      A.   Invico had been asked to facilitate and

25  support Claron to purchase the 51 per cent.

## CLARON N.V.



**EXHIBIT**
**6**
April 18, 2001

### INCORPORATED UNDER THE LAWS OF THE NETHERLANDS ANTILLES ESTABLISHED IN CURAÇAO

STOCK CERTIFICATE NO: 1 FOR SHARES NOS. 0001 THROUGH 6,000

This is to certify that Bearer is entitled to (sixthousand) 6,000 common shares, having a par or nominal value of ONE DOLLAR (US$ 1.00) United States currency each and fully paid of the capital stock of:

## CLARON N.V.

a corporation organized under the laws of the Netherlands Antilles by notarial deed executed by civil law notary M.L. Alexander in Curaçao, on the 21st day of September 1993, the text of this deed having been approved by the Minister of Justice of the Netherlands Antilles on the 21st day of September 1993, by Decree number 2375/N.V.; this stock certificate and shares being subject in all respect to the terms and conditions set forth in the said notarial deed of incorporation of CLARON N.V.

### AUTHORIZED CAPITAL US$ 30,000.00

divided into 30,000 shares each of US$ 1.00

IN WITNESS WHEREOF, CLARON N.V., has caused this certificate to be signed by its Managing Director on this 30th day of September 1993.

_____
Leeward Trust Company N.V.
Managing Director

Original erallier
R. Petenes Fond.
10.5.95

RS00234

RS-ANC 00197



# CERTIFICATE OF DEPOSIT

The undersigned:

hereby certifies and confirms:

1) to have received to keep in safe custody **one (1) share certificate no. 1 representing 6,000 bearer shares in the Corporation**

## CLARON N.V.

established in Curacao having its registered office at Kaya Flamboyan 3d, Willemstad, Curacao, of which corporation Leeward Trust Company N.V. is the Managing Director

2) to have been entrusted with full and unrestricted power to represent the beneficial owner(s) of the abovementioned shares and to give voting instructions on his behalf at general meetings of shareholders.

3) that the real parties in interests on whose behalf and for whose account he holds the aforementioned share certificate(s) are of good character and of sound credit standing.

4) to notify Leeward Trust Company N.V. immediately of any event which may result in the power of attorney referred to herinabove sub 2), being withdrawn or another wise terminated and, in default of any such notification to hold Leeward Trust Company N.V. harmless and to forthwith reimburse Leeward Trust Company N.V. any damages and costs incurred as a consequence thereof, and

5) to hold said share certificates as custodian and to forthwith notify Leeward Trust Company N.V. if the shares are delivered to any party or physical possession of the shares is lost, and

6) to deliver and grant unto Leeward Trust Company N.V. or its nominee the necessary proxies it may require to keep the company in goodstanding in the Netherlands Antilles.

Name of custodian:

Signature of custodian:

Date:

INVICO
Capital Corporation AG
Postfach 4764
CH-8022 Zürich

4.2.94

EXHIBIT 72A

RS00233

RS-ANC 00198

1          A.    Nobody mentioned -- made such a statement.

2          Q.    OK.   Anybody else write such a statement?

3          A.    Nobody else wrote such a statement.

4          MR MACDONALD:   You have 233 and 234.

5     That's in your original.

6          MR SMITH:   I've got that.   You're right.

7     You're right.   You're right.   You're right.   You're

8     right.

9          MR MACDONALD:   I was one step in front of

10    you.

11         MR SMITH:   OK.   233 and 234.

12         MR TATE:   Where is the original of

13    Exhibit 5, may I see it, with the original signatures?

14    (Document handed)   Thank you.

15         MR SMITH:   (To the reporter)   Would you

16    mark this one as -- this is 234.   Would you mark that

17    as 6?   You can go ahead and do that one as 7.

18                              (Exhibit 6 was marked

19                               for identification)

20    BY MR SMITH:

21         Q.    I'm going to show you what has been marked

22    as Exhibit 6 and asked if you can identify that

23    document?

24         A.    That is share certificate number 1 for

25    6,000 shares of Claron NV.

106

1          Q.    And am I correct that this was -- this
2    again is bearer shares for the stock ownership of --
3          A.    That is correct.
4          Q.    -- Claron, is that correct?
5          A.    (The witness nodded)
6                MR MACDONALD:  (To the witness)  You need
7    to  say that out loud.  You answered before.
8                THE WITNESS:  (To the reporter)  OK?
9    BY MR SMITH:
10         Q.    And these were issued to Invico, the
11   certificate?  Did Invico  hold this certificate
12         A.    We held them in custody.
13         Q.    OK.  Meaning that you had it in your
14   possession?
15         A.    Yes.
16         Q.    And this certificate represented 100 per
17   cent of the stock of Claron NV?
18         A.    That's correct.
19         Q.    And these are bearer shares, correct?
20         A.    That's correct.
21         Q.    Now, from inception until -- at least up
22   until May 8, 1995, Invico continuously held this
23   certificate in its possession?
24         A.    These shares were in the files of Claron
25   with Invico.

107

1          Q.    And under the trust agreement you were
2     authorized to hold that and to administer Claron per
3     instructions of Mike McKenzie?
4          A.    Correct.
5          Q.    And again did you direct that Leeward Trust
6     Company serve as the director of this company?
7          A.    We chose Leeward because of the contacts we
8     had in Holland, yes.
9          Q.    Whose signature is that on behalf of
10    Leeward Trust, is that Corsen?
11         A.    I don't know.  Mathyssen, Casseres-Corsen?
12    We can later find out when we look at some documents
13    that she sent.
14         Q.    All right.  Now, this shows that the
15    company was organized on September 21, 1993, correct?
16         A.    Yes.
17         Q.    And who paid the cost of the creation, the
18    organization?
19         A.    I wouldn't know anymore.
20         Q.    Would it be true of Leeward in this case,
21    just as it was in the case with Okibi, Leeward with
22    Okibi, that they were an administrator only in keeping
23    up the formalities in the Netherlands?
24         A.    Yes.
25         Q.    And they served only at the direction of

108

1    Invico?

2         A.    Which instructions we got to instruct them.

3         Q.    OK.  You wouldn't give instructions unless

4    you received instructions from the beneficiary,

5    Michael McKenzie?

6         A.    That's correct.

7         Q.    And then Leeward Trust wouldn't act unless

8    they got instructions from you?

9         A.    Yes, unless it was normal day-to-day

10   routine business --

11        Q.    All right.  Routine business --

12        A.    -- for both parties to keep their company

13   in good shape, in good standing.

14        Q.    All right.  Are you aware of any other

15   shares over and above the 6,000 issued in Exhibit 6?

16        A.    I'm not aware of that.

17        Q.    Again, this was sent to Petenes Foundation

18   in May of 1995?

19        A.    Yes, sir.

20        Q.    For the very same reasons and purposes --

21   for the very same reasons and purposes that you sent

22   the Okibi stock certificate to Petenes Foundation in

23   May of 1995?

24        A.    That is correct.

25        Q.    And, again, you continue to  serve as the

109

1    director of MCK after delivering these shares of stock

2    to Petenes Foundation?

3        A.    That is correct.

4        Q.    And I see your head shaking and I would

5    like to acknowledge it, but we have to have you say

6    "yes" or "no" on the record, OK?  You understand?

7        A.    Yes.

8        Q.    OK.

9                            (Exhibit 7 was marked

10                            for identification)

11            I'm going to show you what has been marked

12    as Exhibit 7, and that's RS00233, and ask if that's

13    your signature at the bottom?

14        A.    This is my signature.

15        Q.    Is that your date of 2/4/94?

16        A.    That is correct.

17        Q.    Would that be the date that you are

18    acknowledging receipt, would it be the date that you

19    did actually receive?  What would that date signify?

20        A.    I would think it's closely when we received

21    it.

22        Q.    This is created September 21, 1993?

23        A.    Yes.

24        Q.    The company, but you don't receive the

25    stock certificate, the certificate of stock, until



INVICO
CAPITAL CORPORATION AG

Kirchgasse 24
Postfach 4754
CH-8022 Zürich

Telefon 0041-1-261 72 11
Telefax 0041-1-261 72 88

Mr Mike McKenzie
7880 San Felipe Road
Suite 100
Houston
Texas 77063 / USA

Zurich, 17. September 1993
SR/psc

*I N V O I C E*                     *Re 93052*

Formation costs, communication costs
of following companies

**EXHIBIT
129
April 20, 2001**

1. **Celon N.V.**

2. **Claron N.V.**

3. **Far Eastern Energy B.V.**

4. **McKenzie India Energy Corp.**          sFr. 20'000.--
                                            =======

Payment via SKA, Paradeplatz 8, CH-8001 Zürich, account no. **276439-21** (SFr.)

RS00297

DISTRIBUTION OF FUNDS

Note Mike McKenzie
16.9.1993
As per Mr. McKenzie's
instructions

$5.025 Mio

$ 157 000.— 3% commission — (hold)

$ $9000 Rental pay out.

$ 149000 formation of companies pay out.

2 x N.V.

2 x B.V.

1 x OKIM 17000

1 x Trust formation 12000 —
Trust agreement.

17q

EXHIBIT
128
April 20, 2001

RS00292

MCKENZIE METHANE POLAND B.V.

16 September 1993

Mr. Rolf Schlegel
INVICO CAPITAL CORPORATION AG
Zurich

Dear Rolf,

You are hereby authorized and instructed to immediately
transfer two hundred eighty-nine thousand dollars US (US
$289,500.00) from the account of McKenzie Methane Poland B.V. at
the DG Bank Schweiz to one of your accounts.  These funds will be
posted in the company books as repayment of principal on a loan
to the company from Michael McKenzie and payment of an invoice
from Invico.  Thank you for handling this matter. I am

Very truly yours,

MCKENZIE METHANE POLAND B.V.

MICHAEL MCKENZIE, President

RS00293

582

1    BY MR SMITH:

2        Q.    All right.  Thank you.  And just so I

3    understand your schedule here, you've got a "Maker"

4    column --

5        A.    That's right.

6        Q.    -- and that's who would execute the note

7    payable to somebody else, right?

8        A.    Yes.

9        Q.    And then the payee was he who was to

10   receive the money, he or she or it?

11       A.    Yes.

12                        (Exhibit 128 was marked

13                         for identification)

14       Q.    I'm going to show you Exhibit 128 and ask

15   you what this is, if you can identify that?

16       A.    This is a distribution for a note of

17   Mr Mike McKenzie.  It's written on 17th September '93

18   on a note that was sent to him and the costs.

19       Q.    OK.  And was this some sort of memoranda of

20   what you were to do with the funds that were

21   represented by this promissory note?

22       A.    That's correct.

23       Q.    Would you explain to me what was done?

24       A.    I would have to have the other page that

25   went with it to form it together.  This was the result

583

1    of a transfer.   The promissory notes, we should have

2    them.

3              Q.   Is that it?   (Document shown)

4              A.   Yes.

5              Q.   Let me attach this.   Are these intended to

6    be attached together or are they --

7              A.   They have to go together, because you find

8    here why 39,000 -- maybe you can't.   That's Mr McKenzie

9    wrote this.

10             Q.   OK.   I'm going to make a part of 128 then

11   the letter.   The attachment is a letter of what, dated

12   what, the same date?

13             A.   It's dated 16th September.

14             Q.   And in his hand and by his initials has he

15   indicated what's to be done with the money that he is

16   addressing be transferred?

17             A.   Under the promissory note for $289,500.

18             Q.   All right.   And what is he directing to be

19   paid?

20             A.   He directs to be paid 39,000 rental pay out

21   and 149,000 for the formation of various companies.

22             Q.   Those formations would be two NVs, two BVs?

23             A.   And Okibi --

24             Q.   What are the two NVs?

25             A.   -- and trust agreement.

584

1          Q.    We've got Claron, Okibi, MCK, MMP BV and
2     what else, the Celop?
3          A.    FEE and the other one.
4          Q.    OK.
5               MR WEISBART:  Did you say FEE?
6               THE WITNESS:  Yes.  FEE, Far Eastern --
7               MR WEISBART:  Oh, is that another entity?
8               THE WITNESS:  That's the Indian.
9               MR WEISBART:  OK.  What did you say after
10     FEE?  Did you say one more?
11               MR MACDONALD:  FEE is a BV.
12               MR WEISBART:  OK.  I understand.  I have
13     Claron, Okibi, MCK, FEE --
14               THE WITNESS:  And the other.  You said
15     Celop.  He said Celop.
16               MR WEISBART:  Celop.
17     BY MR SMITH:
18          Q.    Was that one of them that you created?
19          A.    We did create Celop, yes.
20          Q.    Do you know what this 5.025 million is,
21     3 per cent commission of $151,000?
22          A.    No, I do not know.  But it says here on
23     hold, so it was not paid out.
24               MR SMITH:  OK.  I'm going to give you -- do
25     you want to be the holder of the stuff I'm not going to

585

1    use back?

2              MR MACDONALD:  Sure.  (Document handed)

3         (Counsel's audio-tape was changed/turned over)

4                              (Exhibit 129 was marked

5                              for identification)

6    BY MR SMITH:

7         Q.   Let me show you what has been marked as

8    Exhibit 129 and ask you to identify that, please?

9         A.   That's an invoice to Mike McKenzie for the

10   formation of some companies, for the formation costs,

11   communication costs, of the following companies --

12   Celop, Claron, Far Eastern Energy and McKenzie India --

13   20,000 francs.

14        Q.   Were those paid?

15        A.   Those were paid.

16                             (Exhibit 130 was marked

17                             for identification)

18        Q.   Could I ask you to identify 130, please?

19             MR WEISBART:  Where did 128 go?  Oh, I'm

20   sorry.

21             THE WITNESS:  This is an invoice to

22   Mike McKenzie for administration, domiciliation,

23   telephone and communication costs, McKenzie Group, as

24   per agreement 16th September 1993, 39,000.

25

# TRUST-AGREEMENT

### between

Michael McKenzie                                    hereinafter called
2222 Country Club Blvd.                              "Shareholder"
Sugar Land
Texas 77478
USA

### and

Rolf Schlegel                                       hereinafter called
Lebernhöhe 13                                       "Administrator"
8123 Ebmatingen
Switzerland

WHEREAS, the Administrator has been appointed a member of the Board of Administrators of MCK Development BV, Herengracht 320, 1016 CE Amsterdam, The Netherlands, a Dutch company domiciled in Amsterdam (hereinafter called "Company");

NOW THEREFORE the parties agree as follows:

### Article 1

The Shareholder acknowledges that the Administrator will discharge his duties in his capacity as an individual, and not as a representative, employee or partner in a partnership.

### Article 2

The Administrator undertakes to collect all dividends and liquidation proceeds and all other pecuniary rights derived from said share and, after deduction of taxes, if any, to place the proceeds at the disposal of the Shareholder. The Administrator undertakes to exercise all rights granted to him in his capacity as a shareholder of the Company, in particular the right to vote and to subscribe new shares, in accordance with the instructions of the Shareholder who will refund to the Administrator all taxes, expenses and cash laid out in connection with this undertaking. In carrying out the instruction of the Shareholder, the Administrator must bear in mind the limitations imposed by law, ethics and the Articles of Incorporation and immediately inform the Shareholder in the event any instruction given conflicts with such limitations.



EXHIBIT
133
April 20, 2001

## Article 3

The Administrator has accepted the appointment as member of the Board of Administrators of the Company and undertakes to exercise all functions required by law, the Articles of Incorporation and By-laws while observing to the best of his ability the interests of the Company and the Shareholder.

## Article 4

The Shareholder shall on the Administrator's first request, discharge and hold the Administrator harmless from, and reimburse or advance to the Administrator, the damages, legal costs, bond amounts, etc., related to all liabilities and all claims which are brought against the Administrator pursuant to this Agreement or the law (in particular claims brought against the Administrator based on Articles 752 et seq. Swiss Code of Obligations for administrator's liability), insofar as they have arisen in the course of the Administrator having performed this Agreement in accordance with its terms. The Shareholder shall assist the Administrator in all legal proceedings and shall participate in such proceedings, to the extent permitted by the relevant legal procedure.

During and after termination of this Agreement, the Shareholder neither directly nor indirectly shall make any claims against the Administrator in his capacity as member of the Board of Administrators of the Company, asserting the Administrator's liability;
provided, however, that the Shareholder may bring claims for intentional or gross negligence (Article 100, Paragraph 1, Code of Obligations). The Shareholder releases the Administrator in advance from all liability for actions or omissions which the Administrator undertook or failed to undertake in the course of actual management in accordance with this Agreement.

## Article 5

The Shareholder shall instruct the person(s) entrusted with the actual management of the Company (president, managing director, manager, etc.) to keep the Administrator currently informed as to the business of the Company and its financial situation and furnish other information as the Adminstrator may demand.

## Article 6

The Shareholder shall make available to the Company at all times, and upon the first request of the Administrator, the funds or security necessary for meeting the obligations of the Company.

With regard to the provisions concerning payment of the withholding tax and the responsibility of the Board of Administrators with regard to that tax and other dues and taxes, the Shareholder shall make available in the form of a bank deposit or first class securities to the Company at least 30% of the earnings of the Company which are reported and have accrued in the current business year, or make available to the Company an equivalent bank guarantee. In the absence of such security, the Shareholder will pledge the shares of MCK Development BV to the Administrator as security.

## Article 7

As a member of the Board of the Company, the Administrator will receive an annual fee of SFr. 5'000.-- (net) in addition to the reimbursement of all reasonable expenses incurred in connection with his services on the Board. All compulsory social security contributions on that amount shall be borne by the Company. The Shareholder unconditionally guarantees the payment of the fee by the Company to the Administrator.

In addtion the Administrator is entitled to be reimbursed for all services performed at an hourly rate of SFr. 300.-- and all expenses incurred in connection with his activity pursuant to this Agreement as well as the reimbursement of all costs. The Shareholders shall be responsible for paying the fee and making the reimbursements. The Administrator is entitled against receipt, to pay to himself or otherwise secure payments of his fee and his expenditures including taxes, fees such as domiciliary fees, management fees and obligations of a public law nature, by disposing of any assets of the Company or disposing of these pledged shares.

## Article 8

This Agreement terminates the day the Administrator ceases to be a member of the Board of Administrators of the Company. No termination of this Agreement shall affect the Shareholder's obligations arising hereunder.

## Article 9

The present Agreement is to be interpreted exclusively in accordance with the laws of Switzerland. For the settlement of any dispute arising out of this Agreement the parties accept the jurisdiction of the courts at the Administrator's domicile or at the domicile of the Company at the time of the termination of the mandate. The Administrator shall have the right to file an action at the domicile of the Shareholder.

Zürich, 20th January, 1995

.................................................   ..........................................
Michael McKenzie                                      Rolf Schlegel

588

1          Q.   Ah!  Okey-dokey.

2      (The original document was then marked Exhibit 133)

3               I'm going to show you what has been marked

4  as 133 and ask if you can identify that?

5          A.   This is a trust agreement between

6  Michael McKenzie and myself.  This is a standard

7  contract that we have in Switzerland.  If somebody

8  takes over a position of a director of a company, the

9  trust agreement may be misleading, but it's just the

10  arrangement, administrative arrangement.

11          Q.   Now, this is for the -- you've taken over

12  now as the --

13          A.   MCK Development.  MCK Development, yes.

14          Q.   You've now taken over as Director of

15  MCK Development?

16          A.   That's right.  This was -- that's the base

17  of MCK Development.

18          Q.   All right.

19          A.   It says here, basically it says: "WHEREAS,

20  the Administrator has been appointed a member of the

21  Board of Administrators of MCK Development BV ...",

22  etcetera, a Netherland company.  Now the parties agree

23  that, "The Shareholder acknowledges that the

24  Administrator will discharge his duties in his capacity

25  as an individual, and not as a representative, employee

589

)

1    or partner in a partnership."

2         Q.   All right.   Let me ask you this: you have

3    Michael McKenzie down as the shareholder, correct?

4         A.   Yes.

5         Q.   The shareholder of MCK Development is

6    Claron and Okibi, correct?

7         A.   Yes.

8         Q.   Why are you having Michael McKenzie sign

9    when he's a shareholder?

10        A.   Because Michael McKenzie was the ultimate

11   beneficiary and it was not possible to get the other --

12   the shareholders to sign without approval of the other

)

13   beneficiary, so I took the shortcut.

14        Q.   OK.   It's dated what date?

15        A.   20th January 1995.

16        Q.   Is that Michael McKenzie's signature?

17        A.   That is Michael McKenzie's signature.

18        Q.   Is that an original?

19        A.   It is an original.   And I must say this is

20   the backup to the copy that I get from the

21   shareholders.

22        Q.   Claron and Okibi?

23        A.   Yes.

24        Q.   Right.

25                        (Exhibit 134 was marked

)


EXHIBIT
46
April 19, 2001

# GÉNERAL AGREEMENT

This GENERAL AGREEMENT is entered into as of this day, the 26 19th of May 1994, by and between **MCK DEVELOPMENT B.V. (MCK)**, a Dutch Corporation whose registered seat is Herengracht 320, 1016 CE Amsterdam NL, Dossier Nr. 238.799, and **EuroGas AKTIENGESELLSCHAFT,** (EUG) Städtle 7, 9490 Vaduz, Fürstentum Liechtenstein.

WHEREAS, MCK owns ninety-five percent (95%) of the shares of stock in **MCKENZIE METHANE POLAND BV (MMPBV). BARON FINANCIAL LTD.** (BFL). is the owner of four percent (4%) of the shares, not yet recorded in the share registry of MMPBV.

WHEREAS, MMPBV owns certain rights and obligations under certain joint venture and concession agreements in Poland, including but not limited to the joint venture agreement creating **POL TEX METHANE LTD. (PTM)**, dated the 14th day of September 1990 and amended on the 21st day of February 1993, between PTM and the **Republic of Poland's Minister of Environmental Protection, Natural Resources and Forestry for the Republic of Poland**; a joint venture agreement dated the 14th day of September 1993 between MMPBV and Rybnicha Spolka Weglowa SA creating **McKenzie Methane Rybnik (MMR)**; and other preliminary agreements and joint venture proposals currently outstanding to these and other coal mines in the Upper Silesian Coal Basin of Poland. Copies of agreements and documentation has been made available to EUG.

WHEREAS EUG desires, through MCK, to become the owner of forty-six percent (46%) of MMPBV. EUG will earn this ownership position in MMPBV as it advances funds as set forth in this agreement.

WHEREAS, EUG agrees to pay the sum of forty-six million U.S. dollars ( $ 46.0 million) for forty-six percent ( 46 %) of MMPBV of the sum 26.0 million U.S. dollar will be paid to MCK and 20.0 million U.S. dollar to MMPBV for contribution to capital.

The payment of forty-six million U.S. dollars ( $46.0 million) shall be made as follows:

A. $ *12, 000, 000. 00*shall be paid to MMPBV  as a lump sum payment simultaneous to the closing of EuroGas AG and EuroGas Inc.but not later than May 27th, 1994.

B. $————————— shall be paid to MCK as a lump sum payment  14 business days after EuroGas Inc. receives a copy of a letter from ÖMV  agreeing to purchase gas from MMPBV.

**Page  3**

---

MCK and EUG are in agreement concerning the possible addition of another participant, OMV, who can strengthen PTM's position in obtaining major financing for the project and who would add needed services to the project. In this regard, both MCK and EUG agree to work to this end and to make available from their ownership position in PTM through MMPBV, equal for proportional interest to OMV should they desire to participate in PTM.

MMPBV has made special considerations to key people and MCK and EUG agree to proportionally share in these considerations. This consideration will be in form of a ten per cent (10%) net profit interest.

MCK agrees to grant an immediate board seat in MMPBV to Dr. Reinhard Rauball. EUG shall be entitled to equal representation on the board of directors of MMPBV upon payment of 46.0 million US dollars (forty six million $).

NOW, THEREFORE, MCK and EUG do hereby agree to the following:

1.   GOVERNING LAW. This agreement shall be construed and governed by Swiss law.

2.   COOPERATION. Each party shall cooperate in providing whatever is nescessary for the other to accomodate governmental regulation and procedures.

3. ARBITRATION. The parties shall attempt to resolve any dispute amicably. Any dispute arising out of or related to this Agreement which is not resolved shall be settled by arbitration. Arbitration shall be conducted in accordance with Zurich Chamber of Commerce rules as in effect on the date of this Agreement. The place of arbitration and making of the award shall be in Zurich,  Switzerland and the proceedings shall be Zurich.

4. ASSIGNABILITY. Assignability of this Agreement shall be limited to affiliates of each party.

5. EUG will be merged into a U.S. public company simultaneously with the first payment on this option. MCK,  Rolf Schlegel, PolTex and MMPBV  will cooperate in obtaining all documents, financial statements, and permission from all nescessary parties for making proper disclosures to the Securities and Exchange Commission (SEC) in the United States.

Page  4

6.   EUG's ownership interest in Pol Tex Methane shall flow through MMPBV to the parent company  (Public Company) as a beneficial owner of an undivided interest in Pol Tex Methane.

7.   MCK and EUG agree that MMPBV shall retain and distribute sufficient hard currency from the sale of gas to ÖMV or other  European entities to distribute dividends sufficient to pay 125 % of intrests on EuroGas Inc.debenture offerings.

8.   MCK will vote and  transfer immediately Baron's 4 % interest in MMPBV to EUG after closing of the "STOCK EXCHANGE AGREEMENT" and confirmation to MMPBV. The evidence will be faxed to LEXADMIN TRUST REG. Städtle 7, 9490 Vaduz, Liechtenstein with hard copy by overnight mail.

9.   "Exibit 1" attached hereto contains a list of 20 documents that become part of this agreement  with the understanding  that EuroGas Inc. by law must disclose certain portions to comply with  Securities and Exchange Commission  (SEC) requirements.

Upon approval of this agreement  EUG and MCK will need to enter into a Shareholders Agreement which will provide for specific details of the operations of the projects through MMPBV.

THIS General Agreement is executed this the 24 th  day of  May  1994.

EuroGas AKTIENGESELLSCHAFT          MCK DEVELOPMENT  B.V.

_____          _____
Wolfgang  Rauball                          Michael McKenzie, Director

Received from
*INVICO CAPITAL CORPORATION AG*
on behalf of
*McKenzie Methane Poland B.V.*
following documents:

Feasibility Study Upper Silesian Basin/Gury     3 copies
(undated)

Appraisal Debowiec + Pogorz, Billy, J. Neal     3 copies
Disclaimer 20.1.93     5.18.92

Project information, dated June 8, 1993     3 copies

Concession agreement Febr. 9, 1983 and     3 copies
full conc. docum.

Registration Pol-Tex + facsimile 30.11.93     3 copies
re MMP J.V.

Feasibility study, Debowiec + Pogorz     3 copies
Gury 1.1.93

Joint venture agreement RSW 14.9.93     3 copies

Appraisal of equipment Matthews-Daniel Co. 3.5.93     3 copies

Agreement for delivery, receipt and transportation     3 copies
of natural gas with PGViG 14.11.90

Letter of intent sales of gas to "Pulawy" 23.12.91     3 copies

Letter of intent sales of gas to "Kozbierzyn"     3 copies
20.11.91

Joint venture agreement Pol-Tex 9.9.90 in-     3 copies
cluding concession exp. agreement

Deed of incorp. of MMP B.V. 31.7.92     3 copies

Project balance sheet 22.04.94     3 copies

| | |
|---|---|
| Concession exploitation agreement + Info 21.2.81 on US Company | 3 copies |
| Joint venture permit 13.4.1990 incl. Application May 4th, 1990 | 3 copies |
| Brief summary in window form on Coalbed, Poland and Project | 3 copies |
| EPA report | 3 copies |
| Summary | |
| OMV letter of May 20 and letter of intent of Dec. 21, 1992 | 3 copies |

This documentation is only released to persons who have signed a confidentiality agreement, which is returned to INVICO.

J-160

```
┌─────────────────┐
│ 30 EXHIBIT      │
│    44           │
│ April 19, 2001  │
└─────────────────┘
```

## STOCK EXCHANGE AGREEMENT

This Stock Exchange Agreement is entered in to this 13th Day of June, 1994 between EnergyGlobal AG (in formation), Staedtle 7, FL 9490 Vaduz, Liechtenstein and Jeffrey Limited, Middle & Egmont Street, Kingstown, SVG, hereinafter called AGER

WHEREAS, AGER owns 36 A-shares, numbered A 3 and A 38 incl. and 36 B-shares numbered B 3 -B 38 incl. of McKenzie Methane Poland BV (MMPBV) which equals 12% (twelve percent) of the total outstanding stock of MMPBV and

WHEREAS AGER is desirous of having his ownership in MMPBV converted from shares in a private company (MMPBV) to shares in a US public company and

WHEREAS EGA is the owner of an option to purchase 34% (thirty four percent) of MMPBV and

WHEREAS EGA has signed a letter of intent with a US public company whose name is to become EuroGas Inc. Said merger is scheduled to close on or before June 17th , 1994 in Vaduz, Liechtenstein and

WHEREAS. in the merger agreement between EGA and EuroGas Inc., EGA represents control of AGER 's 12% (twelve percent) and has agreed on an allocation of 2'100'000 shares (two million one hundred thousand shares) of EuroGas Inc., and $4'000'000'00 of series A convertible debentures of EuroGas Inc., which converts into 1'000'000 shares of EuroGas Inc., stock and $5'000'000'00 dollars of series B convertible debentures of EuroGas Inc., which convert into 1'000'000 shares of EuroGas Inc., stock to be issued to AGER for total of 36 A shares and 36 B shares of MMPBV.

Now therefore AGER agrees to accept 2'100'000 shares of stock (two million one hundred thousand) shares of EuroGas Inc. stock and the above mentioned debentures and therefore shall immediately authorize INVICO to record ownership (in the name of EnergyGlobal AG) of it's 36 A shares and 36 B shares of MMPBV upon the execution of a definitive merger agreement between EGA and EuroGas Inc. that provides for an allocation of 2'100'000 shares (two million one hundred thousand shares) and the above mentioned series A and B convertible debentures which each convert to 1,000,000 shares.

This agreement is irrevocable until June 17th, 1994.

EXHIBIT 26

Date: 13th July 1994

RS00145

Energy Global AG In. Gründung
Staedtle 7
9490 Vaduz

Jeffrey Limited
Kingstown
SVG

\- 2 Aug. 1994

* * * * MICHAEL McKENZIE * * * *

DATE: 1 August 94

NAME OF RECIPIENT: Merlin Fish

AT FAX NUMBER: 46-57-48-22-51

FROM: MICHAEL McKENZIE
AT FAX NUMBER: _____

TOTAL NUMBER OF PAGES 2 INCLUDING THIS SHEET

EXHIBIT
45
April 19, 2001

MESSAGE: Merlin —
Please furnish something
concerning the 12% to Jeffery Ltd.

MMPRV owes some
$100,000 in the U.S. (Salary,
taxes, insurance, shipping bill).
This needs to come out of the
initial $750,000 — (Nothing to any
McKenzie.)

Thanks for your interest
in this project —

M

IF YOU DO NOT RECEIVE ALL THE PAGES INDICATED ABOVE
PLEASE CALL THE SENDER AT _____ AS SOON AS POSSIBLE

251

1       A.   Can you come again?

2       Q.   Yes, sir.  You stated that Jeffrey, from

3 your understanding, was a shelf corporation?

4       A.   Yes.

5       Q.   Do you know who owned that shelf

6 corporation?

7       A.   St Vincent Trust Services.

8       Q.   It's not -- wasn't one that was created for

9 Merlin Fish?

10      A.   I'm not aware of that.

11      Q.   Do you know why Jeffrey was created, why

12 Jeffrey was utilized?

13      A.   No.  It was just proposed.

14      Q.   It was proposed what?

15      A.   It was proposed to do so by Mr Fish.

16      Q.   OK.  Mr Fish proposed that Jeffrey be used

17 for what purpose?

18      A.   Well, for this situation, for the

19 transaction.

20      Q.   OK.  When you say "this transaction", the

21 transaction to  sell the 44 per cent of MMP BV to

22 Northampton?

23      A.   I'm sorry, I don't understand your

24 question.

25      Q.   All right.  You said that it was Mr Fish's

252

1    suggestion that Jeffrey be used for this transaction.

2    I'm trying to understand what transaction you're

3    talking about.

4         A.    It was for the 12 per cent.

5              MR SMITH:  OK.  I've got just a few minutes

6    before 5 and this is going to take a lot of time.  So

7    do you all want to break now so that Mark can look at

8    his documents?  Is that OK?

9              THE WITNESS:  How long will it take you so

10   maybe we can start with another thing tomorrow?

11             MR SMITH:  That's what I want to start off

12   with tomorrow, is this.

13             THE WITNESS:  Yes.

14             MR SMITH:  And I will try to be better

15   organized.  And I will have the list done up for you

16   first thing in the morning so that we can pull those

17   documents that remain.

18             MR MACDONALD:  Any additional ones that

19   remain from your list?

20             MR SMITH:  There are a lot, because at the

21   end, when he was trying to get away for that aeroplane,

22   we just were writing them down I mean as fast as we

23   could.  So I don't know what a lot of that stuff really

24   was.

25             MR MACDONALD:  OK.

265

1      Q.    Right.

2      A.    -- for funding of the company, the project.

3      Q.    Right.

4      A.    Yes.

5      Q.    And you -- can you tell me a little bit

6  about the negotiations that went on involving

7  Jeffrey Limited and this Energy Global AG?

8      A.    Well, there was, beforehand, the 4th

9  I think, addendum of the agreement where it spoke about

10  12 per cent shares.  Mr Fish was, on 13th June, in

11  Switzerland, Mr Ulrich, and they had a lot of

12  discussions with Mr Landa.  There was a need for

13  funding and Mr Fish has then had these discussions.

14  And on the 13th, according to my diary, and I remember

15  that vividly round about 1530, they then had found a

16  solution, and it was then that I had been asked to go

17  to Liechtenstein.  I know it because I know that each

18  went in his own car.  I had my car parked, and then

19  they picked me up, and we went from there to

20  Liechtenstein to see Mr Jeeves, who is well-known to

21  Mr Ulrich, who knew Mr Marxer, and that's why they went

22  there.

23          Three of us went there and then the

24  documentation was written.  Documentation on the Stock

25  Exchange Agreement, we are mentioned, as Invico, that

266

1   we are again as administrator authorized or escrow

2   agent, whatever you may call it, to  record ownership in

3   the name of Energy Global, and that we basically asked

4   them to make these transfers.

5       Q.   OK.  Now, you said that the three of you

6   went to Liechtenstein, who besides yourself?

7       A.   That was Mr Fish and Mr Ulrich.

8       Q.   You were trying to impress upon Mr Landa

9   the need for funding --

10      A.   No, I did not have any contact.  These were

11  all contacts within Mr McKenzie, Mr Fish and

12  Mr Rauball, and obviously, to some extent, us as

13  administrator.

14      Q.   What was Mr McKenzie doing during this time

15  period?

16      A.   He had telephone calls with Mr Fish.

17      Q.   OK.  What was Mr Rauball's involvement?

18      A.   I cannot personally recollect and I've not

19  seen any, so far, any correspondence specifically on

20  this specific item.

21      Q.   Well, can we back up a little bit?  Before

22  June of 1994 when this was entered into, the Stock

23  Exchange Agreement, wasn't Eurogas AG to buy the entire

24  46 per cent of MCK -- I'm sorry: of MMP BV?

25      A.   Again, I would have to look at the

1    contract; I think we have an original here.

2         Q.   OK.   In June of 1994, am I correct,

3    Mr Schlegel, that negotiations broke off with

4    Mr Rauball?

5         A.   Yes.

6         Q.   And he went on vacation, on holiday?

7         A.   I don't know.  I know there was some

8    correspondence, and I think even Mr Fish was upset

9    about it too, that there was no funding.  But, again,

10   I think that's in the documentation.  I wouldn't know

11   now.

12        Q.   OK.  But you had heard something about some

13   disagreement on funding?

14        A.   Yes.

15        Q.   The agreement that everybody was operating

16   under before this was that there would be a closing

17   sometime in May or June, correct?

18        A.   Again, I would have to  look it up on the

19   documents.  I cannot say that now.

20        Q.   All right.  Was Mr Fish active in helping

21   set up this Jeffrey Limited?

22        A.   Yes.

23        Q.   Was the -- Jeffrey Limited, was it clear

24   from the outset that that was a company that belonged

25   to Mike McKenzie?

1       A.    I cannot say yes or no.  I only know that
2  Mike McKenzie agreed to pay for the bills, for the
3  invoice, and it was obviously a company that, yes, he
4  controlled, yes, I think.
5       Q.    That he controlled?
6       A.    Can you come again with the question?
7       Q.    Sure.  Let me ask it this way: who
8  negotiated the purchase of the 12 per cent by Jeffrey?
9       A.    That was Mr McKenzie.
10      Q.    And with whom was he negotiating?
11      A.    "Please furnish something concerning the
12  12% [of] Jeffrey [Limited]", which he sent to
13  Merlin Fish on 1st August that was.
14            MR WEISBART:  I'm sorry, I didn't
15  understand.  (To the reporter)  Can you repeat it?
16        (The reporter read back the last answer)
17            MR WEISBART:  I'm still confused.
18            MR SMITH:  I know.  Let me mark this then.
19            MR WEISBART:  OK.
20  BY MR SMITH:
21      Q.    May I mark this?
22      A.    Yes.
23                          (Exhibit 45 was marked
24                          for identification)
25

269

BY MR SMITH:

Q.    I'm going to look over your shoulder if I may.  Let me ask you to  identify what you just produced as Exhibit 45.

A.    As Exhibit 45, this is a -- Michael McKenzie had sent to Mr Fish in Switzerland, when he was with Mr Ulrich, this fax here.

Q.    Do you know that to be Mr Ulrich's fax number?  Do you know one way or the other?

A.    I think we will.  There are -- this number is also in other correspondence.

Q.    OK.  Now, what is it that that's supposed to show?  What are you relying upon there?

A.    I'm saying that Mr McKenzie had been negotiating for Jeffrey Limited.

Q.    All right.  With Mr Fish?

A.    Yes.

Q.    Now, that's dated August 1, 1994.  Were there negotiations that went on before August 1, 1994?  Hold on a second before you answer that.

(Counsel's audio-tape was changed/turned over)

All right.  Would you answer?

A.    Yes, there were.

Q.    How many months before?

A.    Well, that was in June when this urgent

270

1    situation had to be negotiated, and before there was

2    this other contract that was void of Jeffrey which

3    I have here.

4           Q.    That was void of Jeffrey?

5           A.    When I say void of Jeffrey, I mean without

6    consideration of Jeffrey.

7           Q.    Yes, OK.

8           A.    Because it was before that period.

9           Q.    Would you mind pulling that contract for me

10   so we can get that into evidence?

11          A.    Here is the 12 million.  (Document handed)

12          Q.    OK.

13                              (Exhibit 46 was marked

14                              for identification)

15          I'm going to  show you what has been marked

16   as Exhibit 46.  Can you tell me what that is?

17          A.    This is a General Agreement dated -- the

18   names, dates changed -- 26th May 1994, between MCK

19   Development BV and Eurogas Aktiengesellschaft, (EUG)

20   Staedtle, Vaduz, and this was signed by Eurogas

21   Aktiengesellschaft, Mr Wolfgang Rauball, and MCK

22   Development BV, Michael McKenzie, Director.

23          Q.    Can you identify those signatures as the

24   respective parties you just identified?

25          A.    Yes, I do.

273

1   "MCK and EUG agree that INVICO CAPITAL CORPORATION ...

2   will act as the Trustee for the closing of this

3   transaction."

4          Q.   Now, you were supposed to close on May 27th

5   or at least fund $12 million by May 27th.  Was that

6   done?

7          A.   No.

8          Q.   Is that what you referred to earlier as the

9   emergency situation?

10          A.   That's correct.

11          Q.   And what happened?  Was there a falling out

12   between the Rauball faction and the McKenzie faction,

13   disagreement?

14          A.   I wouldn't know anymore, because I don't

15   have any documents to prove this.  There have always

16   been difference of opinions; whether this was the case

17   here, I do not know.

18          Q.   OK.  All right.  Now, there were some

19   meetings thereafter and Mr Rauball was not present when

20   Jeffrey was set up.  Am I understanding what you

21   testified to earlier?

22          A.   I did say that.

23          Q.   OK.  You did say that?

24          A.   Yes.

25          Q.   OK.  And can you explain to me how

274

1    Jeffrey's creation resolved the emergency situation?

2         A.    Well, I can only explain what happened.

3         Q.    OK.

4         A.    Whether it solved it is another question.

5    The company was just formed.  The company was a shelf

6    company.

7         Q.    Jeffrey?

8         A.    Jeffrey.  Then the stock exchange was

9    written.  This, as you know, had been extended,

10   extended, extended, I think up to August or so

11   probably.

12        Q.    Till August?  Is that your statement, up

13   till August?

14        A.    I believe so.

15        Q.    But what I don't understand is how is

16   Jeffrey's creation, how does that address the emergency

17   situation that was faced when the funding of

18   $12 million did not take place?

19        A.    One was looking for another alternative.

20        Q.    OK.  Can you explain to me the other

21   alternative?

22        A.    Well, one was looking for other investors,

23   and the other investor in this case, what turned up to

24   be, I think at this stage, I think it was Northampton,

25   was Mr Fish.

276

1   some sort of deal to buy any interest in MMP BV?

2        A.   I don't know.  Liechtenstein is something

3   that I have absolutely no knowledge.  This was

4   something that Euro -- Energy Global or Eurogas,

5   whatever it was, was a company that was owned by

6   someone else.

7        Q.   When you say authorized by Liechtenstein --

8        A.   I mean -- sorry, I want to make this

9   clarified.  When I say authorized by Liechtenstein

10  I meant, obviously, Energy Global, what you asked me,

11  and Eurogas.

12       Q.   OK.

13       A.   I think the company was called

14  Energy Global at the beginning anyway and then the name

15  changed to Eurogas at a later stage.

16            MR TATE:  Reverse?

17            MR SMITH:  Yes, it is the reverse.

18            THE WITNESS:  It is reverse?

19  BY MR SMITH:

20       Q.   It was Eurogas AG and then it became

21  Energy Global AG, which merged into Eurogas, Inc.

22       A.   OK.  I don't know these things.  These are

23  things that I don't know.

24       Q.   OK.  You needed an infusion of $12 million;

25  that didn't come about.  46 was not funded, right?  Is

277

1    that correct?

2         A.    Yes.

3         Q.    So then you started looking for new

4    investors.   Was that you?

5         A.    No.

6         Q.    Who started --

7         A.    Mr McKenzie was looking for new investors.

8         Q.    And then he brought back to you

9    Northampton?

10        A.    He didn't bring it back to me.   They were

11   just having discussions.   Mr Fish was having

12   discussions with Mr McKenzie and with Mr Rauball and

13   obviously they needed -- they had discussions with

14   other investors.   I know Mr Fish was there.   During a

15   long period, he travelled to lots of people in Germany

16   trying to get some funding going.

17        Q.    How does the creation of Jeffrey --

18   I apologize for being so dense -- but how does the

19   creation of Jeffrey do away with the emergency

20   situation needed for a $12 million cash infusion?

21        A.    Well, I think that was an idea that they

22   had it could happen.

23        Q.    Was there any discussion about the need of

24   value for purposes of taking a company public in the

25   United States?

340

1        A.    I have seen it.

2        Q.    Would you agree that, if you find that, you

3    will supplement --

4        A.    Yes.

5        Q.    -- and provide that to the court reporter?

6        A.    Yes.  I will write it down.

7        Q.    At the very bottom of my exhibit there

8    appears to be the handwriting of somebody who wrote in

9    "McKenzie" and put an arrow.

10       A.    Yes.

11       Q.    Is that your handwriting?

12       A.    It's that of my secretary.

13       Q.    OK.  And that's just to identify who she

14   thought was the --

15       A.    Who she knew it was.

16       Q.    Who she knew it was?

17       A.    Yes.  She knew Mr McKenzie's signature.

18       Q.    All right.  Now, why would Mr McKenzie be

19   signing a St Vincent Trust Service invoice addressed to

20   Energy Global AG?

21       A.    Mr McKenzie was the beneficial owner of the

22   company.

23       Q.    Of Jeffrey?

24       A.    Yes.

25       Q.    All right.  And what was his signature

# ST. VINCENT TRUST SERVICE AG

Reg. Office: Telacker 50, CH-8001 Zürich, Switzerland, Tel. 01 / 211 92 60
MANAGEMENT ADDRESS: Städtle 7, P.O.Box 70, FL-9490 Vaduz, Liechtenstein
Tel. Int.: 41-75- 233 23 93, Fax Int.: 41-75- 233 25 93, Telex: 889384

J183



**EXHIBIT**
59
April 19, 2001

INVOICE 94/003444

Date   19th August, 1994   HM                    Share Capital EC$    10'000.00

to     Energy Global AG, 9490 Vaduz

Name   Jeffrey Limited
       Registration date: 28.04.1994
       5409 IC 1994

1.   Registration
     Government registration fee:
     EC$ 500.-/US$ 190.- up to share capital of EC$ 500'000.--;
     0.1% of share capital above EC$ 500'000.--                        US$      190.00

     Fee for services of Saint Vincent Trust Authority:
     EC$ 750.-/US$ 285.- up to share capital of EC$ 300'000.-;
     0.25% of share capital above EC$ 300'000.--.                      US$      285.00

2.   Annual fees
     (payable in advance on January 1 of each year).
     Government annual fee:
     EC$ 500.-/US$ 190.- up to share capital of EC$ 500'000.--;
     0.1% of share capital above EC$ 500'000.--;
     1/12 of fee for each month in year of registration:
     For 9 month in the year 1994 up to 31.12.1994                     US$      142.50

     Annual fee for Saint Vincent Trust Authority:
     EC$ 500.-/US$ 190.- up to share capital of EC$ 200'000.--;
     0.25% of share capital above EC$ 200'000.--;
     1/12 of fee for each month in year of registration:
     For 9 month in the year 1994 up to 31.12.1994                     US$      142.50

3.   Charges of Registrar
     Registration of documents, recording of facts and
     certification EC$ 20.-/US$ 7.50 each                              US$       22.50

4.   15 % Management fee                                               US$      117.40

                                                                       US$      899.90

     3 St. Vincentian Board Members à 172.50                           US$      517.50
     2 Apostille                                                       US$       80.00
     2 Certific.by Consul                                              US$       70.00
     1 Notarize signature                                              US$       35.00

                                                                       US$    1'602.40

                                               RS00131

TOTAL                                                                  US$    1'602.40

HIBIT  23

Please remit to a/c. US$ PO-344.490.1, Swiss Bank Corporation,
Paradeplatz 6, 8022 Zurich, quoting Company name or number.
Cheques should be drawn on Zurich or New York.



339

1          Q.    Let me show you what has been marked as

2    Exhibit 59 which is 131, RS.  Can you identify that?

3          A.    Yes, I can.

4          Q.    And what is that?

5          A.    This is an invoice from St Vincent Trust

6    Services to Global Energy regarding Jeffrey Limited.

7          Q.    Is it Global Energy or Energy Global?

8          A.    Energy Global.

9          Q.    What's the date?

10          A.    The date is 19th August 1994.

11          Q.    Do you have any idea why you would have

12    that in your file?

13          A.    It had to be paid.

14          Q.    And who paid it?

15          A.    I don't know.  But you have on the bottom

16    here the initial of Mr McKenzie --

17          Q.    Is that the initial or the signature?  Is

18    that the initial or signature?

19          A.    Well, it looks like the initial.

20          Q.    Do you have the original of that document?

21          A.    (After a pause)  No.

22          Q.    I'm sorry.  Your answer was, no, you do not

23    have the original?

24          A.    Not here.

25          Q.    Do  you have the original back --

340

1          A.    I have seen it.

2          Q.    Would you agree that, if you find that, you

3    will supplement --

4          A.    Yes.

5          Q.    -- and provide that to the court reporter?

6          A.    Yes.  I will write it down.

7          Q.    At the very bottom of my exhibit there

8    appears to be the handwriting of somebody who wrote in

9    "McKenzie" and put an arrow.

10         A.    Yes.

11         Q.    Is that your handwriting?

12         A.    It's that of my secretary.

13         Q.    OK.  And that's just to identify who she

14   thought was the --

15         A.    Who she knew it was.

16         Q.    Who she knew it was?

17         A.    Yes.  She knew Mr McKenzie's signature.

18         Q.    All right.  Now, why would Mr McKenzie be

19   signing a St Vincent Trust Service invoice addressed to

20   Energy Global AG?

21         A.    Mr McKenzie was the beneficial owner of the

22   company.

23         Q.    Of Jeffrey?

24         A.    Yes.

25         Q.    All right.  And what was his signature

223

1        Q.    Is page 2 a correct translation of page 1?

2        A.    Yes, it is.

3        Q.    All right.  In what capacity are you acting

4    in writing this letter, Mr Schlegel?

5        A.    We have been chosen to administer the

6    transaction between Jeffrey and Mr Zimmer and we were

7    acting here as escrow agent.

8        Q.    OK.  Were you acting as escrow agent in

9    both directions?  Were you holding the shares of stock

10   plus the money when received?

11       A.    That's correct.

12       Q.    And the -- Jeffrey Limited, isn't it true

13   that you were holding the stock power, the stock

14   certificate, the corporate resolution and general power

15   of attorney all in blank pertaining to Jeffrey Limited?

16       A.    No, that's not true.

17       Q.    OK.  Did you ever have that in your

18   possession when creating -- in creating any kind of

19   bank accounts for Jeffrey?

20       A.    That's correct.  We had it maybe a day,

21   half a day, when we transferred that documentation to

22   the bank to open up the account, then, when we got it

23   back, maybe we send it back to Liechtenstein.

24       Q.    And that would be to Mr Jeeves or

25   Mr Marxer?

224

1        A.    To Mr Marxer, yes.

2        Q.    And Mr Marxer was the what, administrator?

3        A.    He was the administrator, yes.

4        Q.    In Liechtenstein?

5        A.    In Liechtenstein, yes.

6        Q.    And were you the -- you or Invico the

7    administrator for Jeffrey in Switzerland?

8        A.    .Well, that's very difficult to -- it's not

9    really possible, because Jeffrey is in Liechtenstein,

10   that's abroad, outside of Switzerland, so they were

11   responsible.  What we were responsible for was the

12   transaction, the escrow transaction that we have had

13   here, and there were two as you know: there was one

14   with Herr Zimmer and the second one with Ostrov, the

15   130.

16       Q.    There was also one with Armag, was there

17   not?

18       A.    There is a document where Armag had said

19   that they would do something, but I've not seen

20   anything about it.

21       Q.    Was your relationship vis-a-vis Jeffrey

22   only as this escrow agent?

23       A.    We were the administrator and had obviously

24   kept Mr McKenzie informed.

25       Q.    You were the administrator for what?

225

1          A.    For the transaction.

2          Q.    OK.  For the transaction, the option?

3          A.    The option, yes.

4          Q.    OK.

5          A.    And also the, what we received, all the --

6    what's the name? -- the shares and so on.

7          Q.    And is it your testimony that Jeffrey was a

8    McKenzie entity, that he was the beneficiary of

9    Jeffrey?

10         A.    The documentation says that, yes.

11         Q.    Did you deal with anyone other than

12   Mike McKenzie on behalf of Jeffrey Limited?

13         A.    I do not understand the question.

14         Q.    All right.  In your administering these

15   options, did you answer to anyone other than

16   Michael McKenzie?

17         A.    That's a difficult question.  We

18   had obviously the -- on the one side was the buyer.

19         Q.    Correct.

20         A.    On the other side was the seller.

21         Q.    The seller being Jeffrey?

22         A.    Being Jeffrey.

23         Q.    Let me ask you just to look at that one

24   side, the seller side.  Did you address --

25         A.    That was Michael McKenzie.

226

1        Q.    He was the sole person you dealt with on

2    behalf of Jeffrey as the seller, correct?

3        A.    Yes.  Yes.

4        Q.    This letter at page 2 is a correct

5    translation of page 1 did you say?

6        A.    Yes, I did.

7        Q.    OK.  "The bank has just confirmed receipt

8    of the option payment."  Would that be a $400,000

9    payment from Mr Zimmer?

10       A.    That is correct.

11       Q.    So that would have been received then by

12   the bank on November 18th, 1994?  On or before

13   November 18th.

14       A.    Yes.  I must also make a statement to

15   Jeffrey, that we did not have any bank account

16   signature, nor did we get any copies of the -- from the

17   bank from Jeffrey, that went always to Liechtenstein.

18   That's why I said to you, if you administer it from

19   Switzerland, that was very difficult.

20       Q.    OK.

21       A.    So  I'm not always aware of exact dates, but

22   here it's clear.  We got -- there is some documentation

23   where we said to Herr Marxer transfer the funds to

24   MCK Development.

25       Q.    OK.  Why is Mr Rauball, Wolfgang Rauball,



EXHIBIT
43
April 18, 2001



INVICO
CAPITAL CORPORATION AG

Kirchgasse 24
Postfach 4754
CH-8022 Zürich

Telefon 0041-1-261 72 11
Telefax 0041-1-261 72 80

EINSCHREIBEN
STV St. Vincent Trust Services AG
Frau Hildegard Marxer
Städtle 7

FL-9490 Vaduz

Zürich, 22. November 1994   SR/psc

Sehr geehrte Frau Marxer

Wir lassen Ihnen mit diesem Schreiben separat zukommen:
- Instrument of Assignment of Shares von Jeffrey Limited
- Formular A blanko unterzeichnet retour
- Special Resolution blanko unterzeichnet retour
- 2 General Power of Attorney blanko retour

Mit freundlichen Grüssen

RS00096

EXHIBIT 7A

SS 030725

SAINT VINCENT AND THE GRENADINES

## GENERAL POWER OF ATTORNEY

We, _____, St.Vincent

and the Grenadines empower, with the right of substituting

to perform all legal acts as an authorized representatives invested
with full power, including the right to appoint deputies.

This power particularly comprises the following:

> to represent with the right of individual signature the above
> named Limited in every respect and above all, to sign contracts,
> to lend and borrow, to accept and make payments, to open and dispose
> of bank accounts, to pledge assets, to dispose of them or to liquidate
> them, to produce, acquire, develop, manage, let, lease, rent, broke,
> sell or otherwise dispose of any kind of goods, including but not
> restricted to real estate, intellectual property rights, ships; to
> contract, to do any kind of investment deal in futures, to participate
> in other enterprises of any kind, to establish subsidiaries and branch
> offices and to liquidate any or all of them to undertake every kind
> of commercial, financial, trading, service, lending and borrowing
> activity.  All for account of the Company, for others or as a Trustee,
> in short, to do anything which is in the competence of the Board
> of Directors according to memorandum and articles of association of
> the company and the laws of St.Vincent.

THIS POWER OF ATTORNEY IS UNLIMITED

St.Vincent and the Grenadines          For the Board of Directors of
                                       JEFFREY LIMITED

                                       St.Vincent and the Grenadines

                                       _Thelma Beckles_

RS00097

SS 030726

- SAINT VINCENT AND THE GRENADINES

## GENERAL POWER OF ATTORNEY

We, _____, St.Vincent

and the Grenadines empower, with the right of substituting

to perform all legal acts as an authorized representatives invested
with full power, including the right to appoint deputies.

This power particularly comprises the following:

    to represent with the right of individual signature the above
    named Limited in every respect and above all, to sign contracts,
    to lend and borrow, to accept and make payments, to open and dispose
    of bank accounts, to pledge assets, to dispose of them or to liquidate
    them, to produce, acquire, develop, manage, let, lease, rent, broke,
    sell or otherwise dispose of any kind of goods, including but not
    restricted to real estate, intellectual property rights, ships; to
    contract; to do any kind of investment deal in futures, to participate
    in other enterprises of any kind, to establish subsidiaries and branch
    offices and to liquidate any or all of them to undertake every kind
    of commercial, financial, trading, service, lending and borrowing
    activity. All for account of the Company, for others or as a Trustee,
    in short, to do anything which is in the competence of the Board
    of Directors according to memorandum and articles of association of
    the company and the laws of St.Vincent.

THIS POWER OF ATTORNEY IS UNLIMITED

RS00098

St.Vincent and the Grenadines

For the Board of Directors of

JEFFREY    LIMITED

St.Vincent and the Grenadines

*** **************************************
APOSTILLE
(Convention de la Haye du 5 Octobre 1961)
. Country: St.Vincent and the Grenadines
This public document·
. has been signed by DOUGLAS WILLIAMS
. acting in the capacity as Notary Public
_____
CERTIFIED
. at Kingstown, St.Vincent
6. The ʌ day of  May  1994
. by DONALD  BROWNE   Solicitor General
of St.Vincent and the Grenadines
10. Signature
...... Donald R. Browne .......
Solicitor General
**************************************

Signed before me in blank
form.

SS 030727

000129

SAINT VINCENT AND THE GRENADINES

SPECIAL   RESOLUTION

ON . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

THE BOARD OF THE COMPANY. . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . LIMITED, COMPOSED OF . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

HAS MET AT MIDDLE STREET, KINGSTOWN, ST.VINCENT AND THE

GRENADINES.

IT HAD DECIDED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

ST.VINCENT, . . . . . . . . . . . . . . . . . .

FOR THE BOARD OF THE COMPANY

*Thelma Beckles*

Die vorstehende /umstalage Unterschrift des / Ok

*Thelma Beckles*
(Name, Vorname, ggfls. Geburtsname, Geburtstag)

*St. Vincent*
(Wohnsitz)

beglaubige ich hiermit auf Grund
der vor mir erfolgten Vollziehung / ihres Anerkennung
(§ 10 Abs. 1 Ziff. 2 Konsulargesetz vom 11 . . . .
Der / Die Erschienene ist mir persönlich bekannt —
ihre Identität durch Vorlage folgender Urkunden nachgewiesen —

Honorargeneralkonsul — Honorarkonsul
der Bundesrepublik Deutschland

*Indian Bay, den 11. 5. 96*
(Unterschrift)

Konsularbeamter gem. § 10 Abs. 1 Ziff. 2 KG.

RS00099

# INSTRUMENT OF ASSIGNMENT OF SHARES
## ST. VINCENT AND THE GRENADINES

We   SONIA NERO   AND   MARILYN SKERRITT
(hereinafter referred to as "The Assignor")

both of   ST. VINCENT AND THE GRENADINES   for consideration

duly received, hereby assign

    100   Shares numbered 1-50 and 51-100 respectively

standing in our name in the Memorandum of Association and the Share
Register of

    JEFFREY   LIMITED   ("the Company")

to   (hereinafter called "The Assignee")

to be held by the Assignee, his Executors, Administrators or Assignees,
subject to the same conditions upon which we held the same at the time of
execution hereof. We confirm that the Shares assigned hereunder re-
present the total of Shares issued by the Company as of this date.


Signature of Assignors

*H.Skerritt*

of St-Vincent & the Grenadines
(one) Witness to the signature of
the Assignors

*Bayna*

of St-Vincent & the Grenadines

St. Vincent, date   5   day, 1994


RS00100

SS 030729     000191

# A

Kto-/Depot-Nr.:

Vertragspartner:

*Joffey Limited*

## Feststellung des wirtschaftlich Berechtigten

(Formular A gemäss Art. 3 und 4 VSB)

Der/die Unterzeichnete erklärt hiermit:
(Zutreffendes ankreuzen)

    dass der Vertragspartner an den eingebrachten Werten wirtschaftlich berechtigt ist

☒  dass an den eingebrachten Werten wirtschaftlich berechtigt ist:

Name, Vorname (evtl. Firma)

*McKenzie Michael*

Wohnadresse/Sitz, Staat

*2222 Country Club Blvd.*
*Sugar Land*
*Texas 77478*
*USA*

Der Vertragspartner verpflichtet sich, Änderungen der Bank von sich aus mitzuteilen.

Ort, Datum

*Vaduz, 17.11.1994*

Unterschrift

RS00101

SS 030693

1       Q.   OK.  From what source was MCK receiving

2   money in 1995, other than the repayments by Jeffrey and

3   by Claron?  Were there any other sources of income

4   available to MCK in early 1995?

5       A.   Not that I'm aware of, unless --

6            MR MACDONALD:  Where's 38 through 41?

7            THE WITNESS:  Maybe he has got it.  38

8   through 41.

9            MR MACDONALD:  38 through 41, exhibits, do

10  you have them there?

11           MR SMITH:  Yes, I've got them.  (Documents

12  handed)

13           MR MACDONALD:  Thank you.

14                          (Exhibit 43 was marked

15                          for identification)

16  BY MR SMITH:

17      Q.   I'm going to show you what has been marked

18  as Exhibit 43 and ask if you can identify that, please?

19           MR WEISBART:  That's an RS document?

20           MR SMITH:  Yes.  96 through 101.

21           THE WITNESS:  Yes.  This is a letter

22  to Frau Marxer at St Vincent Trust Services in Vaduz,

23  returning to her documents that were sent from the bank

24  which they needed for opening the account of Jeffrey.

25

249

BY MR SMITH:

Q.    So these were sent by Ms Marxer to your office to open this Bilfinanz account in the name of Jeffrey?

A.    That's correct.

Q.    And are the attachments those documents that were sent to  accomplish that?

A.    You are right.

Q.    OK.  And that is Mr Schefer's signature, you do identify that?

A.    Indeed, I do.

Q.    And have you seen these documents before that are attached?

A.    This is not the first time I've seen them, yes.  Is that what you mean?

Q.    This is not the first time you've seen them?

A.    That's right, today, yes.

Q.    In whose handwriting is form A, the last page, written?

A.    Peter Schefer.

Q.    And that is the document that shows that the account that is being set up in the name of Jeffrey is for the benefit of Michael McKenzie in Houston, Texas?

250

1      A.    Yes.

2      Q.    And then that's been signed off on by, is

3   that Jeeves?

4      A.    That's Bryan Jeeves.

5      Q.    Bryan Jeeves.  And then is being submitted

6   by your office to the bank?

7      A.    That's correct.

8      Q.    Mr Schlegel, you received the attachments,

9   the document called general power of attorney, the

10  special resolution, and the instrument of assignment

11  all in blank if you understand what I mean?

12     A.    Yes.

13     Q.    Meaning no one has been granted that, it's

14  left open, is that correct?

15     A.    It has just been left blank.  That's

16  standard general procedure.

17     Q.    You received it in that form and returned

18  it in that form?

19     A.    Yes, sir.

20     Q.    To your knowledge, was anybody ever

21  actually given a general power of attorney or any of

22  these --

23     A.    I do not know.

24     Q.    Do you know whose shelf corporation Jeffrey

25  was?

805

1    there.  I'm sorry.

2                    (Laughter)

3                    Now, you have told us earlier in the

4    deposition that the Petenes or Petenes Foundation was

5    what, a Netherlands Antilles company as you understood

6    it?

7         A.    No.  Petenes Foundation is a Liechtenstein

8    foundation.

9         Q.    Now, how was it that you learned that

10   Michael McKenzie was the beneficiary or the principal

11   of that company?

12        A.    We had to start up, buy that foundation,

13   for Mr McKenzie.

14        Q.    Oh, Invico Capital Corporation?

15        A.    Yes.  There is a transfer in the papers on

16   Bilfinanz to Petenes Foundation, and also further

17   mention of that is in there in the documentation.

18        Q.    The transfer on Bilfinanz to -- was that to

19   set up Petenes Foundation or was it a shelf company

20   that was being bought?

21        A.    It was a shelf -- it was a shelf company

22   anyway.  It was not set up in that way, it was a shelf

23   company.

24        Q.    And the transfer was to buy the shelf

25   company on behalf of Mr McKenzie?

806

A.    Yes.

Q.    OK. And is that in that Exhibit 135, the Bilfinanz bank records?

A.    Yes.

Q.    I'm going to hand you Exhibit 135.  Can you find that particular transfer for us, please, sir?

A.    It's --

MR TATE:  Page three-thirty -- is that 336, Mark?

MR MACDONALD:  336, yes.

MR TATE:  Thank you.

BY MR TATE:

Q.    Would you translate the entry?  What is the heading of the column?

A.    This means -- mentioning what it is down here.

MR SMITH:  Reference?

THE WITNESS:  Reference, yes, I suppose.

BY MR TATE:

Q.    It is spelt B-e-z-e-i-c-h-n-u-n-g and that means reference?

A.    Yes.

Q.    All right.

A.    Then it says here what the funds that -- transfer brought forward, this amount, and here it



INVICO
CAPITAL CORPORATION AG

Kirchgasse 24
Postfach 4754
CH-8022 Zürich

Telefon 0041-1-261 72 11
Telefax 0041-1-261 72 88

Michael McKenzie
2222 Country Club Blvd.
Sugar Land
Texas 77478
U.S.A.



**EXHIBIT**
24
April 18, 2001

Zurich, 08.05.1995
SR/lm

## TRUST AGREEMENTS

Dear Mike

As we discussed previously and again on March 20th, 1995, we have agreed to cancel immediately all trustee ship arrangements.

agreed:

Michael McKenzie

INVICO CAPITAL CORPORATION AG

Rolf Schlegel

167

1          (Exhibit 24 was marked

2          for identification)

3  BY MR SMITH:

4      Q.    I'm going to show you Exhibit 24 and ask

5  that you identify that for me?

6      A.    Yes.  This is a note that confirms previous

7  discussions on March 20th where immediately all

8  trusteeship agreements have been cancelled between

9  Michael McKenzie and Invico Capital Corporation.

10     Q.    That's a letter dated May 8th, 1995?

11     A.    That's right.

12     Q.    From you to Mike McKenzie?

13     A.    That's correct.

14     Q.    Does it bear your signature?

15     A.    It does.

16     Q.    And do you identify the signature of

17  Michael McKenzie on that page as well?

18     A.    I do that.

19     Q.    Did he sign that in your presence?

20     A.    I wouldn't know anymore, but he wasn't --

21     Q.    Based upon that letter, you did in fact

22  terminate --

23     A.    Everything.

24     Q.    -- whatever relationship you had?

25     A.    Yes.

55

BY MR SMITH:

Q.    At whose direction or authority did you
deliver the certificate to Petenes Foundation in May of
1995?

A.    We supplied them, because we finished the
agreement with Mr McKenzie and then we wanted to get
rid of all our assets.  This is what I considered an
asset.

Q.    Of Mr McKenzie's?

A.    Yes.

Q.    And you wanted to get rid of it in May of
1995?

A.    That's correct.  This is not very elegantly
said, but I didn't want to be holder of it anymore.
The company Invico didn't want to be holder of it
anymore.

Q.    Is there a reason why Invico did not want
to be a holder of this anymore?

A.    Yes.  We did terminate the trust agreement
with Mr McKenzie.

Q.    Is that the only reason -- the termination
of the trust, is that the only reason why Invico did
not want to have possession of any assets of
Michael McKenzie?

A.    Yes.

68

1          A.    We did not, no.

2                MR MACDONALD:  (To the witness)  Wait.

3    You're marking an original.

4                (To Mr Smith)  He simply wrote "Exhibit 4"

5    on the exhibit again.

6                MR SMITH:  Oh, OK.

7                THE WITNESS:  I didn't realize.  Sorry.

8                MR SMITH:  All right.  So in his hand --

9                MR MACDONALD:  Right.  Exhibit 4 now has

10   "Exhibit 4" written in his hand during the deposition.

11               MR SMITH:  OK.

12               MR MACDONALD:  Are we done with that one?

13               MR SMITH:  Yes.

14               MR MACDONALD:  OK.

15   BY MR SMITH:

16        Q.    Let me ask you: in the transfer, in the

17   delivery and in the acknowledgment of the delivery by

18   Petenes of the Okibi shares, was Petenes to then serve

19   the function that had been previously served by Invico

20   as the trustee or the administrator of Okibi?

21        A.    We never -- I never thought about that.

22        Q.    All right.  After May 8, 1995 you did,

23   however, remain a director of MCK Development BV, did

24   you not?

25        A.    That is correct, yes.

69

1      Q.   And you stayed as director until sometime

2  in early 1996?

3      A.   That is correct.

4      Q.   After the transfer of the shares in Okibi

5  to Petenes Foundation, to whom did you answer as the

6  administrator or the director of MCK Development?

7      A.   To Mr McKenzie.

8      Q.   You still answered to Mr McKenzie?

9      A.   Yes.

10     Q.   Is that a yes affirmatively?

11     A.   Yes.  Yes.

12     Q.   OK.

13     A.   I answered to  the company, to MCK

14  Development, but got instructions from him.

15     Q.   When you say you answered to the company,

16  MCK Development, who would you answer to?

17     A.   As director of the company, you have

18  responsibility towards your company.

19     Q.   All right.  And again, other than

20  announcing it to the front door of MCK Development,

21  there had to be a person that you announced that to.

22  To whom did you announce it?

23     A.   I did not understand the question.

24     Q.   Who is it that you carried out your --

25     A.   Who gave me instructions?

58

1          Q.    OK.   What investigation were you aware of?

2          A.    I was told that there were difficulties.

3    I had once been told of documentation, I have seen

4    documentation, when there was a transaction, that there

5    was a lot of problems and a lot of debts and that sort

6    of thing.

7          Q.    Do you remember what paper you saw?

8          A.    I didn't get it, I just -- was flicked to

9    me from a distance.

10         Q.    What caused you to deliver the certificate

11   of Okibi to Petenes Foundation?

12         A.    Because I had no other way.  I didn't know

13   where else Invico should supply the documents to.

14         Q.    Why didn't you deliver it to

15   Michael McKenzie?

16         A.    At that stage he was not around here.

17         Q.    Did you hand deliver this to

18   Petenes Foundation?

19         A.    No.  It was sent by post.

20         Q.    Could you have posted it to

21   Michael McKenzie?

22         A.    Yes.

23         Q.    Why didn't you?  Why Petenes Foundation?

24         A.    That's a foundation that Mr McKenzie wanted

25   to have these things held together.

59

1      Q.   So he directed you to send it to

2  Petenes Foundation?

3      A.   Not really.

4      Q.   Was Petenes Foundation set up to hold these

5  assets?

6      A.   Yes.

7      Q.   Was Petenes Foundation intended to be a

8  successor to Invico?

9      A.   I don't know.  You'll have to ask.

10     Q.   Did you have any, you or Invico, have any

11 involvement in setting up Petenes Foundation?

12     A.   We did ask the people there to form the

13 company.

14     Q.   At whose direction did you request the

15 creation of Petenes Foundation?

16     A.   Mr McKenzie.

17     Q.   And when did you make the request to -- of

18 the people to create Petenes Foundation?

19     A.   I do not know anymore.

20     Q.   Was -- had Petenes Foundation been in

21 existence for some months or years prior to this

22 delivery in May of '95?

23     A.   I think it was a shelf company.

24     Q.   OK.  Who is it that you instructed or

25 requested that Petenes Foundation be created or set up?

60

1       A.    Mr Bissig.

2       Q.    And Mr Bissig is located where?

3       A.    In Liechtenstein.

4       Q.    And is he -- what company is he with?

5       A.    Forum Trust.

6             MR WEISBART:  Sorry?

7             THE WITNESS:  Forum Trust.

8             MR TATE:  How do you spell Bissig?

9             THE WITNESS:  B-i-s-s-i-g.

10            MR TATE:  Thank you.

11    BY MR SMITH:

12      Q.    Is this Mr Bissig's signature in the lower

13    right-hand corner --

14      A.    Yes, sir.

15      Q.    -- lower right-hand corner of Exhibit 3?

16      A.    Yes, sir.

17      Q.    Had you met Mr Bissig before?

18      A.    Yes, sir.

19      Q.    Mr Bissig's place of business is in

20    Liechtenstein, is that correct?

21      A.    That is correct.

22      Q.    Is he -- does he share an office with

23    either Jeeves or Marxer?

24      A.    No.  He does have his own office, but they

25    had the same address, it was a floor higher.

# T E L E F A X - M E S S A G E

## E N E R G Y  G L O B A L  A G.

Städtle 7, P.O. Box 70, FL-9490 Vaduz, Liechtenstein
Tel. Int. 0041-75-236 14 14, Fax Int. 0041-75-232 87 28
CompuServe: 100326,66, Internet: 100326.66@compuserve com.

Seiten / Pages: 3                                    Fax No.: 001 801 359 39 54


Howard S. Landa Esq.
Kruse, Landa & Maycock,
L.L.C.
50 West Broadway
Salt Lake City, Utah, 84101-
2034
USA


19 September 1996 SEE


Dear Mr. Landa

Referring to your letter dated August 30, 1996 please find enclosed copies of
the extract from the trade register and the share certificate no 1 of Energy
Global AG, Vaduz.

As you can see from the enclosed documents the board of directors consists
of Mr. Bryan Jeeves OBE and Mr. Lic. Iur. Elmar Bissig (your point 1). The
share capital in the amount of CHF 50'000.— is fully paid. The original bearer
share no. 1 was sent to Eurogas Inc. (your point 2 to 4).

Additionally please be informed that Mr. Normann Marxer left our office in
March 1996.

Should you have any further questions please do not hesitate to contact us.


Yours sincerely
ENERGY GLOBAL AG


Bettina Seeberger
Accountant Department

Escrow023540

## EUROGAS AKTIENGESELLSCHAFT

### VADUZ

Aktienkapital Fr. _____ 50'000.- _____ eingeteilt in

___50___ Aktien im Nominalwert von je Fr. ___1'000.-___

# AKTIENZERTIFIKAT

Nr. ▓▓▓▓▓

über _____50_____ Aktien

Nr. ▓▓▓ bis Nr. ▓50▓

im Gesamtwert von nominal

Fr. _____50'000.-_____

___voll___ einbezahlt

_____Der Inhaber_____

ist als Eigentümer dieses Zertifikates mit den darin bezeichneten
Aktien an unserer Aktiengesellschaft mit allen gesetzlichen und
statutarischen Rechten und Pflichten beteiligt.

Vaduz, _____, den ___16. Mai 1994___

Namens des Verwaltungsrates:

Bryan Jeeves

Escrow023541



| Tag der Eintragung | Seite 1 | E n e r g | | Datum der | Zweck: | Grundkapi | Verwaltug | Firmazeic | Kundhachu | Statuterän | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 16.5.94 | | | | 16.5.94 | | | | | | 27.6.94 | |
| 27.6.94 | | | | | | | | | | | |

E03

BBI VADUZ +75 232B272B + 801 359 3954   17:04   19/09/96

Escrow023542

**V·Bank**

# VERWALTUNGS- UND PRIVAT-BANK AKTIENGESELLSCHAFT
BANQUE PRIVÉE DE GÉRANCE SOCIÉTÉ ANONYME ~ PRIVATE TRUST BANK CORPORATION
FL-9490 VADUZ · POSTFACH 885 · LIECHTENSTEIN · TELEFON 075/5 66 55

## Unterschriftenkarte und Vollmacht

| Kontoinhaber | | Stammnummer |
|---|---|---|

**ENERGY GLOBAL AKTIENGESELLSCHAFT, VADUZ**

Vollmacht über die Konten, Depots und / oder Schrankfächer unter der oben bezeichneten Stammnummer hat / haben:

| Name / Vorname | Unterschrift | einzeln oder kollektiv |
|---|---|---|
| 1. Bryan Jeeves | | einzeln |
| 2. Lic. iur. Elmar Bissig | | einzeln |
| 3. | | |
| 4. | | |
| 5. | | |

Bemerkungen

### Bestimmungen zur Verfügungsberechtigung

Unter Inhaber wird im folgenden der oder die Inhaber(in) von Konten, Depots und / oder Schrankfächern verstanden.

Der Inhaber erteilt den oben genannten Personen Vollmacht, über die Vermögenswerte, die unter der Stammnummer auf seinen Konten, in seinen Depots und / oder Schrankfächern liegen, gemäss Zeichnungsregelung frei zu verfügen und alle Bankgeschäfte abzuwickeln, insbesondere, Bar-, Kredit-, Devisen-, Wertschriften-, Scheck-, Wechsel-, Dokumentar-, Edelmetall-, Festgeldgeschäfte, Zahlungen, Verpfändungen, Wertschriftenbezüge und -überträge, Anlagen und Wiederanlagen aller Art, Termingeschäfte aller Art, Ändern von Versandanweisungen, Konto-, Schrankfach- und Depotauflösungen, Schrankfacheröffnungen, Einrichten von Zweitkonten und -depots bei gleichem Zeichnungsrecht.

Das Substitutionsrecht wird ausgeschlossen.

Erscheint bei natürlichen Personen der Kontoinhaber nicht unter den Bevollmächtigten, zeichnet er einzeln. Bei juristischen Personen sind nur diejenigen Personen zeichnungsberechtigt, die ausdrücklich als Bevollmächtigte aufscheinen.

**Die erteilten Vollmachten gelten über den Zeitpunkt des Todes oder des Eintritts der Handlungsunfähigkeit des Kontoinhabers / Vollmachtgebers hinaus und bleiben voll wirksam. Vorbehalten bleibt der rechtsgültige schriftliche Widerruf durch dazu berechtigte Vertreter oder Erben.**

Mit dem Einreichen einer neuen Unterschriftenkarte / Vollmacht erlöschen alle früheren. Hingegen können Zusatzkarten eingereicht werden, die jedoch als solche zu kennzeichnen sind, ansonsten sie als neue Unterschriftenkarten gelten.

Ohne gegenteilige Angaben gilt für die obigen Vollmachten das Einzelzeichnungsrecht als vereinbart. Alle anderen Zeichnungsarten bedürfen genauer Bezeichnungen. Bei Kollektivzeichnungsrecht gilt ohne zusätzliche Weisungen als vereinbart, dass jeder Bevollmächtigte mit jedem anderen zu zweien zeichnet.

Die Bank prüft jeweils die Verfügungsberechtigung des Kunden und der Bevollmächtigten, doch trägt der Inhaber den Schaden aus dem Nichterkennen von Legitimationsmängeln und Fälschungen, sofern der Bank kein grobes Verschulden nachgewiesen werden kann. Zu einer weitergehenden Legitimationsprüfung ist die Bank nicht verpflichtet.

Von allen Änderungen der Vollmachten ist die Bank unverzüglich zu benachrichtigen.

**Für den Verkehr mit der Bank gelten die Allgemeinen Geschäftsbedingungen sowie die genannten Bestimmungen. Die Echtheit der obenstehenden Unterschriften sowie die sich daraus ergebenden Befugnisse werden hiermit bestätigt.**

Vaduz, 30.06.94/eö
Ort und Datum

ENERGY GLOBAL AKTIENGESELLSCHAFT
Unterschrift des Kontoinhabers

**000520**

| KOE | Erf. | Kontr. |
|---|---|---|

*Lexadmin Trust Reg.*
*Trust Company*

BRYAN JEEVES OBE
HONORARY BRITISH CONSUL
ALLGEMEIN BEEIDETER

LIC. IUR. ELMAR J. BISSIG
VICE CONSUL HONORAIRE D'ESPAGNE

LUZIA BÜCHEL, LICENSED TRUSTEE

STÄDTLE 7
P.O.B. 70
FL-9490 VADUZ
LIECHTENSTEIN

TELEFON 075 / 232 87 26
TELEX 889 384
TELEFAX 075 / 232 87 28

Eurogas Aktiengesellschaft
Städtle 7
9490 **Vaduz**


19. Mai 1994


Honorarabrechnung   **94/001628**


LE/10818 GES   EUROGAS AG
Eurogas Aktiengesellschaft


Wir erlauben uns, Ihnen unser Honorar für ausgeführte Arbeiten
wie folgt zu verrechnen.


| | | |
|---|---|---|
| Fixhonorare | | 6,250.00 |
| Barauslagen | | 5,200.00 |
| **TOTAL** | **CHF** | **11,450.00** |


Wir bitten Sie, uns den oben aufgeführten Betrag auf unser Konto
bei der Verwaltungs- & Privat-Bank AG, 241.595.019 zu überweisen.


Zahlungsbedingungen : 30 Tage netto


**000538**

BANKERS: VERWALTUNGS- UND PRIVAT-BANK AG, VADUZ, ACC.: 241.595.019

Escrow104558

ULRICH-CL  . . .   FAX  0041-57-482251

PAGE 01

# PROXY

Escrow106175

The undersigned shareholder, holder of 120,000,000 shares of Northampton, Inc, a Utah corporation, (the "Company"), hereby votes in favor of the following actions:

1. The change of the name of the Company to Euro Gas, Inc.; and
2. A 24 to 1 reverse stock split of the common stock of the Company.

Dated this _25th_ day of _August_ 1994.

Crawford Ltd.
Middle & Egmont St.
Kingstown
St. Vincent & The Grenadines

# PROXY

The undersigned shareholder, holder of 34,200,000 shares of Northampton, Inc, a Utah corporation, (the"Company"), hereby votes in favor of the following actions:

1.     The change of the name of the Company to Euro Gas, Inc.; and
2.     A 24 to 1 reverse stock split of the common stock of the Company.

Dated this _25th_ day of _August_ 1994.

_(signature)_

Sinbad Ltd
Middle & Egmont St.
Kingstown
St. Vincent & The Grenadines

Escrow106174

# PROXY

The undersigned shareholder, holder of 48,000,000 shares of Northampton, Inc, a Utah corporation, (the "Company"), hereby votes in favor of the following actions:

1. The change of the name of the Company to Euro Gas, Inc.; and
2. A 24 to 1 reverse stock split of the common stock of the Company.

Dated this _25th_ day of _August_ 1994.

Westlake Ltd.
Middle & Egmont St.
Kingstown
St. Vincent & The Grenadines

Escrow106173

From: JILL S. HOLT  To: SCOTT GOODERIDGE   Date: 1/28/96  Time: 11:13:00

## SHAREHOLDER LIST - EuroGas, Inc. / Energy Global, AG Merger

| SHARES | INCREMENTS | SHAREHOLDER |
|---|---|---|
| 560,000 | 5 x 100,000<br>1 x 60,000 | Wolfgang Rauball<br>Bernsteinweg 18<br>Dortmund<br>Germany |
| 560,000 | 5 x 100,000<br>1 x 60,000 | Peter Thoma<br>Blumenrainstr 20<br>9050 Appenzell<br>Switzerland |
| 560,000 | 5 x 100,000<br>1 x 60,000 | Edgar Luber<br>474 Rayners Lane<br>Pinner MiddleSex<br>London England HH5B |
| 1,120,000 | 10 x 100,000<br>2 x 60,000 | Baron Finance Ltd.<br>Hauptgasse 30<br>CH 9050 Appenzell<br>Switzerland<br>Advokapurburo<br>Mr. Walter Regli |
| 2,100,000 | 21 x 100,000 | Jeffrey Ltd.<br>Middle and Eggmont Street<br>Kingstown, St. Vincent and the Grenadines |
| 6,000,000 | 12 x 500,000 | Crawford Ltd.<br>Middle and Eggmont Street<br>Kingstown, St. Vincent and the Grenadines |
| 2,000,000 | 20 x 100,000 | Westlake Ltd.<br>Middle and Eggmont Street<br>Kingstown, St. Vincent and the Grenadines |
| 1,000,000 | 10 x 100,000 | Dr. Reinhard Rauball<br>Wittbraeucker Waldweg 17<br>Herdecke-Ruhr/Germany |

11453

0W100546

2

| 500,000 | 5 x 100,000 | Ostrov Resources Ltd.<br>508-100 Park Royal<br>West Vancouver, BC V7T 1A2<br>Canada |
|---|---|---|
| 500,000 | 1 x 500,000 | Marga Wutzer<br>Waldstr 170<br>51147 Koln<br>Germany |
| 500,000 | 5 x 100,000 | Renate Hofferer<br>Wolf Pader Paltz 2<br>9330 Treibach<br>Austria |
| 375,000 | 3 x 100,000<br>1 x 75,000 | Renate Hofferer c/f Oskar Hofferer<br>Wolf Pader Paltz 2<br>9330 Treibach<br>Austria |
| 375,000 | 3 x 100,000<br>1 x 75,000 | Renate Hofferer c/f Johannes Hofferer<br>Wolf Pader Paltz 2<br>9330 Treibach<br>Austria |
| 1,100,000 | 11 x 100,000 | Inter Realities, AG<br>Badenerstr. 281<br>8003 Zurich<br>Switzerland |
| 947,000 shares | 9 x 100,000<br>1 x 42,000 | Herkules, AG<br>Landstrasse 161<br>9494 Schaan<br>Liechtenstein |
| 13,242 shares | 1 x 13,242 | Sinbad Ltd.<br>Middle and Eggmont Street<br>Kingstown, St. Vincent and the Grenadines |
| 4,000 shares | 1 x 4,000 | Herbert Ray<br>Kirchgasse #2<br>8952 Schlieren<br>Switzerland |

11454

Esc    00547

3

| | | |
|---|---|---|
| 140,758 shares | 1 x 140,758 | MSA Mesa, AG<br>Stadtley 7<br>FL-9490 Vaduz<br>Liechtenstein |
| 300,000 shares | 1 x 300,000 | GIA mbH<br>Alte Landstrasse 64A<br>584452 Witten<br>Germany |
| 1,250,000 shares | 5 x 250,000 | EuroCape Lda<br>Socidade Commercial<br>Rua 5 Dejallo 16<br>Kap Verde |
| 1,050,000 | 10 x 100,000<br>1 x 50,000 | Dr. Reinhard Rauball<br>   in trust Rechtsanwalt Und Notar<br>Friedensplatz<br>44135 Dortmund<br>Germany |
| 100,000 | 1 x 100,000 | W.D.C. Caper Ltd.<br>Stadtley 7<br>FL 9490 Vaduz<br>Liechtenstein |
| 875 ,000 | 8 x 100,000<br>1 x 75,000 | MSA Mesa, AG<br>Stadtley 7<br>FL-9490 Vaduz<br>Liechtenstein |
| 300,000 | 6 x 50,000 | Ester Ottinger<br>Casetta d'Elci<br>Rapolono Terme/SI<br>Italy |
| 675,000 | 6 x 100,000<br>1 x 75,000 | Sinbad Ltd.<br>Middle and Eggmont Street<br>Kingstown, St. Vincent and the Grenadines |
| 1,050,000 | 21 x 50,000 | New Bond Ltd.<br>Stadtley 7<br>FL-9490 Vaduz<br>Liechtenstein |
| TOTAL SHARES | | 23,950,000 Shares |

11455

# LEFAX - MESSAC

## LEXADMIN TRUST REG.

| | |
|---|---|
| Städtle 7 | Tel. Int.        041-75-232 87 26 |
| FL-9490 Vaduz | Fax Int.        041-75-232 87 28 |
| Liechtenstein | Tlx.            889 384 BBJ FL |
| | CompuServe  100326,66 |

Seiten / Pages: 1+ O

27. Juni, 1994 /nm

Fax No.: 057 48 22 51

Mr. Armando Ulrich

**att.**
**Dr. Reinhard Rauball Esq.**
**Friedensplatz 7**
**D-44135 Dortmund**

**RE: EUROGAS AG**

Dear Mr. Rauball

Quote:

   The Stock purchase agreement between Jeffrey Trust   and MCK and the General Agreement between EnergyGlobal AG and Mike McKenzie/ MMPBV are in good standing. All rights and obligations are transferred to EuroGas AG, new EnergyGlobal AG.

Sincerely yours

**LEXADMIN TRUST Reg.**

Bryan jeeves OBE

Escrow107657

# GENERAL AGREEMENT

This GENERAL AGREEMENT is entered into as of this the 2 nd of August 1994, by and between MCK DEVELOPMENT B.V. (MCK), a Dutch Corporation whose registered seat is Herengracht 320, 1016 CE Amsterdam NL, Dossier Nr. 238.799, and EnergyGlobal AKTIENGESELLSCHAFT, (EGA) Städtle 7, 9490 Vaduz, Fürstentum Liechtenstein.

WHEREAS, MCK owns eighty three percent (83%) of the shares of stock in MCKENZIE METHANE POLAND BV (MMPBV). BARON FINANCIAL LTD. (BFL), is the owner of four percent (4%) of the shares and JEFFREY LTD. (JFL) is the owner of twelve percent (12 %) of the shares not yet recorded in the share registry of MMPBV.

WHEREAS, MMPBV owns certain rights and obligations under certain joint venture and concession agreements in Poland, including but not limited to the joint venture agreement creating POL TEX METHANE LTD. (PTM), dated the 14th day of September 1990 and amended on the 21st day of February 1993, between PTM and the Republic of Poland's Minister of Environmental Protection, Natural Resources and Forestry for the Republic of Poland; a joint venture agreement dated the 14th day of September 1993 between MMPBV and Rybnicha Spolka Weglowa SA creating McKenzie Methane Rybnik (MMR); and other preliminary agreements and joint venture proposals currently outstanding to these and other coal mines in the Upper Silesian Coal Basin of Poland. Copies of agreements and documentation has been made available to EGA.

WHEREAS EGA desires, through MCK, to become the owner of thirty four percent (34%) of MMPBV. EGA will earn this ownership position in MMPBV as it advances funds as set forth in this agreement.

WHEREAS, EGA agrees to pay the sum of thirty nine million U.S. dollars ($ 39.0 million) for thirty four percent (34 %) of MMPBV of the sum 19.0 million U.S. dollar will be paid to MCK and 20.0 million U.S. dollar to MMPBV for contribution to capital. Nonepayment of the initial $750,000 payment by August 4, 1994 will terminate this agreement. The payment of thirty nine million U.S. dollars ($39.0 million) shall be made as follows:

    A. $ 750,000.00 shall be paid to MMPBV as a lump sum payment simultaneous to the closing of EGA and EuroGas Inc.but not later than August 4st, 1994. (250,000.00 US $ is hereby acknowledged as being received)

    B. $ 1,800,000.00 shall be paid as a lump sum on or before September 1st, 1994.

    C. $ 2,500,000.00 shall be paid as a lump sum on or before October 10th, 1994 and



EXHIBIT
52
April 19, 2001

D. A minimum payment of 1.147 million U.S. dollars per month commencing 45 days after EGA receives an audited financial statment of MMPBV from a "big six" accounting firm. A total of 39.0 million U.S. dollars ( thirty nine million U.S. dollars ) shall be paid by September 30th, 1995.

The payment of the first 10.0 Mio. US $ (ten million US $) shall go to MMPBV - all payments after the first payment of 10.0 million $ shall be divided so that MMPBV shall receive 34.5 % ( thirty four and a half percent) of the payment as contributed capital. EGA shall receive monthly stock registration at the rate of one percent (1 %) of the total outstanding stock of MMPBV (600 shares) for each one million one hundred forty seven thousand U.S. dollars ( $1.147 million) paid or a proportionate share for proportionate payments. Payments shall be cumulative upon receipt of the first payment by MCK after the audit.

Monthly minimum payments are due by the 10th of each following month to :

DG BANK (SCHWEIZ) AG
Münsterhof 12
CH- 8001 Zürich
SWIFT - Code: DGBKCHZZAXXX
account MCK Development B.V.:        102.771/001.000.840
account McKenzie Methane Poland B.V.  102.772/001.000.840

WHEREAS, the parties agree that the sum of three million nine hundred thousand dollars U.S. ( $ 3.9 million) will be to paid to Bertil Nordling by MMPBV out of future profits.

Non payment of the thirty four million U.S. dollars ($ 34.0 million) or non payment of monthly lump sum or minimum payments as set forth in this agreement will upon ten days written notice terminate the right of EGA to aquire the unpaid portion of this option. .

MCK and EGA agree that INVICO CAPITAL CORPORATION AG, Kirchgasse 24, Zürich (INVICO) will act as the Trustee for the closing of this transaction. EGA agrees to meet immediately with INVICO to set up any nescessary bank accounts and to execute all nescessary documents to close this transaction. EGA will wire transfer all funds into a Trust account with INVICO. INVICO will then be responsible for the issuance and the transfer of the shares of stock in MMPBV to EGA and the transfer of the thirty nine million dollars U.S. (US $ 39.0 million) to MMPBV and MCK as set out above.

Page 3

MCK and EGA are in agreement concerning the possible addition of another participant, OMV, who can strengthen PTM's position in obtaining major financing for the project and who would add needed services to the project. In this regard, both MCK and EGA agree to work to this end and to make available from their ownership position in PTM through MMPBV, equal for proportional interest to OMV should they desire to participate in PTM.

MMPBV has made special considerations to key people and MCK and EGA agree to proportionally share in these considerations. This consideration will be in form of a ten per cent (10%) net profit interest.

MCK agrees to grant an immediate board seat in MMPBV to Merlin V. Fish or his nominee. EGA shall be entitled to equal representation on the board of directors of MMPBV upon payment of 39 million US dollars ( ten million $ ).
*thirty-nine*

NOW, THEREFORE, MCK and EGA do hereby agree to the following:

1.   GOVERNING LAW. This agreement shall be construed and governed by Liechtenstein law.

2.   COOPERATION. Each party shall cooperate in providing whatever is nescessary for the other to accomodate governmental regulation and procedures.

3.   ARBITRATION. The parties shall attempt to resolve any dispute amicably. Any dispute arising out of or related to this Agreement which is not resolved shall be settled by arbitration. Arbitration shall be conducted in accordance with Zurich Chamber of Commerce rules as in effect on the date of this Agreement. The place of arbitration and making of the award shall be in Zurich,  Switzerland and the proceedings shall be Zurich.

4.   ASSIGNABILITY. Assignability of this Agreement shall be limited to affiliates of each party.

5.   EGA will be merged into a U.S. public company simultaneously with the first payment on this option. MCK,  Rolf Schlegel, PolTex and MMPBV  will cooperate in obtaining all documents, financial statements, and permission from all nescessary parties for making proper disclosures ( both immediate and on a quarterly basis ) to the Securities and Exchange Commission (SEC) in the United States.

Page 4

6.    EGA's ownership interest in reserves of the existing or future joint ventures, aquisitions or developements shall flow through MMPBV to the parent company (Public Company) as a beneficial owner of an undivided interest in each project.

7.    MCK and EGA agree that MMPBV shall retain and distribute sufficient hard currency from the sale of gas to ÖMV or other European entities to distribute dividends sufficient to pay 125 % of the intrest cost on EuroGas Inc.debenture offerings.

8.    "Exibit 1" attached hereto contains a list of 20 documents that become part of this agreement with the understanding that EuroGas Inc. by law must disclose certain portions to comply with Securities and Exchange Commission (SEC) requirements.

9.    "Exibit 2" attached hereto is the initial proposed budget agreeable to all parties and shall be implemented.

10.    EuroGas Inc. shall have their nominee sign all payments of more than 5,000.00 US $ in Poland by the 10th of each month. They shall be entitled to a nominee appointment to each joint venture management commitee and the executive commitee of MMPBV. *If Euro Gas is not available on the 10th of the month, payments will be made as per budget*

11.    The scope of work performed by INVICO will be agreed upon by October 15th, 1994 to avoid future conflict of intrest problems.

12.    Both parties shall attempt to convert the 10 % net profit intrests to certain employees to stock in the public company.

Upon approval of this agreement EGA and MCK will need to enter into a Shareholders Agreement which will provide for specific details of the operations of the projects through MMPBV.

THIS General Agreement is executed this the 2nd day of August 1994.

EnergyGlobal AKTIENGESELLSCHAFT

_____
Bryan Jeeves, Director

MCK DEVELOPMENT B.V.

_____
Michael McKenzie, Director

MMPBV

_____
Michael McKenzie, Director

# TELEFAX and COURIER - MESSAGE
## ENERGY GLOBAL AKTIENGESELLSCHAFT

Städtle 7
FL-9490 Vaduz
Liechtenstein

Tel. Int.       041-75-232 87 26
Fax Int.        041-75-232 87 28
Tlx.            889 384 BBJ FL
CompuServe  100326,66

Seiten / Pages: 1+ 4

26. Januar, 1995 /nm

Fax No.: 001-801-35-93-954

Grant L. Hardy CPA
PETERSON, SILER & STEVENSON
Certified Public Acountants
430 East 400 South
Salt Lake City, UT. 84111
USA

**<u>DOCUMENTS</u>**

Dear Mr. Hardy

As instructed  today by Mr. Fish, we are forwarding herewith the documents concerning Jeffrey
Limited.

Please do not hesitate to contact us, if you have any queries.

Sincerely yours

ENERGY GLOBAL AKTIENGESELLSCHAFT

Normann Maxer

encl.

000414

Escr  )

4434

ULRICH. J. LT.   FAX   0041-57-482251                         PAGE 01

# STOCK PURCHASE AGREEMENT

### Between:

Dr. Reinhard RAUBALL, Rechtsanwalt und Notar, Friedensplatz 7 ( am Rathaus )
44135 Dortmund, Germany as attorney in fact

hereinafter called the Investor

### and

EnergyGlobal AG, Staedtle 7, FL-9490 Vaduz, Liechtenstein.

hereinafter called the company (EGA)

### PREAMBLE:

**Whereas** under an Agreement appended hereto designated Exhibit A & B, the Liechtenstein Company EnergyGlobal AG has aquired certain rights, namley the option and existing 16 % (sixteen percent) of McKenzie Methane Poland BV (MMPBV) and

**Whereas** EGA will thereafter raise the capital and exercise the option for 34 % (thirty four percent) of MMPBV for an amount of US$ 39.0 million ( thirty nine million US dollars), and

**Whereas** an injection of US$ 1,000,000.00 million ( one million US dollars) and 12 % ( twelve percent) of MMPBV will be brought into EnergyGlobal AG immediately before the hereafter described merger, and

**Whereas** thereafter EGA immediately will merge with the company in the USA to be named EuroGas Inc. in a reverse acquisition, so that the shareholders of EGA will be the controlling shareholders of the merged entities pursuant to the appended EGA structure designated Exhibit C, and

**Whereas** the Liechtenstein company EGA upon completion of additional funding as a wholly owned subsidiary of the US company EuroGas Inc, can own up to 50 % (fifty percent ) of MMPBV, and

Escrow100.

11598

**Page 2**

Whereas the Investor wishes to participate in the cash injection and aquire equity as described hereunder, and

Whereas the Investor only wishes the invested amount to be remitted to EGA before the merger described hereto

## BOTH PARTIES TO THIS AGREEMENT MUTUALLY AGREE THE FOLLOWING :

1. The Investor will remit under this agreement the sum of 1,000,000.00 US $ ( one million US $ ) on/or before July 29th, 1994 AND 692,772.50 US $ ( six hundred ninety two thousand seven hundred seventy two and fifty cents US $) or the equivalent in DM/ SFr on/or before August 29th, 1994. The purchase price shall be paid by delivery of cash or immediately available funds by wire transfer.

2. The Investor will receive the following equity, based on a share calculation price of US $ 1.4285 ( one dollar forty two eight five cents ) as follows:

700,035 shares for the payment of 1,000,000.00 US $ ( one million US $ ) or equivalent in DM/ SFr. After the merger, but before August 29th, 1994 the investor will remit 692,772.50 ( six hundred ninety two thousand seven hundred seventy two and fifty cents US $ ) to purchase additional equity shares ( 484,965 shares ) at 1.4285 US $ per share.

3. The investor receives the first right of refusal to remit the balance of financing provided the payment dates in paragraph 1, are timely met.

4. This Agreement shall be subject to Liechtenstein law and the court of juristiction is Vaduz, Liechtenstein.

5. In case of disputes in connection with this Agreement, a Court of Arbitration under the exclusion of the Liechtenstein ordinary courts is hereby agreed. Each disputing party shall appoint one arbitrator and the hereby appointed arbitrators shall mutually appoint a third person as Chairman. Arbitration shall be undertaken pursuant to Liechtenstein law. If the two appointed arbitrators cannot agree on a chairman, then such person shall be appointed by the Princely Liechtenstein Court of Justice.

In witness hereof the legally valid signatures of the parties hereto.

11599

Escrow100692

EnergyGlobal AG                                    The Investor

Via Fax:  011-41-75-232 87 28

January 30, 1995

Mr. Bryan Jeeves
Lexadmin Trust Reg.
Stadtle 7
FL-9490 Vaduz
Liechtenstein

Dear Brian:

This letter will address the questions raised in the fax transmission dated January 30, 1995.  The answers are listed by the question numbers from your original fax.

1).      As Eurogas's accountant I confirm that the books and records reflect a payable to Energy Global of $612,000 as is shown in your receivable account 1030.  Eurogas also reflects a receivable from  Energy Global of $11,027,883.20 which agrees to Energy Global account 2005.  Mr. Merlin Fish will also confirm these items in a fax transmission to you latter in the day.

Accounts 2001, 2002 and 2003 are part of what make up the foreign capital account.  These accounts, a long with account 2100 are considered the equity of Energy Global.  Eurogas issued the 20,950,000 shares of Eurogas Inc. common stock for all of the equity in Energy Global.  Please reference the Acquisition Agreement between Energy Global AG and Northampton dated August 3, 1994.  No other confirmation should be necessary.

As you are aware, Barron paid $4,000,000 to acquire an interest in MMPBV.  Jeffery issued a note for $12,000,000 to acquire it's interest in MMPBV.  Both parties then contributed their interest in MMPBV to Energy Global for which Barron  received the foreign capital of $4,000,000 and Jeffery's received foreign capital of $3,000,000 and a note payable  of $9,000,000.  This note payable was assumed by Eurogas in the merger and is currently part of the inter company account 2005.

Mauer had an agreement with Energy Global to contributed a total of $3,041,000.  Of this amount, $1,093,956.80 was received prior to the merger with Eurogas and the balance was received on August 31, 1994.  We may still need to book an entry on Energy Global to reflect the balance received after the merger.  Mauer ultimately received 1,050,000 share of Eurogas stock and $1,541,000 in convertible debentures of Eurogas for his investment.

Account 2004 represents is a liability owed to Wolfgang.  It is not part of the foreign capital account an is not part of the amounts exchanged in the acquisition agreement.  I believe that your bank records reflect the majority of this being repaid to Wolfgangs company, "OSTROV" after September 30, 1994.  With most of the balance being repaid after year end, no confirmation should

11485

Esc.

)

J0578

be necessary on this account.  If one is still needed, it will need to be acquired from Wolfgang. Armando may also have additional information on this balance.

2.      The $11,027,883.20 in account 2005 is correct and should be included in note 3.  The example notes I faxed to your were just that, an example.  Please feel free to make what ever changes are necessary to them in order for them to comply with the actual information.  Please also issue the first copy of the financial statement to me in draft form in order that I might discover any changes that should be made to bring it in to conformity with Eurogas's books.

Regarding the Transitorische Passiven (Accounts payable) item.  I in no way meant to imply that exchange losses are part of that account.  I separated the request in a separate paragraph.  The US auditors simply have asked for information regarding the exchange losses and I am uncertain if the non related income account 7220 represent exchange losses.  Please address exchange losses as a separate item just as you will accounts payable and the other accounts.

3.      The $7,000,000 consist of the $4,000,000 contribution of MMPBV shares by Barron  and the $3,000,000 portion of the Jeffrey's contribution of MMPBV to Energy Global for which they received the "foreign capital".  See item 1 above.  The $9,000,000 is the balance of the Jeffrey's $12,000,000 investment in MMPBV that was contributed to Energy Global in exchange for debt.

4.      The $1,013,942 should simply be your account balance for account 2001.  The fax is difficult to read and I may have the wrong number.  This latest fax appears to read $1,093,956.80.

5.      The accounts have been forwarded to Mr. Fish and Ulrich for substantiation.

6.      Mr. Kranz's original letter can stand as is.  Please address the requested items in a new letter and by issuing a draft (not a final copy) of the financial statements.

In addition to the above items, the US auditors have requested that an estimate of any income taxes that may be owed be recorded on the books of Energy Global as of September 30, 1994.  If no income taxes would be owing off of the income/loss generated during the period please then confirm any timing differences between book recogition of income taxes and the actural taxes being paid.

Sincerely,

Scott C. Godderidge

11486

# TELEFAX - MESSAGE
## LEXADMIN TRUST REG.

| | |
|---|---|
| Städtle 7 | Tel. Int.      041-75-232 87 26 |
| FL-9490 Vaduz | Fax Int.      041-75-232 87 26 |
| Liechtenstein | Tlx.            889 384 BBJ FL |
| | CompuServe 100326,66 |

Seiten / Pages: 1+ 0                                16. Februar, 1995 /nm

Fax No.: 001 801 262 5516

                                                    Mr. Scott Godderidge

Dear Scott

We have received a fax from Merlin Fish confirming on behalf of Northhampton the US$ 12041'000 loan.

We also need an original for Mr. Kranz. However we still have not received (nor has Mr. Kranz) the signed liability certificate requested in his fax to you dated 9th February, 1995. Again we need the original hard copy.

Armando Ulrich was here yesterday and was not very happy that Beat Kranz did not hand him the signed accounts. However, bearing in mind the amounts involved Beat Kranz really requires the foregoing.

Your assistance would be greatly appreciated.


LEXADMIN TRUST Reg.


Normann Marxer


11442

Es.

00535

## STOCK EXCHANGE AGREEMENT

This Stock Exchange Agreement is entered in to this 13th Day of June, 1994 between EnergyGlobal AG (in formation), Staedtle 7, FL 9490 Vaduz, Liechtenstein and Jeffrey Limited, Middle & Egmont Street, Kingstown, SVG, hereinafter called AGER

WHEREAS  AGER owns  36  A-shares, numbered A 3 and -A  38 incl. and  36  B-shares numbered B 3 -B  38 incl. of McKenzie  Methane Poland BV (MMPBV) which equals 12% (twelve percent) of the total outstanding stock of MMPBV and

WHEREAS  AGER  is desirous of having his ownership in MMPBV converted from shares in a private company (MMPBV) to shares in a US public company and

WHEREAS  EGA is the owner of an option to purchase 34% (thirty four percent) of MMPBV and

WHEREAS  EGA has signed a letter of intent with a US public company whose name is to become EuroGas Inc.  Said merger is scheduled to close on or before June 17th ,  1994 in Vaduz, Liechtenstein and

WHEREAS  in the merger agreement between EGA and EuroGas Inc., EGA represents control of AGER 's 12% (twelve percent) and has agreed on an allocation of 2'100'000 shares (two million one hundred thousand shares) of EuroGas Inc., and $4'000'000'00 of series A convertible debentures of EuroGas Inc., which converts into 1'000'000 shares of EuroGas Inc., stock and $5'000'000'00 dollars of series B convertible debentures of EuroGas Inc., which convert into 1'000'000 shares of EuroGas Inc., stock to be issued to AGER  for total of 36  A shares and 36 B shares of MMPBV.

Now therefore AGER  agrees to accept 2'100'000 shares of stock (two million one hundred thousand) shares of EuroGas Inc. stock and the above mentioned debentures and therefore shall immediately authorize INVICO to record ownership (in the name of EnergyGlobal AG) of it's 36  A shares and 36  B shares of MMPBV upon the execution of a definitive merger agreement between EGA and EuroGas Inc. that provides for an allocation of 2'100'000 shares (two million one hundred thousand shares) and the above mentioned series A and B convertible debentures which each convert to 1,000,000 shares.

This agreement is irrevocable until June 17th, 1994.

**001887**

Date: _13th June 1974_

Energy Global AG in Gründung
Staedtle 7
9490 Vaduz
this agreement has been extendet to 26th of July 1994
Energy Global AG

Jeffrey Limited
Kingstown
SVG

Jeffrey Limited, Kingston

_22.7-4,94_

Escrow105913

# *Promissory Note*

US$ 12'000'000.--                                    Vaduz, 13th June, 1994

JEFFREY LIMITED, a Corporation of St. Vincent and the Grenadines, ("Maker") for value received hereby promises and agrees to pay unto MCK Development B.V., Herengracht 320, 1016 CE Amsterdam, The Netherlands, ("Payee") in lawful money of the United States of America the sum of US$ 12'000'000.— (twelve million dollars) to be repaid in accordance with the terms and conditions hereof.

It is understood that the principal amount set forth above is the amount which is owed by the Maker to the Payee for the purchase of 72 shares of MCK Development B.V., Amsterdam.

Payment hereunder shall be made by Maker to Payee in full on June 13th, 2004.

The Maker will make an annual interest payment of 6 3/8 % (one year LIBOR + 1 %), first payment due on June 13th, 1995.

Maker may prepay the amount hereunder in whole or in part at any time prior to the above date at Maker's election.

As security for all present and future claims of the payee under the present Note the Maker pledges to the Payee the 72 shares. In the event of a sale or any other transfer of the shares or any of its rights to the title, the Maker will need the permission of the Payee and will secure the absolute and irrevocable right of regress to the Payee by a separate pledge and Assignment Agreement.

If default is made in the payment of this Note at the annual interest payments or at maturity, Maker agrees and is also to pay to the owner and holder of this note a reasonable amount as attorneys' or collection fees in connection with the collection efforts, if any, by Payee hereunder.

JEFFREY LIMITED



# AMENDMENT TO THE

# PROMISORY NOTE

dated Vaduz, 13th June, 1994

Paragraph 2 should be read as follows:

It is understood that that the principal amount set forth above is the amount which is owed by the Maker to the Payee for the purchase of 72 shares of MMPBV owned by MCK Development B..V., Amsterdam.

Vaduz, 26th January 1995

JEFFREY LIMITED

Normann Marxer

I    N    V        I    C    O



EXHIBIT
49
April 19, 2001

INVICO
CAPITAL CORPORATION AG

Kirchgasse 24
Postfach 4754
CH-8022 Zürich

Telefon 0041-1-261 72 11
Telefax 0041-1-261 72 88

Zurich, 09.08.1994
SR/psc

17q

**TELEFAX**    **057/48'22'51**

To:        Mr Merlin Fish

From:      Rolf Schlegel

Ref:

Number of Pages incl. Cover Page:    -9-

---

Dear Merlin,

Attached documentation is to be signed by Brian Jeeves or Norman Marxer. Any
suggestion is appreciated.

I look forward to hearing from you.

Kind regards,

Rolf Schlegel

INVICO CAPITAL CORPORATION AG

EXHIBIT 25 A

RS00134

000072

## *Promissory Note*

15R June 1994

US$ 12'000'000.–                                    Vaduz, 8th August, 1994

JEFFREY LIMITED, a Corporation of St. Vincent and the Grenadines, ("Maker") for value received hereby promises and agrees to pay unto MCK Development B.V., Herengracht 320, 1016 CE Amsterdam, The Netherlands, ("Payee") in lawful money of the United States of America the sum of US$ 12'000'000.– (twelve million dollars) to be repaid in accordance with the terms and conditions hereof.

It is understood that the principal amount set forth above is the amount which ~~may~~ ouked be ~~drawn by~~ Maker ~~from~~ Payee for the purchase of 72 shares of MCK Development B.V., Amsterdam.

Payment ~~of all sums advanced to Maker by Payee made on June 13th, 1994, and~~ hereunder shall be made by Maker to Payee in full on June 13th, 2004.

The Maker will make an annual interest payment of 6 3/8 % (one year LIBOR + 1 %), first payment due on June 13th, 1995.

Maker may prepay the amount hereunder in whole or in part at any time prior to the above date at Maker's election.

As security for all present and future claims of the payee under the present Note the Maker pledges to the Payee the 72 shares. In the event of a sale or any other transfer of the shares or any of its rights to the title, the Maker will need the permission of the Payee and will secure the absolute and irrevocable right of regress to the Payee by a separate pledge and Assignment Agreement.

If default is made in the payment of this Note at the annual interest payments or at maturity, Maker agrees and is also to pay to the owner and holder of this note a reasonable amount as attorneys' or collection fees in connection with the collection efforts, if any, by Payee hereunder.

JEFFREY LIMITED

_____

RS00135

000073

## Deed of Pledge and Assignment

The undersigned,

 *JEFFREY LIMITED, Kingstown, St. Vincent and the Grenadines,*

hereafter called "Pledgor" by this Deed of Pledge and Assignment hereby assings to

 *MCK Development B.V., Herengracht 320, NL-1016 CE Amsterdam* (hereafter called "MCK")

a pledge covering all of the rights and claims of MCK against

 *JEFFREY LIMITED, Kingstown, St. Vincent and the Grenadines,*

hereafter called "Debtor" in accordance with the following conditions:

1.   The pledge shall constitute a security for all rights and claims (including principal, interest, commissions, compensation, expenses, fees, etc., as well as enforcement costs and court costs) which MCK has against the Debtor. The pledge shall also remain in force in the event of the Debor's indebtedness and obligations having been temporarily extinguished in full or in part.

2.   The pledge shall cover the shares and any other assets of any kind, including all related rights and proceeds due at present or in future (interest, dividends, subscription rights, warrants, stock dividends, etc.) resulting from the shares purchased under the note of 8th August, 1994.

   In the event the pledges are exchanged, the new pledges shall without any further formalities whatsoever serve in substitution of the former pledges. The pledge shall always cover the full objects pledged, even if their value is increased later on by additional payments or for any other reason.

3.   Upon the first demand by MCK the Pledgor shall be bound to cooperate in transferring the pledges to another party and to make available any and all declarations, endorsements and/or assignments necessary for exercising the pledge. Securities which cannot be pledged without a deed of assignment are herewith assigned to MCK in accordance with Art. 901, para. 2 of the Swiss Civil Code.

   Pledges held by third parties may be taken into safekeeping by MCK at any time.

RS00136

000074

*Deed of Pledge and Assignment*           *page -2-*

4. If MCK elects to initiate official collection proceedings against the Debtor, it shall have the option to either institute prosecution for realization of the pledges or to institute the ordinary debt collection procedure.

5. All communications of MCK shall be considered duly and legally made if they have been sent to the last address indicated by the Debtor.

6. Applicable law and court of jurisdiction: All legal relations between the Debtor, the Pledgor and MCK shall be governed by Swiss law.

    The place of performance and the place of prosecution for Debtors and/or Pledgors domiciled or residing abroad, as well as the court of jurisdiction for all legal proceedings, irrespective of the Debtor's and/or Pledgor's domicile or residence, shall be ZURICH 1.

    MCK shall, however, also have the right to prosecute the Debtor and/or the Pledgor before the competent court at his place of domicile, or before any other court having jurisdiction.

Place, date:

_____

The Debtor:                          The Pledgor:

_____       _____

*Jeffrey Ltd*                        *Jeffrey Ltd.*

RS00137

**MSA Mess A.G.**
**Stadtle 7**
**FL 9490 Vaduz-Liechtenstein**

August *9th*, 1994

Northampton, Inc.
435 West 9160 South
Sandy, Utah 84060

Re:    *Northampton, Inc. ("Northampton"), 6,900,000 shares of common stock,*
*in the name of Barbara J. Waldron ("Waldron")*
*and 6,900,000 shares of common stock in the name of*
*Patricia B. Fish (the "Northampton Shares")*

Ladies and Gentlemen:

In connection with our purchase of the Northampton Shares, the undersigned ("Purchaser") represents the following:

1.    Purchaser acknowledges that neither the SEC nor the securities commission of any state or other federal agency has made any determination as to the merits of acquiring the Purchased Stock, and that this transaction involves certain risks.

2.    Purchaser has received and read this Agreement and understands the risks related to the consummation of the transactions herein contemplated.

3.    Purchaser has such knowledge and experience in business and financial matters that it is capable of evaluating Seller and its business operations. Purchaser and its representatives have been given the opportunity to meet with and ask questions of the officers and directors of Seller to obtain any additional information they consider material to the acquisition of the Purchased Stock.

4.    Purchaser is not a "U.S. Person" as defined under regulation 230.902(o)(1) promulgated under the Securities Act and set forth below:

(a)    "U.S. Person" means:

(i)    any natural person residing in the United States;

(ii)    any partnership or corporation organized or incorporated under the laws of the United States;

(iii)    any estate of which any executor or administrator is a U.S. person;

(iv)    any trust of which any trustee in a U.S. person;

(v)    any agency or branch of a foreign entity located in the United States;

Escrow023818

Northampton, Inc.
August _____, 1994
page 2

      (vi)    any non-discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary for the benefit or account of a U.S. person;

      (vii)    any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if an individual) resident in the United States; and

      (viii)    any partnership or corporation if:

      (A)    organized or incorporated under the laws of any foreign jurisdiction; and

      (B)    formed by a U.S. person principally for the purpose of investing in securities not registered under the Securities Act, unless it is organized or incorporated, and owned, by accredited investors (as defined in rule 501(a) under the Securities Act) who are not natural persons, estates or trusts.

5.    Purchaser maintains its principal residence outside the United States.

6.    Purchaser is not acquiring the Purchased Stock for the account or benefit of any U.S. Person.

Very truly yours,

MSA Mesa A.G.

Lic.iur. Elmar Bissig



EXHIBIT
87
April 19, 2001

INVICO
CAPITAL CORPORATION AG

Kirchgasse 24
Postfach 4754
CH-8022 Zürich

Telefon 0041-1-261 72 11
Telefax 0041-1-261 72 88

EINSCHREIBEN
Herrn lic.iur. Elmar Bissig
Forum Trust Reg.
Städtle 7/Postfach 79

FL-9490 Vaduz

Zürich, 8. August 1995
SR/psc

*Petenes Foundation*

Sehr geehrter Herr Bissig

Wir leiten Ihnen noch folgende Aktien und Dokumente weiter, welche sich im Eigentum von Jeffrey Ltd. befinden:

| | |
|---|---|
| 2'100'000 | Aktien von EuroGas, Inc., eingeteilt in 21 Zertifikate à 100'000 Aktien; Zertifikatnummern 4061 - 4081 dazugehörend: 21 Formulare "Stock Assignment separate from Certificate", blanko |
| 600'000 | Aktien von EuroGas, Inc., eingeteilt in 6 Zertifikate à 100'000 Aktien, Zertifikatnummern 4552 - 4557 dazugehörend: 6 Formulare "Stock Assignment separate from Certificate", blanko |
| US$ 5'000'000.— | Debenture Agreement von EuroGas, Inc., Series A convertible debenture |

Im weiteren orientieren wir Sie, dass infolge einer Zertifikat-Aufteilung noch 65'671 Aktien EuroGas, Inc., für Jeffrey Ltd., ausstehend sind. Wir bitten Sie, dieses Zertifikat direkt von Jeffrey Ltd. zu verlangen.

Gerne hören wir von Ihnen.

Mit freundlichen Grüssen

Rolf Schlegel
INVICO CAPITAL CORPORATION AG

EXHIBIT   21

RS00126

RS-ANC 00112

INVICO
CAPITAL CORPORATION AG

Kirchgasse 24
P.O. Box 4754
CH – 8022 Zurich

Phone: 00-1-261-72-11
Fax: 0041-1-261-72-88

REGISTERED LETTER
Mr. Elmar Bissig
Forum Trust Reg.
Städtle 7 / P.O. Box 79

FL-9490 Vaduz

Zurich, August 8, 1995
SR/psc

*Petenes Foundation*

Dear Mr. Bissig,

We hereby send you the following shares and documents owned by Jeffrey Ltd.:

| | |
|---|---|
| 2,100,000 | Shares of EuroGas Inc., divided into 21 certificates of 100,000 shares; certificate numbers 4061-4081, including the 21 associated forms "Stock assignment separate from certificate", blank. |
| 600,000 | Shares of EuroGas Inc., divided into six certificates of 100,000 shares each; certificate numbers 4552-4557, including the associated six forms "Stock assignment separate from certificate", blank. |
| US$ 5,000,000.00 | Debenture agreement for EuroGas Inc. series A convertible debentures. |

Furthermore, we like to inform you that there are still 65,671 shares of EuroGas Inc. outstanding for Jeffrey Ltd. due to the certificate split. We ask you to request this certificate directly from Jeffrey Ltd.

We look forward hearing from you.

With best regards,
/Signed/
Rolf Schlegel
INVICO CAPITAL CORPORATION AG

RS00127

RS-ANC  00112



RS00128

RS-ANC 00113

)iss Postal Service   Receipt                    ☐ **Duplicate**

☒ Letter
☐ Package
☐ Send with declared value                        Order No. <u>111</u>
☐ Deposit
                                                    **Fee**    <u>6.00</u>


Recipient:      Mr. E. Bissig
                Forum Trust Reg., Städtle 7
Destination:    FL-4940 Vaduz

Postal clerk signature  /signature-illegible/        /STAMP/


RS00129

RS-ANC  00113

29 JAN '96  15:30   FORUM TRUST VADUZ 075 ~~~   FROM

## FORUM TRUST REG.

### TELEFAX MESSAGE / DECKBLATT

2 9. Jan. 1996

J 2025

FL-9490 Vaduz
Städtle 7
P.O.Box 79
TELEFON (075) 232 99 59
TELEX 889 844 BRU FL
TELEFAX (075) 233 20 29

FAX TO / AN    Herrn

Schlegel Rolf

Kirchgass

Zürich


EXHIBIT
115
April 20, 2001

Vaduz, 29. Januar 1996

Pages to be transmitted _1_ Seiten werden übermittelt.

PETENES FOUNDATION

Sehr geehrter Herr Schlegel

Die uns am 8. August 1995 gesandten Aktien betr. EuroGas sind am
22. November 1995 im Original an Herrn Dr. R. Rauball übergeben
worden.

Mit freundlichen Grüssen

FORUM TRUST REG.

Falls unvollständig oder nicht leserlich bitte anrufen.

EXHIBIT 27

RS00146

# FROM

## FORUM TRUST REG.

### FAX MESSAGE / COVER SHEET

January 29, 1996

FL-9480 Vaduz                    **FAX TO**          Mr. Rolf Schlegel
Stadtle 7                                            Kirchgasse
P.O. Box 79                                          Zurich
PHONE (075) 232 99 59
TELEX /illegible/
FAX (075) 233 20 29

Vaduz, January 29, 1996

Pages to be transmitted: **1**

PETENES FOUNDATION

Dear Mr. Schlegel,

The originals of the Eurogas shares sent to us on August 8, 1995 were transferred to Dr. R. Rauball on November 22, 1995.

With best regards,

FORUM TRUST REG.
/Signature - illegible/

Please call if incomplete or illegible.

RS00147

RS-ANC  00085

447

1      Q.   I understand that too.  Wasn't -- in June

2  of 1995 wasn't MCK entitled to receive the shares of

3  stock of Eurogas from the March 1995 closing?

4      A.   Yes.

5      Q.   And would you be receiving that for the

6  benefit of MCK, Claron and Okibi?

7      A.   That is correct.  You have that in the

8  forms, in the documentation.

9                              (Exhibit 87 was marked

10                               for identification)

11     Q.   From 126 through 129 I show you Exhibit 87

12  and ask if you can identify that?

13     A.   Yes.  These were the shares that were sent

14  to  MrBissig.

15     Q.   Is that your signature?

16     A.   It is.

17     Q.   And it's addressed to Mr Bissig who  is--

18     A.   Petenes Foundation, yes.

19     Q.   He is with Forum Trust, the administrator

20  of Petenes Foundation?

21     A.   Yes.

22     Q.   And this is dated August 8, 1995?

23     A.   Uh-huh.

24     Q.   Was this -- is that a "yes"?

25     A.   Yes.

449

1        Q.   OK.   Then is my math off or does that mean
2   you have not issued the 100,000 yet?  No, that --
3              MR MACDONALD:  We'll pull out that one and
4   start over?
5              MR SMITH:  Yes.
6              MR TATE:  He's expecting the 65,000 at the
7   bottom.
8              MR SMITH:  Yes.  But does that take into
9   account the Wolfgang too?
10             MR TATE:  Yes, that's correct.
11             MR SMITH:  OK.
12             MR TATE:  It would be 2,665,671 shares
13  minus Wolfgang and Zimmer.
14             MR SMITH:  OK.
15  BY MR SMITH:
16       Q.   And then you also  sent the $5million
17  debenture?
18       A.   Yes, sir.
19       Q.   And along with that you would have sent
20  the -- any stock assignments that had been signed in
21  blank --
22       A.   We sent everything what we had.  We wanted
23  to get rid of it.
24       Q.   And page 3, is that the equivalent of our
25  return receipt showing that it was received by

450

1    Mr Bissig?

2         A.    It's registered postage and he has received

3    it.

4         Q.    And he received that on, it looks like

5    August 8, 1995, is that correct?

6         A.    That's correct, yes.

7                              (Exhibit 88 was marked

8                              for identification)

9         Q.    From RS192 I'm going to show you Exhibit 88

10   and ask if that is a memo prepared by you?

11        A.    That is correct.

12        Q.    And that is your initials in the lower

13   left-hand corner?

14        A.    That is correct.

15        Q.    And this relates to  a meeting between you

16   and Mr W Rauball?

17        A.    No.

18        Q.    Who is the meeting with?

19        A.    The meeting was with Mr Ulrich.

20        Q.    How can you tell that?

21        A.    Because it says here: "Mr W. Rauball told

22   me that Mr. McKenzie has asked for immediate sale ..."

23        Q.    OK.  Does that mean that Mr Ulrich was

24   there?

25        A.    Or Mr -- Mr Ulrich was at a meeting.  I'm

542

1              (Exhibit 115 was marked

2              for identification)

3    BY MR SMITH:

4         Q.   Don't put that one away.  But from 146 and

5    147 I'm going to show you Exhibit 115 and ask if that

6    is what you were referring to?

7         A.   That was, yes.

8         Q.   All right.  Now, this is a letter that you

9    received from Mr Bissig on behalf of Forum Trust which

10   was acting on behalf of Petenes Foundation, correct?

11        A.   Yes, sir.

12        Q.   And that's January 29, 1996?

13        A.   That is correct.

14        Q.   Is page 2 a correct translation of page 1?

15        A.   Yes.

16        Q.   The shares that were sent by you were the

17   shares of Eurogas owned by whom, Jeffrey?

18        A.   Jeffrey.

19        Q.   All right.  Then am I correct that at some

20   point in time in 1995 Dr Reinhard Rauball was in

21   possession of the Eurogas shares that had been

22   distributed therefore to Jeffrey and were due to MCK,

23   Claron, Okibi and yourself?

24        A.   No.  Those were only shares that were due

25   to Jeffrey from Eurogas.

543

1          Q.    I understand that this exhibit refers only

2     to the shares of Jeffrey in Eurogas?

3          A.    That's correct.

4          Q.    I'm saying that in addition to the shares

5     of Jeffrey -- of Eurogas shares due to Jeffrey, weren't

6     the MCK shares of Eurogas also in the possession of

7     Dr Reinhard Rauball as trustee?

8          A.    That is correct.

9          Q.    OK.  Now, this is dated January 29, 1996.

10    So when you were writing this memo to the file and

11    discussing with Mr Marxer in October -- on October 23,

12    1995 as set forth in Exhibit 114, you didn't know where

13    the shares of Jeffrey were, did you?

14         A.    No.  I did, on the other hand, discuss this

15    with Mr Norman Marxer, and looking at this memorandum

16    I would assume that Mr Marxer would have told me that

17    he does not have the shares.

18         Q.    Then why would you ask him to send the

19    Eurogas shares held by Jeffrey?

20         A.    For MCK.  It says on there exactly why.

21         Q.    OK.  Then I'm again confused and I'm sorry.

22    I thought when we were addressing Exhibit 114 you said

23    I had another document in my possession that would

24    address the request made for the Eurogas shares held by

25    Jeffrey, and I showed you Exhibit 115 asking you if

96

1           THE WITNESS:   Come again?

2    BY MR SMITH:

3           Q.    Did you draft any documents in 1993 or 1994

4    by which Ostrov Resources, Inc would acquire a

5    percentage of MMP BV?

6           A.    Before 1993?

7           Q.    Before June of 1994.  Before the

8    Energy Global acquisition, were there other people who

9    were seeking to acquire interest in MMP BV?

10          A.    There was Baron.  I will have to look it

11   up.

12          Q.    All right, we'll look it up.  OK.  You do

13   remember Baron?

14          A.    Yes.

15          Q.    Who handled the Baron transaction?

16          A.    Mr Rauball, Mr Wolfgang Rauball, I mean as

17   a representative.  But again that was 7 years ago and

18   I have not taken any --

19          Q.    Did you negotiate with Mr Rauball as -- he

20   being the representative of Baron, did you negotiate

21   with him on the cost or the amount that would be

22   invested?

23          A.    No.

24          Q.    Was that handled by Mr McKenzie?

25          A.    Yes.  There is documentation on that.

**Protokoll der 1. Generalversammlung der Baron Finance Ltd., Dublin**

**im Advokaturbüro Regli, Hauptgasse 30, 9050 Appenzell, vom 29. Sept. 1993**

Beginn der Versammlung: 1830 Uhr

Anwesend                 Peter Thoma

                            Edgar Luber

                            Eike Ludes

                            Arne Przybilla

                            Wolfgang Rauball

Traktanden:

1. Begrüssung, Feststellung der Stimmrechte

2. Wahl des Board of Directors

3. Managing Director: Grundsatzerklärung

4. Designation of a Secretary

5. Änderung der Articles of Association:

Quorum für Votes of Members 80 Prozent of shares issued (Art. 10), two members personally present.

6. Auftrag zur Regelung der Unterschriftenberechtigung, der Bankaufträge etc.

7. Vollmachterteilung zur Geschäftsführung

8. Vollmachterteilung zum Vertragsabschluss mit The McKenzie Companies

9. Varia

1.      Die Share Holder werden von Edgar Luber begrüsst. Es wird festgestellt, dass sämtliche Shares an der Versammlung vertreten sind. Edgar Luber wird zum Vorsitzenden der Versammlung gewählt. Die Traktanden werden einstimmig genehmigt.

2.      Es werden ins Board of Directors gewählt:

         Edgar Luber, Deutscher, geb. 9.6.1960, Blumenrainstr. 2, CH - 9050 Appenzell

         Arne Przybilla, Deutscher, geb. 15.6.1952, Alte Strasse 64a, D - Witten

Escrow100310

Peter Thoma, Schweizer, geb. 5. Feb. 1950, Blumenrainstr. 20, CH - 9050 Appenzell

Eike Ludes, Deutscher, geb. 10.9.1943, Ostbahnhofstr.1, D - Mayen

Wolfgang Rauball, geb. 26.11.45, Bernsteinweg 18, D - 4600 Dortmund 30

3.  <u>Managing director</u>: Es wird beschlossen, dass die Vertretung gegen Aussen einem Managing director übertragen werden kann, dass dessen Kompetenzen separat geregelt werden. Der Vertrag mit dem Managing director bedarf der Einstimmigkeit des Board of Directors.

4.  <u>Secretary</u>: Secretary is the "Imperial - Company Formations and Business Services", 11 The Shrubberies, George Lane, London .

5.  <u>Changes of the Articles of Association</u>: Art. 10 of the Articles of Association shall be replaced by following article:
    " 10. The quorum for the transaction of business at any general meeting shall be two members personally present and holding or representing by proxy not less than eigth-tenth of the share capital of the company for the time being issued; and Regulation 54 of Table A shall be modified accordingly."

6.  Dr. E. Ronald Pedergnana, CH - 9000 St.Gallen, wird die Vollmacht erteilt, die Unterschriftenberechtigung, die Bankaufträge und die rechtliche Ausführung der Gesellschafterbeschlüsse zu regeln.

7.  Für den Abschluss des Vertrages mit The McKenzie Companies gemäss General Agreement vom 24. September 1993 wird Edgar Luber und Peter Thoma die Vollmacht zur Vertretung der Baron Finance Ltd. erteilt.

8.  Arne Przybilla erhält bis auf Widerruf eine Vollmacht zum Abschluss sämtlicher Geschäfte für die Baron Finance Ltd.

9.  Es wird beschlossen, einen Gesellschaftsvertrag auszuarbeiten, der das Innenverhältnis der Gesellschafter bestimmt.



Escrow100311

011414

Schluss der Versammlung: 1945 Uhr

Der Vorsitzende:

Edgar Luber

Wolfgang Rauball

Arne Przybilla

Eike Ludes

Peter Thoma

Der Protokollführer:

Dr. E. Ronald Pedergnana

Escrow100312

**Amtliche Beglaubigung siehe Rückseite**

011415

Via Fax: 011-41-75-232 87 28

January 30, 1995

Mr. Bryan Jeeves
Lexadmin Trust Reg.
Stadtle 7
FL-9490 Vaduz
Liechtenstein

Dear Brian:

This letter will address the questions raised in the fax transmission dated January 30, 1995. The answers are listed by the question numbers from your original fax.

1).    As Eurogas's accountant I confirm that the books and records reflect a payable to Energy Global of $612,000 as is shown in your receivable account 1030. Eurogas also reflects a receivable from Energy Global of $11,027,883.20 which agrees to Energy Global account 2005. Mr. Merlin Fish will also confirm these items in a fax transmission to you latter in the day.

Accounts 2001, 2002 and 2003 are part of what make up the foreign capital account. These accounts, a long with account 2100 are considered the equity of Energy Global. Eurogas issued the 20,950,000 shares of Eurogas Inc. common stock for all of the equity in Energy Global. Please reference the Acquisition Agreement between Energy Global AG and Northampton dated August 3, 1994. No other confirmation should be necessary.

As you are aware, Barron paid $4,000,000 to acquire an interest in MMPBV. Jeffery issued a note for $12,000,000 to acquire it's interest in MMPBV. Both parties then contributed their interest in MMPBV to Energy Global for which Barron received the foreign capital of $4,000,000 and Jeffery's received foreign capital of $3,000,000 and a note payable of $9,000,000. This note payable was assumed by Eurogas in the merger and is currently part of the inter company account 2005.

Mauer had an agreement with Energy Global to contributed a total of $3,041,000. Of this amount, $1,093,956.80 was received prior to the merger with Eurogas and the balance was received on August 31, 1994. We may still need to book an entry on Energy Global to reflect the balance received after the merger. Mauer ultimately received 1,050,000 share of Eurogas stock and $1,541,000 in convertible debentures of Eurogas for his investment.

Account 2004 represents is a liability owed to Wolfgang. It is not part of the foreign capital account an is not part of the amounts exchanged in the acquisition agreement. I believe that your bank records reflect the majority of this being repaid to Wolfgangs company, "OSTROV" after September 30, 1994. With most of the balance being repaid after year end, no confirmation should

11485

Escrow100578

be necessary on this account.  If one is still needed, it will need to be acquired from Wolfgang.  Armando may also have additional information on this balance.

2.      The $11,027,883.20 in account 2005 is correct and should be included in note 3.  The example notes I faxed to your were just that, an example.  Please feel free to make what ever changes are necessary to them in order for them to comply with the actual information.  Please also issue the first copy of the financial statement to me in draft form in order that I might discover any changes that should be made to bring it in to conformity with Eurogas's books.

Regarding the Transitorische Passiven (Accounts payable) item.  I in no way meant to imply that exchange losses are part of that account.  I separated the request in a separate paragraph.  The US auditors simply have asked for information regarding the exchange losses and I am uncertain if the non related income account 7220 represent exchange losses.  Please address exchange losses as a separate item just as you will accounts payable and the other accounts.

3.      The $7,000,000 consist of the $4,000,000 contribution of MMPBV shares by Barron and the $3,000,000 portion of the Jeffrey's contribution of MMPBV to Energy Global for which they received the "foreign capital".  See item 1 above.  The $9,000,000 is the balance of the Jeffrey's $12,000,000 investment in MMPBV that was contributed to Energy Global in exchange for debt.

4.      The $1,013,942 should simply be your account balance for account 2001.  The fax is difficult to read and I may have the wrong number.  This latest fax appears to read $1,093,956.80.

5.      The accounts have been forwarded to Mr. Fish and Ulrich for substantiation.

6.      Mr. Kranz's original letter can stand as is.  Please address the requested items in a new letter and by issuing a draft (not a final copy) of the financial statements.

In addition to the above items, the US auditors have requested that an estimate of any income taxes that may be owed be recorded on the books of Energy Global as of September 30, 1994.  If no income taxes would be owing off of the income/loss generated during the period please then confirm any timing differences between book recogition of income taxes and the actural taxes being paid.

Sincerely,

Scott C. Godderidge

11486

Escrow100579

# *Confirmation*

Escrow106547

I, Wolfgang Rauball,

confirm that following two promissory notes:

1.  CHF 145'000.-- (one hundred and fortyfive thousand Swiss Francs), dated May 11, 1994, issued on behalf of OSTROV RESOURCES Ltd., 500 - 100 South Park Royal, West Vancouver, Canada, as Payee, and McKenzie Methane Poland B.V. as Maker

2.  CHF 200'000.-- (two hundred thousand Swiss Francs), dated June 21, 1994, issued on behalf of OSTROV RESOURCES Ltd., 500 - 100 South Park Royal, West Vancouver, Canada, as Payee, and McKenzie Methane Poland B.V. as Maker

are considered to be null and void with their inclusion of this amount into the equity funding outlined by the General Agreement dated August 2nd, 1994. Mr W. Tezky and I have provided these funds. Beneficiary of this amount is Energy Global Aktiengesellschaft (EGA) in Fürstentum Liechtenstein. The cancelled promissory notes will be returned to McKenzie Methane Poland B.V.. I furthermore confirm that the SFR. 84'400.-- (eighty four thousand four hundred Swiss Francs) which I provided and which were credited to the account of McKenzie Methane Poland B.V. on August 2nd, 1994, are also to be considered as a contribution by EGA to the project and thus qualify to an equity share as above two promissory notes.

Zurich, 3rd August, 1994

_____
Wolfgang Rauball

000166

# PROMISSORY NOTE

CHF 200'000.--                                        Zurich, June 21, 1994

McKenzie Methane Poland B.V., a Dutch corporation, ("Maker") for value received, hereby promises and agrees to pay unto OSTROV RESOURCES Ltd., 500 - 100 South Park Royal, West Vancouver, Canada, ("Payee") in Swiss Francs the sum of CHF 200'000.-- (two hundred thousand Swiss Francs) to be repaid in accordance with the terms and conditions hereof. *hiervon*

*in Uba enshine reserves* *nderzeichnung*

*Darlehensvertrag*

It is understood that the principal amount set forth above is the amount which may be drawn by Maker from Payee for activities in the development of methane gas in Poland.

Payment of all sums advanced to Maker by Payee made on June 21, 1994 and hereunder shall be made by Maker to Payee in full on June 20, 1995. The Maker will make an annual interest payment of 7 %, first payment due with the principal on June 20, 1995.

Maker may prepay the amount hereunder in whole or in part at any time prior to the above date at Maker's election.

If default is made in the payment of this note at maturity, Maker agrees and is also to pay to the owner and holder of this note a reasonable amount as attorneys' or collection fees in connection with the collection efforts, if any, by Payee hereunder.

*Converted into Share of MMPBV as outlined in the general Agreement between CK Development and Energy global AG, dted August 2nd 1994.*

*original Promissory Note returned to MMPBV this 11th day of November 1994*

*Wolfgang Cambell*

*fad--oo at Ostrov Resources Ltd*

McKenzie Methane Poland B.V.

By _____
Michael McKenzie, Sole Director

Escrow100230

011334

TELECOPIER TRANSMITTAL SHEET -- PRIVILEGED AND CONFIDENTIAL

*This facsimile contains privileged and confidential information intended only for the use of the individual or entity named below. If the reader of the facsimile is not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, you are hereby on notice that you are in possession of confidential and privileged information. Any dissemination, distribution or copying of this facsimile is strictly prohibited. If you have received this facsimile in error, please immediately notify the sender by telephone (collect) and return the original facsimile to the sender at the above address via the U.S. Postal Service.*

|  |  |
|---|---|
| **Date:** | **Jan. 24 , 1997** |
| **To:** | **Wolfgang Rauball** |
| | **Hank Blankenstein** |
| **c.c.:** | **Howard Landa** |
| **From:** | Martin Schuepbach |

| | |
|---|---|
| Fax No: | 214-880-9608 |
| Phone: | 214-880-9035 |

**Number of pages:**   2 (including cover)

**Subject:**

**Dear Wolfgang:**

Please find attached another fax I received from the BV Company. We opened-up this BV Company about a year ago, because you ( WR Ltd.) preferred a Dutch BV company over our already existing Cayman Isl. company. In our agreement between DIPC and WR Ltd. , which was signed November 1995, it was stated a BV company has to be used as the investment vehicule for WR Ltd. I would really appreciate it, if we could settle this bill, so we can avoid any additional troubles from the BV company (see attached fax).

I also received by registered mail the letter from the BV company dated Jan. 17 (I faxed you a copy of the fax). I'll send the letter via FED EX to Hank, together with some other material, which arrived here.

Regards,

Martin A. Schuepbach

Escrow041529

## KRUSE, LANDA & MAYCOCK, L.L.C.

EIGHTH FLOOR, BANK ONE TOWER
50 WEST BROADWAY (300 SOUTH)
SALT LAKE CITY, UTAH 84101-2034

TELEPHONE: (801) 531-7090
TELECOPY: (801) 359-3954

HOWARD S. LANDA

March 11, 1996

*VIA FACSIMILE TRANSMISSION*

Hank Blankenstein                                                    *255-2005*
EuroGas, Inc.
435 West Universal Circle
Sandy, Utah  84070

        Re:     EuroGas, Inc.

Dear Hank:

        As I stated to you, we have passed the impact of the discovery by the auditors for the Company. All of the actual shares were not transferred with respect to the 81% interest in Energy Global until October 4, 1995.  While I believe that the Company did have control and in fact may have been the question is, under the rules there are two types de jur which is legal completion of the acquisition or de facto which all but the paperwork and filings.  Nonetheless, because of the development stage of the company, I think you may have an argument (although reasonably weak) that you need not include the audit of McKenzie Methane in the fiscal year ended September 30, 1994.  As I stated, I think if challenged you will likely not prevail and will have to provide the additional audit material.  It would help substantially if we could get the audit and pro forma filed on form 8-K for the period ended December 31, 1994 relating to McKenzie Methane and EuroGas.

                        Regards,

                        KRUSE, LANDA & MAYCOCK, L.L.C.



                        Howard S. Landa


HSL:ldp


Escrow01057(



# McKENZIE METHANE POLAND B.V.

REGISTERED SEAT: Leidseplein 29, 1017 PS AMSTERDAM NL - DOSSIER NR: 240.140

*wzbogacajac polskę w nowe źródła energii*

---

# FACSIMILE TRANSMISSION

data / date: **May 14, 1993**

dia / to: **Dr. R. Rauball**

nr telefaksu / fax number: **(49-231) 525-754**

od / from: **Stephen J. Jeu**
**713/468-4849 Houston**

ilość stron włączając stronę tytułową / nr. of pages including this cover: **1**

---

Dear Dr. Rauball:

We have tried but have not been able to reach your brother over the last few days. If you are in contact with him would you please pass this message to him. Thank you in advance for your help.


To: Wolfgang Rauball

It is important that we talk. Please call us at any time of day this weekend at any of the numbers below:

|  | Stephen Jeu | Mike McKenzie | Andy Andraczke |
|---|---|---|---|
| telephone: | 713/468-3777 | 713/494-0458 | 48-22/333-920 |
| fax: | 713/468-4849 | 713/494-3199 | 48-22/332-938 |

If you are unable to reach me directly, please leave a telephone number on my recorder where we can reach you this weekend. Would you also please give me the name and number of a contact person in B.C.

Sincerely,

Stephen Jeu

---

WARSAW: 01-687 Warsaw, Poland, ul. Lektykarska 18 - fax 48-22/332-938 - ☎ 48-22/330-468 or 333-920 or 48-902/156-50
HOUSTON: 7880 San Felipe Road, Houston, Texas 77063 USA - fax 713/972-3300 - ☎ 713/783-4300 - tlx 3738961 mckhou

Escrow022920

# FAX  TRANSMISSION

Mr. Norman Marxer
LEXADMIN TRUST REG.
Srädtle 7

FL-9490 Vaduz,

May 20th, 1994

Dear Mr. Marxer,

        Please wire US$ 12,000.00   ( twelve thousand U.S. dollar) immediately to the
following account:   _____

                KRUSE, LANDA & Maycock
                **BANK ONE**
                Broadway-West Temple Office
                80 West Broadway
                Salt Lake City, Utah 84101

                Account No: 1174-0901
                ABA No: 124001545

We appreciate, to receive a copy of the wiring instruction  to Fax 057-48 22 12 A.
Ulrich.

Best Regards

Wolfgang Rauball

Wolfgang Rauball

Escrow107564

To: Merlin Fish     From: Howard S. Landa     6-3-94   10:10am   p. 1   of 2

## KRUSE, LANDA & MAYCOCK

A PROFESSIONAL CORPORATION
EIGTH FLOOR  BANK ONE TOWER
50 WEST BROADWAY / (300 SOUTH)
SALT LAKE CITY UTAH 84101

FACSIMILE TRANSMISSION SHEET
(801) 359-3954

CONFIDENTIALITY NOTICE

The information contained in this facsimile message is legally privileged and/or
confidential information intended only for the receipt by and use of the individual or
entity to whom or which it is addressed. If you are not the intended recipient, you are
hereby notified that any dissemination, distribution, or copying of this telecopy is
strictly prohibited. If you have received this telecopy in error, please immediately notify
us by telephone and return the original message to us at the address on this page via United
States Postal Service. Kruse, Landa & Maycock guarantees return postage. Thank you.

---

To: Merlin Fish                    Date: 6-3-94

From: Howard S. Landa              Page 1 of 2

---

Escrow101434

12343

F00107

KRUSE, LANDA & MAYCOCK, L.L.C.

EIGHTH FLOOR, BANK ONE TOWER
50 WEST BROADWAY (300 SOUTH)
SALT LAKE CITY, UTAH 84101-2034

TELEPHONE (801) 531-7090
TELECOPY (801) 356-3956

HOWARD S. LANDA

June 3, 1994

FACSIMILE TRANSMISSION

Mr. Wolfgang Rauball, President                    011-49-221-4973894
Eurogas A.G.

Dr. Richard Rauball                                011-49-231-525754
Attorney for Investor (Trustee)

Merlin V. Fish, President                          011-41-57-482251
Northampton, Inc.

Gentlemen:

It is my understanding that an agreement between EuroGas, A.G. and Northampton, Inc. has been signed and is currently being funded. The transaction has progressed to the point where public disclosure to the shareholders of Northampton, Inc. is required. There are two disclosure, one is a release form which describes the transaction in summary and is distributed to all shareholders and appropriate financial news services. That disclosure should be made now so that there is no implication that Northampton, Inc. and its affiliates are withholding relevant market information. The second disclosure is the formal and more detailed report to the Securities and Exchange Commission which must be filed within fifteen days of the signing of the agreement. The filing is known as a Current Report on Form 8-K and includes all documentation. It is my understanding that Merlin Fish will return the documentation so that the 8-K can be properly filed.

Based upon my understanding of the transaction, the public disclosure should occur as soon as possible, certainly no later than the close of the market on Monday, June 6, 1994 and the report on form 8-K would be due June 11, 1994.

Please contact me with any assistance you may require to complete these matters and make sure they are timely reported in the manner prescribed by law.

Sincerely,

Howard S. Landa

HSL:ldp

cc:   Scott M. Waldron

12344

Eso—101435

F00108

85

1   compensate us for our activities as administrator and

2   also as a type of incentive.  It's common, it's not

3   unusual.

4       Q.   Obviously, there would be the need to

5   obtain financing of the Poland project, am I correct?

6       A.   Yes.

7       Q.   Did you -- was it part of your function to

8   attempt to obtain investment or financing from third

9   parties?

10      A.   We tried to assist.

11      Q.   In what way?

12      A.   In contacting people, in meeting banks, in

13  sort of preparing material for the meetings.

14      Q.   Did you ever, in your efforts to raise

15  money, deal with Wolfgang or Reinhard Rauball?

16      A.   Mr Rauball came directly to Mr McKenzie,

17  not to us.

18      Q.   Which Mr Rauball?

19      A.   Mr Wolfgang Rauball.

20      Q.   Do you know how he learned of Mr McKenzie?

21      A.   Through Poland.

22      Q.   Through Poland?

23      A.   I think so, yes.

24      Q.   When you say "through Poland", you mean PTM

25  and the methane gas field there?

1      A.   They had something else going they were,

2   I think, discussing on.  They discussed, I think, a

3   chemical plant through a Pole who used to  live in

4   America and I think he put those two together.

5      Q.   Did you have any personal dealings with

6   Mr Wolfgang Rauball in an effort to raise money?

7      A.   We then were administrating the situation

8   with him.  Of course we had contact with him, we had

9   meetings with him, and had contracts exchanged,

10   prepared them and so on, yes.

11      Q.   OK.  I guess my question is you were more

12   than involved from an administrative standpoint.  If

13   there was an agreement negotiated, reached, then you

14   would try to paper that agreement?

15      A.   Yes.

16      Q.   And if there were funds to be issued,

17   Invico, through its accounts, would handle the funds?

18      A.   Certain funds stayed within the company,

19   but we've always acted on instructions as you can see

20   in all documentation.

21      Q.   Sure, I understand.  Did you have any of

22   the face-to-face negotiations in obtaining financing

23   from Mr Wolfgang Rauball or was that handled by

24   somebody else?

25      A.   I had contact with him, but that was never

87

1    the type of negotiations.  He just had the money or

2    not.

3        Q.   I understand.  I understand.  But the

4    result of him putting money in, somebody else persuaded

5    him to put the money in?

6        A.   Yes.  He persuaded him and he saw the

7    project.

8        Q.   All right.  And who did the persuading,

9    Mr McKenzie or somebody else?

10       A.   Mr McKenzie.

11       Q.   So the dealings between Mr Rauball and the

12   Poland project were handled by Mr McKenzie?

13       A.   Yes.

14       Q.   Any investments that came in from

15   Wolfgang Rauball were the result of negotiations by

16   Mr McKenzie?

17       A.   Yes, because Mr McKenzie and

18   Mr Stephen Jeu, they had to present him the project, we

19   had no idea on this project, and Mr Rauball would not

20   put his money into a company which would not produce,

21   in his opinion, results.

22       Q.   OK.  And if Mr Rauball was to say that he

23   dealt with you on these negotiations, then that would

24   not be correct?

25       A.   Inasmuch he would be correct to  say that we

88

1    did the administration.  He discussed with me certain

2    items and dates and so on which we had to change in the

3    contracts and so on.

4         Q.   But if it was to buy a percentage at a

5    dollar amount or a mark amount or whatever, that price

6    would be fixed by someone other than you?

7         A.   That would have to be agreed by -- as you

8    can see in the documentation.

9         Q.   And you didn't have authority to agree to a

10   price or an amount or a number, did you?

11        A.   I was not a director of the company.

12        Q.   Who was?

13        A.   Mr McKenzie.

14        Q.   Did MMP BV, during the same period of time,

15   have directors?

16        A.   Yes.  Mr McKenzie was a director until --

17        Q.   October of 1995?

18        A.   October, exactly, 4th, 1995.

19        Q.   So from creation until October 4, 1995 did

20   he serve as sole director?

21        A.   He did not fully.

22        Q.   I'm sorry, what?

23        A.   He did not fully serve as a full director,

24   because later, when a large part of the company was

25   sold, Mr Rauball joined the company and *voila*.

Merlin,

Reinhard called again. I also talked
to Mike. He is o.k. He realizes that we
have to wait.
I'm waiting for another call. Pls let's talk
afterwards, since I don't want to miss the
call. Will call again at $1^{15}$ p.m.

Regards

Wolfgang

12341

Es. 1432

F00105

MCKENZIE METHANE POLAND B.V.
LEIDSEPLEIN 29
1017 PS AMSTERDAM

9 June 1994

To   Messrs Northampton Inc.
     Messrs Dr. R. Rauball and W. Rauball
     Mr. Merlin Fish
     Mr. Armando Ulrich
     Messrs Baron Finance Ltd.
     Messrs EuroGas Inc.
     Messrs EuroGas Aktiengesellschaft

June 9, 1994

Dear Sirs,

We have signed on May 26, 1994 a general agreement for immediate funding not later than May 27, 1994.

Obviously no funds have been received to date and we hereby put at notice that if the funds are not here, physically available for us to spend on Monday June 13, 1994 by 11.00 am, you can consider the general agreement as null and void.



Yours sincerely,

McKenzie Methane Poland B.V.

Michael McKenzie, Director

Escrow101454

12363

F00125

EXHIBIT "A"

COALBED METHANE PROJECT

UPPER SILESIAN COAL BASIN
POLAND

A Joint Venture Project of McKenzie Methane Poland B.V.

**INTRODUCTION:**

The Shareholders of McKenzie Methane Poland B.V. are Baron Finance Ltd. of Dublin Ireland and the McKenzie Oil and Gas Group of Houston Texas. Baron Finance Ltd. (BFL) has an Option to increase its shareholding in McKenzie Methane Poland B.V. (MMPBV) to 50% with the McKenzie Group retaining 50%.

Both Shareholders of MMPBV have jointly agreed to make room for additional participants. Therefore, an Option has been granted to ÖMV, the Austrian National Oil and Gas Company, a Public Company controlled by the Austrian Government to earn a 25% interest for providing equity and Major Bank Financing to develop the vast gas reserves underlying the MMPBV concession in Southern Poland.

In the event of ÖMV exercising its Option the interest of McKenzie and BFL will be adjusted on a pro-rata basis.

Additional Major Oil and Gas Companies worldwide have expressed a serious interest to participate in the development of this Reservoir. These include Texaco, British Gas, Ruhrgas, Gaz de France etc. MMPBV is in discussions with these Companies, however feels that ÖMV and/or Ruhrgas would be the logical Partner due to the geographical logistics.

**GENERAL INFORMATION:**

The Methane Gas Reservoir in the MMPBV concession according to independent petroleum engineers exceeds 9.3 Trillion Cubic Feet of Gas in place. A conservative estimate of the recoverable reserves is 2.1 Tcf over 50 years or 1.8 Tcf over 20 years.

This translates into total Gross Sales Revenue of $7.350 Billion US (undiscounted) or $2.881 Billion US on a 10% discounted basis using the current price of $3.50 US$/Mcf.

The total capital investment required to drill appr. 430 wells in appr. $275 Million US in 1993 Dollars. For comparison, BASF recently announced to invest 5 Billion DM to develop the large Iam-Gas Reservoir in Siberia in a Joint-Venture with the Russian National Oil and Gas Company GAZPROM.

*12265*

While other Major US Oil and Gas Companies like Amoco, Conoco and McCormick are holding exploration permits on grounds adjacent to the MMP concession, MMP has obtained as the only foreign Company in Poland a valid production concession.

Under the production concession appr. 13 wells have been drilled and equipped. Tests to start production are underway. In addition to the Methane production, a Natural Gas Field is in the process to be connected to an existing pipeline. This field has been tested for production of 6,000,000 Cubic Feet per day. It is anticipated that production will start by the middle of November 1993.

The former communist Polish Government has extensively drilled the concession area and vast geological data are available from over 300 wells. At today's Dollars this alone would amount to a cost of several hundred million Dollars.

MMP is also pursuing several downstream projects, including gas storage and marketing of gas as transportation fuel such as CNG and LNG. The market for the gas is secured as contracts have been signed with the Polish Oil and Gas Company for all the gas to be produced from the concession. It would allow Poland to reduce its dependency on Russian Gas substantially.

MMPBV through MMP holds the production concession on various Coal-Mines owned by the Polish Government. The Joint Venturees of MMP therefore include the Polish Government as Joint Venture Partner. The interest of the Republic of Poland is an equal 15% carried interest in the Joint Ventures. The interest increases after MMP has recovered 200% of its cost or after 11 years to a 50/50 Joint Venture. All financial statements are based on these assumptions.

## FINANCIAL PROJECTIONS OF BFL INTEREST IN MMPBV:

Based on the assumption of an expanded Development program of 327 of the 900 proposed wells, BFL would receive a Net Cash Flow of over $1,000,000,000 US cumulatively over a 10 year period.

This translates into a Net Present Value at 10% Discount of appr. $454,000,000 US.

The IRR is a staggering 61.15%!

Capital expenditures on behalf of BFL would amount to appr. $260,000,000 US and will consist mostly out of Bank Financing in the amount of appr. $195,000,000 US as well as cash flow from early production.

BFL has made arrangements to secure the balance of the Option required to earn the 50% in MMPBV, which may be reduced in the case of ÖMV exercising its Option to participate.

It is in BFL's interest to let ÖMV participate as ÖMV enjoys a solid reputation worldwide and brings a lot of technical experience to the project.

Escrow101

12266

F000020

More important is the ability of the MMPBV Project to sell Gas into OMV-controlled pipelines into West Europe and obtain hard currency thus bypassing the soft Zloy. This in return would allow Major International Banks to finance the project as collateral in the form of hard currency Letter of Credits will be available.

It should be pointed out however that Major International Banks have expressed a serious interest to finance the project already now. The Polish National Bank has advanced over $7,000,000 US towards the project on a non-recourse basis which indicates the confidence of the Polish Government into the project and its Operator McKenzie.

**NOTICE:**

Northampton, Inc. and NEWCO recognized that MMPBV owns certain rights and obligations under certain joint venture and concession agreements in POLAND, including but not limited to the joint venture agreement creating Pol-Tex Methane Ltd. (PTM) dated the 4th day of September 1990, and amended on the 21st day of February 1991; that certain agreements dated the 9th day of February 1993 between PTM and the Republic of Poland's Minister of Environmental Protection, Natural Resources and Forestry for the Republic of Poland; a joint venture agreement dated the 14th day of September 1993 between MMPBV and Rybnicha Spolka Weglowa SA creating McKenzie Methane Rybnik (MMR); and other preliminary agreements and joint venture proposals currently outstanding to these and other coal mines in the upper Silesian Coal Basin of Poland.

Escrow10135

12267

Mr. Wolfgang Rauball
President
EuroGas AG
Städtle 7
9490 Vaduz / Liechtenstein


May 25th, 1994


Re: BARON-EuroGas Inc.  Stock Exchange


Dear Wolfgang,

I have transmitted via Fax the complete stock exchange agreement of May 9th, 1994 directly to Mr. Bryan Jeeves LEXADMIN TRUST REG. Vaduz. I have also faxed a letter to him regarding my authority to enter into this stock exchange agreement along with the minutes of the Board meeting giving me these powers.

I will send overnight hard copys or deliver personally hard copys on thursday May 26th, 1994 to Mr. Jeeves.

It is time to distribute the 2,800,000 shares received by BARON of EuroGas Inc. stock directly to Baron's shareholders. Please instruct EuroGas Inc. to issue the stock equally to E. Luber, P. Thoma, E. Ludes, A. Przybilla and W. Rauball.


Best Regards


A. Przybilla
Alleinzeichnungsberechtigter BARON FINANCE Ltd.


12321

Escrow]01412

ULRICH-     SULT.    FAX   0041-57-482251                                    PAGE 01

May 2, 1994

Howard,

We are ready to restructure the offer with McKenzie I need the language you talked about to ensure this is a pass through deal. Could you draft the language in at least rough form and fax to me so I can include it. The final document of what you need them to sign will come when you draft the closing documents.

Please fax to me at ~~0115~~ 01141574 82251

The Name of the Company that owns the Concession rights is POL-TEX METHANE, LIMITED PARTNERSHIP

The name of the Company we are acquiring is Euro Gas AG Liechtenstein

The name of the Company Euro Gas is buying Stock in is McKenzie Methane Poland B.V. a Netherlands Company.

Copies of critical documents are attached.

Thanks for your help.

Regards,
Mark

TOTAL 13 pages.

Escrow074747

**Telefax**

To: Landon
From: Ful
Date: 8/8/94   Pages: 8 to

Aug 9, 94

Howard.

Please call Jill for exact dates since there was more than one purchase date.

The Structure of Energy Global & Northampton is entitled ... Hi ... At note, 325,000 has also signed agreements to purchase a total of $14,500,000 — See attached stock purchase agreements. An additional 2 million will come in this month, Part of which is $5 Convert. debentures as you can see from the documents.

The Jeffery Ltd $4 & $5 debentures are interest free for 90 days and mandatory Conversion if bid is $4 or $5 for 10 consecutive business days — Otherwise the $5 debentures you proposed will be the same.

I asked the trustee to fax the letter directly to you — It will probably not be mrs. Jeeves — hard to keep track of all the players over here. They will follow with a hard copy.

Regards
Merlin

Escrow074580

# NORTHAMPTON, INC.
## 435 West Universal Circle
## Sandy, UT  84070
## (801) 255-0862

August 25, 1994

VIA FACSIMILE TRANSMISSION

Mr. Brian Jeaves, Director
ENERGYGLOBAL AKTIENGESELLSCHAFT
Stadtle 7, FL-9490 Vaduz

Dear Mr. Jeaves:

Pursuant to the general agreement dated August 2, 1994 and the escrow agreement dated August 10, 1994, you will receive a payment (in DM) equivalent to $2 million US dollars in the next day or so. Under this agreement, $1.8 million (or equivalent in DM) US dollars is to be paid to INVICO Trust account: BILFINANZ UND VERWALTUNG AG, Gladbachstrasse 105, 8044 Zurich, Account #234,614.9001 DM.

I hereby authorize the transfer of $1.8 million US dollars from Energy Global's account to the above mentioned account of McKenzie Methane Poland B.V. immediately upon arrival of the above mentioned $2 million US dollars.

Additionally, please convert from DM and transfer $50 thousand US dollars to Northampton, Inc.'s account in Salt Lake City as follows:

Guardian State Bank, 142 East 200 South, Salt Lake City, UT  84111

Account #31 03664 3          ABA #124002735

All sums over $50 thousand require the approval of Mr. Raubail as well as myself. I have provided a space for him to sign below. Mr Ulrich will get his signature on Friday, August 26th and get the document to you.

Thank you for your prompt assistance in these matters.

Sincerely,

NORTHAMPTON, INC.

Merlin V. Fish
President

jsh

Agreed to this _25th_ day of August 1994.

Wolfgang Raubail

**000727**

Escrow104748

89

1          MR MACDONALD:   (To the witness)   You are

2   using the word "full"; he used the word "sole".

3          THE WITNESS:   "Sole", yes.

4          MR MACDONALD:   I guess the question is --

5   let's try that again to make sure that we're not having

6   a problem in translation between the two.

7   BY MR SMITH:

8          Q.   From the creation of MMP BV until some of

9   the stock in MMP BV was sold to  EnergyGlobal, am I

10   correct that Mr McKenzie served as the only director?

11          A.   That is correct.   I have a note here that

12   it was until August 1994, maybe June 1994.

13          Q.   All right.   So as of August 1994,

14   Mr McKenzie was a director, but he shared that status

15   with Mr Wolfgang Rauball?

16          A.   That's right, and I think I myself was a

17   director too  then

18          Q.   At that point in time?

19          A.   Yes.   But all decisions were made by

20   Mr Rauball.   Any bank, or any transfer of the bank,

21   would have to be authorized by Mr Ulrich or Mr --

22   and Mr Rauball.

23          Q.   Was Mr Ulrich acting on behalf of

24   Mr Rauball?

25          A.   Yes.

341

1    doing?

2         A.   He was approving payment of this bill.

3         Q.   And was the bill paid?

4         A.   I'm sure it was.  I don't know whether it

5    was paid by Jeffrey or how it was paid.

6         Q.   It was not paid by Energy Global?

7         A.   I do not know.  I only know that I checked

8    this one on a trust account.  We didn't pay from Invico

9    trust account.

10        Q.   Why would it have been issued to

11   Energy Global in the first place?

12        A.   This is the same company of Bryan Jeeves

13   and I suppose it was internal, just a mishap.

14        Q.   You said that it was a shelf corporation of

15   Mr Jeeves'?

16        A.   Well, St Vincent Trust has on there, on

17   St Vincent island, their head office and they have

18   various companies with various names, like you have in

19   Delaware; like Delaware companies, lots of names, it's

20   exactly the same.

21        Q.   Let me ask you: you are aware of the

22   employment contracts between MMP BV and Mike, Tim and

23   Steven McKenzie, are you not?

24        A.   I am aware of them.

25        Q.   Do you know when those contracts were

342

1   negotiated?

2        A.    They were negotiated with Mr Rauball.  You

3   have all the copies, haven't you?

4        Q.    Yes, I do.

5        A.    Yes.  You have the dates when they were

6   issued and everything?

7        Q.    I have the dates when they were signed.

8        A.    Yes.

9        Q.    Do  you know when they were negotiated

10       A.    That's really when they were signed.  At

11   that time Mr Rauball called the tune, so it couldn't

12   have been negotiated earlier.

13            MR WEISBART:  I'm sorry, I didn't

14   understand the answer.

15            THE WITNESS:  They were negotiated around

16   the time they were signed, because there was only one

17   person who decided on the value or on the size of the

18   salary, because he called the tune.

19   BY MR SMITH:

20       Q.    Mr Rauball called the tune for MMP BV?

21       A.    He was the one that brought the money.

22       Q.    Do  you have any idea why it was made

23   retroactive to August 1, 1994?

24       A.    No idea.

25       Q.    Do you have any idea -- well, to your

343

1   knowledge was there ever an employment contract between

2   MMP BV and Mike McKenzie or any McKenzie for that

3   matter prior to this employment contract signed by

4   Mr Rauball?

5       A.   Not that I'm aware of.  This would all be

6   documented in information on MMP BV.

7       Q.   You were talking about before it was

8   negotiated by Mr Rauball, are we talking about

9   Wolfgang Rauball or Reinhard Rauball?

10      A.   Mr Wolfgang Rauball signed the contracts as

11  you know.

12      Q.   Right.  And is that who you're saying

13  negotiated, it was Wolfgang Rauball?

14      A.   Yes.

15      Q.   And he provided the money that was used to

16  pay the employment contract amounts?

17      A.   That's --  He and his group provided the

18  funding of the project, and from that funding the

19  salaries had to be paid, which included the McKenzie

20  family plus the -- our engineers, with Andy Andreski

21  and so on.

22              THE REPORTER:  Mr who?

23              THE WITNESS:  Andy Andreski.  That's a

24  difficult name.

25

345

1  signatures: one must be always Mr Ulrich or Mr Rauball.

2  Probably Mr Ulrich; I don't know whether Mr Rauball had

3  signature power in the banks.

4       Q.   OK.  But after August of '94, any kind of

5  transfer of money out of the account required a

6  signature of Mr Ulrich or Mr Rauball?

7       A.   Yes, always, yes.

8       Q.   OK.  Do you remember how long the

9  transactions were handled through the MMP BV accounting

10  system?

11       A.   I do not know, because we had given all our

12  files away back to the MMP BV, so I don't know how long

13  this was done.  But that's -- all was very nicely

14  documented.  The files that we have shown you,

15  instructions, who got it, who agreed with it, and

16  then -- (the witness whistled) -- bank.

17       Q.   Now, there were payments from MMP BV to

18  Steve McKenzie, were there not?

19       A.   I wouldn't know, but if it was, a very

20  little one.

21       Q.   Weren't you asked at one point in time to

22  hold his payments in trust?

23       A.   I was -- one payment I was -- we were going

24  to pay him.  I know $6,000, that's what I remember

25  still.  I think that was the -- and I don't know

348

1    payments under the employment contracts up to that

2    time?  Did you --

3         A.   We put it until, I don't know whether it's

4    up to that time, but, yeah, afterwards, yes.

5              MR SMITH:  OK.

6              MR MACDONALD:  What was the last word,

7    "yeah"?

8              THE REPORTER:  Yes.

9              THE WITNESS:  Yeah.

10             THE REPORTER:  "... yeah, afterwards, yes."

11             MR MACDONALD:  Oh.

12   BY MR SMITH:

13        Q.   So if there was an employment payment made

14   to Mike McKenzie between August 1, 1994 and

15   October 1, 1995, that would be reflected on the books

16   of MMP BV?

17        A.   Absolutely, yes.

18        Q.   Are you aware of payments under -- which

19   were credited against the employment contract from any

20   other source?

21        A.   No.

22                             (Exhibit 60 was marked

23                              for identification)

24        Q.   Mr Schlegel, I'm going to show you what has

25   been marked as Exhibit 60 which is RS142 through 144.

## GlobeGas Contract Payments to McKenzies

### 1995

| Date of Payment | Amount | Lender[1] |
|---|---|---|
| 01/12/95 | $ 1,529.00 | Conquest Financial |
| 03/24/95 | $ 6,255.00 | Conquest Financial |
| 12/12/95 | $ 9,000.00 | Conquest Financial |
| 12/12/95 | $ 30,030.00 | WR Financial |
| TOTAL | $ 46,814.00 | |

### 1996

| Date of Payment | Amount | Lender[1] |
|---|---|---|
| 02/25/96 | $ 35,819.20 | WR Financial |
| 04/18/96 | $ 50,000.00 | Energy Global |
| 04/29/96 | $100,000.00 | Sonanini |
| 05/07/96 | $ 20,000.00 | Sonanini |
| 05/07/96 | $100,890.00 | Rockwell |
| 05/16/96 | $ 25,000.00 | WR Financial |
| 07/10/96 | $ 20,000.00 | Sonanini |
| 07/22/96 | $ 92,000.00 | Energy Global |
| 07/22/96 | $ 8,000.00 | Energy Global |
| 08/16/96 | $ 25,000.50 | WR Financial |
| 09/04/96 | $ 30,000.00 | WR Financial |
| TOTAL | $506,709.70 | |

### 1997

| Date of Payment | Amount | Lender[1] |
|---|---|---|
| 05/21/97 | $100,000.00 | WR Financial |
| 07/02/97 | $ 50,000.00 | Sonanini |
| 07/23/97 | $ 50,000.00 | Sonanini |
| 08/05/97 | $ 50,000.00 | Sonanini |
| 08/22/97 | $ 50,000.00 | Sonanini |
| 09/10/97 | $ 50,000.00 | Sonanini |
| TOTAL | $350,000.00 | |

| GRAND TOTAL | $903,523.70 |
|---|---|

[1]GlobeGas borrowed all the funds used to pay the McKenzies pursuant to the employment contracts. The category marked Lender lists the identity of the lender of the funds.

Escrow020547

# PROMISSORY NOTE

CDN $ 2.000.00                                    Vaduz, January 12, 1995

EnergyGlobal AG, a Liechtenstein corporation, with offices at 7 Staedtle, 9490 Vaduz Liechtenstein, ("Maker"), for value received, hereby promises and agrees to pay unto Conquest Finance Corporation ("Payee") in lawful money of Canada the sum of CDN $ 2.000,00 (Two Thousand Dollars), which Payee paid in cash on behalf of Maker to Mr. Mike McKenzie of 2222 Country Club Boulevard, Sugar Land, Texas 77418, USA, to be repaid by Maker in accordance with the terms and conditions hereof.

It is understood that the principal amount set forth above is the amount which may be drawn by Maker from Payee as repayment for earlier advance.

Payment of all sums advanced to Maker by Payee made on January 12, 1996 and here-under shall be made by Maker to Payee in full on January 12, 1997. The Maker will make an annual interest payment of 10 %, first payment due with the principal on January 12, 1997.

Maker may prepay the amount hereunder in whole or in part at any time prior to the above date at Maker's election.

If default is made in the payment of this Note at maturity , Maker agrees and is also to pay to the owner and holder of this Note a reasonable amount as attorney's or collection fees in connection with the collection efforts, if any, by Payee hereunder.

Maker irrevocably agrees to execute a seperate Loan Agreement with Payee covering the above debt by Maker to Payee upon first demand by Payee.

EnergyGlobal AG

per: _____

Escrow008239

# PROMISSORY NOTE

DM 9.000.-                                             Vaduz, March 24, 1995

EnergyGlobal AG. a Liechtenstein corporation. with offices at 7 Staedtle. 9490 Vaduz Liechtenstein. ("Maker") . for value received. hereby promises and agrees to pay unto Conquest Finance Corporation ("Payee") in lawful money of Germany the sum of DM 9.000.- (Nine Thousand Deutschmarks). which Payee paid in cash on behalf of Maker to Mr. Mike McKenzie of 2222 Country Club Boulevard, Sugar Land, Texas 77418, USA, to be repaid by Maker in accordance with the terms and conditions hereof.

It is understood that the principal amount set forth above is the amount which may be drawn by Maker from Payee as repayment for earlier advance.

Payment of all sums advanced to Maker by Payee made on March 24, 1996 and here-under shall be made by Maker to Payee in full on March 24. 1997. The Maker will make an annual interest payment of 10 %. first payment due with the principal on March 24. 1997.

Maker may prepay the amount hereunder in whole or in part at any time prior to the above date at Maker's election.

If default is made in the payment of this Note at maturity . Maker agrees and is also to pay to the owner and holder of this Note a reasonable amount as attorney's or collection fees in connection with the collection efforts. if any. by Payee hereunder.

Maker irrevocably agrees to execute a seperate Loan Agreement with Payee covering the above debt by Maker to Payee upon first demand by Payee.

EnergyGlobal AG

per: _____

Escrow008238

# PROMISSORY NOTE

US $ 9.000,00                                    Vaduz, December 12, 1995

EnergyGlobal AG, a Liechtenstein corporation, with offices at 7 Staedtle, 9490 Vaduz Liechtenstein, ("Maker"), for value received, hereby promises and agrees to pay unto Conquest Finance Corporation ("Payee") in lawful money of the United States of America the sum of $ 9.000,00 (Nine Thousand Dollars), which Payee paid in cash on behalf of Maker to Mr. Mike McKenzie of 2222 Country Club Boulevard, Sugar Land, Texas 77418, USA, to be repaid by Maker in accordance with the terms and conditions hereof.

It is understood that the principal amount set forth above is the amount which may be drawn by Maker from Payee as repayment for earlier advance.

Payment of all sums advanced to Maker by Payee made on December 12, 1995 and hereunder shall be made by Maker to Payee in full on December 12, 1996. The Maker will make an annual interest payment of 10 %, first payment due with the principal on December 12, 1996.

Maker may prepay the amount hereunder in whole or in part at any time prior to the above date at Maker's election.

If default is made in the payment of this Note at maturity , Maker agrees and is also to pay to the owner and holder of this Note a reasonable amount as attorney's or collection fees in connection with the collection efforts. if any, by Payee hereunder.

Maker irrevocably agrees to execute a seperate Loan Agreement with Payee covering the above debt by Maker to Payee upon first demand by Payee.

EnergyGlobal AG

per: _____

Escrow008233

EGD01217

# PROMISSORY NOTE

US $ 30.030,00                                    Vaduz, December 12, 1995

EnergyGlobal AG. a Liechtenstein corporation, with offices at 7 Staedtle. 9490 Vaduz
Liechtenstein. ("Maker") . for value received. hereby promises and agrees to pay unto
W.R. Financial Consultants Ltd.. a Canadian corporation. ("Payee") in lawful money of
the United States of America the sum of US $ 30.030.00 (Thirty Thousand And Thirty
Dollars). which Payee paid on behalf of Maker to Mr. Mike McKenzie of 2222 Country
Club Boulevard. Sugar Land, Texas 77418. USA. to be repaid by Maker in accordance
with the terms and conditions hereof.

It is understood that the principal amount set forth above is the amount which may be
drawn by Maker from Payee as repayment for earlier advance.

Payment of all sums advanced to Maker by Payee made on December 12. 1995 and
hereunder shall be made by Maker to Payee in full on December 12. 1996. The Maker
will make an annual interest payment of 10 %. first payment due with the principal on
December 12. 1996.

Maker may prepay the amount hereunder in whole or in part at any time prior to the
above date at Maker's election.

If default is made in the payment of this Note at maturity . Maker agrees and is also to
pay to the owner and holder of this Note a reasonable amount as attorney's or collection
fees in connection with the collection efforts. if any. by Payee hereunder.

Maker irrevocably agrees to execute a seperate Loan Agreement with Payee covering the
above debt by Maker to Payee upon first demand by Payee.

EnergyGlobal AG

Escrow008232

# PROMISSORY NOTE

CDN $ 48.800,00                                    Vaduz, February 25, 1996

EnergyGlobal AG. a Liechtenstein corporation, with offices at 7 Staedtle, 9490 Vaduz Liechtenstein. ("Maker") , for value received, hereby promises and agrees to pay unto W.R. Financial Consultants Ltd., a Canadian corporation ("Payee"), in lawful money of Canada the sum of CDN $ 48.800,00 (Fortyeight Thousand Eight Hundred CDN Dollars), which Payee paid on behalf of Maker to Mr. Mike McKenzie of 2222 Country Club Boulevard, Sugar Land, Texas 77418, USA, in compliance and recognition of the management contracts between Globe Gas B.V. and the McKenzie family to be repaid by Maker in accordance with the terms and conditions hereof.

It is understood that the principal amount set forth above is the amount which may be drawn by Maker from Payee as repayment for earlier advance.

Payment of all sums advanced to Maker by Payee made on February 25, 1996 and hereunder shall be made by Maker to Payee in full on February 25, 1997. The Maker will make an annual interest payment of 10 %, first payment due with the principal on February 25, 1997.

Maker may prepay the amount hereunder in whole or in part at any time prior to the above date at Maker's election.

If default is made in the payment of this Note at maturity , Maker agrees and is also to pay to the owner and holder of this Note a reasonable amount as attorney's or collection fees in connection with the collection efforts. if any, by Payee hereunder.

Maker irrevocably agrees to execute a seperate Loan Agreement with Payee covering the above debt by Maker to Payee upon first demand by Payee.

EnergyGlobal AG

Escrow008245

# PROMISSORY NOTE

US $ 100.000,00                           Vaduz, April 29, 1996

EnergyGlobal AG, a Liechtenstein corporation, with offices at 7 Staedtle, 9490 Vaduz Liechtenstein, ("Maker") , for value received, hereby promises and agrees to pay unto Sonanini Holdings Ltd., a Canadian corporation, ("Payee") in lawful money of the United States of America the sum of US $ 100.000.00 (One Hundred Thousand Dollars) , which Payee paid on behalf of Maker to Mr. Mike McKenzie of 2222 Country Club Boulevard, Sugar Land, Texas 77418, USA, to be repaid by Maker in accordance with the terms and conditions hereof.

It is understood that the principal amount set forth above is the amount which may be drawn by Maker from Payee as repayment for earlier advance.

Payment of all sums advanced to Maker by Payee made on April 29, 1996 and hereunder shall be made by Maker to Payee in full on April 29, 1997. The Maker will make an annual interest payment of 10 %, first payment due with the principal on April 29, 1997.

Maker may prepay the amount hereunder in whole or in part at any time prior to the above date at Maker's election.

If default is made in the payment of this Note at maturity , Maker agrees and is also to pay to the owner and holder of this Note a reasonable amount as attorney's or collection fees in connection with the collection efforts, if any, by Payee hereunder.

Maker irrevocably agrees to execute a seperate Loan Agreement with Payee covering the above debt by Maker to Payee upon first demand by Payee.

EnergyGlobal AG

per: _____

Escrow008229

# PROMISSORY NOTE

US $ 20.000.00                                    Vaduz, May 7, 1996

EnergyGlobal AG, a Liechtenstein corporation, with offices at 7 Staedtle, 9490 Vaduz
Liechtenstein, ("Maker") , for value received, hereby promises and agrees to pay unto
Sonanini Holdings Ltd.. a Canadian corporation, ("Payee") in lawful money of the Uni-
ted States of America the sum of US $ 20.000.00 (Twenty Thousand Dollars), which
Payee paid on behalf of Maker to Mr. Mike McKenzie of 2222 Country Club Boule-
vard, Sugar Land, Texas 77418, USA, to be repaid by Maker in accordance with the
terms and conditions hereof.

It is understood that the principal amount set forth above is the amount which may be
drawn by Maker from Payee as repayment for earlier advance.

Payment of all sums advanced to Maker by Payee made on May 7, 1996 and here-
under shall be made by Maker to Payee in full on May 7, 1997. The Maker will make an
annual interest payment of 10 %, first payment due with the principal on May 7, 1997.

Maker may prepay the amount hereunder in whole or in part at any time prior to the
above date at Maker's election.

If default is made in the payment of this Note at maturity , Maker agrees and is also to
pay to the owner and holder of this Note a reasonable amount as attorney's or collection
fees in connection with the collection efforts, if any, by Payee hereunder.

Maker irrevocably agrees to execute a seperate Loan Agreement with Payee covering the
above debt by Maker to Payee upon first demand by Payee.

EnergyGlobal AG

per: _____

Escrow008228

# PROMISSORY NOTE

CDN $ 137.761.00                          Vaduz, May 7, 1996

EnergyGlobal AG, a Liechtenstein corporation, with offices at 7 Staedtle, 9490 Vaduz Liechtenstein, ("Maker"), for value received, hereby promises and agrees to pay unto Rockwell International Ltd. ("Payee") in lawful money of Canada the sum of CDN $ 137.761.00 (One Hundred And Thirty Seven Thousand Seven Hundred And Sixty One CDN Dollars), which Payee paid on behalf of Maker to Mr. Mike McKenzie of 2222 Country Club Boulevard, Sugar Land, Texas 77418, USA, in compliance with the management contracts between Globe Gas B.V. and the McKenzie family to be repaid by Maker in accordance with the terms and conditions hereof.

It is understood that the principal amount set forth above is the amount which may be drawn by Maker from Payee as repayment for earlier advance.

Payment of all sums advanced to Maker by Payee made on May 7, 1996 and hereunder shall be made by Maker to Payee in full on May 7, 1997. The Maker will make an annual interest payment of 10 %, first payment due with the principal on May 7, 1997.

Maker may prepay the amount hereunder in whole or in part at any time prior to the above date at Maker's election.

If default is made in the payment of this Note at maturity, Maker agrees and is also to pay to the owner and holder of this Note a reasonable amount as attorney's or collection fees in connection with the collection efforts, if any, by Payee hereunder.

Maker irrevocably agrees to execute a seperate Loan Agreement with Payee covering the above debt by Maker to Payee upon first demand by Payee.


EnergyGlobal AG

per: _____

Escrow008259

# PROMISSORY NOTE

US $ 25.000.00                                              Vaduz, May 16, 1996

EnergyGlobal AG. a Liechtenstein corporation. with offices at 7 Staedtle. 9490 Vaduz
Liechtenstein. ("Maker") , for value received. hereby promises and agrees to pay unto
W.R. Financial Consultants Ltd., a Canadian corporation. ("Payee") in lawful money of
the United States of America the sum of US $ 25.000,00 (Twentyfive Thousand Dollars)
Dollars). which Payee paid on behalf of Maker to Mr. Mike McKenzie of 2222 Country
Club Boulevard. Sugar Land. Texas 77418. USA. to be repaid by Maker in accordance
with the terms and conditions hereof.

It is understood that the principal amount set forth above is the amount which may be
drawn by Maker from Payee as repayment for earlier advance.

Payment of all sums advanced to Maker by Payee made on May 16, 1996 and here-
under shall be made by Maker to Payee in full on May 16, 1997. The Maker will make
an annual interest payment of 10 %. first payment due with the principal on May16.1997.

Maker may prepay the amount hereunder in whole or in part at any time prior to the
above date at Maker's election.

If default is made in the payment of this Note at maturity , Maker agrees and is also to
pay to the owner and holder of this Note a reasonable amount as attorney's or collection
fees in connection with the collection efforts. if any. by Payee hereunder.

Maker irrevocably agrees to execute a seperate Loan Agreement with Payee covering the
above debt by Maker to Payee upon first demand by Payee.

EnergyGlobal AG

per: _____

Escrow008227

# PROMISSORY NOTE

US $ 20.000,00                                         Vaduz, July 10, 1996

EnergyGlobal AG, a Liechtenstein corporation, with offices at 7 Staedtle, 9490 Vaduz Liechtenstein, ("Maker") , for value received, hereby promises and agrees to pay unto Sonanini Holdings Ltd.. a Canadian corporation, ("Payee") in lawful money of the United States of America the sum of US $ 20.000.00 (Twenty Thousand Dollars), which Payee paid on behalf of Maker to Mr. Mike McKenzie of 2222 Country Club Boulevard. Sugar Land. Texas 77418, USA, to be repaid by Maker in accordance with the terms and conditions hereof.

It is understood that the principal amount set forth above is the amount which may be drawn by Maker from Payee as repayment for earlier advance.

Payment of all sums advanced to Maker by Payee made on July 10, 1996 and hereunder shall be made by Maker to Payee in full on July 10, 1997. The Maker will make an annual interest payment of 10 %. first payment due with the principal on July 10, 1997.

Maker may prepay the amount hereunder in whole or in part at any time prior to the above date at Maker's election.

If default is made in the payment of this Note at maturity , Maker agrees and is also to pay to the owner and holder of this Note a reasonable amount as attorney's or collection fees in connection with the collection efforts. if any, by Payee hereunder.

Maker irrevocably agrees to execute a seperate Loan Agreement with Payee covering the above debt by Maker to Payee upon first demand by Payee.

EnergyGlobal AG

per: _____

# PROMISSORY NOTE

US $ 25.000,50                                             Vaduz, August16, 1996

EnergyGlobal AG. a Liechtenstein corporation. with offices at 7 Staedtle, 9490 Vaduz Liechtenstein, ("Maker") , for value received. hereby promises and agrees to pay unto W.R. Financial Consultants Ltd.. a Canadian corporation. ("Payee") in lawful money of the United States of America the sum of US $ 25.000,50 (Twentyfive Thousand Dollars And Fifty Cents). which Payee paid on behalf of Maker to Mr. Mike McKenzie of 2222 Country Club Boulevard. Sugar Land. Texas 77418, USA, to be repaid by Maker in accordance with the terms and conditions hereof.

It is understood that the principal amount set forth above is the amount which may be drawn by Maker from Payee as repayment for earlier advance.

Payment of all sums advanced to Maker by Payee made on August 16, 1996 and hereunder shall be made by Maker to Payee in full on August 16, 1997. The Maker will make an annual interest payment of 10 %. first payment due with the principal on August 16, 1997.

Maker may prepay the amount hereunder in whole or in part at any time prior to the above date at Maker's election.

If default is made in the payment of this Note at maturity , Maker agrees and is also to pay to the owner and holder of this Note a reasonable amount as attorney's or collection fees in connection with the collection efforts. if any, by Payee hereunder.

Maker irrevocably agrees to execute a seperate Loan Agreement with Payee covering the above debt by Maker to Payee upon first demand by Payee.

EnergyGlobal AG

Escrow008225

# PROMISSORY NOTE

US $ 30.000.00                                    Vaduz. September 4, 1996

EnergyGlobal AG. a Liechtenstein corporation. with offices at 7 Staedtle, 9490 Vaduz Liechtenstein. ("Maker") . for value received, hereby promises and agrees to pay unto W.R. Financial Consultants Ltd., a Canadian corporation. ("Payee") in lawful money of the United States of America the sum of US $ 30.000,00 (Thirty Thousand Dollars) . which Payee paid on behalf of Maker to Mr. Mike McKenzie of 2222 Country Club Boulevard. Sugar Land. Texas 77418. USA, to be repaid by Maker in accordance with the terms and conditions hereof.

It is understood that the principal amount set forth above is the amount which may be drawn by Maker from Payee as repayment for earlier advance.

Payment of all sums advanced to Maker by Payee made on September 4. 1996 and hereunder shall be made by Maker to Payee in full on September 4. 1997. The Maker will make an annual interest payment of 10 %. first payment due with the principal on September 4. 1997.

Maker may prepay the amount hereunder in whole or in part at any time prior to the above date at Maker's election.

If default is made in the payment of this Note at maturity . Maker agrees and is also to pay to the owner and holder of this Note a reasonable amount as attorney's or collection fees in connection with the collection efforts. if any. by Payee hereunder.

Maker irrevocably agrees to execute a seperate Loan Agreement with Payee covering the above debt by Maker to Payee upon first demand by Payee.

EnergyGlobal AG

per: _____

Escrow008226

POST
1996

( NOT ON LIST )

Escrow008278

EGD01262

Nov-12-97 1:21   EuroGas, Inc.                    801 255 2005
31/10 '97 15:15   ＴＦＪＬ ＺＯ ３４１８０３９         ......................

# PROMISSORY NOTE

USD 100'000.--                                           21 May 1997

Energy Global AG, a company incorporated in Vaduz, Liechtenstein, with
registered offices at Städtle 7, 9490 Vaduz, Liechtenstein ("Maker"), being a
wholly owned subsidiary of EuroGas Inc., a public company registered in the
State of Utah, USA, for value received, hereby promises and agrees to pay
to W.R. Financial Consultants Ltd., a Canadian corporation ("Payee"), in
lawful money of the United States of America the sum of USD 100'000.—
(One Hundred Thousand US Dollars), which Payee paid to Mike McKenzie
on account for the employment agreement with Globegas B.V. on behalf of
Maker, to be repaid by the Maker in accordance with the terms and
conditions hereof.

It is understood that the principal amount set forth above is the amount which
may be drawn by Maker from Payee as repayment for earlier advance.

Payment of all sums advanced to Maker by Payee made on 21 May 1997
and hereunder shall be made by Maker to Payee in full on 21 May 1998. The
Maker will make an annual interest payment of 10 %, first payment due with
principal on 21 May 1998.

Maker may repay the amount hereunder in whole or in part at any time prior
to the above date at Maker's election.

If default is made in the payment of this Note at Maturity, Maker agrees and
is also to pay to the owner and holder of this note a reasonable amount as
attorney's or collection fees in connection with the collection efforts, if any, by
Payee hereunder.

Maker irrevocably agrees to execute a separate Loan Agreement with Payee
covering the above debt by Maker to Payee upon first demand by Payee.

Energy Global AG

per:

Escrow008286

# PROMISSORY NOTE

USD 50'000.—                                   **2 July 1997**

Energy Global AG, a company incorporated in Vaduz, Liechtenstein, with registered offices at Städtle 7, 9490 Vaduz, Liechtenstein ("Maker"), being a wholly owned subsidiary of EuroGas Inc., a public company registered in the State of Utah, USA, for value received, hereby promises and agrees to pay to Sonanini Holdings Limited, a Canadian corporation ("Payee"), in lawful money of the United States of America the sum of USD 50'000.— (Fifty Thousand US Dollars), which Payee paid to Mike McKenzie on account for the employment agreement with Globegas B.V. on behalf of Maker, to be repaid by the Maker in accordance with the terms and conditions hereof.

It is understood that the principal amount set forth above is the amount which may be drawn by Maker from Payee as repayment for earlier advance.

Payment of all sums advanced to Maker by Payee made on 2 July 1997 and hereunder shall be made by Maker to Payee in full on 2 July 1998. The Maker will make an annual interest payment of 10 %, first payment due with principal on 2 July 1998.

Maker may repay the amount hereunder in whole or in part at any time prior to the above date at Maker's election.

If default is made in the payment of this Note at Maturity, Maker agrees and is also to pay to the owner and holder of this note a reasonable amount as attorney's or collection fees in connection with the collection efforts, if any, by Payee hereunder.

Maker irrevocably agrees to execute a separate Loan Agreement with Payee covering the above debt by Maker to Payee upon first demand by Payee.

Energy Global AG

per:

*Escrow008282*

EGD01266

# PROMISSORY NOTE

USD 50'000.--                                                    23 July 1997

Energy Global AG, a company incorporated in Vaduz, Liechtenstein, with
registered offices at Städtle 7, 9490 Vaduz, Liechtenstein ("Maker"), being a
wholly owned subsidiary of EuroGas Inc., a public company registered in the
State of Utah, USA, for value received, hereby promises and agrees to pay
to Sonanini Holdings Limited, a Canadian corporation ("Payee"), in lawful
money of the United States of America the sum of USD 50'000.— (Fifty
Thousand US Dollars), which Payee paid to Mike McKenzie on account for
the employment agreement with Globegas B.V. on behalf of Maker, to be
repaid by the Maker in accordance with the terms and conditions hereof.

It is understood that the principal amount set forth above is the amount which
may be drawn by Maker from Payee as repayment for earlier advance.

Payment of all sums advanced to Maker by Payee made on 23 July 1997
and hereunder shall be made by Maker to Payee in full on 23 July 1998. The
Maker will make an annual interest payment of 10 %, first payment due with
principal on 23 July 1998.

Maker may repay the amount hereunder in whole or in part at any time prior
to the above date at Maker's election.

If default is made in the payment of this Note at Maturity, Maker agrees and
is also to pay to the owner and holder of this note a reasonable amount as
attorney's or collection fees in connection with the collection efforts, if any, by
Payee hereunder.

Maker irrevocably agrees to execute a separate Loan Agreement with Payee
covering the above debt by Maker to Payee upon first demand by Payee.


Energy Global AG


per:

Escrow008283

EG-D01267

Nov-12-97  15:21   EuroGas, Inc.                           801 255 2005        P.

# PROMISSORY NOTE

USD 50'000.—                                                5 August 1997

Energy Global AG, a company incorporated in Vaduz, Liechtenstein, with registered offices at Städtle 7, 9490 Vaduz, Liechtenstein ("Maker"), being a wholly owned subsidiary of EuroGas Inc., a public company registered in the State of Utah, USA, for value received, hereby promises and agrees to pay to Sonanini Holdings Limited, a Canadian corporation ("Payee"), in lawful money of the United States of America the sum of USD 50'000.— (Fifty Thousand US Dollars), which Payee paid to Mike McKenzie on account for the employment agreement with Globegas B.V. on behalf of Maker, to be repaid by the Maker in accordance with the terms and conditions hereof.

It is understood that the principal amount set forth above is the amount which may be drawn by Maker from Payee as repayment for earlier advance.

Payment of all sums advanced to Maker by Payee made on 5 August 1997 and hereunder shall be made by Maker to Payee in full on 5 August 1998. The Maker will make an annual interest payment of 10 %, first payment due with principal on 5 August 1998.

Maker may repay the amount hereunder in whole or in part at any time prior to the above date at Maker's election.

If default is made in the payment of this Note at Maturity, Maker agrees and is also to pay to the owner and holder of this note a reasonable amount as attorney's or collection fees in connection with the collection efforts, if any, by Payee hereunder.

Maker irrevocably agrees to execute a separate Loan Agreement with Payee covering the above debt by Maker to Payee upon first demand by Payee.

Energy Global AG

per:

Escrow008279

Case 97-04114   Document 263   Filed in TXSB on 03/15/02   Page 252 of 634

# PROMISSORY NOTE

USD 50'000.—                                    22 August 1997

Energy Global AG, a company incorporated in Vaduz, Liechtenstein, with registered offices at Städtle 7, 9490 Vaduz, Liechtenstein ("Maker"), being a wholly owned subsidiary of EuroGas Inc., a public company registered in the State of Utah, USA, for value received, hereby promises and agrees to pay to Sonanini Holdings Limited, a Canadian corporation ("Payee"), in lawful money of the United States of America the sum of USD 50'000.— (Fifty Thousand US Dollars), which Payee paid to Mike McKenzie on account for the employment agreement with Globegas B.V. on behalf of Maker, to be repaid by the Maker in accordance with the terms and conditions hereof.

It is understood that the principal amount set forth above is the amount which may be drawn by Maker from Payee as repayment for earlier advance.

Payment of all sums advanced to Maker by Payee made on 22 August 1997 and hereunder shall be made by Maker to Payee in full on 22 August 1998. The Maker will make an annual interest payment of 10 %, first payment due with principal on 22 August 1998.

Maker may repay the amount hereunder in whole or in part at any time prior to the above date at Maker's election.

If default is made in the payment of this Note at Maturity, Maker agrees and is also to pay to the owner and holder of this note a reasonable amount as attorney's or collection fees in connection with the collection efforts, if any, by Payee hereunder.

Maker irrevocably agrees to execute a separate Loan Agreement with Payee covering the above debt by Maker to Payee upon first demand by Payee.

Energy Global AG

per: 

Escrow008280

D01264

# PROMISSORY NOTE

USD 50'000.--                                                10 September 1997

Energy Global AG, a company incorporated in Vaduz, Liechtenstein, with registered offices at Städtle 7, 9490 Vaduz, Liechtenstein ("Maker"), being a wholly owned subsidiary of EuroGas Inc., a public company registered in the State of Utah, USA, for value received, hereby promises and agrees to pay to Senanini Holdings Limited, a Canadian corporation ("Payee"), in lawful money of the United States of America the sum of USD 50'000.-- (Fifty Thousand US Dollars), which Payee paid to Mike McKenzie on account for the employment agreement with Globegas B.V. on behalf of Maker, to be repaid by the Maker in accordance with the terms and conditions hereof.

It is understood that the principal amount set forth above is the amount which may be drawn by Maker from Payee as repayment for earlier advance.

Payment of all sums advanced to Maker by Payee made on 10 September 1997 and hereunder shall be made by Maker to Payee in full on 10 September 1998. The Maker will make an annual interest payment of 10 %, first payment due with principal on 10 September 1998.

Maker may repay the amount hereunder in whole or in part at any time prior to the above date at Maker's election.

If default is made in the payment of this Note at Maturity, Maker agrees and is also to pay to the owner and holder of this note a reasonable amount as attorney's or collection fees in connection with the collection efforts, if any, by Payee hereunder.

Maker irrevocably agrees to execute a separate Loan Agreement with Payee covering the above debt by Maker to Payee upon first demand by Payee.


Energy Global AG


per:

Escrow008281

# AFFIDAVIT

STATE OF TEXAS      )
COUNTY OF HARRIS     )

BEFORE ME, the undersigned authority on this day personally appeared the party whose name is subscribed below, who after having been by me first duly sworn, upon oath states as follows:

"My full name is Gayle Frances Holt."

"I am a resident of Harris County."

"During the time period of July through October 1995, Michael McKenzie received the following international funds:

(1) Deutsche Bank, Checque No. 0376854, dated 10/9/95 in the amount of US$142,000.00
(2) $8,000.00 cash"

"These funds represented McKenzie Methane Poland, B.V. salary and expense reimbursements for: Michael McKenzie ($79,500.00: $78,331.00, salary through October, 1995; expense reimbursement: $1,169.00), and salary for Timothy S. McKenzie ($62,500.00 through September 1995). The $8,000.00 cash was expense reimbursement. Copy of deposit attached."

"Records reflecting the above international funds received were given to the McKenzie attorney, Tom Graves to be provided to Steve Smith, Trustee through Tate & Lee ."

"Income to be reported on Form 1040 Individual Income Tax Return for Michael and Frances McKenzie short-year January 1 - October 29, 1995 is $183,330.00. Copy of general ledger sheet attached."

Further, affiant sayeth not.

_____
Gayle Frances Holt

STATE OF TEXAS
COUNTY OF HARRIS

BEFORE ME, the undersigned authority, on this day personally appeared GAYLE FRANCES HOLT, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that she executed the same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this the _21st_ day of August, 1996.

_____
Berniece H. Williams, Notary Public
in and for The State of Texas
My Commission expires: _6-28-97_

Berniece H. Williams
Notary Public
STATE OF TEXAS
My Comm. Exp. 6-28-97

**SHASTA ENTERPRISES, INC.**   09-93
1770 ST. JAMES PL., STE. 350   713-622-5330
HOUSTON, TX  77056

## DEPOSIT TICKET

DATE _____ 10-11 19 95

CHECKS AND OTHER ITEMS ARE RECEIVED FOR DEPOSIT SUBJECT TO THE PROVISIONS
OF THE UNIFORM COMMERCIAL CODE OR ANY APPLICABLE COLLECTION AGREEMENT.
DEPOSITS MAY NOT BE AVAILABLE FOR IMMEDIATE WITHDRAWAL.

**NationsBank**

NationsBank of Texas, N.A.
Houston, TX

| | | |
|---|---|---|
| CURRENCY | | |
| COIN | | |
| CHECKS | | |
| Deutsche Bank | 142,000 | 00 |
| TOTAL from reverse side | | |
| TOTAL DEPOSIT | 142,000 | 00 |

35-2/1130
266

USE OTHER SIDE FOR
ADDITIONAL LISTING
BE SURE EACH ITEM IS
PROPERLY ENDORSED

TOTAL ITEMS

⑆113000023⑆ ⑈266 28643 20⑈

---

Cheque No.
**0376854**

Place and Date
**KÖLN**                    09-10-95

Amount
**US-$    ***142.000,00**          1-378
260

Pay against this cheque to
**MICHAEL MC KENZIE**

or order

| amount in words US Dollar | 100 000 000 | 10 000 000 | 1 000 000 | 100 000 | 10 000 | 1000 | 100 | 10 | 1 |
|---|---|---|---|---|---|---|---|---|---|
| | ****** | ****** | ****** | ONE*** | FOUR** | TWO*** | ZERO** | ZERO** | ZERO** |

**Deutsche Bank**
Aktiengesellschaft
New York Branch

**Deutsche Bank**
Aktiengesellschaft
KÖLN BRANCH
Wenisch                  Schäfer-Monteiro

⑈0376854⑈ ⑆026003780⑆010700 2860016⑈

**SHASTA ENTERPRISES. INC.**   09-93
1770 ST. JAMES PL.. STE. 350   713-622-5330
HOUSTON, TX  77056

## DEPOSIT TICKET

DATE _____ 10-11 19 95

| | | |
|---|---|---|
| CURRENCY | | |
| COIN | | |
| CHECKS | | |
| Deutsche Bank | 142,000 | 00 |
| TOTAL from reverse side | | |
| TOTAL DEPOSIT | 142,000 | 00 |

CHECKS AND OTHER ITEMS ARE RECEIVED FOR DEPOSIT SUBJECT TO THE PROVISIONS
OF THE UNIFORM COMMERCIAL CODE OR ANY APPLICABLE COLLECTION AGREEMENT
DEPOSITS MAY NOT BE AVAILABLE FOR IMMEDIATE WITHDRAWAL.

35-2/1120
2E5

USE OTHER SIDE
ADDITIONAL LISTING
BE SURE EACH ITEM
PROPERLY ENDORSED.

TOTAL ITEMS

**NationsBank**
NationsBank of Texas, N.A.
Houston, TX

⑈1130000 23⑈ ⑈266 2864320⑈

---

8,000.00

| | |
|---|---|
| Cheque No. | |
| **0376854** | Amount |
| Place and Date | **US-$** ***142.000,00 |
| KÖLN | 1-37 |
| | 26C |

09.10.95

Pay against this cheque to

**MICHAEL MC KENZIE**

or order

| amount in words US Dollar | 100 000 000 | 10 000 000 | 1 000 000 | 100 000 | 10 000 | 1 000 | 100 | 10 | 1 |
|---|---|---|---|---|---|---|---|---|---|
| | ***** | ***** | ***** | ONE*** | FOUR** | TWO*** | ZERO** | ZERO** | ZERO** |

**Deutsche Bank**
Aktiengesellschaft

New York Branch

**Deutsche Bank**
Aktiengesellschaft
KÖLN BRANCH

Wenisch

Schäfer-Monteiro

⑈0376854⑈ ⑈0260037800⑈0 10700 2860016⑈

---

| 32050 | ⟨5000.00⟩ | Consulting Fees | 11209 | 62,500.00 | Sal Thru Sept |
| 109 | 5000.00 | Exp. Adv. | | | |
| 11203 | 79,500.00 | | 11210 32050 | 79,500.00 | Sal Thru Oct |
| 32050 | ⟨78331.00⟩ | Consulting Fees | Booked - | 78331.00-Consulting Fees |
| 701 | ⟨1169.00⟩ | Exp. Reimb. | MM | 1169.00-Expense Reimb |
| 701 | ⟨8000.00⟩ | Exp. Reimb. | | |
| 601 | 8000.00 | Personal w/D | | |

FILE COPY

**INTERWEST TRANSFER COMPANY**

P.O. BOX 17136 SALT LAKE CITY, UTAH

84117

(801)272-9294

BROKER

EUROGAS, INC.
ATTN: MERLIN FISH
135 WEST UNIVERSAL CIR
SANDY, UT  84070

EUROGAS, INC.

CERTIFICATES SURRENDERED

RESOLUTION-ILS

CERTIFICATES ISSUED

4031 X 100,000 WOLFGANG RAUBALL (ILS)
4032 X 100,000 WOLFGANG RAUBALL (ILS)
4033 X 100,000 WOLFGANG RAUBALL (ILS)
4034 X 100,000 WOLFGANG RAUBALL (ILS)
4035 X 100,000 WOLFGANG RAUBALL (ILS)
4036 X  60,000 WOLFGANG RAUBALL (ILS)
4037 X 100,000 THOMA (ILS)
4038 X 100,000 THOMA (ILS)
4039 X 100,000 THOMA (ILS)
4040 X 100,000 THOMA (ILS)
4041 X 100,000 THOMA (ILS)

TOTAL SHARES =

TOTAL SHARES = 22,900,000

DATE - SEPTEMBER 13, 1994 DN272
NEW CERTIFICATES ISSUED = 175
CERTIFICATES SURRENDERED = 0

CHARGES
CERTIFICATE FEES = $1,320.00
                 =
                 =

TOTAL AMOUNT DUE = $1,320.00
PAYABLE UPON RECEIPT

Escrow074540

```
4042 X  60,000 THOMA (ILS)
4043 X 100,000 LUBER (ILS)
4044 X 100,000 LUBER (ILS)
4045 X 100,000 LUBER (ILS)
4046 X 100,000 LUBER (ILS)
4047 X 100,000 LUBER (ILS)
4048 X  60,000 LUBER (ILS)
4049 X 100,000 BARON FINANCE LTD. (ILS)
4050 X 100,000 BARON FINANCE LTD. (ILS)
4051 X 100,000 BARON FINANCE LTD. (ILS)
4052 X 100,000 BARON FINANCE LTD. (ILS)
4053 X 100,000 BARON FINANCE LTD. (ILS)
4054 X 100,000 BARON FINANCE LTD. (ILS)
4055 X 100,000 BARON FINANCE LTD. (ILS)
4056 X 100,000 BARON FINANCE LTD. (ILS)
4057 X 100,000 BARON FINANCE LTD. (ILS)
4058 X 100,000 BARON FINANCE LTD. (ILS)
4059 X  60,000 BARON FINANCE LTD. (ILS)
4060 X  60,000 BARON FINANCE LTD. (ILS)
4061 X 100,000 JEFFREY LTD. (ILS)
4062 X 100,000 JEFFREY LTD. (ILS)
4063 X 100,000 JEFFREY LTD. (ILS)
4064 X 100,000 JEFFREY LTD. (ILS)
4065 X 100,000 JEFFREY LTD. (ILS)
4066 X 100,000 JEFFREY LTD. (ILS)
4067 X 100,000 JEFFREY LTD. (ILS)
4068 X 100,000 JEFFREY LTD. (ILS)
4069 X 100,000 JEFFREY LTD. (ILS)
4070 X 100,000 JEFFREY LTD. (ILS)
4071 X 100,000 JEFFREY LTD. (ILS)
4072 X 100,000 JEFFREY LTD. (ILS)
4073 X 100,000 JEFFREY LTD. (ILS)
4074 X 100,000 JEFFREY LTD. (ILS)
4075 X 100,000 JEFFREY LTD. (ILS)
4076 X 100,000 JEFFREY LTD. (ILS)
4077 X 100,000 JEFFREY LTD. (ILS)
4078 X 100,000 JEFFREY LTD. (ILS)
4079 X 100,000 JEFFREY LTD. (ILS)
4080 X 100,000 JEFFREY LTD. (ILS)
4081 X 100,000 JEFFREY LTD. (ILS)
4082 X 500,000 CRAWFORD LTD. (ILS)
4083 X 500,000 CRAWFORD LTD. (ILS)
4084 X 500,000 CRAWFORD LTD. (ILS)
4085 X 500,000 CRAWFORD LTD. (ILS)
```

```
4086 X 500,000 CRAWFORD LTD. (ILS)
4087 X 500,000 CRAWFORD LTD. (ILS)
4088 X 500,000 CRAWFORD LTD. (ILS)
4089 X 500,000 CRAWFORD LTD. (ILS)
4090 X 500,000 CRAWFORD LTD. (ILS)
4091 X 500,000 CRAWFORD LTD. (ILS)
4092 X 500,000 CRAWFORD LTD. (ILS)
4093 X 500,000 CRAWFORD LTD. (ILS)
4094 X 100,000 WESTLAKE LTD. (ILS)
4095 X 100,000 WESTLAKE LTD. (ILS)
4096 X 100,000 WESTLAKE LTD. (ILS)
4097 X 100,000 WESTLAKE LTD. (ILS)
4098 X 100,000 WESTLAKE LTD. (ILS)
4099 X 100,000 WESTLAKE LTD. (ILS)
4100 X 100,000 WESTLAKE LTD. (ILS)
4101 X 100,000 WESTLAKE LTD. (ILS)
4102 X 100,000 WESTLAKE LTD. (ILS)
4103 X 100,000 WESTLAKE LTD. (ILS)
4104 X 100,000 WESTLAKE LTD. (ILS)
4105 X 100,000 WESTLAKE LTD. (ILS)
4106 X 100,000 WESTLAKE LTD. (ILS)
4107 X 100,000 WESTLAKE LTD. (ILS)
4108 X 100,000 WESTLAKE LTD. (ILS)
4109 X 100,000 WESTLAKE LTD. (ILS)
4110 X 100,000 WESTLAKE LTD. (ILS)
4111 X 100,000 WESTLAKE LTD. (ILS)
4112 X 100,000 WESTLAKE LTD. (ILS)
4113 X 100,000 WESTLAKE LTD. (ILS)
4114 X 100,000 RAUBALL, (ILS)
4115 X 100,000 RAUBALL, (ILS)
4116 X 100,000 RAUBALL, (ILS)
4117 X 100,000 RAUBALL, (ILS)
4118 X 100,000 RAUBALL, (ILS)
4119 X 100,000 RAUBALL, (ILS)
4120 X 100,000 RAUBALL, (ILS)
4121 X 100,000 RAUBALL, (ILS)
4122 X 100,000 RAUBALL, (ILS)
4123 X 100,000 RAUBALL, (ILS)
4124 X 100,000 OSTROV RESOURCES LTD. (ILS)
441- X 100,000 OSTROV RESOURCES LTD. (ILS)
4126 X 100,000 OSTROV RESOURCES LTD. (ILS)
4127 X 100,000 OSTROV RESOURCES LTD. (ILS)
4128 X 100,000 OSTROV RESOURCES LTD. (ILS)
4129 X 500,000 WUTZER (ILS)
```

Escrow074542

```
4130 X 100,000 HOFFERER (ILS)
4131 X 100,000 HOFFERER (ILS)
4132 X 100,000 HOFFERER (ILS)
4133 X 100,000 HOFFERER (ILS)
4134 X 100,000 HOFFERER (ILS)
4135 X 100,000 HOFFERER (ILS)
4136 X 100,000 HOFFERER (ILS)
4137 X 100,000 HOFFERER (ILS)
4138 X 100,000 HOFFERER (ILS)
4139 X 100,000 HOFFERER (ILS)
4140 X 100,000 HOFFERER (ILS)
4141 X  75,000 HOFFERER (ILS)
4142 X 100,000 INTER REALITIES, AG (ILS)
4143 X 100,000 INTER REALITIES, AG (ILS)
4144 X 100,000 INTER REALITIES, AG (ILS)
4145 X 100,000 INTER REALITIES, AG (ILS)
4146 X 100,000 INTER REALITIES, AG (ILS)
4147 X 100,000 INTER REALITIES, AG (ILS)
4148 X 100,000 INTER REALITIES, AG (ILS)
4149 X 100,000 INTER REALITIES, AG (ILS)
4150 X 100,000 INTER REALITIES, AG (ILS)
4151 X 100,000 INTER REALITIES, AG (ILS)
4152 X 100,000 INTER REALITIES, AG (ILS)
4153 X 100,000 HERKULES, AG (ILS)
4154 X 100,000 HERKULES, AG (ILS)
4155 X 100,000 HERKULES, AG (ILS)
4156 X 100,000 HERKULES, AG (ILS)
4157 X 100,000 HERKULES, AG (ILS)
4158 X 100,000 HERKULES, AG (ILS)
4159 X 100,000 HERKULES, AG (ILS)
4160 X 100,000 HERKULES, AG (ILS)
4161 X 100,000 HERKULES, AG (ILS)
4162 X 100,000 HERKULES, AG (ILS)
4163 X  42,000 HERKULES, AG (ILS)
4164 X  58,000 HERKULES, AG (ILS)
4165 X 300,000 GIA MBH (ILS)
4166 X 250,000 EUROCAPE LDA (ILS)
4167 X 250,000 EUROCAPE LDA (ILS)
4168 X 250,000 EUROCAPE LDA (ILS)
4169 X 250,000 EUROCAPE LDA (ILS)
4170 X 250,000 EUROCAPE LDA (ILS)
4171 X 100,000 RAUBALL IN TRUST (ILS)
4172 X 100,000 RAUBALL IN TRUST (ILS)
4173 X 100,000 RAUBALL IN TRUST (ILS)
```

Escrow074543

```
4174 X 100,000 RAUBALL IN TRUST (ILS)
4175 X 100,000 RAUBALL IN TRUST (ILS)
4176 X 100,000 RAUBALL IN TRUST (ILS)
4177 X 100,000 RAUBALL IN TRUST (ILS)
4178 X 100,000 RAUBALL IN TRUST (ILS)
4179 X 100,000 RAUBALL IN TRUST (ILS)
4180 X 100,000 RAUBALL IN TRUST (ILS)
4181 X 50,000 RAUBALL IN TRUST (ILS)
4182 X 100,000 W.D.C. CAPER LTD. (ILS)
4183 X 100,000 MSA MESA, AG (ILS)
4184 X 100,000 MSA MESA, AG (ILS)
4185 X 100,000 MSA MESA, AG (ILS)
4186 X 100,000 MSA MESA, AG (ILS)
4187 X 100,000 MSA MESA, AG (ILS)
4188 X 100,000 MSA MESA, AG (ILS)
4189 X 100,000 MSA MESA, AG (ILS)
4190 X 100,000 MSA MESA, AG (ILS)
4191 X 75,000 MSA MESA, AG (ILS)
4192 X 50,000 OTTINGER (ILS)
4193 X 50,000 OTTINGER (ILS)
4194 X 50,000 OTTINGER (ILS)
4195 X 50,000 OTTINGER (ILS)
4196 X 50,000 OTTINGER (ILS)
4197 X 50,000 OTTINGER (ILS)
4198 X 100,000 SINBAD LTD. (ILS)
4199 X 100,000 SINBAD LTD. (ILS)
4200 X 100,000 SINBAD LTD. (ILS)
4201 X 100,000 SINBAD LTD. (ILS)
4202 X 100,000 SINBAD LTD. (ILS)
4203 X 100,000 SINBAD LTD. (ILS)
4204 X 75,000 SINBAD LTD. (ILS)
4205 X 75,000 HOFFERER (ILS)
```

Escrow074544

# SHAREHOLDER LIST - EuroGas, Inc. / Energy Global, AG Merger

1

| SHARES | INCREMENTS | SHAREHOLDER |
|---|---|---|
| 560,000 | 5 x 100,000 / 1 x 60,000 | Wolfgang Raubal, Bernsteinweg 18, Dortmund Germany |
| 560,000 | 5 x 100,000 / 1 x 60,000 | Peter Thoma, Blumenaustr 20, 9050 Appenzell, Switzerland |
| 560,000 | 5 x 100,000 / 1 x 60,000 | Edgar Luber, 474 Rayners Lane, Pinner Middlesex, London England HH5B |
| 1,120,000 | 10 x 100,000 / 2 x 60,000 | Baron Finance Ltd., Hauptgasse 30, CH-9050 Appenzell, Switzerland, Advoxapputuro, Mr. Walter Regli |
| 2,100,000 | 21 x 100,000 | Jeffry Ltd., Middle and Eggmont Street, Kingstown, St. Vincent and the Grenadines |
| 6,000,000 | 12 x 500,000 | Crawford Ltd., Middle and Eggmont Street, Kingstown, St. Vincent and the Grenadines |
| 2,000,000 | 20 x 100,000 | Westlake Ltd., Middle and Eggmont Street, Kingstown, St. Vincent and the Grenadines |
| 1,000,000 | 10 x 100,000 | Dr. Reinhard Raubal, Wilbhraeucker Waldweg 17, Herdecke-Ruhr/Germany |

Escrow0074545

2

| Name / Address | Breakdown | Total |
|---|---|---|
| Ostrov Resources Ltd.<br>508-100 Park Royal<br>West Vancouver, BC V7T1A2<br>Canada | 5 x 100,000 | 500,000 |
| Marga Wurzer<br>Waldstr. 170<br>51147 Köln<br>Germany | 1 x 500,000 | 500,000 |
| Renate Hofferer<br>Wolf Pader Palz 2<br>9330 Treibach<br>Austria | 5 x 100,000 | 500,000 |
| Oskar Hofferer<br>Wolf Pader Palz 2<br>9330 Treibach<br>Austria | 3 x 100,000<br>1 x 175,000<br>1 x 75,000 | 315,000 |
| Johannes Hofferer<br>Wolf Pader Palz 2<br>9330 Treibach<br>Austria | 3 x 100,000<br>1 x 175,000<br>1 x 75,000 | 315,000 |
| Inter Realitea, AG<br>Badenerstr. 281<br>8003 Zürich<br>Switzerland | 11 x 100,000 | 1,100,000 |
| Herkules, AG<br>Landstrasse 161<br>9494 Schaan<br>Liechtenstein | 10 x 100,000<br>1 x 42,000<br>1 x 58,000 | 1,100,000 |
| GIA mbH<br>Alte Landstrasse 64A<br>58445 Witten<br>Germany | 1 x 300,000 | 300,000 shares |
| EuroCape Lda<br>Sociedade Comercial<br>Rua 5 Dejulio 16<br>Kap Verde | 5 x 250,000 | 1,250,000 shares |

Escrow074546

| | | |
|---|---|---|
| Dr. Reinhard Reuball<br>In trust Rechtsanwalt Und Notar<br>Friedensplatz<br>44135 Dortmund<br>Germany | 10 x 100,000<br>1 x 50,000 | 1,050,000 |
| W.D.C. Caper Ltd.<br>Stadtley 7<br>FL-9490 Vaduz<br>Liechtenstein | 1 x 100,000 | 100,000 |
| MSA Mesa, AG<br>Stadtley 7<br>FL-9490 Vaduz<br>Liechtenstein | 8 x 100,000<br>1 x 75,000 | 875,000 |
| Peter Ottinger<br>Caserta d'Flci<br>Rapolono Terme/SI<br>Italy | 6 x 50,000 | 300,000 |
| Simbad Ltd.<br>Middle and Eggmont Street<br>Kingstown, St. Vincent and the Grenadines | 6 x 100,000<br>1 x 75,000 | 675,000 |

3

Escrow074547

Escrow074515

HOWARD S. LANDA

## KRUSE, LANDA & MAYCOCK, L.L.C.

EIGHTH FLOOR, BANK ONE TOWER
50 WEST BROADWAY (301-529-1541)
SALT LAKE CITY, UTAH 84101-2034

TELEPHONE: (801) 531-7090
TELECOPY: (801) 366-5994

November 3, 1994

FACSIMILE TRANSMISSION
011-41-75-232-872N

Normann Marxer
Jeffrey, Ltd.
Middle Egemont Street
Kingston, St. Vincents & Grenadines

Dear Mr. Marxer:

This letter shall constitute notice that EuroGas, Inc. (the "Company"), has elected to convert your $4,000,000 Series A Convertible Debenture pursuant to paragraph 3 as the bid price of the Company's common stock has been equal to or in excess of $4.00 per share for a period of greater than ten days. The procedure to complete the conversion would be as follows:

(1)     You would Federal Express to my office the original Debenture;

(2)     Merlin Fish, president of the Company, will personally deliver the 1,000,000 shares of common stock to you or your representatives in Europe next week;

(3)     Upon receipt of the stock, you would send me by facsimile transmission an acknowledgment of receipt;

(4)     Upon receipt of your acknowledgment, I would deliver the original Debenture to the Company for cancellation.

If you have any questions, please telephone.

Sincerely,

KRUSE, LANDA & MAYCOCK, L.L.C.

Howard S. Landa

HSL:pjc

SENT BY:        11- 3-94 ; 2:47PM ;Kruse, Landa Maycock→       2552005;# 2/ 5

Escrow074516

# JEFFREY LIMITED

## Middle and Egmont Street, Kingstown, St. Vincent & Grenadines

Phone:     41-75 232 24 37
Fax       41-75 232 67 26

Mr. Howard S Landa
Kruse, Landa & Maycock L.L.C.
Eighth floor, Bank one Tower
50 West Broadway (300 South)
Salt Lake City
Utah, 84101-2034

04.11.1994/nm

Depenture Agreement

Dear Mr. Landa

As requested in your Fax dated November 3rd, we are forwarding herewith the Depenture Agreement from EuroGas, Inc. over $ 4'000'000 to your address.

We thank you in advance for acknowledgment of receipt.

Sincerely yours

Jeffrey Limited,

Normann Mercer

SENT BY :                    11- 9-94 ; 2:47PM ;Kruse, Landa Maycock→          2552005;# 3/ 5

$4,000,000                                                                          F.G.

Escrow074517

DEBENTURE AGREEMENT

# EuroGas, Inc.

## SERIES A CONVERTIBLE DEBENTURE
### (Due June 30, 1999)

THE SECURITIES ISSUED PURSUANT HERETO HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER THE SECURITIES LAWS OF ANY STATE.  THESE SECURITIES HAVE BEEN ACQUIRED FOR INVESTMENT AND MAY NOT BE TRANSFERRED OR SOLD IN THE UNITED STATES IN THE ABSENCE OF AN EFFECTIVE REGISTRATION OR OTHER COMPLIANCE UNDER THE ACT OR THE LAWS OF THE APPLICABLE STATE OR A "NO ACTION" OR INTERPRETIVE LETTER FROM THE SECURITIES AND EXCHANGE COMMISSION OR AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE ISSUER, AND ITS COUNSEL, TO THE EFFECT THAT THE SALE OR TRANSFER IS EXEMPT FROM REGISTRATION UNDER THE ACT AND SUCH STATE STATUTES.

> This original Debenture Agreement represents your right to payment, and it is important that you retain it in a safe place. This original Debenture Agreement must be delivered to the Company on payment or conversion.

EuroGas, Inc. (the "Company"), hereby promises to pay to the holder of this debenture, Jeffrey, Ltd., Middle Egemont Street, Kingston, St. Vincents & Grenadines, or its assigns (the "Holder"), the principal sum of $4,000,000 on or before June 30, 1999, and interest as provided herein, subject to the terms and conditions set forth below.

1.    Payment of Principal and Interest.  The Company shall pay to the Holder of this Debenture the principal sum stated hereon, on June 30, 1999, at the offices of the Company at 435 West Universal Circle, Sandy, Utah 84070, in such lawful money of the United States of America as at the time of payment shall be legal tender for the payment of public and private debt, and shall pay semi-annually (June 30 and December 31 of each year) in lawful tender interest thereon commencing November 1, 1994, at a rate of 7.5% per annum.

2.    Conversion by Holder.  The Holder of this Debenture is entitled at any time prior to maturity, or in case this Debenture or some portion hereof shall have been called for prepayment prior to maturity, then until 30 days after the date of the notice of prepayment, to convert the Debenture (or any portion of the principal amount and interest hereof) at the rate of $4.00 per share), into an aggregate of 1,000,000 fully paid and nonassessable shares of common stock, par value $0.001 per share, of the Company (the "Shares").  The conversion right shall be exercised by proper surrender of the original of the Debenture to the Company, accompanied by written notice that the Holder hereof elects to convert the Debenture.

3.    Conversion by Company.  The Company may require the conversion of this Debenture on the terms set forth in paragraph 2 if the Company's common stock trades on NASDAQ (either national market, small cap or bulletin board) or a national exchange at a bid price equal to or in excess of $4.00 per share for a period of ten (10) trading days.

4.    Adjustment of Conversion Rate and Price.  The conversion price, number of Shares issuable upon conversion of the Debenture, and the trading price for conversion set forth in paragraph 3, shall be appropriately adjusted if the Company declares a stock dividend, split, reclassification, distribution, or similar event.



Escrow074518

5.    **Prepayment.** After July 1, 1996, this Debenture is subject to prepayment, in whole or in part, at the election of the Company at any time, on not less than 30 days notice. During the 30 days following the date of any notice of prepayment, the Holder will have the right to convert the Debenture into shares of Common Stock on the terms and conditions provided in paragraph 2. On the date fixed for prepayment, the Debenture shall cease to bear interest with respect to the amount of principal actually paid. Upon the surrender of the original of this Debenture to the Company for prepayment, the amount of principal and interest then due shall be paid. Any Debenture which is prepaid only in part shall be presented to the Company for notation thereon of such partial prepayment.

6.    **Acceleration of Maturity.** In the event of default on the payment of the Debenture, the holder hereof shall have the right to accelerate the maturity date of the Debenture and pursue all of the holder's rights and remedies under law.

7.    **Events of Default.** "Event of Default," when used herein, means any one of the following events:

(a)    Default in the payment of any interest on any Debenture when it becomes due and payable, and continuance of such default of payment for a period of 30 days; or

(b)    Default in the payment of principal of any Debenture in this series when due, whether at maturity, upon prepayment, or otherwise; or

(c)    Default in the performance or breach of any covenant or warranty of the Company in any Debenture (other than a covenant or warranty, the breach or default in performance of which is elsewhere in this section specifically dealt with), and continuation of such default or breach for a period of 60 days after there has been given to the Company by registered or certified mail by the Holder; or

(d)    The entry of a decree or order by a court having jurisdiction in the premises adjudging the Company as bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment, or composition of or in respect of the Company under the Federal Bankruptcy Act or any other applicable federal or state law, or appointing a receiver, assignee, trustee, sequestrator (or other similar official) of the Company or of any substantial part of its property, or ordering the winding up or liquidation of its affairs, and the continuance of any such decree or order unstayed and in effect for a period of 60 consecutive days; or

(e)    The institution by the Company of proceedings to be adjudicated as bankrupt or insolvent, or the consent by it to the institution of bankruptcy or insolvency proceedings against it, or a filing by it of a petition or answer or consent seeking reorganization or relief under the Federal Bankruptcy Act, or any other applicable federal or state law of similar tenor, or appointing a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Company or of any substantial part of its property, or the making by the Company of an assignment for the benefit of creditors, or the admission by it in writing of its inability to pay its debts generally as they become due, or the taking of corporate action by the Company in furtherance of any such action.

8.    **Notices to Holder; Waiver.** Where the Debentures provide for notice to Holder of any event, such notice shall be sufficiently given if in writing and sent by courier providing for delivery within 72 hours or mailed, return receipt requested and postage prepaid, to each Holder affected by such event, at his address as it appears in the Debenture register maintained by the Company, not later than the latest date, and not earlier than the earliest date, prescribed for the giving of such notice. Such notice shall be deemed given as of the date delivered to the courier or deposited in the mail. Neither the failure to deliver or mail such notice, nor any defect in any notice so delivered or mailed to any particular Holder shall affect the sufficiency of such notice with respect to the Holder of other Debentures issued in this series. Where the Debenture provides for notice to the Company, such notice shall be sufficiently given if in writing and mailed, return receipt requested and postage prepaid, to the Company at its address set forth above, not later than the latest date, and not earlier than the earliest date prescribed for the giving of such notice. Where the Debenture provides for notice in any matter, such notice may be waived in writing by the

2



Escrow074519

person entitled to receive such notice, whether before or after the event, and any such waiver shall be equivalent to such notice.

9.    Withholding.  The Company shall be entitled to withhold from all payments of principal and interest on the Debenture any amounts required to be withheld under the applicable provisions of the United States Internal Revenue Code of 1986, as amended, applicable state tax laws, or any other applicable law at the time of such payments.

10.    Governing Law.  The Debenture shall be governed by and construed and interpreted in accordance with the laws of the state of Utah.

11.    Miscellaneous.  This Debenture is subject to the following additional terms and conditions:

(a)    If this Debenture is placed with an attorney for collection, or if suit is instituted for collection, or if any other remedy provided by law is pursued by the registered Holder hereof, because of any Event of Default, the undersigned agrees to pay reasonable attorney's fees, costs, and other expenses incurred by the registered Holder hereof in so doing.

(b)    Subject to the limitations on transfer imposed by United States federal and state securities laws, this Debenture may be transferred, subject to compliance with the provisions hereof.

                                                    EUROGAS, INC.

                                                    By _____
                                                       Merlin V. Fish, President

ATTEST:

By _____
   Jill S. Holt

3



Escrow074520

## KRUSE, LANDA & MAYCOCK, L.L.C.

HOWARD S. LANDA

EIGHTH FLOOR, BANK ONE TOWER
50 WEST BROADWAY (350 SOUTH)
SALT LAKE CITY, UTAH 84101-2034

TELEPHONE: (801) 531-7090
TELECOPY: (801) 359-3954

November 3, 1994

FACSIMILE TRANSMISSION
011-41-75-232-8728

Normann Marxer
Jeffrey, Ltd.
Middle Egremont Street
Kingston, St. Vincent & Grenadines

Dear Mr. Marxer:

This letter shall constitute notice that EuroGas, Inc. (the "Company"), has elected to convert your $4,000,000 Series A Convertible Debenture pursuant to paragraph 3 as the bid price of the Company's common stock has been equal to or in excess of $4.00 per share for a period of greater than ten days. The procedure to complete the conversion would be as follows:

    (1)    You would Federal Express to my office the original Debenture;

    (2)    Merlin Fish, president of the Company, will personally deliver the 1,000,000 shares of common stock to you or your representatives in Europe next week;

    (3)    Upon receipt of the stock, you would send me by facsimile transmission an acknowledgment of receipt;

    (4)    Upon receipt of your acknowledgment, I would deliver the original Debenture to the Company for cancellation.

If you have any questions, please telephone.

Sincerely,

KRUSE, LANDA & MAYCOCK, L.L.C.

Howard S. Landa

HSL:pjc

Escrow074521

KRUSE, LANDA & MAYCOCK, L.L.C.

HOWARD S. LANDA

DIGITIE, OCR BANK ONE TOWER
50 WE ST HWDWYMAY (700 TOUTH)
SALT LAKE CITY, UTAH 84101-2034

TELEPHONE: (801) 531-7090
TELECOPY: (801) 356-2654

November 9, 1994

FACSIMILE TRANSMISSION

255-2005

Merlin V. Fish, President
EuroGas, Inc.
435 West Universal Circle
Sandy, Utah 84070

Dear Merlin:

Enclosed is a letter for your to sign to Progressive Transfer for the issuance of the Jeffrey Ltd. shares.

Regards,

Howard S. Landa

HSL:ldp
enclosure

Escrow074522

# Fax Cover Page

## SUBJECT:

**Mr. Normann Marxer:**

The attached letter from Howard Landa indicates that I would bring stock certificates to you next week. Since I will be leaving on Monday, November 7th, I will need to complete this transaction by tomorrow, November 4th.

If you would sent to my office the Federal Express Airbill Number, as well as a fax stating that you have sent the original debenture document, I will go to the transfer agent and do the necessary paperwork so that I can bring the stock certificates with me.

Thank you for your help in these matters.

Sincerely,


Merlin Fish

jsh

| To: MR. NORMANN MARXER-JEFFREY, LTD | From : JILL S. HOLT |
|---|---|
| For Information Call: 801 255 0862 | At: EUROGAS, INC |
| Pages: 2 | My Fax Number : 801 255-2005 |

Cover pages by Delrina

Escrow074514

## EUROGAS, INC.
435 West Universal Circle
Sandy, Utah 84070
801-255-0862

November 9, 1994

Kurt Hughes
Interwest Transfer Company
1981 East Murray-Holladay Blvd.
Holladay, Utah 84117

Dear Kurt:

Jeffrey Ltd. has delivered to Howard Landa a debenture for conversion. I have enclosed a copy of Mr. Landa's letter setting forth the procedure for conversion. Please deliver a stock certificate for Jeffrey Ltd. for 1,000,000 shares with the appropriate restrictive legend (144 legend, not S) to me for delivery to Europe.

If you have any questions, please telephone me.

Sincerely,

Merlin V. Fish

**INTERWEST TRANSFER COMPANY**

P.O. BOX 17136 SALT LAKE CITY, UTAH

84117

(801)272-9294

FILE COPY

EUROGAS, INC.

CERTIFICATES ISSUED

```
4552 X 100,000 JEFFREY, LTD. (ILS)
4553 X 100,000 JEFFREY, LTD. (ILS)
4554 X 100,000 JEFFREY, LTD. (ILS)
4555 X 100,000 JEFFREY, LTD. (ILS)
4556 X 100,000 JEFFREY, LTD. (ILS)
4557 X 100,000 JEFFREY, LTD. (ILS)
4558 X 100,000 JEFFREY, LTD. (ILS)
4559 X 100,000 JEFFREY, LTD. (ILS)
4560 X 100,000 JEFFREY, LTD. (ILS)
4561 X 100,000 JEFFREY, LTD. (ILS)
```

TOTAL SHARES = 1,000,000

---

BROKER

EUROGAS, INC.
*WALK-IN*

CERTIFICATES SURRENDERED

DEP-CON (ILS)

FOR SHARES =

DATE - NOVEMBER 14, 1994 DN365
NET CERTIFICATES ISSUED = 10
CERTIFICATES SURRENDERED = 0

CHARGES
CERTIFICATE FEES = $100.00

TOTAL AMOUNT DUE = $100.00
PAYABLE UPON RECEIPT

Escrow074511

327

1    BY MR SMITH:

2         Q.   OK.   Do you know where the original is?

3         A.   I'm not sure whether this is the original.

4    (Document handed)

5              MR SMITH:  Thank you.

6              MR MACDONALD:  Handing you two documents

7    from the originals file.

8              MR SMITH:  Then you do have the original,

9    yes.  Let me have back, if I could, the last two

10   exhibits.

11             MR MACDONALD:  56?

12             MR SMITH:  Yes.  (Document handed)

13             MR MACDONALD:  And 55?  (Document handed)

14             MR SMITH:  All right.  I have the originals

15   now of both 55 and 56 and I'd like the court reporter

16   to either make a new exhibit and we'll just substitute

17   that, throw away the old copy.

18             (The original documents were marked as

19                   Exhibits 55 and 56)

20   BY MR SMITH:

21        Q.   I'm going to re-show you 55 and 56 and ask

22   if you would identify both of those?

23        A.   Yes, I do.

24        Q.   What is 55?

25        A.   That's -- is that the same number as we had

1    before?

2         Q.    That is the same number, yes, sir.  It's

3    just the original version.

4         A.    I use the same wording.  It's a Deed of

5    Pledge agreement.  It's an acceptance of

6    MCK Development BV, by its director Mr Mike McKenzie,

7    that MCK Development BV is accepting as security

8    2,100,000 Eurogas shares and two convertibles of total

9    $US9 million convertible in 1 million A shares,

10   1 million B shares.

11        Exhibit 56 is the Deed of Pledge Assignment

12   which is the original that was sent under 49A.

13        Q.    OK.  Let me ask you this, Mr Schlegel: did

14   you ever receive a like document, a deed of pledge, by

15   Jeffrey to secure its $12 million note to MCK?

16        A.    No.

17        Q.    Nothing was ever signed by Jeffrey to

18   secure its obligation back in June -- June 13th, 1994?

19        A.    Sorry, I don't understand the question.

20        MR MACDONALD:  Isn't this that document,

21   counsel?  I don't understand.  I'm referring to 56.

22        MR SMITH:  I understand.

23   BY MR SMITH:

24        Q.    Was there anything earlier received than

25   that to secure the obligation?

329

1          A.    By whom?

2          Q.    By Jeffrey.

3          A.    I don't understand the question.

4          Q.    That's the first deed of pledge signed by

5    Jeffrey?

6          A.    Yes, that they need to honor their

7    commitments with MCK.

8          Q.    Right.  But didn't their obligation to MCK

9    arise in June -- on June 13th, 1994?

10              MR WEISBART:  Didn't what?  I'm sorry.

11   BY MR SMITH:

12         Q.    Didn't their obligation to MCK arise on

13   June 13th, 1994?  Isn't that the date of the promissory

14   note?

15         A.    It's the date of the promissory note,

16   that's correct.

17         Q.    Is that when the obligation arose to  MCK

18              MR MACDONALD:  I'll object to the form of

19   the question because I think that's asking a legal

20   conclusion.  I couldn't answer, much less him going

21   across --

22              MR SMITH:  I withdraw the question.

23              MR TATE:  Why don't you just ask if there

24   is a deed of pledge or security agreement signed prior

25   to August 1994.

330

1          MR SMITH:  I thought that's what I did.

2          MR MACDONALD:  Yes, he did, and the answer

3    was there was none.

4          MR TATE:  OK.  Thanks.

5          MR MACDONALD:  That we're all in agreement

6    with.

7                    (Exhibit 57 was marked

8                    for identification)

9    BY MR SMITH:

10        Q.   RS148 and 149.  I'm tendering to you

11   Exhibit 57.  Is that in your handwriting?  I'm sorry.

12   Is that your memo and your signature?

13        A.   It is my memo and my initial.

14        Q.   Initial, OK.  Is page 2 of that exhibit a

15   correct translation of page 1?

16        A.   Yes.

17        Q.   OK.  Thank you.  Now am I correct,

18   Mr Schlegel, that this is a memorandum of a meeting

19   that you had with Mr McKenzie on July 22, 1994?

20        A.   Offhand it looks to me more a telephone

21   conversation, otherwise there would be no time

22   mentioned there.

23        Q.   All right.  Can you tell me what the fourth

24   subsequent revision with Mike McKenzie is, what

25   contract you're discussing there?


EXHIBIT
56
April 19, 2001

# *Deed of Pledge and Assignment*

The undersigned,

### *JEFFREY LIMITED, Kingstown, St. Vincent and the Grenadines,*

hereafter called "Pledgor" by this Deed of Pledge and Assignment hereby assings to

### *MCK Development B.V., Herengracht 320, NL-1016 CE Amsterdam*
### (hereafter called "MCK")

a pledge covering all of the rights and claims of MCK against

### *JEFFREY LIMITED, Kingstown, St. Vincent and the Grenadines,*

hereafter called "Debtor" in accordance with the following conditions:

1.  The pledge shall constitute a security for all rights and claims (including principal, interest, commissions, compensation, expenses, fees, etc., as well as enforcement costs and court costs) which MCK has against the Debtor. The pledge shall also remain in force in the event of the Debor's indebtedness and obligations having been temporarily extinguished in full or in part.

2.  The pledge shall cover the shares and any other assets of any kind, including all related rights and proceeds due at present or in future (interest, dividends, subscription rights, warrants, stock dividends, etc.) resulting from the shares purchased under the note of 13th June, 1994.

    In the event the pledges are exchanged, the new pledges shall without any further formalities whatsoever serve in substitution of the former pledges. The pledge shall always cover the full objects pledged, even if their value is increased later on by additional payments or for any other reason.

3.  Upon the first demand by MCK the Pledgor shall be bound to cooperate in transferring the pledges to another party and to make available any and all declarations, endorsements and/or assignments necessary for exercising the pledge. Securities which cannot be pledged without a deed of assignment are herewith assigned to MCK.

    Pledges held by third parties may be taken into safekeeping by MCK at any time.

*Deed of Pledge and Assignment*                           *page -2-*

4. If MCK elects to initiate official collection proceedings against the Debtor, it shall have the option to either institute prosecution for realization of the pledges or to institute the ordinary debt collection procedure.

5. All communications of MCK shall be considered duly and legally made if they have been sent to the last address indicated by the Debtor.

6. Applicable law and court of jurisdiction: All legal relations between the Debtor, the Pledgor and MCK shall be governed by Swiss law.

   The place of performance and the place of prosecution for Debtors and/or Pledgors domiciled or residing abroad, as well as the court of jurisdiction for all legal proceedings, irrespective of the Debtor's an/or Pledgor's domicile or residence, shall be ZURICH 1.

   MCK shall, however, also have the right to prosecute the Debtor and/or the Pledgor before the competent court at his place of domicile, or before any other court having jurisdiction.

Place, date:

*Vaduz   6.8.97*

The Debtor:                               The Pledgor:

JEFFREY LIMITED                       JEFFREY LIMITED



MCK Development B.V.
Herengracht 320
NL-1016 CE Amsterdam

11th August, 1994

**_Promissory Note June 13, 1994, US$ 12'000'000.-- (US$ twelve million)_**

Dear Sirs,

With reference to the promissory note of June 13, 1994, and the Deed of Pledge
Agreement and Assignment, securing above note, we agree to accept as security
the 2'100'000 (two million one hundred thousand) shares of EuroGas Inc. and the
two convertibles of total US$ 9'000'000.-- (US$ nine million) convertible in one
million A shares and one million B shares of EuroGas Inc.

MCK Development B.V.

Mike McKenzie, Director

# JEFFREY LIMITED
## Middle and Egmont Street, Kingstown, St. Vincent & Grenadines

Phone:     41-75 232 24 37
Fax:       41-75 232 67 26



EXHIBIT
64
April 19, 2001

4061 – 4081 ✓

## RECEIPT

I Peter Schefer, assistent of the Director of Invico Capital Corporation AG, Zürich acknowledge herewith receipt of the following documents:

2'100'000 Shares of Euro Gas Inc./Jeffrey Limited, common stock ✓

21 Stock Assignments separate from certificate ✓

US$ 5'000'000.– of series A convertible debentures of EUROGAS INC.

Written instruction (copy) dated November 3, 1994, from Kruse, Landa & Maycock L.L.C. ✓

Vaduz, 17.11.1994/nm

in safe
DG-Bank

Peter Schefer
for INVICO

EXHIBIT 29

RS00150

RS ANC 00086

359

1       A.    Uh-huh.

2       Q.    Did I read that correctly?

3       A.    Yes, you did.

4                                  (Exhibit 64 was marked

5                                  for identification)

6       Q.    I'm going to  show you what has been marked

7    as Exhibit 64 which is RS150 and ask if you can

8    identify that for me, please?

9             MR WEISBART:  What's the number again?

10            MR SMITH:  150.

11            MR MACDONALD:  What exhibit number are we

12   on?

13            MR SMITH:  That one right there is 64 which

14   is Exhibit number RS150.

15            THE WITNESS:  This is a receipt

16   confirmation that Mr Schefer has received 2,100,000

17   shares from Eurogas and 21 stock assignments, and a

18   convertible loan, series A.

19   BY MR SMITH:

20       Q.    And then there's an instruction letter as

21   well and that's the exhibit that we earlier identified

22   as the 1 million shares coming from Kruse, Landa, is it

23   not?

24       A.    Yes.

25       Q.    So you are, or Mr Schefer on behalf of

360

1    Invico, is acknowledging that he has in his possession

2    2.1 million shares of Eurogas belonging to

3    Jeffrey Limited, 21 stock certificates, a $5 million

4    debenture, and in transit a million more shares from

5    Kruse, Landa?

6         A.   That is correct.

7         Q.   And whose handwriting is this to the right

8    of Mr Schefer's signature?

9         A.   That's Mr Schefer's signature.

10        Q.   And does that mean that the shares and the

11   assignments and the debenture are physically in the

12   safe at DG Bank?

13        A.   That is correct.

14        Q.   Did Invico maintain a safe deposit box at

15   the bank?

16        A.   Yes, we do.

17        Q.   And this is dated November 17th, 1994?

18        A.   That is correct.

19        Q.   Was this ultimately sent to Mr Zimmer to

20   evidence your actual possession of the shares of stock

21   that he is buying under the option?

22        A.   No, this is not sent to him.  The letter we

23   saw yesterday, documentation, we said that the shares

24   are now physically.

25                           (Exhibit 65 was marked

**DIPL.-KFM. HERBERT ZIMMER**

1 7. Nov. 1994

*WIRTSCHAFTSPRÜFER · STEUERBERATER*
*BENESISSTRASSE 8 - 12*
*D-50672 KÖLN*
*TELEFON: 0221/202060 · TELEFAX: 0221/256087*

HERBERT ZIMMER · BENESISSTR. 8 - 12 · D-50672 KÖLN

INVICO
CAPITAL CORPORATION AG
z. H. Herrn Rolf Schlegel
Kirchgasse 24

CH-8022 Zürich



EXHIBIT
63
April 19, 2001

17.11.1994
ZI/BL

Entwurf OPTION Agreement

Sehr geehrter Herr Schlegel,

zunächst einmal möchte ich mich bei Ihnen für das sehr offene Gespräch am gestrigen Tag in Ihrem Büro bedanken.

Vertragspartner im Optionsvertrag werde ich persönlich sein. Mit dem Entwurf bin ich einverstanden und bitte nur unter Punkt I die exakten Geldbeträge bei einem Preis von 1.707 US $ einzufügen.

Sobald mir der Vertrag rechtsgültig unterschrieben vorliegt und Sie mir bestätigen können, daß die Aktien sich physisch und unbeschränkt zur Sicherstellung des Vertrages in Ihrem Besitz befinden, werde ich das Geld umgehend anweisen.

Mit freundlichen Grüßen

Zimmer

EXHIBIT 2

RS00083

RS-ANC 00027

Nov. 17, 1994

*DIPL.-KFM. HERBERT ZIMMER*
*AUDITOR • TAX CONSULTANT*
*BENESISSTRASSE 8-12*
*D-50672 COLOGNE*
*PHONE: 0221/202060      FAX: 0221/256087*

INVICO
CAPITAL CORPORATION AG
Attn: Rolf Schlegel
Kirchgasse 24

CH-8022 Zurich

11/17/1994
ZI/BL

Draft of OPTION Agreement

Dear Mr. Schlegel,

First, I would like to thank you for the very open discussion we had in your office yesterday.

I will personally be the contract partner of the option contract. I agree with the draft and I only ask that you enter the exact amounts with a price of US$ 1,707 under point 1.

I will transfer the money as soon as the contract is in my possession with legally binding signatures and you confirm that the shares are physically and unencumbered in your possession to secure the contract.

With best regards,

/Signed/
Zimmer

EXHIBIT 2

RS00084

RS-ANC   00027

356

1    was not at the direction of Mr McKenzie?

2           A.    I do not know, because I had not any

3    control over Jeffrey.  It was administered by

4    Mr Marxer.  Mr Marxer is a good friend of Mr Ulrich.

5                                  (Exhibit 63 was marked

6                                   for identification)

7           Q.    I will show you what is marked as

8    Exhibit 63 which is RS83 and 84.  Can you identify

9    that, Mr Schlegel?

10          A.    Yes, I can do that.

11          Q.    What is that?

12          A.    This is a letter from Mr Zimmer to  Invico

13          Q.    It's addressed to you, is it not?

14          A.    It's to Invico Capital Corporation,

15    attention my name.

16          Q.    All right.  And what's the date of that

17    letter?

18          A.    The letter is dated 17th of November 1994.

19          Q.    Would you look at page 2 and tell me if

20    that is a correct translation of page 1?

21          A.    Yes.

22          Q.    OK.  Thank you.  Did you receive this

23    letter from Mr Zimmer?

24          A.    Yes.  It was a fax.

25          Q.    OK.  And am I correct that this is thanking

1   you for the Jeffrey option discussion?

2        A.    That is correct.

3        Q.    And you were acting on behalf of whom in

4   negotiating or discussing the Jeffrey option with

5   Zimmer?

6        A.    On behalf of Mr McKenzie, Mr Rauball.

7        Q.    Was it at the direction of Mr McKenzie and

8   Mr Rauball that you were discussing the Jeffrey option

9   with Mr Zimmer?

10       A.    We were the administration person and we

11  had the -- or the job to get the contract organized and

12  signed.

13       Q.    Now, again, you did not have an

14  administration agreement with Jeffrey, did you?

15.      A.    No, but on the other hand we had been asked

16  to assist here.

17       Q.    And the assistance request came from whom?

18       A.    From both parties, because we were active

19  already on behalf of Mr McKenzie and we also,

20  obviously, had contact with Mr Rauball.

21       Q.    OK.  Now, why would Mr Rauball want you to

22  discuss a Jeffrey option with Mr Zimmer?

23       A.    We discussed that yesterday already.

24  Mr Zimmer is a friend of Mr Rauball.

25       Q.    Is it only because of the friendship that



I    N    V    I    C    O

INVICO
CAPITAL CORPORATION AG

Kirchgasse 24
Postfach 4754
CH-8022 Zürich

Telefon 0041-1-261 72 11
Telefax 0041-1-261 72 88
*TELEFAX 0049/221/256087*

Zürich, 17. November 1994
SR/lm



**An:**  Herrn Herbert Zimmer

**Von:**  Rolf Schlegel

**Ref:**  *Optionsvertrag*

Anzahl Seiten inkl. Deckblatt: - 6 -

Sehr geehrter Herr Zimmer

Soeben habe ich den unterschriebenen Vertrag erhalten und bestätige Ihnen, dass wir 2'100'000 Aktien physisch hier halten. Ebenfalls liegt eine Wandelanleihe hier (Kopie beigelegt). Die restlichen 1 Mio Aktien, welche gewandelt wurden, sind auf dem Wege nach Europa. Sie können Ihre Zahlungen nun in die Wege leiten.

**Export des Gewinns von Polen**
Es besteht ein Gesetz, wobei Gewinne ins Ausland transferiert werden können (Steuerrate 5%). Wir werden nächste Woche vom Finanz-Ministerium eine entsprechende Bestätigung für Sie anfordern.

**Export von Methan-/Erdgas aus Polen**
Oel und Gas sind nicht auf der Liste der nicht exportierbaren Resourcen. Nach Gesetz darf Gas also exportiert werden. Wir werden auch hier eine Bestätigung inkl. Liste der mit einem EXPORT-Verbot unterliegenden Güter anfordern.

Falls Sie weitere Fragen haben, rufen Sie mich doch an. Wir geben Ihnen gerne jegliche Auskunft.

Mit freundlichen Grüssen

Rolf Schlegel

INVICO CAPITAL CORPORATION AG

EXHIBIT 3

RS00085

RS-ANC 00028

# INVICO

INVICO
CAPITAL CORPORATION AG

Zurich, November 17, 1994
SR/lm

Kirchgasse 24
P.O. Box 4754
CH-8022 Zurich

Phone: 0041 -1-261 72 11
Fax: 0041 -1 -261 72 88

*Fax   0049/221/256087*

To:   Mr. Herbert Zimmer

From:  Rolf Schlegel

Re.:   **Option Contract**

Number of pages, incl. cover sheet:   6

---

Dear Mr. Zimmer,

I have just received the signed contract and hereby confirm that we are physically in possession of 2,100,000 shares. We also have a convertible loan (copy enclosed). The remaining 1 million shares that have been converted are on their way to Europe. You can now initiate your payments.

**Export of the Poland profits**

There is a law that permits the transfer of profits to foreign countries (tax rate of 5%). We will request such a confirmation for you from the Treasury Department next week.

**Export of methane/natural gas from Poland**

Oil and gas do not appear on the list of resources that cannot be exported. Accordingly, the law permits the export of gas. We shall also request a confirmation in this case, including a list indicating the goods that cannot be exported.

Please call if you have questions. We stand ready to provide you with information.

With best regards,
/Signed/  .
Rolf Schlegel
INVICO CAPITAL CORPORATION

RS00086

RS-ANC 00028

# OPTION AGREEMENT

Between

**Jeffrey Limited**
**18, Bay Street**
**Kingstown**
**St. Vincent W.I**
**St. Vincent and the Granadines**

and

**Dipl. Kfm. Herbert Zimmer**
**Wirtschaftsprüfer/Steuerberater**
**Benesisstrasse 8-12**
**D-50672 Köln**

Whereas Jeffrey Limited hereby represents that they own 3'100'000 shares of EUROGAS INC. common stock and US$ 5'000'000 of series B convertible debentures of EUROGAS INC which convert to 1'000'000 shares of common stock.

Jeffrey hereby grants to Herbert Zimmer an option to purchase above position for US$ 7'000'000 (seven million) until September 30th. 1995. This option maybe exercised in whole or in part at US$ 1.707 (one dollar seventy point 7 cents US$) per share equivalent.

The parties further agree that Jeffrey has the right to excercise a call for partial payment from Herbert Zimmer if the shares are traded during 10 days at following rates and conditions:

| strike price | | | | |
|---|---|---|---|---|
| 1) | $ 5.50 | 900'000 shares | in total | $ 1.636'300.— |
| 2) | $ 6.25 | 900'000 shares | in total | $ 1.536'300.— |
| 3) | $ 7.— | 1'200'000 shares | in total | $ 2.048'400.— |
| 4) | $ 7.50 | 1'100'000 shares | in total | $ 1'879'000.= |
| | | | in total | $ 7'000'000.— |

EXHIBIT 4

RS00087

RS-ANC 00031

- 2 -

II

Herbert Zimmer agrees to immediately partly exercise the option at following terms:

> purchase of 234329 shares à $ 1.707 in total $ 400'000.--
> by November 20th, 1994.

> purchase of 351494 shares à $ 1.707 in total $ 600'000.--
> payable by January 30th, 1995.

These amounts will be deducted from 1) of part I of the shares leaving 314177 shares à $ 1.707 at total $ 536'300.--.

III    Payment terms:

Immediate payment as per above dates and calls against presentation of shares to the account 237.600 at BILFINANZ UND VERWALTUNG AG, Gladbachstrasse 105, P.O. Box 832, CH-8044 Zurich.

Non payment of the $ 400'000 and/or $ 600'000 or any call payments as set out in this agreement under part II will upon ten days written notice terminate Herbert Zimmer's right to acquire the unpaid portion of this option.

IV    Explanation re origin of funds

Herbert Zimmer confirms by signing this agreement that the funds are not in contradiction to the international law regarding money laundering. The undersigned has full knowledge of the stipulations regarding the directives on combatting and preventing laundering of money and confirms that all trans-actions are undertaken in a fully transparent manner and that the authorities shall be informed in case of need of all relevant matters without gaps.

RS00088

RS-ANC 00032

- 3 -

This agreement executed on the 17th of November 1994.


Jeffrey Limited                              Herbert Zimmer


....................................         ....................................
Norman Marxer


a-jeffre.

RS00089

RS-ANC 00033



**I   N   V   I   C   O**

INVICO
CAPITAL CORPORATION AG

Kirchgasse 24
Postfach 4754
CH-8022 Zürich

Telefon 0041-1-261 72 11
Telefax 0041-1-261 72 88

Zürich, 18. November 1994
SR/psc



---

**TELEFAX   0049/221-25'60'87**

**An:**        Herrn Herbert Zimmer

**Von:**       Rolf Schlegel

**Referenz:**  Zahlungseingang

**Anzahl Seiten inkl. Deckblatt:   -1-**

---

Sehr geehrter Herr Zimmer

Die Bank hat uns soeben den Eingang der Zahlung betreffend Option angezeigt.
Wir danken Ihnen im Namen unseres Mandanten für die rasche Abwicklung.

Wir sind sehr beeindruckt.

Gerne höre ich von Ihnen und wünsche ein schönes Wochenende.

Mit freundlichen Grüssen

Rolf Schlegel

INVICO CAPITAL CORPORATION AG

cc: Herrn Wolfgang Rauball

EXHIBIT ___6___

RS00093

RS-ANC 00034

## INVICO
## CAPITAL CORPORATION AG

Zurich, November 18, 1994
SR/psc

**Fax**   0049/221-25.60.87

To:   Mr. Herbert Zimmer

From:  Rolf Schlegel

Re.:   Payment received

Number of pages, incl. cover sheet:   1

---

Dear Mr. Zimmer,

The bank has just confirmed the receipt of the option payment. We thank you in the name of our client for the quick handling.

We are very impressed.

I am looking forward to hearing from you and wish you a nice weekend.

With best regards,
/Signed/
Rolf Schlegel

cc:   Mr. Wolfgang Rauball

RS00094

RS-ANC 00034

227

1   being copied with your letter here to Mr Zimmer?

2          A.   Herr Zimmer is a friend of Herr Rauball and

3   Herr Rauball introduced him to  Jeffrey for us.  For us,

4   to us I mean.

5          Q.   When he introduced him to Jeffrey, to whom

6   did he introduce Mr Zimmer?

7          A.   He came to us.  It was discussed in Zurich.

8          Q.   Did you have any authority to negotiate

9   with Mr Zimmer as to the price or the terms of the

10  option agreement?

11         A.   Various prices were always discussed with

12  Mr McKenzie and Mr Rauball.

13         Q.   Or Mr Rauball?

14         A.   Yes.

15         Q.   Why with Mr Rauball?

16         A.   Well, he obviously looked for his client,

17  for his friend.

18         Q.   OK.  So in the Zimmer negotiation, any

19  price that was set by McKenzie was communicated to

20  Rauball?

21         A.   Yes.

22         Q.   Did Rauball and McKenzie negotiate that

23  price and the terms?

24         A.   I don't know what happened when -- on

25  things that I was not participant, but --

228

1          Q.    Did you negotiate with Rauball or with

2     Zimmer the terms and the payment and the amounts?

3          A.    We discussed that and then passed it on to

4     Mr McKenzie and there is some documentation here where

5     Mr Rauball put his figures in on the transaction.

6          Q.    Do  you know of any direct negotiations

7     between McKenzie, Mike McKenzie, and Mr Zimmer,

8     Herbert Zimmer, for this Jeffrey option?

9          A.    I do not know of it.

10         Q.    Do you know of any direct negotiations

11    between Mr McKenzie and Wolfgang Rauball pertaining to

12    the Jeffrey option to Mr Zimmer?

13         A.    I do not know.

14         Q.    And you are providing this letter to

15    Mr Zimmer as a courtesy --

16         A.    Yes.

17         Q.    -- or at a direction of Mr Rauball?

18         A.    No, this was as a courtesy.  I was

19    impressed that money came so fast after all my

20    experience.

21         Q.    Say that again?

22         A.    I was very impressed that the money was

23    paid so fast after all my experience.

24         (Counsel's audio-tape was changed/turned over)

25               MR SMITH:  We are going to page 85 through

229

1    89.

2                    (Discussion off the record)

3                    MR WEISBART:  Is this 35 coming up?

4                    MR SMITH:  This is 35 coming up, yes.

5                    MR WEISBART:  It has RS85 through 89?

6                    MR SMITH:  Yes.

7                    MR WEISBART:  OK.  Thank you.

8                                    (Exhibit 35 was marked

9                                     for identification)

10   BY MR SMITH:

11        Q.   I'm going to show you what has been marked

12   as Exhibit 35, and does the first page of that bear

13   your signature?

14        A.   Yes, it does.

15        Q.   Was that a document prepared by you or by

16   your office?

17        A.   By my office.  I signed it.

18        Q.   And was it sent to Mr Zimmer?

19        A.   Indeed.  It was sent by fax to Mr Zimmer.

20        Q.   Is the second page of Exhibit 35 a true --

21   I'm sorry: a correct translation of the first page?

22        A.   (After a pause)  Yes, it is.

23        Q.   It's not clear, Mr Schlegel, but is this,

24   the next three pages, are those enclosures with this

25   transmittal?



# Michael McKenzie

7500 San Felipe Suite 400
Houston, Texas 77063
713-780-9311
Fax: 713-780-9322

*Date:*     November 22, 1994

*To:*      Rolf Schlegel

*Fax:*     41-1-261-7288

*Re:*

*Sender:*   Michael McKenzie

---

*YOU SHOULD RECEIVE ONE PAGE, INCLUDING THIS COVER SHEET. IF YOU DO NOT RECEIVE ALL THE PAGES, PLEASE CALL 713-780-9311.*

---

Dear Rolf,

Please arrange for the following transfers:

| | | |
|---|---|---|
| US $ | 350'000.-- to my account R.W.T. Inc. | #266 405 7014<br>Nations Bank of Texas N.A.<br>ABA #111 0000 25<br>Swift Code NABKUS44DAL |
| NLG | 18'811.70 | to the Bank Indosuez,<br>Amsterdam |

and the rest to your trust account.

Thank you and best regards

EXHIBIT 4

RS00165

RS-ANC-00160

# PROMISSORY NOTE

US$  350'000.--                              November  22nd,  1994

Mr Michael McKenzie, 2222 Country Club Blvd., Sugar Land, Texas 77418, USA ("Maker"), for value received, hereby promises and agrees to pay unto MCK Development B.V., a Dutch Corporation ("Payee"), in lawful money of the United States of America the sum of US$ 350'000.-- (threehundredandfiftythousand dollars) to be repaid in accordance with the terms and conditions hereof.

Payment of all sums advanced to Maker by Payee made on November 22, 1994, and hereunder shall be made by Maker to Payee in full on November 30, 1996. The Maker will make an annual interest payment of 7%, first payment due on November 30, 1995.

Maker may prepay the amount hereunder in whole or in part at any time prior to the above date at Maker's election.

If default is made in the payment of this Note at maturity, Maker agrees and is also to pay to the owner and holder of this Note a reasonable amount as attorneys' or collection fees in connection with the collection efforts, if any, by Payee hereunder.

By _____

Michael McKenzie

EXHIBIT _____

pr-note.

RS00166



BILFINANZ UND VERWALTUNG AG

Zürich

2 5. Nov. 1994

REFERENCE        245500      32075          INVICO CAPITAL CORPORATION AG
                                            POSTFACH 4754
ACCOUNT NO.                1001 USD         8022 ZÜRICH

ACCOUNT HOLDER
MC KENZIE DEVELOPMENT B.V.


DEBIT ADVICE                    ZURICH,  23/11/1994  -070


WE DEBIT YOUR ACCOUNT AS FOLLOWS:

TSF TO R.W.T. INC.    USD      350.000,00

CHARGES :             USD          11,41

NET AMOUNT            USD      350.011,41

| Zahlung  |      |      |
|----------|------|------|
| Beleg Nr.|      |      |
| Buchung  | 1300 | 1003 |

TO YOUR DEBIT          VALUE    25/11/94  USD        350.011,41

ADVICE WITHOUT SIGNATURE

EXHIBIT  43

RS00167

RS-ANC 00170

Gladbachstrasse 105      Telefon 01 250 81 81

# ZAHLUNGSAUFTRAG

per Valuta Soll    `23.11.94`

☐ Post          ☐ Telex/Fax
☒ SWIFT         ☐ Intern
☐ Saldierung; Visum DEZ _____

---

Auftragsgrundlage: ☐ VVA
☐ Telefon vom          Name
☐ Brief      ☐ Telex      ☐ Fax

**Senden an**

BILFINANZ UND VERWALTUNG AG
GLADBACHSTRASSE 105
8044 ZÜRICH

---

**50** Auftraggeber

MCK Development B.V.
Amsterdam

Konto-Nr. 245.400.1001 (US$)
           500

☐ erwähnen
☒ ~~nicht~~ erwähnen ~~~~
☒ im Auftrag eines Kunden

**71** Spesen

☐ keine
☒ zu Lasten Kunde
☐ zu Lasten Begünstigter

---

**32A** Valuta HABEN  **WHG** US$  **Betrag** 350'000.—
25.11.94

**72** Mitteilungen an die Empfängerbank

---

**56** Zwischengeschaltete Bank

Text Belastungsanzeige

---

**57** Bank des Begünstigten

Nations Bank of Texas N.A.
ABA 111 0000 25
Swift NABKUS44DAL

Aussteller
Datum  22.11.1994
Unterschrift

---

**59** Kontonummer des Begünstigten
1 266 405 7014

Bonität geprüft: Visum

Bitte leer lassen

---

Name und Adresse des Begünstigten

R.W.T. Inc.

---

**70** Mitteilung an den Begünstigten

Loan          EXHIBIT __44__

RS00168

PAYMENT ORDER

Expense in foreign currency on 11/23/94

Party placing the order

MCK Development B.V.
Amsterdam

Account No.
245.500.1001 (US$)

X       On behalf of client

a Foreign Currency Revenue
11/25/94

Recipient's bank
Nations Bank of Texas N.A.
ABA 111 0000 25
Swift NABKUS44DAL

Recipient's account number
1 266 405 7014

Recipient's name and address
R.W.T. Inc.

Message to the recipient
Loan

Currency          Amount
US$               350,000.00

Sent to:

BILFINANZ UND VERWALTUNG AG
GLADBACHSTRASSE 105
8044 ZURICH

Fees

☒ To be paid by customer

Prepared by

Date:        11/22/1994

Signature: /Signed/

RS00169

RS-ANC  00169

211

1   BY MR SMITH:

2        Q.   I'm going to show you the exhibit marked

3   30.  Can you identify that for me, please?

4        A.   Yes, I can.

5        Q.   What is that?

6        A.   This is a promissory note for $350,000

7   dated 22nd November 1994.

8        Q.   And that's --

9        A.   The maker is Mr Michael McKenzie.

10       Q.   And the payee is MCK Development?

11       A.   MCK Development.

12       Q.   Is that Mike McKenzie's signature that

13  you've got there?

14       A.   Yes, it is.

15            MR MACDONALD:  And that's on Exhibit 30

16  that your reference is to?

17            MR SMITH:  That's Exhibit 30.  Thank you.

18                          (Exhibit 31 was marked

19                           for identification)

20  BY MR SMITH:

21       Q.   I'm going to show you what has been marked

22  as Exhibit 31 and ask if you can identify that.  That

23  is RS165 through 169.  Can you identify that for me?

24       A.   Yes.  This is an instruction from

25  Mr McKenzie to us to pay, to Invico to pay, 350,000.

212

1   That's the exhibit that you have there.

2               MR MACDONALD:  30?

3               MR SMITH:  30?

4               THE WITNESS:  30, and to pay 18,811.70

5   guilders to Bank Indosuez.  This is another document

6   which we have seen before.

7   BY MR SMITH:

8        Q.   And that was for the payment of either

9   formation of Claron or -- of Okibi, I think, is that

10  right?

11       A.   Yes, or -- yes.  Maybe -- or Netherlands

12  Management Company I think it was.  Payment was made

13  from the MCK Development account to Nations Bank for

14  350,000.

15       Q.   Did you receive the first page of this

16  document?

17       A.   Yes, sir.

18       Q.   And do you identify -- can you identify

19  that as Mike McKenzie's signature?

20       A.   Yes, I do.

21       Q.   Did you carry into effect the instructions?

22       A.   Yes, we did.

23       Q.   It says for you to arrange for the

24  following transfers, the first being the $350,000, and

25  you did that?

215

1      Q.   The latter?

2      A.   Yes.

3      Q.   At the same time, 1994, did you maintain

4   other trust accounts into which Mike McKenzie's or his

5   affiliate's money was placed?

6      A.   No, we've only had that.  You can see it

7   also on the project account.

8      Q.   OK.  So the reference to your trust

9   account, did you place the balance into the MCK Invico

10   account for the benefit of McKenzie that you just

11   identified?

12     A.   I cannot give you an answer to that,

13   because I don't know the balance.

14     Q.   We are identifying $350,000 of a total

15   amount, plus 18 -- what's the equivalent in US dollars

16   of 18,811.70 guilders?

17     A.   I think it's 2.40.  I would say it's about

18   10.

19     Q.   10,000?

20     A.   Yes, something like that.  Again, we can

21   see the difference then in the trust account.

22   Everything is detailed, transparent, for you to see.

23     Q.   Was this money that is being allocated by

24   the first page of Exhibit 31 the money that had been

25   received that day or the day before from Zimmer's

216

1   exercise of his option of the Jeffrey contract?

2          A.   I assume so, because the date is very

3   close.  You can see it again in the accounts here.

4          Q.   And is this another situation where the

5   Zimmer money went into the Jeffrey account, and from

6   the Jeffrey account to the MCK account, and from

7   there --

8          A.   Correct.

9          Q.   -- distributed as per this Exhibit 31?

10         A.   Before --

11              MR WEISBART:  Objection to the form of the

12  question as ambiguous.

13              THE WITNESS:  Sorry?

14              MR WEISBART:  I objected to the form of the

15  question.

16  BY MR SMITH:

17         Q.   Page 3 of Exhibit 31, is this something

18  that's prepared by your office and submitted to

19  Bilfinanz?

20         A.   No.  Page 3 is the confirmation of the

21  debit advice from Bilfinanz to us.

22         Q.   OK.  So this is prepared by the bank and

23  sent to you?

24         A.   That's right.  That's correct.

25         Q.   Where is that loan account that you just

1  was it your practice to obtain a promissory note of

2  Mike McKenzie?

3          A.   Whenever we paid him out money, yes, we

4  did, and the date is the 22nd to when it was signed,

5  I don't know.

6          Q.   In the directions to you he does not direct

7  you to make a loan, he does not direct you to create a

8  promissory note, he just tells you to transfer the

9  money?

10         A.   Yes.

11         Q.   Why was a loan created or note created?

12         A.   This is simple.  Normal business practice,

13 if he would get the money without any loan, then it

14 could be considered, as a shareholder, as dividend, and

15 that would be extremely expensive as tax.

16         Q.   Has Mr McKenzie ever paid back any

17 promissory note to MCK Development?

18         A.   Not that I'm aware of.

19         Q.   Would you look at page 3 just so  we can

20 clarify one thing?  Do you see the account holder on

21 Bilfinanz is McKenzie Development BV?  Do you see that?

22         A.   Yes.  Yes.

23         Q.   Is that separate and apart from

24 MCK Development BV?

25         A.   No, it's all the same.

02/03/95   04:52   ☎713 494 3199         MICHAEL McKENZIE.                    ☑001
3-2-95 11:38   ↕: SWISS OFFICE           McX PRIVAT                  +41+1 261 72 88

I     N     V          I     C     O

-3. Feb. 1995

INVICO
CAPITAL CORPORATION AG

Kirchgasse 24
Postfach 4754
CH-8022 Zürich

Telefon 0041-1-261 72 11
Telefax 0041-1-261 72 88

Zurich, 03.02.1995
SR/lm

**TELEFAX     035**

To:       Mr. Mike McKenzie

From:     Rolf Schlegel

Ref:      *Finances*

Number of Pages Incl. Cover Page:  -  5  -

EXHIBIT
69
April 19, 2001

---

Dear Dear Mike

I think I had a good meeting yesterday. As you may have noticed I had a discussion with a lot of investors. It is not easy to obtain a personal loan from reputable people. My friend in Hamburg met two clients without success - as I found out today.

However, Mr. W has following proposal which I find could be acceptable:

|            |          |          |
|------------|----------|----------|
| $100'000   | transfer | 07.02.95 |
| $300'000   | transfer | 20.02.95 |
| $300'000   | transfer | 28.02.95 |
| $800'000   | transfer | 07.03.95 |

RS00245

This would mean that I would have found a buyer for the promissory note so that MMP could be paid in time.

Furthermore some personal loan could be arranged - after payment of the finder's fee and other expenses.

Mr. W would like to receive - as an extra for his efforts - an option of the remains of the share option with more or less the same terms as H. Zimmer has signed some time ago. I tend to agree with his proposal as it would guarantee that these shares are in the hands of people who are close to the Board.

EXHIBIT  82



02/03/96   04:52   ☎713 494 3199          MICHAEL McKENZIE                    @002
3- 2-96 11:38   :SWISS OFFICE           McK privat      ;    +41 +1 281 72 88;# 2/ 6

- 2 -

As a former board member - what would you suggest. Would you agree?

I look forward hearing from you soon!

With kind regards

Rolf Schlegel

INVICO CAPITAL CORPORATION AG

Encl.        Fax concerning accounting MMP, B.V.?

RS00246

000137

377

1                           (Exhibit 69 was marked

2                              for identification)

3           Would you identify for me what 69 is?

4      A.   69 is a fax from myself to Mr McKenzie.

5      Q.   Dated when?

6      A.   Dated 3rd of February 1995.

7      Q.   You say it was a fax.  It went to

8  Mike McKenzie in Houston?

9      A.   That's correct.

10      Q.   OK.  And did you receive back a response

11  from Mr McKenzie?

12      A.   I received it back.

13      Q.   Did you receive it back by way of fax or by

14  way of in person?

15      A.   We received it back --  We received it by

16  fax.

17      Q.   When you received it by fax, was it bearing

18  some writing in the lower right-hand corner and on page

19  2?

20           MR MACDONALD:  (After a pause - to the

21  witness)  Did you hear the question?

22           THE WITNESS:  Yes, I heard the question.

23  Well, if I have the original and it's signed originally

24  there --

25

378

1   BY MR SMITH:

2           Q.   Signed originally where?  I'm sorry.

3           A.   Here.  (Indicating)

4           Q.   And you're pointing to page 2?

5           A.   He said, "Yes".

6           Q.   And what's below the written "Yes"?

7           A.   That is his signature, his initials,

8   Mr McKenzie's initials.

9           Q.   Are those his initials in the lower

10  right-hand corner of page 1?

11          A.   Yes, they are.

12          Q.   At the top of page 1 am I correct that you

13  transmitted it by fax from your office on 2/3/95 at

14  11.38 to Mr McKenzie and that he sent it back that same

15  day at 4.52 from his --

16          A.   Yes.  I sent it on 3rd February, it was

17  sent to him, and it was sent to  us a few hours later

18          Q.   All right.  And you recognize that as the

19  fax of Michael McKenzie?

20          A.   Yes, I do.

21          Q.   Did you have any telephone conversation

22  with Mr McKenzie about this in addition to the faxing?

23          A.   I cannot recall this anymore.

24          Q.   Can you tell me -- well, first of all is

25  this a -- are there any changes between this document

383

1          A.   Mr Hinterthur was also helping to  find

2     finances and to find investors for the funds and, as

3     you know, he got commission for the Jeffrey --

4     transaction of Jeffrey to Mr Zimmer.

5          Q.   OK.  So Mr Hinterthur was paid a commission

6     for the Zimmer exercise of his option from Jeffrey?

7          A.   That's right.

8          Q.   And who paid that commission?

9          A.   Mr McKenzie.  That is it was reduced from,

10    instead of us receiving any commission on the escrow

11    agreement, we did not receive anything, it was paid to

12    Mr Hinterthur.

13         Q.   Was it a carve-out before the money came to

14    Jeffrey or was it --

15         A.   No, afterwards.

16         Q.   OK.  So out of the $400,000 that was paid

17    by Mr Zimmer, Jeffrey received 400,000 and then paid a

18    commission back to Mr --

19         A.   No.  Jeffrey received the amount that we've

20    discussed, the 400,000.  The 400,000 went into

21    MCK Development and MCK Development paid.

22         Q.   MCK paid it?

23         A.   Yes.

24         Q.   OK.  OK.  In the next paragraph it refers

25    to "Mr W", is that Mr Wolfgang Rauball?



C 2617

EXHIBIT
72
April 19, 2001

## OPTION AGREEMENT

Between

Jeffrey Limited
18, Bay Street
Kingstown
St. Vincent W.I.
St. Vincent and the Grenadines

and

Ostrov Resources Ltd.
502 - 100 Park Royal South
West Vancouver B.C.
Canada

whereas Jeffrey Limited hereby represents that they own 2'865'671 shares of EUROGAS INC. common stock and US$ 5'000'000 of series A convertible debentures of EUROGAS INC. which convert to 1'000'000 shares of common stock.

Jeffrey Limited hereby grants to Ostrov Resources Ltd. an option to purchase above position for US$ 6'600'000.-- (six million six hundred thousand) until September 30th, 1995. This option maybe exercised in whole or in part at US$ 1.707 (one dollar seventy point seven cents US$) per share equivalent.

1.

The parties further agree that Jeffrey has the right to exercise a call for partial payment from Ostrov Resources Ltd. if the shares are traded during 10 days at following rates and conditions:

RS00112

| strike price | | | | | |
|---|---|---|---|---|---|
| | 1) | $ 5.50 | 665'671 | shares in total | $ 1'136'300.-- |
| | 2) | $ 6.25 | 900'000 | shares in total | $ 1'536'300.-- |
| | 3) | $ 7.-- | 1'200'000 | shares in total | $ 2'048'400.-- |
| | 4) | $ 7.50 | 1'100'000 | shares in total | $ 1'879'000.-- |

EXHIBIT 13

II.

Ostrov Resources Ltd. agrees to immediately partly exercise the option at following terms:

Purchase of 100'000 shares à US$ 1.707 in total US$ 170'700.-- by February 17th, 1995.

This amount will be deducted from 1) of part I of the shares leaving 565'671 shares à US$ 1.707 at total US$ 965'600.--.

### III. Payment terms

Immediate payment as per above dates and calls against presentation of shares to the account 237.600 at BILFINANZ UND VERWALTUNG AG, Gladbachstrasse 105, P.O. Box 832, CH-8044.

Non payment of the US$ 170'700.-- or any call payments as set out in this agreement under part II. will upon ten days written notice terminate Ostrov Resources Ltd.'s right to acquire the unpaid portion of this option.

### IV. Assignability

This option agreement can be assigned by Ostrov Resources Ltd..

### V. Explanation re origin of funds

Ostrov Resources Ltd. confirms by signing this agreement that the funds are not in contradiction to the International law regarding money laundering. The undersigned has full knowledge of the stipulations regarding the Swiss directives on combatting and preventing laundering of money and confirms that all transactions are undertaken in a fully transparent manner and that the authorities shall be informed in case of need of all relevant matters without gaps. Ostrov Resources Ltd. will draw any assignee's attention to this fact.

This agreement is executed on the ...15TH...... February, 1995.

Jeffrey Limited                                    Ostrov Resources Ltd.

                                                                            RS00113

Normann Marxer                                     FE3.20.95

394

1   with more or less the same terms as H Zimmer has signed
2   some time ago."  Now, Mr W is Wolfgang Rauball?
3        A.   That's correct.
4        Q.   And he is asking for an option similar to
5   the option agreement that was with Mr Zimmer?
6        A.   That is correct.
7        Q.   And what do you mean "as an extra for his
8   efforts", as a bonus?
9        A.   Well, as a favor.
10       Q.   OK.  Was Mr McKenzie's agreement to both
11  the bonus and the MCK option, was he approving both?
12       A.   It looks as if he has signed on the bottom
13  of the page and again on the following.
14                        (Exhibit 72 was marked
15                         for identification)
16       Q.   I'm going to show you what's Exhibit 72
17  which is at RS112 and 113 and ask you is this the
18  option agreement that was accorded to
19  Mr Wolfgang Rauball as a bonus under this Exhibit 69?
20            MR WEISBART:  What's that number?
21            MR MACDONALD:  72.
22            THE WITNESS:  This is the same price as
23  Mr Zimmer paid.
24  BY MR SMITH:
25       Q.   OK.

395

1          A.    That I can say.

2          Q.    And that's dated February 15th, 1995,

3    correct?

4          A.    Yes.

5          Q.    Same date as the MCK option, which was

6    February 15th and February 20th, right?

7          A.    Sorry.

8          Q.    MCK option, which is --

9          A.    Yes.  Yes.

10         Q.    February 15th?

11         A.    Yes.  Ostrov.

12         Q.    And is Ostrov's signature, whoever is

13   signing on behalf of Ostrov, the same?

14         A.    Ag -- how do you say it?

15         Q.    Agyagos?

16         A.    Agyagos, yes.

17         Q.    And that was the option agreement that was

18   negotiated for by Mr Wolfgang Rauball?

19         A.    Yes.

20         Q.    Let me see this for a second.

21              MR MACDONALD:  (To the witness)  There's no

22   question right now so just --

23   BY MR SMITH:

24         Q.    And again the payment that would be made

25   under the Jeffrey to Ostrov option would be through the

J 2b 16

ORIGINAL
acc*Hare

## BESTÄTIGUNG



82 EXHIBIT
82
April 19, 2001

Ich, Wolfgang Rauball, bestätige, für Ostrov Resources Ltd. erhalten zu haben:

**Zertifikat Nr. 4558 über 100'000 Aktien EuroGas, Inc.,**

zusammen mit

**-1- Stock Assignment separate from Certificate**

gemäss Option Agreement zwischen Jeffrey Limited und Ostrov Resources Ltd. vom 15. Februar 1995.

Vaduz, 5. 4. 1995

_____
Wolfgang Rauball
per: Ostrov Resources Ltd.

EXHIBIT ___17___

RS00119

## CONFIRMATION

I, Wolfgang Rauball, hereby confirm having received the following documents for Ostrov Resources Ltd.:

*Certificate no. 4558 for 100,000 shares of EuroGas shares,*

together with

**-1-  stock assignment, separate from certificate**

)ccording to the Option Agreement between Jeffrey Limited and Ostrov Resources Ltd. of February 15, 1995.

Vaduz, 04/05/1995                    _____ /Signed/ _____
                                         Wolfgang Rauball
                                     for: Ostrov Resources Ltd.



EuroGas, Inc.

NOT VALID UNLESS COUNTER-        ED BY TRANSFER AGENT
INCORPORATED UNDER THE LAWS OF THE STATE OF UTAH

CUSIP NO. 298734 10 4

325,000,000 AUTHORIZED SHARES
PAR VALUE $.001 PER SHARE

No sale, offer to sell, or transfer of the shares represented by this
certificate shall be made unless a registration statement under the
Federal Securities Act of 1933, or an exemption from the registration
requirements of said act, is then in force applicable to said shares.

THIS CERTIFIES THAT

JEFFREY, LTD.

IS THE RECORD HOLDER OF

*ONE HUNDRED THOUSAND*

EuroGas, Inc.

transferable on the books of the Corporation in person or by duly authorized attorney upon surrender of this Certificate
property endorsed. This Certificate is not valid until countersigned by the Transfer Agent and registered by the Registrar.

Witness the facsimile seal of the Corporation and the facsimile signatures of its duly authorized officers.

Dated: NOVEMBER 14, 1994

SECRETARY

PRESIDENT

CORPORATE SEAL   UTAH

RS00121

RS-ANC 00066

## STOCK ASSIGNMENT SEPARATE FROM CERTIFICATE

For Value Received _____

hereby sell, assign and transfer unto _____

_____ ( _____ ) Shares of the

_____

Capital Stock of the _____

standing in _____ name on the books of said _____

_____ represented by Certificate No. _____

herewith and do hereby irrevocably constitute and appoint _____

_____

attorney to transfer the said stock on the books of the within named company with full power of substitution in the premises

_____ _____

The above signature of Normann Marxer, a person known to me, was made this 19th day of January 1995, at the British Consulate at Vaduz, Principality of Liechtenstein, who signed in his capacity as an empowerd person of JEFFREY LIMITED, ST.VINCENT.

Bryan Jeeves OBE
The British Honorary Consul

RS00122

1          Q.    And this then discharged any responsibility

2     that you had to issue shares to Zimmer under the first

3     option agreement?

4          A.    That is correct.

5                              (Exhibit 82 was marked

6                              for identification)

7          Q.    From 119 through 122 I will show you

8     Exhibit 82 and ask if you can identify that for me?

9          A.    Yes, I can.

10         Q.    What is that?

11         A.    This is a confirmation from

12    Mr Wolfgang Rauball dated 5th April 1995 that on behalf

13    of Ostrov Resources he has received share certificate

14    4558 covering 100,000 shares, Eurogas, Inc, and one

15    stock assignment separate to the certificate, according

16    to the option agreement between Jeffrey Limited and

17    Ostrov Resources Limited dated 15th February 1995.

18                MR WEISBART:  Excuse me, Steven.  Do you

19    have the RS number?

20                MR SMITH:  119 to 122.

21    BY MR SMITH:

22         Q.    Is page 2 a true translation of page 1?

23         A.    Yes, sir.

24         Q.    OK.  This was in -- this is being issued to

25    Wolfgang Rauball for Ostrov Resources in exchange for

1  the $170,700 paid previously under the Ostrov/Jeffrey

2  option, is that correct?

3       A.   Yes.

4       Q.   And is that all that was purchased by

5  Ostrov under this option?

6       A.   Yes.

7       Q.   Did -- were there any other purchases of

8  Eurogas stock owned by Jeffrey Limited that you are

9  aware of?

10      A.   I'm not aware.

11      Q.   So as far as you know, the total amount of

12 the Eurogas stock owned by Jeffrey Limited that was

13 reduced, would be the 100,000 shares to

14 Wolfgang Rauball and the 234,000 -- I'm sorry: 234,329

15 shares issued to Zimmer?

16      A.   That's correct.

17      Q.   So that would leave the balance of

18 2,100,000 shares --

19      A.   Yes.

20      Q.   -- less this 300,000 we just talked about,

21 plus a million from debenture A and a million from

22 debenture B?

23      A.   No.

24      Q.   No.  Why?

25      A.   We -- the 2,100,000 minus those figures you

AGER → JEFFREY Receives  2100 Ph10 shares.

4000 Th10 CONV. A = 1000'000 shares.

5000 His conv. B  1000'000 shares.

3'100'000 shares



disol 23.12.94  23.12.94 / 25.11.94  4552-4561  10 Certificate            100's
                17.11.94  4061-4081  21 Certificate à 100'000  = 2100

Receipt  19.1.95  4552 - 4561  10 Certificates à 100 000  =  1 700

1000'000 shares.  Brif. Landa.

EXHIBIT  30 A

JEFFREY → Stockexchange agreement

| | |
|---|---|
| Non registred shares | 2 100 000 |
| 4 Mio convertible A | 1 000 000 |
| ~~1 Mio convertible B~~ | ~~1 000 000~~ |
| total shares | 3 100 000 |

| | | | |
|---|---|---|---|
| 17.11.94 | 4061 — 4081 | 21 Certif. à 100000 | = 2 100 000 ✓ |
| 25.11.94 | 4552 — 4561 | 10 Certif. à 100000 | = 1 000 000 |
| A | | | |

( 19. 1. 95
   Richard Inc )

EXHIBIT 30 B

RS00152

RS-ANC 00088

vorhandeln → 4061 - 4087          21

      Zimmer  4552 - 4887          6

) No Tiff 30  aug.  4585/86/87

          4558  Rauball


Anfang  Zimmer      4559  4560          27. 2. 95
           4561  Aufteilug Zimm.
                  Auflac Masse
                  30 029
                  61 671


Anfang  Akton       4558            130 000
) 5. 4. 95



EXHIBIT 30 C

RS00153

RS ANC 00089

361

1                             for identification)

2           Q.    OK.   I'm going to show you what has been

3    marked as Exhibit 65 which is RS151 through 153, and on

4    Exhibit 65 can you identify the handwriting of that,

5    who wrote this out?

6           A.    That is my handwriting.

7           Q.    All right.   All three pages are yours?

8           A.    Yes.

9           Q.    Do you know when this was prepared?

10          A.    I would assume after the 19th January 1995.

11   This was a handwritten note that I'm anxious to keep in

12   check what we had and what we didn't have, basically a

13   very simple away of accounting for the shares.

14          Q.    All right.   Would you tell me what date it

15   was written after and what you were looking at?

16          A.    I was looking at why -- because I can only

17   go by the dates we have on here.   We have added a few

18   things.   I think there is one 19th January 1995.

19          Q.    Right.

20          A.    It says, "Received ICC".   Then there is

21   also  one, "[Exit] Ostrov", 00,000, 5th April 1995.   So

22   we could even go that far and say maybe it was

23   already -- it was written after 5th April.   That was,

24   as you remember yesterday, the 100 that went to

25   Mr Rauball.

362

1        Q.    Right.   Well, let's take this through if we

2  can.   Up at the top of page 1, if I'm reading this

3  correctly, you only have 3.1 million as opposed to

4  4.1 million shares?

5        A.    Yes.   We never had more than 3.1 million

6  shares.

7        Q.    Never had more than 3.1 in your possession?

8        A.    Yes, because the other ones were never

9  converted.

10       Q.    The $5 million convertible debenture was

11  never converted?

12       A.    No.

13       Q.    Do you know where the $5 million

14  convertible debenture is today?

15       A.    I think we sent it on to -- which is

16  documented -- to  Petenes

17       Q.    Petenes?

18       A.    Uh-huh.

19       Q.    OK. Then if you'd look at the next

20  paragraph, it appears that on November 17th you did

21  have in fact 21 100,000 share certificates totalling

22  2.1 million shares, correct?

23       A.    Correct.

24       Q.    And then on 11/25 you received -- no, you

25  ordered it looks like -- what did you do as to  the

364

1    over a month or so.

2         Q.   OK.   Then there's a million shares and it

3    looks like something --

4         A.   Ah, these are here.   Now you have seen that

5    these are -- were advised, the numbers.   And then you

6    have on the bottom "Receipt" and these are the numbers.

7    You have them here.

8         Q.   OK.   So you have, as of January 19th, 1995,

9    3.1 million shares?

10        A.   When was the deal with Herr Zimmer?

11        Q.   Zimmer was in November.

12        A.   '94?

13        Q.   Right.

14        A.   So I didn't have 3,100,000.

15        Q.   I don't believe that you had carved out his

16   share yet, but be that as it may --

17        A.   You asked -- your question was, we did have

18   at that time 3,100,000, but if we had already given

19   some to Herr Zimmer, my answer must be less --

20        Q.   Less whatever was paid to Mr Zimmer?

21        A.   Yes.   Yes.

22        Q.   Or given to Mr Zimmer?

23        A.   Yes.

24        Q.   What is the last line on page 1, the

25   "1000,000 shares [something]"?

1           A.    "Brief. Landa."  Letter Landa.

2           Q.    Does that mean the million shares that are

3     referenced in the letter of Mr Landa?

4           A.    That's correct, yes.  Mr Landa of the

5     November 3rd, 1994.

6           Q.    Does that mean that that's a million shares

7     that has not been received yet?

8           A.    It has been received, but maybe that was

9     just a note that was made here.  We've always confirmed

10    that we have received this.  Yes, it will be delivered,

11    yes.  There is certainly a receipt somewhere for that.

12          Q.    Would you look at the last page?  What is

13    the first word there reading from left to right at the

14    top?

15          A.    Sorry.  The last page?

16          Q.    Yes.

17          A.    "There is available".

18          Q.    All right.  Now, am I reading this

19    correctly, that you conveyed to Mr Zimmer the stock

20    certificate numbers 4552 through 4557?

21          A.    That's correct.

22          Q.    And then what is below Mr Zimmer's name?

23          A.    That went to -- that also went to

24    Mr Zimmer, those numbers.

25                MR MACDONALD:  Excuse me.  I think --

366

1          THE WITNESS:  Yes, *"Ausgang"*.  *"Ausgang"*
2  means exit.
3  BY MR SMITH:
4          Q.   OK.  Exit, what is -- how does that --
5          A.   How they left the stocks, leaving the
6  stocks.
7          MR MACDONALD:  Meaning the stocks left?
8          THE WITNESS:  No.  If I have so many
9  shares, I have incoming and outgoing; these were
10  outgoing.
11  BY MR SMITH:
12          Q.   459 -- 4559 through 61 are the ones that
13  were going to go to Zimmer?
14          A.   Yes.
15          Q.   And they did in fact go down in the next
16  paragraph, "[Something] Zimmer"?
17          A.   Yes.  That's referring to Zimmer.  When you
18  look back at the correspondence which you have, I think
19  there was one had to be split up.
20          Q.   That's correct.
21          A.   Another one had to be put into another
22  company's name.  So that's why we have this
23  distribution.
24          Q.   Say again for the court reporter, another
25  had to be put into  somebody's name

J25 19

15-MÄR-1995  12:10      RAE DRES WÄSCHE+RAUBALL        +49 231 525754   S.02

# ZAHLUNGSAUFTRAG IM AUSSENWIRTSCHAFTSVERKEHR
Meldung nach § 59 der Außenwirtschaftsverordnung          Meldepflichtiger (Auftraggeber)

**Deutsche Bank**          BLZ 440 700 50

Deutsche Bank

| | | | |
|---|---|---|---|
| Zahlung | Dauerauftrag | | DM-Konto |
| Akkreditiv | zu Lasten des | | Währungs-Konto |
| Inkasso Einlösung | | | Währungs-Termin-Konto |

Ihre Nr.

Währung   Betrag in Ziffern   **182.000,00**

Betrag in Worten   **einhundertzweiundachtzigtausend**

Auftraggeber (Meldepflichtiger)   Konto-Nr.  **174 5041**
Name  **Dr. Reinhard Rauball**
Straße  **Friedensplatz 7**
Ort  **44135 Dortmund**

Bank des Begünstigten

**ilff nz u. Verwaltung AG**

**H t. 4 Zürich**

Begünstigter   Konto-Nr.  **237600**
Name  **Jeffrey Limited**
Straße
Ort

Verwendungszweck

**ptionsvertrag: Ostrov/Jeffrey Limited vom**
**0.02.95 (Restbetrag Optionszahlung)**

| Ihre Kosten/Spesen zu Lasten des | X | Auftraggebers | | Begünstigten |
| Fremde Kosten zu Lasten des | X | Auftraggebers | | Begünstigten |

EXHIBIT 42
April 18, 2001

EXHIBIT 16

RS00117
RS-ANC 00064

Dieser Auftrag wurde in unserem
Geschäftsbereich ausgeführt.

Appendix Z1 for AWV

## PAYMENT ORDER FOR FOREIGN BUSINESS
Report according to Paragraph 58 of the foreign business regulations

Must be reported (party placing the order)

German Bank                    Bank ID Number 440 700 50

German Bank


Currency:              Amount in numbers:
German Mark            182,000.00

Amount in words:      one hundred eighty two thousand

Party placing the order (to be reported)      Account No. 174 3041

Name: Dr. Reinhard Rauball
Street: Friedensplatz 7
Location: 44135 Dortmund

_____

Recipient's bank
Bilfinanz und Verwaltung AG
HL 44 Zurich

_____

Recipient:              Account No. 237600

Name: Jeffrey Limited
Street:
Location:
Purpose:       Option contract: Ostrow/Jeffrey Limited of 02/illegible/95 (remaining amount of option
               payment)

Cost/fees paid by:     x Party placing the order
Outside cost paid by:  x Party placing the order


                          This order was executed
                          in our business district.

03/15/1995    0231/527981  Dortmund, 03/15/95

                          Deutsche Bank
                          Aktiengesellschaft

                                              RS00118

241

1          A.    For 100,000 shares of Eurogas.  That covers
2     these as you know.

3          Q.    Yes, sir.

4          A.    And so -- yes.

5          Q.    Well, let me ask you this: how much was due
6     in US dollars from Mr Rauball for the option?

7                MR WEISBART:  I'm going to object to the
8     question as being ambiguous.  I'm not sure what you're
9     talking about.

10                THE WITNESS:  I think you have clear --
11     there is a document there where it says how much it is,
12     how much Mr Rauball confirmed that, how much he paid
13     for it, and how many shares, the date he received the
14     shares.  And the shares were those two amounts, the 169
15     D-marks and the 40,000, that was the price.  It's
16     certainly under Jeffrey somehow, somewhere.  ICC files.
17     If I may be right, it's 4th April or so.

18                                    (Exhibit 42 was marked
19                                    for identification)

20     BY MR SMITH:

21          Q.    Let me ask you to identify what I have
22     marked as Exhibit 42 which is RS117.  Can you identify
23     that?

24          A.    Yes, I do.

25          Q.    What is that?

242

1    A.   That is the payment that was made to

2  Jeffrey from a trust account of Dr Reinhard Rauball for

3  the option with Ostrov.  This reflects the figure that

4  I mentioned to you before, the 100,000 Eurogas shares.

5    Q.   Is the second page of 42 a correct

6  translation of the first?

7         MR WEISBART:  What are the two pages, 117

8  and 118?

9         MR SMITH:  Yes.

10        THE WITNESS:  (After a pause)  Yes, it is.

11 BY MR SMITH:

12   Q.   How much does 182,000 German marks equal in

13 dollars roughly?

14   A.   Well, of course we have to look at the rate

15 at that time.  Maybe it was about 1.60, I think.  90

16 was 400, so how much is that?

17   Q.   All right.  So 160,000 roughly?

18   A.   We really should not guess, because we have

19 it all.  It's in your files.  You have got the

20 information on the amount.

21   Q.   Well, I guess what I'm trying to find out

22 is would the 69,700 and the 100,000 roughly equate to

23 the 182,000 paid in by Reinhard Rauball?

24   A.   Yes, because he should have paid 170,000,

25 is it, 170,700 for the --

245

1   is it twice now in here?  It's 40 and 41.  The same

2   documentation is in twice.

3   BY MR SMITH:

4        Q.   Why is that the same documentation if one

5   is for 99,985 and one's for 40?

6        A.   I'm sorry.  Sorry.  Sorry.  This goes

7   together then.

8        Q.   All three.

9        A.   I didn't see that.  I see.  Yes, OK.  That

10  I've never seen before.

11       Q.   I agree the three of these --

12       A.   This I have seen before, but this never.

13  These three together, OK.  These are the ones, yes.

14  What is this?  That's what you have on the other end.

15            MR MACDONALD:  We're just getting so

16  confused, nobody is going to make any sense of this

17  transcript at all.

18  BY MR SMITH:

19       Q.   All right.  Let's back off on this one and

20  think about it for a minute.

21       A.   Yes.

22       Q.   There was $209,000 loaned to Mike McKenzie?

23       A.   Yes.

24       Q.   In March of 1995?

25       A.   Uh-huh.

246

Q.    What were the source of those funds?

A.    They were sales of shares.

Q.    Of Jeffrey shares, Jeffrey's Eurogas shares?

A.    Jeffrey's Eurogas shares.

Q.    OK.  And in March of 1995 the person buying those shares was Ostrov, correct?

A.    Yes.  He confirms in his -- yes.  Yes, it was Ostrov.  Here, yes.

Q.    And Ostrov bought only 100,000 shares of stock?

A.    Here.  Exhibit 14: I, Wolfgang Rauball, confirm that they bought Ostrov, yes.  He bought 100,000 shares, Eurogas.

Q.    And for that he was obligated to pay $170,700?

A.    Yes, sir.

Q.    OK.

A.    Here it is.

Q.    Did -- what of these make up the $170,700, the 40,000 --

A.    40,000 which you have there, and if I get my calculator, I'll calculate --  The 182 --

Q.    OK.

A.    -- that's probably about $130,000.

247

1    Q.    OK.

2    A.    And that together is 170,000.

3    Q.    All right.

4    A.    And Mr Rauball confirmed that he had

5    received it on 5th April 1995.

6    Q.    OK.  The 170 came in into Jeffrey's account

7    and then was used --

8    A.    No.

9    Q.    I'm sorry, you're right.

10   A.    Only $130,000 came into the Jeffrey

11   account.  The other 40,000 were sent from whoever to

12   Mr McKenzie.

13   Q.    The 130,000 that went into the Jeffrey

14   account came from Reinhard Rauball?

15   A.    Correct.

16   Q.    Then rolled over to MCK, and MCK loaned

17   that to Mike.  That's $170,700 out of $207,000?

18   A.    Yes.

19   Q.    What was the source of the balance?

20   A.    Money he had in the account of

21   MCK Development.

22   Q.    Was it in MCK?

23   A.    Yes.  If you see, the transfer comes from

24   MCK Development.  That's why the promissory note is

25   also made out to MCK Development.

| REFERENCE NO. | MEDIA | MSG | DATE | TIME | ACCOUNT NO. | DR/CR | AMOUNT |
|---|---|---|---|---|---|---|---|
| 4884 | FW | 04693 | 03/08/95 | 14:03 | 2664057014 | CREDIT | $40,000.00 |

BK NOVA SCOTIA NYC/ORG-OSTROV RESOURCES LTD OGB-B N S VANCOUVER BKG CNTR
NATIONSBANK TX    /CTR/BNF=R.W.T. INC TEXAS/AC-2664057014 RFB=0006160593 OBI=SWI
FT NABKOS44DAL

EXHIBIT
41
April 18, 2001

R W T INC
7676 WOODWAY DR STE 350
HOUSTON, TX 77063-1523

**NationsBank**

NationsBank of Texas, N.A.
P.O. Box 83000-7184, Dallas, Texas 75283

FUNDS TRANSFER ADVICE

*IF ASSISTANCE ON THIS TRANSACTION IS NEEDED, PLEASE CONTACT OUR RESEARCH DEPARTMENT AT 1-800-577-9473.

EXHIBIT 45

RS00170

239

1          Q.    Say that again?

2          A.    You said -- what did you say, 209,000?

3          Q.    The $209,700 note.

4          A.    But that would be there where the note is.

5          Q.    I didn't follow what you said, I'm sorry.

6          A.    I would be able to give you all the details

7     then.  It will come again, I think, when we go through

8     the details.

9                          (Exhibits 39, 40 and 41 were

10                          marked for identification)

11         Q.    Let me give you a few more things to go

12    with that.  I'm going to give you Exhibit 39, 40 and 41

13    to go with 38 and ask if these are the components of

14    the $209,700 loan to Mike McKenzie?

15                MR WEISBART:  What page numbers are they,

16    Steve?

17                MR SMITH:  174, 171, 170 and 172.

18                MR TATE:  And that's Exhibit 38?

19                MR SMITH:  That's 41, 40, 39, 38.

20                MR TATE:  Oh.  You're going to number each

21    one separately?

22                MR SMITH:  Yes.

23                THE WITNESS:  That's the note 209,700, as

24    you rightly say, from Mike McKenzie, promissory note to

25    MCK Development.

240

BY MR SMITH:

     Q.   Those are the components of the 209,700?

     A.   That's right.  If you add them together, you get this amount.

     Q.   And the dates coincide, do they not?

     A.   Looks to me, yes.

     MR WEISBART:  I need to write down those numbers.  I need to take a quick look at those.

BY MR SMITH:

     Q.   Do you know when it was that you obtained information about the $40,000 wire transfer?

     A.   No.  Can I have those documents again?

(Documents handed)

     MR WEISBART:  I didn't get too far.

     THE WITNESS:  You can have them again.
I don't know.  We've put it on this promissory note on 20th of -- so I do not know when we did -- ah.  Well, there is a receipt from Mr Rauball and it must have been at least -- I think that's 4th April, and it must have been, therefore, before 4th April, so we must have received it around this time.

     MR MACDONALD:  (To the witness)  Wait. You're pointing to something.

BY MR SMITH:

     Q.   Yes.  You have a receipt from Mr Rauball?

EXHIBIT
28
April 18, 2001

## Promissary Notes in connection with MCK Development B.V.

| currency | amount | parties | Issued/payment | Interest | Inter. p | maturity | collateral/various |
|---|---|---|---|---|---|---|---|
| $ | 900'000.-- | Claron/MMPCO | 9./10. Dec. 93 | 8 % | 30. Dec. 94 | 30. Dec. 94 | purch. 204 shares MCK |
| $ | 72'000.-- | extension | | | 1. Mar. 95 | 1. Mar. 95 | unpaid interest |
| $ | 225'000.-- | Loan Agreement dated April 26, 1995 between Claron (Borrower) and MCK (Lender), indefinite period (lender has right to call loan within 2 months), 7 % interest, 1st payment due on 30.04.1996, disbursement on 27.3.95 (15') and on 21.4.95 (210'), Collateral: All shares assigned to Claron N.V. from Option & Share Agreement 7th March, 1995. | | | | | |

The $ 225'000.-- have been used as follows:

Interest payment Jan. - April 95 on $ 972'000.-- = 25'920.--

principal repayment = 197'040.--

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| = $ | 774'960.-- | debt from Claron to MMPCO + Interest from May 95 | | | | | |
| = $ | 225'000.-- | debt from Claron to MCK + Interest from disbursement dates | | | | | |

Important note:

$ 900'000.-- as mentioned above serve as a collateral for loans to MIM (see confirmation from Board of Directors of MMP CO dated 27th February, 1995)

durch Schuld 225'/m sind alle Alleen an MCK verpfändel

15.8.95 Rep. SB/px

EXHIBIT 50

RS00176

RS ANC 00186

| currency | amount | parties | Issued/payment | interest | Inter. p | maturity | collateral/various |
|---|---|---|---|---|---|---|---|
| max. $ | 670'000.-- | MIM/MCK | 22.2.95/no paym. | 8 % | 29.2.96 | 29.2.96 | not paid out, collateral is the prom. note $ 900'000.-- 1972', with addendum dated 28.12.94 to MMP CO |
| $ | 350'000.-- | MIM/MCK | 22.11.94/22.11. | 7 % | 30.11.95 | 30.11.96 | collateral $ 900'000.-- as mentioned above/transfer to RWT |
| $ | 209'700.-- | MIM/MCK | 20.3.95/21.3.95 | 7 % | 31.3.96 | 31.3.96 | collateral $ 900'000.-- as mentioned above/transfer to RWT 169'700.--, 40' to RWT directly from Ostrov |
| SFr. | 10'000.-- | MIM/MCK | 20.4.95/20.4.95 | 6 % | 30.4.96 | 30.4.96 | collateral $ 900'000.-- as mentioned above/transfer to trust acc. |

$      559'700.--   debt from MIM to MCK + interest from disbursement dates*

SFr.   10'000.--    debt from MIM to MCK + interest from disbursement date

(*without $ 670'000.-- promissory note which serves as a guarantee)

_Assignment of $ 900'000.-- dated 27.2.95 but is there also for $ 900'000.-- this loan (1) went only given including the 210'000 for which so far no interest has been paid._

moment.

(Discussion off the record)

(Recess taken at 2.55 pm)

(Resumed at 3.23 pm)

MR WEISBART:  As far as the questions that have been raised I guess on and off the record related to whether or not this deposition can be used at trial or could be subject to an objection at trial, based on the fact that the oath was administered by a notary, Mr Burgess, or the fact that Mr Burgess has not sat here throughout this deposition and I assume is not going to be here --

MR SMITH:  Right.

MR WEISBART:  -- throughout the rest of the deposition, we will not object to the admissibility, Eurogas will not object to the admissibility of the deposition on that basis.

MR SMITH:  OK.  All right.

(Exhibit 28 was marked for identification)

BY MR SMITH:

Q.  I'm going to show you what has been marked as Exhibit 28 which, gentlemen, is 176 and it must be 177.  Is that a document prepared by you or your office?

195

A.    Yes.   This is made within the administration efforts by our office.

Q.    And whose signature is that in the lower left-hand corner of the first page?

A.    The signature is the one of Peter Schefer, an employee of Invico.

Q.    And whose handwriting --

A.    Past employee of Invico.

Q.    OK.   These were compiled by him from the records of what, MCK?

A.    MCK on the -- and there's a big list of all the -- we have a list of all the promissory notes that were issued by whoever.

Q.    OK.

A.    And this was a list -- if you read the title it says, "Promissory Notes in connection with MCK Development B.V."

Q.    Was this being prepared by your office as part of the audit that was being conducted in August of 1995?

A.    There has been no audit for MCK Development BV, there was for MMP BV.

Q.    Only?

A.    Yes.

Q.    When was that audit completed?

198

Q.    -- on 11/22/94, correct?

A.    That's correct.

Q.    Now, what is the column "issued/payment"?
What does that mean?

A.    It was issued, when the promissory note was
issued.  That was on the twenty -- you've got it here.
It's one of the materials -- it's 22nd February.

Q.    OK.

A.    But never any payment has been made to
Mr McKenzie.

        MR MACDONALD:  (To the witness)  You mean
"by"?

        THE WITNESS:  Sorry?  No payment has been
made.

        MR MACDONALD:  By him?

        THE WITNESS:  To him.  You see the parties,
he is the maker.  The first one is the maker and the
second one is the maker/payor.

BY MR SMITH:

Q.    Payee?

A.    Payee.

Q.    OK.  If you look at the $209,700 one just
below that --

A.    Yes.

Q.    -- you see issued 3.20.95, payment 3.21.95.

199

Does that mean that the note was signed on the 20th and the cash was funded on the 21st?

A.    Yes.

Q.    That's what that means?

A.    Yes, sir.

Q.    OK.

A.    You will find, again, everything, very detailed information in the banking area.

Q.    All right.  Looking again to the $350,000 note, help me understand, the interest, "inter. p", is that interest payment due?

A.    Yes.

Q.    So on that particular note the first interest payment would be due on 11.30.95?

A.    Yes.

Q.    And was that made?

A.    No.

Q.    The note matured on 11.30.96.  You don't know if that has been paid or not, do you?

A.    I don't know.

Q.    Was it paid -- was there any principal or interest paid on this note while you were still with MCK?

A.    No, sir.

Q.    Above the word "collateral" there is

204

1          A.    That's the idea, why it's in there.   So

2    it's, I think, done the best of possibilities that were

3    existing at that time.

4          Q.    To the right of the "collateral/various"

5    there's some writing and it appears to be "assignment

6    dated --"

7          A.    Yes.

8          Q.    "-- [February 27] 95", is that correct?

9          A.    Yes.   Yes.   It's probably one of those

10   assignments you have in there.

11         Q.    Is that an assignment of the Claron note?

12         A.    Yes.   Yes.   Yes.   Yes.   Yes.   I think --

13                     (Mr MacDonald handed

14                     the witness a document).

15         No, we've got to look --   This transfer is,

16   you know, very detailed shown in the records, so we can

17   look there.

18   BY MR SMITH:

19         Q.    OK.   So there's some detailed writing where

20   the $900,000 Claron note is assigned --

21         A.    Yes, it must be, must be, because --

22                MR MACDONALD:   And which note is this to

23   secure payment on?

24                THE WITNESS:   No.   No, OK.   Yes, we'll have

25   to go through the details, because you see the 169,700,

205

1  that has made it all so  easy to work with these people.

2  169,700 was the one from Dr Rauball and the 40,000 was

3  from -- which they send the check to McKenzie and then

4  we charge him for that.

5  BY MR SMITH:

6      Q.  OK.  Now, let's take then -- we'll come

7  back to that.  We'll come back to that.

8      A.  Yes.

9      Q.  You show the funding to be from -- to  RWT

10  of $169,700 and you're saying that that is the money

11  that came from Rauball.  Is that Reinhard Rauball?

12      A.  Yes, that's -- you have the document in

13  your file.  That's on the trust account; his trust

14  account.  It's not from Reinhard Rauball, but it's from

15  his trust account.

16      Q.  OK.  How is money from Reinhard Rauball to

17  Mike McKenzie a loan by MCK?

18      A.  It went first to MCK, and then from MCK it

19  went on to Mr McKenzie.

20      Q.  All right.  Would that be true of the

21  $40,000 as well?

22      A.  No.  No.

23      Q.  Did that $40,000 go --

24      A.  Yes.

25      Q.  Wait a minute.  -- go from Ostrov to MCK to

206

1    RWT?

2         A.   No.   The 40,000 was something that we only

3    got to know later and so we made him -- we charged him

4    for it, because we said this should be money that

5    should have gone to MCK and not directly to

6    Mr McKenzie.

7         Q.   Well, when you say you learned of it later

8    and you had him sign for it later --

9         A.   Yes.

10        Q.   -- but you had him sign a note dated

11   3.20.95, when later did you learn of this $40,000?

12        A.   I don't know.  You have to look at the

13   documents.  You have all the details.

14        Q.   Are any of these promissory notes that

15   we're looking at backdated?

16        A.   No, I don't think so.  No, that's something

17   we never do.

18        Q.   What does it mean to the right of that --

19   in the column there, it says "legally documented" and

20   it's referring to  the 40,000 to RWT from Ostro?

21        A.   That's in the transfer.  That's the

22   promissory note where we did -- that's the 100,000

23   shares of Eurogas that went to Mr Rauball and he signed

24   for it.  You have the documentation in the files.

25        Q.   That's what you mean by "legally

207

1   documented"?

2        A.   Yes.  And we charged Mr McKenzie for it,

3   because, as I said before, we did not want the

4   shareholder to get money straight round the company,

5   everything has to go through the company.

6        Q.   Can you explain that to me?

7        A.   Yes.  If you have a company and you get

8   money from a supplier and he gives you kickbacks, then

9   you have a problem, because the government will say,

10  well, you don't pay tax, in other words it's like a

11  dividend to you.  And if it doesn't come through the

12  company, you have to pay a high tax on it, whereas the

13  company, it goes into  the company, a company lends it

14  to you, then you just have an interest situation.

15       Q.   OK.  Well, let's take the money that was

16  out of Rauball's, Reinhard Rauball's, trust account,

17  this 169,000.  What was that for?

18       A.   Jeffrey.

19       Q.   That was a payment to Jeffrey, right?

20       A.   Uh-huh.

21       Q.   Who is Jeffrey?

22       A.   Jeffrey is Mr McKenzie.

23       Q.   OK.  So it went into a Jeffrey account and

24  McKenzie is Jeffrey, and then it went into the MCK

25  account?

208

1        A.    Uh-huh.

2              MR MACDONALD:    (To the witness)   That's a

3    "yes"?

4              THE WITNESS:   Yes.

5    BY MR SMITH:

6        Q.    And then MCK loans that same money to

7    McKenzie?

8        A.    Yes.

9        Q.    OK.   Now, why is it that that was done that

10   way?

11       A.    So everything is clearly transparent

12   through the company, so  theres nothing, you know,

13   behind backs or whatever.

14       Q.    Why would it have to go through MCK at all?

15   Why couldn't it go directly from Jeffrey's account into

16   Mike McKenzie's hands since he's the beneficiary of

17   Jeffrey anyway?

18       A.    Because the company -- Jeffrey owed some

19   money to MCK anyway, so that was reduced.

20       Q.    OK.   The last component on here is a 10,000

21   Swiss franc note dated 4.20.95, do you see that?

22       A.    I can see it, yes.

23       Q.    Do  you know what the purpose of that one

24   was?

25       A.    Again you have to look it up on the details



EXHIBIT
32
April 18, 2001

# PROMISSORY NOTE

US$  209'700.--                                        Zurich, March 20, 1995

Michael McKenzie, 2222 Country Club Blvd., Sugar Land, Texas 77418, USA, ("Maker") for value received, hereby promises and agrees to pay unto MCK Development B.V., Herengracht 320, NL-1016 CE Amsterdam, ("Payee") in lawful money of the United States of America the sum of US$ 209'700.-- (two hundred and nine thousand seven hundred dollars) to be repaid in accordance with the terms and conditions hereof.

Payment of all sums advanced to Maker by Payee made on or before March 21, 1995, and hereunder shall be made by Maker to Payee in full on March 31, 1996. The Maker will make an annual interest payment of 7 %, first payment due with the principal on March 31, 1996.

Maker may prepay the amount hereunder in whole or in part at any time prior to the above dates at Maker's election.

If default is made in the payment of this Note at maturity, Maker agrees and is also to pay to the owner and holder of this note a reasonable amount as attorneys' or collection fees in connection with the collection efforts, if any, by Payee hereunder.

By _____

Michael McKenzie

RS00316

221

Q.     Is there an account, in addition to this, known as MCK Development BV at any bank?

A.     Not that I'm aware of.

MR SMITH:  OK.

MR TATE:  May I see Exhibit 32?  Is that still there?  Are you still working with it?

MR MACDONALD:  Are we done with it?

MR SMITH:  That's not 32.

MR MACDONALD:  It's 31.  We haven't got to 32 yet, but you can have 31 if you want.

MR TATE:  I've got it.  Fine.

MR MACDONALD:  OK.  Fine.

MR TATE:  You guys have got to keep up with me.

(Laughter)

(Exhibit 32 was marked

for identification)

BY MR SMITH:

Q.     Mr Schlegel, can I ask you to please look at 32 and identify that?

A.     Yes.  This is a promissory note by Michael McKenzie as maker.  It's dated March 20th, 1995.  It's for $209,700.

Q.     And is that the original promissory note?

A.     Yes, I think it is.

Q.    Does it bear Michael McKenzie's signature?

A.    It does bear his signature.

                    (Exhibit 33 was marked

                    for identification)

Q.    I'm going to show you Exhibit 33 and ask you to identify that?

A.    That's a promissory note in Swiss francs from Michael McKenzie to pay 10,000 francs.

Q.    Is that the original promissory note?

A.    It's an original.

Q.    Is it bearing Mike McKenzie's signature?

A.    Yes.

Q.    Can you identify that as Mike McKenzie's signature?

A.    I do, yes.  It looks a bit different there, but to me that is.

          MR TATE:  10,000 francs?

          THE WITNESS:  Correct.

                    (Exhibit 34 was marked

                    for identification)

BY MR SMITH:

Q.    We're going to RS93 and 94.  I'm just going to show you what has been marked as Exhibit 34.  Is that your signature on page 1 of that document?

A.    It is.

379

1   and what you remember being the original going to him?

2   Is this a true copy as best you can tell?

3          A.   Yes.   But this has all been underlined,

4   blackened, or I don't know.   What is it, from us?   Is

5   that --

6          Q.   I'm afraid that's probably me.

7   I highlighted.

8          A.   OK.

9               MR TATE:  In green.

10              MR SMITH:  Huh?

11              MR TATE:  In green.

12              MR SMITH:  I did?

13              MR TATE:  You always use green and green

14  shows through when you copy it.   I've been telling you

15  that for 5 years.

16                          (Laughter)

17  BY MR SMITH:

18          Q.   Other than the highlighting, does it

19  appear --

20          A.   It is, yes.   That has confused me.

21          Q.   You're writing Mr McKenzie advising him of

22  a discussion with a lot of investors.   What investors

23  had you met with?

24          A.   That was Mr -- ah, different people I spoke

25  to, and my friend in Hamburg, that was Mr Hinterthur.

380

1    Q.    It was who?

2    A.    Hinterthur.

3    Q.    Hinterthur?

4    A.    Hinterthur, yes.

5    Q.    OK.  The one who  ended up being affiliated

6    with or associated with Eurogas?

7    A.    He was -- I think at one stage he was

8    President of Eurogas.

9    Q.    Now, why were you attempting to obtain a

10   personal loan from a reputable person?  You see in that

11   second sentence of the first paragraph?

12   A.    He -- that was proposed to me, that they

13   would buy these promissory notes, that was the -- at

14   this level, and that there must be the contract of --

15   what's its name? -- a similar contract from Jeffrey.

16   Q.    OK.  When you say the promissory notes that

17   you were attempting -- are you talking about the

18   debentures?

19   A.    Yes.

20   Q.    OK.  So you were attempting to borrow

21   against or sell the debentures of Jeffrey?

22   A.    It would have been, yes, that we would have

23   been able to sell the promissory note to  someone, yes.

24   Q.    On behalf of Jeffrey?

25   A.    On behalf of Jeffrey in this case, yes, or

381

1   Mr McKenzie.

2           Q.    Now, in your dealings with Mr Hinterthur?

3   Hinterthur?

4           A.    Mr Hinterthur, yes.

5           Q.    Hinterthur.

6           A.    He's a good friend of Mr Rauball.

7           Q.    And were you trying to sell to him or

8   through any of his contacts these Eurogas debentures?

9           A.    That's correct, yes.

10          Q.    And was Mr Hinterthur aware that these were

11  debentures that had been issued to Jeffrey?

12          A.    Well, this was just proposed --

13          Q.    No, sir, I understand.

14          A.    Yes.

15          Q.    But in your discussions --

16          A.    But this is the proposal of Mr Rauball

17  here.

18          Q.    No, I understand.  But before Mr Rauball,

19  you proposed -- you discussed with other investors,

20  including your friend Mr Hinterthur is what

21  I understood?

22          A.    Yes.

23          Q.    And in your discussion with Mr Hinterthur,

24  did you see if he personally or if he had investors who

25  would be interested in buying or loaning against --

382

1       A.   Promissory note.

2       Q.   OK.  And the promissory note of the

3  debentures of Eurogas to  Jeffrey?

4       A.   Yes.

5       Q.   And in that discussion with Mr Hinterthur,

6  did you -- was he aware, did you make him aware --

7       A.   I don't know.

8       Q.   -- that the debentures belonged or had been

9  issued to Jeffrey?

10      A.   I do not know.

11      Q.   Did you discuss with Mr Hinterthur the

12  owner of Jeffrey?

13      A.   Mr Hinterthur was very well informed on the

14  total situation.

15      Q.   That Jeffrey was Mike McKenzie?

16      A.   Generally that, yes, and generally what's

17  happening.

18           MR WEISBART:  I'm sorry.  I didn't

19  understand the answer.

20           THE WITNESS:  Yes.

21           MR WEISBART:  Was it a "yes"?

22           THE WITNESS:  Yes.

23  BY MR SMITH:

24      Q.   How is it that he was so aware of the

25  situation where Jeffrey was Mike McKenzie?

1       A.    Mr Hinterthur was also helping to  find

2  finances and to find investors for the funds and, as

3  you know, he got commission for the Jeffrey --

4  transaction of Jeffrey to Mr Zimmer.

5       Q.    OK.  So Mr Hinterthur was paid a commission

6  for the Zimmer exercise of his option from Jeffrey?

7       A.    That's right.

8       Q.    And who paid that commission?

9       A.    Mr McKenzie.  That is it was reduced from,

10  instead of us receiving any commission on the escrow

11  agreement, we did not receive anything, it was paid to

12  Mr Hinterthur.

13       Q.    Was it a carve-out before the money came to

14  Jeffrey or was it --

15       A.    No, afterwards.

16       Q.    OK.  So out of the $400,000 that was paid

17  by Mr Zimmer, Jeffrey received 400,000 and then paid a

18  commission back to Mr --

19       A.    No.  Jeffrey received the amount that we've

20  discussed, the 400,000.  The 400,000 went into

21  MCK Development and MCK Development paid.

22       Q.    MCK paid it?

23       A.    Yes.

24       Q.    OK.  OK.  In the next paragraph it refers

25  to "Mr W", is that Mr Wolfgang Rauball?

## Receipt

I, Paul Hinterthür, confirm that I have received the following amounts of commission in relation to investments in Ostrov Resources/MCK Development B.V. and Ostrov Resources/Jeffrey Limited:

| Investment | Date | Commission (1.5%) |
|---|---|---|
| US $270,000.00 | 3/20/95 | US $4,060.00 |
| US $300,000.00 | 4/27/95 | US $4,500.00 |
| **TOTAL** | | US $8,560.00 |

US $8,560.00 received with thanks.

Zurich, May 17, 1995                        [signed] Paul Hinterthür



EXHIBIT
121A
April 20, 2001

SS 030766

37

000151

SEC TRANSLATION 11/16/97 OF:

## *Quittung*

Ich, Paul Hinterthür, bestätige, von INVICO CAPITAL CORPORATION AG, Zürich, folgende Kommissionsbeträge im Zusammenhang mit Investitionen Ostrov Resources/MCK Development B.V. und Ostrov Resources/Jeffrey Limited erhalten zu haben:

| Investition | Datum | Kommission (1,5 %) |
|---|---|---|
| US$ 270'700.-- | 20.03.1995 | US$ 4'060.-- |
| US$ 300'000.-- | 27.04.1995 | US$ 4'500.-- |
| TOTAL | | US$ 8'560.-- |

US$ 8'560.-- dankend erhalten:

Zürich, 17. Mai 1995

Paul Hinterthür

SS 030765

000151

## MEMO TO THE FILES

Subject: Options — Finder's Fee, P. Hinterthür, broker   *not well defined*

*made effort regarding the transaction*

Mr. Rauball was concerned about the development of the JEFFREY and MCK Development options. He was unhappy about the finder's fee (unearned, from his viewpoint) which Mike McKenzie was obligated to pay to INVICO. (He was informed about our contracts and services, which were to give rise to these possible payments. However, he did *not* know about the large outstanding debts that date back to 1994 and still exist today).

He found that his friend, P. Hinterthür, who was to going to support the project *be employed for*, was also to share in this finder's fee. I explained that I was prepared to share if this would help Mr. W. Rauball to pay the fee for certain services.

However, Mr. W. Rauball said that these payments were to take effect only after the entire transaction was completed.

*For peace sake we have*

We voluntarily paid Mr. Hinterthür the full commission of US $8,560.00 for the first transactions of US $270,700.00 on 3/20/95 and US $300,000.00 on 4/27/95, although we received no payment from McKenzie. Our payments related to transactions from 1994, not all of which had been paid up to today.

*for the whole amount*

We have not acceded to Mr. Hinterthür's request for a front-end fee since we are not sure whether the entire transaction will be carried out. *never*

*business*

In light of the present changes in the development of the transaction, Mr. Hinterthür must be informed about the options.

[initialed]
Zurich, September 19, 1995
SR/lm





EXHIBIT

120A

April 21, 2001

SS 030764

000150

SEC TRANSLATION 11/18/97 OF:

## AKTENNOTIZ

Betrifft:                    Optionen - Finder's Fee, Vermittler P. Hinterthür

Herr Rauball bemühte sich für die Abwicklung der Optionen JEFFREY und MCK Development. Er war unglücklich über die aus seiner Sicht unausgewogene Finder's Fee, welche Mike McKenzie an INVICO zu zahlen verpflichtet war (er war über die Tatsache unserer Verträge und Dienstleistungen informiert, welche aus solchen möglichen Zahlungen zu tätigen wären. Er kannte aber die hohen Ausstände nicht, welche noch aus 1994 stammen und auch heute noch bestehen).

Er fand, dass sein Freund, P. Hinterthür, welcher sich für das Projekt einsetzen würde, auch an dieser Finder's Fee zu beteiligen wäre. Ich habe mich bereit erklärt zu teilen, falls Mr W. Rauball damit geholfen werden könne, gewisse Leistungen über diesen Weg zu honorieren.

Mr. W. Rauball sagte jedoch, dass diese Zahlungen erst nach Abwicklung der Gesamttransaktionen zu tätigen wären.

Wir haben, des Friedens Willen, Herrn Hinterthür die volle Kommission für die ersten Transaktionen von US$270'700.-- v. 20.3.1995 und US$300'000.-- v. 27.4.1995 im Betrage von US$8'560.-- ausbezahlt, obschon wir keine Vergütung von McKenzie erhielten. Unsere Vergütungen betrafen immer noch Transaktionen von 1994, welche bis heute noch nicht alle bezahlt wurden!!

Wir haben Herrn Hinterthür's Verlangen nach einer Front end Fee für den Gesamtbetrag nicht stattgegeben, da wir ja nie sicher sind, ob die gesamte Transaktion abgewickelt werden wird.

Angesichts der sich nun ändernden Abwicklung der Geschäfte betreffend der Optionen muss Herr Hinterthür informiert werden.

Zürich, 19. September 1995
SR/lm

SS 030763

000150

433

1   mentioned, plus 1 million is 3,100,000, minus the

2   figures you mentioned, but the debenture was not

3   converted.

4        Q.   The debenture still existed and was

5   convertible?

6        A.   It is convertible, but it was not

7   converted.

8        Q.   OK.  OK.  But the debenture still existed?

9        A.   Correct.

10       Q.   It wasn't cancelled or anything?

11       A.   Not that I'm aware of or was aware of then.

12       Q.   What happened to the 3,100,000 shares less

13   the 300,000, thereabouts, that we just talked about

14   going to Zimmer and to Ostrov?

15       A.   They went to Herr Bissig.  You have

16   documentation.

17       Q.   At Petenes?

18       A.   Yes.

19       Q.   Did the debenture, $5 million debenture,

20   also go to Petenes?

21       A.   There is a letter where it confirms what

22   went to  Petenes

23       Q.   But, for the record, did you send both the

24   debenture and the balance of shares to Petenes?

25       A.   We sent everything we had.

434

1      Q.   Would that include the debenture?

2      A.   Yes.

3           MR SMITH:  OK.

4           MR TATE:  Just for the record, Mr Weisbart,

5    on November 10th, 1996 Mr Hank Blankenstein testified

6    in a deposition that he could tell us that several --

7    that a sizeable portion of that 2,600,000 shares had

8    been sold and he could tell us who sold them, and,

9    despite two court orders to this date, Eurogas has not

10   given us that information; we'd sure like to know it.

11   Just take that under advice if you would, Mr Weisbart.

12                              (Exhibit 83 was marked

13                               for identification)

14   BY MR SMITH:

15        Q.   Here is Exhibit 83 which is from RS114.

16   Can you identify that for me?

17        A.   That is a handwritten note.

18        Q.   Do you know whose -- in whose hand that is?

19        A.   This is my hand.  My handwriting.

20           MR SMITH:  OK.

21           MR WEISBART:  Exhibit 83?

22           MR MACDONALD:  Yes.  Exhibit 83, number

23   114.

24           MR WEISBART:  Sorry.

25           MR MACDONALD:  It's OK.



EXHIBIT
87
April 19, 2001

INVICO
CAPITAL CORPORATION AG

Kirchgasse 24
Postfach 4754
CH-8022 Zürich

Telefon 0041-1-261 72 11
Telefax 0041-1-261 72 88

EINSCHREIBEN
Herrn lic.iur. Elmar Bissig
Forum Trust Reg.
Städtle 7/Postfach 79

FL-9490 Vaduz

Zürich, 8. August 1995
SR/psc

*Petenes Foundation*

Sehr geehrter Herr Bissig

Wir leiten Ihnen noch folgende Aktien und Dokumente weiter, welche sich im Eigentum von Jeffrey Ltd. befinden:

| | |
|---|---|
| 2'100'000 | Aktien von EuroGas, Inc., eingeteilt in 21 Zertifikate à 100'000 Aktien; Zertifikatnummern 4061 - 4081 dazugehörend: 21 Formulare "Stock Assignment separate from Certificate", blanko |
| 600'000 | Aktien von EuroGas, Inc., eingeteilt in 6 Zertifikate à 100'000 Aktien, Zertifikatnummern 4552 - 4557 dazugehörend: 6 Formulare "Stock Assignment separate from Certificate", blanko |
| US$ 5'000'000.-- | Debenture Agreement von EuroGas, Inc., Series A convertible debenture |

Im weiteren orientieren wir Sie, dass infolge einer Zertifikat-Aufteilung noch 65'671 Aktien EuroGas, Inc., für Jeffrey Ltd., ausstehend sind. Wir bitten Sie, dieses Zertifikat direkt von Jeffrey Ltd. zu verlangen.

Gerne hören wir von Ihnen.

Mit freundlichen Grüssen

Rolf Schlegel
INVICO CAPITAL CORPORATION AG

EXHIBIT 21

RS00126

RS-ANC 00112

INVICO
CAPITAL CORPORATION AG

Kirchgasse 24
P.O. Box 4754
CH – 8022 Zurich

Phone: 00-1-261-72-11
Fax: 0041-1-261-72-88

REGISTERED LETTER
Mr. Elmar Bissig
Forum Trust Reg.
Städtle 7 / P.O. Box 79

FL-9490 Vaduz

Zurich, August 8, 1995
SR/psc

*Petenes Foundation*

Dear Mr. Bissig,

We hereby send you the following shares and documents owned by Jeffrey Ltd.:

| | |
|---|---|
| 2,100,000 | Shares of EuroGas Inc., divided into 21 certificates of 100,000 shares; certificate numbers 4061-4081, including the 21 associated forms "Stock assignment separate from certificate", blank. |
| 600,000 | Shares of EuroGas Inc., divided into six certificates of 100,000 shares each; certificate numbers 4552-4557, including the associated six forms "Stock assignment separate from certificate", blank. |

US$ 5,000,000.00   Debenture agreement for EuroGas Inc. series A convertible debentures.

Furthermore, we like to inform you that there are still 65,671 shares of EuroGas Inc. outstanding for Jeffrey Ltd. due to the certificate split. We ask you to request this certificate directly from Jeffrey Ltd.

We look forward hearing from you.

With best regards,
/Signed/
Rolf Schlegel
INVICO CAPITAL CORPORATION AG

RS00127

RS-ANC  00112



RS00128

RS-ANC 00113

)iss Postal Service   **Receipt**                    ❑ **Duplicate**

☒ Letter
❑ Package
❑ Send with declared value
❑ Deposit                                             Order No. <u>111</u>

                                                      **Fee**    <u>6.00</u>

Recipient:    Mr. E. Bissig
                      Forum Trust Reg., Städtle 7
Destination:   FL-4940 Vaduz

Postal clerk signature  /signature-illegible/          /STAMP/

RS00129

RS-ANC  00113

447

1    Q.    I understand that too.  Wasn't -- in June

2    of 1995 wasn't MCK entitled to receive the shares of

3    stock of Eurogas from the March 1995 closing?

4    A.    Yes.

5    Q.    And would you be receiving that for the

6    benefit of MCK, Claron and Okibi?

7    A.    That is correct.  You have that in the

8    forms, in the documentation.

9                              (Exhibit 87 was marked

10                              for identification)

11    Q.    From 126 through 129 I show you Exhibit 87

12    and ask if you can identify that?

13    A.    Yes.  These were the shares that were sent

14    to  MrBissig.

15    Q.    Is that your signature?

16    A.    It is.

17    Q.    And it's addressed to Mr Bissig who  is--

18    A.    Petenes Foundation, yes.

19    Q.    He is with Forum Trust, the administrator

20    of Petenes Foundation?

21    A.    Yes.

22    Q.    And this is dated August 8, 1995?

23    A.    Uh-huh.

24    Q.    Was this -- is that a "yes"?

25    A.    Yes.

448

Q.   Was this information, this transmittal,
shared with Mike McKenzie?

A.   I do not know.

Q.   On the date that you issued your letter to
Mike McKenzie of June 21st, was he aware that you were
still holding the shares of Jeffrey Eurogas stock?

A.   I do not know and I didn't either.  It was
a mishap.  We had this in the bank safe and only,
unfortunately, too late found out that the statement on
21st June does not quite coordinate with this figure.

Q.   It does not what?

A.   Coordinate with Exhibit 87.

MR WEISBART:  Which exhibit number are
you -- is this, Steven?

THE WITNESS:  That's right, 87.

MR WEISBART:  87.

BY MR SMITH:

Q.   All right.  On that date, you sent to
Mr Bissig 2,100,000 shares of Eurogas stock, 600,000
shares of Eurogas stock, and then advised him of the
availability of the balance of 65,671 still due to
Jeffrey after the split?

A.   Yes.

Q.   After the split with Mr Zimmer?

A.   That is correct.

449

Q.   OK.   Then is my math off or does that mean you have not issued the 100,000 yet?  No, that --

MR MACDONALD:  We'll pull out that one and start over?

MR SMITH:  Yes.

MR TATE:  He's expecting the 65,000 at the bottom.

MR SMITH:  Yes.  But does that take into account the Wolfgang too?

MR TATE:  Yes, that's correct.

MR SMITH:  OK.

MR TATE:  It would be 2,665,671 shares minus Wolfgang and Zimmer.

MR SMITH:  OK.

BY MR SMITH:

Q.   And then you also  sent the $5million debenture?

A.   Yes, sir.

Q.   And along with that you would have sent the -- any stock assignments that had been signed in blank --

A.   We sent everything what we had.  We wanted to get rid of it.

Q.   And page 3, is that the equivalent of our return receipt showing that it was received by

450

Mr Bissig?

         A.    It's registered postage and he has received it.

         Q.    And he received that on, it looks like August 8, 1995, is that correct?

         A.    That's correct, yes.

                                    (Exhibit 88 was marked

                                    for identification)

         Q.    From RS192 I'm going to show you Exhibit 88 and ask if that is a memo prepared by you?

         A.    That is correct.

         Q.    And that is your initials in the lower left-hand corner?

         A.    That is correct.

         Q.    And this relates to  a meeting between you and Mr W Rauball?

         A.    No.

         Q.    Who is the meeting with?

         A.    The meeting was with Mr Ulrich.

         Q.    How can you tell that?

         A.    Because it says here: "Mr W. Rauball told me that Mr. McKenzie has asked for immediate sale ..."

         Q.    OK.  Does that mean that Mr Ulrich was there?

         A.    Or Mr -- Mr Ulrich was at a meeting.  I'm

29 JAN '96  15:30   FORUM TRUST VADUZ 075 86867   FROM

J 2025

# FORUM TRUST REG.

### TELEFAX MESSAGE / DECKBLATT

2 9. Jan. 1996

FL-9490 Vaduz
Städtle 7
P.O.Box 79
TELEFON (075) 232 99 59
TELEX 889 114 BRJ FL
TELEFAX (075) 233 20 29

FAX TO / AN      Herrn

Schlegel Rolf

Kirchgass

Zürich



Vaduz, 29. Januar 1996

Pages to be transmitted _1_ Seiten werden übermittelt.

PETENES FOUNDATION

Sehr geehrter Herr Schlegel

Die uns am 8. August 1995 gesandten Aktien betr. EuroGas sind am
22. November 1995 im Original an Herrn Dr. R. Rauball übergeben
worden.

Mit freundlichen Grüssen

FORUM TRUST REG.

Falls unvollständig oder nicht leserlich bitte anrufen.

EXHIBIT 27

RS00146

RS-ANC 00085

### FROM

### FORUM TRUST REG.

### FAX MESSAGE / COVER SHEET

January 29, 1996

FL-9480 Vaduz                    **FAX TO**        Mr. Rolf Schlegel
Stadtle 7                                          Kirchgasse
P.O. Box 79                                        Zurich
PHONE (075) 232 99 59
TELEX /illegible/
FAX (075) 233 20 29

Vaduz, January 29, 1996

Pages to be transmitted: 1


PETENES FOUNDATION


Dear Mr. Schlegel,

The originals of the Eurogas shares sent to us on August 8, 1995 were transferred to Dr. R. Rauball on November 22, 1995.


With best regards,

FORUM TRUST REG.
/Signature - illegible/


Please call if incomplete or illegible.


RS00147

RS-ANC  00085

542

(Exhibit 115 was marked

for identification)

BY MR SMITH:

Q.   Don't put that one away.  But from 146 and
147 I'm going to show you Exhibit 115 and ask if that
is what you were referring to?

A.   That was, yes.

Q.   All right.  Now, this is a letter that you
received from Mr Bissig on behalf of Forum Trust which
was acting on behalf of Petenes Foundation, correct?

A.   Yes, sir.

Q.   And that's January 29, 1996?

A.   That is correct.

Q.   Is page 2 a correct translation of page 1?

A.   Yes.

Q.   The shares that were sent by you were the
shares of Eurogas owned by whom, Jeffrey?

A.   Jeffrey.

Q.   All right.  Then am I correct that at some
point in time in 1995 Dr Reinhard Rauball was in
possession of the Eurogas shares that had been
distributed therefore to Jeffrey and were due to MCK,
Claron, Okibi and yourself?

A.   No. ` Those were only shares that were due
to Jeffrey from Eurogas.

543

Q.    I understand that this exhibit refers only
to the shares of Jeffrey in Eurogas?

A.    That's correct.

Q.    I'm saying that in addition to the shares
of Jeffrey -- of Eurogas shares due to Jeffrey, weren't
the MCK shares of Eurogas also in the possession of
Dr Reinhard Rauball as trustee?

A.    That is correct.

Q.    OK.  Now, this is dated January 29, 1996.
So when you were writing this memo to the file and
discussing with Mr Marxer in October -- on October 23,
1995 as set forth in Exhibit 114, you didn't know where
the shares of Jeffrey were, did you?

A.    No.  I did, on the other hand, discuss this
with Mr Norman Marxer, and looking at this memorandum
I would assume that Mr Marxer would have told me that
he does not have the shares.

Q.    Then why would you ask him to send the
Eurogas shares held by Jeffrey?

A.    For MCK.  It says on there exactly why.

Q.    OK.  Then I'm again confused and I'm sorry.
I thought when we were addressing Exhibit 114 you said
I had another document in my possession that would
address the request made for the Eurogas shares held by
Jeffrey, and I showed you Exhibit 115 asking you if

544

that was the document and you said "yes"?

          A.   That is correct.

          Q.   Why is Mr Marxer in possession of the
Eurogas shares held by Jeffrey?

               MR MACDONALD:   Why had he been?

BY MR SMITH:

          Q.   Why would he -- why is he in possession of
the Eurogas shares held by Jeffrey so that you had to
ask him to send that to you?

          A.   Mr Marxer was the administrator of Jeffrey.

          Q.   Yes, sir.

          A.   Your question is?

          Q.   As the administrator he held all of the
shares and you did not receive them ever, ever, ever,
is that right?

          A.   Not anymore after we sent them to
Petenes Foundation.

          Q.   What is the relationship then between
Marxer and Petenes?

          A.   I do not know.  They knew each other and
they were in the same building.  I don't know what
happened afterwards.  For that reason, I asked
confirmation, as per Exhibit 115, to be sure where they
were.

          Q.   OK.  Mr Marxer promised to mail them out to

545

you on the same day, that being the Eurogas shares?

    A.   Yes, sir.

    Q.   He didn't do that?

    A.   No, sir.

                   (Exhibit 116 was marked

                   for identification)

    Q.   From 155 and 156 I'm going to show you Exhibit 116 and ask if you can identify that from your records?

    MR WEISBART:  155 and 156?

    MR SMITH:  I think that's what I said.

BY MR SMITH:

    Q.   Let me substitute it.  I think that has got highlighting on it on the second page?

    MR MACDONALD:  Yes.

    MR SMITH:  Let me do an exchange.

(Exchange done)

    MR MACDONALD:  Do you have a question?

    MR SMITH:  Yes, I do.

BY MR SMITH:

    Q.   Let me ask you can you identify that document from your file?

    A.   I can.

    Q.   What is that?

    A.   This is a note that Peter Schefer made on

# *OPTION*
# *AGREEMENT*

Between



**MCK Development B.V.**
Herengracht 320
1016 CE Amsterdam


and

**Ostrov Rescources Ltd.**
502 - 100 Park Royal South
West Vancouver B.C.
Canada


MCK Development B.V. hereby represents that it holds over 40 % of the total outstanding shares of McKenzie Methane Poland B.V. of common stock.

MCK Development B.V. hereby grants to Ostrov Resources Ltd. an option to purchase of 21 shares for US$ 1,5 Mio., these representing 3 1/2 % of the 600 shares to be issued of the company.

This option may be exercised in whole or in part of at least 5 shares. The price per share is US$ 71'430.--.


I.

Ostrov Resources Ltd. agrees to pay an option payment of US$ 100'000.-- to secure this option, payable on 17th February, 1995. This amount will be deducted from the purchase price of the shares.


II.

This option is valid until April 1st, 1995, provided following payments are made at following dates:

| US$ 300'000.-- | February 24th, 1995 |
| US$ 300'000.-- | March 3rd, 1995 |
| US$ 300'000.-- | March 10th, 1995 |
| US$ 300'000.-- | March 24th, 1995 |
| US$ 200'000.-- | April 1st, 1995 |

Non payment of any amounts as mentioned above will upon ten days written notice terminate Ostrov Resources Ltd.'s right to acquire the unpaid portion of this option.

## III. Payment terms

Payment of the first US$ 100'000.-- to MCK Development B.V. will have to be made to the account no. 245.500 at BILFINANZ UND VERWALTUNG AG, Gladbachstrasse 105, P.O. Box 832, CH-8044 Zurich by February 17th, 1995.

## IV. Assignability

This option agreement can be assigned by Ostrov Resources Ltd..

## V. Explanation re origin of funds

Ostrov Resources Ltd. confirms by signing this agreement that the funds are not in contradiction to the international law regarding money laundering. The undersigned has full knowledge of the stipulations regarding the Swiss directives on combatting and preventing laundering of money and confirms that all transactions are undertaken in a fully transparent manner and that the authorities shall be informed in case of need of all relevant matters without gaps. It will draw attention to any assignee on this requirement.

This agreement is executed on the ...10 R... February, 1995.

Ostrov Resources Ltd.                          MCK Development B.V.


...........................................          ......................................

opt-agr.doc

SENDEBESTATIGUNG

| | | DATUM/ZEIT | 10- 2-95 16:52 |
|---|---|---|---|
| | | EIGENKENNUNG | +41 +1 261 72 88 |
| | | EIGENNAME | |
| | | FIRMENNAME | SWISS OFFICE |

## GELESENE SEITEN
2

| R | FILE | GEGENSTELLE | STARTZEIT | DAUER | # | KOMMENTAT | ERGEBNIS |
|---|---|---|---|---|---|---|---|
| 1 | 099 | W. RAUBALL | 2-10   16:50 | 1' 25" | 2 | | OK |

## DIESE VORLAGE WURDE BESTÄTIGT.
## VERKL. UNTEN – SIEHE DETAILS IM INFOFELD

### A4

**OPTION**
**AGREEMENT**

Between

**MCK Development B.V.**
Herengracht 320
1016 CE Amsterdam

and

**Ostrov Resources Ltd.**
502 - 100 Park Royal South
West Vancouver B.C.
Canada

MCK Development B.V. hereby represents that it holds over 40 % of the total
outstanding shares of McKenzie Methane Poland B.V. of common stock.

MCK Development B.V. hereby grants to Ostrov Resources Ltd. an option to
purchase 21 shares for US$ 1,5 Mio., these representing 3 1/2 % of the 600
shares to be issued of the company.

This option may be exercised in whole or in part of at least 5 shares. The price per
share is US$ 71'430.--.

I.

Ostrov Resources Ltd. agrees to pay an option payment of US$ 100'000.-- to
secure this option, payable on 17th February, 1995. This amount will be deducted
from the purchase price of the shares.

II.

This option is valid until April 1st, 1995, provided following payments are made
at following dates:

XEROX   3010

# I  N  V  I  C  O

INVICO
CAPITAL CORPORATION AG

Kirchgasse 24
Postfach 4754
CH-8022 Zürich

Telefon 0041-1-261 72 11
Telefax 0041-1-261 72 88

Zürich, 10. Februar 1995
SR/ma

**TELEFAX**   *0049/221-497'38'94*

An:        Herrn Wolfgang Rauball

Von:       Rolf Schlegel

Referenz:   Option Agreement

Anzahl Seiten inkl. Deckblatt:   -3-

_____

Lieber Herr Rauball

Hier wie verlangt das Agreement. Die weiteren Verträge erhalten Sie direkt von FL.

Ich wünsche Ihnen ein schönes Wochenende.

Mit freundlichen Grüssen

Rolf Schlegel

INVICO CAPITAL CORPORATION AG

## SENDEBESTATIGUNG

```
DATUM/ZEIT            10- 2-95 14:58
EIGENKENNUNG          +41 +1 261 72 88
EIGENNAME
FIRMENNAME               SWISS OFFICE
```

GLESENE SEITEN

3

| FILE | GEGENSTELLE | STARTZEIT | DAUER | # | KOMMENTAT | ERGEBNIS |
|------|-------------|-----------|-------|---|-----------|----------|
| 085 | W. RAUBALL | 2-10  14:56 | 2' 04" | 3 | | OK |

## DIESE VORLAGE WURDE BESTÄTIGT.
## VERKL. UNTEN – SIEHE DETAILS IM INFOFELD

### A4

I N V I C O

INVICO
CAPITAL CORPORATION AG                    Zürich, 10. Februar 1995
Kirchgasse 24                             SR/ma
Postlach 4734
CH-8022 Zürich
Telefon 0041-1-261 72 11
Telefax 0041-1-261 72 68

*TELEFAX   0049/221-497'38'94*

An:        Herrn Wolfgang Rauball

Von:       Rolf Schiegel

Referenz:  Option Agreement

Anzahl Seiten inkl. Deckblatt:   -3-

Lieber Herr Rauball

Hier wie verlangt das Agreement. Die weiteren Verträge erhalten Sie direkt von FL.

Ich wünsche Ihnen ein schönes Wochenende.

Mit freundlichen Grüssen

Rolf Schiegel
INVICO CAPITAL CORPORATION AG

XEROX   3010

# *OPTION*
# *AGREEMENT*

Between

**MCK Development B.V.**
Herengracht 320
1016 CE Amsterdam



EXHIBIT
71
April 19, 2001

and

**Ostrov Resources Ltd.**
502 - 100 Park Royal South
West Vancouver B.C.
Canada

MCK Development B.V. hereby represents that it holds over 40 % of the total outstanding shares of McKenzie Methane Poland B.V. of common stock.

MCK Development B.V. hereby grants to Ostrov Resources Ltd. an option to purchase of 21 shares for US$ 1,5 Mio., these representing 3 1/2 % of the 600 shares to be issued of the company.

This option may be exercised in whole or in part of at least 5 shares. The price per share is US$ 71'430.—.

I.

Ostrov Resources Ltd. agrees to pay an option payment of US$ 100'000.— to secure this option, payable on 17th February, 1995. This amount will be deducted from the purchase price of the shares.

II.

This option is valid until April 1st, 1995, provided following payments are made at following dates:

|                    |                    |
|--------------------|--------------------|
| US$ 300'000.--     | February 24th, 1995 |
| US$ 300'000.--     | March 3rd, 1995     |
| US$ 300'000.--     | March 10th, 1995    |
| US$ 300'000.--     | March 24th, 1995    |
| US$ 200'000.--     | April 1st, 1995     |

Non payment of any amounts as mentioned above will upon ten days written notice terminate Ostrov Resources Ltd.'s right to acquire the unpaid portion of this option.

### III. Payment terms

Payment of the first US$ 100'000.-- to MCK Development B.V. will have to be made to the account no. **245.500** at BILFINANZ UND VERWALTUNG AG, Gladbachstrasse 105, P.O. Box 832, CH-8044 Zurich by February 17th, 1995.

### IV. Assignability

This option agreement can be assigned by Ostrov Resources Ltd..

### V. Explanation re origin of funds

Ostrov Resources Ltd. confirms by signing this agreement that the funds are not in contradiction to the international law regarding money laundering. The undersigned has full knowledge of the stipulations regarding the Swiss directives on combatting and preventing laundering of money and confirms that all transactions are undertaken in a fully transparent manner and that the authorities shall be informed in case of need of all relevant matters without gaps. It will draw attention to any assignee on this requirement.

This agreement is executed on the ...10.... February, 1995.

Ostrov Resources Ltd.                    MCK Development B.V.

FEBRUARY 15TH 1995

opt-agr.doc

FEB. 20, 1995

20. 2. 95

386

1          Q.    You ought to be over here.

2                (To the reporter)  Let me ask you to mark

3     these, please.

4                            (Exhibits 70 and 71 were

5                            marked for identification)

6                (To the witness)  I'm going to show you

7     what has been marked as Exhibit 70 and 71.  Can you

8     identify for me, please, first what is Exhibit 70?

9          A.    Exhibit 70 is an option agreement between

10    MCK Development and Ostrov.

11         Q.    And what's the date of that or the

12    effective date?

13         A.    This was first signed on 10th February

14    1995.

15         Q.    And it's bearing whose signature?

16         A.    It is bearing my signature, then Director

17    of MCK Development BV.

18         Q.    All right.  What is the third page?

19         A.    The third page is confirmation that this

20    contract was sent to Mr W Rauball.

21         Q.    Now, why was it sent to  MrRauball?

22         A.    Because Mr Rauball had initiated this and

23    it was here mentioned Mr W has made the following

24    proposal.

25         Q.    All right.

387

1              MR MACDONALD:  Referring to Exhibit 69 just
2     then?
3              THE WITNESS:  Correct.
4     BY MR SMITH:
5         Q.   What is the next page of the document?
6         A.   That's -- here is the agreement.  "Further
7     contract now sent directly from Liechtenstein.  Have a
8     nice weekend."
9         Q.   This is your letter of February 10th to
10    Mr Wolfgang Rauball?
11        A.   That's correct.
12        Q.   All right.  And then --
13             MR WEISBART:  What exhibit is that, please?
14    I'm sorry.
15             MR MACDONALD:  It's all 70.
16             MR WEISBART:  All 70.
17    BY MR SMITH:
18        Q.   And by this agreement, Ostrov Resources is
19    to -- has an option to purchase shares of MCK?
20        A.   That's correct.
21        Q.   And how much are they going to buy?
22             MR MACDONALD:  You mean have an option to
23    buy?
24             MR SMITH:  Right.
25             MR MACDONALD:  OK.

388

1              THE WITNESS:   Twenty-one shares.

2    BY MR SMITH:

3         Q.   OK.  Can you tell me the purpose of Ostrov

4    buying MCK?  What is it -- what was owned at that time

5    by MCK, 80 per cent interest in MMP BV?

6         A.   That is correct.

7         Q.   OK.  Let me ask you to identify Exhibit 71,

8    if you would?

9         A.   Exhibit 71 was sent back to MCK -- to MCK

10   Development, to us, from Mr Rauball.

11        Q.   And it's bearing the fax notation of

12   Mr Rauball sending that to you?

13        A.   It does -- it does show here.

14        Q.   That's W Rauball?

15        A.   W Rauball.

16        Q.   OK.

17        A.   And it's signed by Mr Carfuse on

18   February 20th, 1995.

19        Q.   It's signed by who?

20        A.   Mr Carfuse.  I don't know his name.  He is

21   Hungarian.

22        Q.   It's not Agyagos, is it?

23        A.   Agyagos, yes.

24        Q.   OK.

25        A.   Agyagos in Vancouver.

390

1    BY MR SMITH:

2         Q.   Now you say --

3              MR WEISBART:  Excuse me.  The 10th?

4              THE REPORTER:  Yes.

5    BY MR SMITH:

6         Q.   Let's make one thing clear.  The option

7    agreement that is evidenced by 70 and 71, or 71, which

8    is the fully executed document, is that what was

9    negotiated or what Mr Rauball, Wolfgang Rauball,

10   proposed to you as set forth --

11        A.   Yes.

12        Q.   -- in Exhibit 69?

13        A.   This is the 1.7 million -- 1.5 million as

14   is announced here.  (Indicating)

15        Q.   All right.  And it required, did it not,

16   that there be a payment of $100,000 as an option

17   payment on or before February 17th, 1995?

18        A.   That's correct.

19        Q.   And the first one under Exhibit 69 was for

20   100,000, correct?

21        A.   Uh-huh.

22        Q.   Then there is a $300,000 payment as a

23   second payment, the same as in Exhibit 69?

24        A.   It had been already changed since then.

25        Q.   The dates were changed?

392

1          A.    Can I maybe have a copy of that so at least
2     I know exactly what to look for?   (Document handed)
3     Thank you.
4          Q.    You're welcome.   I need that back to ask
5     you my question.   Let me get that back from you for a
6     moment.
7          A.    Sorry.   Yes.   (Document handed)
8          Q.    I'll just stand with you here.   In
9     Exhibit 69, you go through the proposal that you found
10    acceptable?
11         A.    .Uh-huh.
12         Q.    You communicate that to Mr McKenzie?
13         A.    He agrees.
14         Q.    And he agrees --
15         A.    Yes.
16         Q.    -- and he evidences that agreement by the
17    "Yes" in his --
18         A.    Yes.   Yes.   Yes.
19         Q.    OK.   You have to let me finish.   He
20    indicates that by his "Yes" and his initials on page 2?
21         A.    That is correct.
22         Q.    You then say in the next paragraph: "This
23    would mean that I would have found a buyer for the
24    promissory note so that MMP could be paid in time."
25    What promissory note are you referring to?



PRIVATE TRUST BANK CORPORATION
VADUZ, LIECHTENSTEIN

745
1-799/260

PAY
TO THE
ORDER OF   Mike McKenzie

W.P.E. VADUZ USD1'000.000.--   $ *100'000.--*

DOLLARS

VERWALTUNGS- UND PRIVAT-BANK
AKTIENGESELLSCHAFT

**Swiss Bank Corporation**
New York Branch
Box 3976, Church Street Station
New York, NY 10008

FOR

⑈00074⑈ ⑈026007993⑈040 2359⑈ 7500⑈

Escrow107905

:0704 '95  09:18  ☎214 9   9          DG BANK          ☑001/001

446

EXHIBIT
78
April 19 2001

VELOPMENT B.V.                              MCK DEVELOPMENT B.V.
RACHT 320-POSTBUS 727                       SEKR.KUNDENBETREUUNG

O AMSTERDAM                                 IM HAUSE


ANAGERS:      MÜLLER TONY
              SCHEUCHER ANDREAS


TEMENT  OF  ACCOUNT          AS AT: 20.04.95                   PAGE     1

T ACCOUNT

     0102771/001.000.840
CY:  US DOLLAR

  RRATIVE              VALUE      D E B I T      C R E D I T      B A L A N C E

  OPENING BALANCE PER:    01.01.95                                       0,00

  CHEQUE REMITTANCE         270495                299.977,78        299.977,78

  BALANCE IN YOUR FAVOUR                                           299.977,78

                      OPTION  OSTROV

11411

**VERWALTUNGS-UND PRIVAT - BANK A.G.**
VADUZ, LIECHTENSTEIN

Vaduz, 19th April 19 95            1-24/210

HE ER OF   MCK   Development B.V.————————————————————————————— $ | *300'000.—* |

VP BANK AG USD 300000 ■■■★★★          DOLLARS
VADUZ

CHASE   The Chase Manhattan Bank, N.A.
1 Chase Manhattan Plaza
New York, NY 10081

H. Blum

⑈011411⑈ ⑈021000021⑈ 001 1 571437⑈

# ENERGYGLOBAL AKTIENGESELLSCHAFT

Städtle 7
FL-9490 Vaduz
Liechtenstein
Tel. Int. 041-75-232 87 26
Fax Int. 041-75-232 87 28
Tlx. 669 364 BBJ FL

QUITTUNG

Hiermit bestätige ich, Armando Ulrich, von der Firma Energy Global einen Bankscheck in der Höhe von US\$ 300'000.— zugunsten MCK Developpment B.V. erhalten zu haben.

*astov option*

Vaduz 19. April, 1995/nm

_____
Armando Ulrich

Zweck: *Payment on General Agreemen 3.5.94*

Bankers: Verwaltungs- & Privat-Bank AG, Vaduz
a / c.: 268.834.000, SWIFT VPBV LI 2X
Fax Int.: 041-75-235 65 00, Tel. Int.: 041-75-235 66 55, Tlx.: 889 200

P- 2-95 16:60   ;SWISS OFF            W. RAUBALL        ↑      +41 Y1 261 72 88;# 1/ 2

# *OPTION AGREEMENT*

### Between

**MCK Development B.V.**
Herengracht 320
1016 CE Amsterdam

450

### and

**Ostrov Resources Ltd.**
502 - 100 Park Royal South
West Vancouver B.C.
Canada

MCK Development B.V. hereby represents that it holds over 40 % of the total outstanding shares of McKenzie Methane Poland B.V. of common stock.

MCK Development B.V. hereby grants to Ostrov Resources Ltd. an option to purchase of 21 shares for US$ 1,5 Mio., these representing 3 1/2 % of the 600 shares to be issued of the company.

This option may be exercised in whole or in part of at least 5 shares. The price per share is US$ 71'430.—.

I.

Ostrov Resources Ltd. agrees to pay an option payment of US$ 100'000.— to secure this option, payable on 17th February, 1995. This amount will be deducted from the purchase price of the shares.

II.

This option is valid until April 1st, 1995, provided following payments are made at following dates:

16:50   :SWISS OFF          W. RAUBALL          :    +41 +1 251 72 88;# 2/ 2

US$ 300'000.--          February 24th, 1995

US$ 300'000.--          March 3rd, 1995

US$ 300'000.--          March 10th, 1995

US$ 300'000.--          March 24th, 1995

US$ 200'000.--          April 1st, 1995

Non payment of any amounts as mentioned above will upon ten days written notice terminate Ostrov Resources Ltd.'s right to acquire the unpaid portion of this option.

III. Payment terms

Payment of the first US$ 100'000.-- to MCK Development B.V. will have to be made to the account no. **245.500** at BILFINANZ UND VERWALTUNG AG, Gladbachstrasse 105, P.O. Box 832, CH-8044 Zurich by February 17th, 1995.

IV. Assignability

This option agreement can be assigned by Ostrov Resources Ltd..

V. Explanation re origin of funds

Ostrov Resources Ltd. confirms by signing this agreement that the funds are not in contradiction to the international law regarding money laundering. The undersigned has full knowledge of the stipulations regarding the Swiss directives on combatting and preventing laundering of money and confirms that all transactions are undertaken in a fully transparent manner and that the authorities shall be informed in case of need of all relevant matters without gaps. It will draw attention to any assignee on this requirement.

This agreement is executed on the ...10.R.. February, 1995.

Ostrov Resources Ltd.                    MCK Development B.V.

_FEBRUARY 15TH 1995_

opt-agr.doc

_FEB. 20 1995_                           20. 2. 95

413

1                              for identification)

2   BY MR SMITH:

3        Q.   I'm going to show you, Mr Schlegel, what

4   has just been marked as Exhibit 78 and ask you to

5   identify that for me if you would?

6        A.   Yes.  This is a statement of account from

7   DG Bank having received a check of $300,000.  That is

8   exactly 299,977.78.

9        Q.   Less whatever fee there is?

10       A.   Less -- yes.  No, the fee was already

11   deducted.  The check was 300,000, as you can see, which

12   was handed over.

13            MR MACDONALD:  That's page 2 that you're

14   referring to?

15            THE WITNESS:  It's page 2.  The check is

16   dated 19th April, paid to MCK Development BV.

17   BY MR SMITH:

18       Q.   And who is it from?

19       A.   That's -- I received the check from

20   Herr Ulrich.  Herr Ulrich, Armando Ulrich, he gave it

21   to me.

22       Q.   OK.

23       A.   And I just took it from this amount, from

24   this here.

25       Q.   Now, is that --

414

1      A.   Here you have the confirmation on the third

2   page.   It says Energy Global Aktiengesellschaft.   Here

3   it says "Receipt".   "Herewith I confirm,

4   Armando Ulrich, of the -- from the company

5   Energy Global to have a check of 300,000 in favor of

6   MCK Development BV."   I received it and then I put it

7   in, payment on general agreement.

8      Q.   Whose handwriting is that below the

9   Armando Ulrich signature?

10      A.   This is Armando Ulrich.

11      Q.   And he is referring to payment on general

12   agreement?

13      A.   3rd May, yes.

14      Q.   That says, "Payment [under] General

15   Agreement" --

16      A.   Yes.

17      Q.   -- which is August 3rd, 1994?

18      A.   Yes, what he said, but he was wrong.   What

19   we did here is, that he has paid already, so that was

20   the first tranche of this amount.

21      Q.   OK.   Why do you say he was wrong?

22      A.   He didn't know what he wrote down.

23                        (Laughter)

24           MR WEISBART:   What was the date of the

25   check again?   (Document shown)

BY MR SMITH:

Q.   The reason that you know he was wrong is
because there was no  monies due under the August 3rd
agreement, is that correct?

A.   August '94.  Yes, that's already gone a
long time ago.

Q.   That's right.  And does this payment
coincide with a payment obligation of Ostrov under the
option agreement?

A.   Yes.

MR WEISBART:  Which option agreement?

THE WITNESS:  The first option of 300?

BY MR SMITH:

Q.   It's the MCK option -- MCK Development and
Ostrov Resources Limited option agreement that was
dated February 10th, signed by Agyagos on February 15th
and February 20th.

MR TATE:  That's Exhibit 71?

MR MACDONALD:  Well, that copy of it is
physically attached in Schlegel's records or Invico's
records as the last two pages of this group of
documents --

MR TATE:  OK.

MR MACDONALD:  -- that have just been
marked as Exhibit 78.  So there are several kinds of

416

1   documents in group exhibit 78.

2            MR TATE:  The second page of exhibit -- or

3   Exhibit 71 is actually, or the document that was also

4   marked as Exhibit 71, is attached to this?

5            MR SMITH:  Right.  That's correct.

6            MR TATE:  Thank you.

7   BY MR SMITH:

8        Q.   Now, you applied this check of

9   April 19, 1995 to the first instalment that was due on

10  February 24th, '95?

11       A.   I just -- yes.  I mean --

12       Q.   Do you agree with me that, for this to  be

13  an effective agreement, paragraph 1 requires an option

14  payment of $100,000 by February 17th?

15       A.   You are right.

16       Q.   Do you know if that option payment was

17  made?

18       A.   I don't know.

19       Q.   You didn't receive it?

20       A.   No.  On the other hand, payment was late

21  and it still, sort of, was used.

22       Q.   Did you check with Mike McKenzie to verify

23  this would be acceptable, accepting this late?

24       A.   Not really.

25       Q.   You just took it?

417

1      A.    Yes.  If you are hungry, you take any piece

2   of bread.

3                        (Laughter)

4      Q.    Are we expressing your hunger?

5      A.    Not mine.  I've had a good lunch.

6      Q.    This, if I heard you right, Armando Ulrich

7   of the firm of Energy Global is tendering this?

8      A.    Yes.  He has -- he confirms that he has

9   received from Energy Global this check.

10      Q.    OK.  So was Energy --

11      A.    Of 300,000 to -- for MCK.

12      Q.    All right.  And Energy Global then issued

13   this $300,000 check?

14      A.    Yes.

15            MR TATE:  What's the date of that deposit

16   again?

17            THE WITNESS:  It was deposited at the bank

18   on the 4th.

19            MR WEISBART:  I'm sorry?

20            THE WITNESS:  Yes, 20th April.

21            MR TATE:  20th April.

22            THE WITNESS:  1995.

23                              (Exhibit 79 was marked

24                              for identification)

25

USTROV RESOURCES LTD                    PAGE   01
FROM : OSTROV RESOURCES LTl       PHONE NO. : +604 5876173        Apr. 10 1995 04:23PM P01

# SALE & ASSIGNMENT

*13*

OSTROV RESOURCES Ltd. (hereinafter reffered to as Ostrov) 508/100 Park Royal South, West Vancouver,BC,Canada, hereby sells,assigns and transfers all right, title and interest in the Option Agreement dated Feb. 10th, 1995 (a copy of wich is attached ) for the sum of <u>Four Million Fourteen Thousand Five Hundred United States Dollars ( $4,014,500 USD</u> to Energy Global AG (hereinafter called EnergyGlobal) of Staedtle 7, FL-9490 Vaduz, Liechtenstein. Said payment is due on or before May 1,1995. Upon signing this Agreement, Ostrov entitles EnergyGlobal full power of attorney to use, sell, assign, transfer,pledge or hypothecate the Option for the best interest of all parties concerned.

The terms of payment shall be <u>Eight Hundred and Fifty Thousand United States Dollars ( $ 850,000 USD</u> upon signing, and the balance either in cash or tradeable stock calculated at Five United States Dollars ( $ 5.00 USD ) per share.

Signed this 10th day, 1995

OSTROV RESOURCES Ltd. *15*

Trustee            CORPORATE SECRETARY

EnergyGlobal AG

Trustee

Escrow100226



I   N   V   I   C   O

INVICO
CAPITAL CORPORATION AG

Kirchgasse 24
Postfach 4754
CH-8022 Zürich

Telefon 0041-1-261 72 11
Telefax 0041-1-261 72 88

Zurich, 13.09.1995
SR/lm



EXHIBIT
89
April 19, 2001

**TELEFAX    005999/369101**

To:        Leeward Trust Company N.V.

From:      Rolf Schlegel

Ref:       OKIBI N.V.   /Share option and share exchange agreement

Number of Pages incl. Cover Page: –14–

Dear Mrs Casseres-Corsen

Attached you will find the share option and share exchange agreement dated 7th March 1995 which should be closed within the next few weeks.

Also attached is a copy of the share distribution resulting from the merger dated 24th, April 1995.

A buyer for the shares has been found as you can see from the attached option agreement dated 11th September 1995 and the board resolution of MCK Development B.V.

We invite you to sign the attached option agreement in favour of OXBRIDGE Ltd so that 315'740 shares can be sold for $473'610.00.

Kindly let me have the hard copy so that I can have it signed by OXBRIDGE Ltd.

Kind regards,

Rolf Schlegel

INVICO CAPITAL CORPORATION AG

Encl. see page 2

EXHIBIT 10

RS00195

RS-ANC 001 42

- 2 -

Encl. - Option & Share exchange agreement 7.3.1995
    - Distribution of shares dated 24.4.1995
    - Board resolution dated 11.9.1995
    - Option agreement MCK Development B.V./OXBRIDGE Ltd
    - Option agreement OKIBI N.V./OXBRIDGE Ltd
    - Shareholders Resolution dated 7.9.1995
      (please sign and have Claron N.V. sign this resolution)

RS00196

## OPTION AND SHARE EXCHANGE AGREEMENT

The Option and Stock Exchange Agreement, dated as of this 7th day of March, 1995 (herein called "Agreement"), is entered into by and between EuroGas, Inc. (herein called "EGAS"), a United States public company, and MCK Development (herein called "MCK"), a Netherlands private company.

### WITNESSETH

WHEREAS, MCK owns _____ shares of McKenzie Methane Poland, BV *or has options to 482 shares of MMP B.V. or (80.3%)* (herein called "MMPBV", some of these shares are subject to an Option and General Agreement with Energy Global, AG and Ostrov Resources Ltd. or its assigns).

WHEREAS, MCK desires to exchange its total interest in MMPBV for common and preferred shares of EGAS.

WHEREAS, MCK represents that its ownership of MMPBV is unencumbered and free of any liens, hypothecations or pledges of any kind, written or verbal, and that all shares are property and validly issued and recorded on the company's books. A resolution of the MCK Board of Directors authorizing this transaction is attached hereto as Exhibit "C".

WHEREAS, the above number of shares represents a control position of MMPBV and MCK recognizes that their exchange for EGAS stock would transfer control of MMPBV to EGAS with all of the rights, privileges and responsibilities of a control shareholder on the effective date of exchange but not later than April 18, 1995.

WHEREAS, the exchanges is to be consummated upon the receipt of audited financial statements of MMPBV. EGAS in its sole discretion may waive the audit requirement.

WHEREAS, the signing of this Agreement binds MCK until April 18, 1995 to exchange its MMPBV shares for EGAS shares on the conditions listed below, recognizing EGAS has the sole right and authority to decline to consummate this transaction.

WHEREAS, EGAS represents that it is a US public company as documented by the attached "Exhibit A" and "Exhibit B" (Securities and Exchange documents September 30, 1994 Form 10-K and December 31, 1994 Form 10-Q) and that it has authorized but unissued, common, and preferred treasury stock available to consummate this transaction.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants herein contained, the parties hereto agree as follows:

1.   Incorporation of Recitals. The above stated recitals are incorporated herein by this reference.

2.   The Exchange Transaction. MCK grants EGAS an exclusive option until April 18, 1995 to acquire all of the remaining interest of MCK in MMPBV for the following

1

RS00197

consideration:

    a.    1,500,000 shares of free-trading common stock (be included in a Regulation-S Registration on or before April 18, 1995);

    b.    2,500,000 shares of EGAS preferred stock which shall have the following rights and privileges:

        (1)    Non-voting;
        (2)    A dividend of $.05 per share per year payable January 31 for the period ending the previous December 31.
        (3)    Automatically convertible after two years into 5,000,000 shares of EGAS common stock;
        (4)    Redeemable by EGAS during the first two years, upon 30 days notice ( ~~$ 92,000,000~~ 8.3% X $1,147,000) for a total of ~~$ 925,000~~ _____ with the provision that MCK may elect to convert the preferred shares to common during the 30 day period.

_$ 92 104 102_

    c.    The option will only be exercised after a review of MMPBV's books by EGAS unless this requirement is waived by the board of directors of EGAS.

    d.    MCK reserves the right to allow the shareholders of MCK or option holder of MMP B.V. stock from MCK, to enter into an exchange agreement directly with Euro Gas Inc. for their proportionate ownership of MCK (or optional shares of MMP B.V) to the extent the law allows.



RS00198

3.    **EGAS Concurrent Registration.** EGAS shall concurrently undertake a Regulation-S Registration on the following terms:

    a.    On offering price of $5.00 per share;
    b.    Minimum shares offered of 3,000,000 with a maximum shares offered of 9,000,000;
    c.    Inclusion of the 1,500,000 shares of common stock to be issued to MCK pursuant to Section 2(a);
    d.    Piggy-back rights for certain existing shareholders;
    e.    The appointment of a qualified agent/underwriter who will guarantee proper distribution.

4.    **Covenants of MCK.** MCK hereby covenants that they will not permit MMPBV to engage in any further commitments that will increase the liabilities of the company without the approval of EGAS.

    MCK will cooperate fully within the state, country, or local government in an orderly transfer and assignment of any contracts required.

5.    **Entire Agreement.** This Agreement constitutes the entire Agreement among the parties pertaining to the subject matter hereof. No amendment to, modification or waiver of, or consent with respect to any provision of this Agreement shall in any event be effective unless the same shall be in writing and signed and delivered by the parties, and then any such amendment, modification, waiver, or consent shall be effective only in the specific instance and for the specific

purpose for which given.

6.   Multiple Counterparts.  This Agreement may be executed in any number of counterparts and by the different parties on separate counterparts and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute but one and the same Agreement.

7.   Governing Law.  This Agreement shall be construed and in accordance with and governed by the laws of the Country of Switzerland.

8.   Binding.  This Agreement shall be binding upon and inure to the benefit of, the parties and their respective heirs, executors, administrators, successors, legal representatives, and assigns; provided that this provision shall not be construed as permitting assignment, substitution delegation, or other transfer of rights or obligations, set strictly in accordance with the provisions with this Agreement.

9.   No Assignment.  Neither the rights nor the duties of a party under this Agreement may be assigned or delegated by either party in whole or in part without the prior written consent of the other party.

10.   Further Documentation.  Each of the parties agree to execute and deliver such documentation as may be reasonably necessary to complete this transaction.

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first above written.

EUROGAS, INC.

_____
Merlin V. Fish, President

MCK DEVELOPMENT

_____
Rolf Schlegel, Managing Director

3

RS00199

# MCK Development B.V.
Herengracht 320
1016 CE AMSTERDAM

Zurich, 24.04.1995
SR/psc

**TELEFAX    001/801-255′20′05**

To:        Ms Jill Holt, EUROGAS INC.

From:      Rolf Schlegel

Ref:       your fax of 4/21/95

Number of Pages incl. Cover Page:    -2-

Dear Jill,

Attached please find the names of the shareholders for the merger:

Total shares of common stock:        1′435′181
Total shares of preferred stock:      2′391′968

| | | | |
|---|---|---|---|
| Claron N.V. | 25.50 % | common stock | 365′971 ✓ |
| Kaya Flamboyan 3d | 25.50 % | preferred stock | 609′952 ✓ |
| Curaçao/Neth. Antilles | | | |
| | | | |
| Okibi N.V. | 22.00 % | common stock | 315′740 ✓ |
| Kaya Flamboyan 3d | 22.00 % | preferred stock | 526′233 ✓ |
| Curaçao/Neth. Antilles | | | |
| | | | |
| Schlegel Rolf | 2.50 % | common stock | 35′880 ✓ |
| Lebernhöhe 13 | 2.50 % | preferred stock | 59′799 ✓ |
| CH-8123 Ebmatingen | | | |
| | | | |
| the rest: | | | |
| MCK Development B.V. | 50.00 % | common stock | 717′590 → |
| Herengracht 320 | 50.00 % | preferred stock | 1′195′984 ✓ |
| 1016 CE Amsterdam | | | |
| | | | |
| in total: | | common stock | 1′435′181 |
| | | preferred stock | 2′391′968 |

Ingeschreven in Handelsregister KvK Amsterdam onder nr. 238.799

RS00200

_page  -2-_

Please note that all shares have to be sent to MCK Development B.V. for distribution. Furthermore we ask you to attach the forms "Stock Assignment separate from Certificate".

We look forward to hearing from you.

Kind regards,

Rolf Schlegel
(signed in his absence by Peter Schefer)
MCK Development B.V.

RS00201

RS-ANC 00154

# Resolution of the Board of Directors
## of MCK Development B.V.,
### an incorporated private company
### with limited liability,
### registered in Amsterdam

Whereas on the 11th of September 1995 a special meeting of the Board of Directors of MCK Development B.V. was held at 11.15h at Kirchgasse 24, 8001 Zurich.

Pursuant to proper notice having been given, all directors of the company were present at the meeting. Mr. Rolf Schlegel, the sole director of the company presided over the meeting as chairman.

The Board of Directors of the company adopted the following resolution:

Resolved, that

1)   Rolf Schlegel is hereby granted the authority to sign an option agreement with Oxbridge Ltd to sell 717'590 shares of common stock of EUROGAS Inc., Salt Lake City, at a price of a $1.50 per share, as soon as that they are the company's property after the successful exchange of shares as per agreement dated March 7th, 1995.

The option price is to be fixed at $1'000.-- which amount will be deducted from the purchase price when exercising the option.

The option is to be limited until the 15th of December, 1995.

2)   Rolf Schlegel is authorized to assist the shareholders of MCK Development B.V.  to sell their common stock.

In witness whereof, the undersigned executed this unanimous written consent of the Board of Directors of the company on this the 7th day of September 1995.

Rolf Schlegel
Chairman

RS00202

RS-ANC 00155

# OPTION AGREEMENT

between

MCK Development B.V.
Herengracht 320
1016 CE Amsterdam
Netherlands                                    (hereinafter referred to as "Optionor")

and

Oxbridge Ltd
Arthur House
50 A Portland Road
London SE25 4PO                                (hereinafter referred to as "Optionee")

I       Whereas the Optionor hereby represents that they own 717'590 shares of
        common stock of EUROGAS Inc., Salt Lake City, after a successful closing
        of the option and share exchange agreement of March 7th, 1995, between
        the Optionor and EUROGAS Inc.

II.     The Optionor hereby grants to the Optionee an option to purchase above
        position for US$1'076'385.00 (US Dollars one million seventy six thousand
        threehundred and eightyfive) until December 15th, 1995. This option
        agreement is assignable.

        The purchase price for this option is $1'000.00 payable at the date of
        signature of this contract. This amount will be credited to the payment
        when the option is being exercised. The option can be exercised in full or in
        parts.

III.    Payment terms:

        The payment to the Optionor is to be made to the account
        102.771/001.000.840 at DG Bank (Schweiz) AG Münsterhof 12, 8001
        Zürich.

RS00203

- 2 -

IV.   The Optionee confirms by signing this agreement, that the funds are not in contradiction to any national law of money laundring and confirms that all transactions are undertaken in a fully transparent manner.

V.   The EuroGas Inc. shares owned by the Optionor and referred to in this option agreement will beheld in trust for the duration of this option agreement, but not later than December 15th, 1995 for the Optionor and the Optionee by Dr. Reinhard Rauball.

The Optionor and the Optionee hereby give their consent by signing below.

Any portion of EuroGas Inc. shares not purchased by the Optionee will be returned to the Optionor by not later than December 15th, 1995.

This agreement is executed on the ll.K:.9., 1995.

OXBRIDGE Ltd                              MCK Development B.V.

_____                         _____

opt-agre.doc

RS00204

RS ANC 00157

## SHAREHOLDERS RESOLUTION

**The undersigned:**

1. CLARON N.V., of Curaçao, the Netherlands Antilles,

2. OKIBI N.V., of Curaçao, the Netherlands Antilles,

3. Rolf Schlegel, of Ebmatingen, Switzerland

**whereas:**

- the undersigned are holders of the entire issued and outstanding share capital, consisting of in total 400 shares, each share having a nominal value of NLG 100.-- of MCK Development B.V., having its seat at Amsterdam, hereinafter to be referred to as the: "Company";

- no depositary receipts for shares in the Company have been issued with the Company's concurrence and there are no persons to whom the law attributes the right accruing to holders of depositary receipts issued with the Company's concurrence;

**in accordance with article 20 of the Articles of Incorporation of the Company it is hereby resolved:**

a. to grant approval to the intended transfer of 164 A shares and 164 B shares in the capital of McKenzie Methane Poland B.V., of Amsterdam, each share having a nominal value of NLG 100.--, by the Company to Energy Global AG, Städtle 7, 9490 Vaduz, Fürstentum Liechtenstein, as per attached Option and Share exchange agreement of March 7th, 1995, and to authorize the Company's sole Managing Director, Rolf Schlegel, to enter into the sale agreement and to have the notarial deed of share transfer executed and to do anything required for this share transfer;

RS00205

- 2 -

b.   to grant approval to the intended issue of 88 A shares and 88 B shares in the capital stock of McKenzie Meethane Poland B.V., to Energy Global AG as per attached option and share exchange agreement dated March 7th, 1995.

c.   to authorize the Company's sole Managing Director, Mr Rolf Schlegel, to sign the relevant shareholders resolution and to do anything required in connection with this share issue.

The transactions shall be consummated by the execution of the relevant notarial deeds, in front of a civil law notary of Caron & Stevens, of Amsterdam, after A. Ulrich and Rolf Schlegel have confirmed that the relevant shares are in MCK's ownership.

Finally, the undersigned conclude that after the aforementioned transactions, Energy Global AG, will be holder of 100% of the issued share capital of McKenzie Methane Poland B.V.

Signed in Zurich, September 7th, 1995

Rolf Schlegel


Signed at Curaçaco, Netherlands


CLARON N.V.


OKIBI N.V.

RS00206

RS-ANC 00159

18/09'95  11:24  ☎ 599 9 369301          LEEWARD TRUST                          P.02
                  SWISS OFFICE          LEEWARD TRUST       :    +41 +1 261 72 88;#11/16

## OPTION AGREEMENT

between

OKIBI N.V.                          (hereinafter referred to as "Optionor")
Kaya Flamboyan 3d
Curacao, Netherlands Antilles

                                    and

Oxbridge Ltd
Arthur House
50 A Portland Road
London SE25 4PO                     (hereinafter referred to as "Optionee")


I      Whereas the Optionor hereby represents that they own 315'740 shares of
       common stock of EUROGAS Inc., Salt Lake City, after a successful closing
       of the option and share exchange agreement of March 7th, 1995, between
       the Optionor and EUROGAS Inc.

II.    The Optionor hereby grants to the Optionee an option to purchase above
       position for US$473'610.00 (US Dollars fourhundred and seventythree
       thousand six hundred and ten) until December 15th, 1995. This option
       agreement is assignable.

       The purchase price for this option is $500.00 payable at the date of
       signature of this contract. This amount will be credited to the payment
       when the option is being exercised. The option can be exercised in full or in
       parts.

                                                                    RS00207

Payment terms:

III.   The payment to the Optionor is to be made to the account of MCK
       Development B.V. in trust for OKIBI N.V., 245.500.1001 US$, at
       BILFINANZ UND VERWALTUNG AG, Gladbachstrasse 105, CH-8044 Zürich

- 2 -

IV.  The Optionee confirms by signing this agreement, that the funds are not in contradiction to any national law of money laundring and confirms that all transactions are undertaken in a fully transparent manner.

V.  The EuroGas Inc. shares owned by the Optionor and referred to in this option agreement will be held in trust for the duration of this option agreement, but not later than December 15th, 1995 for the Optionor and the Optionee by Dr. Reinhard Rauball.

The Optionor and the Optionee hereby give their consent by signing below.

Any portion of EuroGas Inc. shares not purchased by the Optionee will be returned to the Optionor by not later than December 15th, 1995.

This agreement is executed on the                    , 1995.

OXBRIDGE Ltd                          OKIBI N.V.
                                      LEEWARD TRUST COMPANY N.V.

_____                       _____

RS00208

RS-ANC 00161

460

1      Q.    Was it an oral agreement?

2      A.    Sorry?

3      Q.    Was it an oral agreement or written

4   agreement?

5      A.    Written agreement for everyone

6   specifically.

7              MR TATE:   What about the preferred shares?

8              MR SMITH:   That's a good point too.   Let's

9   go off the record a second.

10                 (Discussion off the record)

11             MR SMITH:   All right.   Then let's turn to

12  what is RS195 through 208 and we will mark that one as

13  89.

14                              (Exhibit 89 was marked

15                               for identification)

16  BY MR SMITH:

17     Q.   I'm going to show you what has been marked

18  as Exhibit 89, Mr Schlegel, and ask if you can identify

19  that for me?

20     A.   Yes.   This is a letter to Leeward Trust

21  Company as regards the share and option exchange

22  agreement with Oxbridge.

23     Q.   OK.   And the option and share exchange

24  agreement is that which is third, fourth and fifth

25  page?

462

1    the resolution, right?

2            THE WITNESS:  Yes.

3    BY MR SMITH:

4        Q.   Then the next page over you have an option

5    agreement between MCK Development and Oxbridge signed

6    by you on 11th September 1995, correct?

7        A.   Yes.

8        Q.   Then two pages over from that you have at

9    page 205 the Shareholders' Resolution of MCK

10   Development?

11       A.   Yes.

12       Q.   That is for the -- that's dated

13   September 7, 1995, and is this to authorize you to

14   enter into  the sale option with Oxbridge

15       A.   Well, it says here what it is for.  It's --

16       Q.   To Energy Global.  OK.  Two pages over from

17   that is an option agreement between Oxbridge and Okibi?

18       A.   Yes.

19       Q.   And you have that signed by the authorized

20   representative of Leeward Trust?

21       A.   Yes.

22       Q.   And although it's not here, isn't it true

23   that you had a like option agreement signed by

24   Leeward Trust authorizing a like sale of Claron's

25   interest to Oxbridge?

463

1          A.    That is correct.

2               MR TATE:  Do you have that with you today,

3    the Claron -- the like document relating to Claron?

4               THE WITNESS:  I wouldn't know.  I have to

5    look.  It's exactly the same.

6               MR TATE:  I understand.  We need the

7    evidence for our record --

8               THE WITNESS:  Yes.  I will make a note,

9    Claron.

10              MR TATE:  Before we close.

11              THE WITNESS:  I think you should really

12   have everything here, do you?

13              MR SMITH:  I don't think so.  I went

14   through --

15              THE WITNESS:  These option agreements, one

16   just has to say that, in order to make them valid and

17   limit it, payments have to be made for MCK, as you can

18   see on number 1, $1,000, and for the others also a

19   payment of dollars that has never been made.  So we

20   have always taken the position that the sale has not

21   concluded.

22              MR TATE:  Oxbridge has never paid

23   consideration for the sale?

24              THE WITNESS:  Never.

25



# EuroGas Inc.

MAY 16, 1995

_FACSIMILE TRANSMISSION_

HOWARD S. LANDA, ESQ.
KRUSE, LANDA & MAYCOCK
8TH FLOOR BANK ONE TOWER
50 WEST BROADWAY
SALT LAKE CITY, UT 84101

DEAR HOWARD:

PURSUANT TO THE MERGER OF MMPBV AND EUROGAS, INC., PLEASE ISSUE THE FOLLOWING PREFERRED STOCK:

CLARON N.V.                                     1 x 509,952 SHARES
KAYA FLAMBOYAN 3D
CURAÇAO/NETH. ANTILLES

OKIBI N.V.                                      1 x 526,233 SHARES
KAYA FLAMBOYAN 3D
CURAÇAO/NETH. ANTILLES

SCHLEGEL ROLF                                   1 x 59,799 SHARES
LEBERNHÖHE 13
CH-8123 EBMATINGEN
SWITZERLAND

MCK DEVELOPMENT B.V.                            1 x 1,195,984 SHARES
HERENGRACHT 320
1016 CE AMSTERDAM
HOLLAND

I AM LEAVING FOR EUROPE ON THURSDAY MORNING AND WOULD LIKE TO TAKE THESE CERTIFICATES WITH ME.
PLEASE CALL JILL AS SOON AS THEY ARE COMPLETE, AND WE WILL MAKE ARRANGEMENTS TO PICK THEM UP.

THANK YOU FOR YOUR ASSISTANCE.

SINCERELY,

EUROGAS, INC.

MERLIN V. FISH
PRESIDENT

JSH

435 West Universal Circle, Sandy, Utah 84070,          Phone: ++1 801 255 08 62, Fax: ++1 801 255 20 05
European Division:
Energy Global AG, Kirchgasse 24, CH-8001 Zürich,       Phone: ++41  1 267 60 94, Fax: ++41  1 267 60 93

Escrow010857

This Certifies That

CLARON N.V.

is the owner of

SIX HUNDRED NINE THOUSAND NINE HUNDRED FIFTY-TWO (609,952) ———— Shares of the Capital Stock of

EUROGAS, INC.

1995 Series Preferred Stock

transferable only on the Books of the Corporation by the holder hereof in person or by duly authorized Attorney on surrender of this Certificate properly endorsed.

In Witness Whereof, the duly authorized officers of this Corporation have hereunto subscribed their names and caused the corporate Seal to be hereunto affixed at Salt Lake City, Utah

this _____ day of _____ May _____ A.D. 19 95

Jill S. Holt, Secretary

Verlin V. Fish, President

Shares $0.001 Each

EUROGAS, INC.

INCORPORATED UNDER THE LAWS OF

UTAH

ONE HUNDRED THOUSANDTHS

This Certifies that

Five Hundred Twenty-six Thousand Two Hundred Thirty-three (526,233) Shares of the Capital Stock of

OKIEH N.V.

EUROGAS, INC.

1995 Series Preferred Stock

No. 002

UTAH

526,233

EUROGAS, INC.

... is the owner of ...

transferable on the Books of the Corporation by the holder hereof in person or by attorney upon surrender of this Certificate properly endorsed.

In Witness Whereof, the duly authorized officers of this Corporation have hereunto subscribed their names and caused the Corporate Seal to be hereunto affixed at Salt Lake City, Utah this _____ day of MAY A.D. 1995

Jill S. Holt, Secretary

Merlin V. Fish, President

Shares 526,233 Each

**INCORPORATED UNDER THE LAWS OF**

**UTAH**

No. 003

Shares 59,799.

EUROGAS, INC.

1995 Series Preferred Stock

# This Certifies that

Fifty-Nine Thousand Seven Hundred Ninety-Nine (59,799)

SCHLEGEL ROLF

*is the owner of*

*Shares of the Capital Stock of*

EUROGAS, INC.

*transferable only on the Books of the Corporation by the holder hereof in person or by duly authorized Attorney on surrender of this Certificate properly endorsed.*

*In Witness Whereof the duly authorized officers of this Corporation have hereunto subscribed their names and caused the corporate seal to be hereunto affixed at Salt Lake City, Utah this ____ day of ____ A.D. 19__*

J111 S. Holt, Secretary

Merlin V. Fish, President

Shares $.01/001 Each





# EuroGas Inc.

Escrow100349

MAY 16, 1995

_FACSIMILE TRANSMISSION_

MR. KURT HUGHES
INTERWEST TRANSFER COMPANY
1981 EAST 4800 SOUTH, SUITE 100
SALT LAKE CITY, UT 84117

DEAR KURT:

PURSUANT TO THE MERGER OF MMPBV AND EUROGAS, INC., PLEASE ISSUE THE FOLLOWING COMMON STOCK WHICH IS REGISTERED UNDER REGULATION-S A COPY OF WHICH IS ATTACHED. AS A RESULT, NO LEGEND IS TO BE PLACED ON THE CERTIFICATES. MR. LANDA AND I WILL DELIVER A RESTRICTION LETTER UPON DELIVERY OF THE STOCK, FORBIDDING TRANSFER TO ANY US CITIZEN OR ENTITY PRIOR TO AUGUST 1, 1995   PLEASE BLOCK ANY REQUESTED TRANSFERS ACCORDINGLY:

CLARON N.V.                                    1 X 365,971 SHARES
KAYA FLAMBOYAN 3D
CURAÇAO/NETH. ANTILLES

OKIBI N.V.                                     1 X 315,740 SHARES
KAYA FLAMBOYAN 3D
CURAÇAO/NETH. ANTILLES

SCHLEGEL ROLF                                  1 X 35,880 SHARES
LEBERNHÖHE 13                                  1 X 192,600 SHARES
CH-8123 EBMATINGEN
SWITZERLAND

MCK DEVELOPMENT B.V.                           1 X 665,090 SHARES
HERENGRACHT 320                                1 X 52,500 SHARES
1016 CE AMSTERDAM
HOLLAND

OSTROY RESOURCES, LTD.                         1 X 625,779 SHARES
508-100 PARK ROYAL SOUTH
WEST VANCOUVER B.C.
CANADA  V7T1A2

435 West Universal Circle, Sandy, Utah 84070.
European Division:
Energy Global AG, Kirchgasse 24, CH-8001 Zürich.

Phone: ++1 801 255 08 62, Fax: ++1 801 255 20 05

Phone: ++41  1 267 60 94, Fax: ++41  1 267 60 93

I AM LEAVING FOR EUROPE ON THURSDAY MORNING AND WOULD LIKE TO TAKE THESE CERTIFICATES WITH ME. PLEASE CALL JILL AS SOON AS THEY ARE COMPLETE, AND WE WILL MAKE ARRANGEMENTS TO PICK THEM UP.

THANK YOU FOR YOUR ASSISTANCE.

                                SINCERELY,

                                EUROGAS, INC.

                                MERLIN V. FISH
                                PRESIDENT

JSH
ENCLOSURE

CC:   HOWARD S. LANDA, ESQ.

Escrow100350

## FACSIMILE COVER PAGE

| | | | |
|---|---|---|---|
| **To:** | **LINDA PIA** | **Time:** | **14:15:30** |
| **From :** | **EUROGAS, INC.** | **Date:** | **05/16/95** |
| S⋅⋅ ⋅ ⋅ct: | **WinFax Scan And Send** | | |
| ⌐  ⌐ (including cover): | **4** | | |

O:   LINDA PIA

ROM:  JILL HOLT

ATE:  MAY 16, 1995

Escrow100352

nda, these are for your information.  We have sent copies to Howard, but Merlin thinks you may need
ı remind Howard about what to do with the preferred stock since we need it by Thursday.

ake Care.

xxxxx

)

)

011146



NOT VALID UNLESS ~ ...ERSIGNED BY TRANSFER AGENT
INCORPORATED UNDER THE LAWS OF THE STATE OF UTAH

**NUMBER**

# EuroGas, Inc.

325,000,000 AUTHORIZED SHARES
PAR VALUE: $.001 PER SHARE

CUSIP NO. 298734 10 4

**SHARES**

THIS CERTIFIES THAT

CLARON N.V.

IS THE RECORD HOLDER OF

*THREE HUNDRED SIXTY FIVE THOUSAND NINE HUNDRED SEVENTY ONE*

EuroGas, Inc.

transferable on the books of the Corporation in person or by duly authorized attorney upon surrender of this Certificate properly endorsed. This Certificate is not valid until countersigned by the Transfer Agent and registered by the Registrar.

Witness the facsimile seal of the Corporation and the facsimile signatures of its duly authorized officers.

Dated:   MAY 17, 1995



SECRETARY





PRESIDENT





# EuroGas, Inc.

NOT VALID UNLESS SIGNED BY TRANSFER AGENT
INCORPORATED UNDER THE LAWS OF THE STATE OF UTAH



325,000,000 AUTHORIZED SHARES
PAR VALUE: $.001 PER SHARE

CUSIP NO. 298734 10 4





THIS CERTIFIES THAT

OKIBI N.V.

IS THE RECORD HOLDER OF

*THREE HUNDRED FIFTEEN THOUSAND SEVEN HUNDRED FORTY*

transferable on the books of the Corporation in person or by duly authorized attorney upon surrender of this Certificate properly endorsed. This Certificate is not valid until countersigned by the Transfer Agent and registered by the Registrar.

Witness the facsimile seal of the Corporation and the facsimile signatures of its duly authorized officers.

Dated:   **MAY 17, 1995**



EuroGas, Inc.

SECRETARY

PRESIDENT

Escrow012834





NOT VALID UNLESS .................RSIGNED BY TRANSFER AGENT
INCORPORATED UNDER THE LAWS OF THE STATE OF UTAH



NUMBER

# EuroGas, Inc.

325,000,000 AUTHORIZED SHARES
PAR VALUE: $.001 PER SHARE

CUSIP NO. 298734 10 4



STATUS

THIS CERTIFIES THAT

SCHLEGEL ROLF

IS THE RECORD HOLDER OF

*THIRTY FIVE THOUSAND EIGHT HUNDRED EIGHTY*

EuroGas, Inc.

transferable on the books of the Corporation in person or by duly authorized attorney upon surrender of this Certificate properly endorsed. This Certificate is not valid until countersigned by the Transfer Agent and registered by the Registrar.

Witness the facsimile seal of the Corporation and the facsimile signatures of its duly authorized officers.

Dated:  MAY 17, 1995



SECRETARY

PRESIDENT

Escrow1201



NOT VALID UNLESS C_____ .SIGNED BY TRANSFER AGENT
INCORPORATED UNDER THE LAWS OF THE STATE OF UTAH

# EuroGas, Inc.

325,000,000 AUTHORIZED SHARES
PAR VALUE: $.001 PER SHARE

CUSIP NO. 298734. 10 4

THIS CERTIFIES THAT

SCHLEGEL ROLF

IS THE RECORD HOLDER OF

*ONE HUNDRED NINETY TWO THOUSAND SIX HUNDRED*

EuroGas, Inc.

transferable on the books of the Corporation in person or by duly authorized attorney upon surrender of this Certificate
properly endorsed. This Certificate is not valid until countersigned by the Transfer Agent and registered by the Registrar.

Witness the facsimile seal of the Corporation and the facsimile signatures of its duly authorized officers.

Dated:   MAY 17, 1995



SECRETARY





PRESIDENT



NUMBER



# EuroGas, Inc.

325,000,000 AUTHORIZED SHARES
PAR VALUE: $.001 PER SHARE

NOT VALID UNLESS C_____SIGNED BY TRANSFER AGENT
INCORPORATED UNDER THE LAWS OF THE STATE OF UTAH

CUSIP NO. 298734 10 4

SHARES



THIS CERTIFIES THAT

MCK DEVELOPMENT B.V.

IS THE RECORD HOLDER OF

\*SIX HUNDRED SIXTY FIVE THOUSAND NINETY\*

*transferable on the books of the Corporation in person or by duly authorized attorney upon surrender of this Certificate properly endorsed. This Certificate is not valid until countersigned by the Transfer Agent and registered by the Registrar.*

*Witness the facsimile seal of the Corporation and the facsimile signatures of its duly authorized officers.*

Dated:   MAY 17, 1995

EuroGas, Inc.



SECRETARY



EuroGas, Inc.
CORPORATE
Seal
UTAH



PRESIDENT



# EuroGas, Inc.

NOT VALID UNLESS SIGNED BY TRANSFER AGENT
INCORPORATED UNDER THE LAWS OF THE STATE OF UTAH

325,000,000 AUTHORIZED SHARES
PAR VALUE: $.001 PER SHARE



CUSIP NO. 298734 10 4



THIS CERTIFIES THAT

MCK DEVELOPMENT B.V.

IS THE RECORD HOLDER OF

*FIFTY TWO THOUSAND FIVE HUNDRED*

EuroGas, Inc.

transferable on the books of the Corporation in person or by duly authorized attorney upon surrender of this Certificate properly endorsed. This Certificate is not valid until countersigned by the Transfer Agent and registered by the Registrar.

Witness the facsimile seal of the Corporation and the facsimile signatures of its duly authorized officers.

Dated: MAY 17, 1995



SECRETARY

PRESIDENT

Escrow012838

INTERWEST TRANSFER COMPANY
P.O. BOX 17136 SALT LAKE CITY, UTAH
84117
(801) 272-9294

**FILE COPY**

EUROGAS, INC.

CERTIFICATES ISSUED

```
4939 X 365,971 CLARON N.V. (ILS)
4940 X 315,740 OKIBI N.V. (ILS)
4941 X 35,880 ROLF (ILS)
4942 X 192,600 ROLF (ILS)
4943 X 665,090 ROLF (ILS)
4944 X 52,500 MCK DEVELOPMENT B.V. (ILS)
4945 X 25,779 MCK DEVELOPMENT B.V. (ILS)
4946 X 100,000 OSTROV RESOURCES, LTD. (ILS)
4947 X 100,000 OSTROV RESOURCES, LTD. (ILS)
4948 X 100,000 OSTROV RESOURCES, LTD. (ILS)
4949 X 100,000 OSTROV RESOURCES, LTD. (ILS)
```

TOTAL SHARES = 2,253,560

---

BROKER

EUROGAS, INC.
*WALK-IN*

RESOLUTION

CERTIFICATES SURRENDERED

(REG-S LEGEND)

TOTAL SHARES =

CERTIFICATE FEES = $130.00

DATE - MAY 17, 1995 DN420
NEW CERTIFICATES ISSUED = 13
CERTIFICATES SURRENDERED = 0

CHARGES

CERTIFICATE FEES = $130.00

TOTAL AMOUNT DUE = $130.00
PAYABLE UPON RECEIPT

Escrow026295

4950 X 100,000 OSTROV RESOURCES, LTD. (ILS)
4951 X 100,000 OSTROV RESOURCES, LTD. (ILS)

Escrow026296

Date: 5/16/95 Time: 14:06:07                                                    Page 2 of 3



# EuroGas Inc.

MAY 16, 1995

*FACSIMILE TRANSMISSION*

MR. KURT HUGHES
INTERWEST TRANSFER COMPANY
1981 EAST 4800 SOUTH, SUITE 100
SALT LAKE CITY, UT 84117

DEAR KURT:

PURSUANT TO THE MERGER OF MMPBV AND EUROGAS, INC., PLEASE ISSUE THE FOLLOWING COMMON STOCK WHICH IS REGISTERED UNDER REGULATION-S A COPY OF WHICH IS ATTACHED. AS A RESULT, NO LEGEND IS TO BE PLACED ON THE CERTIFICATES. MR. LANDA AND I WILL DELIVER A RESTRICTION LETTER UPON DELIVERY OF THE STOCK, FORBIDDING TRANSFER TO ANY US CITIZEN OR ENTITY PRIOR TO AUGUST 1, 1995. PLEASE BLOCK ANY REQUESTED TRANSFERS ACCORDINGLY:

| | |
|---|---|
| CLARON N.V.<br>KAYA FLAMBOYAN 3D<br>CURAÇAO/NETH. ANTILLES | 1 x 365,971 SHARES |
| OKIBI N.V.<br>KAYA FLAMBOYAN 3D<br>CURAÇAO/NETH. ANTILLES | 1 x 315,740 SHARES |
| SCHLEGEL ROLF<br>LEBERNHÖHE 13<br>CH-8123 EBMATINGEN<br>SWITZERLAND | 1 x 35,880 SHARES<br>1 x 192,600 SHARES |
| MCK DEVELOPMENT B.V.<br>HERENGRACHT 320<br>1016 CE AMSTERDAM<br>HOLLAND | 1 x 665,090 SHARES<br>1 x 52,500 SHARES |
| OSTROV RESOURCES, LTD.<br>508-100 PARK ROYAL SOUTH<br>WEST VANCOUVER B.C.<br>CANADA V7T1A2 | 1 x 625,779 SHARES |

see Break

RECEIVED
MAY 16 1995

435 West Universal Circle, Sandy, Utah 84070,
European Division:
Energy Global AG. Kirchgasse 24, CH-8001 Zürich,

Phone: ++1 801 255 08 62, Fax: ++1 801 255 20 05

Phone: ++41  1 267 60 94, Fax: ++41  1 267 60 93

Escrow026297

I AM LEAVING FOR EUROPE ON THURSDAY MORNING AND WOULD LIKE TO TAKE THESE
CERTIFICATES WITH ME. PLEASE CALL JILL AS SOON AS THEY ARE COMPLETE, AND WE WILL
MAKE ARRANGEMENTS TO PICK THEM UP.

THANK YOU FOR YOUR ASSISTANCE.

                                    SINCERELY,

                                    EUROGAS, INC.

                                    MERLIN V. FISH
                                    PRESIDENT

JSH
ENCLOSURE

CC:    HOWARD S. LANDA, ESQ.

Escrow026298



# EUROGAS INC.

MAY 16, 1995

### _FACSIMILE TRANSMISSION_

MR. KURT HUGHES
INTERWEST TRANSFER COMPANY
1981 EAST 4800 SOUTH, SUITE 100
SALT LAKE CITY, UT 84117

DEAR KURT:

I HAVE ONE CORRECTION ON HOW THE OSTROV RESOURCES, LTD. REGULATION-S COMMON
STOCK SHOULD BE ISSUED.  PLEASE ISSUE AS FOLLOWS RATHER THAN AS MY PREVIOUS
INSTRUCTIONS INDICATED:

OSTROV RESOURCES, LTD.                          1 x 25,779 SHARES
508-100 PARK ROYAL SOUTH                         6 x 100,000 SHARES
WEST VANCOUVER B.C.
CANADA V7T 1A2

THANK YOU FOR YOUR HELP.

                                    SINCERELY,

                                    EUROGAS, INC.

                                    MERLIN V. FISH
                                    PRESIDENT

JSH

Escrow026299

BROKER

EUROGAS
435 WEST UNIVERSAL CIRCLE
SANDY, UT 84070

CERTIFICATES SURRENDERED

RESOLUTION
REG-S

TOTAL SHARES =

DATE - MAY 31, 1996 LS292
NEW CERTIFICATES ISSUED = 1
CERTIFICATES SURRENDERED = 0

CHARGES

CERTIFICATE FEES = $15.00

=

=

TOTAL AMOUNT DUE = $15.00
PAYABLE UPON RECEIPT

INTERWEST TRANSFER COMPANY
P.O. BOX 17136 SALT LAKE CITY, UTAH
84117
(801)272-9294

EUROGAS, INC.

CERTIFICATES ISSUED

5610 x 10,000 MCK DEVELOPMENT (IIS)

TOTAL SHARES = 10,000

FILE COPY

Escrow010458

# EUROGAS, INC.

**435 West Universal Circle**
**Sandy, Utah 84070**

May 30, 1996

Mr. Kurt Hughes
Interwest Transfer Company
1981 East 4800 South, Suite 100
Salt Lake City, Utah 84117

*FACSIMILE TRANSMISSION*
*277-3147*

Re:　EuroGas, Inc.

Dear Kurt:

Enclosed is a certified resolution authorizing the issuance of 10,000 shares of common stock to MCK Development. In the Reg S offering last year, we failed to issue the appropriate shares. Please prepare the certificate so that I may pick it up in the morning as I am leaving for Zurich on Sunday.

Sincerely,

EUROGAS, INC.

Hank Blankenstein, Secretary

8332/292

### CERTIFIED RESOLUTION
### of
### EUROGAS, INC.

The undersigned. Hank Blankenstein, Secretary of EuroGas, Inc. (the "Company") hereby certifies that the Board of Directors of the Company adopted the resolutions set forth below on May 30 , 1996, and that the resolution remains in full force and effect.

RESOLVED, that the Company issue 10,000 shares of its common stock to MCK Development.

Dated this 30 day of May , 1996.

EUROGAS, INC.

_Hank Blankenstein_

Hank Blankenstein, Secretary

RECEIVED
MAY 3 1 1996

Escrow010460

1   I have submitted.

2        Q.   Does that documentation include the sale or

3   the exchange of Jeffrey's interest in MMP BV for

4   Eurogas, Inc stock?

5        A.   Yes.

6        Q.   All right.  Are you aware -- back to my

7   question then -- was -- did MCK Development BV receive

8   any Eurogas stock in exchange for its interest in

9   MMP BV?

10       A.   In paper, yes, but not physically.

11       Q.   I understand.  But it was to have received

12  a certain number of shares?

13       A.   Yes, documentation.

14       Q.   Would that be true also of Claron?

15       A.   Yes.

16       Q.   Would that be true also of Okibi?

17       A.   Yes.

18       Q.   OK.  Now again --

19            MR MACDONALD:  The difficulty he is having

20  is, he has got a large -- I mean remember we are going

21  across two languages, and, although his English is

22  pretty good --

23            MR SMITH:  I understand.

24            THE WITNESS:  You are going from Europe to

25  Asia and everywhere and basically all the details are

# KRUSE, LANDA & MAYCOCK, L.L.C.

HOWARD S. LANDA

EIGHTH FLOOR, BANK ONE TOWER
50 WEST BROADWAY (300 SOUTH)
SALT LAKE CITY, UTAH 84101-2034

TELEPHONE (801) 531-7090
TELECOPY (801) 359-3954

March 11, 1996

*VIA FACSIMILE TRANSMISSION*

Hank Blankenstein                                                                      *255-2005*
EuroGas, Inc.
435 West Universal Circle
Sandy, Utah 84070

          Re:     EuroGas, Inc.

Dear Hank:

          You have informed me that the auditors for EuroGas have discovered that the acquisition of the remaining interest in MMPBV did not legally occur until October 4, 1995 and that such may be reason not to include the audited figures of MMPBV in the annual report on form 10-K SB for the period ended September 30, 1995. As I stated to you, under the circumstances of development stage company, I think you can take that position, even though EuroGas did announce that it had completed the acquisition prior to the end of the year and, in fact, did have control of MMPBV. The position is weak and in consistent with the prior announcements. It is also my understanding that you are going to proceed on the basis, despite the weaknesses and the argument.

          As I stated, I think if challenged you will likely not prevail and will have to provide the additional audit material. It would help substantially if we could get the audit and pro forma filed on form 8-K for the period ended December 31, 1994 relating to MMPBV and EuroGas.

                              Regards,

                              KRUSE, LANDA & MAYCOCK, L.L.C.

                              /s/ Howard S. Landa

                              Howard S. Landa

HSL:ldp

Escrow080732

**MCK Development B.V.**
*Herengracht 320*
*1016 CE Amsterdam*

EINSCHREIBEN
Verwaltungsrat
Energy Global AG
Städtle 7

FL-9490 Vaduz

11.12.1995

EXHIBIT
119
April 20, 2001

*Aktien Eurogas, Inc.*

Sehr geehrte Herren

Am 7. März 1995 wurde mit dem Option and Share Exchange Agreement vereinbart, dass mit Uebergabe aller Anteile der Aktien, welche MCK Development B.V. an Globegas B.V. (früher McKenzie Methane Poland B.V.) hielt, folgende Aktien von Eurogas, Inc., übergeben werden:

| No. 4944 | 52'500 | shares |
| No. 4943 | 655'090 | shares |
| No. 4942 | 192'600 | shares |
| No. 4941 | 35'880 | shares |
| No. 4940 | 315'740 | shares |
| No. 4939 | 365'971 | shares |



R.S. schon erhalten.

1995 series preferred stock
| No. 001 | 609'952 | shares |
| No. 002 | 526'233 | shares |
| No. 003 | 59'799 | shares |
| No. 004 | 1'195'984 | shares |

Diese Aktien wurden der Gesellschaft am Closing, 4. Oktober 1995 in Amsterdam, nicht übergeben, wurden jedoch treuhänderisch von Herrn Rechtsanwalt Dr. Reinhard Rauball in Dortmund gemäss beiliegendem Schreiben von Energy Global vom 2.6.1995 gehalten.

EXHIBIT 68

RS00224

Trotz wiederholter Aufforderung unsererseits unter anderem mit Herrn A. Ulrich und Herrn W. Rauball wurden uns diese Aktien bis heute nicht übergeben. Zwar wurden in der ersten Hälfte September Optionsverträge mit einer Firma Oxbridge Ltd. von MCK Development B.V. unterzeichnet, diese wurden aber nie durch Unterschrift von Oxbridge Ltd. bestätigt oder durch Bezahlung der Optionsprämie akzeptiert bzw. validiert. Die Verträge sind deshalb nicht zustande gekommen. Diese Aktien sind Eigentum der MCK Development B.V.

Wegen Druck der Verwaltung und Behörden in Holland sind wir gezwungen, diese Aktien jetzt ohne weiteren Verzug einzufordern. Wir haben mit viel Geduld in wiederholten Telefongesprächen Herrn A. Ulrich und Herrn W. Rauball gebeten, die Aktien zu übergeben. Leider sind wir immer noch ohne diese Aktien.

Ein weiteres Abwarten würde nicht nur für MCK Development B.V. katastrophale Folgen haben sondern auch für Energy Global AG, und ich bitte Sie als Verwaltungsrat, dafür besorgt zu sein, dass diese Aktien bis zum 15.12.1995 übergeben werden.

Dankeschön für Ihre Unterstützung.

Mit freundlichen Grüssen

Rolf Schlegel
Managing Director
MCK Development B.V.

Beilage:
- Brief Energy Global AG vom 2. Juni 1995
- Option and Share Exchange Agreement vom 7. März 1995

RS00225

**MCK Development B.V.**
Herengracht 320
1016 CE Amsterdam

REGISTERED LETTER
Board of Directors
Energy Global AG
Städtle 7

FL-9490m Vaduz

12/11/1995

*Eurogas Inc. shares*

Dear Sir or Madam,

With the option and share exchange agreement dated March 7, 1995, it was agreed that the
Eurogas Inc. shares listed below will be transferred with the transfer of all Globegas B.V.
shares (previously called McKenzie Methane Poland) held by MCK Development B.V.:

| No. 4944 | 52,500 shares | |
| No. 4943 | 655,090 shares | |
| No. 4942 | 192,600 shares | _____ Already received by R.S. |
| No. 4940 | 35,880 shares | |
| No. 4939 | 365,971 shares | |

1995 series preferred stock
| No. 001 | 609,952 shares |
| No. 002 | 526,233 shares |
| No. 003 | 59,799 shares |
| No. 004 | 1,195,984 shares |

These shares were not transferred to the company during the closing on October 4, 1995 in
Amsterdam, but were given to attorney at law Dr. Reinhard Rauball as trustee in Dortmund
according to the enclosed letter of 06/02/1995 from Energy Global.

RS00226

RS-ANC  00262

Despite our repeated requests addressed to Mr. A. Ulrich and Mr. W. Rauball, among others, these shares have not been transferred to us to-date. Although option agreements were signed by MCK Development B.V. during the first half of September, they with a firm called Oxbridge were never confirmed with a signature by Oxbridge Ltd. or accepted or validated with a paying of the option premium. These shares are the property of MCK Development B.V.

Because management and the authorities here in Holland are putting pressure on us, we are forced to immediately request these shares. We have by way of much patience and phone conversations with Mr. A. Ulrich and Mr. W. Rauball asked for a transfer of the shares. We are unfortunately still without these shares.

A further delay would have catastrophic consequences not only for MCK Development B.V., but also for Energy Global AG and I thus ask you as a member of the governing board to ensure that these shares have been transferred by 12/15/1995.

Many thanks for your support.

<div align="center">

With best regards,
/Signed/
Rolf Schlegel
Managing Director
MCK Development B.V.

</div>

Enclosures:

- Letter of June 2, 1995 from Energy Global AG
- Option and share exchange agreement dated March 7, 1995

RS00227

RS-ANC 00263

MCK Development B.V.
Herengracht 320
1016 CE Amsterdam



REGISTERED LETTER
Board of Directors
Energy Global AG
Städtle 7

FL-9490m Vaduz

12/11/1995

*Eurogas Inc. shares*

Dear Sir or Madam,                                  *handed over*

With the option and share exchange agreement dated March 7, 1995, it was agreed that the Eurogas Inc. shares listed below will be transferred with the transfer of all Globegas B.V. shares (previously called McKenzie Methane Poland) held by MCK Development B.V.:

| No. 4944 | 52,500 shares |
|----------|---------------|
| No. 4943 | 655,090 shares |
| No. 4942 | 192,600 shares |
| No. 4940 | 35,880 shares |
| No. 4939 | 365,971 shares |

_____  Already received by R.S.

1995 series preferred stock

| No. 001 | 609,952 shares |
|---------|----------------|
| No. 002 | 526,233 shares |
| No. 003 | 59,799 shares |
| No. 004 | 1,195,984 shares |

*held*

*handed over*

These shares were not transferred to the company during the closing on October 4, 1995 in Amsterdam, but were given to attorney at law Dr. Reinhard Rauball as trustee in Dortmund according to the enclosed letter of 06/02/1995 from Energy Global.

RS00226

RS-ANC  00262

*handed*

Despite our repeated requests addressed to Mr. A. Ulrich and Mr. W. Rauball, among others, these shares have not been transferred to us to-date. Although option agreements were signed by MCK Development B.V. during the first half of September, they with a firm called Oxbridge were never confirmed with a signature by Oxbridge Ltd. or accepted or validated with a paying of the option premium. These shares are the property of MCK Development B.V.

Because management and the authorities here in Holland are putting pressure on us, we are forced to immediately request these shares. We have by way of much patience and phone conversations with Mr. A. Ulrich and Mr. W. Rauball asked for a transfer of the shares. We are unfortunately still without these shares.

A further delay would have catastrophic consequences not only for MCK Development B.V., but also for Energy Global AG and I thus ask you as a member of the governing board to ensure that these shares have been transferred by 12/15/1995.

Many thanks for your support.

With best regards,
/Signed/
Rolf Schlegel
Managing Director
MCK Development B.V.

Enclosures:

- Letter of June 2, 1995 from Energy Global AG
- Option and share exchange agreement dated March 7, 1995

RS00227

RS-ANC 00263

554

discussions we had early this morning, those two.

    Q.   Right.  And then it says: "Accordingly, the letter sent to you on December 11, 1995 is no longer needed and is of no significance."  I'm sure it was 226.  Where's yesterday's exhibit?  Do you know what exhibit that was late yesterday?  (Document shown)

    A.   Yes.  You wanted that now?

        MR SMITH:  We can do that now.

        (Discussion off the record)

        MR SMITH:  It's from 224 to 227.

        MR WEISBART:  Do we have it marked?

        MR MACDONALD:  I don't think it has been marked.

                (Exhibit 119 was marked

                for identification)

BY MR SMITH:

    Q.   It will be Exhibit 119, and ask you if you can identify the first two pages of that?

    A.   This was a letter that was sent on 11th December 1995 from MCK Development to the Board of Directors of Energy Global.

    Q.   Is that bearing your signature?

    A.   I signed this.

    Q.   And is the third and fourth page, are they correct translations of the first and second page of

the exhibit?

    A.   No.

    Q.   Would you tell me what corrections would have to be made to make it a correct translation?

    MR TATE:  Mr Smith, could I suggest that you permit him to simply make the changes on those two pages on the exhibit?

    MR SMITH:  That's quite a good idea. That's a great idea.

    MR TATE:  On pages two-twenty --

BY MR SMITH:

    Q.   Unless they're -- are they significant changes?

    A.   Except on page 2 there are quite a few.

    MR TATE:  Oh, there are?  OK.

    THE WITNESS:  Unfortunately.

    MR SMITH:  All right.

    MR TATE:  Well, it would probably help.  Is the translation so bad that you can't correct it by interlineating or --

BY MR SMITH:

    Q.   It looks like you did there.  Do you want to go ahead and do that on the exhibit?

    A.   I will have to do it later then, yes. I can do that, yes.

556

1              MR TATE:  OK.

2    BY MR SMITH:

3         Q.   Well, is there any change on the first page

4    of that?

5              MR MACDONALD:  Could I just suggest that,

6    since he has done it in hand, that you make that A?

7              MR TATE:  That's good.

8              MR SMITH:  That's fine.  That's a good

9    idea.

10             THE WITNESS:  Yes.

11             MR MACDONALD:  It's easier than having --

12             MR TATE:  If he has done it already.  That

13   is what I was suggesting --

14             MR SMITH:  OK.

15             MR TATE:  -- but he has done it already.

16             MR SMITH:  May I have your revisions?

17   Let's do this one as --

18             MR MACDONALD:  119A.

19             MR SMITH:  119A.

20                            (Exhibit 119A was marked

21                             for identification)

22   BY MR SMITH:

23        Q.   I'm going to show you what has been marked

24   as 119A, and am I correct that this represents in your

25   hand the interline corrections to the translation of

557

1   119?

2          A.   Yes.

3          Q.   OK.   Now, still the last paragraph on that

4   page, page 1 of the translation, reads now: "These

5   shares were not handed over to the company during the

6   closing on October 4, 1995 in Amsterdam, but were

7   given --"

8          A.   But were held.

9          Q.   "-- but were held by attorney at law

10  Dr. Reinhard Rauball as trustee in Dortmund according

11  to the enclosed letter of 06/02/1995 from

12  Energy Global."  Did I read that correctly?

13         A.   That's correct.

14         Q.   OK.   The shares that are being referred to,

15  are those identified as the common and preferred shares

16  of Eurogas higher up in the letter?

17         A.   That is correct.

18         Q.   And that would be all of the shares of

19  Eurogas, common and preferred, given to MCK Development

20  BV, Claron, Okibi and you in exchange for the interest

21  in MMP BV?

22         A.   Correct.

23         Q.   And the reference to "not transferred to

24  the company", the company here is MCK Development?

25         A.   That is correct.

Oxbridge Ltd
Arthur House
50 A Portland Road
London. SE25 4PG

π Mike McKannis –
instructions to Management
of MCLL for sale of
Company



**EXHIBIT**
**94**
April 20, 2001

# POWER OF ATTORNEY

The undersigned:

OKIBI

~~CELOP N.V.~~, a limited liability company organized and existing under the laws of the Netherlands Antilles, having its registered and business offices at 3D Kaya Flamboyan, Curaçao, hereinafter referred to as ~~CELOP~~ OKIBI

whereas:

MCK DEVELOPMENT, B.V.

- The relevant parties have entered into an Agreement with regard to shares in the capital stock of ~~FEE FAR EASTERN ENERGY CORPORATION B.V.~~
- Pursuant to the Agreement:

   1. In total ~~160~~ shares, in the capital stock of ~~FEE FAR EASTERN~~ ~~ENERGY~~ ~~CORPORATION B.V.~~ shall be transferred from ~~CELOP N.V.~~ to ~~SEBASTOPOL CORPORATION N.V.~~, a limited liability company organised and existing under the laws of ~~India~~, having its registered and business offices at ~~Curaçao~~.

OXBRIDGE (T)

All transactions contemplated by the Agreement, have been specified, approved and resolved in a shareholders resolution, signed on the 29th of November nineteenhundred ninety five (hereinafter referred to as the Shareholders Resolution);

declares to give power of attorney to:

each of the deputy civil law notary's of ~~Gabou & Stevens~~, in Amsterdam

on behalf of the undersigned:

   1. to do anything which the attorney deems necessary in connection with the above mentioned transactions, including but not limited to the execution of all necessary deeds and documents, all this with the power of substitution.

The attorney is expressly authorized to act in conformity with the instructions of Invico Capital Corporation AG, as set forth in the Escrow Agreement.

Place, date, 29th November 1995

CELOP N.V.

)name of signatory(ies):

Title:

10/11'95  18:57  ☎ 5'  9 369101      LEEWARD TRUST                    P.02

# POWER OF ATTORNEY

The undersigned:

~~CELOP N.V.~~ *CLARON* a limited liability company organized and existing under the laws of the Netherlands Antilles, having its registered and business offices at 3D Kaya Flamboyan, Curaçao, hereinafter referred to as ~~CELOP~~ *CLARON*

whereas:

- The relevant parties have entered into an Agreement with regard to shares in the capital stock of ~~FEE FAR EASTERN ENERGY CORPORATION B.V.~~ *MCK DEVELOPMENT*
- Pursuant to the Agreement:

1. in total ~~200~~ *204* shares, in the capital stock of ~~FEE FAR EASTERN ENERGY CORPORATION B.V.~~ *MCK* shall be transferred from ~~CELOP N.V.~~ *CLARON* to ~~ICF AGRO INDUSTRIES LIMITED~~ *OXBRIDGE LTD*, a limited liability company organised and existing under the laws of ~~India~~ *Great Britain*, having ~~its registered and business offices at Calcutta.~~ *as address*

All transactions contemplated by the Agreement, have been specified, approved and resolved in a shareholders resolution, signed on the ~~29th~~ of November nineteenhundred ninety five (*CLARON*) (hereinafter referred to as the Shareholders Resolution); *Deciuele*

declares to give power of attorney to:

each of the deputy civil law notary's of ~~Caron & Stevens,~~ in Amsterdam

on behalf of the undersigned:

1. to do anything which the attorney deems necessary in connection with the above mentioned transactions, including but not limited to the execution of all necessary deeds and documents, all this with the power of substitution.

The attorney is expressly authorized to act in conformity with the instructions of Invico Capital Corporation AG, as set forth in the Escrow Agreement.

Place, date .....29th November 1995....

**CELOP N.V.**

line of signatory(ies):

Title:

LEEWARD TRUST

30/11'95  18:59  ☎ 599   69101
15-11-95 13:33   ;SWISS OFFICE                    +41 +1 281 72 88;# 5/ 5

- 2 -

**In accordance with article 34 of the Articles of Incorporation of the Company it is hereby resolved:**

a)     to grant approval - in the meaning of article 14 of the Company's Articles of Incorporation - to the transfer of 200 shares in the Company, by CELOP N.V. to IFB AGRO INDUSTRIES LIMITED for a price of US$ 18'000.00 (eighteenthousand USDollars).

b)     to transfer 160 shares in the Company's capital stock by CELOP N.V. to SEBASTOPOL CORPORATION N.V. on the condition that SEBASTOPOL CORPORATION N.V. will pay in total US$ 14'000 (fourteenthousand USDollars). The transfer will be made as payments arrive.

Furthermore it is resolved that the FEE FAR EASTERN ENERGY CORPORATION B.V. will be accepting a 5 year loan from SEBASTOPOL CORPORATION N.V. US$450'000.00 at an interest rate of 6,5% whereby the interest is either paid on a yearly basis or capitalized.

The share-transactions shall be consumated by the execution of the relevant notarial deeds, in front of a civil law notary of Caron & Stevens, of Amsterdam, after INVICO CAPITAL CORPORATION AG has indicated by fax what funds are in place.

Finally, the undersigned conclude that after the aforementioned transactions, IFB AGRO INDUSTRIES LIMITED will be holder of 50% of the issued share capital of FEE FAR EASTERN ENERGY CORPORATION B.V. and SEBASTOPOL CORPORATION N.V. shall be holder of 40% of the issued share capital of FEE FAR EASTERN ENERGY CORPORATION B.V.

Place, date,                    28th November 95

CELOP N.V.                                    INVICO CAPITAL CORPORATION AG

by:

title:

v-street.doc

(1) 20 shares      by   Rolf Schlegel

for price US# 200,000-

The transfer will be made as payment service.

(2)  178 Shares        by    OKIBI NV

for rate   US 1,800,000-

(3)  200 Shares      by   CLARUN

for rate US# 1,000,000 —

# SHAREHOLDERS RESOLUTION

The undersigned:

1.    GELOP N.V., 3 D Kaya Flamboyan, Curaçao, Netherlands Antilles

2.    INVICO CAPITAL CORPORATION AG, Kirchgasse 24, P.O.Box 4754, 8022 Zurich, Switzerland

whereas:

-    the undersigned are holders of the entire issued and outstanding share capital, consisting of in total 400 shares, each share having a nominal value of NLG 100.— of FEE FAR EASTERN ENERGY CORPORATION B.V., having its seat in Amsterdam, hereinafter to be referred to as the: "Company".

-    no depositary receipts for shares in the Company have been issued with the Company's concurrence and there are no persons to whom the law attributes the right accruing to holders of depositary receipts issued with the Company's concurrence.

I   N   V  I   C   O

EXHIBIT
IO3
April 20, 2001

INVICO
CAPITAL CORPORATION AG

Kirchgasse 24
Postfach 4754
CH-8022 Zürich

Telefon 0041-1-261 72 11
Telefax 0041-1-261 72 88

Zürich, 13. Februar 1996
SR/psc

**TELEFAX   056/668'22'51**

An:        Herrn Armando Ulrich

Von:       Rolf Schlegel

Referenz:  MCK Development B.V. - Kaufvertrags-Entwurf

Anzahl Seiten inkl. Deckblatt:   -11-

---

Lieber Armando

Ich lasse Dir noch den Entwurf des Kaufvertrages betreffend MCK Development B.V. zukommen. Sobald Herr Dietmanns o.K. da ist, werden die Aktionäre Caron & Stevens mit Vollmacht für den Abschluss beauftragen.

Bitte übermittle diese Information doch Herrn Dietmann. Ebenfalls wird der Wechsel von US$ 200'000.-- auf 28.03.1996 ausgestellt und ihm zugestellt.

Mit freundlichen Grüssen

Rolf Schlegel

INVICO CAPITAL CORPORATION AG

## SENDEBESTATIGUNG

| | | | | |
|---|---|---|---|---|
| DATUM/ZEIT | | | 13- 2-96 16:45 | |
| EIGENKENNUNG | | | +41 +1 261 72 88 | |
| EIGENNAME | | | | |
| FIRMENNAME | | | SWISS OFFICE | |

## GELESENE SEITEN
### 11

| IR | FILE | GEGENSTELLE | STARTZEIT | DAUER | # | KOMMENTAT | ERGEBNIS |
|----|------|-------------|-----------|-------|---|-----------|----------|
| 1 | 215 | A. ULRICH | 2-13  16:38 | 7' 10" | 11 | | OK |

## DIESE VORLAGE WURDE BESTATIGT.
## VERKL. UNTEN – SIEHE DETAILS IM INFOFELD

### A4

INVICO
CAPITAL CORPORATION AG

Kirchgasse 24
Postfach 4734
CH-8022 Zürich

Telefon 0041-1-261 72 11
Telefax 0041-1-261 72 88

Zürich, 13. Februar 1996
SR/psc

**TELEFAX** ·056/668·22'51

An:      Herrn Armando Ulrich

Von:     Rolf Schlegel

Referenz:   MCK Development B.V. - Kaufvertrags-Entwurf

Anzahl Seiten inkl. Deckblatt:   -11-

Lieber Armando

Ich lasse Dir noch den Entwurf des Kaufvertrages betreffend MCK Development
B.V. zukommen. Sobald Herr Dietmanns o.K. da ist, werden die Aktionäre Ceron
& Stevens mit Vollmacht für den Abschluss beauftragen.

Bitte übermittle diese Information doch Herrn Dietmann. Ebenfalls wird der
Wechsel von US$ 200'000.-- auf 28.03.1996 ausgestellt und ihm zugestellt.

Mit freundlichen Grüssen

Rolf Schlegel

INVICO CAPITAL CORPORATION AG

XEROX   3010



page 1

## SHARE PURCHASE AGREEMENT

The undersigned,

1.   **OKIBI N.V.**, a public limited liability company organized and existing under the laws of the Netherlands Antilles, having its corporate seat at Curaçao and its registered office at 3D Kaya Flamboyan, Curaçao, hereinafter to be referred to as "Seller I";

2.   **CLARON N.V.**, a public limited liability company organized and existing under the laws of the Netherlands Antilles, having its corporate seat at Curaçao and its registered office at 3D Kaya Flamboyan, Curaçao, hereinafter to be referred to as "Seller II";

3.   **MR ROLF SCHLEGEL**, a private individual, residing at Lebernhöhe 13, 8123 Ebmatingen, Switzerland, hereinafter to be referred to as "Seller III";

4.   **MCK DEVELOPMENT B.V.**, a limited liability company organized and existing under the laws of The Netherlands, having its registered office at Amsterdam, Herengracht 320, Amsterdam, The Netherlands, hereinafter referred to as the "Company"; and

5.   **OXBRIDGE LIMITED**, a company organized and existing under the laws of St. Vincent and the Grenadines, West Indies, with its corporate seat in Kingstown and its registered office address at Kingstown, St. Vincent, West Indies, hereinafter to be referred to as the "Purchaser",

hereinafter collectively referred to as the "Parties",

*Preliminary draft share purchase agreement*
*02/PDW/February 5, 1996/12.00 AM*
*for internal discussion purposes only*

**WHEREAS:**

(a)     Seller I, Seller II and Seller III (hereinafter collectively referred to as "Sellers") are the owners of the entire issued and outstanding capital in the Company;

(b)     by notarial deed dated March 10, 1995 Seller I and Seller II pledged their respective shares in the capital of the Company to Mr Rolf Schlegel as a security for any sum which Mr Rolf Schlegel may claim from Seller I, Seller II and/or the Company under a Trust Agreement dated February 13, 1995, entered into by the parties to said pledge, hereinafter referred to as the "Pledge";

(c)     on December 14, 1995 the Sellers agreed to sell and transfer all the shares in the Company to the Purchaser, which agreed to purchase and acquire said shares from Sellers; and

(d)     Sellers now wish to sell and transfer the shares and the Purchaser wishes to purchase and acquire the shares on the terms and conditions specified in this Agreement.

**HAVE DECLARED AND AGREED AS FOLLOWS:**

**ARTICLE 1 - Definitions**

Unless explicitly stated otherwise, the following definitions as used in the Agreement shall have the following meaning:

Agreement        :          this share purchase agreement with all Exhibits thereto;

*Preliminary draft share purchase agreement*
*02/PDW/February 5, 1996/12.00 AM*
*for internal discussion purposes only*

| | | |
|---|---|---|
| Closing Date | : | the date and time on which Sellers and Purchaser will sign this Agreement and consummate all transactions as contemplated by this Agreement; |
| Option and Share Exchange Agreement: | | Option and share exchange agreement between Euro-gas Inc. and the Company, dated March 7, 1995, attached to this agreement as Exhibit I; |
| Shares | : | the entire issued and outstanding share capital of the Company consisting of 400 registered shares, numbered 1 up to and including 400, each having a nominal value of NLG 100,--  (one hundred Dutch guilders); and |
| Trust Agreement | : | Trust Agreement between Claron N.V., Okibi N.V. and Mr. Rolf Schlegel, dated February 13, 1995, attached to this Agreement as Exhibit II. |

## ARTICLE 2 - Sale and transfer of shares

2.1.     At the Closing Date, Seller I shall sell and transfer to the Purchaser, and the Purchaser shall purchase and acquire, title to 176 (one hundred and seventy-six) fully paid shares of the Company, free of pledge, hereinafter referred to as the "Seller I-Shares", numbered 205 up to and including 380, each share having a nominal value of NLG 100 (one hundred Dutch guilders).

*Preliminary draft share purchase agreement*
*02/PDWIFebruary 5, 1996/12.00 AM*
*for internal discussion purposes only*

page 4

2.2. At the Closing Date Seller II shall sell and transfer to the Purchaser, and the Purchaser shall purchase and acquire, title to 204 (two hundred and four) fully paid shares of the Company, free of pledge, hereinafter referred to as the "Seller II-Shares", numbered 1 up to and including 204, each share having a nominal value of NLG 100 (one hundred Dutch guilders).

2.3. At the Closing Date Seller III shall sell and transfer to the Purchaser, and the Purchaser shall purchase and acquire title to 20 (twenty) fully paid shares of the Company, hereinafter referred to as the "Seller III-Shares", numbered 381 up to and including 400, each share having a nominal value of NLG 100 (one hundred Dutch guilders).

## ARTICLE 3 - Purchase Price

3.1 The purchase price amounts to USD 2,200,000.-- (the "Purchase Price") which Purchase Price shall be paid and settled on the Closing Date as follows:

(a) Seller I shall receive from Purchaser a Promissory Note, signed in its favour, for an amount of USD 1,000,000.-- (one million U.S. dollars), a copy of which is attached to this Agreement as Exhibit IV.

(b) Seller II shall receive from Purchaser a Promissory Note, signed in its favour, for an amount of USD 1,000,000.-- (one million U.S. dollars), a copy of which is attached to this Agreement as Exhibit V.

(c) Seller III shall receive from Purchaser a Promissory Note, signed in its favour, for an amount of USD 200,000.-- (two hundred thousand U.S. dollars), a copy of which is attached to this Agreement as Exhibit VI.

*Preliminary draft share purchase agreement*
*02/PDWI/February 5, 1996/12.00 AM*
*for internal discussion purposes only*

## ARTICLE 4 - Actions on the Closing Date

4.1     The following actions shall take place on the Closing Date at the offices of Caron & Stevens at Leidseplein 29, Amsterdam at 10.00 AM:

    (a)     The parties shall sign and execute this Agreement.

    (b)     Simultaneously with the signing of this Agreement Sellers shall transfer the Shares to the Purchaser by means of a Deed of Transfer of Shares to be passed before one of the notaries at Caron & Stevens, a form of which has been attached to this Agreement as Exhibit II (hereinafter: the "Deed of Transfer").

    (c)     In the Deed of Transfer Seller III shall relinquish his right of Pledge ("afstand doen") on the Seller I- Shares on the Seller II-Shares, and Seller I and Seller II shall accept such relinquishment by Seller III;

    (d)     In the Deed of Transfer Mr Rolf Schlegel shall be dismissed as managing director of the Company and shall be fully discharged for his management of the Company prior and up to the Closing Date by the Purchaser in its newly acquired capacity as sole shareholder of the Company;

    (e)     In the Deed of Transfer Mr H.D. Dietmann shall be appointed as the new managing director of the Company by the Purchaser in its newly acquired capacity as sole shareholder of the Company.

*Preliminary draft share purchase agreement*
*02/PD W/February 5, 1996/12.00 AM*
*for internal discussion purposes only*

(f)     Purchaser shall pay and settle the Purchase Price in the amount of USD 2,200,000.-- (two million two hundred thousand United States dollars) as stipulated in article 4 of this Agreement.

## ARTICLE 5 - Warranties of Seller

5.1     Each of the Sellers, both jointly and individually, represent(s) and warrant(s) to Purchaser that:

(a)     the Company has been duly incorporated by notarial deed, executed on May 26, 1992;

(b)     the Company is a private limited liability company registered under number 33238799 in the Trade Register of the Chamber of Commerce and Industry in Amsterdam;

(c)     the Shares constitute the entire issued and outstanding share-capital of the Company and that the Shares have been validly issued and are fully paid up;

(d)     no depository receipts ("certificaten") have been issued in respect of the Shares, whether or not with the cooperation of the Company;

(e)     the Shares have not been seized or attached;

(f)     the Purchaser shall acquire full and unencumbered title to the Shares, free and clear of usufructs or pledges;

*Preliminary draft share purchase agreement*
*02/PDW/February 5, 1996/12.00 AM*
*for internal discussion purposes only*

(g)   the Company has not been dissolved and no resolution to dissolve the Company or to amend the Company's Articles of Incorporation has been adopted or prepared;

(h)   the Company has not been declared bankrupt and that a filing or request to declare the Company bankrupt is not pending and that the Company has not requested or obtained a moratorium of payment ("surséance van betaling");

(i)   the Company is no party to a legal merger in the sense of article 309 of book 2 of the Dutch Civil Code, which has not yet become effective.

## ARTICLE 6 - Obligations of Purchaser/Company

6.1   Purchaser and Company shall fully cooperate with the resignation of Mr Rolf Schlegel on the Closing Date, as Managing Director of the Company and the appointment of Mr H.D. Dietmann to replace Mr Rolf Schlegel in said capacity.

6.2   As of the Closing Date Purchaser and the Company shall indemnify and shall hold Mr Rolf Schlegel harmless against any present and/or future (third party, either tax- or other related) claims, damages, loss and liability of any kind and nature, including but not limited to interest, penalties and auditor's and attorney's fees, which may arise or be incurred pursuant to Mr Rolf Schlegel's acting as managing director of the Company prior to and including the Signing Date.

6.3   All costs of administration and domiciliation for 1996, due to Netherlands Management Company N.V., Amsterdam, shall be paid by the Purchaser.



*Preliminary draft share purchase agreement*
*02/PDW/February 5, 1996/12.00 AM*
*for internal discussion purposes only*

## ARTICLE 7 - Representations and warranties of the Purchaser

7.1   Purchaser represents and warrants to the Sellers:

(a)   that the Purchaser is a corporation duly incorporated and validly existing in good standing under the laws of St. Vincent and the Grenadines;

(b)   that the execution and delivery of this Agreement has been authorized and approved by the board of directors of Purchaser and that all necessary corporate action on behalf of the Purchaser has been taken, and the Purchaser needs no license, consent, approval, authorization or other regulatory authority required under the laws and regulations of its articles of incorporation for the execution of this Agreement;

(c)   that the execution of this Agreement and the performance of the convenants herein contemplated does not result in any breach of any of the terms, conditions or provisions of, or constitute a default under any agreement or other instrument to which Purchaser is a party or by which it may be bound or affected; there is no litigation invoking which could prevent or hinder the execution and performance under this Agreement; and

(d)   that the present Agreement shall be binding and enforceable against the Purchaser.

## ARTICLE 8 - Awareness

8.1   Purchaser acknowledges and confirms that it is fully aware of the condition and the business of the Company and of all the transactions concluded and actions undertaken by the Company and its management from the date of its incorporati-

*Preliminary draft share purchase agreement*
*02/PDW/February 5, 1996/12.00 AM*
*for internal discussion purposes only*

on, in particular, but not limited to, the conclusion by the Company of an Option and Share Exchange Agreement and the subsequent transfer of Eurogas Inc. shares to the Sellers, and Purchaser hereby approves said transactions and actions by the Company and its management.

## ARTICLE 9 - Discharge

9.1   By signing this Agreement, Sellers, in their capacity of holders of the entire issued and outstanding share capital, hereby resolve outside a meeting, in accordance with article 20 of the Articles of Association, that Mr Rolf Schlegel in his capacity as managing director of the Company shall be completely and finally discharged for his management of the Company prior and up to and including the Closing Date.

## ARTICLE 10 - Miscellaneous

10.1   This Agreement shall in all respects be governed by and construed in accordance with the laws of the Netherlands.

10.2   All disputes arising out or in connection with this Agreement shall be brought before the competent court in Amsterdam.

10.3   Any party hereto may waive any of his or its rights in the Agreement without invalidating the Agreement.

10.4   The parties waive the right to demand rescission ("ontbinding") of this Agreement on the basis of the prevailing provisions of the Dutch Civil Code.

*Preliminary draft share purchase agreement*
*02/PDW/February 5, 1996/12.00 AM*
*for internal discussion purposes only*

## ARTICLE 11 - Illegality

11.1   Parties to this Agreement agree that, if one or more provisions hereof should be adjudicated to be invalid or unenforceable, the remainder of this Agreement shall remain valid and enforceable. The Parties commit themselves to replace the invalid or unenforceable provisions by such provisions which will be binding and which will deviate as little as possible - in view of the aim and purpose of the Agreement - from the invalid unenforceable provisions.

IN WITNESS WHEREOF, this Agreement has been duly executed by the parties hereto in triplicate originals as of the       day of                  , 1996.

OKIBI N.V.                    OXBRIDGE LIMITED

By:                           By:
Title:                        Title:

CLARON N.V.

By:                           MR ROLF SCHLEGEL
Title:

MCK DEVELOPMENT B.V.

By:
Title:

*Preliminary draft share purchase agreement*
*02/FDW/February 5, 1996/12.00 AM*
*for internal discussion purposes only*

493

1    mark this, please?

2                                    (Exhibit 94 was marked

3                                    for identification)

4    BY MR SMITH:

5         Q.   I'm going to show you what's Exhibit 94 and

6    ask you to identify that, please?

7         A.   It's -- these are some papers, some drafts,

8    some corrections, to prepare a power of attorney

9    to the -- a power of attorney to the shareholders of

10   MCK Development BV.

11        Q.   In order to convey the shares of stock of

12   MCK, is that correct?

13        A.   To convey MCK Development stock to

14   Oxbridge.

15        Q.   All right.  And the first page, is that an

16   address for Oxbridge?

17        A.   This is an address for Oxbridge, where to

18   send it to.

19        Q.   Did you in fact prepare and send to

20   Oxbridge the Exhibit 90?

21        A.   I cannot remember anymore, but it would be

22   in the documentation if I had it.

23        Q.   Can you tell me the date of the Exhibit 94,

24   on or about?

25                  MR MACDONALD:  Are you asking what date it

507

1    purchase common shares of EuroGas ... from

2    MCK-Development B.V., OKIBI ... and others."

3         Q.   OK.  Thank you.  And then would you

4    identify 101 for me?

5         A.   This exhibit is a fax to Mr Armando Ulrich

6    from Peter Schefer confirming a telephone conversation.

7    It's dated 17th October 1995 and it says for the

8    Oxbridge transaction: "As discussed we need the

9    following documents: An excerpt of the commercial

10   register for Oxbridge; directors' resolution; payment

11   advice.  We also -- we need a trust agreement from

12   Dr Reinhard Rauball.  For Mr W Rauball we need the

13   share certificates which we mentioned in our fax on

14   6th October '95 to him.  And then between Jeff and MCK

15   following is to be clarified: that payment of

16   promissory note is overdue; that the additional

17   promissory note has not yet been signed from Jeffrey.

18   Thank you for your support."

19             MR MACDONALD:  For the record, Mr Schlegel

20   has just been translating the text of that document,

21   Exhibit 101, into English.

22             MR WEISBART:  I didn't catch all that.  I'm

23   sorry.  (To the reporter)  Could you read that back?

24             (The record was read back)

25             MR MACDONALD:  There is an additional



**I    N    V    I    C    O**

INVICO
CAPITAL CORPORATION AG

Kirchgasse 24
Postfach 4754
CH-8022 Zürich

Telefon 0041-1-261 72 11
Telefax 0041-1-261 72 88



**EXHIBIT
95
April 26, 2001**

## TELEFAX

To:        Ms Monica Siegel

From:      Rolf Schlegel

Date:      5. 1. 96

Ref:       MCK Development

Number of Pages incl. Cover Page:    8

_____

For information as per telephone
conversation of this afternoon.
The transaction must be executed
paralel to a hold harmless agreement.
Will talk to you on Monday.

With best regards,

INVICO CAPITAL CORPORATION AG

## SENDEBESTÄTIGUNG

| | | |
|---|---|---|
| DATUM/ZEIT | | 5- 1-98 15:50 |
| EIGENKENNUNG | | +41 +1 261 72 88 |
| EIGENNAME | | |
| FIRMENNAME | | SWISS OFFICE |

# LESENE SEITEN
## 8

| FILE | GEGENSTELLE | STARTZEIT | DAUER | # | KOMMENTAT | ERGEBNIS |
|---|---|---|---|---|---|---|
| 127 | BAKER & McK NL | 1- 5  15:46 | 3' 55" | 8 | | OK |

## DIESE VORLAGE WURDE BESTÄTIGT.
## VERKL. UNTEN – SIEHE DETAILS IM INFOFELD

### A4



I N V I C O

INVICO
CAPITAL CORPORATION AG

Klosbachstr. 24
Postfach 4754
CH-8022 Zürich
Telefon 0041-1-261 72 11
Telefax 0041-1-261 72 88

**TELEFAX**

To:  Ms Monica Siegel

From:  Rolf Schlegel

Date:  5.1.96

Ref:  McK Development

Number of Pages incl. Cover Page:  8

For information as per telephone
conversation of this afternoon.
The transaction must be executed
parallel to a hold harmless agreement.
Will talk to you on Monday.

With best regards,

INVICO CAPITAL CORPORATION AG

XEROX  3010

# *PROMISSORY NOTE*

US$   1'000''000.--                              London,   .........................

OXBRIDGE LTD, a British Corporation ("Maker"), .............................. for value received, hereby promises and agrees to pay unto OKIBI N.V. Kaya Flamboyan 3d, P.O. Box 4403, Curaçao, Netherlands Antilles (Payee"), in lawful money of the United States of America the sum of US$ 1'000'000.-- (one million dollars) to be repaid in accordance with the terms and conditions hereof.

It is understood that the principal amount set forth above is the amount which may be drawn by Maker from Payee for the purchase of 204 shares of MCK Development B.V., Amsterdam.

Payment ....... ...........................hereunder shall be made by Maker to Payee in full on June 30th, 1996. The Maker will make an annual interest payment of 8%, the payment due with the principal on June 30th, 1996.

Maker may prepay the amount hereunder in whole or in part at any time prior to the above date at Maker's election.

If default is made in the payment of this Note at maturity, Maker agrees and is also to pay to the owner and holder of this Note a reasonable amount as attorneys' or collection fees in connection with the collection efforts, if any, by Payee hereunder.


By_____
                    OXBRIDGE LTD


prn-okib.doc

# PROMISSORY NOTE

US$  1'000''000.--                              London,  ...........................

OXBRIDGE LTD, a British Corporation ("Maker"), ..............................for value received, hereby promises and agrees to pay unto CLARON N.V. Kaya Flamboyan 3d, P.O. Box 4403, Curaçao, Netherlands Antilles (Payee"), in lawful money of the United States of America the sum of US$ 1'000'000.-- (one million dollars) to be repaid in accordance with the terms and conditions hereof.

It is understood that the principal amount set forth above is the amount which may be drawn by Maker from Payee for the purchase of 204 shares of MCK Development B.V., Amsterdam.

Payment ..................................hereunder shall be made by Maker to Payee in full on June 30th, 1996. The Maker will make an annual interest payment of 8%, the payment due with the principal on June 30th, 1996.

Maker may prepay the amount hereunder in whole or in part at any time prior to the above date at Maker's election.

If default is made in the payment of this Note at maturity, Maker agrees and is also to pay to the owner and holder of this Note a reasonable amount as attorneys' or collection fees in connection with the collection efforts, if any, by Payee hereunder.

By_____
                    OXBRIDGE LTD

prn-clar.doc

# POWER OF ATTORNEY

The undersigned:

**OKIBI N.V.** a limited liability company organized and existing under the laws of the Netherlands Antilles, having its registered and business offices at 3D Kaya Flamboyan, Curaçao, hereinafter referred to as **OKIBI**

whereas:

- The revelant parties have entered into an Agreement with regard to shares in the capital stock of **MCK DEVELOPMENT B.V.**
- Pursuant to the Agreement:

    1. In total 176 shares, in the capital stock of MCK Deveolpment B.V. shall be transferred from OKIBI to Oxbridge Ltd., a limited liability company organised and existing under the laws of England, having its business offices in London.

All transactions contemplated by the Agreement, have been specified, approved and resolved in a shareholders resolution, dated on the 14th of December 1995 (nineteenhundred ninety five) (hereinafter referred to as the Shareholders Resolution);

**declares to give power of attorney to:**

**each of the deputy civil law notary's of Caron & Stevens, Amsterdam**

on behalf of the undersigned:

1. to do anything which the attorney deems necessary in connection with the above mentioned transactions, including but not limited to the execution of all necessary deeds and documents, all this with the power of substitution.

Place, date, ....... Curaçao ......... 1 5 DEC 1995

LEEWARD TRUST COMPANY N.V.

OKIBI N.V.

Name of signatory(ies):  CIRO B. RÖMER

Title:

# POWER OF ATTORNEY

The undersigned:

CLARON N.V. a limited liability company organized and existing under the laws of the Netherlands Antilles, having its registered and business offices at 3D Kaya Flamboyan, Curaçao, hereinafter referred to as CLARON

    whereas:

    -    The revelant parties have entered into an Agreement with regard to shares in the capital stock of MCK DEVELOPMENT B.V.

    -    Pursuant to the Agreement:

        1.    In total 204 shares, in the capital stock of MCK Deveolpment B.V. shall be transferred from CLARON to Oxbridge Ltd., a limited liability company organised and existing under the laws of England, having its business offices in London.

All transactions contemplated by the Agreement, have been specified, approved and resolved in a shareholders resolution, dated on the 14th of December 1995 (nineteenhundred ninety five) (hereinafter referred to as the Shareholders Resolution);

declares to give power of attorney to:

each of the deputy civil law notary's of Caron & Stevens, Amsterdam

on behalf of the undersigned:

1.    to do anything which the attorney deems necessary in connection with the above mentioned transactions, including but not limited to the execution of all necessary deeds and documents, all this with the power of substitution.

Place, date,.... *Curaçao*     1 5 DEC 1995

LEEWARD TRUST COMPANY N.V.

CLARON N.V.

Name of signatory(ies): CIRO E. RÖMER

Title:

# SHAREHOLDERS RESOLUTION

## The undersigned:

1. CLARON N.V., 3 D Kaya Flamboyan, Curaçao, Netherlands Antilles

2. OKIBI N.V., 3 D Kaya Flamboyan, Curaçao, Netherlands Antilles

3. Schlegel Rolf, Lobernhöhe 13, 8123 Ebmatingen, Switzerland

## whereas:

- the undersigned are holders of the entire issued and outstanding share capital, consisting of in total 400 shares (CLARON N.V.: 204 shares, OKIBI N.V.: 176 shares, Schlegel Rolf: 20 shares), each share having a nominal value of NLG 100.-- of MCK Development B.V., having its seat in Amsterdam, hereinafter to be referred to as the: "Company".

- no depositary receipts for shares in the Company have been issued with the Company's concurrence and there are no persons to whom the law attributes the right accruing to holders of depositary receipts issued with the Company's concurrence.

./.

- 2 -

<u>in accordance with article 34 of the Articles of Incorporation of the Company it is hereby resolved:</u>

a) to grant approval - in the meaning of article 14 of the Company's Articles of Incorporation - to the transfer of 204 shares in the Company, by CLARON N.V. to Oxbridge Ltd., Arthur House, 50 A, Portland Road, London 5SE5 4PO against a promissory note in the amount of US$ 1'000'000.– (US$ one million).

b) to grant approval - in the meaning of article 14 of the Company's Articles of Incorporation - to the transfer of 176 shares in the Company, by OKIBI N.V. to Oxbridge Ltd., Arthur House, 50 A, Portland Road, London 5SE5 4PO against a promissory note in the amount of US$ 1'000'000.– (US$ one million).

c) to grant approval - in the meaning of article 14 of the Company's Articles of Incorporation - to the transfer of 20 shares in the Company, by Rolf Schlegel to Oxbridge Ltd., Arthur House, 50 A, Portland Road, London 5SE5 4PO against payment of US$ 200'000.– in cash. The transfer is made against payment.

The share-transactions shall be consumated by the execution of the relevant notarial deeds, in front of a civil law notary of Caron & Stevens, of Amsterdam.

Finally, the undersigned conclude that after the aforementioned transactions, Oxbridge Ltd. will be holder of 100 % of the issued share capital of MCK Development B.V.

Place, date: 14.12.1995

CLARON N.V.                                    OKIBI N.V.

by:                                           by:

title:                                        title:


Rolf Schlegel

# POWER OF ATTORNEY

The undersigned:

Rolf Schlegel, born on 11th January, 1942 in St. Gallen, Switzerland, residing at Lebernhöhe 13, 8123 Ebmatingen, Switzerland, hereinafter referred to as Rolf Schlegel

      whereas:

           –    The relevant parties have entered into an Agreement with regard to shares in the capital stock of MCK Development B.V.

           –    Pursuant to the Agreement:

                 1.    In total 20 shares, in the capital stock of MCK Development B.V. shall be transferred from Rolf Schlegel to Oxbridge Ltd., a limited liability company organised and existing under the laws of England, having its business offices in London.

All transactions contemplated by the Agreement, have been specified, approved and resolved in a shareholders resolution, dated 14th of December nineteenhundred ninety five (hereinafter referred to as the Shareholders Resolution);

declares to give power of attorney to:

each of the deputy civil law notary's of Caron & Stevens, Amsterdam

on behalf of the undersigned:

1.    to do anything which the attorney deems necessary in connection with the above mentioned transactions, including but not limited to the execution of all necessary deeds and documents, all this with the power of substitution.

Place, date, *Zurich, 14.12.1995*

*Rolf Schlegel* [signature]

Rolf Schlegel

# OXBRIDGE LIMITED

Trust House, 112 Bonadie Street, POB 613, Kingstown  St.Vincent and the Grenadines
Tel.: 809 - 457 - 1145. Fax: 809 - 457 - 1961

European Representative:
Arthur House
50A Portland Road
London SE25 4PO
Tel. Int. 44 181 655 2046
Fax Int. 44 181 655 2032



EXHIBIT
100
April 20, 2001

## GENERAL POWER OF ATTORNEY

We, OXBRIDGE LTD., St. Vincent and the Grenadines empower, with the right of substituting

### Mr. Hans D. Dietmann
### Frankfurt am Main

to perform all legal acts as an authorized representative invested with full power, including the right to appoint deputies.

This power particularly comprises the following:

to represent with the right of individual signature the above named Limited in every respect and above all, to sign certain option agreements to purchase common shares of EuroGas Inc. from MCK-Development B.V., OKIBI B.V. CLARON B.V. and others.

To sign contracts, to lend and borrow, to accept and make payments, to open and dispose of bank accounts;to contract, to do any kind of investment deal in futures, to participate in other enterprises of any kind, to undertake every kind of commercial, financial, trading, service, lending and borrowing activity.

All for account of the Company, for others or as a Trustee, in short, to do anything which is in the competence of the Board of Directors according to memorandum and articles of association of the company and the laws of St. Vincent.

This Power of Attorney is unlimited.

For the Board of Directors of

OXBRIDGE LIMITED
E.J. BUDDEN/Director

Dated 7th September, 1995

497

1                             for identification)
2          I'm going to show you what has been marked as
3    Exhibit 95 and ask you to please identify that for the
4    record?
5          A.    This is a note, a fax, to Ms Siegel,
6    S-i-e-g-e-l, of Caron & Stevens in Amsterdam, dated
7    5th January 1996.  I have spoken to her and I sent to
8    her a promissory note, a draft, for 1 million, just a
9    simple draft, 1 million, where Oxbridge agrees to pay
10   to Okibi 1 million, where Oxbridge agrees to pay to
11   Claron -- Oxbridge Limited, a British corporation.
12   Then the power of attorney of Okibi to sell the 176
13   shares.
14         Q.    And that's executed by?
15         A.    That's executed by Leeward Trust, signed by
16   Ciro B Roemer -- that's spelt C-i-r-o  B. R-o umlaut
17   m-e-r -- dated 15th December.
18         Q.    19 --
19         A.    1995.  15 December 1995.  Then a power of
20   attorney of Claron NV again signed by Ciro B Roemer on
21   the same date.  Plus the shareholders' resolution
22   signed by the three shareholders: Claron, Okibi and
23   Schlegel, Rolf.
24         Q.    Is that shareholders' resolution the same
25   as our Exhibit 90?  It appears to be dated the same --

498

1      A.    That's correct.

2      Q.    All right.

3      A.    Plus the power of attorney of Schlegel for

4  20 shares.  And I must say these 20 shares would go

5  back to the companies, they would not be going to

6  Schlegel.

7      Q.    At whose direction did you send these to

8  Caron & Stevens?

9      A.    On direction of this note here, draft,

10  because Caron & Stevens had to make the transfer of the

11  shares.

12      Q.    All right.  Are --

13      MR WEISBART:  (To the reporter)  I'm sorry.

14  Could you repeat the answer?

15      (The last answer was read back)

16      MR MACDONALD:  They're the Dutch notary for

17  purposes of the formal transfers of the document that

18  was -- correct?

19      THE WITNESS:  Yes.  They are the only

20  people who can transfer the shares.  It has to be

21  registered in the book of MCK which I have here.

22  BY MR SMITH:

23      Q.    But would that be at the direction of

24  Mike McKenzie to do that or just because you knew it

25  had to go through Caron & Stevens or what?

499

1   A. No, in Holland, every transaction, every
2 share sale, has to go through a notary, because there
3 was too much, in the past, too much trouble with it.
4   Q. But you would not have sent it to a notary
5 unless you had authority of the owner of the shares of
6 stock to do that, is that correct?
7   A. That is correct, and Exhibit 94 was that
8 authority, and the previous documentation that were
9 submitted.
10   Q. And that authorization came from whom?
11   A. Mr McKenzie.
12   Q. Are there any other documents that advanced
13 this transaction?
14   A. This is not to do with the transfer of
15 shares, this isn't.
16   Q. Right.
17   A. This is something with it.  So maybe it
18 mentions it later.
19   MR MACDONALD:  Mr Schlegel has just made
20 reference to another document from his Oxbridge file or
21 from the Invico Oxbridge file.
22   THE WITNESS:  This is a note that I made
23 when Mr Ulrich was in our office on 10th January '96
24 that he got two promissory notes for 1 million to pass
25 on.  Then he was shown the correspondence with Caron &

1                Would you mark this as well?

2                              (Exhibit 101 was marked

3                              for identification)

4    BY MR SMITH:

5         Q.    Let me show you what has been marked as

6    Exhibit 100 and ask if you can identify that for me?

7         A.    That's a General Power of Attorney to

8    Mr Hans Dietmann in Frankfurt for Oxbridge Limited.

9    St Vincent and Grenadines empower, etcetera,

10   Mr Dietmann to take -- perform all legal acts.  He was

11   the person that did the transaction.

12        Q.    Is this the same Mr Dietmann that was

13   co-director of MCK, MMP BV?

14        A.    I never knew that he was any -- he is an

15   accountant, but he was never director until as long as

16   I know.

17        Q.    All right.

18        A.    He may have been afterwards, but not during

19   my time.

20        Q.    And what -- would you read this one

21   paragraph?

22        A.    "The power particularly comprises the

23   following: to represent with the right of individual

24   signature the above named Limited in every respect and

25   above all, to sign certain option agreements to

507

1   purchase common shares of EuroGas ... from

2   MCK-Development B.V., OKIBI ... and others."

3        Q.   OK.  Thank you.  And then would you

4   identify 101 for me?

5        A.   This exhibit is a fax to Mr Armando Ulrich

6   from Peter Schefer confirming a telephone conversation.

7   It's dated 17th October 1995 and it says for the

8   Oxbridge transaction: "As discussed we need the

9   following documents: An excerpt of the commercial

10  register for Oxbridge; directors' resolution; payment

11  advice.  We also -- we need a trust agreement from

12  Dr Reinhard Rauball.  For Mr W Rauball we need the

13  share certificates which we mentioned in our fax on

14  6th October '95 to him.  And then between Jeff and MCK

15  following is to be clarified: that payment of

16  promissory note is overdue; that the additional

17  promissory note has not yet been signed from Jeffrey.

18  Thank you for your support."

19            MR MACDONALD:  For the record, Mr Schlegel

20  has just been translating the text of that document,

21  Exhibit 101, into English.

22            MR WEISBART:  I didn't catch all that.  I'm

23  sorry.  (To the reporter)  Could you read that back?

24                 (The record was read back)

25            MR MACDONALD:  There is an additional



# To whom it may concern:

On behalf of the shareholders of OKIBI NV, it is their desire for you to authorize the proper party to instruct Rolf Schlegel, Director of MCK Development BV to transfer its shares of stock in MCK Development BV to Energy Global AG.

On behalf of the shareholders of OKIBI NV

This the 4 day of September 1995



EXHIBIT
21
April 18, 2001

To whom it may concern:

On behalf of the shareholders of CLARON NV, it is their desire for you to
authorize the proper party to instruct Rolf Schlegel, Director of MCK
Development BV to transfer its shares of stock in MCK Development BV to
Energy Global AG.

On behalf of the shareholders of OKIBI NV

This the 4 day of September 1995

156

1        Q.    May I see that documentation?

2        A.    This is the -- (Document handed)  That's

3   correct, isn't it?  It says here to sell MCK shares.

4        Q.    Yes.  Does that go with it?  (Document

5   handed)

6        A.    That's the original.  It's not signed.

7   That's only there to prepare.  These were just some

8   notes I had myself for this.

9        Q.    Is that Mike's handwriting?  (Indicating)

10       A.    Yes.

11       Q.    May I staple this?

12       A.    Yes.

13       Q.    Let me ask you on the record first.  What

14  you've given me are two documents dated 4th September

15  1995.  Do you have the originals of those or are those

16  originals?  (Mr Smith was handed an envelope with a

17  document inside)  Oh, my.  I will give you back your

18  copies.  (Documents handed)

19             (To the reporter)  Could you mark these for

20  me as 20 and 21?

21                         (Exhibits 20 and 21 were

22                         marked for identification)

23             (To the witness)  I'm going to show you

24  what has been marked as 20 and 21 and ask if you can

25  identify those for me?

157

1      A.    Yes.

2      Q.    What are they?

3      A.    They are two instructions to instruct the

4   director, Rolf Schlegel, director of MCK Development

5   BV, to  transfer its shares of stocks in MCK Development

6   BV to Energy Global.

7      Q.    Signed by whom?

8      A.    Signed by Mike McKenzie on behalf of the

9   shareholders of Okibi NV.  Both times I see Okibi NV.

10     Q.    So  is was on behalf of Claron and Okibi?

11     A.    It's on behalf of Claron and Okibi, but

12  that was probably a mistake there that --

13     Q.    In the body of the --

14     A.    Yes.

15     Q.    If you look  at the bodies of both, one says

16  for Claron, one says for Okibi?

17     A.    That's right, yes.  That's what I took as

18  instructions.

19           MR WEISBART:  I'm sorry.  What did you say?

20           THE WITNESS:  That's what would have been

21  the instructions.

22  BY MR SMITH:

23     Q.    That's dated September 4, 1995.  And did

24  you request that this be signed by Mr McKenzie or the

25  stockholders?

158

1      A.   Yes.  I could not act, as a director, to do
2  that anyway.
3      Q.   OK.
4      A.   Because I needed then to start the
5  procedure of making the transfer also, because you
6  can't just, in Holland, sell shares, it has to go
7  through the notary and so on.
8      Q.   Was that process started?
9      A.   It was.
10     Q.   Was it completed?
11     A.   I'm not aware of that, because I fizzled
12  out then.
13     Q.   All right.
14     A.   There was -- instructions were given how to
15  do that.
16     Q.   But it's your understanding that this was
17  to transfer the stock of MCK held by Claron and Okibi
18  to Energy Global?
19     A.   Yes.  There is some documentation around.
20     Q.   Let me ask you: do you recognize the
21  signature of Mr McKenzie in both instances?
22     A.   Yes, I did, and I took it as an
23  instruction.
24     Q.   Did you see him sign it?
25     A.   No.

159

1       Q.   Based upon this, did you initiate the

2   actions necessary to effect a transfer on the stock

3   registry of Okibi and Claron?

4       A.   We did start, yes.

5       Q.   Okibi and Claron would be on the stock

6   registry of MCK, wouldn't it?

7       A.   Yes.  What happened, what the director of

8   MCK Development had to do then is to  get a

9   shareholders' agreement, get approval of the

10  shareholders, get everything together, and then, from

11  there, transfer the agreement to the notary, and the

12  notary then would have had to check everything and then

13  go through the procedure.

14      Q.   As of this date, September 4th, 1995, did

15  MCK still own some interest in MMP BV?

16      A.   That's a difficult question.  I think

17  I have written it down somewhere, a timetable.  Where

18  is it?  It's a thin black folder.  Yes.

19          MR TATE:  May I see Exhibit 19?  (Document

20  handed)

21          THE WITNESS:  We are talking now which

22  date?

23  BY MR SMITH:

24      Q.   September 4th, 1995.

25      A.   September the 4th.  Yes, transfer was only



**OPTION AGREEMENT**

between

CLARON N.V.                                  (hereinafter referred to as "Optionor")
Kaya Flamboyan 3d
Curacao, Netherlands Antilles

                                             and

Oxbridge Ltd
Arthur House
50 A Portland Road
London SE25 4PO                              (hereinafter referred to as "Optionee")

I     Whereas the Optionor hereby represents that they own 365'971 shares of
      common stock of EUROGAS Inc., Salt Lake City, after a successful closing
      of the option and share exchange agreement of March 7th, 1995, between
      the Optionor and EUROGAS Inc.

II.   The Optionor hereby grants to the Optionee an option to purchase above
      position for US$548'956.50 (US Dollars fivehundred and fourtyeight
      thousand ninehundred and fiftysix point fifty cents) until December 15th,
      1995. This option agreement is assignable.

      The purchase price for this option is $500.00 payable at the date of
      signature of this contract. This amount will be credited to the payment
      when the option is being exercised. The option can be exercised in full or in
      parts.

III.  **Payment terms:**

      The payment to the Optionor is to be made to the account of MCK
      Development B.V. in trust for CLARON N.V., 245.500.1001 US$, at
      BILFINANZ UND VERWALTUNG AG, Gladbachstrasse 105, CH-8044 Zürich

18/09 ... 15:59   :SWIS  PFICE        LEEWARD TRUST        +41 +1 261 72 88;# 7/ 8

- 2 -

IV. The Optionee confirms by signing this agreement, that the funds are not in contradiction to any national law of money laundring and confirms that all transactions are undertaken in a fully transparent manner.

V. The EuroGas Inc. shares owned by the Optionor and referred to in this option agreement will be held in trust for the duration of this option agreement, but not later than December 15th, 1995 for the Optionor and the Optionee by Dr. Reinhard Raubell.

The Optionor and the Optionee hereby give their consent by signing below.

Any portion of EuroGas Inc. shares not purchased by the Optionee will be returned to the Optionor by not later than December 15th, 1995.

This agreement is executed on the                              , 1995.

OXBRIDGE Ltd                          CLARON N.V.
                                      LEEWARD TRUST COMPANY N.V.

e-opt-1.doc



**I    N    V    I    C    O**

INVICO
CAPITAL CORPORATION AG

Kirchgasse 24
Postfach 4754
CH-8022 Zürich

Telefon 0041-1-261 72 11
Telefax 0041-1-261 72 88

Zürich, 17. Oktober 1995
SR/psc



**TELEFAX    057/48'22'51**

An:         Herrn Armando Ulrich

Von:        Peter Schefer

Referenz:   Unser Telefongespräch

Anzahl Seiten inkl. Deckblatt:   -1-

---

Sehr geehrter Herr Ulrich

Wie besprochen benötigen wir noch folgende Dokumente:

- HR-Auszug Oxbridge
- Directors Resolution
- Payment advice
- Trust Agreement/Treuhandverträge von Dr. Reinhard Rauball
- von Herrn W. Rauball benötigen wir noch die Aktienzertifikate gemäss unserem Fax vom 6.10.95 an ihn
- Zwischen Jeffrey und MCK ist noch folgendes zu klären: die Zinszahlung aus der Promissory Note ist überfällig, der Zusatz zur Promissory Note wurde von Jeffrey noch nicht unterzeichnet.

Besten Dank für Ihre Unterstützung.

Gerne hören wir von Ihnen.

Mit freundlichen Grüssen

Peter Schefer
INVICO CAPITAL CORPORATION AG



I    N    V    I    C    O

**INVICO**
**CAPITAL CORPORATION AG**

Kirchgasse 24
Postfach 4754
CH-8022 Zürich

Telefon 0041-1-261 72 11
Telefax 0041-1-261 72 88

Zurich, 28.11.1995
SR/lm

**TELEFAX   0044/171/581 2869**          *Cheval Apartments, Ltd*

To:       Mike McKenzie

From:     Rolf Schlegel

Ref:      MCK



Number of Pages incl. Cover Page:   - **6** -

_____

Dear Mike

Regarding your visit to Cologne, MCK should for good order's sake have the
following documents which I have asked for a long time:

    I      Trustee agreement of Dr. R. Rauball holding all preferred and
          common shares resulting from the sale of MCK's share of Globegas.

    II     If no trustee agreement is being made, all shares must be handed
          over to MCK - the rightful owner!

    III    The preferred shares are eligible to a dividend.

There are some other items which should be discussed and solved and I look
forward to seeing Mr W. Rauball in Zurich.

Kind regards,

Rolf Schlegel

EXHIBIT 67

**INVICO CAPITAL CORPORATION AG**

RS00223

# *AKTENNOTIZ*



**EXHIBIT**
90 A
April 20, 2001

Gespräch:                    Meeting, Mike McKenzie

Datum:                       14.12.1995

Mike McKenzie came to visit Switzerland to meet W. Rauball in order to transfer the shares of MCK Development B.V. to OXBRIDGE. Mike told me that he had agreed with Rauball that two promissory notes would have to be issued by OXBRIDGE to OKIBI N.V. and CLARON N.V. and that $200'000 would be paid to Invico. He would want to obtain 500'000 in order to pay for the lawsuit that he is still finishing with the Trustee & the bishops.

He has signed all the papers and he told me that he informed W. Rauball and A. Ulrich that he told the trustee about the action, i.e. not us.

Mike McKenzie said on the telephone from the airport before leaving that he would arrange everything for a closing:

1.     Payment
2.     Release letter W. Rauball
3.     Promissory Notes
4.     Zahlung Miete an Invico

I should fax the documents to A. Ulrich, as the fax of W. Rauball would not work!

Zürich, 15. Dezember 1995
SR/lm

EXHIBIT 6a

RS00228

507

1    purchase common shares of EuroGas ... from

2    MCK-Development B.V., OKIBI ... and others."

3         Q.   OK.   Thank you.   And then would you

4    identify 101 for me?

5         A.   This exhibit is a fax to Mr Armando Ulrich

6    from Peter Schefer confirming a telephone conversation.

7    It's dated 17th October 1995 and it says for the

8    Oxbridge transaction: "As discussed we need the

9    following documents: An excerpt of the commercial

10   register for Oxbridge; directors' resolution; payment

11   advice.   We also -- we need a trust agreement from

12   Dr Reinhard Rauball.   For Mr W Rauball we need the

13   share certificates which we mentioned in our fax on

14   6th October '95 to him.   And then between Jeff and MCK

15   following is to be clarified: that payment of

16   promissory note is overdue; that the additional

17   promissory note has not yet been signed from Jeffrey.

18   Thank you for your support."

19            MR MACDONALD:   For the record, Mr Schlegel

20   has just been translating the text of that document,

21   Exhibit 101, into English.

22            MR WEISBART:   I didn't catch all that.   I'm

23   sorry.   (To the reporter)  Could you read that back?

24            (The record was read back)

25            MR MACDONALD:   There is an additional

1          A.    No.

2          Q.    Did you advise Mr McKenzie that the shares

3    of Jeffrey stock were being held in kind of a lock-up

4    situation until Ostrov released them?

5                MR WEISBART:   Objection to the form of the

6    question, leading.

7                THE WITNESS:   I do not have any

8    documentation, I have not seen any documentation

9    lately, where this is confirmed.

10   BY MR SMITH:

11         Q.    This is during the time period October 26,

12   1995.  Was Mr McKenzie in Europe at that time?

13         A.    I think we know he was here in September.

14         Q.    Right.  And we know he was there in October

15   for the closing on October 4?

16         A.    That's the 4th, right, yes.

17         Q.    Do you know how long he stayed after the

18   October 4th closing?

19         A.    I think an hour or two and -- (The witness

20   whistled)

21                         (Laughter)

22                              (Exhibit 117 was marked

23                               for identification)

24         Q.    From 223 I'm going to show you Exhibit 117

25   and ask if you can identify that?

1          A.    This is a fax which we sent to or Invico

2    sent to Mr McKenzie, to London, while he was here in

3    London.

4          Q.    What's the date of that fax?

5          A.    The fax is dated 28th of November 1995.

6          Q.    Now, it references a visit to Cologne.  Is

7    that a visit to Cologne by Mike McKenzie?

8          A.    That is correct.

9          Q.    Had it occurred or was it about to occur?

10         A.    It was to be occurring, because we asked

11   him to do certain things.

12         Q.    And one of those was to obtain a trustee

13   agreement from Dr Rauball?

14         A.    That's correct.

15         Q.    And is it correct that at that time

16   Dr Rauball was holding all of the Eurogas preferred and

17   common shares due to MCK?

18              MR SMITH:  (To the witness)  Do you want

19   her to repeat the question?

20              THE WITNESS:  Can you come again, please?

21   BY MR SMITH:

22         Q.    Sure.  Sure.  It references a, "Trustee

23   agreement of Dr. R. Rauball holding all preferred and

24   common shares resulting from the sale of MCK's share of

25   Globegas".  Did I read that correctly?

491

1          Q.    And what is that?

2          A.    This is a meeting that Mr Mike McKenzie had

3     with Mr Rauball where they discussed the sale of the

4     shares of MCK Development to Oxbridge.

5          Q.    All right.  And would you read into the

6     record the next sentence, please?

7               MR MACDONALD:  You mean the second

8     paragraph?

9               MR SMITH:  No, the second sentence.

10              THE WITNESS:  "Mike told me that he had

11    agreed with Rauball that two promissory notes would

12    have to be issued by OXBRIDGE to OKIBI N.V. and CLARON

13    N.V. and that $200'000 would be paid to Invico.  He

14    would want to obtain 500'000 in order to pay for the

15    lawsuit that he is still finishing with the Trustee &

16    the bishops."

17    BY MR SMITH:

18         Q.    All right.  Do you know what trustee he's

19    talking about?

20         A.    At that time I heard the name Mr Smith

21    mentioned.

22         Q.    (Laughter)  OK.  Now, did you prepare this

23    memorandum?

24         A.    I did prepare this memorandum.  It was

25    signed on 15th December to get together to do the

490

1          A.    This is MC -- I was out of the MMP BV

2     company.

3          Q.    But still MCK?

4          A.    This is MCK and I was still a shareholder

5     of MCK --

6          Q.    All right.

7          A.    -- selling -- signing the shareholders'

8     resolution.

9               MR SMITH:  All right.

10              MR TATE:  Mr Smith, Exhibit 228 goes with

11    those.  Page 228 goes with those documents.  RS228 goes

12    with those documents.  It goes with Exhibit 90.  It

13    bears the same date and relates to the same thing.

14              MR MACDONALD:  Do you want to add that as

15    90A, if I might suggest?

16              MR SMITH:  Yes.

17              MR TATE:  That was what I was suggesting.

18    Thank you.

19              MR SMITH:  It's going to be --

20                            (Exhibit 90A was marked

21                             for identification)

22    BY MR SMITH:

23         Q.    I'm going to show you what's marked as 90A

24    and ask if you can identify that, please?

25         A.    Yes, I can.

516

1          Q.    Did you receive back the shares of stock
2     that had been transferred?
3          A.    No, sir.
4          Q.    At this point in time did Dr Rauball hold
5     these shares of stock with the stock power certificate
6     signed in blank?
7          A.    I assume so.  I mean, yes.
8               MR MACDONALD:  I wasn't sure I understood
9     the question, so --
10    BY MR SMITH:
11         Q.    The six stock power certificates that you
12    sent him, were they signed by the appropriate authority
13    so that the shares could be transferred?
14         A.    I don't know anymore.
15                              (Exhibit 105 was marked
16                              for identification)
17         Q.    I'm going to show you what has been marked
18    as Exhibit 105 -- it comes from RS182, 183 -- and ask
19    if you can identify that, please?
20         A.    This is a note, a memorandum, concerning a
21    telephone conversation with Mr Marxer of Jeffrey.
22         Q.    OK.  And is page 2 a correct translation of
23    page 1?
24         A.    Yes.
25         Q.    Mr Schlegel, why were you making -- well,

526

1    MCK and Schlegel.

2                MR TATE:  He is going to find for you the

3    precise date.

4                MR SMITH:  OK.

5                THE WITNESS:  Week 37 started on

6    11th September.

7                MR MACDONALD:  Of what year, please?

8                THE WITNESS:  1995, and ended on

9    17th September 1995.  The first two parties could sign

10   the agreements much faster than the other parties who

11   were in the Antilles.

12   BY MR SMITH:

13        Q.    The first two parties being R Schlegel and

14   MCK Development?

15        A.    Correct.

16        Q.    All right.  So those had already been

17   signed and sent on?

18        A.    Correct.

19        Q.    Now then, the remaining option agreements

20   Okibi and Claron were presented, were those signed

21   presentations or were they --

22        A.    They were already signed at that stage and

23   I think it says here I could only present the fax

24   copies and that our copies were in the mail.

25        Q.    OK.  OK.  Why would you be giving these to

527

1   Mr W Rauball?

2          A.   Mr Rauball acted on behalf of Oxbridge.

3          Q.   Paragraph 4: "A board resolution by MCK

4   Development ... regarding the option agreement was also

5   made."  Is that a correct translation?

6          A.   Yes.

7          Q.   Was that made during the meeting with

8   Mr Rauball or had it been made previously?

9          A.   It has been -- has been handed over it

10  says, not made.

11         Q.   The translation is "made"?

12         A.   It says there, yes, but it has been handed

13  over.

14         Q.   OK.

15         A.   (The witness spoke in German).

16              THE REPORTER:  What?  Sorry.

17              MR MACDONALD:  Handed over.

18              THE WITNESS:  Handed over.

19              THE REPORTER:  Oh.  I thought there was

20  something else you said after that.

21              THE WITNESS:  In German it would read --

22  (the witness spoke in German).

23              THE REPORTER:  Yes, that's what you said,

24  yes.

25              MR SMITH:  Off the record.

As Filed: July 23, 1998                                                   SEC File No.

# SECURITIES AND EXCHANGE COMMISSION

## Form S-1

### Registration Statement Under the Securities Act of 1933

## EUROGAS, INC.

(Exact name of registrant as specified in its charter)

**Utah**

(State or other jurisdiction of incorporation or organization)

**1311**

(Primary Standard Industrial Classification Code Number)

**87-0427676**

(I.R.S. Employer Identification No.)

**942 East 7145 South, #101A, Midvale, Utah 84047  (801) 255-0862**

(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)

**Hank Blankenstein, 942 East 7145 South, #101A, Midvale, Utah 84047  (801) 255-0862**

(Name, address, including zip code, and telephone number, including area code, of agent for service)

Copies to:

Keith L. Pope, Esq.
Kruse, Landa & Maycock, L.L.C.
Eighth Floor, Bank One Tower
50 West Broadway
Salt Lake City, Utah  84101-2006
Telephone:  (801) 531-7090
Telecopy:  (801) 531-7091

Approximate date of commencement of proposed sale to the public:  As soon as practicable after the effective date of this registration statement.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, check the following box.  ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering.  ☐

If delivery of the prospectus is expected to be made pursuant to Rule 434, please check the following box.  ☐

### CALCULATION OF REGISTRATION FEE

| Title of Each Class of Securities to be Registered | Amount to be Registered[1] | Proposed Maximum Offering Price Per Unit[2] | Proposed Maximum Aggregate Offering Price | Amount of Registration Fee |
|---|---|---|---|---|
| Common Stock | 10,000,000 | $3.6875 | $36,875,000 | $10,879 |

[1]  There are also registered pursuant to Rule 416 such additional number of securities as may be issuable under the antidilution provisions of the Company's Warrants and Options to purchase Common Stock.

[2]  Estimated solely for purposes of calculating the registration fee.  The last price of the Common Stock was $3.6875 as reported by the Bulletin Board on July 17, 1998.

The registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this registration statement shall thereafter become effective in accordance with section 8(a) of the Securities Act of 1933, as amended, or until the registration statement shall become effective on such date as the Commission, acting pursuant to said section 8(a), may determine.



The following table sets forth the approximate range of high and low bids for the common stock of the Company during the periods indicated based on information concerning the trading of the common stock on the Bulletin Board. All prices reflected herein have been adjusted retroactively to reflect the 24-for-1 reverse stock split recently approved by the Company. The quotations presented reflect interdealer prices, without retail markup, markdown, commissions, or other adjustments and may not necessarily represent actual transactions in the common stock.

| Quarter Ended | High Bid | Low Bid |
|---|---|---|
| March 31, 1996 | $ 3.25 | $ 1.125 |
| June 30, 1996 | $ 7.875 | $ 1.75 |
| September 30 1996 | $ 5.75 | $ 2.875 |
| December 31, 1996 | $ 5.00 | $ 2.875 |
| March 31, 1997 | $ 6.75 | $ 3.4375 |
| June 30, 1997 | $ 12.50 | $ 4.375 |
| September 30, 1997 | $ 10.6875 | $ 4.9375 |
| December 31, 1997 | $ 7.625 | $ 3.75 |
| March 31, 1998 | $ 6.8125 | $ 3.9375 |
| June 30, 1998 | $ 5.75 | $ 3.625 |

The liquidity of the common stock may be limited, and the reported price quotes may not be indicative of prices that could be obtained in actual transactions. On July 17, 1998, the closing quotation for the Company's common stock in the over-the-counter market was 3.6875.

No dividends have been paid on the Company's common stock, and the Company does not have retained earnings from which to pay dividends. The Company accrued cumulative preferred dividends of $423,530 and $150,592 in 1997 and 1996, respectively. Of this amount, $305,325 was paid in 1997 by the issuance of common stock in connection with the conversion of a portion of the preferred stock. In 1996, the Company paid dividends on the preferred stock of $120,000 in cash at a time the Company had a stockholders' deficit. All cumulative dividends with respect to the Company's preferred stock would be required to be paid prior to the Company declaring or paying any dividend on its common stock. (See "SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT.") Even if the Company was to generate the necessary earnings, it is not anticipated that dividends will be paid in the foreseeable future, except to the extent required by the terms of the cumulative preferred stock currently issued and outstanding.

Sale of Unregistered Securities

In May 1998, the Company entered into a Subscription Agreement pursuant to which it agreed to sell up to 30,000 shares of its 1998 Series B Convertible Preferred Stock for an aggregate of $30,000,000 gross proceeds. At the time of the execution of the agreement, 8,000 shares were sold by the Company for gross proceeds of $8,000,000 to three sophisticated investors. The Company obtained representations that the purchasers were acquiring the securities for their own investment and without the intent to make a distribution of such securities, placed a restrictive legend on the certificates representing the securities, and relied on the non-public offering exemption to the registration requirements of the Securities Act in making this sale. The Common Stock issuable on conversion of the 1998 Series B Convertible Preferred Stock is also restricted, but the resale of such securities by the Selling Shareholders is covered by this Prospectus.

During 1997, the Company sold or delivered 10,544,030 shares of common stock and 4,450,000 options in transactions that were not registered under the Securities Act as described in more detail below. Unless otherwise noted, the sales were made without the participation of underwriters and without the payment of any commission. The Company relied upon the exemptions from registration provided in Section 4(2) of the Securities Act and Regulation D.

No placement of securities involved a public offering. The two offerings for cash proceeds were to sophisticated institutions. The balance of shares and options were delivered in connection with either a conversion of outstanding indebtedness or the acquisition of property or mineral interests. In each instance, the Company used the proceeds for general working capital.

equity and debt transactions to meet its cash requirements. While the Company currently has sufficient cash to meet its short-term needs, it will be required to obtain additional cash either from financing transactions or operating activities to meet its longer-term needs. Obtaining additional equity financing or structuring strategic relationships will continue to result in dilution of the percentage ownership of the Company by the current shareholders.

If the Company is unable to establish production or reserves sufficient to justify the carrying value of its assets or to obtain the necessary funding to meet its short and long-term obligations or to fund its exploration and development program, all or a portion of the mineral interests in unproved properties will be charged to operations, leading to significant additional losses.

**Year 2000**

The Company uses computers principally for processing and analyzing geophysical and geological data, and administrative functions such as word processing, accounting and management, and financial reporting. The Company's principal computer systems have been purchased since December 31, 1995. The software utilized by the Company is standard "off-the-shelf" software, typically available from a number of vendors. While the Company believes it is taking all appropriate steps to assure year 2000 compliance, it is dependent substantially on vendor compliance. The Company intends to modify or replace those systems that are not year 2000 compliant. The Company is requiring its systems and software vendors to represent that the services and products provided are, or will be, year 2000 compliant. The Company estimates that the cost to redevelop, replace, or repair its technology will not be material. In addition to its own computer systems, in connection with its business activities, the Company interacts with suppliers, customers, creditors, and financial service organizations domestically and globally who use computer systems. It is impossible for the Company to monitor all such systems, and there can be no assurance that the failure of such systems would not have material adverse impacts on the Company's business and operations.

**FINANCIAL STATEMENTS**

The financial statements and supplementary data are set forth immediately following the signature page.

**CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

The Company and its current auditors have not disagreed on any items of accounting treatment or financial disclosure.

**DIRECTORS, EXECUTIVE OFFICERS, PROMOTERS AND CONTROL PERSONS; COMPLIANCE WITH SECTION 16(a) OF THE EXCHANGE ACT**

Set forth below is the name and age of each executive officer and director of the Company, together with all positions and offices of the Company held by each and the term of office and the period during which each has served:

| Name | Age | Positions With the Company | Director Since |
|---|---|---|---|
| Dr. Reinhard Rauball | 52 | Director | 1994 – August |
| Paul Hinterthur | 60 | President and Director | 1995 – December |
| Hank Blankenstein | 56 | Vice-President and Director | 1995 – December |
| Dr. Gregory P. Fontana | 38 | Director | 1996 – January |
| Dr. Hans Fischer | 52 | Director | 1996 – January |
| J. Toni Preuss | 50 | Managing Director of GlobeGas | N/A |

37

The current board of directors was elected at the December 12, 1997, shareholders' meeting. A director's regular term continues until the next annual meeting of shareholders and thereafter until his successor is duly elected and qualified. Officers serve at the pleasure of the board of directors. There is no family relationship among the current directors and executive officers.

The Company's executive committee consist of three members, Paul Hinterthur, Hank Blankenstein, and J. Toni Preuss, an officer and director of the Company's subsidiary, GlobeGas. The executive committee is charged with overseeing the day-to-day management of the Company and with making all significant contractual and financial decisions.

## Company Control

Dr. Reinhard Rauball, the chairman of the board of directors, and Wolfgang Rauball, the Company's chief consultant, are brothers. Both gentlemen have been key figures in arranging the original transaction with Energy Global, the acquisition of the concessions in Poland, the later acquisition of Danube, which holds concessions in Slovakia, the acquisition of EJ and the Yakutia Concession, and the participation in the British Columbia project. From time to time, the Rauballs, principally Wolfgang Rauball, have also arranged for equity and debt financing for the Company through parties with whom they have previous business and personal relationships and have directly loaned some of their own funds to the Company. (See "CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS.")

While there is no formal agreement among the Rauballs and other debt and equity holders of Company, the practical result of the relationships is to vest control of the Company in the Rauballs.

The following sets forth brief biographical information for each of the foregoing individuals.

*Dr. Reinhard Rauball* is a director of the Company. He has been an attorney in Dortmund, Germany, since 1974, as well as a government appointed Notary since 1991. He was a law instructor at Bochum University from 1977 to 1979 and is the author of numerous legal publications and books on constitutional law in Germany. Dr. Rauball currently represents a number of prominent German industrial companies and acts as counsel to the German government on special projects. From 1983 to 1990, he was the chairman of the Supervisory Board of Etienne Aigner, AG, a publicly-held company in Munich, Germany, which is a leading international fashion concern with franchise shops in over 50 countries around the world. He was the president of Borussia Dortmund, a leading German soccer club, from 1979 to 1982 and 1984 to 1986.

*Wolfgang Rauball* has acted as an independent consultant to the European subsidiaries of the Company since August 1994. He is president of Pol-Tex Methane Sp. zo.o. in Poland and also acts as a director of GlobeGas B.V. Amsterdam. Mr. Rauball attended Darmstadt Technical University in Germany from 1967 through 1971 but did not receive a degree. Thereafter, Mr. Rauball worked as a mining geologist in Canada from 1972 to the present date. During the period 1976 through 1986, his consulting activities were primarily for companies conducting exploration for gold ore bodies in Canada, the United States, and South America. Wolfgang Rauball arranges for financing for business enterprises, primarily public companies engaged in the mineral industry. In 1993, Wolfgang Rauball was convicted by a German court of negligently causing the bankruptcy of a German subsidiary of a Canadian company. Mr. Rauball was a managing director of the Canadian company. Beginning in 1987, he was involved in a contest for control of the Canadian company. During the contest, the German subsidiary used some of its capital to purchase restricted securities of an unrelated company, which purchase caused the German subsidiary to become insolvent from a balance sheet point of view. Prior to being able to solve the problem, Mr. Rauball was deprived of his ability to participate in management of the Canadian company (his right to participate in management was subsequently restored by the British Columbia Securities Commission in Canada). German law is very strict in this regard and generally holds managing directors of parent companies responsible for either infusing additional funds to make the subsidiary solvent or making the appropriate bankruptcy filings on behalf of the subsidiary, neither of which was done in this case. The German court held that Mr. Rauball was negligent in participating in the original stock purchase by the German subsidiary. Mr. Rauball received a suspended sentence and a monetary fine of approximately $70,000. This type of activity is not a crime in either the United States or Canada, where Mr. Rauball then resided, and therefore, the board of directors of the Company does not feel that this matter compromises in any way the value of Mr. Rauball's services.

38

## SECURITY OWNERSHIP OF
## CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The following table sets forth, as of July 21, 1998, the number of shares of the Company's common stock, par value $0.001, held of record or beneficially by each person who held of record or was known by the Company to own beneficially, more than 5% of the Company's common stock, and the name and shareholdings of each officer and director and of all officers and directors as a group.

| Name of Person or Group[1] | Common Stock | Options[2] | Percent[3] |
|---|---|---|---|
| **Principal Shareholders:** | | | |
| Chemilabco, B.V.[4]<br>World Trade Center<br>Amsterdam Netherlands | 10,540,000 | 0 | 16.2% |
| Finance Credit & Development<br>Corporation, Ltd.<br>"Chateau Amiral"<br>Bloc B–42, Boulevard<br>d'Italic<br>MC 9800 Monaco | 2,688,333 | 2,200,000 | 7.5% |
| Thomson Kernaghan & Co., Ltd.<br>365 Bay Street, 10th Floor<br>Toronto Ontario MSH2V2[5] | 10,000,000 | 0 | 15.4% |
| **Officers, Directors, and<br>Controlling Persons:** | | | |
| Dr. Reinhard Rauball[6] | 579,000 | 250,000 | 1.3% |
| Wolfgang Rauball[7] | 1,100,000 | 50,000 | 1.8% |
| Paul Hinterthur[8] | 100,000 | 200,000 | 0.5% |
| Dr. Gregory P. Fontana | 0 | 100,000 | 0.2% |
| Dr. Hans Fischer | 0 | 100,000 | 0.2% |
| Hank Blankenstein | 0 | 200,000 | 0.3% |
| J. Toni Preuss | 0 | 0 | 0.0% |
| **All Officers, Directors, and<br>Controlling Persons<br>as a Group (7 Persons)** | 1,779,000 | 900,000 | 4.1% |

[1] Except as otherwise indicated, to the best knowledge of the Company, all stock is owned beneficially and of record by the listed shareholder, and each shareholder has sole voting and investment power.

[2] Represents options to acquire shares of Common Stock at an exercise price of $1.50 per share except for the option held by Finance Credit & Development Corporation, Ltd., which is exercisable at $3.00 per share. All options are currently exercisable.

[3] The percentage indicated represents the number of shares of Common Stock held by the indicated shareholder divided by the 64,845,811 shares of Common Stock issued and outstanding as of July 21, 1998.

[4] Includes shares held by Chemilabco's parent, Oxbridge, Ltd.

(footnotes continued on following page.)

43

(5) The 10,000,000 shares reflects the number of shares of Common Stock issuable on conversion of the 1998 Series B Convertible Preferred Stock the Company is contractually obligated to register. The actual number of shares issuable on conversion will vary depending on the trading price of the Company's Common Stock immediately prior to conversion. Under the terms of the Subscription Agreement, Thomson, Kernaghan & Co., Ltd. has the right to acquire all 30,000 shares of the 1998 Series B Convertible Preferred Stock. To date, only 8,000 shares have been issued of which 300 shares have been converted into 98,877 shares of Common Stock. If the remaining currently issued and outstanding 7,700 shares of 1998 Series B Convertible Preferred Stock were converted based on the trading price for the Common Stock of $3.6875 as of July 17, 1998, Thomson Kernaghan & Co., Ltd. would be entitled to receive approximately 2,630,000 shares of Common Stock.

(6) Dr. Rauball is the record owner, as trustee, of an additional 50,000 shares, although he relinquished his trusteeship effective August 26, 1996, and consequently, these shares are not reflected on the foregoing table.

(7) These shares are held in the name of the spouse and children of Wolfgang Rauball. Wolfgang Rauball disclaims a direct economic interest in these shares, but may be deemed to beneficially own such shares under the guidelines of the Exchange Act.

(8) These shares are held in the name of the spouse of Mr. Hinterthur. Mr. Hinterthur disclaims a direct economic interest in these shares, but may be deemed to beneficially own them under the guidelines of the Exchange Act.

## CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

Prior to January 1, 1997, the Company had a number of related party transactions, descriptions of which are set forth in the Company's reports filed with the Commission.

Unless otherwise indicated, the terms of any of the following transactions were not the result of an arms-length negotiations because such transactions were between parties that were related or had other business, professional or personal relationships that may have affected the terms of such transaction.

### Dr. Reinhard Rauball and Wolfgang Rauball

Dr. Reinhard Rauball, the chairman of the board of directors, and Wolfgang Rauball, the Company's chief consultant, are brothers. Both gentlemen have been key figures in arranging the original transaction with Energy Global, the acquisition of the concessions in Poland, the later acquisition of Danube, which holds concessions in the Slovak Republic, the acquisition of EJ and the Yakutia Concession, and the participation in the British Columbia project. From time to time, the Rauballs, principally Wolfgang Rauball, have also arranged for equity and debt financing for the Company through parties with whom they have previous business and personal relationships and have directly loaned some of their own funds to the Company. (See Note 5 to the Financial Statements.)

While there is no formal agreement among the Rauballs and other debt and equity holders of Company, the practical result of the relationships is to vest control of the Company in the Rauballs.

### Relationship With Oxbridge and Chemilabco

Chemilabco and its parent, Oxbridge, Ltd., constitute the largest single shareholder of the Company. (See "SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT.")

In 1997, Chemilabco and Oxbridge purchased 1,430,000 shares of the Company's restricted stock for a cash purchase price of $10 million.

On December 31, 1997, the Company still owed Oxbridge an aggregate of $1,230,235. Oxbridge holds (with others) the shares of Pol-Tex Methane Sp. zo.o. as security for the debt.

### Herbert Zimmer

Herbert Zimmer, a certified accountant, holds 700,000 shares of common stock and represents some of the Company's shareholders and debenture holders. Mr. Zimmer has from time to time assisted the Company in completing its internal accounting. During 1997, Mr. Zimmer advanced $2,023,306 as a short-term loan. In connection with this loan, Mr. Zimmer deposited proceeds from the issuance of common stock by the Company and

WÄSCHE + RAUBALL, DO. +49 231 525754 S.01

# DR. REINHARD RAUBALL

RECHTSANWALT

FRIEDENSPLATZ 7 · 44135 DORTMUND · TELEFON 0231/527981 · TELEFAX 0231/525754

Kruse, Landa + Maycock L.L.C.                    23/1/1997

c/o Mr. Howard Landa

50 West Broadway (300 South)

Salt Lake City, UTAH 84101-2031

Re: Euro Gas Inc

Dear Mr. Landa,

the date upon which I surrendered my trusteeship was:

26.8.1996.

The 'Officer's and Director's Questionnaire' follows early Friday morning (your time)!

Best regards

Reinhard Rauball

Escrow004866

GESAMT SEITEN 01

## KRUSE, LANDA & MAYCOCK, L.L.C.

HOWARD S. LANDA

EIGHTH FLOOR, BANK ONE TOWER
50 WEST BROADWAY (300 SOUTH)
SALT LAKE CITY, UTAH 84101-2034
E-mail; klmlaw.com

TELEPHONE: (801) 531-7090
TELECOPY: (801) 359-3954

March 21, 1997

FEDERAL EXPRESS

W. Steve Smith, Esq.
Floyd, Smith & Rios, P.C.
600 Travis, Suite 2100
Houston, Texas 77002

Dear Steve:

This is letter is written in response to your letter dated February 21, 1997. It is not a complete response since I need to request help from the accountants for EuroGas, in preparing some of the schedules, particularly with respect to specific payments and designated accounts from McKenzie. As I state below I have already sent them a detailed letter about what we need and should have that sometime next week. They are now out doing the field work as the annual report on 10-K for the period ended December 31, 1996 is due March 31, 1997. They are scheduled to return next week.

I have tried to avoid repetition of documentation and focus on those which you have not already received.

1.      Your main question concerns EuroGas' acquisition of what is now known as Globe Gas which was formerly known as McKenzie Methane Poland B.V. For convenience in this letter, I have referred to the entity as Globe Gas. Most of the transactions were effected by my client through Energy Global, its wholly-owned subsidiary. (Certainly using securities of EuroGas, its parent.) This letter does not always distinguish between the two.

a.      <u>Nordling.</u> Mr. Nordling's activities with respect to Globe Gas occurred prior to the involvement of my client. Apparently Mr. Nordling invested about $3,600,000 in Globe Gas which was then subsequently forfeited when he failed to meet his cash commitments in accordance with the terms of his agreement. The accountants for EuroGas have considered that forfeiture complete. It is my understanding the Mr. McKenzie now wishes to say that there was some other entity (MMPCO?) in which he was involved that owes Nordling the $3,600,000. I can find no corporate support nor consideration for such a theory.

b.      <u>Acquisition of Baron and Jeffrey interests.</u> My client originally purchased interests in Globe Gas from Globe Gas shareholders, namely Baron and Jeffrey and delivery of cash to Globe Gas.

(i)      My client completed an exchange with Baron whereby Baron's 4% interest in Globe Gas was exchanged for common shares of EuroGas. (I do not believe there is any dispute about the fact that Baron actually paid $4,000,000 to Globe Gas for its stock. Copies of a recent case with respect to Baron is enclosed herewith as Exhibit 1.)

(ii)      My client acquired the 12% interest held in Globe Gas held by Jeffrey Ltd. (which it acquired from MCK Development, the majority shareholder, apparently in a note in the amount of $12,000,000. See Item 3.) in exchange for EuroGas instruments principally for two EuroGas convertible debentures, one in the amount of $4,000,000 convertible in 1,000,000 shares and the other 5,000,000 convertible to 1,000,000 shares. All debentures were subsequently converted. See Exhibit 2.

(iii)     My client also delivered cash to be used in the project. Those funds were from Energy Global and provided principally by Reinhard Rauball. See Exhibit 3.

c.     <u>Interim events</u>. Subsequent to the initial acquisition by my client, it delivered additional cash to raise its percentage interest in Globe Gas to 19 + %. See 10-K and audit report. All that material has been set forth in the company's periodic reports delivered to you, in Globe Gas records and accounting papers also previously delivered to you. During that time, there developed acrimony between my client and Misters Schlegel and McKenzie, all of which has been detailed in the material set forth to you. (Parenthetically, I had advised my client that based upon what I had seen, including some matters discussed below, that there had been substantial misrepresentation and possibly misappropriation. My client has made certain claims to date against Schlegel et al. and is supplementing its claims as we have discussed. My client may have a claim against McKenzie and I would appreciate a claim form as I note from one of your letters that you are re-calculating claims.)

d.     <u>Acquisition of 80% interest</u>. As detailed in the company reports, my client was able to acquire the remaining 80% of Globe Gas. The following applies:

(i)     The negotiations were principally conducted by Mr. Fish (the then EuroGas president) and supported by both Wolfgang and Reinhard Rauball.

(ii)     Globe Gas and all the other shareholders were represented by Rolf Schlegel. It is my understanding that Claron and Okibi received their interest in EuroGas through a distribution from MCK Development. As you may recall, Mr. Schlegel represtnted that Claron and Okibi were shareholders of MCK Development. My client did not have a direct contractual relationship with Claron or Okibi and therefore does not have much information about them. (Except the limited amount provided by Schlegel.). Exhibit 3 contains a letter from Mr. Schlegel directing distribution of shares to each of the entities.

(iii)     All legal matters were reviewed and handled by Carron and Stevens.

(iv)     We believe part of the motivation for Mr. Schlegel to complete the sale is that he had no money available to continue to run the project, knew that the Concession had to be renegotiated to have any value, and could not provide appropriate accounting for my clients.

(v)     The agreements covering the acquisition are contained in Exhibit 3.

(vi)     The company paid the total compensation as follows for that 80+% interest:

$1,150,000 in cash of which $850,000 was paid in cash at Mr. Schlegel's insistence.

2,256,500 shares of common stock which was covered in a Reg S offering. See Exhibit 4.

2,391,968 shares of 1995 Series A Preferred Stock, details of which have been previously sent to you.

632,900 shares of common stock were also issued to Ostrov which I believe should be considered as part of this transaction and documents are contained in the Exhibit 3. Ostrov had the original rights to participate, which were delivered to EuroGas. The disclosure to this matter is also set forth in the company's annual report on 10-K for the period ending December 31, 1995.

(vii)     The documentation for the Netherlands was finally completed in October by Carron and Stevens, which is included in Exhibit 3. The cash raised for this transaction and the stock issued (except for the Preferred) was covered in an underwriting by Union Capital. See Exhibit 3. Please note from the Schlegel agreements contained in the other Exhibits that the undertaking of this registration was a requirement of the transaction. As far as I know, for a significant period of time, no common stock has shown the name of MCK Development, Claron, or Okibi. I can only assume that this stock has filtered through the system over the past two years. The only stock restricted with respect to that underwriting was the newly created Preferred Stock upon which EuroGas received your notice of adverse claim.

Escrow021050

e.     Other factors.  You ask about who my client relied upon.  Of course my client relied upon the representations from Rolf Schlegel, but beyond that, upon reliance of Carron and Stevens, the attorneys and notars handling the transactions.  Under the European system, it is up to them to verify a number of items.  Therefore, I believe my client purchased from all the appropriately recorded list of shareholders for a substantial consideration.  As we stated before, I believe your claim lies only against these shareholders.

If you add the cash which has been put into Globe Gas, including that estimated through December 31, 1996 of at least $10,000,000 and the delivered securities with current market value and cash of approximately $50,000,000 to the listed holders of Globe Gas, my client has $60,000,000 into what you term Poland or the Polish project.  This does not take into account the indirect costs.  To date, the only material that my client's accountants have received is a reconciliation from McKenzie showing that no amounts are due McKenzie or any of his entities.  Therefore, my client has a difficult time understanding on what you base a claim.  Of course, my client does not deny the fact that you may have an excellent claim against a number of "Schlegel entities".

2.     As stated above, Jeffrey Limited held the two debentures which were converted .  See Exhibit 2.

3.     The former accountants for the company, Peterson and Siler, obtained a copy of the so-called Jeffrey note from Schlegel.  See Exhibit 4.  As a matter of speculation, he probably still holds that note.

4.     The company is currently unsure as to who the principals of Claron, Jeffrey, and Okibi are, although they have been in the past represented by Mr. Schlegel.  To date, Mr. Schlegel has refused to communicate with me.  I believe that Baron is a completely separate unrelated entity.  See Exhibit 1.

5.     The renegotiation of the Concession in Poland was handled principally by Andy Andrazcke, Wolfgang Rauball and Armando Ulrich.  One of the reasons for the renegotiation concession was related to the so-called Amoco letter of intent.  Amoco entered a letter of intent with the company to be in position of which we now assume Texaco will be  (There was also interest from Conoco and other parties.).  However, shortly after getting into due diligence, Amoco withdrew, as it was my understanding that they determined that the Concession was so over-burdened with costs as to be unusable, and that therefore no discussions could take place until the Concession was altered.  That is to some extent what Texaco started and until that renegotiated Concession was issued in about March of 1996, no progress was made.  See Exhibit 5.

6.     The acquisition of the 15% of PTM from KWKJ was handled by Mr. Andrazcke, Mr. Rauball, and Mr. Armando Ulrich.  The interest of the Polish state coal as you refer to as KWGM was acquired for approximately $1,225,000 consisting of a cash payment of $25,000 and a release of the obligation of the Polish state coal company to reimburse Globe Gas the amount of $1,200,000 for drilling and related costs (its 15%).  It was clear from the discussions (and I was present for the closing in May of 1996) that the Polish state coal company was unable to meet its obligations and that this was the only practical solution.  See Exhibit 6.

7.     See accountant work papers for loan reconciliation.

8.     See accountant work paper for loan reconciliation.

9.     The administrative services were paid to Invico Trust and Mr. Schlegel in both 1994 and 1995.  At that time, he was a stockholder in Globe Gas (only part of 1995).

10.     McKenzie contracts.  As I stated, I left a message for the accountants who should be able to assist me in putting together a schedule of all agreements and payments for McKenzie entities.  I have also received recent instructions with respect to these contracts which I need to share with you as soon as I get some clarification.  I have enclosed two pieces of correspondence as Exhibit 7 which we do not have a record of having previously delivered.  I did not enclose a copy of the reconciliation that McKenzie prepared with respect to those accounts and inter-company transfers which occurred prior to my client's acquisition, since his cover letter reflects that reconciliation was also provided to you and Dick Tate.

11.     See Item 10 above.

Escrow021051

12.     As we discussed, there seems to be no question that Baron delivered the $4,000,000 and I believe its stock can only be counted as fully paid for. Also see Exhibit 1.

13.     We are not quite sure who are the principals of Herkules, although they appear to have  had an initial interest in Energy Global and are not connected to the former Globe Gas shareholders. We clearly do know Sinbad Ltd., who is represented by Armando Ulrich,. received its shares as shareholders in Energy Global and for services rendered directly to EuroGas. We can find no nexus to McKenzie in any sense with respect to those 715,420 shares of stock.

14.     No.

15.     You should have already received whatever I received from Grant Thornton.

16.     Exhibits include all the material with respect to the "Schlegel" agreements.

17.     As stated in Item 10 I am asking the client to prepare a complete list of all payments to McKenzie.

18.     Not to my client's knowledge. No UCC filings have been recorded in Utah, although that is not necessarily a requirement to take a lien depending upon who has possession of the shares in question.

19.     All we can do is ask. My experiences with independent Liechtenstein agents is they are not particularly forthcoming with information, mostly due to the legal requirements imposed by Liechtenstein.

Sincerely,

KRUSE, LANDA & MAYCOCK, L.L.C.

Howard S. Landa

HSL:cta

enclosure

Escrow021052

FLOYD, SMITH & RIOS, P.C.

ATTORNEYS AT LAW

600 TRAVIS, SUITE 2100
HOUSTON, TEXAS 77002

TEL:(713) 223-9404
FAX:(713) 223-0400

February 21, 1997

**VIA FACSIMILE (801) 359-3954**

Mr. Howard S. Landa
Kruse, Landa & Maycock, L.L.C.
8th Floor, Bank One Tower
50 West Broadway (300 South)
Salt Lake City, Utah 84101-2034

Re:     *Harven Michael McKenzie,* Case No. 95-48397-H2-7; *Steven Darryl McKenzie;*
Case No. 95-50153-H2-7; *Timothy Stewart McKenzie,* Case No. 95-48474-H2-7;
*La Plata Pipeline Co.* Case No. 95-47220-H2-7; and *McKenzie Energy Corp., U.S*
Case No. 95-47219-H2-7

Dear Howard:

I take the liberty of writing this letter independent of Kukui and Dick Tate. While much
of our agenda is similar, I feel that my time line, at least for the immediate future, is much more
critical than that of Kukui.

I would like to meet and discuss with Mr. Agyagos many matters. As you requested, I
will generally set forth these topics for your review and discussion with him, before my meeting
with him, hopefully next week:

1.     The relationship with and the involvement of Mike, Tim and Steve McKenzie in
the Poland Project (the Poland Project includes the Concessions, PTM and its partners,
MMPBV, MCK Development BV, MMPCO, Nordling, Baron, Schlegel, Okibi, Jeffrey,
Claron, GlobeGas, EuroGas and all dealings by, between and among the above and/or
their principals and agents);

2.     The relationship with and involvement of Rolf Schlegel and Invico Capital Corp.
A.G. with the McKenzies and in the Poland Project;

3.     The principals of Jeffrey, Claron, Okibi, Baron and Herkules;

Escrow021053

4.     The 40,000 Canadian dollars Mr. Agyagos caused to be wired to the RWT account under the control Mike McKenzie and any other wire transfers by him;

5.     Mr. Agyagos' right to purchase the stock of Jeffrey Ltd. - with whom did he deal, how much was he to pay, to whom was this payment to be made, what happened to this option? Will he provide me with all documents and correspondence pertaining to this?;

6.     How did Crawford Ltd. obtain 3.5 million shares, Ostrov obtain 290,000 shares and Westlake obtain 310,000 shares in MMPBV? If payment was made, please provide copies of the checks, advices or other means of payment.

I think you can see my discussion with Mr. Agyagos is extremely important to me. If a subpoena would make it easier for him to meet and talk, I would be happy to obtain one for him.

Howard, I need quite a bit of information from you and/or your client as well:

1.     Of critical importance and timing is the question of EuroGas' purchase of MMPBV-

   a.     With whom (which individuals) did Global or EuroGas negotiate on the original 16%, then the 2% , then the .72% and then the .19% interests in MMPBV? I would like copies of all correspondence, checks issued, transfer or wire advices, endorsements, stock issued and transferred, receipts, tracking of all of the cash that was paid and accounting thereof.

   b.     By General Agreement dated August 4, 1994, Energy Global agreed to acquire 39% of MMPBV. There was $750,000.00 acknowledged as received by Rolf Schlegel on August 4,1994. I need a tracking of the monies that were paid to Rolf Schlegel as to source, amounts, etc. There was apparently a subsequent timely receipt by Invico Trust of $1.8 million on this obligation. I need an accounting of that as to amounts, dates, sources and the like. In both instances, why is the money going to Rolf Schlegel in the first place? Under the agreement there was another $2.5 million due on October 4, 1994, then the balance would be paid over time until the $39 million figure was reached. If I remember correctly, the minimum monthly payment would be $1.147 million. What other payments were made? On those other payments, please account for amounts, sources, dates, payees and the like. Apparently payments were suspended for a period of time by subsequent agreement. The payment obligation was reinstated and to commence after completion of the audit. In any event, the $39 million was due and payable in full by September 30, 1995. Has the balance of the $39 million been paid? If not, will it? If not, why? Please give me an accounting of the full $39 million obligation of Energy Global.

   c.     With the purchase of the remaining approximately 80 ½ %, the statement reflects that there was an agreement reached with MCK and the "other remaining owners of GlobeGas". Who are these other remaining owners of GlobeGas with whom your client reached agreement? On March 31, 1995 or sometime prior

thereto, $850,000.00 was paid out of the $1,150,000.00 required for this purchase of remaining interests. To whom was this paid? Will you provide copies of the checks, wire or transfer documents that were issued along with the deposit or endorsement information thereon? To whom were the 2,256,560 shares of common stock issued? Has the $300,000.00 balance been paid? If not, why? If so, will you provide copies of the checks and endorsement or deposit information? To whom are the 2,391,968 shares of convertible preferred stock issued on this transaction?

2.      Jeffrey Ltd. held 2 debentures, 1 for $4,000,000.00 and 1 for 5,000,000.00, both convertible into a million shares each of common stock. It appears that the $4,000,000.00 debenture was converted in November, 1994. I would like all documentation pertaining to this debenture and subsequent conversion. What is the status on the $5,000,000.00 debenture?

3.      Where is the $12,000,000.00 Jeffrey note? Will that be turned over to me?

4.      Who are the principals of Claron, Jeffrey, Okibi, and Baron and can you arrange a meeting for me with each?

5.      Who handled the renegotiation of the Concession in Poland? Please provide all relevant documentation.

6.      Who handled the acquisition of the 15% of PTM from KWKJ? Please provide all relevant paperwork.

7.      The 10Q at March 31, 1995 identifies repayment of a shareholder of $313,500.00. Who is this shareholder? Please provide copies of the cancelled check, front and back, or the wire or transfer documentation. Notes to the financial statement indicate that $313,500.00 was advanced directly to MMPBV by a stockholder in August and October of 1994 and that only $286,616.00 had been repaid as of that footnote date. Is this the same reference to the $313,500.00 10Q stockholder? Again, please provide copies of all checks and the endorsement information.

8.      The 10Q also references a short term advance of $332,942.00 by a shareholder. Who is that shareholder? Has that shareholder been repaid? Please provide documentation on the advance and repayment.

9.      Notes to the consolidated financial statements for the years ended 12/31/94, 93 and 92, Note G, indicates that a stockholder actually provided various administrative services through a company of which he is an employee and for which he was paid approximately $194,000.00 in 1994 and $237,000.00 in 1993. Who is the stockholder? Were any payments made in 1995 and 1996? Please provide all relevant checks or transfer advices and endorsement or deposit information.

10.     Note H to the financial statement indicates that there are employment contracts for consulting services with certain individuals including a former director and members of

his immediate family. Please identify this former director and members of his immediate family and please provide copies of any and all contracts or agreements pertaining to such services and any and all correspondence related to such contracts or payments thereunder. The Note further reflects that there is due and payable in 1995 $876,400.00, in 1996 $720,400.00 and in 1997 $445,233. How is this allocated among this director and the members of his family? What are the duties of each to be performed under each respective employment or consulting contract. Please provide me with an accounting of all payments made to the McKenzie family for the period 1994 through date under these contracts. In that regard, I request copies of the checks that were issued or wire transfer advices made, an identification of the source of those funds and any correspondence pertaining to same, by, between or among the principals of MMPBV, the McKenzies or their agents, Mr. Schlegel, or others of or related to the Poland project.

11.     In a similar regard, several demands were made for payment by Mike McKenzie of amounts due him, his family and his companies under promissory notes, intercompany transfers, etc. Please identify all demands made in the years 1994, 1995, 1996 and to date in 1997 and provide copies of all faxes, letters and the like concerning such demand and any responses thereto, both text and actual payments. On any payments please provide information as to the source, dates and amounts, and the place or person to whom such money was sent. The same request is made concerning any voluntary payments within this time period to Mike, Tim, Steve or one or more of their companies.

12.     It appears that Baron received some stock, cash or notes. What did it receive and what consideration did it pay for same. You indicated there is a lawsuit involving Baron Financial over 902,000 shares. Please provide me with a copy of the relevant pleadings in that lawsuit.

13.     Who or what is Herkules? Would you please track the stock issue to Herkules and help me identify the consideration paid by Herkules. I request the same information on Sinbad Ltd. and its 715,42 shares of stock.

14.     Is Mr. Rauball holding any stock in trust for any of the McKenzie family members, and by holding I mean for the benefit of, direct or by indirectly?

15.     Will you please provide the Grant Thornton workpapers?

16.     Schlegel agreed to convert the remaining 80.3% interest, which was being sold to Energy Global or EuroGas, into 1.5 million shares of common stock and 2.5 million shares of preferred stock and allocate same as follows:

| | |
|---|---|
| Claron | 25.5% |
| Okibi | 22.5% |
| Schlegel | 2.5 |
| MCK Development | 50.0% |

Was this agreement carried into effect. What authority did Schlegel have to negotiate? On whose behalf and at whose direction was Schlegel acting?

17.     Please provide all communication after October 30, 1995 by and between Mike McKenzie, Tim McKenzie or Steve McKenzie, each individually or on behalf of one or more of their companies and MMPBV, GlobeGas BV, MCK Development BV, Rolf Schlegel, EuroGas, Merlin Fish, Billy Agyagos, Claron, Okibi and/or anyone else associated with the Poland Project.

18.     Does Schlegel hold a lien upon or is he the transferee of any shares of stock from Okibi? If the answer is yes, please provide any and all documentation pertaining to same.

19.     Please establish a meeting for me with Norman Marxxer. It appears that he is someone authorized to act on behalf of Energy Global

Finally, to you as counsel for EuroGas, Inc., the transfer agent for certain of the involved preferred stock, demand is made for turnover of EuroGas stock in the name of and of payments made in payment of any debentures issued to Claron, Rolf Schlegel, Okibi, Jeffrey and MCK Development. The bases of my claims result from the alter ego nature of MMPCO to my debtors or from my actual and/or derivative rights through MMPCO to set aside transfers of any interest in MCK or the Poland project and to recover all stock, monies, debentures and other considerations paid due to failure of consideration, fraud, constructive trust and/or conspiracy.

Should a bond or other indemnification be required as a result of this demand for turnover, I have been assured by Mr. Dick Tate that Kukui, Inc. will provide the necessary bonding or other form of indemnification.

I request that we meet next week at your pleasure and for as long as you can give me so that I may review the requested documents and see if we can resolve all matters between us within the short period remaining.

I look forward to hearing from you soon.

Sincerely,

FLOYD, SMITH & RIOS, P.C.

By: _____
    W. Steve Smith

WSS/njc

cc:    Richard Tate
       Blanche A. Duett

## KRUSE, LANDA & MAYCOCK, L.L.C.

EIGHTH FLOOR, BANK ONE TOWER
50 WEST BROADWAY (300 SOUTH)
SALT LAKE CITY, UTAH 84101-2034

HOWARD S. LANDA

TELEPHONE. (801) 531-7090
TELECOPY: (801) 359-3954

August 10, 1995

**CONFIDENTIAL**
**ATTORNEY/CLIENT PRIVILEGE**

Wolfgang Rauball
EuroGas, Inc.

*FACSIMILE TRANSMISSION*
*1-604-932-5939*

Dear Mr. Rauball:

Enclosed are copies of the letters concerning the outstanding obligations of EuroGas and my firm's requirements for a deposit to be held in trust. As we discussed, EuroGas needs to wire to my account $64,071.51. The account information is as follows:

> Kruse, Landa & Maycock, L.L.C.
> Trust Account #1258 7742
> Routing #124001545
> Bank One
> 80 West Broadway
> Salt Lake City, Utah 84101

Please also send by facsimile a confirmation of the wire.

Sincerely,

Howard S. Landa

HSL:ldp

Escrow106262

551

1          A.    That's correct.

2          Q.    All right.  So am I to understand that on

3     that day Dr R Rauball was holding all of the Eurogas

4     preferred and common shares due to MCK from its sale of

5     MMP BV?

6          A.    That's correct.

7          Q.    Would that also include the shares

8     attributable to the interest of Claron and Okibi?

9          A.    Yes.

10         Q.    In paragraph II it states that, "If no

11    trustee agreement is being made, all shares must be

12    handed over to MCK - the rightful owner!"

13         A.    Yes.

14         Q.    Why is MCK the rightful owner?

15         A.    Of the Eurogas shares.

16         Q.    OK.  Now, does that -- are you making

17    demand for all shares including that due to Claron and

18    Okibi?

19         A.    Yes.

20         Q.    It states: "The preferred shares are

21    eligible to a dividend."  Did you know that for a fact?

22         A.    Yes.

23         Q.    How did you know that?

24         A.    That is in the Stock Exchange Agreement

25    written down and also the convertible.

Escrow026306

FILE COPY

**INTERWEST TRANSFER COMPANY**
P.O. BOX 17136 SALT LAKE CITY, UTAH
84117
(801)272-9294

EUROGAS, INC.

CERTIFICATES ISSUED

5610 x 10,000 NCK DEVELOPMENT (ILS)

TOTAL SHARES = 10,000

**BROKER**

EUROGAS
435 WEST UNIVERSAL CIRCLE
SANDY, UT   84070

CERTIFICATES SURRENDERED

RESOLUTION
REG-S

TOTAL SHARES =

DATE - MAY 31, 1996 LS292
NEW CERTIFICATES ISSUED = 1
CERTIFICATES SURRENDERED = 0

CHARGES
  CERTIFICATE FEES = $15.00
                   =

TOTAL AMOUNT DUE  = $15.00
PAYABLE UPON RECEIPT

Escrow026307

**EUROGAS, INC.**
435 West Universal Circle
**Sandy, Utah 84070**

May 30, 1996

*FACSIMILE TRANSMISSION*
*277 3147*

Mr. Kurt Hughes
Interwest Transfer Company
1981 East 4800 South, Suite 100
Salt Lake City, Utah 84117

Re:    EuroGas, Inc.

Dear Kurt:

Enclosed is a certified resolution authorizing the issuance of 10,000 shares of common stock to MCK Development. In the Reg S offering last year, we failed to issue the appropriate shares. Please prepare the certificate so that I may pick it up in the morning as I am leaving for Zurich on Sunday.

Sincerely,

EUROGAS, INC.

Hank Blankenstein, Secretary.

Escrow026308

RECEIVED
MAY 3 1 1996

**CERTIFIED RESOLUTION**
of
**EUROGAS, INC.**

The undersigned, Hank Blankenstein, Secretary of EuroGas, Inc. (the "Company") hereby certifies that the Board of Directors of the Company adopted the resolutions set forth below on May 30, 1996, and that the resolution remains in full force and effect.

RESOLVED, that the Company issue 10,000 shares of its common stock to MCK Development.

Dated this 30 day of May, 1996.

EUROGAS, INC.

Hank Blankenstein, Secretary

**KRUSE, LANDA & MAYCOCK, L.L.C.**

EIGHTH FLOOR, BANK ONE TOWER
50 WEST BROADWAY (300 SOUTH)
SALT LAKE CITY, UTAH 84101-2034

TELEPHONE: (801) 531-7090
TELECOPY: (801) 359-3954

HOWARD S. LANDA

November 20, 1996

**CONFIDENTIAL**
**FACSIMILE TRANSMISSION** *255-2005*

Hank Blankenstein
EuroGas, Inc.
942 East 7145 South, #101A
Midvale, Utah 84047

Dear Hank:

Enclosed is my understanding of who holds the preferred shares issued in the acquisition of GlobeGas. Do these parties still hold these shares?

Best regards,

/s/ Howard S. Landa

Howard S. Landa

HSL:ldp.

Escrow068149

# MEMORANDUM

| | |
|---|---|
| **TO:** | RICH LUDLOW |
| **FROM:** | HOWARD S. LANDA |
| **DATE:** | NOVEMBER 20, 1996 |
| **SUBJECT:** | EUROGAS, INC. |

I need you to trace certain shares issued by EuroGas, Inc. as I have listed below and while I do have a current shareholder's list, after you are familiarized with it, I need to send a letter of introduction to Kurt Hughes at Interwest Transfer and Hank Blankenstein, EuroGas' secretary, to assist you. We are trying to find out who holds certain shares, name and address. I want you to trace each share from when it was originally issued going through each transfer on the books of the transfer agent.

Escrow068150

# M E M O R A N D U M

TO: Howard Landa

FROM: Rich Ludlow

DATE: December 2, 1996

RE: Ownership of shares of Eurogas

As per your request, I contacted Kurt Hughes at Interwest Transfer and requested information regarding the ownership of the shares represented by Certificate Numbers 4939, 4940, 4941, 4942, 4943 and 4944. I have attached the information he faxed back. I used this information, along with a certificate record covering the period from 8/3/1994 thru 10/21/1996, to track who owns the abovementioned shares.

SUMMARY

1)    Claron N.V., 365,971 shares, Certificate 4939
      Okibi N.V., 315,740 shares, Certificate 4940
      transferred 2/22/1996 to
      Canaccord Capital Co. ("Canaccord"), 681,711 shares, Certificate 5329
      transferred 3/6/1996 to
      Philadep & Co., 791,711 shares, Certificate 5352

2)    Rolf Schlegel 192,600 shares, Certificate 4942
      transferred 2/23/1996 to
      Cede & Co., 192,600 shares, Certificate 5342

3)    Rolf Schlegel 35,880 shares, Certificate 4941
      MCK Development B.V., 665,090 shares, Certificate 4943
      MCK Development B.V., 52,500 shares, Certificate 4944
      transferred 4/16/1996 to
      Canaccord 753,470 shares, Certificate 5560
      transferred 4/24/1996 to
      Philadep & Co., 753,470 shares, Certificate 5566
      transferred 7/9/1996 to
      Cede & Co., 984,728 shares, Certificate 5683

Escrow010119

Escrow010120

Certificate #4939 held by Claron N.V., representing 365,971 shares of Eurogas and Certificate #4940 held by Okibi N.V., representing 315,740 shares were transferred to Canaccord on 2/22/1996. The 681,711 shares were represented by Certificate #5329. Certificate #5329 was then transferred to Philadep & Co, along with 110,000 shares which Canaccord had previously (07/1995) acquired from Westlake Ltd., for a total transfer of 791,711 shares represented by Certificate #5352. This transfer took place 3/5/1996. According to the transfer agent's records Certificate #5352, is still held in the name of Philadep & Co.

Certificate #4942 representing 192,600 shares of Eurogas held by Rolf Schlegel were transferred on 2/23/1996 to Cede & Co, this Certificate continues to be held by Cede & Co.

Certificate #4941, held by Rolf Schlegel and Certificates #4943 and #4944, held by MCK Development B.V., were transferred to Canaccord on 4/16/1996. The total amount transferred to Canaccord was 753,470. These shares were represented by Certificate #5560. The 753,470 shares were then transferred to Philadep & Co, on 4/24/1996, evidenced by Certificate #5566. Philadep & Co., then transferred the 753,470 shares, along with 231,258 previously acquired shares held by Philadep & Co., to Cede & Co, on 7-9-96 represented by Certificate #5683. These shares are currently held in the name of Cede & Co.

**600000**

BY:

# KRUSE, LANDA & MAYCOCK, L.L.C.

HOWARD S. LANDA

EIGHTH FLOOR, BANK ONE TOWER
50 WEST BROADWAY (300 SOUTH)
SALT LAKE CITY, UTAH 84101-2034

TELEPHONE: (801) 531-7090
TELECOPY: (801) 359-3954

December 28, 1995

*FACSIMILE TRANSMISSION*

Mr. Kurt Hughes
Interwest Transfer Company
1981 East 4800 South, Suite 100
Salt Lake City, Utah 84117

Re:     EuroGas, Inc.

Dear Kurt:

On behalf of EuroGas, Inc., I have received written representations from Westlake, Ltd., Claron B.V., and OKIBI BV, that they are not beneficially owned by the same parties and that therefore, their individual requests to transfer stock should be honored.

Sincerely,

Howard S. Landa

HSL:ldp

Escrow069151

Post-it™ brand fax transmittal memo 7671 | # of pages ▶
To DENISE | From Howard
Co. | Co.
Dept. | Phone #
Fax # 2552-2005 | Fax #

# EUROGAS INC.

December 28, 1995

**FACSIMILE TRANSMISSION**

Kurtis D. Hughes
Interwest Transfer Co., Inc.
1981 East 4800 South
Salt Lake City, UT. 84117

Dear Kurt:

Please accept this letter as your authorization to accept Howard Landa's opinion regarding the transfer of the following certificates:

#4100 x 100,000 r/t/o Westlake
#4940 x 315,740 r/t/o Olobt, N.V.
#4939 x 365,971 r/t/o Claron

Please proceed with the transfer of these certificates. Again, thank you for your help and patience in this matter.

Sincerely,

EuroGas, Inc.

Hank Blankenstein
Secretary/Treasurer

415 West Universal Circle, Sandy, Utah 84070.
Phone:+1 801 255 06 62, Fax:+1 801 255 20 05

European Division.
Energy Global AG, Kirchenweg 24, ch-8001 Zurich.
Phone:+41  1 267 60 94, Fax:+41 1 267 60 93

Escrow069150

000026

# EUROGAS INC.

February 21, 1996

## FACSIMILE TRANSMISSION

Kurt D. Hughes
Interwest Transfer Co., Inc.
1981 East 4800 South
Salt Lake city, UT. 84117

Dear Kurt:

We have confirmed that Okibi, NV and Claron, NV are not affiliates of EuroGas, Inc., nor are they considered control persons of EuroGas, Inc.  Please proceed with the transfer of the following certificates:

Okibi NV        certificate # 4940 x 315,740
Claron NV       certificate # 4939 x 365,971

Thank you for your help in this matter.

Sincerely

EuroGas, Inc.

Hank Blankenstein
Secretary/Treasurer

455 West Universal Circle, Sandy, Utah 84070,   Phone:+1 801 255 08 62, Fax:++1 801 255 20 05
European Division:
Energy Global AG, Kirchgasse 24, ch-8001 Zurich,   Phone: ++41  1 267 60 94, Fax: ++41 1 267 60 93

Escrow069168

**KRUSE, LANDA & MAYCOCK, L.L.C.**
50 WEST BROADWAY (300 SOUTH)
EIGHTH FLOOR, BANK ONE TOWER
SALT LAKE CITY, UTAH 84101-2034

HOWARD S. LANDA

TELEPHONE: (801) 531-7090
TELECOPY: (801) 359-3954

May 24, 1996

*FACSIMILE TRANSMISSION*

Mr. Geoffrey Newton
Baker & Botts
2001 Ross Avenue
Dallas, Texas 75201

Re:     EuroGas, Inc./Danube

Dear Mr. Newton:

Enclosed is a letter concerning the due diligence material. I sent most of the material to Mr. Troyer by federal express yesterday. I also gave Bob Dobbins most of the documentation concerning GlobeGas acquisition, which is now owned 100%, and items with respect to the purchase of the 15% of PolTex Methane owned by the State coal company in Poland. (The price was approximately $1,300,000 as you calculate the cash and the relief from the State company's requirement to put up 15% of the indebtedness reflected on the PolTex Methane books.) I also enclose a copy of your due diligence list with my notations to show what has been provided. Below are some additional comments:

1.     Minute Books. I have asked Hank Blankenstein to provide me with the minutes books so that we can send you the last three or four years of minutes.

2.     Corporate Structure. The current corporate structure of EuroGas holds subsidiaries in descending tiers which are 100% owned as follows:

Energy Global (Liechtenstein)
GlobeGas (Netherlands)
PolTex Methane (Poland)

The Company also has two other concessions which they own in various percentages known as MMR and MMI. There are references to those entities in the Company's periodic reports.

3.     Organizational Chart. The organizational chart is being altered due to the entrance of the new personnel and will be sent to you in due course.

4.     Shareholders. You have the list of the holders of the common stock. All of the 1995 Series Preferred Stock, par value $0.001 was issued. I have asked Hank Blankenstein to provide a list of the current holders of preferred shares. Because of the conversion of the debentures and recent activities, I do not have an updated option and convertible securities list. I have asked Hank Blankenstein to provide an updated list.

Escrow042130

**KRUSE, LANDA & MAYCOCK, L.L.C.**

Mr. Geoffrey Newton
Baker & Botts
May 24, 1996
Page 2

5.    Offerings.  The only equity "public" offering was offered through Union Capital Markets, Ltd. of London.  Stock was issued only to foreign shareholders and the materials have been provided to Ed Tomko by David King.

6.    Financing.  The only financing arrangements outstanding currently are the convertible debentures and perhaps some new interim loans.  Hank Blankenstein will provide you with a list of those matters.

7.    SEC Matters.  I am allowing David King and Ed Tomko to handle the discussions with respect to the SEC investigation.

I received your supplementary request.  Some of the material was given to Bob Dobbins and I have asked Hank Blankenstein to collect much of the other material.  While we had an in-depth discussion on EuroGas' accounting, I have not heard any statement as to the date we might expect Danube's financial statements.  Please advise me as to which firm is handling the matter and its time table.

Sincerely,

KRUSE, LANDA & MAYCOCK, L.L.C.

Howard S. Landa

HSL:ldp
enclosure

cc:    EuroGas, Inc.

**KRUSE, LANDA & MAYCOCK, L.L.C**
EIGHTH FLOOR, BANK ONE TOWER
50 WEST BROADWAY (300 SOUTH)
SALT LAKE CITY, UTAH 84101-2034

TELEPHONE: (801) 531-7090
TELECOPY: (801) 359-3954

**FACSIMILE TRANSMISSION SHEET**
**Xerox 7032 (CCITT Group 2 and Group 3)**
**(801) 359-3954**

DATE: May 24, 1996 TIME (MDT): ____
MESSAGE TO: Geoffrey Newton
FIRM: Baker & Botts
FAX NUMBER TRANSMITTED TO: 1-214-953-6503
NO. OF PAGES (INCLUDING THIS COVER SHEET)
FROM: Howard S. Landa
KLM CLIENT FILE NO: 2175.00

**FOR QUESTIONS AND/OR PROBLEMS WITH RESPECT TO THIS FACSIMILE TRANSMISSION PLEASE CONTACT:**

**Linda Pia**

**AT (801) 531-7090**

**CONFIDENTIAL NOTICE**

[illegible]

☐ FOR YOUR INFORMATION
☐ FOR REVIEW AND COMMENT
☐ PER OUR CONVERSATION
☐ PER YOUR REQUEST
☐ FOR NECESSARY ACTION
☐ ORIGINAL TO FOLLOW BY STANDARD MAIL
☐ ORIGINAL TO FOLLOW BY OVERNIGHT COURIER
☐ SEE COMMENTS BELOW

COMMENTS/SPECIAL INSTRUCTIONS:

# TRANSMISSION REPORT

THIS DOCUMENT WAS CONFIRMED
(REDUCED SAMPLE ABOVE - SEE DETAILS BELOW)

** COUNT **
TOTAL PAGES SCANNED : 7
TOTAL PAGES CONFIRMED : 7

*** SEND ***

| No. | REMOTE STATION | START TIME | DURATION | #PAGES | MODE | RESULTS |
|---|---|---|---|---|---|---|
| 1 | 812149536503 | 5-24-96 11:38AM | 2'58" | 7/ 7 | EC | COMPLETED 9600 |
| | | TOTAL | 0:02'58" | 7 | | |

NOTE:
No. : OPERATION NUMBER 48 : 4800BPS SELECTED EC : ERROR CORRECT G2 : G2 COMMUNICATION
PD : POLLED BY REMOTE SF : STORE & FORWARD RI : RELAY INITIATE RS : RELAY STATION
MB : SEND TO MAILBOX PG : POLLING A REMOTE MP : MULTI-POLLING RM : RECEIVE TO MEMORY

Escrow042131

## KRUSE, LANDA & MAYCOCK, L.L.C.

EIGHTH FLOOR, BANK ONE TOWER
50 WEST BROADWAY (300 SOUTH)
SALT LAKE CITY, UTAH 84101-2034
E-mail: klmlaw.com

HOWARD S. LANDA

TELEPHONE: (801) 531-7090
TELECOPY. (801) 359-3954

February 13, 1997

*FACSIMILE TRANSMISSION*

*011 49 4048 2984*

Paul Hinterthur, President
EuroGas, Inc.

*011 49 221 497 3894*

Wolfgang Rauball
Cologne, Germany

Gentlemen:

Enclosed is a copy of a letter I sent to Hank concerning the Jeffrey Ltd., shares.  As you can see, I requested that he forward to me all evidence of the transfer of shares.  However, I would strongly suggest that the purchasers send the certificates to the transfer agent to have them put into the actual names of the owners and I would suggest that they do it immediately for their own protection.

Best regards,

KRUSE, LANDA & MAYCOCK, L.L.C.

Howard S. Landa

HSL:cta

enclosure

Escrow043163

## KRUSE, LANDA & MAYCOCK, L.L.C.

EIGHTH FLOOR, BANK ONE TOWER
50 WEST BROADWAY (300 SOUTH)
SALT LAKE CITY, UTAH 84101-2034
E-mail: klmlaw.com

TELEPHONE: (801) 531-7090
TELECOPY: (801) 359-3954

HOWARD S. LANDA

February 13, 1997

*CONFIDENTIAL*
*FACSIMILE TRANSMISSION*
*255-2005*

Hank Blankenstein
EuroGas, Inc.
942 East 7145 South, #101A
Midvale, Utah  84047

Dear Hank:

As we discussed, it is my understanding that many of the shares held by Jeffrey Ltd. have been sold to third parties for value.  Please send me copies of those bills of sale and other documents of assignment so that our records are complete.

Sincerely,

Howard S. Landa

HSL:cta

## KRUSE, LANDA & MAYCOCK, L.L.C.

EIGHTH FLOOR, BANK ONE TOWER
50 WEST BROADWAY (300 SOUTH)
SALT LAKE CITY, UTAH 84101-2034
E-mail: klmlaw.com

HOWARD S. LANDA

TELEPHONE: (801) 531-7090
TELECOPY: (801) 359-3954

February 14, 1997

*CONFIDENTIAL*
*FACSIMILE TRANSMISSION*

*011 49 4048 2984*

Paul Hinterthur, President
EuroGas, Inc.

*011 49 221 497 3894*

Wolfgang Rauball
Cologne, Germany

Gentlemen:

This letter is meant to outline to you the various factors that you should consider in trying to put together this transaction with Bishop's Estate. Bishop's Estate (which includes Kukui) has teamed with the bankruptcy trustee Steven Smith to pursue various recoveries including but not limited to the claims discussed below. For purposes of this letter I have referred to that team as Bishop's Estate. When I met with them two days ago, they outlined for me the causes of action they plan to bring in the near future. If a settlement is not reached, they plan four different legal actions in four different countries, one of which is the United States. This strategy is easily developed from reading the public records and applying known legal theories. Frankly, I am surprised it took them this long. The strategy itself is not novel, however a successful pursuit of the strategy in a public company situation with foreign shareholders is rare. It takes an outfit like Bishop's to be able to afford the legal cost and time. However, seeing what they did to McKenzie makes me believe they are serious.

Of course Bishop's Estate has no intention of suing EuroGas, however they do plan to pursue those shareholders who received interest in GlobeGas from McKenzie (prior to EuroGas' purchase) and then subsequently received EuroGas shares when EuroGas purchased GlobeGas (see discussion of claims below) As I explained to Paul, this is like living next to the garbage dump. They do not actually put the trash in your yard, but it still smells. A settlement will do EuroGas a lot of good with the SEC, Nasdaq, and Bishop's Estate. And based upon Bishop's size, I think the preferred shareholders would be well advised to effect a settlement.

Please remember that in all instances EuroGas intends to act only as an agent to facilitate settlement, never as a principal. No number of shares have been discussed nor any commitments made. EuroGas has no legal standing to make any commitments. However, I do believe that the agency arrangement will allow EuroGas to influence the course of action and help prevent the situation from getting out of control.

Set forth is an outline of the actual claims because I think there is a misunderstanding of the theories under U.S. law:

EuroGas claims. Set forth in the Schlegel letter copy was a brief summary of EuroGas' claims against the MCK Development and Schlegel. Paul seemed upset over the nature of the letter to Schlegel. One, I sent it because Paul insisted and two, I wrote it in a very careful manner so that EuroGas would

Escrow 20535

)                                              )

) **KRUSE, LANDA & MAYCOCK, L.L.C.**

Paul Hinterthur
Wolfgang Rauball
February 14, 1997
Page 2

have first claim to the 1995 preferred shares rather than Bishop's Estate. I think you can see the wisdom of this position since once again you have the ability to help control the situation. The notice only prevents the transfer of the preferred shares pending settlement of the matter. EuroGas as the transfer agent can also change its mind and allow a transfer, absent a court order which bars it from doing so. It is not an actual claim as to ownership. If I need to modify or explain the letter in any way, please let me know. I believe EuroGas has a very good claim, both in Switzerland and the Netherlands against these people for about $800,000, [approximately 150,00 shares of preferred (represents 300,000 shares in common)]. EuroGas' claim against the stock itself is "iffy". It is based upon an unliquidated damage claim and really does not relate to the specific ownership of this stock. The advantage of EuroGas' litigation is that EuroGas is the actual transfer agent. Neither Schelgel nor MCK Development want to appear in the United States. If EuroGas were pushed into litigation, it would not have the ability to bond. (Obviously, if EuroGas teamed up with Bishop's Estate, anything can be bonded.)

Bishop's Estate's Claim. This claim is premised upon the following:

)       a.       The creditors of McKenzie and McKenzie entities are entitled to its properties.

        b.       to the extent McKenzie sold any interest to companies such as GlobeGas BV (then named MMPBV) in real transactions for real consideration, Bishop's Estate has no claim.

        c.       However, if some of the entities and transactions were of a sham or strawman nature, Bishop's Estate is entitled to pursue the parties and the proceeds of the transaction. In this case, the proceeds in the GlobeGas transaction are common and 1995 preferred shares of EuroGas (EuroGas shares).

        d.       The parties which are the obvious ones to pursue are primarily MCK Development and secondarily Schlegel, Clarion, Okibi and Jeffrey Ltd. This information comes from McKenzie's records which are in the possession of the bankruptcy court, not primarily from EuroGas' records. McKenzie's records reflect that no cash was ever received from any of the five entities. There are some promissory notes, but they are of a suspicious nature.

        e.       If any of those parties listed in (d) above have sold their interest in EuroGas shares in a real transaction, then Bishop's Estate can no longer pursue the EuroGas shares from the then owners.

        f.       If however, there has only been a change in the owners of MCK Development, Clarion, Okibi, and Jeffrey Ltd., Bishop's Estate would still be able to pursue the EuroGas shares. As I tried to explain to Paul, the key is who owns the EuroGas shares, not who owns the company who owns the EuroGas shares.

))      g.       Maybe these shares have been sold by Clarion, Okibi, MCK Development, and Jeffrey Ltd. to third parties, but there is no records of such sale at the respective transfer agents. Please

Escrow 20536

**KRUSE, LANDA & MAYCOCK, L.L.C.**

Paul Hinterthur
Wolfgang Rauball
February 14, 1997
Page 3

remember that the U.S. ownership system is based in large part upon registration, not who bears the certificate.

The danger is that Bishop's will be able to freeze the transferability of the EuroGas shares and pursue a long and costly piece of litigation. I can foresee the preferred stock holders spending more than $1,000,000 to defend themselves with no guarantee of success. I believe we agree that it would be beneficial to all concerned to avoid that situation. The advantage that EuroGas has on the preferred shares is that EuroGas is the transfer agent. The common stock held in Jeffrey's name is administered by Interwest Transfer.

<u>Proposed Agreement of Cooperation</u>. Enclosed is a draft of a letter of cooperation for your review. I do not even know if Bishop's Estate will sign such an agreement, however they have indicated they would like to proceed in a similar manner. I think you can see from the draft what I am trying to accomplish while making sure that EuroGas occupies the position of agent, not principal in the transaction. From a practical point of view, if the preferred shareholders are close to a number that Kukui is willing to accept, I would assume some of the major shareholders would want to provide assistance. Of course, Chemilabco comes to mind as it holds the largest block of stock which it acquires at a dollar cost about .04 per share. And, Chemilabco has the most to gain if EuroGas is successful in getting Bishop's as a major capital partner.

Of course nothing will be sent to Bishop's Estate until we have had a chance to discuss the matter further.

Best regards,

KRUSE, LANDA & MAYCOCK, L.L.C.

Howard S. Landa

HSL:cta

enclosure

** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
** COMPANY # 0832 Page 1 **
** AS OF 11/14/1997 **

Escrow002716

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|

VOJTECH AGYAGOS
SSN:                6269        100,000     06/20/1997        666 BURRARD STREET SUITE 1180     VANCOUVER BC CANADA      V6C 2
                    ─────────────────────
                    1          100,000

PERRY S AKINS &                                                               956 JACON WAY                    PACIFIC PALISADES        CA 90272
METHAL A. AKINS JT TEN
SSN: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     4254        500         09/15/1994
                    ─────────────────────
                    1          500

STEPHEN ALDEN                                                                 44 CARRIGLEA DR                  RIVERSIDE                CT 06878
SSN: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     4442        417         10/04/1994
                    ─────────────────────
                    1          417

CARL O ALLRED                                                                 1270 W 5050 S                    TAYLORSVILLE             UT 84123
SSN:                5161        342         09/06/1995
                    ─────────────────────
                    1          342

) ANDERSON                                                                    4170 SOUTH 530 EAST #22E         SALT LAKE CITY           UT 84107
SSN: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     6377        500  I      07/22/1997
                    ─────────────────────
                    1          500

ELLIOT ANDERSON                                                               241 E 2450 SO                    BOUNTIFUL                UT 84010
SSN:                2844        834         07/02/1991
                    ─────────────────────
                    1          834

GREG ANDERSON                                                                 2204 NORTH 26TH STREET           BOISE                    ID 83702
SSN: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     6374        500  I      07/22/1997
                    ─────────────────────
                    1          500

KAREN ANDERSON                                                                P.O. BOX 504,                    APO AP                   96558
SSN: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     6375        500  I      07/22/1997
                    ─────────────────────
                    1          500

LYNNE A ANDERSON                                                              4170 SOUTH 530 E. NO. 22E        SALT LAKE CITY           UT 84107
SSN: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     6274        5,000  I    06/24/1997
                    6382        11,167  I   07/22/1997
                    ─────────────────────
                    2          16,167

) DERSON                                                                      84 E. 2000 S.                    OREM                     UT 84058
SSN: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     6713        434         11/07/1997
                    ─────────────────────
                    1          434

ANDERSON MICHAEL J                                                            819 E 1080 N                     LEHI                     UT 84043
SSN:

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|

|  | 1 | 667 | | | | |

PHILLIP ANDRUS                                                  803 S BLUFF                      ST GEORGE        UT 84770
SSN: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   4222   1,375   09/14/1994

|  | 1 | 1,375 | | | | |

ANSON R E                                                      484 WESTFIELD ROAD               ALPINE           UT 84003
SSN:   0   335   2,084   10/08/1986

|  | 1 | 2,084 | | | | |

APS   UCVCS TTEE PHILLIP   A PI                                9710 S 700 E #203                SANDY            UT 84070
SSN:870397147   484   5,209   12/09/1986

|  | 1 | 5,209 | | | | |

APS   UCVCS TTEE DAVID IRAPS   RVINE                           9710 S 700 E #203                SANDY            UT 84070
SSN:   0   1429   209   09/16/1987

|  | 1 | 209 | | | | |

APS   UCVCS TTEE KENT TOLBOE   TOLBO                           9710 S 700 E #203                SANDY            UT 84070
SSN:   0   2338   417   09/14/1988

|  | 1 | 417 | | | | |

APS   UCVCS TTEE LINDA IRAPS   RVINE                           9710 S 700 E #203                SANDY            UT 84070
SSN:   0   1428   209   09/16/1987

|  | 1 | 209 | | | | |

APS   UCVCSTTEE FBO OKUMURA                                    9710 SO 700 E #203               SANDY            UT 84070
SSN:   2659   542   12/13/1989

|  | 1 | 542 | | | | |

PHILIP BARBARO & MARGARET BARBARO TTEES                        2441 NE TRAIL WAY                POULSBO          WA 98370
BARBARO REV LIVING TRUST UAD 12-10-93
SSN: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   5653   300   06/14/1996

|  | 1 | 300 | | | | |

TOM BASSETT                                                    338 EAST 200 NORTH               LINDON           UT 84042
SSN: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   5758   1   08/08/1996

|  | 1 | 1 | | | | |

BEAUCHAMP FINANCE
SSN:   6704   16,953   11/05/1997

|  | 1 | 16,953 | | | | |

** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
** COMPANY # 0832 Page 3 **
** AS OF 11/14/1997 **

Escrow002718

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|
| BECKER BARBARA A | | | | 4612 STONEWALL AVENUE | DOWNERS GROVE | IL 60515 |
| SSN:327463258 | 454 | 1,042 | 12/05/1986 | | | |
| | 1 | 1,042 | | | | |
| DEBRA BERG | | | | 4811 W. 40TH LANE | ST LEWIS PARK | MN 55416 |
| SSN: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 | 5258 | 250 I | 10/26/1995 | | | |
| | 1 | 250 | | | | |
| JURGEN BERGER | | | | GUMBLSWEG 7 | D-79279 VOHRSTETTEN | GERMA |
| SSN: | 5069 | 176 | 07/21/1995 | | | |
| | 1 | 176 | | | | |
| BRIAN BINGLEY | | | | 48 FAIRFAX AVE, PENROSE, AUCKLAND | NEW ZEALAND | |
| SSN: | 6222 | 1,200 | 06/11/1997 | | | |
| | 1 | 1,200 | | | | |
| STEVEN T BIRCHALL | | | | 435 W 9160 S | SLC | UT 84070 |
| )-52-2502 | 4458 | 230 | 10/12/1994 | | | |
| | 1 | 230 | | | | |
| BRANDRUP DOUGLAS W | | | | ONE WALL STREET % GRIGGS BALDWIN | NEW YORK | NY 10015 |
| SSN:    0 | 182 | 834 | 10/08/1986 | | | |
| | 1 | 834 | | | | |
| BROTEN SANDEE | | | | 1458 W JAMES WAY | ANAHEIM | CA 92801 |
| SSN:546666285 | 2015 | 834 | 02/29/1988 | | | |
| | 1 | 834 | | | | |
| MARTELL BROWER | | | | 474 SO 40 E | FARMINGTON | UT 84025 |
| SSN: | 2904 | 84 | 10/23/1991 | | | |
| | 1 | 84 | | | | |
| BROWN BROTHERS HARRIMAN & CO | | | | 59 WALL ST | NEW YORK | NY 13205 |
| SSN:13-4973745 | 6717 | 2,000 | 11/10/1997 | | | |
| | 6719 | 60,000 | 11/10/1997 | | | |
| | 2 | 62,000 | | | | |
| BROWN CHRIS | | | | 114 S 600 W | PAYSON | UT 84651 |
| )74628 | 2583 | 271 | 03/17/1989 | | | |
| | 1 | 271 | | | | |
| BROWN CINDY & STEP | | | | 40 S 900 E #8B | SALT LAKE CITY | UT 84102 |
| SSN:529217190 | 1293 | 21 | 08/10/1987 | | | |

** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC **
** COMPANY # 0832 Page 4 **
** AS OF 11/14/1997 **

Escrow002719

| Name | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|------|-------|--------|-----------|---------|------|--------|
| | 1 | 21 | | | | |
| BUCHANAN TROY | | | | | | |
| SSN: 0 | 1989 | 250 | 02/02/1988 | | | |
| | 1 | 250 | | | | |
| DIANE BUTLER & | | | | 23 ADNE LANE | SELDEN | NY 11784 |
| THOMAS A. BUTLER JT TEN | | | | | | |
| SSN: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 | 6686 | 125 | 10/27/1997 | | | |
| | 1 | 125 | | | | |
| ROBERT A CAMPBELL | | | | 2874 SOUTH HWY 91 | NEW HARMONY | UT 84757 |
| SSN: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 | 4814 | 1 | 03/15/1995 | | | |
| | 1 | 1 | | | | |
| CARD DARRELL H & | | | | 454 N MAIN STREET | ALPINE | UT 84003 |
| SSN: 52924850 | 1029 | 834 | 05/28/1987 | | | |
| | 1 | 834 | | | | |
| WYNNETTE K | | | | 5304 LUCKY CLOVER LANE | MURRAY | UT 84123 |
| SSN:564388745 | 956 | 71 | 05/04/1987 | | | |
| | 1 | 71 | | | | |
| CAREY PHILIP J | | | | 8510 S 1380 E | SANDY | UT 84093 |
| SSN:559740788 | 2465 | 42 | 12/09/1988 | | | |
| | 1 | 42 | | | | |
| JOHN CARSTENSEN | | | | P.O. BOX 900592 | SANDY | UT 84090 |
| SSN: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 | 4905 | 2,084 | 04/13/1995 | | | |
| | 1 | 2,084 | | | | |
| CEDE & CO | | | | PO BOX 222 BOWLING GREEN STATION | NEW YORK | NY 10274 |
| SSN:13-2555119 | 4273 | 250,000 | 09/16/1994 | | | |
| | 4841 | 183,800 | 03/21/1995 | | | |
| | 5202 | 500,000 | 09/18/1995 | | | |
| | 5267 | 200,000 | 11/06/1995 | | | |
| | 5286 | 300,000 | 11/29/1995 | | | |
| | 5295 | 500,000 | 12/13/1995 | | | |
| | 5296 | 500,000 | 12/13/1995 | | | |
| | 5299 | 102,084 | 12/28/1995 | | | |
| | 5342 | 192,600 | 02/23/1996 | | | |
| | 5343 | 156,250 | 02/26/1996 | | | |
| | 5345 | 400,000 | 02/27/1996 | | | |
| | 5381 | 302,000 | 03/27/1996 | | | |
| | 5384 | 350,000 | 03/28/1996 | | | |
| | 5559 | 100,000 | 04/16/1996 | | | |
| | 5588 | 150,500 | 05/10/1996 | | | |

Escrow002720

| Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|-------|--------|------------|---------|------|--------|
| 5595 | 803,334 | 05/17/1996 | | | |
| 5605 | 230,209 | 05/28/1996 | | | |
| 5608 | 156,833 | 05/30/1996 | | | |
| 5683 | 984,728 | 07/09/1996 | | | |
| 5755 | 756,354 | 08/07/1996 | | | |
| 5801 | 100,000 | 09/23/1996 | | | |
| 6014 | 313,833 | 03/14/1997 | | | |
| 6040 | 200,000 | 04/03/1997 | | | |
| 6058 | 360,000 | 04/08/1997 | | | |
| 6081 | 970,217 | 04/24/1997 | | | |
| 6128 | 871,496 | 05/12/1997 | | | |
| 6150 | 101,250 | 05/22/1997 | | | |
| 6151 | 106,667 | 05/23/1997 | | | |
| 6170 | 375,715 | 05/29/1997 | | | |
| 6182 | 500,000 | 06/02/1997 | | | |
| 6213 | 200,400 | 06/09/1997 | | | |
| 6233 | 601,207 | 06/13/1997 | | | |
| 6248 | 500,743 | 06/16/1997 | | | |
| 6255 | 5,000 | 06/18/1997 | | | |
| 6258 | 550,000 | 06/19/1997 | | | |
| 6262 | 410,000 | 06/20/1997 | | | |
| 6271 | 16 | 06/23/1997 | | | |
| 6284 | 100,000 | 06/25/1997 | | | |
| 6287 | 50,000 | 06/26/1997 | | | |
| 6289 | 76,111 | 07/01/1997 | | | |
| 6299 | 209 | 07/02/1997 | | | |
| 6300 | 250 | 07/02/1997 | | | |
| 6303 | 300,000 | 07/03/1997 | | | |
| 6308 | 3,000 | 07/07/1997 | | | |
| 6309 | 220,000 | 07/07/1997 | | | |
| 6315 | 717 | 07/09/1997 | | | |
| 6317 | 500,000 | 07/09/1997 | | | |
| 6318 | 500,000 | 07/09/1997 | | | |
| 6323 | 203,000 | 07/11/1997 | | | |
| 6324 | 500,000 | 07/11/1997 | | | |
| 6325 | 500,000 | 07/11/1997 | | | |
| 6327 | 107,700 | 07/14/1997 | | | |
| 6357 | 25,000 | 07/16/1997 | | | |
| 6367 | 250,000 | 07/18/1997 | | | |
| 6369 | 30,500 | 07/21/1997 | | | |
| 6372 | 500,000 | 07/23/1997 | | | |
| 6384 | 500,000 | 07/23/1997 | | | |
| 6385 | 500,000 | 07/23/1997 | | | |
| 6391 | 763,787 | 07/29/1997 | | | |
| 6392 | 511,500 | 07/28/1997 | | | |
| 6394 | 381 | 07/28/1997 | | | |
| 6396 | 533,521 | 07/30/1997 | | | |
| 6449 | 450 | 07/29/1997 | | | |
| 6451 | 200,000 | 07/29/1997 | | | |
| 6452 | 500,000 | 07/29/1997 | | | |
| 6453 | 500,000 | 07/29/1997 | | | |
| 6454 | 300,000 | 07/30/1997 | | | |
| 6475 | 13,867 | 08/05/1997 | | | |
| 6476 | 50 | 08/05/1997 | | | |

** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
** COMPANY # 0832 Page 6 **
** AS OF 11/14/1997 **

Escrow002721

| Name | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|------|-------|--------|------------|---------|------|--------|
| | 6493 | 500,000 | 08/08/1997 | | | |
| | 6494 | 1,000 | 08/08/1997 | | | |
| | 6495 | 33,445 | 08/08/1997 | | | |
| | 6496 | 100,000 | 08/11/1997 | | | |
| | 6520 | 760,000 | 08/20/1997 | | | |
| | 6521 | 8,884 | 08/20/1997 | | | |
| | 6522 | 7,120 | 08/20/1997 | | | |
| | 6525 | 179,095 | 08/20/1997 | | | |
| | 6527 | 84,791 | 08/20/1997 | | | |
| | 6528 | 35,686 | 08/20/1997 | | | |
| | 6529 | 35,658 | 08/20/1997 | | | |
| | 6530 | 798 | 08/21/1997 | | | |
| | 6539 | 17,843 | 08/25/1997 | | | |
| | 6543 | 822,084 | 08/27/1997 | | | |
| | 6547 | 200,000 | 08/29/1997 | | | |
| | 6548 | 500,000 | 08/29/1997 | | | |
| | 6549 | 500,000 | 08/29/1997 | | | |
| | 6550 | 500,000 | 08/29/1997 | | | |
| | 6551 | 500,000 | 08/29/1997 | | | |
| | 6554 | 784,699 | 09/02/1997 | | | |
| | 6559 | 12,188 | 09/03/1997 | | | |
| | 6560 | 92,043 | 09/03/1997 | | | |
| | 6561 | 100,000 | 09/04/1997 | | | |
| | 6564 | 52,840 | 09/05/1997 | | | |
| | 6565 | 104,964 | 09/05/1997 | | | |
| | 6580 | 300,000 | 09/09/1997 | | | |
| | 6581 | 5,953 | 09/10/1997 | | | |
| | 6583 | 12,229 | 09/10/1997 | | | |
| | 6584 | 34,833 | 09/11/1997 | | | |
| | 6585 | 550,000 | 09/11/1997 | | | |
| | 6609 | 100,000 | 09/12/1997 | | | |
| | 6610 | 3,859 | 09/12/1997 | | | |
| | 6613 | 17,449 | 09/16/1997 | | | |
| | 6614 | 461,168 | 09/16/1997 | | | |
| | 6615 | 26,839 | 09/16/1997 | | | |
| | 6618 | 42,343 | 09/17/1997 | | | |
| | 6624 | 144,610 | 09/18/1997 | | | |
| | 6626 | 8,498 | 09/19/1997 | | | |
| | 6629 | 69,502 | 09/23/1997 | | | |
| | 6630 | 83,514 | 09/24/1997 | | | |
| | 6635 | 46,098 | 09/25/1997 | | | |
| | 6636 | 1,113,683 | 09/25/1997 | | | |
| | 6644 | 2,225,870 | 09/26/1997 | | | |
| | 6645 | 46,091 | 09/26/1997 | | | |
| | 6646 | 69,252 | 09/26/1997 | | | |
| | 6647 | 20,185 | 09/29/1997 | | | |
| | 6648 | 108,561 | 09/30/1997 | | | |
| | 6649 | 102,053 | 09/30/1997 | | | |
| | 6651 | 16,863 | 10/02/1997 | | | |
| | 6652 | 12,495 | 10/03/1997 | | | |
| | 6654 | 175,829 | 10/06/1997 | | | |
| | 6656 | 93,902 | 10/09/1997 | | | |
| | 6659 | 52,151 | 10/10/1997 | | | |
| | 6662 | 250,000 | 10/13/1997 | | | |

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|
| | 6669 | 182,425 | 10/16/1997 | | | |
| | 6672 | 77,982 | 10/20/1997 | | | |
| | 6673 | 51,099 | 10/20/1997 | | | |
| | 6678 | 1,000 | 10/22/1997 | | | |
| | 6682 | 834 | 10/23/1997 | | | |
| | 6684 | 80,000 | 10/27/1997 | | | |
| | 6685 | 10,302 | 10/27/1997 | | | |
| | 6690 | 104,693 | 10/29/1997 | | | |
| | 6691 | 144,064 | 10/29/1997 | | | |
| | 6692 | 100 | 10/30/1997 | | | |
| | 6696 | 52,432 | 10/31/1997 | | | |
| | 6697 | 79,821 | 11/03/1997 | | | |
| | 6700 | 27,500 | 11/05/1997 | | | |
| | 6701 | 11,002 | 11/05/1997 | | | |
| | 6708 | 54,059 | 11/06/1997 | | | |
| | 6709 | 504,964 | 11/06/1997 | | | |
| | 6712 | 1,066 | 11/07/1997 | | | |
| | 6714 | 417 | 11/07/1997 | | | |
| | 6715 | 667 | 11/10/1997 | | | |
| | 6720 | 900 | 11/11/1997 | | | |
| | 6723 | 15,211 | 11/13/1997 | | | |
| | 144 | 35,002,785 | | | | |

| CHRET FRANK CIKAN | | | | 8221 CANYON FERRY ROAD BOX 1156 | HELENA | MT 59624 |
|---|---|---|---|---|---|---|
| SSN: 32342896 | 1144 | 467 | 06/15/1987 | | | |
| | 1 | 467 | | | | |

| MORRIS CHAKLAI | | | | 6 EAGLES BLUFF | PORT CHESTER | NY 10573 |
|---|---|---|---|---|---|---|
| SSN: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 | 4385 | 8,334 | 09/30/1994 | | | |
| | 1 | 8,334 | | | | |

| CHEMILABCO | | | | ARTHUR HOUSE, 50A PORTLAND ROAD SE 254 LONDON | | UK |
|---|---|---|---|---|---|---|
| SSN: | 6508 | 5,000 I | 08/20/1997 | | | |
| | 6509 | 5,000 I | 08/20/1997 | | | |
| | 6510 | 5,000 I | 08/20/1997 | | | |
| | 6511 | 5,000 I | 08/20/1997 | | | |
| | 6512 | 5,000 I | 08/20/1997 | | | |
| | 6513 | 5,000 I | 08/20/1997 | | | |
| | 6 | 30,000 | | | | |

| CHEMILABCO BV | | | | | | |
|---|---|---|---|---|---|---|
| SSN: | 5704 | 500,000 I | 07/22/1996 | | | |
| | 5705 | 500,000 I | 07/22/1996 | | | |
| | 5706 | 500,000 I | 07/22/1996 | | | |
| | 5707 | 500,000 I | 07/22/1996 | | | |
| | 5708 | 500,000 I | 07/22/1996 | | | |
| | 5709 | 500,000 I | 07/22/1996 | | | |
| | 5710 | 500,000 I | 07/22/1996 | | | |
| | 5711 | 50,000 I | 07/22/1996 | | | |

Escrow002723

| Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|-------|--------|------------|---------|------|--------|
| 5713 | 50,000 I | 07/22/1996 | | | |
| 5714 | 50,000 I | 07/22/1996 | | | |
| 5715 | 50,000 I | 07/22/1996 | | | |
| 5716 | 50,000 I | 07/22/1996 | | | |
| 5717 | 50,000 I | 07/22/1996 | | | |
| 5718 | 50,000 I | 07/22/1996 | | | |
| 5719 | 50,000 I | 07/22/1996 | | | |
| 5720 | 50,000 I | 07/22/1996 | | | |
| 5721 | 100,000 I | 07/22/1996 | | | |
| 5722 | 100,000 I | 07/22/1996 | | | |
| 5723 | 100,000 I | 07/22/1996 | | | |
| 5724 | 100,000 I | 07/22/1996 | | | |
| 5725 | 100,000 I | 07/22/1996 | | | |
| 5728 | 500,000 I | 07/22/1996 | | | |
| 5864 | 100,000 I | 11/19/1996 | | | |
| 5867 | 100,000 I | 11/19/1996 | | | |
| 5868 | 100,000 I | 11/19/1996 | | | |
| 5869 | 100,000 I | 11/19/1996 | | | |
| 5870 | 100,000 I | 11/19/1996 | | | |
| 5871 | 100,000 I | 11/19/1996 | | | |
| 5872 | 100,000 I | 11/19/1996 | | | |
| 5873 | 100,000 I | 11/19/1996 | | | |
| 5874 | 100,000 I | 11/19/1996 | | | |
| 5875 | 100,000 I | 11/19/1996 | | | |
| 5876 | 100,000 I | 11/19/1996 | | | |
| 5877 | 100,000 I | 11/19/1996 | | | |
| 5878 | 100,000 I | 11/19/1996 | | | |
| 5879 | 100,000 I | 11/19/1996 | | | |
| 5880 | 100,000 I | 11/19/1996 | | | |
| 5881 | 100,000 I | 11/19/1996 | | | |
| 5882 | 100,000 I | 11/19/1996 | | | |
| 5883 | 100,000 I | 11/19/1996 | | | |
| 5884 | 100,000 I | 11/19/1996 | | | |
| 5885 | 100,000 I | 11/19/1996 | | | |
| 5886 | 100,000 I | 11/19/1996 | | | |
| 5887 | 100,000 I | 11/19/1996 | | | |
| 5888 | 100,000 I | 11/19/1996 | | | |
| 5889 | 100,000 I | 11/19/1996 | | | |
| 5890 | 100,000 I | 11/19/1996 | | | |
| 5891 | 100,000 I | 11/19/1996 | | | |
| 5892 | 100,000 I | 11/19/1996 | | | |
| 5893 | 100,000 I | 11/19/1996 | | | |
| 5895 | 250,000 I | 11/19/1996 | | | |
| 5896 | 250,000 I | 11/19/1996 | | | |
| 5897 | 250,000 I | 11/19/1996 | | | |
| 5898 | 250,000 I | 11/19/1996 | | | |
| 5901 | 250,000 I | 11/19/1996 | | | |
| 5902 | 250,000 I | 11/19/1996 | | | |
| 5907 | 500,000 I | 11/19/1996 | | | |
| 6587 | 50,000 I | 09/12/1997 | | | |
| 6588 | 50,000 I | 09/12/1997 | | | |
| 6589 | 50,000 I | 09/12/1997 | | | |
| 6590 | 50,000 I | 09/12/1997 | | | |
| 6591 | 50,000 I | 09/12/1997 | | | |

```
** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
            ** COMPANY # 0832 Page 9 **                    Escrow002724
                 ** AS OF 11/14/1997 **
```

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|

| | 6592 | 50,000 I | 09/12/1997 | | | |
| | 6593 | 50,000 I | 09/12/1997 | | | |
| | 6594 | 10,000 I | 09/12/1997 | | | |
| | 6595 | 10,000 I | 09/12/1997 | | | |
| | 6596 | 10,000 I | 09/12/1997 | | | |
| | 6597 | 10,000 I | 09/12/1997 | | | |
| | 6598 | 10,000 I | 09/12/1997 | | | |
| | 6599 | 10,000 I | 09/12/1997 | | | |
| | 6600 | 10,000 I | 09/12/1997 | | | |
| | 6601 | 10,000 I | 09/12/1997 | | | |
| | 6602 | 10,000 I | 09/12/1997 | | | |
| | 6603 | 10,000 I | 09/12/1997 | | | |
| | 6604 | 10,000 I | 09/12/1997 | | | |
| | 6605 | 10,000 I | 09/12/1997 | | | |
| | 6606 | 10,000 I | 09/12/1997 | | | |
| | 6607 | 10,000 I | 09/12/1997 | | | |
| | 6608 | 10,000 I | 09/12/1997 | | | |

| | 80 | 10,300,000 | | | | |

Br CHISHOLM
SS. 34-8073   4959   2,500   05/26/1995   PO BOX 1570   TEMECULA   CA 92593

| | 1 | 2,500 | | | | |

BRETT E CHMURA                                      6034 KEVIN DRIVE   BARTLETT   TN 38135
SSN: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   6531   36   08/21/1997

| | 1 | 36 | | | | |

BLAINE CHRISTENSEN &                                2906 W 7000 S   WEST JORDAN   UT 84084
IDONA J. CHRISTENSEN
SSN:   4312   834   09/21/1994

| | 1 | 834 | | | | |

DEAN F CLARK                                        1166 E 300 S   PROVO   UT 84606
SSN:   4382   188   09/29/1994

| | 1 | 188 | | | | |

COLBO
SSN:   6707   16,953   11/05/1997

| | 1 | 16,953 | | | | |

VELIA
0   292   2,084   10/08/1986                        2810 E WANDA WAY   SALT LAKE CITY   UT 84117

| | 1 | 2,084 | | | | |

COLOPHON
SSN:   6706   7,265   11/05/1997

```
                    ** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **          Escrow002725
                             ** COMPANY # 0832 Page 10 **
                                 ** AS OF 11/14/1997 **
```

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|

```
                      1      7,265

CONQUEST FINANCIAL CORPORATION                      TALACKER 50                  8001 ZURICH        SWITZ
SSN:                  6664    100,000   10/16/1997
                      6665    100,000   10/16/1997
                      6666    100,000   10/16/1997
                      6667    100,000   10/16/1997
                      6668    100,000   10/16/1997
                      ─────────────────
                      5      500,000

RON W COOK &                                        223 MANHATTAN BLVD           SUNNYVALE          TX 75182
CAROL J. COOK JT TEN
SSN: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  6721     100     11/11/1997
                      ─────────────
                      1      100

KAREN D COPELAND                                    7960 S. ROYAL LANE           SANDY              UT 84093
SSN:             6276    2,250 I 06/24/1997
                      ─────────────
                      1      2,250

PAULA MARIE COSGROVE &                              2103 W NIOBE AVE             ANAHEIM            CA 92804
GARY MICHAEL COSGROVE JT TEN
SSN: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  4215     313    09/14/1994
                      ─────────────
                      1      313

R CRAIG COSTELLO                                    169 S PALISADES DR           OREM               UT 84058
SSN:             4315     417    09/21/1994
                      ─────────────
                      1      417

COVEY & COMPANY                                     115 S MAIN STREET            SALT LAKE CITY     UT 84101
SSN:870454482    2534      69    02/06/1989
                      ─────────────
                      1      69

GREG M CRANDALL                                     1514 N 110 W                 OREM               UT 84057
SSN:             2815     542    04/15/1991
                      ─────────────
                      1      542

CRANE MARY STUART                                   3 SHERATON SQURE #2H % MRS YANDEL   NEW YORK    NY 10014
SSN:     0       324    4,167   10/08/1986
                      ─────────────
                      1      4,167

JOHN CUNLIFFE TTEE FBO THE PLANET LEASING           PO BOX 5112                  TRENTON            NJ 08638
CO. PENSION TRUST UAD 01-09-1992
SSN:22-1936765   6257    1,000   06/18/1997
                      ─────────────
                      1      1,000
```

```
                    ** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
                            ** COMPANY # 0832 Page 11 **                      Escrow002726
                              ** AS OF 11/14/1997 **
```

| lame | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|------|-------|--------|------------|---------|------|--------|

```
GERALD J CUTLER & VIOLET M CUTLER TTEES FBO THE       4900 KAUFFMAN              TEMPLE CITY        CA 91780
CUTLER FAMILY TRUST DTD 01/24/1994
SSN: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   6199      200    06/04/1997
                 ─────────────────
                    1       200
```

```
DALTON BARRY                                          4600 S 2300 E             HOLLADAY           UT 84117
SSN:264703015    2527      334    01/31/1989
                 ─────────────────
                    1       334
```

```
BETTY ANN DANKS                                       12 MEEANEE QUAY, WESTSHORE, NAPIER  NEW ZEALAND
SSN:            6223    1,800    06/11/1997
                 ─────────────────
                    1     1,800
```

```
JOHN EDWARD DANKS                                     72 WAGHORNE STREET, NAPIER      NEW ZEALAND
SSN:            6221      600    06/11/1997
                 ─────────────────
                    1       600
```

```
PETER WILLIAMS DANKS                                  12 MEEANEE QUAY, WESTSHORE, NAPIER  NEW ZEALAND
SSN:            6047    4,000    04/03/1997
                 ─────────────────
                    1     4,000
```

```
MARK DAVIS                                            5595 SOUTH 200 WEST       OGDEN              UT 84405
SSN: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  4577    1,500    11/21/1994
                 ─────────────────
                    1     1,500
```

```
DAVIS ARTHUR I                                        %JTC CORP 649 RAHWAY AVENUE    UNION         NJ 07083
SSN: 67180587    2372    4,167    10/17/1988
                 ─────────────────
                    1     4,167
```

```
DB CUSTODY & CO                                       31 WEST 52ND ST.          NEW YORK           NY 10019
SSN:13-2994988   6029  100,000 I 03/24/1997
                 6179  222,500 I 05/30/1997
                 ─────────────────
                    2   322,500
```

```
BEVAN HOWARD DE BERRY                                 HARBOUR CITY TOWER, 6TH FLOOR  LAMBTON QUAY 6001    NEWZE
SSN:NRA          5926    1,000    12/02/1996
                 ─────────────────
                    1     1,000
```

```
CONRAD B DEL ROSARIO                                  333 WEST NEILSON          CARSON             CA 90745
SSN:            2898      209    10/23/1991
                 ─────────────────
                    1       209
```

```
HANS PETER DIETRICH                                   HOH STRASSE 216           8004 ZURICH        SWITZ
```

** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
** COMPANY # 0832 Page 12 **
** AS OF 11/14/1997 **

Escrow002727

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|
| | 1 | 20,000 | | | | |
| DILLON READ & COMPANY | | | | 120 WALL STREET 6TH FLOOR | NEW YORK | NY 10005 |
| SSN: | 6710 | 12,207 | 11/06/1997 | | | |
| | 1 | 12,207 | | | | |
| DNR INCORP EMPLOYEES | | | | *DOCTOR C U 967 E 4800 S #1 | SALT LAKE CITY | UT 84117 |
| SSN:    0 | 2389 | 355 | 11/04/1988 | | | |
| | 1 | 355 | | | | |
| DOBBINS CAPITAL | | | | 2651 NORTH HARWOOD SUITE 500 | DALLAS | TX 75201 |
| SSN: | 6577 | 38,390 I | 09/08/1997 | | | |
| | 1 | 38,390 | | | | |
| DOBBINS PARTNERS LP | | | | 2651 NORTH HARWOOD SUITE 500 | DALLAS | TX 75201 |
| SSN: | 6576 | 118,600 I | 09/08/1997 | | | |
| | 1 | 118,600 | | | | |
| DRESSEN DAN | | | | 6678 SOUTH 3095  WEST | W JORDAN | UT 84084 |
| SSN: | 2619 | 417 | 06/21/1989 | | | |
| | 1 | 417 | | | | |
| DWC HOLDINGS LLC | | | | 716 EAST 4500 SOUTH #S-260 | SALT LAKE CITY | UT 84107 |
| SSN:84-1375601 | 6087 | 50,000 | 04/30/1997 | | | |
| | 6088 | 25,000 | 04/30/1997 | | | |
| | 6089 | 25,000 | 04/30/1997 | | | |
| | 6090 | 25,000 | 04/30/1997 | | | |
| | 6091 | 25,000 | 04/30/1997 | | | |
| | 5 | 150,000 | | | | |
| JOE T EBERHARD | | | | DORFSTRASSE 15 CH-8903  (CITY) BIRN SWITZERLAND | | |
| SSN: | 5230 | 100 | 10/05/1995 | | | |
| | 1 | 100 | | | | |
| JANNA HUNT EISENHART C/F | | | | 4114 HAYVENHURST DRIVE | ENCINO | CA 91436 |
| VICTORIA MARINA EISENHART UTMA CA | | | | | | |
| SSN: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 | 5593 | 50 | 05/13/1996 | | | |
| | 1 | 50 | | | | |
| ... / ELMER & | | | | BOX 40295 | LYNNDYL | UT 84640 |
| CONNIE L. ELMER JT TEN | | | | | | |
| SSN: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 | 5631 | 125 | 06/10/1996 | | | |
| | 1 | 125 | | | | |

```
                  ** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
                        ** COMPANY # 0832 Page 13 **
                           ** AS OF 11/14/1997 **                        Escrow002728
```

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|
| HILTRUD ESMERICH | | | | 97828 MARKTHEI | DEFELD | GERMA |
| SSN: | 5664 | 50,000 I | 06/24/1996 | | | |
| | 1 | 50,000 | | | | |
| EURO FACTORS INTL | | | | | | |
| SSN: | 6702 | 16,953 | 11/05/1997 | | | |
| | 1 | 16,953 | | | | |
| EUROPLAN TRUST CO IOM LIMITED | | | | 19 MOUNT HAVELOCK, DOUGLAS | ISLE OF MAN | UK |
| SSN: | 6206 | 9,150 | 06/05/1997 | | | |
| | 1 | 9,150 | | | | |
| EVANS BETH | | | | 1000 N 1440 E | PROVO | UT 84604 |
| SSN: 0 | 2370 | 2,084 | 10/21/1988 | | | |
| | 1 | 2,084 | | | | |
| RY FAIRBOURN | | | | 657 EAST HAWK ST | MERIDIAN | ID 83642 |
| | 2905 | 250 | 10/23/1991 | | | |
| | 1 | 250 | | | | |
| EC MIKE FALK & | | | | 8013 CORNFLOWER CIR | BUENA PARK | CA 90620 |
| JUDY E. FALK JT TEN | | | | | | |
| SSN: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 | 4386 | 346 | 09/30/1994 | | | |
| | 1 | 346 | | | | |
| DANIEL FELDMAN & | | | | 1285 N. 400 E. #1 | LOGAN | UT 84321 |
| JENNIFER FELDMAN | | | | | | |
| SSN: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 | 5363 | 250 I | 03/11/1996 | | | |
| | 6376 | 500 I | 07/22/1997 | | | |
| | 2 | 750 | | | | |
| FINANCE CREDIT AND DEVELOPMENT | | | | | | |
| CORPORATION | | | | | | |
| SSN: | 6399 | 22,500 I | 07/29/1997 | | | |
| | 6400 | 22,500 I | 07/29/1997 | | | |
| | 6401 | 50,000 I | 07/29/1997 | | | |
| | 6402 | 45,000 I | 07/29/1997 | | | |
| | 6403 | 90,000 I | 07/29/1997 | | | |
| | 6404 | 90,000 I | 07/29/1997 | | | |
| | 6405 | 13,333 I | 07/29/1997 | | | |
| | 6406 | 25,000 I | 07/29/1997 | | | |
| | 6407 | 25,000 I | 07/29/1997 | | | |
| | 6408 | 25,000 I | 07/29/1997 | | | |
| | 6409 | 25,000 I | 07/29/1997 | | | |
| | 6410 | 10,000 I | 07/29/1997 | | | |
| | 6411 | 10,000 I | 07/29/1997 | | | |

```
                    ** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
                            ** COMPANY # 0832 Page 14 **                    Escrow002729
                                ** AS OF 11/14/1997 **
```

| Name | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|------|-------|--------|------------|---------|------|--------|
| | 6413 | 10,000 I | 07/29/1997 | | | |
| | 6414 | 10,000 I | 07/29/1997 | | | |
| | 6415 | 10,000 I | 07/29/1997 | | | |
| | 6416 | 10,000 I | 07/29/1997 | | | |
| | 6417 | 10,000 I | 07/29/1997 | | | |
| | 6418 | 10,000 I | 07/29/1997 | | | |
| | 6419 | 10,000 I | 07/29/1997 | | | |
| | 6420 | 100,000 I | 07/29/1997 | | | |
| | 6421 | 100,000 I | 07/29/1997 | | | |
| | 6422 | 100,000 I | 07/29/1997 | | | |
| | 6423 | 100,000 I | 07/29/1997 | | | |
| | 6424 | 100,000 I | 07/29/1997 | | | |
| | 6425 | 100,000 I | 07/29/1997 | | | |
| | 6426 | 100,000 I | 07/29/1997 | | | |
| | 6427 | 100,000 I | 07/29/1997 | | | |
| | 6428 | 100,000 I | 07/29/1997 | | | |
| | 6429 | 100,000 I | 07/29/1997 | | | |
| | 6430 | 100,000 I | 07/29/1997 | | | |
| | 6431 | 100,000 I | 07/29/1997 | | | |
| | 6432 | 100,000 I | 07/29/1997 | | | |
| | 6433 | 100,000 I | 07/29/1997 | | | |
| | 6434 | 100,000 I | 07/29/1997 | | | |
| | 6435 | 100,000 I | 07/29/1997 | | | |
| | 6436 | 100,000 I | 07/29/1997 | | | |
| | 6437 | 100,000 I | 07/29/1997 | | | |
| | 6438 | 100,000 I | 07/29/1997 | | | |
| | 6439 | 100,000 I | 07/29/1997 | | | |
| | 6440 | 100,000 I | 07/29/1997 | | | |
| | 6441 | 100,000 I | 07/29/1997 | | | |
| | 6442 | 100,000 I | 07/29/1997 | | | |
| | 6443 | 100,000 I | 07/29/1997 | | | |
| | 6444 | 100,000 I | 07/29/1997 | | | |
| | 6445 | 100,000 I | 07/29/1997 | | | |
| | 6446 | 100,000 I | 07/29/1997 | | | |
| | 6447 | 100,000 I | 07/29/1997 | | | |

```
                    49       3,333,333
```

| | | | | | | |
|------|-------|--------|------------|---------|------|--------|
| GARY L FISH | | | | 1130 E 600 S | ALPINE | UT 84004 |
| SSN: | 4873 | 3,839 | 03/30/1995 | | | |
| | 1 | 3,839 | | | | |
| FISHER JOSEPH S | | | | 826 W 600 N | SALT LAKE CITY | UT 84116 |
| SSN:      0 | 2345 | 159 | 09/23/1988 | | | |
| | 1 | 159 | | | | |
| ALAN K FLAKE JR | | | | 4070 W SADDLEBACK RD | PARK CITY | UT 84060 |
| SSN: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 | 4871 | 513 | 03/30/1995 | | | |
| | 1 | 513 | | | | |

```
                    ** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
                              ** COMPANY # 0832 Page 15 **            Escrow002730
                                 ** AS OF 11/14/1997 **

             Cert#      Shares   Issue Date      Address                   CITY           ST ZIP
********************************************************************************************************


SSN:          2618      1,042    06/21/1989

              1         1,042

FOLGER BRENT                                     353 E 3065 S              SALT LAKE CITY  UT 84115
SSN:     0    135         417    10/08/1986

              1           417

GEORGE E FOSTER                                  BOX 148                   WESTPORT POINT  MA 02791
SSN: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  3003     625    11/30/1992

              1           625

ROBERT A FREY                                    700 PARKWOOD DR           ANDERSON        SC 29625
SSN: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  4212     625    09/14/1994

              1           625

GERALD A FRODAHL                                 310686 RAWHIDE LANE       PRINCEVILLE     OR 97754
  59-16-4384   3071     2,396    11/15/1993

              1         2,396

FT TRADING                                       78 CANNON STREET          LONDON  ENGLAND UK   EC4N
SSN:          6699     12,098    11/04/1997

              1        12,098

FTS WORLDWIDE CORP                                                                        
SSN:          6705     37,541    11/05/1997

              1        37,541

GAGNON JOHN T & MARY J                           2821 JOHN AVRE #2         SUPERIOR        WI 54880
SSN:          2649       188     11/15/1989

              1           188

GANNETT III CHARLES C                            265 S ALPINE CIRCLE       ALPINE          UT 84004
SSN:569903611    2356      84    10/03/1988

              1            84

GANNETT JONATHAN H                               265 S ALPINE CIRCLE       ALPINE          UT 84004
SSN:569903612    2357      84    10/03/1988

              1            84

SUSAN ANNE GARAVAGLIA                            32948 INDIANA             LIVIONA         MI 48150
SSN: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  5576     100    05/03/1996

              1           100
```

** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC.
** COMPANY # 0832 Page 16 **
** AS OF 11/14/1997 **

Escrow002731

| Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|

**AX GEFFNER**
SN: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

| | | | 1592 SIM PLACE | ANAHEIM | CA 92802 |
|---|---|---|---|---|---|
| 6211 | 168 | 06/06/1997 | | | |
| 6253 | 8,840 | 06/18/1997 | | | |
| 2 | 9,008 | | | | |

**MAX C GEFFNER**
SSN:

| | | | 1592 SIM PL | ANAHEIM | CA 92802 |
|---|---|---|---|---|---|
| 4221 | 1,375 | 09/14/1994 | | | |
| 1 | 1,375 | | | | |

**SANFORD GEFFNER**
SSN: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

| | | | 1351 E SONOMA DR | ALTADENA | CA 91001 |
|---|---|---|---|---|---|
| 4429 | 2,000 | 10/03/1994 | | | |
| 5354 | 2,000 | 03/05/1996 | | | |
| 5834 | 1,000 | 11/01/1996 | | | |
| 3 | 5,000 | | | | |

**JOSEPH W GEISNER &**
**SUZANNE M. GEISNER**
SSN:

| | | | PO BOX 8310 | SANTA ROSA | CA 95407 |
|---|---|---|---|---|---|
| 2902 | 730 | 10/23/1991 | | | |
| 1 | 730 | | | | |

**MILLIE GRANGER**
SSN:

| | | | 4245 SO 1650 E | SLC | UT 84124 |
|---|---|---|---|---|---|
| 4266 | 417 | 09/15/1994 | | | |
| 1 | 417 | | | | |

**GREENHEAD INVESTMENTS CORP**
SSN:87-0532344

| | | | | | |
|---|---|---|---|---|---|
| 5682 | 1,000 | 07/08/1996 | | | |
| 1 | 1,000 | | | | |

**HALABI TARIK**
SSN:      0

| | | | 2144 S 1100 E #325 | SALT LAKE CITY | UT 84106 |
|---|---|---|---|---|---|
| 2561 | 417 | 02/09/1989 | | | |
| 1 | 417 | | | | |

**HALL JOSHUA M**
SSN:526573057

| | | | 225 WALNUT AVENUE #220A (MR) | ST CHARLES | IL 60174 |
|---|---|---|---|---|---|
| 1244 | 2,500 | 08/03/1987 | | | |
| 1 | 2,500 | | | | |

**HALSEY KATHERINE L**
SSN: 40267363

| | | | BOX 102 RIDGEFIELD ROAD | WILTON | CT 06897 |
|---|---|---|---|---|---|
| 2515 | 4,167 | 01/27/1989 | | | |
| 1 | 4,167 | | | | |

**TIMOTHY B HANNIFIN JR**
SSN:

| | | | PO BOX 616 | EUREKA | UT 84628 |
|---|---|---|---|---|---|
| 4384 | 417 | 09/30/1994 | | | |
| 1 | 417 | | | | |

** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
** COMPANY # 0832 Page 17 **
** AS OF 11/14/1997 **

Escrow002732

| a. | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|

ELLEN HANSEN &
FRANK HANSEN JT TEN          432 18TH STREET          WEST BABYLON   NY 11704
SSN: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   5942      70   12/27/1996

                 1          70

ELLEN HANSEN C/F             432 18TH STREET          WEST BABYLON   NY 11704
JOHN HANSEN UGMA NY
SSN: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   5941      20   12/27/1996

                 1          20

VIRGINIA HARRINGTON          244 DAROCA AVE           SAN GABRIEL    CA 91775
SSN: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   4337    2,084   09/26/1994

                 1        2,084

HARVEY R HATCH               2153 SAN JUAN CIR.       ST. GEORGE     UT 84790
SSN:          5340     167   02/27/1996

                 1         167

HEATH BILL                   4201 OLYMPIC WAY         SALT LAKE CITY  UT 84124
SSN:     0   295     417   10/08/1986

                 1         417

HELLER VIVIAN D & S          8 DRIFTWOOD              IRVING         CA 92714
SSN:723010284   1834     709   01/04/1988

                 1         709

HERKULES AG                  LANDSTRASSE 161          9494 SCHAAN         LIECH
SSN:          4161   100,000 I 09/13/1994

                 1      100,000

ELIZABETH B HERRMANN         6 WHALING RD             DARIEN         CT 06820
SSN: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   4259   25,001   09/15/1994

                 1       25,001

RENATE HOEFFERER             WOLF-PADER-PLATZ 2 9330 TREIBACH/KA AUSTRIA
SSN:          5457    50,000 I 04/08/1996
              5458    50,000 I 04/08/1996
              5459    50,000 I 04/08/1996
              5460    50,000 I 04/08/1996
              5464    10,000 I 04/08/1996
              5465    10,000 I 04/08/1996
              5469    10,000 I 04/08/1996
              5470    10,000 I 04/08/1996
              5475     5,000 I 04/08/1996
              5476     5,000 I 04/08/1996

** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
** COMPANY # 0832 Page 18 **
** AS OF 11/14/1997 **

Escrow002733

| ) | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|
| | 10 | 250,000 | | | | |
| RENATE HOFFERER | | | | WOLF PADER PALTZ 2 | 9330 TREIBACH | AUSTR |
| SSN: | 4133 | 100,000 I | 09/13/1994 | | | |
| | 4134 | 100,000 I | 09/13/1994 | | | |
| | 2 | 200,000 | | | | |
| DAVID L HOLT BENEFICIARY DELAMAR HOLT JR FAMILY TRUST | | | | 2777 KENTUCKY AVE | SLC | UT 84117 |
| SSN: | 4242 | 480 | 09/13/1994 | | | |
| | 1 | 480 | | | | |
| DELAMAR HOLT JR FAMILY TRUST | | | | 2777 KENTUCKY AVE | SLC | UT 84117 |
| SSN:87-6203227 | 4241 | 480 | 09/13/1994 | | | |
| | 1 | 480 | | | | |
| DELAMAR HOLT TTEE FBO DELAMAR HOLT JR FAMILY TRUST UAD 05/18/84 | | | | 2777 KENTUCKY AVENUE | SALT LAKE CITY | UT 84117 |
| 6-20-3227 | 5958 | 1,000 | 02/05/1997 | | | |
| | 1 | 1,000 | | | | |
| HOVLAND DOUG | | | | 1310 SPRUANCE ROAD | MONTEREY | CA 93940 |
| SSN:180462488 | 1526 | 292 | 10/09/1987 | | | |
| | 1 | 292 | | | | |
| HOWARD DARRELL W & MAUDE | | | | 1979 YALE AVE | SLC | UT 84108 |
| SSN: | 2690 | 230 | 03/27/1990 | | | |
| | 1 | 230 | | | | |
| LOGAN A HUBBS | | | | 650 S RANCHO SANTA FE RD #82 | SAN MARCOS | CA 92069 |
| SSN: | 4213 | 3,105 | 09/14/1994 | | | |
| | 1 | 3,105 | | | | |
| LOWELL E HURST & LUCY HURST JT TEN | | | | 2890 W 5700 S | BENNION | UT 84118 |
| SSN: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 | 4227 | 334 | 09/14/1994 | | | |
| | 1 | 334 | | | | |
| AG-INTER CONSULT SECS AA | 5565 | 1,500 | 04/24/1996 | C/O W&W BUEROSERVICE GMBH; LUEGALLE 40545 DUESSELDORF | | FR GERMA |
| | 1 | 1,500 | | | | |
| INGELS WINNIE M | | | | 28 N 300 E | BRIGHAM CITY | UT 84302 |
| SSN:504204753 | 2559 | 209 | 02/09/1989 | | | |

** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
** COMPANY # 0832 Page 19 **
** AS OF 11/14/1997 **

Escrow002734

| Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|-------|--------|------------|---------|------|--------|

| | 1 | 209 | | | | |

**INTER REALITIES AG**
SSN:                                    BADENERSTR 281              8003 ZURICH        SWITZ

| | 4145 | 100,000 I | 09/13/1994 |
| | 4146 | 100,000 I | 09/13/1994 |
| | 5603 | 73,000 I | 05/24/1996 |
| | 5604 | 27,000 I | 05/24/1996 |

| | 4 | 300,000 | | | | |

**J ROMEO & CO**
SSN:13-3549344   5946   550,000 I 01/15/1997        C/O PO BOX 50000           NEWARK             NJ 07101

| | 1 | 550,000 |

**BLAINE E JACKLIN**
SSN: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   4433   1,042   10/03/1994         952 E EMERALD ST           ANAHEIM            CA 92804

| | 1 | 1,042 |

**JACOBSEN**
-18-9463   5953   1   01/27/1997                   2760 HIGHLAND DRIVE 7      SALT LAKE CITY     UT 84106

| | 1 | 1 |

**JUNE JACOBSON**
SSN: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   6611   265   09/12/1997           453 EAST 14TH STREET APT 9-B   NEW YORK       NY 10009

| | 1 | 265 |

**JEFFREY LIMITED**
SSN:                                    PO BOX 70                  FL-9490 VADUZ      LIECH

| | 5216 | 100,000 I | 10/03/1995 |
| | 5221 | 100,000 I | 10/03/1995 |
| | 5222 | 100,000 I | 10/03/1995 |
| | 5228 | 100,000 I | 10/03/1995 |

| | 4 | 400,000 |

**JEFFREY LTD**
SSN:   4800   65,671 I 03/08/1995                  GRANBY ST POB 613          KINGSTOWN ST VINCENT   GRENA

| | 1 | 65,671 |

**JEPSON BRET R**
SSN:   2726   280   07/10/1990                      PO BOX 422                 LAYTON             UT 84041

| | 1 | 280 |

**JOHNS WARREN**
SSN:   0   1231   1,042   07/30/1987                77 W 200 S #300 (MR)       SALT LAKE CITY     UT 84101

| | 1 | 1,042 |

** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
** COMPANY # 0832 Page 20 **
** AS OF 11/14/1997 **

Escrow002735

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|
| SSN: | 2699 | 70 | 05/11/1990 | | | |
| | 1 | 70 | | | | |
| JONES RON | | | | 915 S STATE STREET | OREM | UT 84058 |
| SSN:528563896 | 2380 | 125 | 10/24/1988 | | | |
| | 1 | 125 | | | | |
| LEONARD JORDAN | | | | 170 GROVE AVE | FITZGERALD | GA 31750 |
| SSN: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 | 4868 | 600 | 03/30/1995 | | | |
| | 1 | 600 | | | | |
| JAMES P JORDAN III & | | | | 855 HILLCREST ST | EL SEGUNDO | CA 90245 |
| LANA JORDAN JT TEN | | | | | | |
| SSN: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 | 4341 | 625 | 09/27/1994 | | | |
| | 1 | 625 | | | | |
| JULIUS BAER SECURITIES INC | | | | 330 MADISON AVE | NEW YORK | NY 10017 |
| | 6311 | 100,000 I | 07/08/1997 | | | |
| | 6312 | 100,000 I | 07/08/1997 | | | |
| | 2 | 200,000 | | | | |
| TERRY G KALLER & | | | | 6563 ULITHI ST | CYPRESS | CA 90630 |
| ROSE ANN KALLER JTWROS | | | | | | |
| SSN: | 2912 | 1,125 | 10/23/1991 | | | |
| | 1 | 1,125 | | | | |
| KEMSLEY TRADING | | | | | | |
| SSN: | 6703 | 16,953 | 11/05/1997 | | | |
| | 1 | 16,953 | | | | |
| KINK & CO | | | | C/O STATE STREET BANK & TURST CO. P BOSTON | | MA 02206 |
| SSN:04-6283701 | 5372 | 100,000 | 03/18/1996 | | | |
| | 1 | 100,000 | | | | |
| EARLE WESTON KIRTON | | | | HARBOUR CITY TOWER, 6TH FLOOR; LAMB WELLINGTON 6001 | | NEWZE |
| SSN:NRA | 6003 | 1,000 | 03/07/1997 | | | |
| | 1 | 1,000 | | | | |
| JI GLENN | | | | 1134 BIDWELL AVENUE | CHICO | CA 95926 |
| 566497243 | 478 | 5,209 | 12/09/1986 | | | |
| | 1 | 5,209 | | | | |
| KUKUI INC | | | | 567 SOUTH KING STREET, SUITE 310 | HONOLULU | HI 96813 |
| SSN: | 5863 | 100,000 I | 11/19/1996 | | | |

** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
** COMPANY # 0832 Page 21 **
** AS OF 11/14/1997 **

Escrow002736

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|
| | 1 | 100,000 | | | | |
| FRANK KUSIAK & | | | | 13833 WATERHOUSE WAY | ORLANDO | FL 32828 |
| TONI KUSIAK JT TEN | | | | | | |
| SSN: | 5918 | 521 | 11/26/1996 | | | |
| | 1 | 521 | | | | |
| TERRY E LANDA | | | | 6053 SOUTH 2300 EAST | SALT LAKE CITY | UT 84121 |
| SSN: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 | 5798 | 18,912 I | 09/16/1996 | | | |
| | 6172 | 11,260 | 05/29/1997 | | | |
| | 2 | 30,172 | | | | |
| GEORGE LASKEY | | | | 1136 SOUTH WOUSTER | LOS ANGELES | CA 90035 |
| SSN: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 | 5645 | 300 | 06/13/1996 | | | |
| | 1 | 300 | | | | |
| W LATER MD | | | | | | |
| OFIT SHARING PLAN | | | | | | |
| SSN:87-0400987 | 6381 | 500 I | 07/22/1997 | | | |
| | 1 | 500 | | | | |
| LAYTHORPE LISA RENEE D | | | | 281 PHEASANTBROOK DRIVE (T STOP) | CENTERVILLE | UT 84014 |
| SSN:      0 | 136 | 417 | 10/08/1986 | | | |
| | 1 | 417 | | | | |
| LEO HAROLD | | | | 5402 CHEVY CHASE CIRCLE | SALT LAKE CITY | UT 84117 |
| SSN:528684350 | 2530 | 625 | 01/31/1989 | | | |
| | 2635 | 625 | 09/13/1989 | | | |
| | 2766 | 2,084 | 12/03/1990 | | | |
| | 3 | 3,334 | | | | |
| HERMAN E LEWIS SR C/F | | | | PO BOX 51687 | FT. BENNING | GA 31905 |
| CRYSTAL V. LEWIS UTMA GA | | | | | | |
| SSN: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 | 5298 | 500 | 12/27/1995 | | | |
| | 1 | 500 | | | | |
| FRED LIEBER | | | | 503 N 400 W | SLC | UT 84103 |
| SSN: | 4228 | 417 | 09/14/1994 | | | |
| | 1 | 417 | | | | |
| DEAN R & JOAN B LINDSAY TTEES OF THE LINDSAY FAMILY | | | | 1360 NORTH ELKRIDGE LN | ALPINE | UT 84004 |
| TRUST (AND TO THEIR SUCCESSORS IN TRUST) | | | | | | |
| SSN: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 | 4821 | 10,000 | 03/20/1995 | | | |
| | 4822 | 10,000 | 03/20/1995 | | | |

** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. ** _
** COMPANY # 0832 Page 22 **
** AS OF 11/14/1997 **

Escrow002737

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|
| | 4828 | 25,000 I | 03/20/1995 | | | |
| | 4829 | 25,000 I | 03/20/1995 | | | |
| | 4830 | 25,000 I | 03/20/1995 | | | |
| | 4831 | 25,000 I | 03/20/1995 | | | |
| | 4832 | 25,000 I | 03/20/1995 | | | |
| | 4833 | 25,000 I | 03/20/1995 | | | |
| | 4834 | 25,000 I | 03/20/1995 | | | |
| | 4836 | 25,000 I | 03/20/1995 | | | |
| | 4837 | 25,000 I | 03/20/1995 | | | |
| | 12 | 270,000 | | | | |
| LOCKWOOD LORA L | | | | 2537 PACIFIC COAST HWY #D-248 | TORRANCE | CA 90505 |
| SSN:553550568 | 2039 | 667 | 03/04/1988 | | | |
| | 1 | 667 | | | | |
| LONG TAMMY & BEN | | | | 523 W 850 N | PLEASANT GROVE | UT 84057 |
| SSN:     0 | 642 | 167 | 02/13/1987 | | | |
| | 1 | 167 | | | | |
| VINCENT | | | | 5805 20 AVE | BROOKLYN | NY 11204 |
| SSN: | 2719 | 84 | 07/05/1990 | | | |
| | 1 | 84 | | | | |
| PEGGY LORIGAN | | | | PO BOX 9 CAMBRIDGE 2351 | NEW ZEALAND | |
| SSN:99-9999999 | 6057 | 1,000 | 04/08/1997 | | | |
| | 1 | 1,000 | | | | |
| EDGAR LUBER | | | | 474 RAYNERS LANE   PINNER MIDDLESEX LONDON ENGLAND | | H#5B |
| SSN: | 4043 | 100,000 I | 09/13/1994 | | | |
| | 4045 | 100,000 I | 09/13/1994 | | | |
| | 4046 | 100,000 I | 09/13/1994 | | | |
| | 3 | 300,000 | | | | |
| LUNDGREN THOR E & NOR | | | | 13029 HARTSOOK STREET | SHERMAN OAKS | CA 91423 |
| SSN: 22142593 | 1166 | 209 | 07/13/1987 | | | |
| | 1 | 209 | | | | |
| LUX INMOBILIEN GMBH | | | | FURST PUCKLER STR 50 | D-50935 KOLN | GERMA |
| SSN: | 4799 | 34,329 I | 03/08/1995 | | | |
| | 1 | 34,329 | | | | |
| PATRICIA M MARSH | | | | 3120 NW 53 DR | GAINESVILLE | FL 32606 |
| SSN: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 | 6217 | 43 | 06/10/1997 | | | |
| | 1 | 43 | | | | |

** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
** COMPANY # 0832 Page 23 **
** AS OF 11/14/1997 **

Escrow002738

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|
| ARTINEZ SANDRA K & T | | | | 1231 E TAMARA STREET | SANDY | UT 84070 |
| SN:      0    1251 | | 375 | 08/03/1987 | | | |
| | 1 | 375 | | | | |
| IASON DEBI | | | | 4540 JUPITER | SALT LAKE CITY | UT 84124 |
| SSN:     0    766 | | 1,042 | 04/07/1987 | | | |
| | 1 | 1,042 | | | | |
| JOAN MASTICK & | | | | 19421 ENTRADERS AVE | TORRANCE | CA 99050 |
| G. KENT MASTICK | | | | | | |
| SSN:    4338 | | 55 | 09/26/1994 | | | |
| | 1 | 55 | | | | |
| MATHIE HOWARD L | | | | 1926 LAMBOURNE AVENUE | SALT LAKE CITY | UT 84106 |
| SSN:528364899    65 | | 417 | 10/08/1986 | | | |
| | 1 | 417 | | | | |
| N PETER MAY | | | | RR BOX 173-3 BUSHY HILL RD | DEEP RIVER | CT 06417 |
| SSN:    4366 | | 209 | 09/27/1994 | | | |
| | 1 | 209 | | | | |
| JEFF MCCALLISTER | | | | 1050 NO 790 E | LEHI | UT 84043 |
| SSN: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   4305 | | 188 | 09/20/1994 | | | |
| | 1 | 188 | | | | |
| RICHARD J MCCLENDON | | | | 955 S. 800 E. | SPRINGVILLE | UT 84663 |
| SSN: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   4965 | | 1,249 | 06/07/1995 | | | |
| | 1 | 1,249 | | | | |
| F LYNN MCGHIE | | | | 4855 WANDER LANE | SALT LAKE CITY | UT 84117 |
| SSN: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   2957 | | 6,084 | 07/06/1992 | | | |
| | 1 | 6,084 | | | | |
| ROGER MCGHIE | | | | 3811 SO 3275 E | SLC | UT 84109 |
| SSN: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   4601 | | 209 | 11/29/1994 | | | |
| | 1 | 209 | | | | |
| BA MEIER | | | | 9624 POPPY LN | SANDY | UT 84094 |
| A:    4231 | | 209 | 09/14/1994 | | | |
| | 1 | 209 | | | | |
| MEMPO TRUST | | | | 1651 NORTH HARWOOD SUITE 260 | DALLAS | TX 75201 |
| SSN:    6293 | | 93,750 I | 07/02/1997 | | | |

** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. ** —
** COMPANY # 0832 Page 24 **
** AS OF 11/14/1997 **

Escrow002739

| Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|
| 6694 | 306,672 I | 10/30/1997 | | | |
| 3 | 508,622 | | | | |

PAUL T MITCHELL OR ALISON L MITCHELL TTEES FBO
THE MITCHELL FAMILY TRUST UTD 6-19-80

| | | | 16641 WELLINGTON DR | HUNTINGTON BEACH | CA 92649 |
|---|---|---|---|---|---|
| SSN: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  4377 | 834 | 09/29/1994 | | | |
| 1 | 834 | | | | |

WELDON R MONROE JR

| | | | 2361 N. 840 W. | CLINTON | UT 84015 |
|---|---|---|---|---|---|
| SSN: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  3059 | 1,292 | 09/20/1993 | | | |
| 1 | 1,292 | | | | |

MONTAGUE DANIEL

| | | | 2694 E 7800 S | SALT LAKE CITY | UT 84121 |
|---|---|---|---|---|---|
| SSN: 64546488  2467 | 105 | 12/09/1988 | | | |
| 1 | 105 | | | | |

MSA MESA AG

| | | | STADTLEY 7 | FL-9490 VADUZ | LIECH |
|---|---|---|---|---|---|
| 4190 | 100,000 I | 09/13/1994 | | | |
| 1 | 100,000 | | | | |

LEONARD L MYERS

| | | | 3037 S 2000 E | SLC | UT 84109 |
|---|---|---|---|---|---|
| SSN:  4210 | 417 | 09/14/1994 | | | |
| 1 | 417 | | | | |

NEILSON STEVEN

| | | | 1027 CHEYENNE STREET | SALT LAKE CITY | UT 84104 |
|---|---|---|---|---|---|
| SSN:528965066  2557 | 417 | 02/09/1988 | | | |
| 1 | 417 | | | | |

NEW BOND LTD

| | | | STADTLEY 7 | FL-9490 VADUZ | LIECH |
|---|---|---|---|---|---|
| SSN:  4591 | 15,000 I | 11/23/1994 | | | |
| 1 | 15,000 | | | | |

HALEY JEAN NICASTRO &
GERALDINE NICASTRO JT TEN

| | | | 3339 GEORGETOWN SQUARE | SALT LAKE CITY | UT 84109 |
|---|---|---|---|---|---|
| SSN: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  5277 | 1 | 11/27/1995 | | | |
| 1 | 1 | | | | |

NIELSON HEATHER

| | | | 572 N 1100 W | PROVO | UT 84606 |
|---|---|---|---|---|---|
| 8778905  2360 | 42 | 10/03/1988 | | | |
| 1 | 42 | | | | |

BRIAN D NORRIS

| | | | PO BOX 583 | DOUGLAS | GA 31533 |
|---|---|---|---|---|---|
| SSN: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  4889 | 50 | 04/06/1995 | | | |

```
                    ** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
                          ** COMPANY # 0832 Page 25 **              Escrow002740
                              ** AS OF 11/14/1997 **
```

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|

```
              1         50
```

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|
| NKE OETKER | | | | STADTSTR 15 | D-79104 FREIBURG | GERMA |
| SN: | 5056 | 1,000 | 07/21/1995 | | | |
| | 1 | 1,000 | | | | |
| RALF OETKER | | | | STADTSTR 15 | D-79104 FREIBURG | GERMA |
| SSN: | 5057 | 1,000 | 07/21/1995 | | | |
| | 1 | 1,000 | | | | |
| HEINZ OFTINGER | | | | KIRCHWEG 145A  8102 OBERENGSTRINGEN SWITZERLAND | | |
| SSN: | 5386 | 5,000 I | 04/01/1996 | | | |
| | 1 | 5,000 | | | | |
| OSTROV RESOURCES LTD | | | | 508-100 PARK ROYAL | WEST VANCOUVER | BC V7T 1 |
| SSN: | 4125 | 100,000 I | 09/13/1994 | | | |
| | 4126 | 100,000 I | 09/13/1994 | | | |
| | 4665 | 10,000 I | 01/04/1995 | | | |
| | 4666 | 10,000 I | 01/04/1995 | | | |
| | 4667 | 10,000 I | 01/04/1995 | | | |
| | 4668 | 10,000 I | 01/04/1995 | | | |
| | 4669 | 10,000 I | 01/04/1995 | | | |
| | 7 | 250,000 | | | | |
| FLORENCE OSWALD | | | | 794 BIARITZ AVE | LAS VEGAS | NV 89123 |
| SSN: | 4234 | 84 | 09/14/1994 | | | |
| | 1 | 84 | | | | |
| MARK A OSWALD | | | | 794 BIARITZ AVE | LAS VEGAS | NV 89123 |
| SSN: | 4233 | 625 | 09/14/1994 | | | |
| | 1 | 625 | | | | |
| MARK E OSWALD | | | | 794 BIARITZ AVE | LAS VEGAS | NV 89123 |
| SSN: | 4232 | 84 | 09/14/1994 | | | |
| | 1 | 84 | | | | |
| OSWALD LOUISE A | | | | 1433 HOLLYWOOD AVE | SLC | UT 84105 |
| SSN: | 2691 | 230 | 03/27/1990 | | | |
| | 1 | 230 | | | | |
| OXBRIDGE LIMITED | | | | ARTHUR HOUSE, 50A PORTLAND ROAD SE  254 LONDON | | UK |
| SSN: | 6502 | 250,000 I | 08/20/1997 | | | |
| | 6503 | 250,000 I | 08/20/1997 | | | |
| | 6504 | 250,000 I | 08/20/1997 | | | |
| | 6505 | 250,000 I | 08/20/1997 | | | |
```

** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
** COMPANY # 0832 Page 26 **
** AS OF 11/14/1997 **

Escrow002741

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|
| | 6507 | 150,000 I | 08/20/1997 | | | |
| | 6 | 1,400,000 | | | | |
| IICK & KATHY PARAS SSN: | 2835 | 105 | 06/04/1991 | 4250 WANDER LN | SALT LAKE CITY | UT 84124 |
| | 1 | 105 | | | | |
| PARATH RICHARD E & SSN:727037673 | 1165 | 209 | 07/13/1987 | 521 PLEASANT STREET | WORCESTER | MA 01602 |
| | 1 | 209 | | | | |
| PAULA K PAULSON SSN: | 4223 | 417 | 09/14/1994 | 7328 SO VISCAYNE DR | SLC | UT 84121 |
| | 1 | 417 | | | | |
| DON L PETERSON SSN: | 2921 | 334 | 11/15/1991 | 506 SO 1300 E | PROVO | UT 84601 |
| | 1 | 334 | | | | |
| PETTINGILL NEIL C/F KELLY SSN: | 2614 | 750 | 06/19/1989 | 6799 SO 3095 WEST | W JORDAN | UT 84084 |
| | 1 | 750 | | | | |
| TIMOTHY K PHILLIPS SSN: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 | 5291 | 850 | 12/06/1995 | ROUTE 7, BOX 53 | DOUGLAS | GA 31533 |
| | 1 | 850 | | | | |
| STERLING PIERCE & CORRINE PIERCE JT TEN SSN: | 4249 | 375 | 09/14/1994 | 151 N 1300 E | PLEASANT GROVE | UT 84062 |
| | 1 | 375 | | | | |
| VERDA PIERCE & MAX PIERCE JTWROS SSN: | 4282 | 375 | 09/16/1994 | 1055 E. GROVE CREEK | PLEASANT GROVE | UT 84062 |
| | 1 | 375 | | | | |
| EL POWELL 9-60-6690 | 4459 | 10,000 | 10/12/1994 | 507 W CASTLE COURT | GLENWOOD SPRINGS | CO 81601 |
| | 1 | 10,000 | | | | |
| PRICE JOHN A & JAN SSN:563708073 | 1111 | 1,042 | 06/12/1987 | 4960 PROTER HILLROAD | LA MESA | CA 92041 |

```
                    ** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
                           ** COMPANY # 0832 Page 27 **                   Escrow002742
                              ** AS OF 11/14/1997 **
```

| Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|-------|--------|------------|---------|------|--------|
| 1 | 1,042 | | | | |
| **IETER QUAST** | | | RADERSCHEIDSTR. 7 | 50935 KOLN | GERMA |
| SN: 6044 | 852,630 I | 04/02/1997 | | | |
| 1 | 852,630 | | | | |
| **! B I ASSOCIATES** | | | XBRANDON PO BOX 713 | CENTERVILLE | UT 84014 |
| SSN:870411020 2471 | 625 | 12/15/1988 | | | |
| 1 | 625 | | | | |
| **DEAN J RASMUSSEN** | | | BOX 734 | AMERICAN FORK] | UT 84003 |
| SSN: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 5632 | 209 | 06/10/1996 | | | |
| 1 | 209 | | | | |
| **REINHARD RAUBALL** | | | WITTBRAEUCKER WALDWEG 17 | HERDECKE-RUHR | GERMA |
| SSN: 4116 | 100,000 I | 09/13/1994 | | | |
| 4117 | 100,000 I | 09/13/1994 | | | |
| 4118 | 100,000 I | 09/13/1994 | | | |
| 4119 | 100,000 I | 09/13/1994 | | | |
| 4120 | 100,000 I | 09/13/1994 | | | |
| 4121 | 100,000 I | 09/13/1994 | | | |
| 4122 | 100,000 I | 09/13/1994 | | | |
| 7 | 700,000 | | | | |
| **REINHARD RAUBALL IN TRUST** | | | FRIEDENSPLATZ | 44135 DORTMUND | GERMA |
| **RECHTSANWALT UND NOTAR** | | | | | |
| SSN: 6545 | 50,000 I | 08/28/1997 | | | |
| 1 | 50,000 | | | | |
| **REINHARD RAUBALL TTEE** | | | | | |
| SSN: 5739 | 100,000 I | 07/31/1996 | | | |
| 5740 | 100,000 I | 07/31/1996 | | | |
| 5741 | 100,000 I | 07/31/1996 | | | |
| 5742 | 100,000 I | 07/31/1996 | | | |
| 5743 | 100,000 I | 07/31/1996 | | | |
| 5744 | 100,000 I | 07/31/1996 | | | |
| 5745 | 100,000 I | 07/31/1996 | | | |
| 5746 | 100,000 I | 07/31/1996 | | | |
| 5747 | 100,000 I | 07/31/1996 | | | |
| 5748 | 100,000 I | 07/31/1996 | | | |
| 5749 | 3,917 I | 07/31/1996 | | | |
| 11 | 1,003,917 | | | | |
| **HERBERT RAY** | | | KIRCHGASSE 2, CH-8952 SCHLIEREN | SWITZERLAND | |
| SSN: 6582 | 25,000 | 09/10/1997 | | | |
| 1 | 25,000 | | | | |

** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
** COMPANY # 0832 Page 28 **
** AS OF 11/14/1997 **

Escrow002743

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|
| KATHRYN REEVE | | | | 26731 WESTVALE | PVP | CA 90274 |
| SSN: | 4436 | 265 | 10/03/1994 | | | |
| | 1 | 265 | | | | |
| TERRY REEVE | | | | 26731 WESTVALE | PVP | CA 90274 |
| SSN: | 4437 | 265 | 10/03/1994 | | | |
| | 1 | 265 | | | | |
| REIFF RAY & CONNIE | | | | 125 VIA MENTONE | NEWPORT BEACH | CA 92663 |
| SSN:552643805 | 1323 | 1,250 | 08/17/1987 | | | |
| | 1 | 1,250 | | | | |
| RETIREMENT ACCOUNTS & CO C/F | | | | 805 S 12TH STREET | FT PIERCE | FL 34950 |
| DOROTHY V. TOLSON IRA | | | | | | |
| SSN:84-1314088 | 6679 | 1,000 | 10/22/1997 | | | |
| | 1 | 1,000 | | | | |
| JD RICHARDS | | | | 4549 SO 1300 E | SLC | UT 84117 |
| | 4423 | 572 | 10/03/1994 | | | |
| | 1 | 572 | | | | |
| JAMES P RICHARDS | | | | 4549 SO 1300 E | SLC | UT 84117 |
| SSN: | 4424 | 381 | 10/03/1994 | | | |
| | 1 | 381 | | | | |
| THOMAS J RICHARDS | | | | 4549 SO 1300 E | SLC | UT 84117 |
| SSN: | 4425 | 381 | 10/03/1994 | | | |
| | 1 | 381 | | | | |
| ROTHWEIN JOSEPH P | | | | 322 N 2000 W #BICO-2 | SALT LAKE CITY | UT 84116 |
| SSN:189302226 | 2554 | 417 | 02/09/1989 | | | |
| | 1 | 417 | | | | |
| RUSH & CO | | | | PO BOX 61 WALL ST. STATION | NEW YORK | NY 10005 |
| SSN:13-6066333 | 6718 | 60,000 | 11/10/1997 | | | |
| | 1 | 60,000 | | | | |
| STEFFEN SCHADE | | | | AN FISCHTAL 84  D-14169 | BERLIN  GERMANY | |
| | 6272 | 1 | 06/23/1997 | | | |
| | 1 | 1 | | | | |
| WILLIAM E SCHMIDT | | | | 2741 W TOLA AVE | ANAHEIM | CA 92804 |
| SSN: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 | 4216 | 125 | 09/14/1994 | | | |

```
                    ** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
                         ** COMPANY # 0832 Page 29 **              Escrow002744
                              ** AS OF 11/14/1997 **
```

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|
| | 1 | 125 | | | | |
| SCHRAVER EDWARD | | | | NAVAL SUB BASE 140 SYLVESTER ROAD | SAN DIEGO | CA 92106 |
| SSN: 0 | 2270 | 250 | 08/15/1988 | | | |
| | 1 | 250 | | | | |
| MARTIN SCHUEPBACH | | | | 2651 NORTH HARWOOD SUITE 120 | DALLAS | TX 75201 |
| SSN: | 6579 | 118,600 I | 09/08/1997 | | | |
| | 1 | 118,600 | | | | |
| MARTIN A SCHUEPBACH | | | | 2651 NORTH HARWOOD SUITE 120 | DALLAS | TX 75201 |
| SSN: | 6143 | 93,750 I | 05/20/1997 | | | |
| | 6711 | 780,352 I | 11/06/1997 | | | |
| | 2 | 874,102 | | | | |
| BERND SCHWAB | | | | MILLEN STR 57 | 0619 STUTTGART | GERMA |
| SSN: | 4521 | 25,000 I | 11/14/1994 | | | |
| | 1 | 25,000 | | | | |
| FRED L SCOTT | | | | 257 E 50 S | NO. SLC | UT 84054 |
| SSN: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 | 4374 | 4,167 | 09/28/1994 | | | |
| | 1 | 4,167 | | | | |
| SIGLER & CO | | | | 4 NEW YORK PLAZA 11TH FLGOR | NEW YORK | NY 10004 |
| SSN: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 | 6355 | 200,000 I | 07/16/1997 | | | |
| | 6514 | 250,000 I | 08/20/1997 | | | |
| | 2 | 450,000 | | | | |
| SIGMA TECHNOLOGY | | | | LE PIGNONROUTE DES CAPELLES ST SAMP | GUERNSEY CHANNEL | ISLAN |
| SSN: | 4974 | 4,000 | 06/16/1995 | | | |
| | 1 | 4,000 | | | | |
| SILBIGER JACK | | | | 5325 GYPSY | LAS VEGAS | NV 89107 |
| SSN:101242609 | 2543 | 834 | 02/09/1989 | | | |
| | 1 | 834 | | | | |
| SINBAD LTD | | | | MIDDLE & EGGMONT ST. | KINGSTOWN ST VINCENT | GRENA |
| SSN: | 6103 | 100,000 | 05/02/1997 | | | |
| | 6117 | 63,242 | 05/06/1997 | | | |
| | 2 | 163,242 | | | | |
| SLATER ELIZABETH J | | | | 310 E 46TH ST | NEW YORK | NY 10017 |
| SSN: | 2791 | 209 | 02/15/1991 | | | |

```
                    ** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
                            ** COMPANY # 0832 Page 30 **              Escrow002745
                               ** AS OF 11/14/1997 **
```

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|

**LATER KIM W**
SSN:529512986  2276  209  08/16/1988  360 S 100 E  PLEASANT GROVE  UT 84052

  1  209

**KAREN E SMITH**
SSN: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  4245  2,084  09/14/1994  175 W 73RD ST APT6B  NEW YORK  NY 10023

  1  2,084

**SMITH DAIVD**
SSN:  2601  6,250  05/11/1989  2049 SKIMMER COURT 324  CLEARWATER  FL 34622

  1  6,250

**SMITH JOAN**
SSN:528043063  100  417  10/08/1986  4310 ALBRIGHT STREET  SALT LAKE CITY  UT 84124

  1  417

**N RON R**
SSN:529028204  2315  188  09/08/1988  790 E 900 S  PLEASANT GROVE  UT 84062

  1  188

**CHARLES STUART &**
**BARBARA STUART  JT TEN**
SSN: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  2953  11  06/17/1992  BOX 2197  PROVO  UT 84603

  1  11

**ROBERT W SWANSON**
SSN: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  5615  100  06/03/1996  8225 GOLDEN AVENUE  LEMON GROVE  CA 91945

  1  100

**BARRY D SWENSEN**
SSN: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  5278  1  11/27/1995  1946 ATKIN AVE.  SALT LAKE CITY  UT 84106

  1  1

**TANGARO JOHN**
SSN:529031835  1730  417  12/02/1987  3343 S 1300 E #2  SALT LAKE CITY  UT 84106

  1  417

**TEBAY**
SSN: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  6378  500 I 07/22/1997  4067 SOUTH 570 EAST #131  SALT LAKE CITY  UT 84107

  1  500

**TERRY LADELL & MAR**
  180 N 825 E  AMERICAN FORK  UT 84003

```
                        ** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
                                ** COMPANY # 0832 Page 31 **              Escrow002746
                                   ** AS OF 11/14/1997 **

        )          Cert#      Shares   Issue Date        Address                      CITY            ST ZIP
************************************************************************************************************************
```

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|
| | 1 | 463 | | | | |
| WAYNE K THALMAN | | | | 720 E 1700 SO | OREM | UT 84057 |
| SSN: | 2821 | 417 | 04/16/1991 | | | |
| | 1 | 417 | | | | |
| PETER THOMA | | | | BLUMENRAINSTR 20 | 9050 APPENZELL | SWITZ |
| SSN: | 4038 | 100,000 I | 09/13/1994 | | | |
| | 5702 | 10,000 I | 07/22/1996 | | | |
| | 2 | 110,000 | | | | |
| THOMSON KENT & DEBOR | | | | 1639 W TOSCANINI DR | RANCHO PALOS VERDES | CA 90275 |
| SSN:305629433 | 2387 | 209 | 11/02/1988 | | | |
| | 1 | 209 | | | | |
| THORNTON JOHN | | | | 6325 S MT VERNON DRIVE | MURRAY | UT 84107 |
| 95282 | 2524 | 209 | 01/31/1989 | | | |
| | 1 | 209 | | | | |
| TRESCHITTA DOMENICK P | | | | XBALLARD MEDICAL 6864 S 300 W | MIDVALE | UT 84047 |
| SSN: 49304981 | 2553 | 1,250 | 02/09/1989 | | | |
| | 1 | 1,250 | | | | |
| TRONCALE KATHLEEN N & | | | | 23 SPARROHAWK | IRVINE | CA 92714 |
| SSN:384188003 | 485 | 2,605 | 12/09/1986 | | | |
| | 1 | 2,605 | | | | |
| TERRY LYNN TURNER | | | | PO BOX 20422 | V.O.C. | AZ 86341 |
| SSN: | 2891 | 625 | 10/23/1991 | | | |
| | 1 | 625 | | | | |
| FRED H TURPIN C/F | | | | 771 WEST END AVE | NEW YORK | NY 10025 |
| LAURA ELIZABETH BAKER TURPIN UGMA NY | | | | | | |
| SSN: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 | 6524 | 840 | 08/20/1997 | | | |
| | 1 | 840 | | | | |
| UBS SECURITIES LLC | | | | 350 PARK AVENUE 2ND FLR | NEW YORK | NY 10022 |
| | 6722 | 173,786 | 11/11/1997 | | | |
| | 1 | 173,786 | | | | |
| ARMANDO ULRICH | | | | | | |
| SSN: | 6681 | 85,000 | 10/22/1997 | | | |
| | | 85,000 | | | | |

```
                        ** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
                                ** COMPANY # 0832 Page 32 **
                                  ** AS OF 11/14/1997 **                    Escrow002747
```

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|

**ALFONS VAN BURK**
SSN:NRA

| | 5790 | 200 | 09/09/1996 | SENSENFELD 121 | D-46244 BOTTROP | GERMA |
|---|---|---|---|---|---|---|
| | 1 | 200 | | | | |

**VAN HORN JOHN E TTEE**
SSN:

| | 2743 | 417 | 10/02/1990 | 1941 E FRUIT ST | SANTA ANA | CA 92701 |
|---|---|---|---|---|---|---|
| | 1 | 417 | | | | |

**VANCE BETH**
SSN:529525530

| | 2522 | 167 | 01/31/1989 | 9623 S 1600 W | SOUTH JORDAN | UT 84095 |
|---|---|---|---|---|---|---|
| | 1 | 167 | | | | |

**JOAN S VANCOUWENBERGHE**
SSN:

| | 4250 | 167 | 09/14/1994 | 9532 GRAND VIEW DR | SLC | UT |
|---|---|---|---|---|---|---|
| | 1 | 167 | | | | |

**VETARE &**
**JOAN VETARE JTWROS**
SSN: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

| | 4010 | 1,000 | 09/12/1994 | 72 BRETT LN  PO BOX 282 | BEDFORD | NY 10506 |
|---|---|---|---|---|---|---|
| | 4011 | 1,000 | 09/12/1994 | | | |
| | 4012 | 1,167 | 09/12/1994 | | | |
| | 3 | 3,167 | | | | |

**FRANK G VETARE &**
**JOAN C. VETARE JT TEN**
SSN: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

| | 5586 | 500 | 05/10/1996 | 72 BRETT LANE | BEDFORD | NY 10506 |
|---|---|---|---|---|---|---|
| | 5587 | 500 | 05/10/1996 | | | |
| | 2 | 1,000 | | | | |

**MICHAEL A VETARE &**
**FRANK G. VETARE  TEN COM**
SSN: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

| | 5786 | 300 | 08/28/1996 | 72 BRETT LANE | BEDFORD | NY 10506 |
|---|---|---|---|---|---|---|
| | 1 | 300 | | | | |

**WALKER NIEL**
SSN:528682907

| | 2385 | 1,334 | 10/31/1988 | 12828 S 6000 W | HERRIMAN | UT 84065 |
|---|---|---|---|---|---|---|
| | 1 | 1,334 | | | | |

**RS LUNNISS NOMINEES LIMITED**
A/C 49158
SSN:NRA

| | 5955 | 1,000 | 01/31/1997 | 2 REDWELL ST. | NORWICH NR2 4SN | UK ENGLA |
|---|---|---|---|---|---|---|
| | 5960 | 1,000 | 02/05/1997 | | | |
| | 6039 | 1,000 | 03/27/1997 | | | |

```
                 ** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
                          ** COMPANY # 0832 Page 33 **              Escrow002748
                             ** AS OF 11/14/1997 **
```

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|

**DC CAPER LTD**
SN:

| | 5090 | 50,000 I | 08/14/1995 | STADTLEY 7 | FL 9490 VADUZ | LIECH |
| | 1 | 50,000 | | | | |

**WESTLAKE LTD**
SSN:

| | 5011 | 100,000 | 07/21/1995 | MIDDLE & EGGMONT ST | KINGSTOWN ST VINCENT & GRENA |
| | 1 | 100,000 | | | | |

**WHALEN BELIVEAU & ASSOCIATES INC**
SSN:NRA

| | 5909 | 1,000 | 11/22/1996 | 666 BURRARD STREET | VANCOUVER BC V6C 2X8 | CANAD |
| | 5910 | 2,000 | 11/22/1996 | | | |
| | 5911 | 2,000 | 11/22/1996 | | | |
| | 3 | 5,000 | | | | |

**WHEAT FIRST SECURITIES INC**
SSN-54-0796506

| | 6724 | 353,370 | 11/14/1997 | PO BOX 6570 | GLEN ALLEN | VA 23058 |
| | 1 | 353,370 | | | | |

**WHITBY GEORGE L**
SSN:521128801

| | 2367 | 417 | 10/13/1988 | 480 RIDGE LANE | PAYSON | UT 84651 |
| | 1 | 417 | | | | |

**WILCO**
SSN:87-0278784

| | 6716 | 41,667 | 11/10/1997 | PO BOX 11587 | SALT LAKE CITY | UT 84147 |
| | 1 | 41,667 | | | | |

**DENIS MICHAEL WILLIAM LANDER**
SSN:NRA

| | 5929 | 1,000 | 12/02/1996 | % 115 CALCUTTA STREET; KHANDALLAH | WELLINGTON 6004 | NEWZE |
| | 1 | 1,000 | | | | |

**RW WILLIAMS & RUTH P WILLIAMS TTEES FBO**
R.W. WILLIAMS FAMILY TRUST 05/25/79
SSN: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

| | 5572 | 700 | 05/02/1996 | 723 W. 1340 S. | PROVO | UT 84601 |
| | 1 | 700 | | | | |

**WISER L KENNETH &**
SSN:528285473

| | 488 | 542 | 12/09/1986 | 3843 N 900 W | PLEASANT VIEW | UT 84404 |
| | 1 | 542 | | | | |

**JEFF A WRIGHT**
SSN: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

| | 4888 | 120 | 04/06/1995 | 3333 LA MESA RD | SLC | UT 84109 |
| | 1 | 120 | | | | |

```
** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
          ** COMPANY # 0832 Page 34 **                    Escrow002749
              ** AS OF 11/14/1997 **
```

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|
| ZDRAZIL GRACE | | | | 1764 BRYAN AVENUE (MR) | SALT LAKE CITY | UT 84108 |
| SSN:       0 | 282 | 417 | 10/08/1986 | | | |
| | 1 | 417 | | | | |
| ZUBKOFF DEAN R | | | | 12087 LEIF ERICSON DRIVE | MORENO VALLEY | CA 92387 |
| SSN:549354113 | 1746 | 521 | 12/07/1987 | | | |
| | 1 | 521 | | | | |

** TOTALS **

| | |
|---|---|
| Free-Trading Stock | 37,325,044 |
| Investment Stock | 23,516,523 |
| Total Shares | 60,841,567 |
| Total Stockholders | 278 |

** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
** COMPANY # 0832 Page 1 **
** AS OF 04/25/1997 **

Escrow002750

| ) | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|-------|--------|------------|---------|------|--------|

*****************************************************************************************************

| | | | | | | |
|---|-------|--------|------------|---------|------|--------|
| 'Y S AKINS & | | | | 956 JACON WAY | PACIFIC PALISADES | CA 90272 |
| IAL A. AKINS JT TEN | | | | | | |
| 413-3S-4162 | 4254 | 500 | 09/15/1994 | | | |
| | 1 | 500 | | | | |
| HEN ALDEN | | | | 44 CARRIGLEA DR | RIVERSIDE | CT 06878 |
| 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 | 4442 | 417 | 10/04/1994 | | | |
| | 1 | 417 | | | | |
| . O ALLRED | | | | 1270 W 5050 S | TAYLORSVILLE | UT 84123 |
| : | 5161 | 342 | 09/06/1995 | | | |
| | 1 | 342 | | | | |
| :OT ANDERSON | | | | 241 E 2450 SO | BOUNTIFUL | UT 84010 |
| : | 2844 | 834 | 07/02/1991 | | | |
| | 1 | 834 | | | | |
| )DERSON | | | | | | |
| : | 5364 | 5,750 I | 03/11/1996 | | | |
| | 1 | 5,750 | | | | |
| ERSON MICHAEL J | | | | 819 E 1080 N | LEHI | UT 84043 |
| :870403873 | 2508 | 667 | 01/20/1989 | | | |
| | 1 | 667 | | | | |
| .LIP ANDRUS | | | | 803 S BLUFF | ST GEORGE | UT 84770 |
| :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 | 4222 | 1,375 | 09/14/1994 | | | |
| | 1 | 1,375 | | | | |
| )N R E | | | | 484 WESTFIELD ROAD | ALPINE | UT 84003 |
| : 0 | 335 | 2,084 | 10/08/1986 | | | |
| | 1 | 2,084 | | | | |
| UCVCS TTEE PHILLIP | A PI | | | 9710 S 700 E #203 | SANDY | UT 84070 |
| :870397147 | 484 | 5,209 | 12/09/1986 | | | |
| | 1 | 5,209 | | | | |
| 'S TTEE DAVID IRAPS | RVINE | | | 9710 S 700 E #203 | SANDY | UT 84070 |
| 0 | 1429 | 209 | 09/16/1987 | | | |
| | 1 | 209 | | | | |
| UCVCS TTEE KENT TOLBOE | TOLBO | | | 9710 S 700 E #203 | SANDY | UT 84070 |
| : 0 | 2338 | 417 | 09/14/1988 | | | |

** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
** COMPANY # 0832 Page 2 **
** AS OF 04/25/1997 **

Escrow002751

| Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|-------|--------|------------|---------|------|--------|
| 1 | 417 | | | | |
| G UCVCS TTEE LINDA IRAPS  RVINE | | | 9710 S 700 E #203 | SANDY | UT 84070 |
| N: 0   1428 | 209 | 09/16/1987 | | | |
| 1 | 209 | | | | |
| G UCVCSTTEE FBO OKUMURA | | | 9710 SO 700 E #203 | SANDY | UT 84070 |
| N: 2659 | 542 | 12/13/1989 | | | |
| 1 | 542 | | | | |
| IAN J BABCOCK | | | 846 N 200 W | AMERICAN FORK | UT 84003 |
| N: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  4690 | 518 | 01/11/1995 | | | |
| 1 | 518 | | | | |
| AD D BALDWIN | | | 846 N 200 W | AMERICAN FORK | UT 84003 |
| N: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  4689 | 518 | 01/11/1995 | | | |
| 1 | 518 | | | | |
| 1.  ARBARO & MARGARET BARBARO TTEES | | | 2441 NE TRAIL WAY | POULSBO | WA 98370 |
| RBARO REV LIVING TRUST UAD 12-10-93 | | | | | |
| N: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  5653 | 300 | 06/14/1996 | | | |
| 1 | 300 | | | | |
| IRON FINANCE LTD | | | HAUPTGASSE 30 | CH-9050 APPENZELL | SWITZ |
| N: 4049 | 100,000 I | 09/13/1994 | | | |
| 4050 | 100,000 I | 09/13/1994 | | | |
| 4051 | 100,000 I | 09/13/1994 | | | |
| 4052 | 100,000 I | 09/13/1994 | | | |
| 4053 | 100,000 I | 09/13/1994 | | | |
| 4054 | 100,000 I | 09/13/1994 | | | |
| 4055 | 100,000 I | 09/13/1994 | | | |
| 4056 | 100,000 I | 09/13/1994 | | | |
| 4057 | 100,000 I | 09/13/1994 | | | |
| 4058 | 100,000 I | 09/13/1994 | | | |
| 4059 | 60,000 I | 09/13/1994 | | | |
| 4060 | 60,000 I | 09/13/1994 | | | |
| 12 | 1,120,000 | | | | |
| M BASSETT | | | 338 EAST 200 NORTH | LINDON | UT 84042 |
| N: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  5758 | 1 | 08/08/1996 | | | |
| 1 | 1 | | | | |
| YERISCHE LANDESBANK | | | BOCKENHEIMER LANDSTR. 19 | 6325 FRANKURT/MAIN | GERMA |
| N: 6055 | 500,000 I | 04/07/1997 | | | |
| 1 | 500,000 | | | | |

** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
** COMPANY # 0832 Page 3 **
** AS OF 04/25/1997 **

Escrow002752

| ) | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|

CKER BARBARA A                                         4612 STONEWALL AVENUE           DOWNERS GROVE      IL 60515
N:327463258    454      1,042   12/05/1986

              1      1,042

COLO BELLANCA                                          VIA MAGGIORE 14                 AVIANO (PRODENONE)    ITALY
N:           5425     20,000 I 04/08/1996
             5426     20,000 I 04/08/1996
             5427     20,000 I 04/08/1996
             5428     20,000 I 04/08/1996
             5429     20,000 I 04/08/1996
             5430     20,000 I 04/08/1996
             5431     20,000 I 04/08/1996
             5432     20,000 I 04/08/1996
             5433     20,000 I 04/08/1996
             5434     20,000 I 04/08/1996

             10     200,000

COLO BELLANCO
N·           5978    100,000 I 02/13/1997

              1     100,000

BRA BERG                                               4811 W. 40TH LANE               ST LEWIS PARK      MN 55416
N: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  5258      250 I 10/26/1995

              1        250

IRGEN BERGER                                           GUMBLSWEG 7                     D-79279 VOHRSTETTEN   GERMA
N:           5069      176   07/21/1995

              1        176

IRI BIRCHALL                                           20 SOUTH 700 E #2               PROVO              UT 84606
N: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  4626      417   12/13/1994

              1        417

EVEN T BIRCHALL                                        435 W 9160 S                    SLC                UT 84070
N: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  4458      230   10/12/1994

              1        230

ATH BIRCHALL &                                         20 SO 700 E #2                  PROVO              UT 84606
IRI F. BIRCHALL JTWROS
·    59-2208   4648    2,000   12/23/1994

              1      2,000

IRI BIRCHALL C/F                                       20 SOUTH 700 E #2               PROVO              UT 84606
AN FISH UGMA UT
N: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  4629      417   12/13/1994

```
                    ** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **          Escrow002753
                           ** COMPANY # 0832 Page 4 **
                              ** AS OF 04/25/1997 **
```

| Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|-------|--------|------------|---------|------|--------|

| | 4631 | 417 | 12/13/1994 | | | |
| | 4632 | 417 | 12/13/1994 | | | |
| | 4740 | 200 | 02/10/1995 | | | |
| | 5 | 1,868 | | | | |

**IRI F BIRCHALL C/F**
**ARCI L. FISH**

| N: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 | 4652 | 2,000 | 12/23/1994 | 20 SO 700 E #2 | PROVO | UT 84606 |
| | 4653 | 2,000 | 12/23/1994 | | | |
| | 4654 | 2,000 | 12/23/1994 | | | |
| | 3 | 6,000 | | | | |

**IDEBE M BLACKHAM & UDELL R BLACKHAM TTEES FBO**
**IE PHOEBE M. BLACKHAM REVOCABLE FAMILY**

| N: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 | 4856 | 10,000 I | 03/24/1995 | 1063 E ALPINE DR | ALPINE | UT 84004 |
| | 4857 | 31,667 I | 03/24/1995 | | | |
| | 2 | 41,667 | | | | |

**DOUGLAS W**

| 0 182 | 834 | 10/08/1986 | ONE WALL STREET % GRIGGS BALDWIN | NEW YORK | NY 10015 |
| | 1 | 834 | | | | |

**UL F BRANSZTET**

| N: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 | 6027 | 250 | 03/24/1997 | 3350 JAYWOOD TER J222 | BOCA RATON | FL 33431 |
| | 1 | 250 | | | | |

**IDI G BROCKBANK**

| N: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 | 4885 | 193 | 04/06/1995 | 160 N 85 E | OREM | UT 84057 |
| | 1 | 193 | | | | |

**GRID G BROCKBANK**

| N: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 | 4882 | 781 | 04/06/1995 | 160 N 85 E | OREM | UT 84057 |
| | 1 | 781 | | | | |

**BINE E BROCKBANK**

| N: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 | 4884 | 193 | 04/06/1995 | 160 N 85 E | OREM | UT 84057 |
| | 1 | 193 | | | | |

**BROCKBANK**

| )-8669 | 4883 | 389 | 04/06/1995 | 1555 SOUTH 425 E | OREM | UT 84058 |
| | 5599 | 1,000 | 05/20/1996 | | | |
| | 2 | 1,389 | | | | |

**OTEN SANDEE**

| J-545555205 | 0015 | --- | | 1458 W JAMES WAY | ANAHEIM | CA 92801 |

```
** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
          ** COMPANY # 0832 Page 5 **                    Escrow002754
             ** AS OF 04/25/1997 **
```

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|
| | 1 | 834 | | | | |
| RTELL BROWER | | | | 474 SO 40 E | FARMINGTON | UT 84025 |
| N: | 2904 | 84 | 10/23/1991 | | | |
| | 1 | 84 | | | | |
| DWN CHRIS | | | | 114 S 600 W | PAYSON | UT 84651 |
| N:529274628 | 2583 | 271 | 03/17/1989 | | | |
| | 1 | 271 | | | | |
| DWN CINDY & STEP | | | | 40 S 900 E #8B | SALT LAKE CITY | UT 84102 |
| V:529217190 | 1293 | 21 | 08/10/1987 | | | |
| | 1 | 21 | | | | |
| CHANAN TROY | | | | | | |
| N: 0 | 1989 | 250 | 02/02/1988 | | | |
| | 1 | 250 | | | | |
| NE BUTLER & | | | | 4 LAMB PL. | DIX HILLS | NY 11746 |
| MAS A. BUTLER JT TEN | | | | | | |
| I: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 | 5943 | 450 | 12/27/1996 | | | |
| | 1 | 450 | | | | |
| LER DIANE | | | | #8 RANDOM ROAD | ENGLEWOOD | CO 80110 |
| I: 0 | 2349 | 417 | 09/28/1988 | | | |
| | 1 | 417 | | | | |
| LER WILLIAM M | | | | #8 RANDOM ROAD | ENGLEWOOD | CO 80110 |
| I: 0 | 2350 | 417 | 09/28/1988 | | | |
| | 1 | 417 | | | | |
| ERT A CAMPBELL | | | | 2874 SOUTH HWY 91 | NEW HARMONY | UT 84757 |
| :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 | 4814 | 1 | 03/15/1995 | | | |
| | 1 | 1 | | | | |
| ACCORD CAPITAL CORPORATION | | | | 2200-609 GRANVILLE ST., BOX 10337 P VANCOUVER BY V7Y 1H2 | | CANAD |
| : | 6013 | 200,000 | 03/14/1997 | | | |
| | 1 | 200,000 | | | | |
| R CANNADY | | | | PO BOX 5007 | FITZGERLAD | GA 31750 |
| :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 | 5240 | 50 | 10/11/1995 | | | |
| | 1 | 50 | | | | |

```
                    ** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
                           ** COMPANY # 0832 Page 6 **                    Escrow002755
                           ** AS OF 04/25/1997 **
```

| ) | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|-------|--------|------------|---------|------|--------|
| RD DARRELL H & N: 52924850 | 1029 | 834 | 05/28/1987 | 454 N MAIN STREET | ALPINE | UT 84003 |
| | 1 | 834 | | | | |
| RD WYNNETTE K N:564388745 | 956 | 71 | 05/04/1987 | 5304 LUCKY CLOVER LANE | MURRAY | UT 84123 |
| | 1 | 71 | | | | |
| REY PHILIP J N:559740788 | 2465 | 42 | 12/09/1988 | 8510 S 1380 E | SANDY | UT 84093 |
| | 1 | 42 | | | | |
| HN CARSTENSEN N: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 | 4905 | 2,084 | 04/13/1995 | 8775 S OAK VALLEY DR | SANDY | UT 84093 |
| | 1 | 2,084 | | | | |
| T CATANOSO 4-0747 | 5919 | 1,000 | 11/27/1996 | 102 HAWTHORNE DRIVE | RIO GRANDE | NJ 08242 |
| | 1 | 1,000 | | | | |
| DE & CO N:13-2555119 | 4273 | 250,000 | 09/16/1994 | PO BOX 222 BOWLING GREEN STATION | NEW YORK | NY 10274 |
| | 4276 | 1,000 | 09/16/1994 | | | |
| | 4277 | 374 | 09/16/1994 | | | |
| | 4335 | 1,339 | 09/26/1994 | | | |
| | 4383 | 480 | 09/30/1994 | | | |
| | 4443 | 2,084 | 10/04/1994 | | | |
| | 4460 | 834 | 10/13/1994 | | | |
| | 4488 | 1,667 | 10/28/1994 | | | |
| | 4489 | 1,250 | 10/28/1994 | | | |
| | 4497 | 563 | 11/03/1994 | | | |
| | 4498 | 417 | 11/03/1994 | | | |
| | 4499 | 1,042 | 11/03/1994 | | | |
| | 4500 | 625 | 11/03/1994 | | | |
| | 4504 | 834 | 11/07/1994 | | | |
| | 4505 | 794 | 11/08/1994 | | | |
| | 4513 | 709 | 11/09/1994 | | | |
| | 4520 | 605 | 11/14/1994 | | | |
| | 4563 | 1,042 | 11/15/1994 | | | |
| | 4564 | 501 | 11/15/1994 | | | |
| | 4570 | 521 | 11/17/1994 | | | |
| | 4571 | 209 | 11/17/1994 | | | |
| | 4585 | 417 | 11/22/1994 | | | |
| | 4586 | 584 | 11/22/1994 | | | |
| | 4593 | 292 | 11/28/1994 | | | |
| | 4598 | 208 | 11/29/1994 | | | |
| | 4600 | 375 | 11/29/1994 | | | |
| | 4612 | 668 | 12/08/1994 | | | |

** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
** COMPANY # 0832 Page 7 **
** AS OF 04/25/1997 **

Escrow002756

| Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|-------|--------|------------|---------|------|--------|
| 4617 | 834 | 12/13/1994 | | | |
| 4633 | 1,046 | 12/15/1994 | | | |
| 4635 | 84 | 12/16/1994 | | | |
| 4681 | 1,459 | 01/10/1995 | | | |
| 4727 | 6,249 | 02/08/1995 | | | |
| 4749 | 7,568 | 02/16/1995 | | | |
| 4803 | 834 | 03/10/1995 | | | |
| 4840 | 2,730 | 03/21/1995 | | | |
| 4841 | 183,800 | 03/21/1995 | | | |
| 4895 | 2,400 | 04/10/1995 | | | |
| 4896 | 125 | 04/10/1995 | | | |
| 4919 | 292 | 04/27/1995 | | | |
| 4934 | 4,850 | 05/12/1995 | | | |
| 4935 | 662 | 05/12/1995 | | | |
| 4952 | 209 | 05/17/1995 | | | |
| 4956 | 20,000 | 05/23/1995 | | | |
| 4961 | 56,800 | 06/02/1995 | | | |
| 4962 | 1,125 | 06/05/1995 | | | |
| 4964 | 418 | 06/07/1995 | | | |
| 4973 | 125 | 06/16/1995 | | | |
| 4975 | 45,000 | 06/19/1995 | | | |
| 4996 | 1,446 | 06/29/1995 | | | |
| 4998 | 1,667 | 07/05/1995 | | | |
| 5000 | 1,192 | 07/17/1995 | | | |
| 5072 | 5,550 | 07/28/1995 | | | |
| 5119 | 1,250 | 08/22/1995 | | | |
| 5151 | 834 | 08/29/1995 | | | |
| 5163 | 417 | 09/06/1995 | | | |
| 5202 | 500,000 | 09/18/1995 | | | |
| 5203 | 834 | 09/27/1995 | | | |
| 5247 | 4,366 | 10/12/1995 | | | |
| 5260 | 30,000 | 11/01/1995 | | | |
| 5267 | 200,000 | 11/06/1995 | | | |
| 5283 | 1,160 | 11/29/1995 | | | |
| 5284 | 59 | 11/29/1995 | | | |
| 5286 | 300,000 | 11/29/1995 | | | |
| 5287 | 17 | 11/29/1995 | | | |
| 5295 | 500,000 | 12/13/1995 | | | |
| 5296 | 500,000 | 12/13/1995 | | | |
| 5299 | 102,084 | 12/28/1995 | | | |
| 5304 | 150 | 01/03/1996 | | | |
| 5307 | 2,400 | 01/16/1996 | | | |
| 5308 | 20,000 | 01/19/1996 | | | |
| 5314 | 3,158 | 01/23/1996 | | | |
| 5342 | 192,600 | 02/23/1996 | | | |
| 5343 | 156,250 | 02/26/1996 | | | |
| 5345 | 400,000 | 02/27/1996 | | | |
| 5375 | 2,450 | 03/19/1996 | | | |
| 5376 | 4,167 | 03/19/1996 | | | |
| 5381 | 302,000 | 03/27/1996 | | | |
| 5384 | 350,000 | 03/28/1996 | | | |
| 5559 | 100,000 | 04/16/1996 | | | |
| 5564 | 1,134 | 04/24/1996 | | | |

** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
** COMPANY # 0832 Page 8 **
** AS OF 04/25/1997 **

Escrow002757

| Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|-------|--------|------------|---------|------|--------|
| 5571 | 17 | 05/02/1996 | | | |
| 5588 | 150,500 | 05/10/1996 | | | |
| 5592 | 32 | 05/13/1996 | | | |
| 5595 | 803,334 | 05/17/1996 | | | |
| 5596 | 875 | 05/20/1996 | | | |
| 5602 | 292 | 05/23/1996 | | | |
| 5605 | 230,209 | 05/28/1996 | | | |
| 5606 | 625 | 05/29/1996 | | | |
| 5607 | 95,000 | 05/30/1996 | | | |
| 5608 | 156,833 | 05/30/1996 | | | |
| 5611 | 150 | 05/31/1996 | | | |
| 5623 | 14,200 | 06/05/1996 | | | |
| 5625 | 417 | 06/05/1996 | | | |
| 5628 | 538 | 06/07/1996 | | | |
| 5630 | 1,385 | 06/10/1996 | | | |
| 5638 | 230 | 06/10/1996 | | | |
| 5642 | 6,292 | 06/12/1996 | | | |
| 5652 | 98 | 06/14/1996 | | | |
| 5659 | 1,183 | 06/20/1996 | | | |
| 5666 | 3,500 | 06/25/1996 | | | |
| 5671 | 10,708 | 06/28/1996 | | | |
| 5674 | 2,126 | 07/03/1996 | | | |
| 5683 | 984,728 | 07/09/1996 | | | |
| 5688 | 700 | 07/09/1996 | | | |
| 5690 | 1,604 | 07/15/1996 | | | |
| 5699 | 1,000 | 07/22/1996 | | | |
| 5731 | 833 | 07/24/1996 | | | |
| 5732 | 53 | 07/26/1996 | | | |
| 5738 | 1,000 | 07/30/1996 | | | |
| 5752 | 292 | 08/01/1996 | | | |
| 5753 | 10,000 | 08/05/1996 | | | |
| 5754 | 27,434 | 08/06/1996 | | | |
| 5755 | 756,354 | 08/07/1996 | | | |
| 5757 | 147 | 08/08/1996 | | | |
| 5759 | 50,000 | 08/09/1996 | | | |
| 5761 | 10,000 | 08/13/1996 | | | |
| 5770 | 98,000 | 08/20/1996 | | | |
| 5787 | 15,000 | 09/03/1996 | | | |
| 5789 | 209 | 09/09/1996 | | | |
| 5794 | 2,786 | 09/10/1996 | | | |
| 5801 | 100,000 | 09/23/1996 | | | |
| 5803 | 10,000 | 09/27/1996 | | | |
| 5820 | 251 | 10/14/1996 | | | |
| 5826 | 6,600 | 10/28/1996 | | | |
| 5829 | 20,000 | 10/29/1996 | | | |
| 5830 | 1,000 | 10/31/1996 | | | |
| 5831 | 963 | 10/31/1996 | | | |
| 5833 | 438 | 11/01/1996 | | | |
| 5840 | 509 | 11/13/1996 | | | |
| 5912 | 20,000 | 11/22/1996 | | | |
| 5930 | 146 | 12/03/1996 | | | |
| 5939 | 4,100 | 12/24/1996 | | | |
| 5940 | 460 | 12/27/1996 | | | |

** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
** COMPANY # 0832 Page 9 **
** AS OF 04/25/1997 **

Escrow002758

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|
| | 5947 | 18 | 01/20/1997 | | | |
| | 5952 | 1 | 01/27/1997 | | | |
| | 5957 | 925 | 02/05/1997 | | | |
| | 5964 | 700 | 02/06/1997 | | | |
| | 5998 | 42,000 | 03/07/1997 | | | |
| | 6014 | 313,833 | 03/14/1997 | | | |
| | 6019 | 260 | 03/19/1997 | | | |
| | 6025 | 25,000 | 03/24/1997 | | | |
| | 6026 | 150 | 03/24/1997 | | | |
| | 6034 | 400 | 03/25/1997 | | | |
| | 6036 | 2,000 | 03/26/1997 | | | |
| | 6041 | 14,600 | 03/31/1997 | | | |
| | 6043 | 334 | 04/02/1997 | | | |
| | 6045 | 4,500 | 04/03/1997 | | | |
| | 6048 | 200,000 | 04/03/1997 | | | |
| | 6050 | 400 | 04/04/1997 | | | |
| | 6051 | 4,000 | 04/04/1997 | | | |
| | 6053 | 1,000 | 04/07/1997 | | | |
| | 6054 | 500 | 04/07/1997 | | | |
| | 6058 | 360,000 | 04/08/1997 | | | |
| | 6060 | 2,000 | 04/09/1997 | | | |
| | 6062 | 60,000 | 04/15/1997 | | | |
| | 6068 | 575 | 04/18/1997 | | | |
| | 6078 | 1,459 | 04/23/1997 | | | |
| | 6081 | 970,217 | 04/24/1997 | | | |
| | 161 | 9,908,936 | | | | |
| HAET FRANK CIKAN | | | | 8221 CANYON FERRY ROAD BOX 1156 | HELENA | MT 59624 |
| SN: 32342896 | 1144 | 467 | 06/15/1987 | | | |
| | 1 | 467 | | | | |
| ORRIS CHAKLAI | | | | 6 EAGLES BLUFF | PORT CHESTER | NY 10573 |
| SN: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 | 4385 | 8,334 | 09/30/1994 | | | |
| | 1 | 8,334 | | | | |
| HEMILABCO BV | | | | | | |
| SN: | 5704 | 500,000 I | 07/22/1996 | | | |
| | 5705 | 500,000 I | 07/22/1996 | | | |
| | 5706 | 500,000 I | 07/22/1996 | | | |
| | 5707 | 500,000 I | 07/22/1996 | | | |
| | 5708 | 500,000 I | 07/22/1996 | | | |
| | 5709 | 500,000 I | 07/22/1996 | | | |
| | 5710 | 500,000 I | 07/22/1996 | | | |
| | 5711 | 50,000 I | 07/22/1996 | | | |
| | 5712 | 50,000 I | 07/22/1996 | | | |
| | 5713 | 50,000 I | 07/22/1996 | | | |
| | 5714 | 50,000 I | 07/22/1996 | | | |
| | 5715 | 50,000 I | 07/22/1996 | | | |
| | 5716 | 50,000 I | 07/22/1996 | | | |
| | 5717 | 50,000 I | 07/22/1996 | | | |

** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
** COMPANY # 0832 Page 10 **
** AS OF 04/25/1997 **

Escrow002759

| Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|-------|--------|------------|---------|------|--------|
| 5719 | 50,000 I | 07/22/1996 | | | |
| 5720 | 50,000 I | 07/22/1996 | | | |
| 5721 | 100,000 I | 07/22/1996 | | | |
| 5722 | 100,000 I | 07/22/1996 | | | |
| 5723 | 100,000 I | 07/22/1996 | | | |
| 5724 | 100,000 I | 07/22/1996 | | | |
| 5725 | 100,000 I | 07/22/1996 | | | |
| 5728 | 500,000 I | 07/22/1996 | | | |
| 5864 | 100,000 I | 11/19/1996 | | | |
| 5865 | 100,000 I | 11/19/1996 | | | |
| 5866 | 100,000 I | 11/19/1996 | | | |
| 5867 | 100,000 I | 11/19/1996 | | | |
| 5868 | 100,000 I | 11/19/1996 | | | |
| 5869 | 100,000 I | 11/19/1996 | | | |
| 5870 | 100,000 I | 11/19/1996 | | | |
| 5871 | 100,000 I | 11/19/1996 | | | |
| 5872 | 100,000 I | 11/19/1996 | | | |
| 5873 | 100,000 I | 11/19/1996 | | | |
| 5874 | 100,000 I | 11/19/1996 | | | |
| 5875 | 100,000 I | 11/19/1996 | | | |
| 5876 | 100,000 I | 11/19/1996 | | | |
| 5877 | 100,000 I | 11/19/1996 | | | |
| 5878 | 100,000 I | 11/19/1996 | | | |
| 5879 | 100,000 I | 11/19/1996 | | | |
| 5880 | 100,000 I | 11/19/1996 | | | |
| 5881 | 100,000 I | 11/19/1996 | | | |
| 5882 | 100,000 I | 11/19/1996 | | | |
| 5883 | 100,000 I | 11/19/1996 | | | |
| 5884 | 100,000 I | 11/19/1996 | | | |
| 5885 | 100,000 I | 11/19/1996 | | | |
| 5886 | 100,000 I | 11/19/1996 | | | |
| 5887 | 100,000 I | 11/19/1996 | | | |
| 5888 | 100,000 I | 11/19/1996 | | | |
| 5889 | 100,000 I | 11/19/1996 | | | |
| 5890 | 100,000 I | 11/19/1996 | | | |
| 5891 | 100,000 I | 11/19/1996 | | | |
| 5892 | 100,000 I | 11/19/1996 | | | |
| 5893 | 100,000 I | 11/19/1996 | | | |
| 5894 | 250,000 I | 11/19/1996 | | | |
| 5895 | 250,000 I | 11/19/1996 | | | |
| 5896 | 250,000 I | 11/19/1996 | | | |
| 5897 | 250,000 I | 11/19/1996 | | | |
| 5898 | 250,000 I | 11/19/1996 | | | |
| 5899 | 250,000 I | 11/19/1996 | | | |
| 5900 | 250,000 I | 11/19/1996 | | | |
| 5901 | 250,000 I | 11/19/1996 | | | |
| 5902 | 250,000 I | 11/19/1996 | | | |
| 5903 | 250,000 I | 11/19/1996 | | | |
| 5904 | 500,000 I | 11/19/1996 | | | |
| 5905 | 500,000 I | 11/19/1996 | | | |
| 5906 | 500,000 I | 11/19/1996 | | | |
| 5907 | 500,000 I | 11/19/1996 | | | |

** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
** COMPANY # 0832 Page 11 **
** AS OF 04/25/1997 **

Escrow002760

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|
| JCE J CHISHOLM | | | | PO BOX 1570 | TEMECULA | CA 92593 |
| N: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 | 4959 | 2,500 | 05/26/1995 | | | |
| | 1 | 2,500 | | | | |
| ARLES T CHRIETZBERG JR | | | | P.O. BOX 1344 | CARMEL | CA 93921 |
| N: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 | 5802 | 1,250 | 09/24/1996 | | | |
| | 1 | 1,250 | | | | |
| RINE CHRISTENSEN | | | | 2906 W 7000 S | WEST JORDAN | UT 84084 |
| N: | 4311 | 667 | 09/21/1994 | | | |
| | 1 | 667 | | | | |
| RINE CHRISTENSEN & ONA J. CHRISTENSEN | | | | 2906 W 7000 S | WEST JORDAN | UT 84084 |
| N: | 4312 | 834 | 09/21/1994 | | | |
| | 1 | 834 | | | | |
| I.. RISTOFFERSON | | | | 1604 N 600 E | LEHI | UT 84043 |
| N: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 | 5636 | 2,500 | 06/10/1996 | | | |
| | 1 | 2,500 | | | | |
| T C CLAERHOUT | | | | 1475 E 4080 S | SLC | UT 84124 |
| N: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 | 4226 | 1,250 | 09/14/1994 | | | |
| | 1 | 1,250 | | | | |
| AN F CLARK | | | | 1166 E 300 S | PROVO | UT 84606 |
| N: | 4382 | 188 | 09/29/1994 | | | |
| | 1 | 188 | | | | |
| GER D CLARK | | | | 1930 N SKYLINE DR | OREM | UT 84057 |
| N: | 4381 | 188 | 09/29/1994 | | | |
| | 1 | 188 | | | | |
| LEMAN VELIA | | | | 2810 E WANDA WAY | SALT LAKE CITY | UT 84117 |
| N: 0 | 292 | 2,084 | 10/08/1986 | | | |
| | 1 | 2,084 | | | | |
| COLLARD | | | | 3920 MARKET ST | WEST VALLEY CITY | UT 84119 |
| N: | 2894 | 667 | 10/23/1991 | | | |
| | 1 | 667 | | | | |
| IREN D COPELAND | | | | 7960 SO ROYAL LANE | SANDY | UT 84098 |
| N: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 | 5007 | | | | | |

** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
** COMPANY # 0832 Page 12 **
** AS OF 04/25/1997 **

Escrow002761

| Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|

| | 5208 | 6,250 I | 10/02/1995 | | | |
| | 2 | 35,417 | | | | |

JLA MARIE COSGROVE &
RY MICHAEL COSGROVE JT TEN
N: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  4215     313   09/14/1994        2103 W NIOBE AVE          ANAHEIM        CA 92804

| | 1 | 313 |

CRAIG COSTELLO
N:         4315     417   09/21/1994        169 S PALISADES DR        OREM           UT 84058

| | 1 | 417 |

VEY & COMPANY
N:870454482  2534      69   02/06/1989        115 S MAIN STREET         SALT LAKE CITY UT 84101

| | 1 | 69 |

F˙  ˙ANDALL
         2815     542   04/15/1991        1514 N 110 W              OREM           UT 84057

| | 1 | 542 |

ANE MARY STUART
N:    0    324   4,167   10/08/1986        3 SHERATON SQURE #2H % MRS YANDEL  NEW YORK   NY 10014

| | 1 | 4,167 |

AWFORD LTD
N:         4082   500,000 I 09/13/1994       MIDDLE & EGGMONT ST       KINGSTOWN ST VINCENT & GRENA
           4083   500,000 I 09/13/1994
           4084   500,000 I 09/13/1994
           4086   500,000 I 09/13/1994
           4090   500,000 I 09/13/1994
           4091   500,000 I 09/13/1994

| | 6 | 3,000,000 |

RLENE M CROSS
N: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  4336    834   09/26/1994        206 APPALACHIAN CIR       PLACENTIA      CA 92670

| | 1 | 834 |

JHN CUNLIFFE TTEE FBO PLANET LEASING CO
J    TRUST UAD 01/09/92
N:   36765  5825   2,000   10/25/1996        P.O. BOX 5112             TRENTON        NJ 08638

| | 1 | 2,000 |

LTON BARRY
N:264703015  2527    334   01/31/1989        4600 S 2300 E             HOLLADAY       UT 84117

```
                    ** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
                           ** COMPANY # 0832 Page 13 **
                              ** AS OF 04/25/1997 **                    Escrow002762
```

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|
| | 1 | 334 | | | | |
| TER WILLIAMS DANKS | | | | 12 MEEANEE QUAY, WESTSHORE, NAPIER | NEW ZEALAND | |
| N: | 6047 | 4,000 | 04/03/1997 | | | |
| | 1 | 4,000 | | | | |
| BIN BRUCE DANKS | | | | PO BOX 406, NAPIER | NEW ZEALAND | |
| N: | 6046 | 1,500 | 04/03/1997 | | | |
| | 1 | 1,500 | | | | |
| RK DAVIS | | | | 5595 SOUTH 200 WEST | OGDEN | UT 84405 |
| N: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 | 4577 | 1,500 | 11/21/1994 | | | |
| | 1 | 1,500 | | | | |
| VIS ARTHUR I | | | | XJTC CORP 649 RAHWAY AVENUE | UNION | NJ 07083 |
| N: 67180587 | 2372 | 4,167 | 10/17/1988 | | | |
| | 1 | 4,167 | | | | |
| CUSTODY & CO | | | | 31 WEST 52ND ST. | NEW YORK | NY 10019 |
| N:13-2994988 | 6029 | 100,000 I | 03/24/1997 | | | |
| | 1 | 100,000 | | | | |
| VAN HOWARD DE BERRY | | | | HARBOUR CITY TOWER, 6TH FLOOR | LAMBTON QUAY 6001 | NEWZE |
| N:NRA | 5926 | 1,000 | 12/02/1996 | | | |
| | 1 | 1,000 | | | | |
| YLE R DEFRIEZ C/F | | | | 2995 E. 3135 S. | SALT LAKE CITY | UT 84109 |
| RIC J. DEFRIEZ | | | | | | |
| N: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 | 5914 | 150 | 11/22/1996 | | | |
| | 1 | 150 | | | | |
| NRAD B DEL ROSARIO | | | | 333 WEST NEILSON | CARSON | CA 90745 |
| N: | 2898 | 209 | 10/23/1991 | | | |
| | 1 | 209 | | | | |
| RGARETE DEUSSER | | | | VILLASTR. 9 64342 SEEHEIM | GERMANY | |
| N: | 5696 | 110,971 I | 07/16/1996 | | | |
| | 1 | 110,971 | | | | |
| OLFGANG DEUSSER | | | | | | |
| N: | 5693 | 107,665 I | 07/16/1996 | | | |
| | 1 | 107,665 | | | | |

```
                    ** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
                          ** COMPANY # 0832 Page 14 **              Escrow002763
                            ** AS OF 04/25/1997 **
```

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|

```
N:      5435    100,000 I 04/08/1996
        5436    100,000 I 04/08/1996
        5437     10,000 I 04/08/1996
        5438     10,000 I 04/08/1996
        5439     10,000 I 04/08/1996
        5440     10,000 I 04/08/1996
        5441     10,000 I 04/08/1996
        5442     10,000 I 04/08/1996
        5443     10,000 I 04/08/1996
        5444     10,000 I 04/08/1996
        5445     10,000 I 04/08/1996
        5446     10,000 I 04/08/1996
        ------------------------
        12      300,000
```

NS PETER DIETRICH                               HOHLSTRASSE 216              8004 ZURICH          SWITZ
```
N:      4992     20,000 I 06/27/1995
        ------------------------
        1        20,000
```

IR   -- ?P EMPLOYEES                            XDOCTOR C U 967 E 4800 S #1  SALT LAKE CITY       UT 84117
```
        0   2389       355   11/04/1988
        ------------------------
        1           355
```

)BBINS CAPITAL CORPORATION
```
3N:     5766    250,000 I 08/16/1996
        ------------------------
        1       250,000
```

)BBINS PARTNERS LP
```
3N:     5765    772,500 I 08/16/1996
        ------------------------
        1       772,500
```

RESSEN DAN                                      6678 SOUTH 3095  WEST        W JORDAN            UT 84084
```
3N:     2619       417   06/21/1989
        ------------------------
        1           417
```

ILLIAM STANFORD DURRANT & LOIS H DURRANT TTEES FBO   1513 E. 5975 SOUTH      SALT LAKE CITY     UT 84121
HE W.S. DURRANT TRUST UTD 11/15/95
```
SN: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   5292   4,167   12/06/1995
        ------------------------
        1            4,167
```

W   ?INGS LLC                                   716 EAST 4500 SOUTH, SUITE #260  SALT LAKE CITY   UT 84107
```
(    375601  5987     50,000 I 03/03/1997
             5988     50,000 I 03/03/1997
             5989     50,000 I 03/03/1997
             5990     50,000 I 03/03/1997
             5991     25,000 I 03/03/1997
             5992     25,000 I 03/03/1997
             5993     25,000 I 03/03/1997
```

```
                    ** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
                          ** COMPANY # 0832 Page 15 **                    Escrow002764
                              ** AS OF 04/25/1997 **

    )      Cert#     Shares   Issue Date        Address                      CITY            ST ZIP
**************************************************************************************************************


           5994     25,000 I 03/03/1997

           8       300,000
---
NE T EBERHARD                                   DORFSTRASSE 15 CH-8903  (CITY) BIRM SWITZERLAND
N:         5230        100  10/05/1995

           1          100
---
WARDS MARJIE E                                  6359 S 725 E                 MURRAY          UT 84107
N:529426268  1381      542  08/26/1987

           1          542
---
GER & CO                                        PO BOX 15087 CHURCH STREET STATION  NEW YORK  NY 10008
N:136-022146  5784  20,000 I 08/29/1996

           1       20,000
---
NNA HUNT EISENHART C/F                          4114 HAYVENHURST DRIVE       ENCINO          CA 91436
   MARINA EISENHART UTMA CA
   8-1413    5593       50  05/13/1996

           1           50
---
ILL ELLISON &
LIE A. ELLISON JT TEN
N:         4953        417  05/18/1995

           1          417
---
N H ELMER &                                     BOX 40295                    LYNNDYL         UT 84640
NNIE L. ELMER JT TEN
N: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  5631    125  06/10/1996

           1          125
---
ILTRUD EMMERICH                                 97828 MARKTHEI               DEFELD             GERMA
N:
           5664     50,000 I 06/24/1996
           5665     50,000 I 06/24/1996
           5695    102,696 I 07/16/1996

           3      202,696
---
DNIS ERICKSON &                                 3430 ECCLES                  OGDEN           UT 84403
NET ERICKSON JTWROS
S          4365      4,584  09/27/1994

           1        4,584
---
UROCAPE LDA                                     SOCIDADE COMMERCIAL          RUA 5 DEJALLO 16   KAP V
N:
           4166    250,000 I 09/13/1994
           4167    250,000 I 09/13/1994
```

```
                    ** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **          Escrow002765
                              ** COMPANY # 0832 Page 16 **
                               ** AS OF 04/25/1997 **
```

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|
| | 4170 | 250,000 I | 09/13/1994 | | | |
| | 4 | 1,000,000 | | | | |
| ROPLAN TRUST CO IOM LTD | | | | EUROPLAN HOUSE 19MT HAVELOCK | DOUGLAS ISLE OF MAN | IMI 2 |
| N:NRA | 5965 | 9,300 | 02/06/1997 | | | |
| | 1 | 9,300 | | | | |
| NS BETH | | | | 1000 N 1440 E | PROVO | UT 84604 |
| N:    0 | 2378 | 2,084 | 10/21/1988 | | | |
| | 1 | 2,084 | | | | |
| EGORY FAIRBOURN | | | | 657 EAST HAWK ST | MERIDIAN | ID 83642 |
| N: | 2905 | 250 | 10/23/1991 | | | |
| | 1 | 250 | | | | |
| MIKE FALK & | | | | 8013 CORNFLOWER CIR | BUENA PARK | CA 90620 |
| O  ALK JT TEN | | | | | | |
| -4593 | 4386 | 346 | 09/30/1994 | | | |
| | 1 | 346 | | | | |
| NIEL FELDMAN & | | | | 1285 N. 400 E. #1 | LOGAN | UT 84321 |
| NNIFER FELDMAN | | | | | | |
| N: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 | 5363 | 250 I | 03/11/1996 | | | |
| | 1 | 250 | | | | |
| YLLIS FILLMORE C/F KRISTEN FILLMORE UGMA NY | | | | 815 E ALPINE DR | ALPINE | UT 84004 |
| N: | 2907 | 1,125 | 10/23/1991 | | | |
| | 1 | 1,125 | | | | |
| RY L FISH | | | | 1130 E 600 S | ALPINE | UT 84004 |
| N: | 4873 | 3,839 | 03/30/1995 | | | |
| | 1 | 3,839 | | | | |
| EGORY M FISH | | | | 1115 E MOUNTAIN DR | ALPINE | UT 84004 |
| N: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 | 4628 | 417 | 12/13/1994 | | | |
| | 4650 | 2,000 | 12/23/1994 | | | |
| | 2 | 2,417 | | | | |
| A  SH | | | | 1115 E MOUNTAIN DR | ALPINE | UT 84004 |
| N: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 | 4627 | 417 | 12/13/1994 | | | |
| | 4649 | 2,000 | 12/23/1994 | | | |
| | 2 | 2,417 | | | | |

```
            ** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **       Escrow002766
                   ** COMPANY # 0832 Page 17 **
                     ** AS OF 04/25/1997 **
```

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|
| l: | 4655 | 1,846 | 12/23/1994 | | | |
| | 5806 | 15,551 | 09/30/1996 | | | |
| | 2 | 17,397 | | | | |
| HER JOSEPH S | | | | 826 W 600 N | SALT LAKE CITY | UT 84116 |
| l:   0 | 2345 | 159 | 09/23/1988 | | | |
| | 1 | 159 | | | | |
| N K FLAKE JR | | | | 4070 W SADDLEBACK RD | PARK CITY | UT 84060 |
| l: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 | 4871 | 513 | 03/30/1995 | | | |
| | 1 | 513 | | | | |
| NT WAYNE | | | | 2202 WEST GENTILE | LAYTON | UT 84041 |
| N: | 2618 | 1,042 | 06/21/1989 | | | |
| | 1 | 1,042 | | | | |
| NT | | | | 353 E 3065 S | SALT LAKE CITY | UT 84115 |
| 0 | 135 | 417 | 10/08/1986 | | | |
| | 1 | 417 | | | | |
| RBAR NOMINEES LTD | | | | P.O. BOX 1205 | DUNEDIN 9015 | NEWZE |
| C 1061 | | | | | | |
| N:NRA | 5999 | 1,000 | 03/07/1997 | | | |
| | 6000 | 2,000 | 03/07/1997 | | | |
| | 6001 | 2,000 | 03/07/1997 | | | |
| | 6002 | 2,000 | 03/07/1997 | | | |
| | 6079 | 1,000 | 04/23/1997 | | | |
| | 6080 | 1,000 | 04/23/1997 | | | |
| | 6 | 9,000 | | | | |
| RBAR NOMINEES LTD A/C 75734 | | | | P.O. BOZX 1205 | DUNEDIN 9015 | NEWZE |
| N:NRA | 5924 | 1,000 | 12/02/1996 | | | |
| | 1 | 1,000 | | | | |
| ORGE E FOSTER | | | | BOX 148 | WESTPORT POINT | MA 02791 |
| N: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 | 3003 | 625 | 11/30/1992 | | | |
| | 1 | 625 | | | | |
| I  REI | | | | CAMPINGSTRASSE 4 | 83346 BERGEN | GERMA |
| N | 5487 | 10,000 I | 04/08/1996 | | | |
| | 5488 | 10,000 I | 04/08/1996 | | | |
| | 5489 | 10,000 I | 04/08/1996 | | | |
| | 5490 | 10,000 I | 04/08/1996 | | | |
| | 5491 | 10,000 I | 04/08/1996 | | | |
| | 5492 | 10,000 I | 04/08/1996 | | | |

** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
** COMPANY # 0832 Page 18 **
** AS OF 04/25/1997 **

Escrow002767

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|
| | 5494 | 10,000 I | 04/08/1996 | | | |
| | 5495 | 10,000 I | 04/08/1996 | | | |
| | 5496 | 10,000 I | 04/08/1996 | | | |
| | 10 | 100,000 | | | | |
| BERT A FREY | | | | 700 PARKWOOD DR | ANDERSON | SC 29625 |
| N: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 | 4212 | 625 | 09/14/1994 | | | |
| | 1 | 625 | | | | |
| RALD A FRODAHL | | | | 310606 RAWHIDE LANE | PRINCEVILLE | OR 97754 |
| N: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 | 3071 | 2,396 | 11/15/1993 | | | |
| | 1 | 2,396 | | | | |
| GNON JOHN T & MARY J | | | | 2821 JOHN AVAE #2 | SUPERIOR | WI 54880 |
| N: | 2649 | 188 | 11/15/1989 | | | |
| | 1 | 188 | | | | |
| II CHARLES C | | | | 265 S ALPINE CIRCLE | ALPINE | UT 84004 |
| N:009903611 | 2356 | 84 | 10/03/1988 | | | |
| | 1 | 84 | | | | |
| NNETT JONATHAN H | | | | 265 S ALPINE CIRCLE | ALPINE | UT 84004 |
| N:569903612 | 2357 | 84 | 10/03/1988 | | | |
| | 1 | 84 | | | | |
| JSAN ANNE GARAVAGLIA | | | | 32948 INDIANA | LIVIONA | MI 48150 |
| N: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 | 5576 | 100 | 05/03/1996 | | | |
| | 1 | 100 | | | | |
| WID A GARSIDE & | | | | 11861 HIDDEN VALLEY CLUB DR | SANDY | UT 84092 |
| JSEMARY I. GARSIDE JT TEN | | | | | | |
| N: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 | 4636 | 2,000 | 12/16/1994 | | | |
| | 1 | 2,000 | | | | |
| JX C GEFFNER | | | | 1592 SIM PL | ANAHEIM | CA 92802 |
| N: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 | 4217 | 20,840 | 09/14/1994 | | | |
| | 4221 | 1,375 | 09/14/1994 | | | |
| | 2 | 22,215 | | | | |
| ANFORD GEFFNER | | | | 1351 E SONOMA DR | ALTADENA | CA 91001 |
| N: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 | 4427 | 2,000 | 10/03/1994 | | | |
| | 4428 | 2,000 | 10/03/1994 | | | |
| | 4429 | 2,000 | 10/03/1994 | | | |
| | 4430 | 1,500 | 10/03/1994 | | | |

```
                      ** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
                              ** COMPANY # 0832 Page 19 **              Escrow002768
                                   ** AS OF 04/25/1997 **
```

| Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|-------|--------|------------|---------|------|--------|

```
           5834     1,000   11/01/1996

            6      10,500
```

( GEFFNER &                                    1592 SIM PL                ANAHEIM        CA 92802
ERIE GEFFNER JT TEN
N: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   4219    4,168   09/14/1994

            1       4,168

LERIE GEFFNER &                                1592 SIM PLACE             ANAHEIM        CA 92802
EVEN WILLIAMS JT TEN
N: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   5561     184    04/17/1996

            1        184

JSEPH W GEISNER &                              PO BOX 8310                SANTA ROSA     CA 95407
JZANNE M. GEISNER
N:            2902     730    10/23/1991

            1        730

El.. R GELLER                                  445 RIVERSIDE DR           NEW YORK       NY 10027
SN: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   4724   1,000   02/06/1995

            1       1,000

IA MBH                                         ALTE LANDSTRASSE 64A       584452 WITTEN  GERMA
SN:            4165   300,000 I 09/13/1994

            1      300,000

ENNETH GOGGIA                                  211 N 850 E.               PL. GROVE      UT 84062
SN: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   5274   1,900   11/20/1995
                5811   1,556   09/30/1996

            2       3,456

MILLIE GRANGER                                 4245 SO 1650 E             SLC            UT 84124
SN:            4266     417    09/15/1994

            1        417

GREENHEAD INVESTMENTS CORP                     3240 SO METROPOLITAN WAY   SLC            UT 84109
SSN:87-0532344   5235   10,500   10/11/1995
                5682    1,000   07/08/1996

            2      11,500

HALABI TARIK                                   2144 S 1100 E #325         SALT LAKE CITY UT 84106
SSN:      0     2561     417    02/09/1989

            1        417
```

```
** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **       Escrow002769
          ** COMPANY # 0832 Page 20 **
             ** AS OF 04/25/1997 **
```

| ) | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|-------|--------|------------|---------|------|--------|
| ICE HALL | | | | 1445 N. MAIN | SPANISH FORK | UT 84660 |
| l: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 | 5813 | 15,000 I | 10/01/1996 | | | |
| | 1 | 15,000 | | | | |
| .L JOSHUA M | | | | 225 WALNUT AVENUE #220A (MR) | ST CHARLES | IL 60174 |
| l:526573057 | 1244 | 2,500 | 08/03/1987 | | | |
| | 1 | 2,500 | | | | |
| .SEY KATHERINE L | | | | BOX 102 RIDGEFIELD ROAD | WILTON | CT 06897 |
| N: 40267363 | 2515 | 4,167 | 01/27/1989 | | | |
| | 1 | 4,167 | | | | |
| MOTHY B HANNIFIN JR | | | | PO BOX 616 | EUREKA | UT 84628 |
| N: | 4384 | 417 | 09/30/1994 | | | |
| | 1 | 417 | | | | |
| 1⌐ ‾SEN & | | | | 432 18TH STREET | WEST BABYLON | NY 11704 |
| ⌐EN JT TEN | | | | | | |
| N.‗‗-64-2628 | 5942 | 70 | 12/27/1996 | | | |
| | 1 | 70 | | | | |
| LEN HANSEN C/F | | | | 432 18TH STREET | WEST BABYLON | NY 11704 |
| JHN HANSEN UGMA NY | | | | | | |
| SN: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 | 5941 | 20 | 12/27/1996 | | | |
| | 1 | 20 | | | | |
| ARE & CO | | | | C/O PO BOX 11203 | NEW YORK | NY 10249 |
| SN:13-6062916 | 6023 | 25,000 I | 03/20/1997 | | | |
| | 1 | 25,000 | | | | |
| IRGINIA HARRINGTON | | | | 244 DAROCA AVE | SAN GABRIEL | CA 91775 |
| SN: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 | 4337 | 2,084 | 09/26/1994 | | | |
| | 1 | 2,084 | | | | |
| AURA HARWOOD | | | | 993 MEMORIAL DRIVE APT #201 | CAMBRIDGE | MA 02138 |
| SN: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 | 5962 | 1,980 | 02/05/1997 | | | |
| | 1 | 1,980 | | | | |
| K ) HATCH | | | | 2153 SAN JUAN CIR. | ST. GEORGE | UT 84790 |
| SN: | 5348 | 167 | 02/27/1996 | | | |
| | 1 | 167 | | | | |
| EATH BILL | | | | 4201 OLYMPIC WAY | SALT LAKE CITY | UT 84124 |

```
** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **          Escrow002770
         ** COMPANY # 0832 Page 21 **
            ** AS OF 04/25/1997 **
```

| Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|-------|--------|-----------|---------|------|--------|

| | | 1 | 417 | | | | |

**LER VIVIAN D & S** — 8 DRIFTWOOD — IRVING — CA 92714

| Cert# | Shares | Issue Date |
|-------|--------|-----------|
| N:723010284  1834 | 709 | 01/04/1988 |
| 1 | 709 | |

**EX HENTELOFF** — 331 VISTA PACIFICA — SANTA BARBARA — CA 93109

| N: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  4340 | 2,084 | 09/27/1994 |
| 1 | 2,084 | |

**RKULES AG** — FL 9404 SCHAAN — LANDSTRASSE 161 — LIECH

| N: | 4991 | 60,000 I | 06/27/1995 |
| | 4153 | 100,000 I | 09/13/1994 |
| | 4155 | 100,000 I | 09/13/1994 |
| | 4156 | 100,000 I | 09/13/1994 |
| | 4157 | 100,000 I | 09/13/1994 |
| | 4158 | 100,000 I | 09/13/1994 |
| | 4159 | 100,000 I | 09/13/1994 |
| | 4160 | 100,000 I | 09/13/1994 |
| | 4161 | 100,000 I | 09/13/1994 |
| | 6004 | 5,000 I | 03/10/1997 |
| | 6005 | 37,000 I | 03/10/1997 |
| | 11 | 902,000 | |

**LIZABETH B HERRMANN** — 6 WHALING RD — DARIEN — CT 06820

| N: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  4259 | 25,001 | 09/15/1994 |
| 1 | 25,001 | |

**EIDI HEWLETT** — 898 E 400 S — KAYSVILLE — UT 84037

| SN: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  4791 | 1,000 | 03/02/1995 |
| 1 | 1,000 | |

**ENNIFER HEWLETT** — 898 E 400 S — KAYSVILLE — UT 84037

| SN: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  4792 | 1,000 | 03/02/1995 |
| 1 | 1,000 | |

**OBERT HEWLETT** — 898 E 400 S — KAYSVILLE — UT 84037

| SN: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  4790 | 700 | 03/02/1995 |
| 1 | 700 | |

**UTH HEWLETT** — 898 E 400 S — KAYSVILLE — UT 84037

| SN: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  4789 | 3,500 | 03/02/1995 |
| 1 | 3,500 | |

** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
** COMPANY # 0832 Page 22 **
** AS OF 04/25/1997 **

Escrow002771

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|
| N: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 | 4793 | 1,000 | 03/02/1995 | | | |
| | 1 | 1,000 | | | | |
| EFANIE F HEWLETT | | | | | | |
| N: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 | 5807 | 15,000 | 09/30/1996 | | | |
| | 1 | 15,000 | | | | |
| JDD HEWLETT | | | | | | |
| SN: | 5244 | 8,210 | 10/11/1995 | | | |
| | 5380 | 850 | 03/26/1996 | | | |
| | 5680 | 1,240 | 05/20/1996 | | | |
| | 5812 | 759 | 09/30/1996 | | | |
| | 5915 | 100 | 11/22/1996 | | | |
| | 5 | 11,159 | | | | |
| JDD K HEWLETT | | | | 3240 S. METROPOLITAN | SALT LAKE CITY | UT 84109 |
| SN: | 5640 | 3,000 | 06/11/1996 | | | |
| | 5680 | 1,500 | 07/08/1996 | | | |
| | 5779 | 4,000 | 08/27/1996 | | | |
| | 5934 | 2,000 | 12/16/1996 | | | |
| | 5995 | 25,000 | 03/05/1997 | | | |
| | 5996 | 5,000 | 03/05/1997 | | | |
| | 6075 | 7,000 | 04/22/1997 | | | |
| | 6076 | 5,000 | 04/22/1997 | | | |
| | 6077 | 3,000 | 04/22/1997 | | | |
| | 9 | 55,500 | | | | |
| RUTH HEWLETT C/F | | | | 898 E 400 S | KAYSVILLE | UT 84037 |
| JESSICA HEWLETT | | | | | | |
| SSN: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 | 4794 | 1,000 | 03/02/1995 | | | |
| | 4795 | 1,000 | 03/02/1995 | | | |
| | 2 | 2,000 | | | | |
| HELGA HOEFFERER | | | | MAGISTER MUENZGRABENGUERTEL 19/18 | 8010 GRAZ | AUSTR |
| SSN: | 5477 | 10,000 I | 04/08/1996 | | | |
| | 5478 | 10,000 I | 04/08/1996 | | | |
| | 5479 | 10,000 I | 04/08/1996 | | | |
| | 5480 | 10,000 I | 04/08/1996 | | | |
| | 5481 | 10,000 I | 04/08/1996 | | | |
| | 5482 | 10,000 I | 04/08/1996 | | | |
| | 5483 | 10,000 I | 04/08/1996 | | | |
| | 5484 | 10,000 I | 04/08/1996 | | | |
| | 5485 | 10,000 I | 04/08/1996 | | | |
| | 5486 | 10,000 I | 04/08/1996 | | | |
| | 10 | 100,000 | | | | |
| RENATE HOEFFERER | | | | WOLF-PADER-PLATZ 2 9330 TREIBACH/KA AUSTRIA | | |

Escrow002772

```
                    ** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
                              ** COMPANY # 0832 Page 23 **
                              ** AS OF 04/25/1997 **
```

| Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|-------|--------|------------|---------|------|--------|
| 5458 | 50,000 I | 04/08/1996 | | | |
| 5459 | 50,000 I | 04/08/1996 | | | |
| 5460 | 50,000 I | 04/08/1996 | | | |
| 5461 | 50,000 I | 04/08/1996 | | | |
| 5462 | 50,000 I | 04/08/1996 | | | |
| 5463 | 50,000 I | 04/08/1996 | | | |
| 5464 | 10,000 I | 04/08/1996 | | | |
| 5465 | 10,000 I | 04/08/1996 | | | |
| 5466 | 10,000 I | 04/08/1996 | | | |
| 5467 | 10,000 I | 04/08/1996 | | | |
| 5468 | 10,000 I | 04/08/1996 | | | |
| 5469 | 10,000 I | 04/08/1996 | | | |
| 5470 | 10,000 I | 04/08/1996 | | | |
| 5471 | 5,000 I | 04/08/1996 | | | |
| 5472 | 5,000 I | 04/08/1996 | | | |
| 5473 | 5,000 I | 04/08/1996 | | | |
| 5474 | 5,000 I | 04/08/1996 | | | |
| 5475 | 5,000 I | 04/08/1996 | | | |
| 5476 | 5,000 I | 04/08/1996 | | | |

```
          20      450,000
```

ENnie HOFFERER                          WOLF PADER PALTZ 2        9330 TREIBACH      AUSTR
SSN:
| 4132 | 100,000 I | 09/13/1994 | | | |
| 4133 | 100,000 I | 09/13/1994 | | | |
| 4134 | 100,000 I | 09/13/1994 | | | |

```
           3      300,000
```

DAVID L HOLT BENEFICIARY DELAMAR HOLT JR     2777 KENTUCKY AVE        SLC            UT 84117
FAMILY TRUST
SSN:    4242        480        09/13/1994

```
           1        480
```

DELAMAR HOLT JR FAMILY TRUST               2777 KENTUCKY AVE        SLC            UT 84117
SSN:87-6203227    4241        480        09/13/1994

```
           1        480
```

DELAMAR HOLT TTEE FBO DELAMAR HOLT JR      2777 KENTUCKY AVENUE     SALT LAKE CITY UT 84117
FAMILY TRUST UAD 05/18/84
SSN: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    5958      1,000        02/05/1997

```
           1      1,000
```

P    VE                                    530 S 300 W              SALT LAKE CITY UT 84110
S.        0      785      5,417    04/09/1987

```
           1      5,417
```

HORNE DAVID                                530 S 300 W              SALT LAKE CITY UT 84110
SSN:    0      257      16,667    10/08/1986

** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
** COMPANY # 0832 Page 24 **
** AS OF 04/25/1997 **

Escrow002773

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|
| | 1 | 16,667 | | | | |
| JVLAND DOUG | | | | 1310 SPRUANCE ROAD | MONTEREY | CA 93940 |
| 3N:180462488 | 1526 | 292 | 10/09/1987 | | | |
| | 1 | 292 | | | | |
| JWARD DARRELL W & MAUDE | | | | 1979 YALE AVE | SLC | UT 84108 |
| 3N: | 2690 | 230 | 03/27/1990 | | | |
| | 1 | 230 | | | | |
| JGAN A HUBBS | | | | 650 S RANCHO SANTA FE RD #82 | SAN MARCOS | CA 92069 |
| SN: | 4213 | 3,105 | 09/14/1994 | | | |
| | 1 | 3,105 | | | | |
| DWELL E HURST & LUCY HURST JT TEN | | | | 2890 W 5700 S | BENNION | UT 84118 |
| SN: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 | 4227 | 334 | 09/14/1994 | | | |
| | 1 | 334 | | | | |
| CS AG-INTER CONSULT SECS | | | | C/O W&W BUEROSERVICE GMBH; LUEGALLE 40545 DUESSELDORF | | FR GERMA |
| 3SN:NRA | 5565 | 1,500 | 04/24/1996 | | | |
| | 1 | 1,500 | | | | |
| NGELS WINNIE M | | | | 28 N 300 E | BRIGHAM CITY | UT 84302 |
| 3SN:504204753 | 2559 | 209 | 02/09/1989 | | | |
| | 1 | 209 | | | | |
| INTER REALITIES AG | | | | BADENERSTR 281 | 8003 ZURICH | SWITZ |
| 3SN: | 4144 | 100,000 I | 09/13/1994 | | | |
| | 4145 | 100,000 I | 09/13/1994 | | | |
| | 4146 | 100,000 I | 09/13/1994 | | | |
| | 4147 | 100,000 I | 09/13/1994 | | | |
| | 4149 | 100,000 I | 09/13/1994 | | | |
| | 4150 | 100,000 I | 09/13/1994 | | | |
| | 4151 | 100,000 I | 09/13/1994 | | | |
| | 4152 | 100,000 I | 09/13/1994 | | | |
| | 5603 | 73,000 I | 05/24/1996 | | | |
| | 5604 | 27,000 I | 05/24/1996 | | | |
| | 10 | 900,000 | | | | |
| I. JP | | | | 1917 MAPLEBROOK COURT | EL CAJON | CA 92019 |
| SSN: | 5204 | 41,667 I | 10/02/1995 | | | |
| | 1 | 41,667 | | | | |
| JAMES R IVIE | | | | 233 W HILLSIDE CIR | ALPINE | UT 84004 |

** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
** COMPANY # 0832 Page 25 **
** AS OF 04/25/1997 **

Escrow002774

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|

| | 1 | 3,450 | | | | |

| ROMEO & CO | | | | C/O PO BOX 50000 | NEWARK | NJ 07101 |
| N:13-3549344 | 5946 | 550,000 I | 01/15/1997 | | | |
| | 5548 | 100,000 I | 04/09/1996 | | | |
| | 5558 | 100,000 I | 04/15/1996 | | | |
| | 5577 | 100,000 I | 05/03/1996 | | | |
| | 5578 | 100,000 I | 05/03/1996 | | | |
| | 6074 | 50,000 I | 04/21/1997 | | | |

| | 6 | 1,000,000 | | | | |

| AINE E JACKLIN | | | | 952 E EMERALD ST | ANAHEIM | CA 92804 |
| N: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 | 4433 | 1,042 | 10/03/1994 | | | |

| | 1 | 1,042 | | | | |

| IELMA JACOBSEN | | | | 2760 HIGHLAND DRIVE 7 | SALT LAKE CITY | UT 84106 |
| N: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 | 5953 | 1 | 01/27/1997 | | | |

| | 1 | 1 | | | | |

| EFFREY LIMITED | | | | PO BOX 70 | FL-9490 VADUZ | LIECH |
| N: | 5212 | 100,000 I | 10/03/1995 | | | |
| | 5216 | 100,000 I | 10/03/1995 | | | |
| | 5217 | 100,000 I | 10/03/1995 | | | |
| | 5218 | 100,000 I | 10/03/1995 | | | |
| | 5219 | 100,000 I | 10/03/1995 | | | |
| | 5220 | 100,000 I | 10/03/1995 | | | |
| | 5221 | 100,000 I | 10/03/1995 | | | |
| | 5222 | 100,000 I | 10/03/1995 | | | |
| | 5223 | 100,000 I | 10/03/1995 | | | |
| | 5224 | 100,000 I | 10/03/1995 | | | |
| | 5228 | 100,000 I | 10/03/1995 | | | |
| | 5229 | 84,699 I | 10/03/1995 | | | |

| | 12 | 1,184,699 | | | | |

| EFFREY LTD | | | | GRANBY ST POB 613 | KINGSTOWN ST VINCENT | GRENA |
| SN: | 4800 | 65,671 I | 03/08/1995 | | | |
| | 5613 | 100,000 I | 05/31/1996 | | | |
| | 4554 | 100,000 I | 11/14/1994 | | | |
| | 4555 | 100,000 I | 11/14/1994 | | | |

| | 4 | 365,671 | | | | |

| E.   RET R | | | | PO BOX 422 | LAYTON | UT 84041 |
| SN: | 2726 | 280 | 07/10/1990 | | | |

| | 1 | 280 | | | | |

| MD ENTERPRISES TRUST | | | | 11861 HIDDEN VALLEY CLUB | SANDY | UT 84092 |

** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **          Escrow002775
** COMPANY # 0832 Page 26 **
** AS OF 04/25/1997 **

| ) | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|-------|--------|------------|---------|------|--------|

| | 1 | 2,084 | | | | |

TER JOHN
N:
| | 5415 | 10,000 I | 04/08/1996 | AACHENERSTRASSE 495 | 50933 KOELN | GERMA |
| | 5416 | 10,000 I | 04/08/1996 | | | |
| | 5417 | 10,000 I | 04/08/1996 | | | |
| | 5418 | 10,000 I | 04/08/1996 | | | |
| | 5419 | 10,000 I | 04/08/1996 | | | |
| | 5420 | 10,000 I | 04/08/1996 | | | |
| | 5421 | 10,000 I | 04/08/1996 | | | |
| | 5422 | 10,000 I | 04/08/1996 | | | |
| | 5423 | 10,000 I | 04/08/1996 | | | |
| | 5424 | 10,000 I | 04/08/1996 | | | |

| | 10 | 100,000 | | | | |

JHNS WARREN
SN:        0
| | 1231 | 1,042 | 07/30/1987 | 77 W 200 S #300 (MR) | SALT LAKE CITY | UT 84101 |

| | 1 | 1,042 | | | | |

Jr.  -BOWLES COMPANY INC
SN:
| | 2699 | 70 | 05/11/1990 | 430 EAST 4TH SOUTH | SALT LAKE CITY | UT 84111 |

| | 1 | 70 | | | | |

ONES RON
SN:528563896
| | 2380 | 125 | 10/24/1988 | 915 S STATE STREET | OREM | UT 84058 |

| | 1 | 125 | | | | |

EONARD JORDAN
SN: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
| | 4868 | 600 | 03/30/1995 | 170 GROVE AVE | FITZGERALD | GA 31750 |

| | 1 | 600 | | | | |

IONALD JORDAN
SN: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
| | 4869 | 600 | 03/30/1995 | 170 GROVE AVE | FITZGERALD | GA 31750 |

| | 1 | 600 | | | | |

IAMES P JORDAN III &
LANA JORDAN JT TEN
SN: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
| | 4341 | 625 | 09/27/1994 | 855 HILLCREST ST | EL SEGUNDO | CA 90245 |

| | 1 | 625 | | | | |

TERn  G KALLER &
ROSE ANN KALLER JTWROS
SSN:
| | 2912 | 1,125 | 10/23/1991 | 6563 ULITHI ST | CYPRESS | CA 90630 |

| | 1 | 1,125 | | | | |

** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
** COMPANY # 0832 Page 27 **
** AS OF 04/25/1997 **

Escrow002776

| ) | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|-------|--------|------------|---------|------|--------|
| NK & CO | | | | C/O STATE STREET BANK & TURST CO. P BOSTON | | MA 02206 |
| SN:04-6283701 | 5372 | 100,000 | 03/18/1996 | | | |
| | 1 | 100,000 | | | | |
| ARLE WESTON KIRTON | | | | HARBOUR CITY TOWER, 6TH FLOOR; LAMB WELLINGTON 6001 | | NEWZE |
| SN:NRA | 6003 | 1,000 | 03/07/1997 | | | |
| | 1 | 1,000 | | | | |
| JRLEN A KNIGHT | | | | 7773 WASHINGTON RD | MAGNA | UT 84044 |
| SN: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 | 4870 | 400 | 03/30/1995 | | | |
| | 1 | 400 | | | | |
| JUGLAS C KOCH | | | | 131 HUMMELS HILL ROAD | KUTZTOWN | PA 19530 |
| SN: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 | 5832 | 960 | 10/31/1996 | | | |
| | 1 | 960 | | | | |
| I' TT KOEHLER | | | | RR 3 PO BOX C-10 | SUNDANCE | UT 84604 |
| 2-6904 | 4434 | 834 | 10/03/1994 | | | |
| | 1 | 834 | | | | |
| OSHI GLENN | | | | 1134 BIDWELL AVENUE | CHICO | CA 95926 |
| SN:566497243 | 478 | 5,209 | 12/09/1986 | | | |
| | 1 | 5,209 | | | | |
| ORTNEY KUGLER | | | | 16622 TORRINGTON CT | SPRING | TX 77379 |
| SN: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 | 4700 | 350 | 01/13/1995 | | | |
| | 4780 | 175 | 02/27/1995 | | | |
| | 2 | 525 | | | | |
| D KUGLER | | | | 16622 TORRINGTON CT | SPRING | TX 77379 |
| SN: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 | 4698 | 150 | 01/13/1995 | | | |
| | 4778 | 350 | 02/27/1995 | | | |
| | 2 | 500 | | | | |
| REVOR KUGLER | | | | 16622 TORRINGTON CT | SPRING | TX 77379 |
| SN: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 | 4699 | 2,000 | 01/13/1995 | | | |
| | 4779 | 1,025 | 02/27/1995 | | | |
| | 2 | 3,025 | | | | |
| RAINER KUHNL | | | | ROSA-HAGEN-WEG 15 | D-79312 EMMENDINGEN | GERMA |
| SN: | 5066 | 500 | 07/21/1995 | | | |
| | 1 | 500 | | | | |

**\*\* COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. \*\***
**\*\* COMPANY # 0832 Page 28 \*\***
**\*\* AS OF 04/25/1997 \*\***

Escrow002777

| ) | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|

N:                     5863        100,000 I  11/19/1996
                       ——————————————————
                          1        100,000

ANK KUSIAK &                                           13833 WATERHOUSE WAY          ORLANDO         FL 32828
NI KUSIAK JT TEN
N:                     5918            521  11/26/1996
                       ——————————————————
                          1            521

.RRY E LANDA                                           6053 SOUTH 2300 EAST          SALT LAKE CITY  UT 84121
.N: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         5798         18,912 I  09/16/1996
                       ——————————————————
                          1         18,912

.RSEN LAYNE                                            3075 WILLETTE CIR             W JORDAN        UT 84084
.N:                    2611            417  06/19/1989
                       ——————————————————
                          1            417

:DD-  .SKEY                                            1136 SOUTH WOUSTER            LOS ANGELES     CA 90035
    2-3923             5645            300  06/13/1996
——                     ——————————————————
                          1            300

.YTHORPE LISA RENEE D                                  281 PHEASANTBROOK DRIVE (T STOP)  CENTERVILLE  UT 84014
:N:       0            136            417  10/08/1986
                       ——————————————————
                          1            417

:D HAROLD                                              5402 CHEVY CHASE CIRCLE       SALT LAKE CITY  UT 84117
:N:528684350           2530            625  01/31/1989
                       2635            625  09/13/1989
                       2766          2,084  12/03/1990
                       ——————————————————
                          3          3,334

ERMAN E LEWIS SR C/F                                   PO BOX 51687                  FT. BENNING     GA 31905
RYSTAL V. LEWIS UTMA GA
:N: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         5298            500  12/27/1995
                       5320            500  02/09/1996
                       ——————————————————
                          2          1,000

EXADMIN TRUST REG                                      STADTLE 7                     FL 9490 VADUZ   LIECH
:N:                    5081         10,000 I  08/14/1995
                       5082         10,000 I  08/14/1995
                       5083         10,000 I  08/14/1995
                       5084         10,000 I  08/14/1995
                       5085         10,000 I  08/14/1995
                       ——————————————————
                          5         50,000

** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
** COMPANY # 0832 Page 29 **
** AS OF 04/25/1997 **

Escrow002778

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|
| N: | 4228 | 417 | 09/14/1994 | | | |
| | 1 | 417 | | | | |
| AN R & JOAN B LINDSAY TTEES OF THE LINDSAY FAMILY | | | | 1360 NORTH ELKRIDGE LN | ALPINE | UT 84004 |
| UST (AND TO THEIR SUCCESSORS IN TRUST) | | | | | | |
| N: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 | 4820 | 10,000 | 03/20/1995 | | | |
| | 4821 | 10,000 | 03/20/1995 | | | |
| | 4822 | 10,000 | 03/20/1995 | | | |
| | 4823 | 25,000 I | 03/20/1995 | | | |
| | 4824 | 25,000 I | 03/20/1995 | | | |
| | 4826 | 25,000 I | 03/20/1995 | | | |
| | 4828 | 25,000 I | 03/20/1995 | | | |
| | 4829 | 25,000 I | 03/20/1995 | | | |
| | 4830 | 25,000 I | 03/20/1995 | | | |
| | 4831 | 25,000 I | 03/20/1995 | | | |
| | 4832 | 25,000 I | 03/20/1995 | | | |
| | 4833 | 25,000 I | 03/20/1995 | | | |
| | 4834 | 25,000 I | 03/20/1995 | | | |
| | 4836 | 25,000 I | 03/20/1995 | | | |
| | 4837 | 25,000 I | 03/20/1995 | | | |
| | 15 | 330,000 | | | | |
| NDREAS LOBLEIN | | | | SCHLEIEMACHERSTR 5 | 10961 BERLIN | GERMA |
| SN: | 5065 | 4,000 | 07/21/1995 | | | |
| | 1 | 4,000 | | | | |
| OCKWOOD LORA L | | | | 2537 PACIFIC COAST HWY #D-248 | TORRANCE | CA 90505 |
| SN:553550568 | 2039 | 667 | 03/04/1988 | | | |
| | 1 | 667 | | | | |
| ONG TAMMY & BEN | | | | 523 W 850 N | PLEASANT GROVE | UT 84067 |
| SN: 0 | 642 | 167 | 02/13/1987 | | | |
| | 1 | 167 | | | | |
| ONGO VINCENT | | | | 5805 20 AVE | BROOKLYN | NY 11204 |
| SN: | 2719 | 84 | 07/05/1990 | | | |
| | 1 | 84 | | | | |
| EGGY LORIGAN | | | | PO BOX 9 CAMBRIDGE 2351 | NEW ZEALAND | |
| SN:99-9999999 | 6057 | 1,000 | 04/08/1997 | | | |
| | 1 | 1,000 | | | | |
| EDGAR LUBER | | | | 474 RAYNERS LANE   PINNER MIDDLESEX LONDON ENGLAND | | HH5B |
| SN: | 4043 | 100,000 I | 09/13/1994 | | | |
| | 4045 | 100,000 I | 09/13/1994 | | | |
| | 4046 | 100,000 I | 09/13/1994 | | | |

** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
** COMPANY # 0832 Page 30 **
** AS OF 04/25/1997 **

Escrow002779

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|
| | 4 | 400,000 | | | | |
| NDGREN THOR E & NOR | | | | 13029 HARTSOOK STREET | SHERMAN OAKS | CA 91423 |
| GN: 22142593   1166 | | 209 | 07/13/1987 | | | |
| | 1 | 209 | | | | |
| JX IMMOBILIEN GMBH | | | | FURST PUCKLER STR 50 | D-50935 KOLN | GERMA |
| GN:   4799 | | 34,329 I | 03/08/1995 | | | |
| | 1 | 34,329 | | | | |
| ARTINEZ SANDRA K & T | | | | 1231 E TAMARA STREET | SANDY | UT 84070 |
| GN:   0   1251 | | 375 | 08/03/1987 | | | |
| | 1 | 375 | | | | |
| ASON DEBI | | | | 4540 JUPITER | SALT LAKE CITY | UT 84124 |
| SN:   0   766 | | 1,042 | 04/07/1987 | | | |
| | 1 | 1,042 | | | | |
| DAN MASTICK & | | | | 19421 ENTRADERS AVE | TORRANCE | CA 99050 |
| . KENT MASTICK | | | | | | |
| SN:   4338 | | 55 | 09/26/1994 | | | |
| | 1 | 55 | | | | |
| ATHIE HOWARD L | | | | 1926 LAMBOURNE AVENUE | SALT LAKE CITY | UT 84106 |
| SN:528364899   65 | | 417 | 10/08/1986 | | | |
| | 1 | 417 | | | | |
| TEVEN PETER MAY | | | | RR BOX 173-3 BUSHY HILL RD | DEEP RIVER | CT 06417 |
| SN:   4366 | | 209 | 09/27/1994 | | | |
| | 1 | 209 | | | | |
| EFF MCCALLISTER | | | | 1050 NO 790 E | LEHI | UT 84043 |
| SN: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   4305 | | 188 | 09/20/1994 | | | |
| | 1 | 188 | | | | |
| ATTHEW MCCLELLAN | | | | 355 S. DOUGLAS ST. #3 | SALT LAKE CITY | UT 84102 |
| SN:   5810 | | 225 | 09/30/1996 | | | |
| | 1 | 225 | | | | |
| RICHARD J MCCLENDON | | | | 955 S. 800 E. | SPRINGVILLE | UT 84663 |
| SN: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   4965 | | 1,249 | 06/07/1995 | | | |
| | 1 | 1,249 | | | | |

```
                    ** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **          Escrow002780
                           ** COMPANY # 0832 Page 31 **
                              ** AS OF 04/25/1997 **
```

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|

| | | | | | | |
|---|---|---|---|---|---|---|
| LLIAM A MCCLENDON & | | | | HC75 BOX 2045 | CAMP VERDE | AZ 86322 |
| TTY J. MCCLENDON JT TEN | | | | | | |
| N: | 4875 | 209 | 04/04/1995 | | | |
| | 1 | 209 | | | | |
| LYNN MCGHIE | | | | 4855 WANDER LANE | SALT LAKE CITY | UT 84117 |
| N: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 | 2957 | 6,084 | 07/06/1992 | | | |
| | 1 | 6,084 | | | | |
| EVE C MCGHIE | | | | 1709 E CHEROKEE DR | PLEASANT GROVE | UT 84062 |
| N: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 | 4013 | 480 | 09/12/1994 | | | |
| | 1 | 480 | | | | |
| )GER MCOMIE | | | | 3811 SO 3275 E | SLC | UT 84109 |
| N: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 | 4601 | 209 | 11/29/1994 | | | |
| | 1 | 209 | | | | |
| /ER | | | | 9624 POPPY LN | SANDY | UT 84094 |
| N: | 4231 | 209 | 09/14/1994 | | | |
| | 1 | 209 | | | | |
| EMPO TRUST | | | | | | |
| N: | 5767 | 705,000 I | 08/16/1996 | | | |
| | 1 | 705,000 | | | | |
| AUL T MITCHELL OR ALISON L MITCHELL TTEES FBO | | | | 16641 WELLINGTON DR | HUNTINGTON BEACH | CA 92649 |
| HE MITCHELL FAMILY TRUST UTD 6-19-80 | | | | | | |
| SN: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 | 4377 | 834 | 09/29/1994 | | | |
| | 1 | 834 | | | | |
| OHN W MOFFLY | | | | 100 MEADOW RD | RIVERSIDE | CT 06878 |
| SN: | 4911 | 6,250 | 04/24/1995 | | | |
| | 1 | 6,250 | | | | |
| ELDON R MONROE JR | | | | 2361 N. 840 W. | CLINTON | UT 84015 |
| SN: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 | 3059 | 1,292 | 09/20/1993 | | | |
| | 1 | 1,292 | | | | |
| L    DANIEL | | | | 2694 E 7800 S | SALT LAKE CITY | UT 84121 |
| SN: 64546488 | 2467 | 105 | 12/09/1988 | | | |
| | 1 | 105 | | | | |
| JAMES A MOORE | | | | 15 CEDAR GLEN | IRVINE | CA 92714 |

** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
** COMPANY # 0832 Page 32 **
** AS OF 04/25/1997 **

Escrow002781

| ) | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|-------|--------|------------|---------|------|--------|
| | 1 | 842 | | | | |
| MESA AG | | | | STADTLEY 7 | FL-9490 VADUZ | LIECH |
| : | 4190 | 100,000 I | 09/13/1994 | | | |
| | 4421 | 140,758 I | 09/30/1994 | | | |
| | 4898 | 10,000 I | 04/13/1995 | | | |
| | 4899 | 10,000 I | 04/13/1995 | | | |
| | 4900 | 10,000 I | 04/13/1995 | | | |
| | 4901 | 10,000 I | 04/13/1995 | | | |
| | 4902 | 1,667 I | 04/13/1995 | | | |
| | 7 | 282,425 | | | | |
| WARD L MYERS | | | | 3037 S 2000 E | SLC | UT 84109 |
| : | 4210 | 417 | 09/14/1994 | | | |
| | 1 | 417 | | | | |
| .SON STEVEN | | | | 1027 CHEYENNE STREET | SALT LAKE CITY | UT 84104 |
| ⁻⁻⁻⁻⁵⁵⁰66 | 2557 | 417 | 02/09/1988 | | | |
| | 1 | 417 | | | | |
| . NELSON | | | | 106 WEST 880 SOUTH | PROVO | UT 84601 |
| 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 | 5974 | 1,000 | 02/11/1997 | | | |
| | 1 | 1,000 | | | | |
| NEX RESOURCE CORP | | | | 2548 WILLIAM AVE. | NORTH VANCOUVER | V7K 1 |
| | 6069 | 100,000 I | 04/21/1997 | | | |
| | 6070 | 100,000 I | 04/21/1997 | | | |
| | 6071 | 100,000 I | 04/21/1997 | | | |
| | 6072 | 100,000 I | 04/21/1997 | | | |
| | 6073 | 100,000 I | 04/21/1997 | | | |
| | 5 | 500,000 | | | | |
| BOND LTD | | | | STADTLEY 7 | FL-9490 VADUZ | LIECH |
| | 4591 | 15,000 I | 11/23/1994 | | | |
| | 1 | 15,000 | | | | |
| ' JEAN NICASTRO & | | | | 3339 GEORGETOWN SQUARE | SALT LAKE CITY | T 84109 |
| .DINE NICASTRO JT TEN | | | | | | |
| i28-17-8380 | 5277 | 1 | 11/27/1995 | | | |
| | 1 | 1 | | | | |
| ON HEATHER | | | | 572 N 1100 W | PROVO | T 84606 |
| i28778905 | 2360 | 42 | 10/03/1988 | | | |
| | 1 | 42 | | | | |

```
                        ** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
                                ** COMPANY # 0832 Page 33 **                Escrow002782
                                   ** AS OF 04/25/1997 **
```

| ) | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|-------|--------|------------|---------|------|--------|

```
IAN D NORRIS                                    PO BOX 583                    DOUGLAS        GA 31533
N: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   4889        50   04/06/1995
                ─────────────────
                  1          50

ID F O'NEAL &                                   1706 AMBROSE RD.              AMBROSE        GA 31512
NNIE A. O'NEAL
N: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   5271     2,000   11/20/1995
                ─────────────────
                  1      2,000

KE DETKER                                       STADTSTR 15                   D-79104 FREIBURG   GERMA
N:              5056     1,000   07/21/1995
                ─────────────────
                  1      1,000

LF DETKER                                       STADTSTR 15                   D-79104 FREIBURG   GERMA
N:              5057     1,000   07/21/1995
                ─────────────────
                  1      1,000

:        INGER                                  KIRCHWEG 145A  8102 OBERENGSTRINGEN SWITZERLAND
N:              5385    10,000   04/01/1996
                5386     5,000 I 04/01/1996
                5387     1,000   04/01/1996
                5388     1,000   04/01/1996
                5389     1,000   04/01/1996
                5390     1,000   04/01/1996
                5391     1,000   04/01/1996
                5392     1,000   04/01/1996
                5393     1,000   04/01/1996
                5394     1,000   04/01/1996
                5395     1,000   04/01/1996
                5396     1,000   04/01/1996
                ─────────────────
                 12     25,000

RENT OLSON                                      114 ALAN ST BAY MEADOWS ESTATE   DOUGLAS      GA 31533
SSN: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  4739   10,000   02/10/1995
                4754     6,500   02/16/1995
                4773     8,900   02/27/1995
                5157    10,500   08/30/1995
                5158     5,025   08/30/1995
                ─────────────────
                  5     40,925

3R'   OLSON                                     114 ALAN ST-BAY MEADOWS ESTATE   DOUGLAS      GA 31533
3S.   80-0306    4693    2,070   01/11/1995
                ─────────────────
                  1      2,070

KAREN OLSON                                     114 ALAN ST                   DOUGLAS        GA 31533
SSN:           4774     7,400   02/27/1995
```

Escrow002783

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|
| | 1 | 7,400 | | | | |
| MBERLY OLSON | | | | BAY MEADOWS ESTATE | DOUGLAS | GA 31533 |
| N: | 5078 | 200 | 08/09/1995 | | | |
| | 5272 | 200 | 11/20/1995 | | | |
| | 2 | 400 | | | | |
| NEE C OLSON TRUST | | | | 114 ALAN ST BAY MEADOWS ESTATE | DOUGLAS | GA 31533 |
| N: | 4851 | 800 | 03/22/1995 | | | |
| | 1 | 800 | | | | |
| NEE CAMPBELL OLSON TRUST | | | | 1850 S 200 W #4 | BOUNTIFUL | UT 84010 |
| N: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 | 4768 | 610 | 02/22/1995 | | | |
| | 4777 | 677 | 02/27/1995 | | | |
| | 2 | 1,287 | | | | |
| STROV RESOURCES LTD | | | | 508-100 PARK ROYAL | WEST VANCOUVER | BC V7T 1 |
| N: | 4125 | 100,000 I | 09/13/1994 | | | |
| | 4126 | 100,000 I | 09/13/1994 | | | |
| | 4665 | 10,000 I | 01/04/1995 | | | |
| | 4666 | 10,000 I | 01/04/1995 | | | |
| | 4667 | 10,000 I | 01/04/1995 | | | |
| | 4668 | 10,000 I | 01/04/1995 | | | |
| | 4669 | 10,000 I | 01/04/1995 | | | |
| | 7 | 250,000 | | | | |
| LORENCE OSWALD | | | | 794 BIARITZ AVE | LAS VEGAS | NV 89123 |
| SSN: | 4234 | 84 | 09/14/1994 | | | |
| | 1 | 84 | | | | |
| MARK A OSWALD | | | | 794 BIARITZ AVE | LAS VEGAS | NV 89123 |
| SSN: | 4233 | 625 | 09/14/1994 | | | |
| | 1 | 625 | | | | |
| MARK E OSWALD | | | | 794 BIARITZ AVE | LAS VEGAS | NV 89123 |
| SSN: | 4232 | 84 | 09/14/1994 | | | |
| | 1 | 84 | | | | |
| OSWALD LOUISE A | | | | 1433 HOLLYWOOD AVE | SLC | UT 84105 |
| S: | 2691 | 230 | 03/27/1990 | | | |
| | 1 | 230 | | | | |
| BRIGITTE PACHER-SCHMITZ | | | | BRUESSELERSTRASSE 59 | 50672 KOELN | GERMA |
| SSN: | 5497 | 10,000 I | 04/08/1996 | | | |
| | 5498 | 10,000 I | 04/08/1996 | | | |

** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
** COMPANY # 0832 Page 35 **
** AS OF 04/25/1997 **

Escrow002784

| Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|
| 5500 | 10,000 I | 04/08/1996 | | | |
| 5501 | 10,000 I | 04/08/1996 | | | |
| 5502 | 10,000 I | 04/08/1996 | | | |
| 5503 | 10,000 I | 04/08/1996 | | | |
| 5504 | 10,000 I | 04/08/1996 | | | |
| 5505 | 10,000 I | 04/08/1996 | | | |
| 5506 | 10,000 I | 04/08/1996 | | | |
| 10 | 100,000 | | | | |

ENA PALACIOS-GAMARRA                          ANGELA POSESTA 153            PUEBLO LIBRE, LIMA    PERU
N:

| Cert# | Shares | Issue Date |
|---|---|---|
| 5447 | 10,000 I | 04/08/1996 |
| 5448 | 10,000 I | 04/08/1996 |
| 5449 | 10,000 I | 04/08/1996 |
| 5450 | 10,000 I | 04/08/1996 |
| 5451 | 10,000 I | 04/08/1996 |
| 5452 | 10,000 I | 04/08/1996 |
| 5453 | 10,000 I | 04/08/1996 |
| 5454 | 10,000 I | 04/08/1996 |
| 5455 | 10,000 I | 04/08/1996 |
| 5456 | 10,000 I | 04/08/1996 |
| 10 | 100,000 | |

ICK & KATHY PARAS                             4250 WANDER LN               SALT LAKE CITY    UT 84124
SN:        2835        105      06/04/1991

        1          105

ARATH RICHARD E &                             521 PLEASANT STREET          WORCESTER    MA 01602
SN:727037673  1165      209      07/13/1987

        1          209

OHN PASKETT                                   550 NORTH MAIN ST            ALPINE    UT 84004
SN:        4753      1,100      02/16/1995
           4783      1,500      02/27/1995
           5236      1,000      10/11/1995

        3        3,600

PAULA K PAULSON                               7328 SO VISCAYNE DR          SLC    UT 84121
SSN:       4223        417      09/14/1994

        1          417

FP    D PETERSEN                              654 E 200 S_                 HYRUM    UT 84319
SS.  /38-5006  4372      834      09/28/1994

        1          834

UWE PETERSEN                                  HAUPSTR. 35 64521 GROSS-GERAU  GERMANY
SSN:       5694     38,668 I     07/16/1996

```
** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
            ** COMPANY # 0832 Page 36 **                    Escrow002785
                ** AS OF 04/25/1997 **
```

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|
| | 1 | 38,668 | | | | |
| VID L PETERSON | | | | 62 NORTH GARDEN PARK DR #5 | OREM | UT 84057 |
| N: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 | 4881 | 781 | 04/06/1995 | | | |
| | 4912 | 635 | 04/25/1995 | | | |
| | 2 | 1,416 | | | | |
| N L PETERSON | | | | 506 SO 1300 E | PROVO | UT 84601 |
| N: | 2921 | 334 | 11/15/1991 | | | |
| | 1 | 334 | | | | |
| JHN M PETERSON | | | | 2188 E. 6525 S. | SALT LAKE CITY | UT 84121 |
| JN: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 | 5679 | 1,000 | 07/08/1996 | | | |
| | 1 | 1,000 | | | | |
| NJA MARIE PETERSON | | | | 62 N. GARDEN PARK #5 | OREM | UT 84057 |
| JN: | 5552 | 1,400 | 04/10/1996 | | | |
| | 1 | 1,400 | | | | |
| ETTINGILL NEIL C/F KELLY | | | | 6799 SO 3095 WEST | W JORDAN | UT 84084 |
| SN: | 2614 | 750 | 06/19/1989 | | | |
| | 1 | 750 | | | | |
| ICHARD PFLUGLER | | | | *BAUERVERBAND; DAMMSTR 9 | D-84034 LANDSHUT | GERMA |
| SN:NRA | 5791 | 300 | 09/09/1996 | | | |
| | 1 | 300 | | | | |
| HILADEP & CO | | | | 1900 MARKET ST 2ND FLOOR | PHILADELPHIA | PA 19103 |
| SSN:23-1922951 | 5352 | 791,711 | 03/05/1996 | | | |
| | 5579 | 25 | 05/06/1996 | | | |
| | 5689 | 5,555 | 07/11/1996 | | | |
| | 5700 | 151 | 07/22/1996 | | | |
| | 5783 | 65,779 | 08/29/1996 | | | |
| | 5792 | 257 | 09/10/1996 | | | |
| | 5823 | 420 | 10/15/1996 | | | |
| | 6017 | 3,578 | 03/18/1997 | | | |
| | 6056 | 4,020 | 04/08/1997 | | | |
| | 9 | 871,496 | | | | |
| T? X PHILLIPS | | | | ROUTE 7, BOX 53 | DOUGLAS | GA 31533 |
| SS. 04-6410 | 5291 | 850 | 12/06/1995 | | | |
| | 1 | 850 | | | | |
| STERLING PIERCE & | | | | 151 N 1300 E | PLEASANT GROVE | UT 84062 |
| CORRINE PIERCE JT TEN | | | | | | |

Escrow002786

```
                ** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
                        ** COMPANY # 0832 Page 37 **
                          ** AS OF 04/25/1997 **
```

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|

| | 1 | 375 | | | | |
| RDA PIERCE & | | | | 1055 E. GROVE CREEK | PLEASANT GROVE | UT 84062 |
| IX PIERCE  JTWROS | | | | | | |
| N: | 4282 | 375 | 09/16/1994 | | | |
| | 1 | 375 | | | | |
| LEN L PIERCE JR | | | | 938 CAROL AVENUE | ERMA CAPE MAY | NJ 08204 |
| N: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 | 5922 | 400 | 11/27/1996 | | | |
| | 1 | 400 | | | | |
| N POPE | | | | 1228 E 2400 N | LAYTON | UT 84040 |
| N: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 | 4705 | 175 | 01/19/1995 | | | |
| | 1 | 175 | | | | |
| ICHAEL POWELL | | | | 507 W CASTLE COURT | GLENWOOD SPRINGS | CO 81601 |
| S    )0-6690 | 4459 | 10,000 | 10/12/1994 | | | |
| | 1 | 10,000 | | | | |
| HARON PRICE | | | | 1029 NORTH MAIN | FARMINGTON | UT 84025 |
| SSN: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 | 4852 | 3,000 | 03/22/1995 | | | |
| | 1 | 3,000 | | | | |
| RICE JOHN A & JAN | | | | 4960 PROTER HILLROAD | LA MESA | CA 92041 |
| SSN:563708073 | 1111 | 1,042 | 06/12/1987 | | | |
| | 1 | 1,042 | | | | |
| RPICH BILLIE & JOH | | | | 6291 GLEN OAKS | MURRAY | UT 84107 |
| SSN:    0 | 304 | 417 | 10/08/1986 | | | |
| | 1 | 417 | | | | |
| DIETER QUAST | | | | RADERSCHEIDSTR. 7 | 50935 KOLN | GERMA |
| SSN: | 6044 | 852,630 I | 04/02/1997 | | | |
| | 1 | 852,630 | | | | |
| R B I ASSOCIATES | | | | XBRANDON PO BOX 713 | CENTERVILLE | UT 84014 |
| SSN: 79411020 | 2471 | 625 | 12/15/1988 | | | |
| | 1 | 625 | | | | |
| RAHN & BODMER | | | | TALSTRASSE 15 P.O. BOX 4522 | CH 8022 ZURICH | |
| SSN: | 5750 | 500,000 I | 07/31/1996 | | | |
| | 1 | 500,000 | | | | |

```
** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **        Escrow002787
            ** COMPANY # 0832 Page 38 **
              ** AS OF 04/25/1997 **
```

| ) | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|-------|--------|-----------|---------|------|--------|

N J RASMUSSEN
: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

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|-------|--------|-----------|---------|------|--------|
| | 5632 | 209 | 06/10/1996 | BOX 734 | AMERICAN FORK] | UT 84003 |
| | 1 | 209 | | | | |

NHARD RAUBALL
|:

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|-------|--------|-----------|---------|------|--------|
| | 4116 | 100,000 I | 09/13/1994 | WITTBRAEUCKER WALDWEG 17 | HERDECKE-RUHR | GERMA |
| | 4117 | 100,000 I | 09/13/1994 | | | |
| | 4118 | 100,000 I | 09/13/1994 | | | |
| | 4119 | 100,000 I | 09/13/1994 | | | |
| | 4120 | 100,000 I | 09/13/1994 | | | |
| | 4121 | 100,000 I | 09/13/1994 | | | |
| | 4122 | 100,000 I | 09/13/1994 | | | |
| | 4123 | 100,000 I | 09/13/1994 | | | |
| | 8 | 800,000 | | | | |

INHARD RAUBALL IN TRUST
CHTSANWALT UND NOTAR
N:

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|-------|--------|-----------|---------|------|--------|
| | 4171 | 100,000 I | 09/13/1994 | FRIEDENSPLATZ | 44135 DORTMUND | GERMA |
| | 4172 | 100,000 I | 09/13/1994 | | | |
| | 4173 | 100,000 I | 09/13/1994 | | | |
| | 4174 | 100,000 I | 09/13/1994 | | | |
| | 4175 | 100,000 I | 09/13/1994 | | | |
| | 4176 | 100,000 I | 09/13/1994 | | | |
| | 4177 | 100,000 I | 09/13/1994 | | | |
| | 4178 | 100,000 I | 09/13/1994 | | | |
| | 4179 | 100,000 I | 09/13/1994 | | | |
| | 4180 | 100,000 I | 09/13/1994 | | | |
| | 4181 | 50,000 I | 09/13/1994 | | | |
| | 11 | 1,050,000 | | | | |

EINHARD RAUBALL TTEE
GN:

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|-------|--------|-----------|---------|------|--------|
| | 5739 | 100,000 I | 07/31/1996 | | | |
| | 5740 | 100,000 I | 07/31/1996 | | | |
| | 5741 | 100,000 I | 07/31/1996 | | | |
| | 5742 | 100,000 I | 07/31/1996 | | | |
| | 5743 | 100,000 I | 07/31/1996 | | | |
| | 5744 | 100,000 I | 07/31/1996 | | | |
| | 5745 | 100,000 I | 07/31/1996 | | | |
| | 5746 | 100,000 I | 07/31/1996 | | | |
| | 5747 | 100,000 I | 07/31/1996 | | | |
| | 5748 | 100,000 I | 07/31/1996 | | | |
| | 5749 | 3,917 I | 07/31/1996 | | | |
| | 11 | 1,003,917 | | | | |

IERBERT RAY
SSN:

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|-------|--------|-----------|---------|------|--------|
| | 4420 | 4,000 I | 09/30/1994 | KIRCHGASSE #2 | 8952 SCHLIEREN | SWITZ |
| | 1 | 4,000 | | | | |

/ATURVAL DEEUE

```
                    ** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **        Escrow002788
                            ** COMPANY # 0832 Page 39 **
                               ** AS OF 04/25/1997 **
```

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|
| N: | 4436 | 265 | 10/03/1994 | | | |
| | 1 | 265 | | | | |
| RRY REEVE | | | | 26731 WESTVALE | PVP | CA 90274 |
| N: | 4437 | 265 | 10/03/1994 | | | |
| | 1 | 265 | | | | |
| BINE REIFENSCHEID | | | | STADTSTR 15 | 79104 FREIBURG | GERMA |
| N: | 5067 | 2,500 | 07/21/1995 | | | |
| | 1 | 2,500 | | | | |
| IFF RAY & CONNIE | | | | 125 VIA MENTONE | NEWPORT BEACH | CA 92663 |
| N:552643805 | 1323 | 1,250 | 08/17/1987 | | | |
| | 1 | 1,250 | | | | |
| HN RICE | | | | PO BOX 434 | KENAI | AK 99611 |
| N     0-4225 | 4730 | 2,500 | 02/10/1995 | | | |
| | 4731 | 2,500 | 02/10/1995 | | | |
| | 4732 | 2,500 | 02/10/1995 | | | |
| | 4733 | 2,500 | 02/10/1995 | | | |
| | 4734 | 2,500 | 02/10/1995 | | | |
| | 4735 | 2,500 | 02/10/1995 | | | |
| | 4736 | 2,500 | 02/10/1995 | | | |
| | 4737 | 2,500 | 02/10/1995 | | | |
| | 8 | 20,000 | | | | |
| HN A RICE | | | | PO BOX 434 | KENAI | AK 99611 |
| SN: | 4610 | 6,950 | 12/07/1994 | | | |
| | 1 | 6,950 | | | | |
| : DAVID RICHARDS | | | | 4549 SO 1300 E | SLC | UT 84117 |
| SN: | 4423 | 572 | 10/03/1994 | | | |
| | 1 | 572 | | | | |
| JAMES P RICHARDS | | | | 4549 SO 1300 E | SLC | UT 84117 |
| SN: | 4424 | 381 | 10/03/1994 | | | |
| | 1 | 381 | | | | |
| T    RICHARDS | | | | 4549 SO 1300 E | SLC | UT 84117 |
| S | 4425 | 381 | 10/03/1994 | | | |
| | 1 | 381 | | | | |
| CRAIG M RIDD & | | | | 26595 SOTELOJ | MISSION VIEJO | CA 92692 |
| JOY S. RIDD | | | | | | |

```
                    ** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
                         ** COMPANY # 0832 Page 40 **                Escrow002789
                            ** AS OF 04/25/1997 **
```

| Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|-------|--------|------------|---------|------|--------|

```
           1         313
```

KWELL INTERNATIONAL LTD
:          6012     100,000 I 03/13/1997

```
           1        100,000
```

HWEIN JOSEPH P                            322 N 2000 W #BICO-2          SALT LAKE CITY    UT 84116
I:189302226    2554        417   02/09/1989
```
           1        417
```

3AN SANTAGE
N:         5816      1,084   10/04/1996
```
           1       1,084
```

CHAEL SCHAAL                              MERKLEWEG 23 70599 STUTTGART   GERMANY
N:         4582     25,000 I 11/21/1994
           4590     10,000 I 11/23/1994
```
           2       35,000
```

GMAR SCHIMANSKI                           DRACHENWEG 9                   9333 ALTHOFEN     AUSTR
N:         5507     10,000 I 04/08/1996
           5508     10,000 I 04/08/1996
           5509     10,000 I 04/08/1996
           5510     10,000 I 04/08/1996
           5511     10,000 I 04/08/1996
           5512     10,000 I 04/08/1996
           5513     10,000 I 04/08/1996
           5514     10,000 I 04/08/1996
           5515     10,000 I 04/08/1996
           5516     10,000 I 04/08/1996
```
          10       100,000
```

ILLIAM E SCHMIDT                          2741 W TOLA AVE               ANAHEIM           CA 92804
SN: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  4216      125   09/14/1994
```
           1        125
```

CHRAVER EDWARD                            NAVAL SUB BASE 140 SYLVESTER ROAD  SAN DIEGO     . CA 92106
SN:     0   2270        250   08/15/1988
```
           1        250
```

MARTIN A SCHUEPBACH
SN:        5768    772,500 I 08/16/1996
```
           1       772,500
```

```
              ** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
                         ** COMPANY # 0832 Page 41 **              Escrow002790
                            ** AS OF 04/25/1997 **
```

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|
| I: | 4521 | 25,000 I | 11/14/1994 | | | |
| | 1 | 25,000 | | | | |
| SCOTT | | | | 257 E 50 S | N SLC | UT 84054 |
| N: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 | 4642 | 1,250 | 12/20/1994 | | | |
| | 1 | 1,250 | | | | |
| ED L SCOTT | | | | 257 E 50 S | NO. SLC | UT 84054 |
| N: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 | 4373 | 4,167 | 09/28/1994 | | | |
| | 4374 | 4,167 | 09/28/1994 | | | |
| | 2 | 8,334 | | | | |
| ALAN SESSIONS | | | | 4635 S 3750 W | ROY | UT 84067 |
| N: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 | 4440 | 500 | 10/04/1994 | | | |
| | 1 | 500 | | | | |
| P'   CO | | | | PO BOX 50000 | NEWARKRK | NJ 07101 |
| i.     A1527 | 5817 | 500,000 I | 10/08/1996 | | | |
| | 6063 | 10,000 I | 04/16/1997 | | | |
| | 6064 | 10,000 I | 04/16/1997 | | | |
| | 6065 | 10,000 I | 04/16/1997 | | | |
| | 6066 | 10,000 I | 04/16/1997 | | | |
| | 6067 | 10,000 I | 04/16/1997 | | | |
| | 6 | 550,000 | | | | |
| IGMA TECHNOLOGY | | | | LE PIGNONROUTE DES CAPELLES ST SAMP GUERNSEY CHANNEL | | ISLAN |
| SN: | 4974 | 4,000 | 06/16/1995 | | | |
| | 1 | 4,000 | | | | |
| ILBIGER JACK | | | | 5325 GYPSY | LAS VEGAS | NV 89107 |
| SN:101242609 | 2543 | 834 | 02/09/1989 | | | |
| | 1 | 834 | | | | |
| SINBAD LTD | | | | MIDDLE & EGGMONT STREET | KINGSTOWN ST VINCENT & GRENA | |
| SN: | 4198 | 100,000 I | 09/13/1994 | | | |
| | 4203 | 100,000 I | 09/13/1994 | | | |
| | 4204 | 75,000 I | 09/13/1994 | | | |
| | 4419 | 13,242 I | 09/30/1994 | | | |
| | 4525 | 25,000 I | 11/14/1994 | | | |
| | 4527 | 25,000 I | 11/14/1994 | | | |
| | 4533 | 10,000 I | 11/14/1994 | | | |
| | 4534 | 10,000 I | 11/14/1994 | | | |
| | 4536 | 5,000 I | 11/14/1994 | | | |
| | 4537 | 5,000 I | 11/14/1994 | | | |
| | 4538 | 5,000 I | 11/14/1994 | | | |
| | 4539 | 5,000 I | 11/14/1994 | | | |

```
                    ** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
                              ** COMPANY # 0832 Page 42 **               Escrow002791
                              ** AS OF 04/25/1997 **
```

| Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|-------|--------|------------|---------|------|--------|

```
       5201      7,500   09/14/1995

        14     390,742
```

**ATER ELIZABETH J**
N:                           310 E 46TH ST                    NEW YORK      NY 10017
```
      2791        209   02/15/1991

        1        209
```

**ATER KIM W**
N:529512986                  360 S 100 E                      PLEASANT GROVE   UT 84062
```
      2276        209   08/16/1988

        1        209
```

**.OVGOLD CORPORATION**
:N:                          TALACKER 50 8001 ZURICH          SWITZERLAND
```
      5517    10,000 I 04/08/1996
      5518    10,000 I 04/08/1996
      5519    10,000 I 04/08/1996
      5520    10,000 I 04/08/1996
      5521    10,000 I 04/08/1996
      5522    10,000 I 04/08/1996
      5523    10,000 I 04/08/1996
      5524    10,000 I 04/08/1996
      5525    10,000 I 04/08/1996
      5526    10,000 I 04/08/1996
      5527    10,000 I 04/08/1996
      5528    10,000 I 04/08/1996
      5529    10,000 I 04/08/1996
      5530    10,000 I 04/08/1996
      5531    10,000 I 04/08/1996
      5532    10,000 I 04/08/1996
      5533    10,000 I 04/08/1996
      5534    10,000 I 04/08/1996
      5535    10,000 I 04/08/1996
      5536    10,000 I 04/08/1996
      5537     5,000 I 04/08/1996
      5538     5,000 I 04/08/1996
      5539     5,000 I 04/08/1996
      5540     5,000 I 04/08/1996
      5541     5,000 I 04/08/1996
      5542     5,000 I 04/08/1996
      5543     5,000 I 04/08/1996
      5544     5,000 I 04/08/1996
      5545     5,000 I 04/08/1996
      5546     5,000 I 04/08/1996

        30    250,000
```

**KAMILL SMITH**
SSN:                         265 S. ALPINE CIRCLE             ALPINE       UT 84004
```
      4270         84   09/15/1994

        1         84
```

```
                    ** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **          Escrow002792
                           ** COMPANY # 0832 Page 43 **
                           ** AS OF 04/25/1997 **
```

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|

| | 4245 | 2,084 | 09/14/1994 | | | |
I: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

| | 1 | 2,084 | | | | |

NT SMITH
N: | 4269 | 84 | 09/15/1994 | 265 S. ALPINE CIRCLE | ALPINE | UT 84004

| | 1 | 84 | | | | |

ED P SMITH &
RLENE SMITH JT TEN
N: | 4339 | 3,834 | 09/26/1994 | 228 SOUTH SCENIC DR | ALPINE | UT 84004

| | 1 | 3,834 | | | | |

N SMITH &
NDA L. SMITH JTWROS
N: | 4268 | 1,293 | 09/15/1994 | 265 S. ALPINE CIRCLE | ALPINE | UT 84004

| | 1 | 1,293 | | | | |

VD
N: | 2601 | 6,250 | 05/11/1989 | 2049 SKIMMER COURT 324 | CLEARWATER | FL 34622

| | 1 | 6,250 | | | | |

MITH JOAN
SN:528043063 | 100 | 417 | 10/08/1986 | 4310 ALBRIGHT STREET | SALT LAKE CITY | UT 84124

| | 1 | 417 | | | | |

RED T SMITH TTEE FBO JEAN P SMITH
EVOCABLE TRUST DTD 11-26-90
SN: | 4022 | 6,167 | 09/12/1994 | 4221 W JUNIPER CIR | ALPINE | UT 84004

| | 1 | 6,167 | | | | |

SORENSEN RON R
SSN:529028204 | 2315 | 188 | 09/08/1988 | 790 E 900 S | PLEASANT GROVE | UT 84062

| | 1 | 188 | | | | |

CHARLES SPENCE
SSN: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 | 3039 | 417 | 06/08/1993 | 1142 REGENT CT | OREM | UT 84057

| | 1 | 417 | | | | |

M
J SPLAINE
SSN: | 4318 | 501 | 09/22/1994 | 311 LINCOLN ST | WORCESTER | MA 01605

| | 1 | 501 | | | | |

MARTIN SPORTSCHUTZ | | | | ALTINGER STR 817 | 71032 BOBLINGEN | GERMA

**\*\* COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. \*\***
**\*\* COMPANY # 0832 Page 44 \*\***
**\*\* AS OF 04/25/1997 \*\***

Escrow002793

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|
| | 1 | 50,000 | | | | |
| ARVIN ALLAN STERN & AUDREY ELAINE STERN TTEES FBO | | | | 5461 AMESTOY AVENUE | ENCINO | CA 91316 |
| ARVIN A. & AUDREY E. STERN LIVING TRUST | | | | | | |
| SN: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 | 5954 | 500 | 01/31/1997 | | | |
| | 1 | 500 | | | | |
| ANFORD KEITH STEVENS | | | | 2371 GROVE AVENUE APT 12 | SAN DIEGO | CA 92154 |
| SN: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 | 5841 | 200 | 11/13/1996 | | | |
| | 1 | 200 | | | | |
| KURT STRASSLE | | | | | | |
| SN: | 5400 | 20,000 I | 04/01/1996 | | | |
| | 5401 | 20,000 I | 04/01/1996 | | | |
| | 5402 | 25,000 I | 04/01/1996 | | | |
| | 5581 | 73,000 I | 05/06/1996 | | | |
| | 5582 | 27,000 I | 05/06/1996 | | | |
| | 5 | 165,000 | | | | |
| CHARLES STUART & | | | | BOX 2197 | PROVO | UT 84603 |
| BARBARA STUART  JT TEN | | | | | | |
| SSN: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 | 2953 | 11 | 06/17/1992 | | | |
| | 1 | 11 | | | | |
| TERRY STULTS | | | | PO BOX 5007 | FITZGERLAD | GA 31750 |
| SSN: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 | 5241 | 100 | 10/11/1995 | | | |
| | 1 | 100 | | | | |
| ROBERT W SWANSON | | | | 8225 GOLDEN AVENUE | LEMON GROVE | CA 91945 |
| SSN: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 | 5615 | 100 | 06/03/1996 | | | |
| | 1 | 100 | | | | |
| BARRY D SWENSEN | | | | 1946 ATKIN AVE. | SALT LAKE CITY | UT 84106 |
| SSN: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 | 5278 | 1 | 11/27/1995 | | | |
| | 1 | 1 | | | | |
| SWISS BANK CORPORATION | | | | POSTFACH CH-8010 ZURICH | SWITERZLAND | |
| SSN: | 5327 | 500,000 I | 02/19/1996 | | | |
| | 1 | 500,000 | | | | |
| TANGARO JOHN | | | | 3343 S 1300 E #2 | SALT LAKE CITY | UT 84106 |
| SSN:529031835 | 1730 | 417 | 12/02/1987 | | | |
| | 1 | 417 | | | | |

```
                    ** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **        Escrow002794
                              ** COMPANY # 0832 Page 45 **
                              ** AS OF 04/25/1997 **
```

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|

E LEE TAYLOR
| :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 | 4886 | 600 | 04/06/1995 | 3372 LA MESA RD | SLC | UT 84109 |
| | 1 | 600 | | | | |

ES LEE TAYLOR
| :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 | 4887 | 400 | 04/06/1995 | 3325 LA MESA RD | SLC | UT 84109 |
| | 1 | 400 | | | | |

N TAYLOR
| N: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 | 5677 | 1,000 | 07/08/1996 | | | |
| | 5808 | 3,000 | 09/30/1996 | | | |
| | 5809 | 2,460 | 09/30/1996 | | | |
| | 3 | 6,460 | | | | |

RRY LADELL & MAR
| N:529180383 | 922 | 463 | 04/27/1987 | 180 N 825 E | AMERICAN FORK | UT 84003 |
| | 1 | 463 | | | | |

YNc n THALMAN
| N: | 2821 | 417 | 04/16/1991 | 720 E 1700 SO | OREM | UT 84057 |
| | 1 | 417 | | | | |

ETER THOMA
| N: | 4038 | 100,000 I | 09/13/1994 | BLUMENRAINSTR 20 | 9050 APPENZELL | SWITZ |
| | 4042 | 60,000 I | 09/13/1994 | | | |
| | 5702 | 10,000 I | 07/22/1996 | | | |
| | 5703 | 2,000 I | 07/22/1996 | | | |
| | 4 | 172,000 | | | | |

ULIA THOMPSON
| SN: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 | 4624 | 417 | 12/13/1994 | 536 W 113TH ST #74 | NEW YORK | NY 10025 |
| | 1 | 417 | | | | |

HOMSON KENT & DEBOR
| SN:305629433 | 2387 | 209 | 11/02/1988 | 1639 W TOSCANINI DR | RANCHO PALOS VERDES | CA 90275 |
| | 1 | 209 | | | | |

HORNTON JOHN
| Y )95282 | 2524 | 209 | 01/31/1989 | 6325 S MT VERNON DRIVE | MURRAY | UT 84107 |
| | 1 | 209 | | | | |

TRESCHITTA DOMENICK P
| SSN: 49304981 | 2553 | 1,250 | 02/09/1989 | *BALLARD MEDICAL 6864 S 300 W | MIDVALE | UT 84047 |

```
                    ** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **        Escrow002795
                              ** COMPANY # 0832 Page 46 **
                                 ** AS OF 04/25/1997 **
```

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|

```
INCALE KATHLEEN N &                                23 SPARROWHAWK              IRVINE         CA 92714
N:384188003    485      2,605   12/09/1986
              ---------------------
               1      2,605


TER TSCHIRKY
N:            5397     20,000 I 04/01/1996
              5398     20,000 I 04/01/1996
              5399     20,000 I 04/01/1996
              ---------------------
               3     60,000


RRY LYNN TURNER                                    PO BOX 20422               V.O.C.         AZ 86341
N:            2891      625    10/23/1991
              ---------------------
               1      625


FONS VAN BURK                                      SENSENFELD 121             D-46244 BOTTROP    GERMA
SN:NRA        5790      200    09/09/1996
              ---------------------
               1      200


AN HORN JOHN E TTEE                                1941 E FRUIT ST            SANTA ANA      CA 92701
SN:           2743      417    10/02/1990
              ---------------------
               1      417


ANCE BETH                                          9623 S 1600 W              SOUTH JORDAN   UT 84095
SSN:529525530  2522     167    01/31/1989
              ---------------------
               1      167


JOAN S VANCOUWENBERGHE                             9532 GRAND VIEW DR         SLC            UT
SSN:          4250      167    09/14/1994
              ---------------------
               1      167


MATTHEW S VETARE                                   20 LAURA LN                HOPEWELL       NY 12533
SSN: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  4595   300    11/28/1994
              ---------------------
               1      300


FRANK VETARE &                                     72 BRETT LN  PO BOX 282    BEDFORD        NY 10506
JOAN VETARE JTWROS
SSN: 72-18-8858  4009   1,000  09/12/1994
              4010    1,000   09/12/1994
              4011    1,000   09/12/1994
              4012    1,167   09/12/1994
              ---------------------
               4     4,167


FRANK G VETARE &                                   72 BRETT LANE              BEDFORD        NY 10506
```

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|
| N: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 | 5586 | 500 | 05/10/1996 | | | |
| | 5587 | 500 | 05/10/1996 | | | |
| | 2 | 1,000 | | | | |
| CHAEL A VETARE & | | | | 72 BRETT LANE | BEDFORD | NY 10506 |
| ANK G. VETARE  TEN COM | | | | | | |
| N: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 | 5786 | 300 | 08/28/1996 | | | |
| | 1 | 300 | | | | |
| RGIE E VIERIG & MAX O VIERIG TTEES FBO | | | | 2490 EAST OLYMPUS DRIVE | SALT LAKE CITY | UT 84124 |
| E MARGIE E. VIERIG TRUST UAD 09/21/93 | | | | | | |
| N:87-0514760 | 5948 | 200 | 01/20/1997 | | | |
| | 1 | 200 | | | | |
| FFREY W WADE | | | | 551 BRENTWOOD RD | DOUGLAS | GA 31533 |
| SN: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 | 4890 | 2,337 | 04/06/1995 | | | |
| | 1 | 2,337 | | | | |
| MUnnt P WALBRIDGE | | | | 100 NORTH BARRANCA ST | WEST COVINA | CA 91791 |
| SN: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 | 4922 | 7,500 | 04/28/1995 | | | |
| | 1 | 7,500 | | | | |
| ARBARA J WALDRON | | | | 1430 NORTH GROVE DR | ALPINE | UT 84004 |
| SN: | 4747 | 168 | 02/16/1995 | | | |
| | 4850 | 3,896 I | 03/22/1995 | | | |
| | 2 | 4,064 | | | | |
| RANT WALDRON | | | | 1430 NORTH GROVE DR | ALPINE | UT 84004 |
| SN: | 4367 | 5,417 | 09/27/1994 | | | |
| | 1 | 5,417 | | | | |
| ARBARA WALDRON C/F | | | | 1430 N GROVE DR | ALPINE | UT 84004 |
| HEIDI WALDRON | | | | | | |
| SN: | 4347 | 417 | 09/27/1994 | | | |
| | 4348 | 417 | 09/27/1994 | | | |
| | 4349 | 417 | 09/27/1994 | | | |
| | 4350 | 417 | 09/27/1994 | | | |
| | 4351 | 417 | 09/27/1994 | | | |
| | 4352 | 417 | 09/27/1994 | | | |
| | 6 | 2,502 | | | | |
| DAVID G WALKER | | | | 946 E 900 S | SPRINGVILLE | UT 84663 |
| SSN: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 | 4741 | 1,207 | 02/10/1995 | | | |
| | 1 | 1,207 | | | | |

```
** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
              ** COMPANY # 0832 Page 48 **                    Escrow002797
                ** AS OF 04/25/1997 **
```

| Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|-------|--------|-----------|---------|------|--------|

**.KER NIEL**
**N:528682907**

| | 2385 | 1,334 | 10/31/1988 | 12828 S 6000 W | HERRIMAN | UT 84065 |
| | 1 | 1,334 | | | | |

**RY A WALSH**
**N: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**

| | 5793 | 250 | 09/10/1996 | 6776 TARAWA DRIVE | CINCINNATI | OH 45224 |
| | 1 | 250 | | | | |

**NA MAE WARDLE &**
**X G. WARDLE**
**N: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**

| | 4880 | 193 | 04/06/1995 | 745 E CENTER ST | SPRINGVILLE | UT 84663 |
| | 1 | 193 | | | | |

**EDERICK M WARREN JR**
**N: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**

| | 5821 | 1,000 | 10/14/1996 | 91 WINSTON HILL ROAD | FORT THOMAS | KY 41075 |
| | 6052 | 1,000 | 04/04/1997 | | | |
| | 2 | 2,000 | | | | |

**ATERS LUNNISS NOMINEES LIMITED**
**/C 49158**
**SN:NRA**

| | 5955 | 1,000 | 01/31/1997 | 2 REDWELL ST. | NORWICH NR2 4SN   UK ENGLA |
| | 5960 | 1,000 | 02/05/1997 | | | |
| | 6039 | 1,000 | 03/27/1997 | | | |
| | 3 | 3,000 | | | | |

**DC CAPER LTD**
**SN:**

| | 5090 | 50,000 I | 08/14/1995 | STADTLEY 7 | FL 9490 VADUZ | LIECH |
| | 1 | 50,000 | | | | |

**AL WEATHERS**
**SN:**

| | 4785 | 4,167 | 03/01/1995 | 2863 CARRIAGE LN | OGDEN | UT 84403 |
| | 1 | 4,167 | | | | |

**IORT WEINBERG**
**SN: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**

| | 4479 | 1,000 | 10/25/1994 | 8447 WILSHIRE BLVD #105 | BEVERLY HILLS | CA 90211 |
| | 1 | 1,000 | | | | |

**VESTLAKE LTD**
**?**

| | 4094 | 100,000 I | 09/13/1994 | MIDDLE & EGGMONT ST | KINGSTOWN ST VINCENT &  GRENA |
| | 4099 | 100,000 I | 09/13/1994 | | | |
| | 5011 | 100,000 | 07/21/1995 | | | |
| | 5014 | 10,000 | 07/21/1995 | | | |
| | 4 | 310,000 | | | | |

Escrow002798

** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
** COMPANY # 0832 Page 49 **
** AS OF 04/25/1997 **

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|

1:NRA

| | 5909 | 1,000 | 11/22/1996 | | | |
| | 5910 | 2,000 | 11/22/1996 | | | |
| | 5911 | 2,000 | 11/22/1996 | | | |
| | 3 | 5,000 | | | | |

ITBY GEORGE L
N:521128801

| | 2367 | 417 | 10/13/1988 | 480 RIDGE LANE | PAYSON | UT 84651 |
| | 1 | 417 | | | | |

LCO
N:87-0278784

PO BOX 11587      SALT LAKE CITY   UT 84147

| | 4281 | 12,025 | 09/16/1994 |
| | 4283 | 10,417 | 09/19/1994 |
| | 4290 | 16,250 | 09/20/1994 |
| | 4309 | 18,750 | 09/21/1994 |
| | 4441 | 40,461 | 10/04/1994 |
| | 4450 | 4,167 | 10/07/1994 |
| | 4468 | 6,252 | 10/18/1994 |
| | 4475 | 30,000 | 10/25/1994 |
| | 4476 | 9,000 | 10/25/1994 |
| | 4486 | 10,000 | 10/26/1994 |
| | 4501 | 39,733 | 11/04/1994 |
| | 4516 | 5,990 | 11/10/1994 |
| | 4518 | 521 | 11/11/1994 |
| | 4569 | 2,084 | 11/15/1994 |
| | 4615 | 18,751 | 12/12/1994 |
| | 4618 | 10,000 | 12/13/1994 |
| | 4806 | 834 | 03/10/1995 |
| | 4809 | 2,084 | 03/13/1995 |
| | 4816 | 11,000 | 03/16/1995 |
| | 4861 | 4,319 | 03/29/1995 |
| | 4874 | 5,000 | 03/31/1995 |
| | 4878 | 11,462 | 04/05/1995 |
| | 4894 | 417 | 04/10/1995 |
| | 4920 | 27,614 | 04/28/1995 |
| | 4921 | 25,000 | 04/28/1995 |
| | 4923 | 10,000 | 05/03/1995 |
| | 4924 | 10,000 | 05/03/1995 |
| | 4928 | 3,209 | 05/11/1995 |
| | 4954 | 5,000 | 05/19/1995 |
| | 4957 | 4,001 | 05/24/1995 |
| | 4967 | 2,545 | 06/08/1995 |
| | 4969 | 1,042 | 06/12/1995 |
| | 4994 | 1,047 | 06/29/1995 |
| | 5071 | 1,125 | 07/27/1995 |
| | 5073 | 417 | 07/28/1995 |
| | 5162 | 834 | 09/06/1995 |
| | 5175 | 7,000 | 09/08/1995 |
| | 5290 | 242 | 12/06/1995 |
| | 5346 | 64,544 | 02/27/1996 |
| | 5351 | 878 | 03/01/1996 |
| | 5353 | 84 | 03/05/1996 |

| Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|
| 5562 | 6,463 | 04/17/1996 | | | |
| 5563 | 1,667 | 04/19/1996 | | | |
| 5585 | 43 | 05/10/1996 | | | |
| 5612 | 2,084 | 05/31/1996 | | | |
| 5626 | 700 | 06/06/1996 | | | |
| 5658 | 7,292 | 06/20/1996 | | | |
| 5661 | 750 | 06/21/1996 | | | |
| 5782 | 38,690 | 08/28/1996 | | | |
| 5931 | 4,688 | 12/04/1996 | | | |
| 5972 | 417 | 02/10/1997 | | | |
| 5975 | 6,250 | 02/11/1997 | | | |
| 5980 | 542 | 02/18/1997 | | | |
| 6011 | 4,168 | 03/13/1997 | | | |
| 6022 | 2,000 | 03/20/1997 | | | |
| 6028 | 1,022 | 03/24/1997 | | | |
| 6030 | 25,000 | 03/24/1997 | | | |
| 6031 | 3,896 | 03/24/1997 | | | |
| 6037 | 1,375 | 03/26/1997 | | | |
| 60 | 587,876 | | | | |

MICHAEL WILLIAM LANDER
SN:

| | 5929 | 1,000 | 12/02/1996 | X 115 CALCUTTA STREET; KHANDALLAH | WELLINGTON 6004 | NEWZE |
| 1 | | 1,000 | | | | |

W WILLIAMS & RUTH P WILLIAMS TTEES FBO
.W. WILLIAMS FAMILY TRUST 05/25/79
SN: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

| 5572 | 700 | 05/02/1996 | 723 W. 1340 S. | PROVE | UT 84601 |
| 1 | 700 | | | | |

HISER L KENNETH &
SN:528285473

| 488 | 542 | 12/09/1986 | 3843 N 900 W | PLEASANT VIEW | UT 84404 |
| 1 | 542 | | | | |

HIZARD INC
SSN:        0

| 1271 | 8,334 | 08/04/1987 | BANK ONE TOWER 8TH FLOOR 50 W BROAD | SALT LAKE CITY | UT 84101 |
| 1273 | 2,084 | 08/04/1987 | | | |
| 2334 | 1,042 | 09/13/1988 | | | |
| 3 | 11,460 | | | | |

ROBERT J WOLF
SSN:

| 2832 | 834 | 05/22/1991 | 113 SUNNYSIDE DR | BATTLECREEK | MI 49015 |
| 1 | 834 | | | | |

ROLAND WOLFLE
SSN:

| 5044 | 5,229 | 07/21/1995 | EMMENDINGER STR 17 | D-79108 FREIBURG | GERMA |
| 1 | 5,229 | | | | |

```
                ** COMPLETE STOCK HOLDERS LIST OF EUROGAS, INC. **
                        ** COMPANY # 0832 Page 51 **              Escrow002800
                           ** AS OF 04/25/1997 **
```

| | Cert# | Shares | Issue Date | Address | CITY | ST ZIP |
|---|---|---|---|---|---|---|
| ET WORLD | | | | 1985 MANTLE AVE | SLC | UT 84119 |
| N: | 4426 | 250 | 10/03/1994 | | | |
| | 1 | 250 | | | | |
| FF A WRIGHT | | | | 3333 LA MESA RD | SLC | UT 84109 |
| N: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 | 4888 | 120 | 04/06/1995 | | | |
| | 1 | 120 | | | | |
| UART WRIGHT & | | | | 1400 E CLAYBORNE AVE | SLC | UT 84106 |
| LISSA WRIGHT | | | | | | |
| N: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 | 4867 | 1,705 | 03/30/1995 | | | |
| | 5243 | 3,500 | 10/11/1995 | | | |
| | 5773 | 1,000 | 08/27/1996 | | | |
| | 3 | 6,205 | | | | |
| RGA HUTZER | | | | WALDSTR 170 | 51147 KOLN | GERMA |
| N: | 4129 | 500,000 I | 09/13/1994 | | | |
| | 1 | 500,000 | | | | |
| RAZIL GRACE | | | | 1764 BRYAN AVENUE (MR) | SALT LAKE CITY | UT 84108 |
| N:     0 | 282 | 417 | 10/08/1986 | | | |
| | 1 | 417 | | | | |
| ERBERT ZIMMER | | | | | | |
| N: | 5383 | 500,000 I | 03/28/1996 | | | |
| | 1 | 500,000 | | | | |
| UBKOFF DEAN R | | | | 12087 LEIF ERICSON DRIVE | MORENO VALLEY | CA 92387 |
| N:549354113 | 1746 | 521 | 12/07/1987 | | | |
| | 1 | 521 | | | | |

```
* TOTALS **

ree-Trading Stock    12,498,770
nvestment Stock      37,997,722
otal Shares          50,496,492
otal Stockholders          402
```

# KRUSE, LANDA & MAYCOCK, L.L.C.

EIGHTH FLOOR, BANK ONE TOWER
50 WEST BROADWAY (300 SOUTH)
SALT LAKE CITY, UTAH 84101-2034
E-mail: klmlaw.com

TELEPHONE: (801) 531-7090
TELECOPY: (801) 359-3954

HOWARD S. LANDA

February 10, 1997

*CONFIDENTIAL*
*FACSIMILE TRANSMISSION*
*255-2005*

Hank Blankenstein
EuroGas, Inc.
942 East 7145 South, #101A
Midvale, Utah 84047

Dear Hank:

Enclosed herewith is a letter you requested.  As I have told you, there is no problem in Jeffrey Ltd. loaning the company money.  It should be evidenced by a promissory note to Jeffrey Ltd. Repayment to Jeffrey can be dealt with in the future.

Yours truly,

Howard S. Landa

HSL:cta

enclosed

Escrow043225

## KRUSE, LANDA & MAYCOCK, L.L.C.

EIGHTH FLOOR, BANK ONE TOWER
50 WEST BROADWAY (300 SOUTH)
SALT LAKE CITY, UTAH  84101-2034
E-mail: klmlaw.com

TELEPHONE  (801) 531-7090
TELECOPY: (801) 359-3954

HOWARD S. LANDA

February 10, 1997

*CONFIDENTIAL*
*FACSIMILE TRANSMISSION*
*255-2005*

Hank Blankenstein
EuroGas, Inc.
942 East 7145 South, #101A
Midvale, Utah  84047

Dear Hank:

It is my understanding that Jeffrey Ltd. wishes to sell 40,000 shares of restricted common stock of EuroGas represented by certificates 5968 through 5971.  These shares were issued by reason of conversion of the convertible debenture dated in September of 1994 and therefore have been held the requisite two years.  These shares may be sold by Jeffrey Ltd. so long as it is before April 1, 1997 and the following is undertaken:

(1) Jeffrey Ltd. timely files the required 144 notice.

(2) the shares sold by Jeffrey Ltd. when aggregated with any other sales Jeffrey has made within the last 90 days do not exceed the greater of (i) 1% of the issued and outstanding shares of that class of stock or (ii) the average weekly reported volume of trading in the stock as reported by Nasdaq or a national securities exchange that is the principal market for the stock.

(3) the shares are sold in a broker's transaction.

If Jeffrey Ltd. or broker acting on behalf of Jeffrey provides Interwest Transfer with the appropriate evidence of compliance, EuroGas need not require anything further to allow the sale to proceed.

If you have further questions, please let me know.

Sincerely,

Howard S. Landa

HSL:cta

Escrow043226