IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| HARVEN MICHAEL MCKENZIE | § | |
| DEBTOR(S) | § | CASE NO.    95-48397-H5-7 |
| | § | Administratively Consolidated Under |
| W. STEVE SMITH, TRUSTEE | § | CASE NO.    95-47219-H5-7 |
| PLAINTIFF(S) | § | ADVERSARY NO.  97-4114 and |
| | § | ADVERSARY NO.  97-4155 |
| VS. | § | |
| | § | |
| HARVEN MICHAEL MCKENZIE, | § | |
| ET AL., | § | |
| DEFENDANT(S) | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Before the Court are adversary proceedings 97-4114 and 97-4155.  This Court has jurisdiction of these proceedings pursuant to 28 U.S.C. §§ 1334 and 157.  These are core proceedings.

### I. Findings of Fact

### A.  General Matters

1.       To the extent any finding of fact is more properly considered a conclusion of law, it is adopted as such.

2.       On October 30, 1995, Harven Michael McKenzie ("McKenzie") filed his voluntary petition under Chapter 7 of the United States Bankruptcy Code (the "Code").

3.      Thereafter, W. Steve Smith was appointed as Trustee and duly qualified for such position by posting the requisite bond (the "Trustee").

### B.  Domestic Problems and the Polish Joint Venture

4.      Beginning in 1988, utilizing a corporation known as McKenzie Methane Corporation ("MMC"), McKenzie entered into Development Agreements with large investors for the drilling and operation of methane gas wells in Alabama, Colorado and New Mexico.  The investors ultimately put up over $160 million in turnkey costs (which was a stated percentage of what McKenzie agreed would be the total cost of drilling the 694 wells of the investment package, with McKenzie and/or MMC to pay the percentage balance) and $21 million in non-turnkey costs.  Neither McKenzie nor MMC put up the required percentage share and only about ½ of the promised wells were drilled.  Estimates of the costs to complete the wells exceeded $100 million.  McKenzie's unfulfilled obligation is at least $68 million.

5.      McKenzie Methane Poland Company ("MMPCO") was a Texas corporation owned equally by each member of the McKenzie Family, with the 25% interest of Frances McKenzie purportedly held as her "Separate Property".  McKenzie served as director and president of MMPCO from its inception in approximately January 1986 until April, 1996.

6.      In September 1990, MMPCO entered into a joint venture with Kopalnia Wegla Karumiennego Jastrzebie ("KWKJ"), a Polish entity that owned certain rights or profit interests in a concession from the Polish government to explore for and/or exploit a substantial amount of acreage for methane gas.  This joint venture was called Pol-Tex Methane, Ltd. ("PTM"), a limited liability joint venture registered under the laws of the Republic of Poland.

324

2

7.     Originally, MMPCO held an 85% profit interest in PTM and KWKJ held a 15% profit interest.  Some of MMC's investors' funds were used in Poland on PTM, without permission or even knowledge of the investors.

8.     On December 4, 1990, McKenzie finally revealed to his investors that the McKenzie/MMC share of the costs of the domestic investment program had not been paid.  He had used all investors' funds to drill the wells that were drilled, including the McKenzie/MMC share of those costs, and did not have the funds to complete the additional wells for which he had already been paid tens of millions of dollars.

9.     In March of 1991, McKenzie obtained a $6.5 million interim loan from the Bank of Montreal ("BOM"), in an attempt to fund the McKenzie/MMC domestic program obligations. However, the BOM loan was insufficient to even make minimal progress toward fulfillment of those obligations and did not ease McKenzie's severe financial crises.

### C. Efforts to Distance PTM From McKenzie's Investors and Creditors

10.     Beginning in August of 1991, the relationship between McKenzie and his U.S. investors and creditors grew increasingly acrimonious, with the investors clamoring for more and more information concerning sources and uses of funds.

11.     As a result of this pressure, McKenzie began a series of steps to distance the interest in PTM from their reach purportedly causing the transfers of part, then the whole of his and/or MMPCO's interests in PTM to third parties, ultimately being corporate entities of foreign registration.

12.     MMPCO entered into its first alleged sale to Mr. Bertil Nordling ("Nordling") by agreement dated June 7, 1991, which provided that Nordling would purchase 50% of MMPCO's 85% profit interest in PTM for $20.3 million (the "Nordling Agreement").

3

13.     By early 1992, Nordling had raised only $3.9 million and was defaulted out in April of 1992.

14.     In March, 1992 KUKUI, Inc. ("KUKUI"), one of the major investors in McKenzie's domestic programs filed suit against McKenzie and MMC in Fort Bend County, Texas seeking, among other things, an accounting of all funds invested by KUKUI and its predecessors (the "Fort Bend Case").

15.     Desperate to get PTM moving, on May 14, 1992, McKenzie entered into an agreement, formalizing earlier oral agreements with Rolf Schlegel ("Schlegel") and his company, Invico Capital Corporation ("Invico"), by which Invico, for a commission, agreed to help secure investments for PTM.

16.     On May 21, 1992, KUKUI began its discovery in the Fort Bend Case seeking from McKenzie and MMC all records on the use of funds invested in the U.S. programs. Disclosure would lead to discovery of the extent of McKenzie's non-performance under the investment Development Programs, that McKenzie owned PTM and that investor funds from MMC had been used to acquire/develop PTM. McKenzie delayed.

17.     In order to provide insulation for PTM, Schlegel instructed his lawyers, at McKenzie's direction, to form MCK Development, B.V. ("MCK"). On May 28, 1992, McKenzie caused MMPCO to transfer its 85% interest in PTM to MCK. No consideration was given to MMPCO for its transfer, except for a 51% interest in MCK, the other 49% being addressed in the next paragraph. McKenzie served as MCK's Managing, if not sole, Director until succeeded by Invico in early to mid 1995.

18.     On March 3, 1992, McKenzie, as the "Trustor", entered into a Trust Agreement with Invico, as Trustee, which recited:

Trustor owns 49% of the shares of MCK Development B.V. [a company then being created – "in formation"], a holding company which, in turn, owns a majority of the shares of McKenzie Methane Poland B.V. ["MMPBV"] "in formation". . . [which] is involved in methane gas exploration as well as marketing, production, and other related activities pertaining to projects in Poland. The Trustor hereby authorizes the Trustee to exercise Trusteeship of this **investment**. This agreement governs the fiduciary responsibilities of the Trustee with respect to securing the property and interests of the Trustor in MCK. . . The administration of MCK. . . will be covered in a separate mandate.

Trust Agreement, March 3, 1992 – Preamble (emphasis and bracket added).

Various Articles addressed how McKenzie's interest in MCK would be acquired and held:

Article 1

The Trustor authorizes the Trustee, in its own, but for the account of and at the risk of Trustor to form a corporation in the Netherlands Antilles namely OKIBI S.A. N.V. ["Okibi"] which shall buy 49% of the share capital of MCK. . . , which is to be held in fiduciary trust on behalf of the Trustor.

Article 2

The Trustor affirms its knowledge and full approval of both the conditions of the contract for the purchase of 49% of MCK. . . and the activities of MCK. . .

. . .

Article 4

The Trustee agrees that any and all actions, including with respect to the Antilles Corporation, it may take pertaining to control, direct or indirect, over the 49% of ownership of MCK. . . , such as selling, transferring, pledging of shares. . . as security and any actions in legal proceedings relating to this ownership or rights associated thereto, in particular voting rights, will be undertaken **only in accordance with instructions given to it by Trustor or parties acting with legal power of attorney from the Trustor.**

5

Article 5

The Trustee agrees that it will distribute any and all profits, dividends, additional shares issued in the future, and any other consideration, including proceeds of liquidation, which it receives as a result of its ownership stake in MCK. . . , in accordance with instructions given to it by Trustor.

. . .

Article 7

In fulfilling its responsibility as Trustee, the Trustee will follow all written instructions (letter, telex, fax) of the Trustor.  In the absence of instructions from the Trustor, the Trustee has the right, but not the obligation, to make decisions without such instructions in cases which, in the Trustee's judgment, the best interests of the Trustor are served by acting without delay.

. . .

Article 10

**The Trustee agrees to keep the Trustor's identity and this Trusteeship Agreement secret. . . The Trustor agrees likewise to this secrecy agreement.**

*Id* (emphasis and bracket added).

Article 14 of this Trust Agreement recites that termination of the agreement may be effectuated by either party upon six months prior written notice presented at quarter's end. *Id.*

19.    The bearer share certificate of Okibi was issued to and held by Schlegel/Invico. Schlegel/Invico continued to hold the Okibi bearer share for McKenzie until directed by McKenzie to transfer it to Petenes Foundation within the 5 month period before he filed his bankruptcy.  Petenes was a shell entity formed in Liechtenstein, bought by Schlegel and utilized by Schlegel for and as directed by McKenzie

20.    .On July 22, 1992, Northwestern Mutual Life intervened in the Fort Bend case as another injured investor plaintiff.  On July 24, 1992, KUKUI filed its Petition for Temporary

6

Restraining Order and for Temporary Injunction seeking access to information regarding the status of its investment and the use of its funds.

21.     On July 27, 1992, Schlegel, at McKenzie's direction, caused incorporation of McKenzie Methane Poland, B.V. ("MMPBV") with MCK as the sole shareholder.  On July 31, 1992 MCK was formally incorporated.  Its initial shareholders were 51% MMPCO and 49% Okibi. On September 11, 1992, MCK transferred, for no consideration, its 85% interest in PTM to MMPBV. McKenzie served as sole Director of MMPBV until in August of 1994, when Wolfgang Rauball became a co-director.  From that point on Wolfgang Rauball alone had final say on all MMPBV money matters.  McKenzie continued as co-director of MMPBV until his resignation on October 4, 1995, just 26 days before he filed his voluntary petition in bankruptcy.

22.     On October 8, 1992, depositions began in the Fort Bend Case.  By November 2, 1992, all efforts to deny discovery were defeated and KUKUI held documentation and information which revealed use of over $2 million of domestic investor money for PTM.  Also by this date, Pilgreen Producing Co. ("Pilgreen"), McKenzie's field operator for his domestic methane programs, filed for bankruptcy and the control of more than 600 Alabama well locations were lost to McKenzie.

23.     On January 12, 1993, BOM filed suit in Illinois against MMC, McKenzie, Tim McKenzie and Steve McKenzie on their defaulted loan. (the "BOM Suit")

24.     Facing the intense pressure of the Fort Bend Case, the BOM Suit, and his obligations to develop PTM, McKenzie began, on February 1, 1993, negotiations with Wolfgang Rauball to sell him or an affiliated company 50% of MMPBV.  Wolfgang Rauball was from the outset aware of McKenzie's problems with his domestic investors, the pending litigation, and McKenzie's ownership and control of MCK, Okibi and, later, Claron, N.V. ("Claron").

25.     On March 30, 1993, KUKUI joined MMPCO, Tim McKenzie, Steve McKenzie and Frances McKenzie as defendants in the Fort Bend Case alleging that funds which had been invested in the domestic programs of MMC had been fraudulently transferred to MMPCO for use on PTM.

26.     On May 4, 1993, McKenzie, as sole Director of MMPBV, and Wolfgang Rauball on behalf of Ostrov signed an Initial Agreement to sell 50% of MMPBV to Ostrov Recources, Ltd. ("Ostrov") for $50 million.   In the accompanying Confidentiality Agreement, Wolfgang Rauball was designated as president of Ostrov.  Ostrov is controlled, if not outright owned, by Wolfgang Rauball.  On June 9, 1993, this Initial Agreement was terminated and Ostrov and MCK signed a Purchase Agreement and a Funding Agreement by which Ostrov would purchase 50% of MMPBV for $50 million ($3.9 million of this money is to repay Nordling, although he had already been defaulted out).  These agreements died as well.

27.     Hercules, A.G. ("Hercules") then stepped forward in August of 1993 to buy 50% of MMPBV for $50 million.    Hercules is a company in which Wolfgang Rauball held an interest, held all of the bearer shares, and was a control person , if not its managing director. McKenzie signed the agreement.   Hercules paid $4.6 million, but unlike the Nordling Agreement, the agreement with Hercules provided for transfer of interests in MMPBV related to the percentage of the $50 million obligation paid.  The $4.6 million was paid to MMPBV, not MCK.  Part of these funds were transferred at McKenzie's direction from MMPBV through an Invico trust account to McKenzie disguised as loans which have never been repaid.  Shortly thereafter, Wolfgang Rauball instructed McKenzie to return the $4.6 million to Hercules and Baron Finance, Ltd. ("Baron") would issue new payment to acquire the interest in its name. McKenzie had already spent all but $600,000.  McKenzie returned that amount to Wolfgang

Rauball.  On September 24, 1993, Baron and McKenzie signed a new $50 million agreement. No money was paid in under this agreement, but Baron did acquire 4% of MMPBV,  based upon the Hercules portion of payment which was not returned.   Baron is a company in which Wolfgang Rauball held an interest, held all of the bearer shares and was a control person, if not its managing director.

28.     On September 9, 1993, KUKUI obtained a summary judgment in the Fort Bend Case declaring MMC had resigned as operator of all domestic wells.   By that judgment, McKenzie lost control over most of the domestic well income.

29.     On September 14, 1993, all the parties to the Fort Bend Case signed a letter of intent and Rule 11 Agreement to settle the Fort Bend Case conditioned upon performance or occurrence of certain subsequent conditions by McKenzie.   The parties signed a formal settlement agreement between October 13 and 20, 1993, but still subject to conditions subsequent.

30.     On September 21, 1993, Schlegel, at McKenzie's direction, formed Claron.  The December 8, 1993 Trust Agreement memorialized this creation for the benefit of McKenzie.  On December 8, 1993, McKenzie as the Trustor entered into a Trust Agreement with Invico as Trustee which recited:

> The Trustor plans to develop coalbed methane in Poland and wants to purchase a 51% stake of MCK. . .   The Trustor hereby authorizes the Trustee to exercise Trusteeship of this investment. This agreement governs the fiduciary responsibilities of the Trustee with respect to securing the property and interests of the Trustor in MCK. . . , which owns a majority of McKenzie Methane Poland B.V.  The administration of the companies will be covered in a separate mandate.

Trust Agreement, December 8, 1993 – Preamble.

Various Articles addressed how McKenzie's interest in MCK would be acquired and held:

### Article 1

The Trustor authorizes the Trustee, on its own, but for the account of and at the risk of the Trustor to form a corporation in the Netherlands Antilles namely Claron N.V., which shall buy 51% of the share capital of MCK. . . which is to be held in fiduciary trust on behalf of the Trustor.

### Article 2

The Trustor affirms its knowledge and full approval of both the condition of the purchase costs of the shares of 51% (MCK) and the activities of MCK.

Trust Agreement, December 8, 1993.

This Trust Agreement had, also, virtually identical provisions as the Okibi Trust Agreement for Trustor direction (Articles 4 and 7), distributions (Article 5), secrecy (Article 10) and termination (Article 14).

The bearer share of Claron was issued to and held by Schlegel/Invico. Schlegel/Invico continued to hold the Claron bearer share for McKenzie until directed by McKenzie to transfer it to Petenes, within the five (5) month period before he filed his bankruptcy

31.     On November 29, 1993, KUKUI's counsel reiterated its position to McKenzie that if the condition subsequent was not met by McKenzie by December 3, 1993, the Fort Bend Case Settlement Agreement would terminate. When the conditions were not met, the Settlement Agreement terminated on December 3, 1993. Formal notice of this termination and of resumption of McKenzie's deposition the following week was received by McKenzie on December 6, 1993.

32.     Facing inevitable resumption of the Fort Bend Case and the judgment that would surely flow therefrom, the December 8, 1993 Trust Agreement to create Claron was signed by

McKenzie and Schlegel that day.   On December 9, 1993, MMPCO sold its 51% of MCK to Claron for a $900,000 unsecured note.  In spite of the sale, McKenzie remained director of MCK and MMPBV (although to this date he professes to know no one at either Claron or Okibi, in spite of the requirement that those shareholders determine the directors of both MCK and MMPBV and that now Claron owed MMPCO $900,000).

33.    McKenzie was ordered on January 11, 1994 to resume his deposition in the Fort Bend Case.  A May trial setting was targeted.

34.    On March 4, 1994, McKenzie removed the Fort Bend Case to Federal District Court.  On April 8, 1994, the case was remanded.

35.    On April 20, 1994, MMC filed Chapter 11.  McKenzie's defalcation would surely be discovered, thus his efforts to distance the  PTM from his creditors intensified.

36.    Jeffrey, Ltd ("Jeffery") was formed on April 27, 1994 in the St. Vincent and Grenadines by or at the direction of Merlin Fish, who was president of Northampton, Inc., which became EuroGas, Inc. ("EuroGas"), obtained by Schlegel for the beneficial ownership of McKenzie.  Schlegel/Invico held all of the shares of Jeffrey with a signed-in-blank stock power, a signed-in-blank corporate authorization and a signed-in-blank power of attorney.

37.    Wolfgang Rauball and Reinhard Rauball were well aware of the claims and litigation against McKenzie in the United States and were officially notified of MMC's bankruptcy on May 9, 1994.

38.    BOM filed a motion for appointment of a Chapter 11 trustee over the MMC bankruptcy on May 13, 1994.

39.    Wolfgang Rauball formed a Liechtenstein corporation known as EuroGas, A.G. on May 16, 1994.  At all pertinent times, he held its bearer share and was its president.

40.     An Escrow Agreement dated May 18, 1994, between Reinhard Rauball and Lex Admin Trust (a Bryan Jeeves/Norman Marxer company), contemplating establishment of EuroGas A.G. and funding of a percentage interest in MMPBV was sent to Wolfgang Rauball.

### D.  EuroGas Stock And Issuance

### 1.  The First Sale (And Efforts In The Process).

41.     Wolfgang Rauball, acting in the name of EuroGas A.G., and McKenzie, acting in the name of MCK, entered into a General Agreement dated May 26, 1994.  This Agreement recited MCK's 95% ownership of MMPBV (Baron then owning 4% and Schlegel owning 1%). MCK, Baron and Schlegel had acquired their respective ownership percentages in MMPBV in transactions which had been undertaken for the purpose of distancing that asset from McKenzie's creditors.  EuroGas A.G. agreed to purchase 46% of MMPBV from MCK's 95% (which with Baron's 4% would give Wolfgang Rauball co-owner status) for $46 million, $12 million of which was payable in cash no later than May 27, 1994.  The General Agreement of May 26, 1994 did not fund.

42.     On June 6, 1994, the Bankruptcy Court set a hearing on BOM's motion to appoint trustee for June 14, 1994.  Until that time, MMC was functioning as a debtor-in-possession. McKenzie was desperately seeking cash to satisfy BOM and forestall the appointment of a Trustee.  Wolfgang Rauball was aware of the existence of the MMC bankruptcy and McKenzie's cash needs.

43.     Allegedly, on June 13, 1994, MCK sold 12% of MMPBV to Jeffrey for a $12 million unsecured promissory note, payable interest only annually, maturing on June 13, 2004. McKenzie was, and remained the beneficial owner of Jeffrey.   Wolfgang Rauball and Reinhard Rauball knew this fact, as well as the fact that McKenzie was and remained beneficial owner of Claron, OKIBI and MCK.  This finding is based upon the fact of negotiations with these

"companies" through McKenzie, their payments to McKenzie for these companies or interest of these companies, and the fact that neither can identify the principal of these companies or point to anyone else with whom they dealt on behalf of these companies.

44.     Purportedly, on that same day, June 13, 1994, Jeffrey and Energy Global A.G. ("EGA"), the name change of EuroGas, A.G. entered into a Share Exchange Agreement by which Jeffrey agreed to exchange its 12% interest in MMPBV to EGA for 2,100,000 shares of EuroGas, Inc. ("EuroGas") common stock and $9 million of EuroGas debentures, which are convertible into 2 million shares of EuroGas common stock, following the EGA merger into Northampton, with a subsequent name change to EuroGas. This Stock Exchange Agreement was signed by Bryan Jeeves ("Jeeves") on behalf of EGA and by Norman Marxer ("Marxer") on behalf of Jeffrey. Jeeves and Marxer share the same office, and have held various and numerous positions of "title for hire", especially in regard to all the entities involved in the purchases and sales of MMPBV and the subsequent sales of the EuroGas consideration by these sellers.

45.     On June 14, 1994, Reinhard Rauball notified Paul Hinterthur that his client is prepared to put up $1 million that day if he received clarification from McKenzie that the Polish concession was in good standing. Also, on June 13, 1994, EGA (f/k/a EuroGas A.G.) and MCK entered into a second General Agreement by which EGA agreed to purchase 34% of MMPBV *from MCK's 95%* for $39 million. Jeeves signed on behalf of EGA and McKenzie signed on behalf of MCK and MMPBV. This sale was to close on or before June 17, 1994.

46.     Jeeves informed Wolfgang Rauball on June 27, 1994 that the stock purchase agreement between *Jeffrey Trust* and MCK and General Agreement between EuroGas A.G. and Mike McKenzie/MMPBV were in good standing. Nevertheless, the June 13, 1994 General Agreement did not close.

47.     On July 6, 1994, the Court appointed Robert Ogle ("Ogle") as MMC's Chapter 11 trustee.

48.     McKenzie granted Wolfgang Rauball several extensions of the closing called for under the June 13, 1994 General Agreement.  In exchange, Wolfgang Rauball caused several extension payments to be made by Ostrov.  However, at the end of July, 1994, McKenzie terminated this General Agreement.

49.     A new agreement was made between McKenzie and Wolfgang Rauball, entitled General Agreement, dated August 2, 1994.  By that agreement, MCK then agreed to convey 34% of its now 83% interest in MMPBV (giving recognition to the 12% transfer to Jeffrey from its 95% holding) to EGA for $39 million payable over time, with a split stream of payment between MCK and MMPBV.  The immediate $12 million cash payment was removed from the earlier agreements.  Five million dollars ($5,000,000.00) would be paid within 3 months of closing. McKenzie for MCK and MMPBV and Jeeves for EGA signed this Agreement.  As a result of this Agreement, Fish, President of Northampton/EuroGas, or his nominee, was granted an immediate seat on the board of MMPBV.  Wolfgang Rauball assumed that position and thereafter controlled all expenditures of money by or for MMPBV.

50.     Pursuant to a Share Exchange Agreement between Northampton and EGA, Northampton acquired all of the EGA shares and the shareholders of EGA received 89% of Northampton's shares on August 3, 1994.  Northampton was then renamed EuroGas.  EuroGas also issued $9 million in debentures which went to Jeffrey.  As a result of the reverse merger, the majority or dominant owners of EuroGas became Wolfgang Rauball (individually and through family and controlled companies), Reinhard Rauball (individually, through clients for which he

14

acted as trustee and through controlled companies) and Jeffrey and other Jeeves/Marxer offshore administered companies.

51.     As a result of the first Sale, Jeffrey received 2.1 million shares of EuroGas stock and a $4 million and a $5 million debenture convertible into 1 million each of EuroGas stock.

52.     During the period between the August 1994 closing, whereby EGA acquired Jeffrey's and Baron's interests totaling 16% of MMPBV, and the next agreement, in March 9, 1995, EuroGas acquired 2.7% more of MMPBV.  This percentage gain is reflected in EuroGas' SEC reports.  The consideration to purchase this 2.7% interest has not been identified, to the SEC or in sworn testimony, except for the statement that it resulted from infusions of cash into or for the benefit of MMPBV.

53.     In September, 1994, BOM obtained a $7 million plus judgment against McKenzie and his sons.

54.     In November, 1994, MMPCO assigned to McKenzie the Claron Note to use as collateral for a loan from MCK, 51% of which was owned by Claron.

55.     The sale of MMPCO's interest in PTM to MCK and of MMPCO's interests in MCK to Claron and Okibo were made with the intent to remove any ties to PTM.

56.     McKenzie's assignment of the Claron note to MCK was intended to remove the Claron Note as an available, on-shore, asset for McKenzie's creditors.

57.     Thereafter, post bankruptcy commencement and without Court or Trustee authority, MMPCO purports to write off the balance of its Claron Note.

58.     Prior to August 1994, MMPBV had no sources of money other than what it took from the  various McKenzie companies in Texas, what it raised from loans, and what it raised from investors.  After the August 1994 closing, MMPBV still had no sources of money, no loans

in 1994 and none later (except as created after the fact, as will be addressed later), and the only investment was for the 2.7% acquisition addressed in the preceding paragraph. Yet the money flowed to McKenzie under what has been identified as employment agreements between MMPBV, signed off on by Wolfgang Rauball, the new co-director of MMPBV and who alone approved disbursements for MMPBV, and McKenzie, Tim McKenzie and Steve McKenzie. Each of these employment contracts was retroactive to August 1, 1994 and was for a minimum period of 3 years. McKenzie was to be paid $250,000 a year, payable $20,833 monthly as "Chairman and Managing Director of MMPBV", and Tim McKenzie and Steve McKenzie were each to be paid $150,000 a year, payable $12,500 monthly. Tim McKenzie was to serve as Vice-President Finance (although he has admitted he never performed any such duties). Steve McKenzie was to serve as Vice President of Exploration and Production. McKenzie and Tim McKenzie signed their agreements, but allegedly Steve McKenzie did not. Steve McKenzie also never performed any duties for MMPBV. However, money was paid in the name of Steve McKenzie and kept by McKenzie. (Also, the Unanimous Consent in Lieu of a Meeting of the Board of Directors of EuroGas, Inc. January 18, 1996 cancelled the GlobeGas, B.V. (f/k/a MMPBV) employment contracts with McKenzie, Tim McKenzie *and Steve McKenzie* effective January 31, 1996.)

59.    The pre-bankruptcy payments by MMPBV and by third parties for McKenzie, Tim McKenzie and Steve McKenzie were sent to McKenzie's accounts in Houston in the names of RWT, Inc. ("RWT")[1] then IDG Consulting ("IDG")[2] when RWT was discovered, then Shasta

---

[1]    RWT, Inc. is a corporation owned by McKenzie's accountant, Boyce Jones. Boyce Jones had his own RWT, Inc. account. McKenzie set up another RWT, Inc. account on September 7, 1994 to which he alone had access to receive the employment payments. At the time McKenzie opened this account he already had outstanding judgments against him and a summary judgment motion of BOM was set for hearing on September 14, 1994. On September 14, 1994, BOM obtained a $7.8 million judgment. Wolfgang Rauball consented to the payments to the RWT, Inc. account even though the alleged contracts were in the names of the McKenzies individually.

Enterprises, Inc. ("Shasta")[3] when IDG was discovered or were paid in cash. The payments from MMPBV identified by McKenzie as payments under the employment agreements totaled, for the time period September 12, 1994 through December 23, 1994, $201,665.66. However, EuroGas' purported accounting received after many Trustee demands, fails to list any payments to the McKenzies during this time period. Wolfgang Rauball, likewise, was unable to provide any information on McKenzie's accounting of payments received during this time period, although he alone was responsible for all cash disbursements out of MMPBV during this time period. For 1995, McKenzie identified MMPBV payments under the employment agreements for the period January 1, 1995 through April 5, 1995 of $153,050.72 and identified payments for the employment contracts through the end of 1995[4] in the amounts and from the sources which follow:

| 08/17/95 | Royal Bank of Canada[5] | $14,519.06 |
| 09/20/95 | EuroGas[6] | $21,566.64 |
| 10/11/95 | Bank Draft Poland[7] | $155,000.00 |
| 10/30/95 – Bankruptcy of McKenzie filed | | |

[2]   When Ogle's Special Investigator's Report was due to be made public, thereby revealing the RWT, Inc. account, McKenzie opened an account in the name of IDG Consulting to receive the employment payments. IDG Consulting is another Boyce Jones Company.

[3]   Shasta Enterprises, Inc. is a Texas corporation owned 25% each by Tim McKenzie and Steve McKenzie and 50% by Frances McKenzie Separate Property (McKenzie's 25% interest having been transferred to her on or about October 8, 1992).

[4]   Payments to McKenzie, allegedly under the employment contracts, continued post-petition and will be addressed later
[5]   Drawn on account of and signed by Wolfgang Rauball.
[6]   Drawn on account of and signed by Wolfgang Rauball.
[7]   When confronted with a $142,000 check to McKenzie drawn on Deutsche Bank, the Affidavit of McKenzie's bookkeeper later identified this check as salary and expense reimbursement for McKenzie totaling $79,500 ($78,331 through 10/95 salary and $1,169.00 expense reimbursement) and $62,500 as salary for Tim McKenzie through 9/95. In addition $8,000.00 was identified as cash picked up earlier by McKenzie. The check did not initially clear and Tim McKenzie wrote to Herbert Zimmer ("Zimmer") in Europe to clear up the problem. It cleared just before McKenzie filed bankruptcy. As will be shown, Zimmer had an option with Jeffrey to purchase its EuroGas shares.

| 12/29/95 | W.R. Financial | $21,626.30 |

However EuroGas' belated accounting for the 1995 employment agreements differ greatly:

| 01/12/95 | Conquest | $1,529.00 |
| 03/24/95 | Conquest | $6,255.00 |
| 12/12/95 | Conquest | $9,000.00 |
| 12/12/95 | W R Financial | $30,030.00 |

60.     If the above infusions of money were not intended to acquire the additional 2.7% of MMPBV from McKenzie (or to pay for Jeffrey's EuroGas stock as will be shown later), then that acquisition occurred as the result of an Option Agreement dated February 10, 1995, negotiated by McKenzie on behalf of MCK and Wolfgang Rauball on behalf of Ostrov. By that agreement, Ostrov agreed to purchase 21 shares of MMPBV (3.5%) for $1.5 million, exercisable in whole or in part of at least 5 shares at a per share price of $71,430. An initial payment of $100,000 was made.   In addition, *EGA*, not Ostrov, made a $300,000 payment to Schlegel/Invico.   Ostrov assigned its rights and interests under this Option Agreement to EuroGas for $4,014,500.00 and realized stock upon the second closing of the 80.3% sale of MMPBV to EuroGas.  Paul Hinterthur ("Hinterthur"), *who became president of EuroGas in 1995*, earned a commission on the money resulting from the February 10, 1995 MCK/Ostrov Option Agreement.  It was paid by Schlegel, in September of 1995, but it was to have been paid by McKenzie under his agreement with Schlegel to find investors.   Both Hinterthur and Wolfgang Rauball knew this was a transaction benefiting McKenzie and for which McKenzie was obligated to pay the commission.

61.    The money received by MCK under these various agreements were *funneled*, in part, in the form of "loans" to McKenzie which were never repaid, or in the form of "repayments" of loans by Frances McKenzie Separate Property.  In addition, the Claron $900,000 note matured in December of 1994.  On December 28, 1994, McKenzie extended the Claron note plus interest, now $972,000.  (Rather than MCK declaring a dividend, paying the money to Claron for Claron to meet its December 1994 note obligation to MMPCO, MCK loaned money on hand, from the various infusions, to McKenzie, later <u>secured</u> (allegedly) by the Claron note which had been released by MMPCO to McKenzie.)  However, when the Claron extension note matured, MCK "loaned" its shareholder, Claron, $223,000 to pay the interest and $210,000 of the principal.  Claron made the payment to the RWT, Inc. account controlled by McKenzie, not to MMPCO, the note payee, and not to MCK, the note assignee.  McKenzie used this money, did not report it on his income tax and he ultimately waived the balance of the Claron note, rather than allow Trustee to recover it.  Claron never repaid the loan to MCK.

## 2.    <u>The Second Sale (and Efforts in the Process)</u>.

62.    The balance, approximately 80.3% of MMPBV, was transferred to EuroGas as the result of an Option and Share Exchange Agreement dated March 7, 1995 between MCK and EuroGas.  By this agreement, MCK agreed to transfer the balance of MMPBV to EuroGas (some of which "shares are subject to an Option and General Agreement with Energy Global, A.G., and Ostrov Resources, Ltd. or its assigns") in exchange for EuroGas common stock and 1995 EuroGas Series A Preferred Stock (the "Preferred Stock").  This agreement did provide that MCK had the right to allow its shareholders to receive their proportional shares of EuroGas common stock and Preferred Stock directly.  However, these were not "proportional shares"

which were to be issued.  MCK was to receive the majority of the stock, yet Okibi and Claron were issued significant shares, as well as was Schlegel:

| Name | Shares of Common Stock | Shares of Preferred Stock |
|------|------------------------|---------------------------|
| Claron | 365,971 | 609,952 |
| Okibi | 315,740 | 526,233 |
| MCK | 665,090 and 52,900 | 1,195,984 |

The preferred stock was convertible into 2 shares of EuroGas common stock for each share of EuroGas preferred stock

63.     On May 16, 1995, EuroGas requested Howard Landa ("Landa")of Kruse, Landa & Maycock ("KLM"), counsel for Northampton, Inc., into which EGA merged and which became EuroGas, counsel for EGA and counsel for EuroGas, to issue the Preferred Stock, and EuroGas requested Interwest Transfer Company to issue the EuroGas common stock, to Claron, Okibi, MCK and Schlegel.  In the representation of EuroGas, Landa and KLM reported to and took instruction from Wolfgang Rauball and Reinhard Rauball.  Although MCK, Claron, Okibi and Schlegel were named on the certificates of EuroGas common stock and Preferred Stock, the shares were not issued to MCK, Claron, Okibi or Schlegel before McKenzie's bankruptcy was commenced.    They went instead to Reinhard Rauball and at McKenzie's bankruptcy commencement were still held by Reinhard Rauball.

**E.  Disposition Of The EuroGas Stock Of Jeffrey, Claron, Okibi And MCK**

64.     On or about November 17, 1994, Zimmer entered into an Option Agreement with McKenzie to purchase Jeffrey's 3.1 million shares of EuroGas common stock (the $4 million debenture having been converted to the 1 million shares of common stock plus the 2.1 million shares already issued to Jeffrey) and the $5 million debenture, for $7 million, exercisable in whole or in part at the rate of $1.707 per share.  McKenzie and Wolfgang Rauball negotiated this

price.  Zimmer is an associate of, investor with and accountant for Wolfgang Rauball.  (Herbert Zimmer is also the person who sent the $142,000 check to McKenzie identified at footnote 7 in paragraph 59).  Wolfgang Rauball introduced Zimmer to McKenzie.  Zimmer purchased approximately 234,000 shares for $400,000.00.  A part of the option money paid by Zimmer to Jeffrey was placed in an account in the name of Jeffrey, set up by Schlegel.  In setting up accounts in Switzerland, the anti-money laundering laws of Switzerland require that the beneficial owner of that account be identified.  Schlegel identified the beneficial owner to be McKenzie.  This $400,000 was then transferred from Jeffrey's account by Schlegel at McKenzie's direction to MCK's account, and Schlegel, at McKenzie's direction, wired $350,000.00 to McKenzie's RWT account in Houston disguised as a loan to him from MCK. McKenzie never repaid this loan.

65.     Zimmer apparently failed to purchase more than his initial option amount and Schlegel, at McKenzie's direction, terminated the agreement (unless the $142,000 check from Zimmer in October, 1995 was in consideration of additional Jeffrey held stock).

66.     Subsequently, Wolfgang Rauball agreed to provide loans and other considerations to McKenzie, but he wanted an option on the Jeffrey's remaining EuroGas shares at the same price granted Zimmer.  McKenzie granted this request to Wolfgang Rauball and an Option Agreement was entered into between Jeffrey and Ostrov.  Wolfgang Rauball receipted for a 100,000 EuroGas share certificate in exchange for $170,700.00 paid in.  The $170,700.00 payment came from 2 sources:  i) Reinhard Rauball to the extent of approximately $130,700.00, which went from Reinhard Rauball to the account of Jeffrey beneficially owned by McKenzie on March 8, 1995;  and ii) a $40,000 wire transfer from Ostrov to McKenzie's RWT account in Houston on March 8, 1995.  The money in the Jeffrey account (the Reinhard Rauball payment

and the balance of Zimmer option payment) was then, and in addition to the $40,000 wire transfer, transferred to McKenzie's account by Schlegel at McKenzie's direction as a loan to McKenzie by MCK.  This loan purportedly included the $40,000 wire transfer to McKenzie's RWT account.  McKenzie never repaid this alleged loan.  Following the signing of this Option Agreement, many loans were thereafter obtained by Wolfgang Rauball for McKenzie's use, as Wolfgang Rauball promised.  As stated earlier, Hinterthur, who became president of EuroGas, earned a commission on this "Ostrov" option as well.  Both Hinterthur and Wolfgang Rauball knew this "Option" was a transaction benefiting McKenzie and for which McKenzie was obligated to pay the commission.  (Hinterthur, who became president of EuroGas, also proposed at one time to buy from McKenzie Jeffrey's two EuroGas debentures, totaling $9 million.)

67.    On May 8, 1995, as Ogle's investigator was inquiring into McKenzie's involvement with MMPBV and trying to contact Schlegel, Schlegel and McKenzie purportedly terminated their trust relationships.[8]  The bearer shares of Okibi and Claron were then transferred by Schlegel to and receipted for by Elmar Bissig ("Bissig") on behalf of Petenes.  Jeffrey's remaining EuroGas shares and its 5 million debenture were also transferred to Petenes on August 8, 1995.  After the bankruptcy of McKenzie commenced on October 30, 1995, Bissig as "administrator" for Petenes, on November 22, 1995, sent Jeffrey's EuroGas shares and remaining debenture to Reinhard Rauball.  Bissig, like Jeeves and Marxer, is another "title for hire".[9]

---

[8]    Termination required 6 months prior written notice given at a quarter end.

[9]    Bissig was also signatory on EGA's bank account and served as a director of EGA.  Bissig is a member with Jeeves of Lexadmin Trust Reg. ("Lexadmin") with whom Marxer officed until March, 1996.  Lexadmin served as agent for EuroGas, A.G., for Crawford, Ltd. (with address of Middle and Egmont St., Kingston, St. Vincent and The Grenadines), for Sinbad, Ltd. (at same address), for Westlake, Ltd. (at same address), and for Jeffrey (at same address), all of which were owners of EuroGas stock.  Marxer and Jeeves were directors of EGA and were the principals of Lexadmin  Marxer was the authorized agent of Jeffrey.  Bissig was also the authorized representative of MSA Mesa, an offshore company for the benefit of Fish, which also acquired stock in EuroGas.

68.     The closing of the remaining 80.3% of MMPBV finally occurred on October 4, 1995, *just 26 days before McKenzie filed bankruptcy*.[10]  However, the EuroGas common stock and Preferred Stock due to Claron, Okibi, MCK and Schlegel as a result of that closing continued to be held by Reinhard Rauball as trustee, in spite of demands by McKenzie and Schlegel.  (On or about May 31, 1996, Reinhard Rauball received another 10,000 shares of EuroGas common stock issued in the name of MCK.)

69.     However, before this October 1995 "closing", McKenzie and Wolfgang Rauball negotiated a number of agreements.  First, there was to be a transfer of the shares in MCK from Claron and Okibi to EGA for $2.2 million.  McKenzie prepared and signed the Shareholder's Resolution in favor of Claron's and Okibi's sale and prepared the Share Purchase Agreement and Power of Attorney for execution by Armando Ulrich, who had succeeded or was heir apparent to succeed to sole directorship of MCK.  It does not appear that this transaction closed.  Another transaction negotiated by McKenzie and Wolfgang Rauball was the Option Agreement for sale of EuroGas common stock and Preferred Stock, held by MCK, Claron and Okibi, to Oxbridge, a client of Reinhard Rauball and an entity which became a control entity of EuroGas.  The sale was authorized at $1.50 a share.  The necessary closing documents were all signed on behalf of Claron, Okibi and MCK at the direction of McKenzie.  The Option Agreement provided that the EuroGas shares owned by Claron, Okibi and MCK would be held in trust by Reinhard Rauball for both Optioner and Optionee for the duration of the agreement, but for no later than December 15, 1995.  On that date any shares not purchased were to be returned to Claron, Okibi and/or MCK.  This "sale" did not close *pre-petition*.  Reinhard Rauball did not return the EuroGas common stock and the Preferred Stock of MCK, Claron and Okibi on December 15, 1995 or

---

[10]     Ostrov received 632,000 shares of EuroGas common stock and $850,000 for its "interest" in MMPBV apparently acquired under its option with MCK

thereafter.  As will be shown, Oxbridge did ultimately end up with most, if not all of this stock after McKenzie's bankruptcy commencement.

## F.  Situation At Bankruptcy Commencement And Thereafter

70.  McKenzie filed bankruptcy on October 30, 1995.  During the approximate 12 months preceding his bankruptcy, McKenzie:

- Received the equivalent of 4.1 million shares of EuroGas common stock through Jeffrey's sale of "its" 12% interest in MMPBV (2.1 million shares and 2 debentures convertible into 1 million shares each).  He sold at least 234,000 shares to Zimmer for $400,000, $350,000 of which was transferred to him in the United States disguised as a loan.  McKenzie never repaid this loan and has never reported its income on his returns to the IRS. He sold at least 100,000 shares to Wolfgang Rauball (albeit in the name of Ostrov) for $170,000 paid by Wolfgang Rauball and Reinhard Rauball.  Again, this was transferred to McKenzie (along with the balance of the Zimmer money) disguised as a loan.  McKenzie has never repaid this loan and has never reported its income on his returns to the IRS.  McKenzie extended the "Ostrov" option into 1996.  The balance of these shares issued to Jeffrey, approximately 3,766,000 shares, were transferred by his Trustee, Schlegel, to his foundation, Petenes, (and later by Petenes to Reinhard Rauball).

- Received $545,802.08 identified by McKenzie as employment agreement payments, although this did not comport by a long shot with his "employer's" records.

- Received as "loans" from MCK at least $557,000 which he never repaid.

- Caused the transfer of his shares in/ownership of Claron and Okibi by his trustee, Schlegel, to his foundation, Petenes.

- Received in name the equivalent of 6,064,039 shares of EuroGas common stock (giving effect to the conversion rate for the Preferred Stock) of Claron, Okibi and MCK, which were held in "trust" by Reinhard Rauball.  McKenzie executed the documents

necessary for sale of these shares to Oxbridge, although this sale did not close prior to bankruptcy.

71.   On November 22, 1995, Petenes transferred Jeffrey's EuroGas shares and debentures to Reinhard Rauball.   The bearer shares of Claron and Okibi were transferred at McKenzie's direction by Petenes to Reinhard Rauball.   On May 31, 1996, 10,000 shares of EuroGas common stock, issued in the name of MCK, was also issued by EuroGas to Reinhard Rauball.

72.   Although forced out of MMPBV by Wolfgang Rauball and Reinhard Rauball because of his bankruptcy and other litigation problems, payments to McKenzie continued, but not from MMPBV or its new name, GlobeGas, B.V.   McKenzie alleges these payments were on his and Tim McKenzie's (and Steve McKenzie's, though not signed) employment agreements with MMPBV.   Yet the identification of "employment" payments reported by McKenzie and by EuroGas differ significantly.   EuroGas finally produced what it now says is a recap of payments to the McKenzies under the MMPBV employment agreement.   The pre-petition payments acknowledged by EuroGas, but differing from McKenzie's, were earlier identified.   On a post-petition basis, the dates, amount and sources of payments identified by EuroGas are as follows:

| 12/12/95 | W. R. Financial | $ 30,030.00 |
| 02/25/96 | W. R. Financial | $ 35,819.20 |
| 04/18/96 | EGA | $ 50,000.00 |
| 04/29/96 | Sonanini | $100,000.00 |
| 05/07/96 | Sonanini | $ 20,000.00 |
| 05/07/96 | Rockwell | $100,890.00 |
| 05/16/96 | W. R. Financial | $ 25,000.00 |

| 07/10/96 | Sonanini | $ 20,000.00 |
|---|---|---|
| 07/22/96 | EGA | $ 92,000.00 |
| 07/22/96 | EGA | $  8,000.00 |
| 08/16/96 | W. R. Financial | $ 25,000.00 |
| 09/04/96 | W. R. Financial | $ 30,000.00 |
| 05/21/97 | W. R. Financial | $100,000.00 |
| 07/02/97 | Sonanini | $ 50,000.00 |
| 07/22/97 | Sonanini | $ 50,000.00 |
| 08/05/97 | Sonanini | $ 50,000.00 |
| 08/22/97 | Sonanini | $ 50,000.00 |
| 09/10/97 | Sonanini | $ 50,000.00 |
| Total Admitted | | $886,739.70 |

These payments were all made direct from payor to McKenzie and not to MMPBV or Globe Gas B. V. and then, by the "employer" to McKenzie. EuroGas alleges that GlobeGas borrowed all funds used to pay the McKenzies pursuant to the employment contracts. However, in each case, these payments were made by or at the direction of Wolfgang Rauball, who then, or probably later after being questioned by Trustee, instructed Jeeves or Marxer to issue an EGA promissory note to this or that paying company. Not one of these notes have been repaid by EGA. It was long after these alleged payments that EuroGas purportedly authorized these payments and assumed the obligation to repay these Wolfgang Rauball note payees. No repayment was intended or has been made.

73.     McKenzie had earlier identified his 1996 and 1997 salary payments as follows:

| 02/26/96 | GlobeGas, B.V. | $ 35,000.00 |
| 03/12/96 | GlobeGas, B.V. | $ 50,000.00 |
| 04/30/96 | MMPBV | $100,000.00* |
| 05/09/96 | MMPBV | $100,000.00* |

*McKenzie's General Ledger showed McKenzie "brought back cash from trip" of $10,000.00 on

04/25/96, of $10,000.00 on 04/30/96, of $10,000 on May 9, 1996.  That same Ledger shows:

| 07/15/96 | Sonanini | $ 20,000.00 |
| 07/22/96 | Brought back cash from trip | $  8,000.00 |
| 07/24/96 | Private Trust Bankcorp | $ 92,000.00 |
| 08/19/96 | American Express Bank Draft | $ 20,000.00 |
| 10/28/96 | DEM | $ 32,011.51 |
| 11/25/96 | Wolfgang Rauball (Canadian dollars) | $ 36,555.05 |
| 12/11/96 | Canadian check $50,000.00 from Wolfgang Rauball given directly to Tom Graves for payment on account | $ 35,976.40 |
| 12/19/96 | Wolfgang Rauball | $ 35,788.42 |

Even later, another chart prepared by McKenzie showed the loans from Wolfgang Rauball to him

in 1996:

| Wolfgang Rauball | 04/25/96 | $ 10,000.00 cash |
| Wolfgang Rauball | 04/30/96 | $ 10,000.00 cash |
| Wolfgang Rauball | 05/9/96 | $ 10,000.00 cash |
| WT Holding, Ltd. | 07/15/96 | $ 20,000.00 |

| Wolfgang Rauball | 07/24/96 | $ 92,000.00 |
| Wolfgang Rauball | 07/24/96 | $   8,000.00 cash |
| Wolfgang Rauball | 08/19/96 | $ 20,000.00 |
| Wolfgang Rauball | 10/28/96 | $ 32,011.51 |
| Wolfgang Rauball | 11/25/96 | $ 36,555.05 |
| Wolfgang Rauball | 12/11/96 | $ 35,976.40[11] |
| Wolfgang Rauball | 12/19/96 | $ 35,788.42 |
| Total | | $310,731.38 |

The "Receipts 1997" Ledger presented by McKenzie showed the following:

| 01/02/97 | Wolfgang Rauball | $ 35,750.03 Loan Returned |
| 01/16/97 | Wolfgang Rauball | $ 36,565.74 Loan |
| 05/02/97 | Wolfgang Rauball | $ 25,000.00 Loan |
| 05/21/97 | Wolfgang Rauball | $ 94,811.32 Consulting Fees – Wales and Computers |
| 07/03/97 | Sonanini | $ 50,000.00 Consulting Fees – Wales |
| 07/24/97 | Wolfgang Rauball | $ 45,000.00 Loan |
| 08/07/97 | Sonanini | $ 50,000.00 Consulting Fees – Wales |
| 08/22/97 | Sonanini | $ 50,000.00 Consulting Fees – Wales |
| 09/11/97 | Sonanini | $ 50,000.00 Consulting Fees – Wales |

A comparison clearly shows that, at best, there is a disagreement over application of funds, and at worst, an outright misrepresentation by the defendants.  For example, EuroGas shows EGA

---

[11]     The $35,976.40 check "was given to Adair & Myers for services" and the $35,788.42 check "was returned in January 1997".

paying salary payments of $92,000 and $8,000 on July 22, 1996, while McKenzie reflects these same payments as "Loans – Wolfgang Rauball". EuroGas shows the 4 last payments above for McKenzie salaries, advanced by Sonanini; McKenzie shows all 4 to be "Consulting Fees – Wales". In fact, there are no receipts identified on McKenzie's Receipts 1997 records as a payment due under his employment contracts with MMPBV/GlobeGas or from EGA or from EuroGas. All are identified as loans from Wolfgang Rauball and payments by Wolfgang Rauball and/or Sonanini for consulting fees – Wales.

74.     The foregoing payments, salary, and loans are an attempt, after the fact, to disguise payments to McKenzie for his EuroGas stock.

75.     On or about May 31, 1996, Reinhard Rauball received the additional 10,000 shares of EuroGas common stock issued by EuroGas to MCK.

76.     Jeffrey was reported on EuroGas' early SEC reports as a control person, one holding 5% or more of the stock of EuroGas. Although MCK (through the stock issued to it and its owners, Claron and Okibi) held more than 5%, it was never listed as a control person. Chemilabco did become a reported control person, owning more than 5% of EuroGas. Chemilabco was owned by Oxbridge. Chemilabco's shares included the shares held by Oxbridge. In 1997, Chemilabco and Oxbridge purportedly purchased 1,430,000 shares of EuroGas becoming the largest stockholders of EuroGas. Chemilabco and/or Oxbridge is/are clients of Reinhard Rauball. Reinhard Rauball was named by MCK, Claron, Okibi, Schlegel and Oxbridge as trustee for Oxbridge and Claron, Okibi and MCK under the pre-petition Option Agreement authorized by McKenzie for sale to Oxbridge of the EuroGas common stock owned by Claron, Okibi and MCK, for $1.50 per share.

77.     EuroGas and the Rauballs knew of McKenzie's pre-petition financial and litigation problems, the bankruptcy of MMC and of McKenzie's intent to file and of his actual bankruptcy filing.  On December 15, 1995, Reinhard Rauball did not make payment to Trustee and Plaintiff herein and did not return to him the EuroGas common stock and the Preferred Stock belonging to Claron, Okibi and MCK (therefore McKenzie) as he was required to do under the Oxbridge Options.  Yet, Oxbridge became the largest stockholder of EuroGas.  Reinhard Rauball allegedly surrendered his trusteeship on August 26, 1996.  Yet, he did not turn over to Trustee, the proceeds of the actual EuroGas shares due to Trustee via his ownership of Claron, Okibi, Jeffrey and MCK – approximately 9.7 million shares, or the Claron and Okibi bearer shares.

78.     On each of the transactions referenced above, on the Poland Project, there was allegedly no writing of any sort within the possession or control of McKenzie.  McKenzie destroyed all documents related to the Poland Project.  When confronted with documents related to the Poland Project or trusts for his benefit, he denied his signature and the validity of documents not bearing his signature.  When faced with Trustee's employment of a handwriting expert, he admitted his signature to the many newly discovered documents.  When his testimony was refuted by testimony and documents of Schlegel, McKenzie testified he did not know what he was doing – he did just what Schlegel told him to do.  This has been refuted by Schlegel and common sense.  McKenzie testimony has not been credible.

79.     EuroGas entered into an agreement with KUKUI, Inc. and into a separate agreement with Trustee, both of which enabled EuroGas to go forward with a sale of the assets of MMPBV to a subsidiary of Texaco, Inc. without fear of interruption by litigation then being pursued separately by KUKUI, Inc. and by Trustee.  The agreement with Trustee was dated March 6 and 7, 1997 between Trustee and EuroGas (the "First Settlement Agreement").  It was

30

approved by the Bankruptcy Court. By this First Settlement Agreement, Trustee consented to the sale by EuroGas to Texaco, waiving any claim against Texaco or the property Texaco was acquiring. In exchange, EuroGas agreed to provide information concerning, not permit transfer of, to assist in recovery of, and to withhold payments or conversions in regard to the EuroGas stock and debentures issued to Jeffrey and the EuroGas common stock and the Preferred Stock given in the name of MCK, Claron, Okibi and Schlegel. This agreement negotiated by Landa and KLM[12] (and may have been signed by Landa on behalf of EuroGas and it subsidiaries) was approved and ratified by the EuroGas Board, which included Reinhard Rauball as chairman. Wolfgang Rauball, unofficially as part of the EuroGas Board and specifically in his individual capacity and as control person of EuroGas, in deposition admitted his approval and/or ratification of this agreement.

80. In spite of, and in direct contravention of the First Settlement Agreement and the representations which led to the First Settlement Agreement, EuroGas, Landa, KLM, Wolfgang Rauball and Reinhard Rauball joined with McKenzie to not only conceal the true facts above, but to misrepresent the facts and misdirect Trustee in his efforts to uncover the facts. For example:

   (a)   Landa wrote to Lee Henkel, an attorney for KUKUI, Inc.:

   4.   The difficulty is most acute in dealing with the common shares issued to Schlegel and MCK Development in the GlobeGas acquisition because those certificates do not bear any restricted legend and have probably been transferred to other parties who will claim a BFP defense.

   5.   The 1995 Preferred Stock issued to Schlegel, et al. does carry a restrictive legend, is not easily or freely tradable, and makes an easier target . . . we are still trying to find out who owns Claron N.V. and Okibi N.V. and, for purposes of this letter, I am not including those shares until I get further information.

---

[12] Landa and KLM represented Northhampton. Following the reverse merger, Landa and KLM represented EuroGas.

December 11, 1996 Landa letter to Henkel.

(b)      In response to Trustee's request of March 31, 1997 for the sources, amounts, dates and where sent of the consulting or employment agreement payments to the McKenzies, Landa responded:

> GlobeGas has continued to pay the "McKenzie family" for consulting services . . . I will also put out a priority request for the accounting [you requested].

Landa March 3, 1997 letter to Trustee.

(c)      In that same letter Landa revised the language of the First Settlement Agreement to read:

> 4.      As the transfer agent for its 1995 Series A Preferred Stock ("Preferred Stock") EuroGas shall give immediate notice to Trustee of any proposed transfer or conversion of such Preferred Stock and not permit any transfer for thirty days to provide Trustee sufficient time to either obtain an appropriate court order preventing such transfer. . . This provision shall apply *to the current registered holders of the 1995 Series A Preferred Stock, Rolf Schlegel, MCK Development BV, Claron N.V. and Okibi N.V., any purported transferee*. . . or any person or entity holding for or an account of the McKenzie Family.

*Id* (emphasis added).

(d)      On March 4, 1997 Landa further assured Trustee:

> The beauty of this procedure is that EuroGas gives notice, but the 30 day period does not run until someone tries to transfer the shares.  The stop transfer order has been entered. . . EuroGas will be under an obligation to send notice. . .

March 4, 1997 Landa letter to Trustee.

(e)     On March 21, 1997, Landa represented that the acquisition of the

remaining 80% of MMPBV was negotiated principally by Merlin Fish, Wolfgang

Rauball and Reinhard Rauball, but in spite of that:

> [m]y client did not have a direct contractual relationship with Claron
> or Okibi and therefore does not have much information about them.

> The company is currently unsure as to who the principals of Claron,
> Jeffrey, and Okibi are. . .

Landa March 21, 1997 letter to Trustee.

(f)     Wolfgang Rauball filed his sworn affidavit in this adversary

proceeding declaring:

> 7.     In the summer of 1994, I was a shareholder in an European
> company, Energy Global, who acquired an 18.93% ownership
> in MMPBV.  In August 1994, Energy Global (sic) was merged
> with Northampton, Inc., whose name was changed in
> September 1994 to EuroGas.  Eventually, Energy Global
> purchased 100% of MMPBV.  *To the best of my personal
> knowledge, none of this purchase was from any of the
> McKenzie's (sic), either directly or indirectly.*

Wolfgang Rauball Affidavit dated January 14, 1998 (emphasis added).

(g)     Hank Blankenstein, as Vice-President and a Director of EuroGas,

filed his Affidavit in this Adversary Proceeding stating:

> In August of 1997, EuroGas issued 1,430,000 shares of restricted
> common stock in exchange for $10 million ($7.00 per share) pursuant
> to a subscription agreement entered into with Chemilabco, a subsidiary
> of Oxbridge, Ltd. . .  Chemilabco requested that 1,400,000 of those
> shares be issued to its parent Oxbridge, Ltd., a request with which
> EuroGas complied. . . .  *To my knowledge, the only EuroGas shares
> owned by Oxbridge are those shares it received directly from EuroGas
> in August of 1997.*

Blankenstein Affidavit April 22, 1998 (emphasis added).

33

81.     Although asked specifically and given <u>numerous</u> opportunities in their respective depositions to expound or clarify, the sworn testimony given by EuroGas, Landa and Wolfgang Rauball remained consistent:

- They did not deal with McKenzie.

- They purchased nothing that benefited McKenzie directly or indirectly

- They did not know who were the principals or beneficial owners of Claron, Okibi or Jeffrey.

- They held nothing of or for McKenzie.

- They did not know what happened to the shares of stock, EuroGas common stock or Preferred Stock, issued to Jeffrey, Claron, Okibi or MCK.

- They would provide all information as it became available.

- Initially, they had no documents and later they produced very little of the documentation produced by Schlegel or obtained from the KLM Documents which showed their complicity.

82.     Contrary to these statements and representations, as early as May 24, 1996, Landa represented to Baker & Botts that EuroGas would provide a list of the current holders of the Preferred Stock and on November 20, 1996, Landa advised EuroGas of who held the Preferred Stock.  Landa directed an associate in his firm to trace the common stock issued for acquisition of MMPBV.  By December 2, 1996, Landa had the tracing in hand.  On December 28, 1995, Landa advised the EuroGas Common Stock transfer agent that he had received written representation as to the beneficial owners of Claron, Okibi and Westlake, Ltd., whereupon the

34

315,740 shares of EuroGas common stock registered in the name of Okibi and the 365,971 shares of EuroGas common stock registered in the name of Claron, which both received in part payment for their interests in MMPBV, were transferred at the direction of Hank Blankenstein, Secretary/Treasurer of EuroGas.  Blankenstein represented that neither Claron nor Okibi were control persons of EuroGas so that the transfer could be effectuated.  Even as the First Settlement Agreement was being drafted, Landa wrote to Hinterthur and Wolfgang Rauball:

> Enclosed is a copy of a letter sent to Hank [Blankenstein] concerning the Jeffrey Ltd., shares.  As you can see, I requested he forward to me all evidence of the transfer of shares.  *However, I would strongly suggest that the purchasers send the certificates to the transfer agent to have them put into the actual names of the owners and I would suggest that they do it immediately for their own protection.*

Landa's February 13, 1997 letter to Hinterthur, president of EuroGas, and Wolfgang Rauball (emphasis added).  When asked if he had been provided with any information about Jeffrey from the Kruse Landa law firm, Wolfgang Rauball replied, "No".  Deposition of Wolfgang Rauball, Vol. I, April 26, 1999, p. 73.  The letter attached by Landa is to Hank Blankenstein from Landa of even date:

> [I]t is my understanding that many of the shares held by Jeffrey Ltd. have been sold to third parties for value.  Please send me copies of those bills of sale and other documents of assignment so that our records are complete.

On February 10, 1997, Landa advised Blankenstein that there was no problem in Jeffrey loaning EuroGas money.  By separate letter that same date Landa advised Blankenstein on how to fulfill Jeffrey's "wish" to sell 40,000 shares of restricted common stock, certificate nos. 5968 through 5971, which were obtained as a result of conversion in September of 1994 of one of the EuroGas debentures given to Jeffrey.

83.    *In response to Landa's* warning, the following stock sales were effectuated between April 25, 1997 (right after execution of the First Settlement Agreement) and November 14, 1997:

> Baron sold 1,120,000 shares
>
> Nicola Belanen sold 200,000 shares of stock acquired from Jeffrey
>
> *Jeffrey sold 1,000,000 shares*
>
> Wolfgang Rauball's wife sold 800,000 shares
>
> Reinhard Rauball, Trustee sold 1,100,000 shares
>
> Oxbridge acquired 1.4 million shares *and Chemilabco sold 2.2 million shares*.

No one at KLM or EuroGas notified Trustee of the Jeffrey transfers at Landa's suggestion.

84.    The Affidavit of Hank Blankenstein in paragraph 75 identifies 1,430,000 shares acquired by Chemilabco in August of 1997, but states further that "[t]o my knowledge, the only EuroGas shares owned by Oxbridge are those shares it received [1.4 million] direct from EuroGas in August of 1997."   Blankenstein Affidavit, April 22, 1998.

85.    Clearly if 1.4 million shares constitute control requiring SEC reporting, then 2.2 million shares was known to EuroGas.  Oxbridge did take stock under the Oxbridge Options with Claron, Okibi and MCK of which Reinhard Rauball was trustee for both buyer and seller and the holder of the EuroGas stock, under one of two transactions addressed in the next paragraph. Oxbridge is a client of Reinhard Rauball and a control person of EuroGas.

86.    Two different transactions occurred post petition with Oxbridge and the Claron, Okibi and MCK EuroGas stock held by Reinhard Rauball.  At the direction of McKenzie, Schlegel did execute an Option Agreement on September 11, 1995 between MCK and Oxbridge

whereby MCK granted an option to Oxbridge to purchase its 717,590 shares of EuroGas common stock for $1,076,385.  Schlegel also obtained the signatures of the "administrators" of Claron and Okibi to Option Agreements with Oxbridge to grant options to Oxbridge to purchase their 365,971 and 315,740 shares of EuroGas common stock, respectively, for $548,957 and $473,610, respectively.   All were turned over to Wolfgang Rauball to obtain Oxbridge's signatures.  Reinhard Rauball held these shares for the benefit of buyer and seller.  Following McKenzie's bankruptcy commencement and McKenzie's effort to recover money or the stock from Reinhard Rauball another agreement was reached.  McKenzie drafted for Schlegel a Shareholders' Resolutions for MCK, to be executed by Schlegel, Claron and Okibi, a Power of Attorney by Okibi and Claron and a Share Purchase Agreement whereby Schlegel, Claron and Okibi were to sell their shares of MCK to Oxbridge for $2.2 million.  Promissory notes of $1 million each were prepared payable to Claron and Okibi.   The Powers of Attorney and Shareholders Resolution were all dated mid December, 1995.  Schlegel was ousted sometime in late 1995 and never received back any agreement signed by Oxbridge.  He attempted to recover this stock, as well as the other stock of Jeffrey, the promissory notes, etc. from Reinhard Rauball and Wolfgang Rauball, but was unsuccessful.

87.     On September 4, 1998, Howard Kleiman, attorney for Rockwell Limited and Oxbridge Limited, wrote Hank Blankenstein of EuroGas advising that his clients had purchased the Preferred Stock and requested what procedure was to be taken to convert these shares.  (No notice of this communication was provided to Trustee, until many years later in discovery enforcement.)  Attached to this letter was a General Purchase Agreement dated February 26, 1996 signed by Armando Ulrich on behalf of MCK and Hans Dietman under a General Power of Attorney from Oxbridge on behalf of Oxbridge.   To this General Purchase Agreement were

appended the earlier referenced Option Agreements between Oxbridge and Okibi, Oxbridge and

Claron, Oxbridge and Schlegel and Oxbridge and MCK, now all signed by Hans Dietman on

behalf of Oxbridge.  In the General Purchase Agreement, the parties recited that

- MCK had been unable to deliver its common stock to Oxbridge
  since *MCK is considered an affiliate of EuroGas;*

- MCK may be considered to *be part of a control block;*

- the Preferred Stock cannot be converted into common shares
  before May 17, 1997 and may be still restricted after
  conversion since MCK shareholding percentage *may exceed
  10% of the total issued share capital of EuroGas.*

General Purchase Agreement (emphasis added).  [None of this affiliation or control was ever

reported on any filing with the SEC.]  Based thereon, the option period to purchase the common

stock was extended to June 30, 1998 and the price reduced from $1.50/share to $.30/share.  In

addition, Oxbridge committed to buy the 2,391,968 shares of Preferred Stock for $600,000.

Payments were to be made to the US $ account of MCK at Bilfinanz.  This Agreement further

provided that the dividends on the Preferred Stock were to be paid to MCK for 1996 and 1997

and thereafter until the Preferred Stock was transferred to Oxbridge.  The dividends were paid by

EuroGas, but Trustee was not informed of the payment, payee or address.  The amount paid was

$260,140.80.

88.    Because of Reinhard Rauball's involvement as trustee and on behalf of his client,

Oxbridge, and resulting from his and EuroGas' knowledge imputed as a result of Armando

Ulrich's position as sole director of MCK and his control person status at EuroGas, EuroGas

knew of this transfer well before the letter's date of September 4, 1998.  That is further

evidenced by Hank Blankenstein's direction on behalf of EuroGas, in *August* of 1998, to make

the 1996 and 1997 dividend payments on the Preferred Stock, totaling $260,140.80, to MCK.

Where the money went from there is unknown.  The paying of the dividends on the Preferred Stock was not disclosed to Trustee.

89.     When asked, Wolfgang Rauball testified as follows:

Q.     (by Mr. Smith) Do you know why MCK and/or the others that received the 1995 voting preferred shares of stock are not listed as control persons?

A.     I have no idea.

Q.     To your knowledge, Mr. Rauball, have there been any transfers of 1995 preferred stock by MCK, Claron, Okibi, Schlegel, anybody?

A.     No, there haven't been any transfers, because I made sure after this settlement agreement appeared, after I got knowledge of it, that we abide and make sure no transfers take place.

Q.     When you say make sure no transfers take place, how did you go about doing that?

A.     I instructed Blankenstein to immediately notify Kruse Landa in case some of these shares appeared to be transferred or were showing up at the transfer agent.

♦          ♦          ♦

A.     No, I'm not aware (of any transfers of the 1995 preferred stock), but I could ask Mr. Blankenstein later on and could tell you tomorrow.

Q.     He would know if there had been a transfer?

A.     Yes, because EuroGas would be the party to transfer the shares.

Deposition of Wolfgang Rauball, Vol 3, April 28, 1999, p. 448, lines 9-25, p. 450, lines 9-13.

90.     The testimony given by Wolfgang Rauball, individually and as central person of EuroGas, and by Landa on behalf or EuroGas was not only not credible, but false.

91.     McKenzie concealed and misrepresented the facts and breached his duty as a Debtor.  EuroGas, Wolfgang Rauball and Reinhard Rauball concealed and misrepresented the

39

facts and breached their duty resulting from the First Settlement Agreement, as well as their duty arising as a result of sworn testimony and affidavits.

## G.     <u>EuroGas Stock Valuation</u>

92.     In the October through November, 1994, time period when Jeffrey received the equivalent of 4.1 million shares of EuroGas, the common stock was selling at $4.25 per share.

93.     On October 30, 2995 when McKenzie filed bankruptcy, the EuroGas common stock was selling at $4.00 per share.

94.     Between March 6, 1997 when the First Settlement between Trustee and EuroGas was signed and July, 1997, when that settlement was approved by the Bankruptcy Court, the EuroGas common stock reached a high selling price of $12.50 per share.  As of that date, Trustee had valid claim to of 9,037,854 shares of EuroGas stock.

## H.     <u>Other Relevant Matters</u>

95.     Wolfgang Rauball, Reinhard Rauball and EuroGas dealt only with McKenzie in acquiring from Claron, Okibi, MCK and Jeffrey McKenzie's interests in MMPBV.

96.     Wolfgang Rauball, Reinhard Rauball and EuroGas dealt only with McKenzie in acquiring from or helping McKenzie dispose of EuroGas common stock, debentures or Preferred Stock issued to or in the name of Claron, Okibi, MCK and Jeffrey.

97.     Wolfgang Rauball, Reinhard Rauball and EuroGas helped McKenzie dispose of the Jeffrey's EuroGas stock and Claron's, Okibi's and MCK's EuroGas stock by way of disguised employment payments, loans, cash payments and undisclosed payments.

98.     Facts clearly known to McKenzie, Wolfgang Rauball, Reinhard Rauball and EuroGas are misrepresented or not disclosed.

99.     Obligations of EuroGas, Wolfgang Rauball and Reinhard Rauball to report, stop payment of dividends, avoid conversion of stock undertaken in an agreement approved by the Bankruptcy Court have been disregarded and violated.

100.    Wolfgang Rauball, Reinhard Rauball and Hinterthur dealt with McKenzie in each of these roles and continued as such as control persons, chairman and president of EuroGas. Before them Fish dealt with McKenzie in each of these roles.  Landa and KLM on behalf of EuroGas dealt with McKenzie in these roles.  All led Trustee and the Court astray while concealing these transactions on behalf of EuroGas, Wolfgang Rauball and Reinhard Rauball.

101.    Wolfgang Rauball was deposed in this case and in a related case brought by KUKUI against EuroGas on three different occasions:

> April 26 - 30, 1999;
> September 13 - 14, 1999; and
> January 17 - 19, 2000.

102.    During the course of those depositions, he was asked numerous questions regarding the ownership of Claron, Okibi, MCK, and Jeffrey.  On numerous occasions in those depositions, he explicitly denied knowledge of ownership of those entities.  On many other occasions, when the context of the questions provided the opportunity and called for disclosure of his knowledge relating to the ownership of those entities, he did not disclose the ownership and thus misrepresented by omission.  At all times during the course of these depositions he was aware of the interest of both Trustee and KUKUI in obtaining information regarding the ownership of Claron, Okibi, MCK, and Jeffrey.  He was also aware of the fact that the Trustee claimed the EuroGas stock, which had been issued to Claron, Okibi, MCK, and Jeffrey, were assets of the estate.     Despite this knowledge, he both affirmatively and by omission misrepresented facts relating to the ownership of those entities.

41

103.    Wolfgang Rauball, Reinhard Rauball and EuroGas aided and abetted and conspired with McKenzie to realize the full value of MMPBV and to conceal that realization, with full knowledge of doing so, from McKenzie's creditors, Trustee and this Court.  In so doing, Wolfgang Rauball, Reinhard Rauball and EuroGas knowingly misled and deceived the SEC and the buying public to their benefit.  Each of the defendants has defrauded McKenzie's creditors, the bankruptcy estate, Trustee, Court and the investing public and conspired, to do so

104.    The attorney's fees and expenses incurred in obtaining the truth concerning the allegations in this adversary proceeding are greater than $500,000.

## II.  CONCLUSIONS OF LAW

### A.    General Matters

1.    To the extent any conclusion of law is more properly considered a finding of fact, it is adopted as such.

2.    McKenzie is Jeffrey.

3.    McKenzie is Okibi.

4.    McKenzie is Claron.

5.    McKenzie is MCK.

6.    EuroGas, Reinhard Rauball and Wolfgang Rauball knew at all relevant time periods that McKenzie is/was Jeffrey, Okibi, Claron and MCK.

### B.  Breach Of Fiduciary Duties — McKenzie

7.    McKenzie invoked the bankruptcy processes for his corporation, MMC, and for himself (and participated in his sons' invocation of personal bankruptcies).  As such, he has various fiduciary duties as a debtor, including full disclosure on his Schedules of all property of the estate, including any beneficial interests, and on his Statement of Financial Affairs of all

42

transfers within the time periods relevant above, all property held in trust, accounts in which he held interests and the like.  He is also obligated to turn over all property of the estate to Trustee and to make no transfer or concealment of same.  The same duties and obligations of disclosure extend to his testimony and affidavits.  Not only did McKenzie breach his duty of disclosure, he went further and denied the existence of the matters set forth above and misrepresented the facts and attempted to misdirect Trustee, and before him, McKenzie's creditors.

8.    McKenzie knew of what he failed to disclose and of his duty to disclose.  McKenzie also knew that what he did disclose was false.  In both instances, he intended for Trustee and others to rely.  He concealed and converted property recoverable for the estate and property of the estate.  McKenzie's actions and/or inactions have cost the estate millions of dollars, not only in the loss of property of the estate or property recoverable for the estate, but also in the administrative expenses necessarily incurred as a result.  McKenzie  is liable to Trustee in an amount determined by the selling price of the EuroGas shares, plus the dividends paid thereon.

### C.  Violation Of Duty To Turn Over Assets Of The Estate Under Section 542 — Reinhard Rauball

9.    Michael McKenzie filed for bankruptcy on October 30, 1995.  Just 26 days before his filing, the closing occurred with respect to the remaining 80.3% of MMPBV. The EuroGas common stock and preferred stock due to sale of the Claron, Okibi, and MCK as a result of that closing  was transferred to Reinhard Rauball.  McKenzie and Schlegel on behalf of McKenzie made demand upon Reinhard Rauball to return the stock to McKenzie.  However, Reinhard Rauball ignored those demands and continued to hold the stock beyond McKenzie's October 30, 1995 bankruptcy filing and beyond the December 15, 1995 termination of the Oxbridge option.  On November 22, 1995, Elmar Bissig transferred Jeffrey's EuroGas shares and remaining

debenture to Reinhard Rauball.  The bearer shares of Claron and Okibi were also transferred from Petenes to Reinhard Rauball   Reinhard Rauball became aware of the bankruptcy of Michael McKenzie at or about the time of the filing.  Consequently, there arose upon him a duty under Section 542 of the Bankruptcy Code to turn over to the Trustee the bearer shares of Okibi and Claron and the EuroGas shares which were beneficially owned and controlled by Michael McKenzie.  Reinhard Rauball refused to do so.

10.     As early as August, 1996, the Trustee met with EuroGas' counsel, Mr. Howard Landa.  At the time Reinhard Rauball was the Chairman of EuroGas.  In that meeting and on repeated occasions thereafter, the Trustee made it clear to counsel for EuroGas who then passed on to Reinhard Rauball, the Trustee's claim to be the beneficial owner of the EuroGas shares due to Claron, Okibi , MCK and Jeffrey.  This fact became particularly clear to Reinhard Rauball upon the filing of these two consolidated adversary proceedings in February and March of 1997.

11.     Reinhard Rauball further knew that the EuroGas shares as well as the Claron and Okibi bearer shares were the property of McKenzie's bankruptcy estate because he had been making and/or facilitating payments for the benefit of McKenzie which were, in actuality, payments for the purchase of the EuroGas stock.

12.     Reinhard Rauball further had direct knowledge of the Trustee's claim to the beneficial ownership of Claron, Okibi and MCK as well as the EuroGas shares due to Claron, Okibi, MCK and Jeffrey as a result of the settlement agreement between the Trustee and EuroGas entered into on March 6 and 7, 1997.

13.     Despite clear knowledge of the Trustee's claim to the beneficial ownership of the bearer shares and the EuroGas shares which were being held in his possession, Reinhard Rauball has consistently refused  and continues to refuse to turn over to the bankruptcy estate the bearer

shares and EuroGas common and preferred shares which are beneficially owned by the estate. His refusal constitutes a direct breach of the statutory duty imposed upon him under Section 542 of the Bankruptcy Code and has proximately caused damage to the estate in an amount determined by the selling price of the EuroGas shares during the relevant period plus the dividends paid thereon.

**D.** **Violation Of Duty Of Turnover Under Section 543 — Reinhard Rauball**

14.    To the extent that Reinhard Rauball took the possession of the bearer shares and the EuroGas shares due to Claron, Okibi, MCK and Jeffrey which was beneficially owned by Michael McKenzie, in Reinhard Rauball's capacity as a Trustee, Section 543 of the Bankruptcy Code imposed upon Reinhard Rauball a duty to turn over that property to the bankruptcy trustee upon Reinhard Rauball's obtaining knowledge of the existence of the bankruptcy.    Reinhard Rauball claims to have terminated his trusteeship of the shares on August 26, 1996.   Yet, he did not turn over to the Trustee the bearer shares, the EuroGas shares due to Claron, Okibi and MCK or the proceeds thereof.   As set forth in the foregoing subsection B, his failure to do so caused damage to the estate in an amount determined by the selling price of the EuroGas shares during the relevant period and the dividends paid thereon.

**E.**  **Violation Of The Duty Of Turnover Pursuant To Section 542 Of The Bankruptcy Code — Wolfgang Rauball**

15.    Wolfgang Rauball was aware of the bankruptcy filing by McKenzie on or about October 30, 1995 and the pre-bankruptcy litigation and creditor demands against McKenzie. Despite knowledge of that filing, Wolfgang Rauball negotiated and facilitated the transfers of the bearer shares and the EuroGas shares beneficially owned by McKenzie to his brother, Reinhard. In addition, Wolfgang Rauball facilitated and made both pre and post-petition payments to Michael McKenzie in the form of "loans" or "employment payments" or "consulting payments"

which were in reality payment for the shares of EuroGas stock which were beneficially owned by McKenzie.  Despite his knowledge of the existence of the bankruptcy and despite repeated demands by the Trustee, Wolfgang Rauball has continued to refuse to turn over to the bankruptcy estate the bearer shares and EuroGas the shares of stock beneficially owned by McKenzie or the proceeds of the sale of that stock.  Wolfgang Rauball is liable to the bankruptcy estate  in an amount determined by the selling price of the EuroGas shares and the dividends paid thereon.

### F.       Breach Of Contract — EuroGas

16.    On or about March 6, 1997 Trustee and EuroGas entered into a settlement agreement under which EuroGas agreed to (a)  provide information concerning the EuroGas stock and debentures issue to Jeffrey and the EuroGas common stock and preferred stock due to Claron, Okibi, MCK and Schlegel; (b)  prevent the transfer of those shares without giving the Trustee notice and an opportunity to obtain court relief in connection therewith; (c) to assist Trustee in recovery of those shares; and, (d) withhold dividend payments or conversions in regard to the EuroGas stock and debentures.  EuroGas acting through its attorney Landa, its Chairman Reinhard Rauball and its control person Wolfgang Rauball not only breached the obligations of EuroGas under that settlement agreement but affirmatively concealed true facts regarding Reinhard Rauball's possession, custody and control of the common stock, preferred stock and debentures.

17.    EuroGas' breach of its obligations under the settlement agreement with respect to assisting in recovery of the common and preferred stock prohibited the Trustee from gaining control of that stock at a time when its price was at its market high.  EuroGas is liable to Trustee in an amount determined by the selling price of the EuroGas shares and dividends paid thereon.

### G.   Fraud In The Inducement — EuroGas

18.   At the time of the negotiation and execution of the March, 1997 Settlement Agreement, EuroGas, through its counsel Landa, repeatedly represented to Trustee that EuroGas did not know the owners of or the whereabouts of the common and preferred stock due to Claron, Okibi and MCK.  Further, EuroGas represented that it did not know the identity of the owner of the Jeffrey shares and debenture.  In order to induce the Trustee into entering into the agreement, EuroGas represented to the Trustee that it would make available to him all information in the control of EuroGas concerning the common and preferred stock and debentures, would assist the Trustee in recovery of same, would prevent conversion of the preferred shares and payment of the dividends without giving Trustee adequate notice to obtain court relief.  Trustee relied upon those representations in entering into the agreement.  Trustee subsequently learned that EuroGas never intended to perform upon its representations.  The representations were material and were relied upon by the Trustee in entering into the agreement.  Trustee was induced to give up the leverage provided by the Texaco transaction to the Trustee in his attempts to discover the true identity and whereabouts of the relevant stock and debentures.  Had EuroGas performed consistent with its representations, Trustee would have easily discovered the location and ownership of the EuroGas shares and debentures and been able to bring those persons before this Court.  As a proximate result of the foregoing fraud of EuroGas, Trustee has been damaged and is entitled to judgment in an amount determined by the selling price of the EuroGas Shares and dividend payments.

### H.   Conversion — Reinhard Rauball And Wolfgang Rauball

19.   The actions of Reinhard Rauball and Wolfgang Rauball in taking control of the EuroGas shares due to Claron, Okibi and MCK and the stock and debentures of Jeffrey, Ltd. and

their refusal to deliver same to the bankruptcy trustee upon their learning of the McKenzie bankruptcy filing constitute an unauthorized and unlawful assumption and exercise of dominion and control over the property of the bankruptcy estate to the exclusion of the estate and inconsistent with the rights of the estate.  Consequently, Reinhard Rauball and Wolfgang Rauball committed conversion of the property of the bankruptcy estate causing damage to the bankruptcy estate in an amount determined by the selling price of the EuroGas shares plus the dividends paid thereon.

I.     **Misappropriation Of Assets And Post-Petition Avoidable Transfers — Michael McKenzie, Wolfgang Rauball, Reinhard Rauball**

20.     The concealment of pre-petition transfers recoverable for the estate and the concealment and transfer of property of the estate by McKenzie and EuroGas, Wolfgang Rauball and Reinhard Rauball constitutes misappropriation of estate assets.

21.     The transfers/conversion of estate property without Court authority or Code provision is avoidable.  No benefit was received by the estate.  The transfers are void.

22.     McKenzie, Reinhard Rauball and Wolfgang Rauball are liable for conversion, misappropriation of assets and post-petition avoidable transfers this connection, each is jointly and severally liable for the damages determined by the value of the EuroGas shares plus the dividends paid.

J.     **Civil Conspiracy/Aiding And Abetting Civil Conspiracy — Michael McKenzie, Wolfgang Rauball, Reinhard Rauball And EuroGas.**

23.     The conduct complained of was a conspiracy between and among McKenzie, Wolfgang Rauball, Reinhard Rauball and EuroGas.  Each aided and abetted the other.  The objects to be accomplished were concealment of estate property and hindering the Trustee's

efforts to identify and recover estate property.   The specific acts carried out by each of the conspirators are as follows:

- Reinhard Rauball used his positions as Trustee for Oxbridge, Claron, Okibi and MCK to become chairman of EuroGas and, along with his brother, one of two control persons for EuroGas.   He then used his position as a control person and Chairman of EuroGas and the Trusteeships under which he purportedly held the bearer shares of Claron and Okibi and the EuroGas stock due to Claron, Okibi and the MCK to conceal from this court, McKenzie's beneficial ownership of the bearer shares and the EuroGas stock.

- EuroGas and Reinhard Rauball, acting as Chairman of EuroGas, and Wolfgang Rauball acting as a control person of EuroGas orchestrated, facilitated, authorized and/or knowingly permitted numerous misrepresentations to this court, the Trustee and to McKenzie estate creditors for the purpose of concealing McKenzie's beneficial ownership of the bearer shares of Claron and Okibi and well as the EuroGas shares due to Claron, Okibi, MCK and the stock and debentures received by Jeffrey.

- EuroGas, Wolfgang Rauball and Reinhard Rauball as control persons of EuroGas and Reinhard Rauball as Chairman of EuroGas, misrepresented to the SEC the control person status of MCK so as to avoid reporting McKenzie's ownership status to the SEC and making such information available to McKenzie's creditors in the public records of the SEC;

- EuroGas, Wolfgang Rauball and Reinhard Rauball made numerous alleged employment payments and loans to McKenzie which were, in reality, consideration for the purchase of the MMPBV stock from McKenzie;

- EuroGas, Wolfgang Rauball and Reinhard Rauball delayed accountings requested by the Trustee and when finally provided, those accountings contained false and inconsistent reconciliations by EuroGas and Wolfgang Rauball;

- Wolfgang Rauball and entities owned by Wolfgang Rauball made numerous post-petition payments to McKenzie for his stock which were alleged to be loans to McKenzie that were never expected to be repaid (see paragraph 64);

- EuroGas, Wolfgang Rauball and Reinhard Rauball authorized or ratified numerous false statements by Landa regarding EuroGas's lack of knowledge of the true owners of Claron, Okibi, MCK and Jeffrey;

- Wolfgang Rauball submitted a sworn affidavit of declaration referenced in subsection 77 (F) at the bottom of page 37 containing false and misleading information regarding the purchase of shares of MMPBV from McKenzie or McKenzie related entities;

- EuroGas, acting through Hank Bl21ankenstein, submitted an affidavit set forth in subparagraph 77 G above containing false representations indicating that Oxbridge had not received shares of EuroGas from an entity owned or controlled by McKenzie;

- As shown in Exhibit 1 attached to this Petition, Wolfgang Rauball testified falsely on the occasions itemized therein and on other occasions itemized therein, provided misleading testimony regarding ownership of Claron, Okibi, MCK and Jeffrey;

- EuroGas acting under the direction of Wolfgang Rauball and Reinhard Rauball has breached its obligations under the March 6 and 7, 1997 First Settlement Agreement with the Trustee in order to avoid providing information to the Trustee and this Court regarding McKenzie's beneficial ownership of Claron, Okibi, MCK and Jeffrey;

- EuroGas, Wolfgang Rauball and Reinhard Rauball engaged in a spurious appeal of this court's ruling on the Trustee's Motion for Summary Judgment in the case styled: *James R. Holbrook vs. W. Steve Smith, et.al., Adversary No. 01-3064*, for the purpose of delaying this Court's ultimate determination of the merits of this case.

24.     There was a meeting of the minds on each of these objectives and/or courses of action, albeit, not always did their stories jive, e.g. accounting for the "salary" payments. The acts complained of were unlawful. Even if the scheme somehow was found to be legal, the scheme was carried out by McKenzie, EuroGas and the Rauballs by unlawful means, as by perjury or fraud upon the Court to effect the scheme. As a result of this conspiracy, this estate and its creditors were severely damaged.

25.     Such acts, failures to act, omissions and misrepresentations were intentional and in furtherance of the goals of McKenzie and EuroGas, Wolfgang Rauball and Reinhard Rauball and done with knowledge that such conduct was illegal and done maliciously with knowledge that such conduct injured the estate and its creditors.

26.     Based upon the foregoing, McKenzie, EuroGas, Reinhard Rauball and Wolfgang Rauball are liable for conspiracy and aiding and abetting. In this connection, each is jointly and

severally liable for the damages based upon the value of the EuroGas shares plus the dividends paid thereon.

## K.  Judgment Amount and Punitive Damages

27.     The amount of value of the EuroGas shares shall be the $12.50 per share reached during the time period of the execution of and Court approval of the first Settlement Agreement between Trustee and EuroGas.  That, coupled with the dividends paid, totals $113,233,315.90. Trustee shall be entitled to pre- and post- judgment interest on that amount from March 7, 1997 at 5.45%.

28.     The willful, callous, and/or reckless indifference to the acts or omissions which led to this estate's loss of assets and/or to the rights of the bankruptcy estate and its creditors, warrants assessment of punitive damages, jointly and severally, against McKenzie, EuroGas, Wolfgang Rauball and Reinhard Rauball in the amount of $500,000.

Signed this ____ day of _____, 2004 at Houston, Texas.


_____
KAREN K. BROWN
UNITED STATES BANKRUPTCY JUDGE